FILED

2003 AUG 29  AM 8: 37

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

CORY R. MAPLES,                          *
                                         *
                    Petitioner,          *
                                         *
        vs.                              *
                                         *
DONAL CAMPBELL, Commissioner             *        CV-03-B-2399-NE
of the Alabama Department of             *
Corrections,                             *
                                         *
                    Respondent.          *

## PETITION FOR WRIT OF HABEAS CORPUS
## BY PRISONER IN STATE CUSTODY UNDER DEATH SENTENCE

Petitioner Cory Maples, now incarcerated at Holman State Prison in Atmore,

Alabama, respectfully petitions this Court for relief from his unconstitutionally obtained

conviction and death sentence.

1.      Mr. Maples makes application to this Court for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.

2.      On October 30, 1997, Mr. Maples was convicted of the capital murder of

Stacy Terry and Barry Robinson in violation of Ala. Code § 13A-5-40(10) (1994)

(murder of two persons by one act or pursuant to one scheme or course of conduct) and

Ala. Code § 13A-5-40(2) (1994) (murder during a robbery), in the Morgan County

Circuit Court, Judge Glenn Thompson presiding.  On the following day, October 31,

1997, the jury recommended the death penalty by a vote of 10 to 2.

3.      On November 21, 1997, the trial court, finding one aggravating factor and one statutory mitigating factor, sentenced Mr. Maples to death.

4.      Mr. Maples's conviction and sentence were affirmed by the Alabama Court of Criminal Appeals on March 26, 1999.  Maples v. State, 758 So. 2d 1 (Ala. Crim. App. 1999).

5.      The Alabama Supreme Court affirmed on December 10, 1999.  Ex parte Maples, 758 So. 2d 81 (Ala. 1999).

6.      On October 2, 2000, the United States Supreme Court denied Mr. Maples's petition for writ of certiorari.  Maples v. Alabama, 531 U.S. 830 (2000).

7.      On August 1, 2001, Petitioner, through counsel, filed a petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure requesting post-conviction relief on eleven enumerated grounds and requesting an evidentiary hearing on the merits of the claims.  Petitioner was represented pro bono publico, by Ms. Clara Ingen-Housz and Mr. Jaasi Munanka of the New York law firm of Sullivan & Cromwell.  Mr. John Butler of Huntsville, Alabama appeared as local counsel for the sole purpose of allowing Ms. Ingen-Housz and Mr. Munanka to appear pro hac vice in the Circuit Court of Morgan County, Alabama.

8.      On September 28, 2001, Respondent State of Alabama filed an answer and moved to dismiss the Rule 32 Petition for post-conviction relief.  On December 27, 2001, Judge Glenn E. Thompson of the Morgan County Circuit Court denied Respondent's motion to dismiss finding that the Petition was sufficiently pled.  Copies of the order were mailed to Ms. Ingen-Housz, Mr. Munanka and Mr. Butler.

-2-

9.      Thereafter, Ms. Ingen-Housz left the firm of Sullivan & Cromwell to work as an attorney in Belgium.  Mr. Munanka also left Sullivan & Cromwell and is currently clerking for a federal district court judge in the Southern District of New York. However, Sullivan & Cromwell attorneys continued in the pro bono representation of Mr. Maples.  Several additional attorneys from Sullivan & Cromwell, including undersigned attorney Marc De Leeuw, assumed responsibility for the matter.  Since Judge Thompson had ruled that the matter had been sufficiently pled, Mr. De Leeuw and other attorneys at Sullivan & Cromwell continued to prepare for the anticipated evidentiary hearing.

10.     On May 22, 2003, Judge Thompson entered an Order denying Mr. Maples' Rule 32 petition for post-conviction relief.  Copies of this order were mailed to Ms. Ingen-Housz and Mr. Munanka at Sullivan & Cromwell and also to Mr. Butler. By that time, Ms. Ingen-Housz and Mr. Munanka had left the firm of Sullivan & Cromwell and the copies sent to them were returned to the clerk of the Morgan County Circuit Court.  The copy sent to Mr. Butler was received by him.  However, since Mr. Butler's sole involvement in the case had been to file his appearance, he assumed that counsel at Sullivan & Cromwell had received the May 22, 2003 order based on the notation that copies had been sent to Ms. Ingen-Housz and Mr. Munanka.  As a result, Mr. Maple's current attorneys at Sullivan & Cromwell, including undersigned, Marc De Leeuw remained unaware that the Order of Judge Thompson, denying post-conviction relief, had been issued.

-3-

11.  On August 13, 2003, Mrs. Lisa Maples, Cory Maples' mother, called Sullivan & Cromwell to inform Cory's current attorneys that Cory had received a letter from John Hayden, the Attorney General of Alabama. The letter apparently stated that the Circuit Court of Morgan County had denied Petitioner's Rule 32 petition on May 22, 2003, that Petitioner's right to appeal that decision had expired May 22, 2003 and that his deadline for filing a federal habeas corpus petition was September 9, 2003. Cory Maples was the only person who received this letter.

12.  On August 22, 2003, a clerk of the Circuit County Court of Morgan County confirmed to Mr. Maples' current attorneys at Sullivan & Cromwell that the two copies of the May 22, 2003 Order mailed to Ms. Ingen-Housz and Mr. Munanka had been returned to that Court.

13.  On August 26, 2003, in light of the foregoing, undersigned counsel and Mr. Butler filed a Motion to Reissue the Court's May 22, 2003 Order denying Petitioner's Rule 32 Petition with the Circuit Court of Morgan County, Alabama. That motion is currently pending. If it is granted, undersigned counsel, on behalf of Mr. Maples, would intend to appeal the matter to the Alabama Court of Criminal Appeals and, if necessary, to the Alabama Supreme Court.

## GROUNDS SUPPORTING PETITION FOR RELIEF

I.  **TRIAL COUNSEL WERE INEFFECTIVE DURING THE GUILT STAGE OF MR. MAPLES'S TRIAL, AND THEREBY DEPRIVED MR. MAPLES OF HIS CONSTITUTIONAL RIGHTS.**

14.  Mr. Maples was denied effective legal representation during the guilt phase of his capital trial. This failure of trial counsel denied Mr. Maples his rights under

the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Strickland v. Washington, 446 U.S. 668 (1984).

15.     Mr. Maples's trial counsel, Mark Craig and Phil Mitchell[1] (collectively, "Counsel"), did not render reasonably effective assistance of counsel before, during or after his capital murder trial and conviction.

16.     It is widely recognized that a criminal defendant is entitled to effective legal representation. See Strickland v. Washington, 466 U.S. 668 (1984); Gideon v. Wainwright, 372 U.S. 335 (1963). Indeed, the adversarial system of justice depends on effective defense counsel. See United States v. Cronic, 466 U.S. 648 (1984). As detailed in the following Paragraphs 17 to 186 herein, Counsel for Mr. Maples were ineffective at all stages of the criminal proceedings against Mr. Maples. At the trial for his life, Mr. Maples's Counsel abdicated their constitutionally mandated responsibility to subject the State's case to meaningful adversarial testing. The errors of Counsel "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993). Indeed, performance of Counsel fell far below "an objective standard of reasonableness" and failed "to make the adversarial testing process work." Strickland, 466 U.S. at 688, 690. None of the numerous errors of Counsel could be construed as part of a "sound trial strategy." Id. at 689. Mr. Maples now seeks relief from his unconstitutionally obtained conviction and sentence.

---

[1]     Addresses of trial counsel and direct appeal counsel listed on Attachment A.

-5-

**A.     Counsel Were Ineffective, in Part, Because of Inadequate Compensation.**

17.     In part, Counsel's ineffectiveness was the product of the insufficient

funding available for counsel in a capital case. At the time of Mr. Maples's trial,

Alabama law provided that court-appointed attorneys in capital cases could not be

compensated more than $1,000 for out-of-court work for each phase of a capital trial,

based on a $20 hourly rate. See Ala. Code § 15-12-21 (1975). Accordingly, Counsel

received no compensation whatsoever for out-of-court work in excess of fifty hours,

other than overhead expenses, and were compensated at rates far below market level for

the initial fifty hours. If Counsel had received adequate compensation, Counsel could

have performed adequate investigation in preparation of both the guilt and penalty phases

of Mr. Maples's trial, including searching for and interviewing relevant witnesses. If

adequately compensated, Counsel also could have adequately prepared the few defense

witnesses called to testify on Mr. Maples's behalf. Adequate compensation of Counsel

could also have resulted in the avoidance of the multitude of issues raised in this Petition

that, individually and cumulatively, result in ineffective assistance of counsel. This

compensation is simply inadequate for the time required to adequately represent a capital

defendant. But for Counsel's inadequate compensation, the outcome of Mr. Maples's

trial would have been different.

18.     This inadequate and statutorily-limited compensation violated the

separation of powers doctrine, deprived Mr. Maples of effective assistance of counsel and

violated his due process and equal protection rights. See Bailey v. State, 424 S.E. 2d 503

(S.C. 1992) (holding that capital litigation complexity required court-appointed attorneys

-6-

to receive reasonable compensation from state and county funds); <u>Makemson</u> v. <u>Martin County</u>, 491 So. 2d 1109, 1112-13 (Fla. 1986) (holding that $3,500 limit on compensation in capital trial violated separation of powers and denied capital de§fendants effective assistance of counsel); <u>DeLisio</u> v. <u>Alaska Superior Court</u>, 740 P. 2d 437, 443 (Alaska 1987) (holding that the takings clause precludes attorney payment at less than that "received by the average competent attorney operating on the open market"). "It is well established that the Sixth Amendment guarantees to criminal defendants not only the right of assistance of counsel, but requires that assistance be legally effective." <u>Walthrop</u> v. <u>State</u>, 506 So. 2d 273, 275 (Miss. 1987); <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984). The failure to provide adequate funding to Mr. Maples's court-appointed Counsel curtailed this most fundamental right.

**B.    Counsel Were Ineffective for Admitting Critical Elements of the Charged Offenses During Closing Argument.**

19.    The relevant Alabama statute enumerates one capital offense as "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct." Ala. Code § 13A-5-40 (10) (1994) ("Count One"). During closing arguments, Counsel admitted both elements of this offense -- (1) the intentional murders of two people (2) pursuant to one scheme or course of conduct. But for Counsel's ineffective performance in these admissions, there is a reasonable probability that the outcome of Mr. Maples's trial would have been different. Counsel's admissions denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.^

### i.      Counsel's Admission of Intent.

20.      Counsel's admissions during trial deprived Mr. Maples of his constitutional right to be tried before an impartial jury.  During closing arguments, Counsel told the jury that Mr. Maples intentionally caused a loss of life and that he should be guilty of at least one lesser included count of murder.  "We are asserting that there is at least sufficient evidence as to one murder that he's guilty of and possibly two." (R. at 2913-14, 2939.)[2]  Later in the closing, Counsel admitted "two murders, ladies and gentlemen, his own actions for which he is responsible."  (R. at 2918, 2929-30.)

### ii.      Counsel's Admission of One Scheme or Course of Conduct.

21.      Counsel also admitted that Mr. Maples murdered pursuant to one scheme or course of conduct.  "What we have here is the instance of him walking out to the car and in an instantaneous rush killing two people."  (R. at 2918.)  The State noted this admission during closing argument when they argued that "[Counsel] told you both deaths were caused instantaneously."  (R. at 2959.)

### iii.      These Admissions by Counsel Constitute Ineffective Assistance of Counsel.

22.      Despite Mr. Maples's desire, expressed in open court, to plead not guilty to all of the counts contained in the indictment, Counsel's admissions, as detailed in Paragraphs 20 to 21, were the "functional equivalent" of a plea of guilty to capital murder, a plea which resulted in a sentence of death.  See Wiley v. Sowders, 647 F.2d

---

[2]      In this petition, "R.____" refers to the court reports transcript of the Morgan County trial; "c.___ refers to the Morgan County Clerk's record of the case.  State and defense exhibits are referenced by exhibit number.

642, 649 (6th Cir. 1981) (citing <u>United States</u> v. <u>Brown</u>, 428 F.2d 1100, 1104 n.4 (D.C. Cir. 1970)); <u>Cox</u> v. <u>Hutto</u>, 589 F.2d 394, 396 (8th Cir. 1979); <u>Achtien</u> v. <u>Dowd</u>, 117 F.2d 989, 994 (7th Cir. 1941).  It is fundamental that counsel may not override their client's decision to plead not guilty.  <u>See</u> <u>Brookhart</u> v. <u>Janis</u>, 384 U.S. 1, 7-8 (1966).  That decision is reserved solely to the client, and may not be usurped by his counsel.  <u>See</u> <u>Jones</u> v. <u>Barnes</u>, 463 U.S. 745, 751 (1982); <u>Wainwright</u> v. <u>Sykes</u>, 433 U.S. 72, 93 n.1 (1977) (Burger, C. J., concurring).  Therefore, Counsel's conduct in overriding Mr. Maples's decision to plead not guilty "fall[s] outside the wide range of professionally competent assistance." <u>Strickland</u>, 466 U.S. at 688.

23.     The crime of intentional murder is automatically elevated to capital murder when two or more persons are murdered by a defendant pursuant to one scheme or course of conduct.  <u>See</u> <u>Holladay</u> v. <u>State</u>, 549 So. 2d 122, 130 (Ala. Crim. App. 1988).  Thus, Counsel's admission of Mr. Maples's guilt to a capital crime denied him the right to have his guilt presented to the jury as an adversarial issue. <u>See</u> <u>Wiley</u>, 647 F.2d at 650.

24.     The jury, having been informed by Mr. Maples's own Counsel that he was guilty as charged, could not possibly have accorded Mr. Maples a presumption of innocence.  Thus, Mr. Maples was tried by a jury that had a fixed opinion of his guilt prior to deliberations.  Unsurprisingly, the jury deliberated less than four hours before unanimously determining that Mr. Maples was guilty of two counts of capital murder.

25.     Counsel's admissions during closing arguments at the guilt phase of the trial deprived Mr. Maples of a fair trial and was based on a failure to know or understand the law that cannot be accorded deference as a reasonable trial strategy. <u>See</u> <u>Horton</u> v.

Zant, 941 F.2d 1449, 1463 (11th Cir. 1991); People v. Carter, 354 N.E.2d 482, 485 (Ill. App. Ct. 1976) (citing United States v. Bella, 353 F.2d 718, 719 (7th Cir. 1965)). There is a reasonable probability that, but for Counsel's deficient performance, the result of the proceeding would have been different.

**C.      Counsel's Chosen Strategy Not to Investigate, Pursue and Present a Defense Based on Intoxication was Unreasonable.**

  **i.      Counsel Failed to Investigate, Pursue and Present a Defense Based on Intoxication.**

  26. As detailed below, substantial evidence existed that Mr. Maples was intoxicated on alcohol and drugs on the night of the offense, showing that Mr. Maples lacked the capacity to form the specific intent necessary under Alabama's capital murder statutes. Some, but not all, of this available evidence of intoxication was presented by the State during the guilt phase of the trial. Counsel's performance was unreasonable and woefully inadequate in that, as further explained below, (a) they failed to introduce all available evidence of intoxication, (b) they systematically objected when the State attempted to introduce evidence that showed or tended to show that Mr. Maples was intoxicated, thereby causing some of the evidence favorable to the defense not to be included and (c) they called "defense" witnesses whose testimony tended to contradict the more reliable available evidence that Mr. Maples was intoxicated and cross-examined prosecution witnesses to rebut evidence of Mr. Maples's use of alcohol and drugs. Counsel's conduct in failing to pursue and present a defense based on intoxication "fall[s] outside the wide range of professionally competent assistance." Daniels, 650 So. 2d 5 at, 552 (quoting Strickland, 466 U.S. at 688).

27.    The State introduced extensive evidence proving that Mr. Maples was intoxicated by the time he went to a pool hall shortly before the shootings (drinking a "few beers" at an evening cookout (R. at 2738-39); drinking more alcohol at a party, (R. at 2740); and going to a bar and continually drinking more alcohol between 8:30 p.m. or 9:00 p.m. and 10:30 p.m. or 11:00 p.m. (R. at 1795-1821)).  At the pool hall, Mr. Maples appeared drunk to some of those present.  A witness at the pool hall testified that Mr. Maples was acting "[j]ust loud in general, you know, like a drunk person would act when they get too much in them or something."  (R. at 1858-60.)  Jason Boyd, who was at the pool hall and played pool with Mr. Maples, testified that Mr. Maples "wasn't shooting [pool] as well [as normal] and seemed like he was a little hyper, but that was about it" and that it was possible that he was affected by "something."  (R. at 1848.)

28.    The State also introduced evidence that Mr. Maples used crack and crystal methamphetamine on the night of the shootings: evidence of drug paraphernalia (R. at 2516-17), testimony from April Phillips, an acquaintance of Mr. Maples's whom Mr. Maples visited shortly after the shootings, that Mr. Maples had drugs in his hand and told her that he had been doing "crystal meth and crack" that evening (R. at 1894, 1910-11, 1915), and testimony that Mr. Maples bought crack cocaine on the night of the shootings (R. at 1458, 1983, 1986).

29.    In stark contrast, Counsel attempted to establish through cross-examination of State witnesses and the testimony of several defense witnesses that Mr. Maples was not intoxicated at the time of the shootings.  Amazingly, while summarizing the cross-examination and direct examination testimony during his closing

-11-

argument, Counsel inaccurately told the jury that "[t]here is no evidence that he consumed drugs that night." (R. at 2920.)

30.    Given this abundant evidence that Mr. Maples was intoxicated at the time of the offense, no reasonable counsel would have failed to present and pursue a defense of intoxication.  Such failure, which could only amount to Counsel's failure to conduct a substantial investigation into any of Mr. Maples's plausible lines of defense, constituted ineffective assistance of counsel.  See House v. Balkcom, 725 F.2d 608, 617-18 (11th Cir.), cert. denied, 469 U.S. 870 (1984).  Indeed, a defense based on intoxication would have rebutted the specific intent element required by law for each capital offense Mr. Maples was charged.  In the absence of specific intent, Mr. Maples could only be convicted of a lesser included offense (Ala. Code § 13A-1-9(a) (1994)), in this case manslaughter (Ala. Code § 13A-6-3 (1994)).  In addition, a finding of intoxication at the guilt phase of the trial would have been consistent with the mitigating factors presented by the defense during the sentencing phase of the trial.  (See Paragraphs 175 to 176.)

30A.    Similarly, Counsel failed to investigate evidence of intoxication. Accordingly, although Counsel briefly interviewed James Smith (a.k.a. "Fishbone"), one of the prosecution's witnesses regarding Mr. Maples' post-crime behavior, Counsel never inquired about whether Mr. Maples appeared to be intoxicated.  Nor did Counsel ask the three other individuals who were present at Mr. Smith's house about Mr. Maples's appearance, although Counsel were already aware of the conclusive evidence of Mr. Maples's intoxicated state shortly before the shootings (see Paragraphs 18 to 20), as well as after the shootings, based, among other things, on his interview of Ms. Phillips

-12-

conducted at about the same time as Mr. Smith's interview. Therefore, Counsel

unreasonably failed to properly investigate all the evidence available to him that

Mr. Maples's intoxicated state.

30B.    Had Counsel done so, Counsel would have learned that Mr. Maples

appeared to be intoxicated and in fact told Mr. Smith that he had taken drugs prior to his

arrival at Mr. Smith's house.  Such evidence could have been used to support an

intoxication defense; it also would have undermined the State's robbery theory by

demonstrating that Mr. Maples apparently did not need to sell the cue stick found in

Mr. Terry's vehicle in order to obtain drugs, thus establishing a reasonable doubt

regarding Mr. Maples' intentions to rob in order to feed a drug habit.  (See Paragraphs 30

to 31.)

31.    In light of the foregoing, Counsel's performance fell so far below the

standard of reasonable performance that it cannot be considered either a strategic decision

or effective assistance of Counsel.  Given the evidence against Mr. Maples and the

prosecution's strategy at trial, no competent counsel would have made the strategic

choices Counsel made or conducted the defense as Counsel did.  Counsel's choice of

strategy, use of inconsistent strategies, and efforts (or lack thereof) to implement these

strategies were unreasonable and constitute ineffective assistance of counsel.  See

Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000).  Thus, "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  Strickland, 466 U.S. at 694.

ii.    **Counsel Failed to Request a Jury Instruction on Intoxication and Manslaughter.**

32.    Despite of all the evidence presented at trial, albeit mostly presented by the State, showing that Mr. Maples was intoxicated at the time of the offense, Counsel also failed to request jury instructions relating to intoxication and the lesser included offense of manslaughter.

33.    It is established that an accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, see Owen v. State, 611 So. 2d 1126, 1128 (Ala. Crim. App. 1992); where the evidence is offered by the State, see Coon v. State, 494 So. 2d 184, 187 (Ala. Crim. App. 1986); and where the defendant denies the commission of the crime, see Owen, 611 So. 2d at 1127-28.

34.    Moreover, a defendant is entitled to have charges given as long as they are supported "by any evidence, however weak, insufficient, or doubtful in credibility." Chevers v. State, 361 So. 2d 1106, 1107 (Ala. 1978) (citations omitted); see also Duncan v. State, 6 So. 2d 450, 453 (Ala. Ct. App. 1942); Fletcher v. State, 621 So. 2d 1010, 1019 (Ala. Crim. App. 1993) ("It is clear that '[a] defendant is entitled to a charge on an [intoxication] if there is any reasonable theory from the evidence that would support the position.' This is true regardless of 'however weak, insufficient, or doubtful in credibility' the evidence concerning that offense.") (citing Ex parte Oliver, 518 So. 2d 705, 706 (Ala. 1987) and Chevers, 361 So. 2d at 1107).  It is solely in the absence of any evidence of intoxication whatsoever that the court could potentially refuse to give an instruction on intoxication when requested by Counsel.  Thus, even if Counsel had not

-14-

pursued a defense strategy based on intoxication, it was incumbent upon Counsel to request the court give such instructions because evidence of intoxication was extensively presented and discussed at trial.

35.     Counsel's failure to request such instructions severely prejudiced Mr. Maples at trial as well as on appeal, because (a) the jury was deprived of the opportunity to consider the issue of Mr. Maples's intoxication and (b) absent Counsel's specific request, the court's failure to give such instructions was reviewed by the appellate court under the stringent "plain error" standard.  See Maples, 758 So. 2d at 28 et. seq.  This prejudice was compounded by Counsel's failure to further investigate available evidence of intoxication, and to pursue and present a defense based on intoxication.  (See Paragraphs 18 to 23.)  The combination of these two errors was not considered on direct appeal.

36.     In light of the foregoing, Counsel's performance fell so far below the standard of reasonable performance and demonstrated such failure to know or understand the law that it cannot be considered either a strategic decision or effective assistance of Counsel.  Here, "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

**D.     Counsel Failed to Adequately Challenge the State's Investigation and Presentation of the Case.**

37.     Counsel failed to properly challenge the State's investigation and presentation of its case, failed to object to irrelevant and prejudicial evidence introduced

by the State, failed to adequately cross-examine State witnesses and failed to recognize or adequately object to court error, thereby abdicating their constitutionally mandated responsibility to subject the State's case to adversarial testing. See Strickland v. Washington, 466 U.S. 668 (1984). The errors of Counsel allowed the State to present its weak case essentially unchallenged and untested, and permitted the State to present considerable evidence that should have been suppressed or otherwise properly excluded.

### i. Counsel Failed to Adequately Challenge the State's Presentation of the Robbery Elements.

38. Counsel failed to challenge the State's proof regarding Mr. Maples's intent to rob at the time of the incident. Under Alabama law, an accused "is not guilty of capital robbery-murder where the intent to rob was formed only after the victim was killed." Connolly v. State, 500 So. 2d 57, 62 (Ala. Crim. App. 1985). Despite the lack of evidence suggesting that the murder of Stacy Terry was in furtherance of the robbery -- and not the other way around, as Mr. Maples explained in his videotaped statement made shortly after his arrest -- Counsel made no argument on this crucial issue. (R. at 2730-32.)

39. Counsel were ineffective for failing to introduce available evidence that Mr. Maples had access to Mr. Terry's vehicle prior to the incident and could have taken it without force. Particularly, although Le Ann Clemons testified at trial that, during the evening preceding the murders, Mr. Maples had had free access to the keys of Mr. Terry's vehicle (R. at 1809), Counsel failed to draw the obvious inference that Mr. Maples did not need to commit the murders in order to rob Mr. Terry's vehicle, and

-16-

thus to create a reasonable doubt as to Mr. Maples's intentions at the time of the

shootings.  With that evidence, Counsel should have persuasively argued against the

prosecution's theory that Mr. Maples committed these crimes in order to take the car

from Mr. Terry by force.  Since the State's evidence pertaining to Mr. Maples's intent at

the time of the incident was far from overwhelming, Counsel were ineffective for failing

to introduce evidence that would have established reasonable doubt and negated the

prosecution's theory regarding Mr. Maples's intentions.

### ii. Counsel Failed to Object to or Adequately Argue Against the Admission of Irrelevant and Prejudicial Post-Murder Events.

40.     It is axiomatic that only relevant, probative evidence is properly

admissible at trial.  See Ala. R. Evid. 402; Old Chief v. United States, 519 U.S. 172

(1997).  Therefore, Counsel's failure to challenge the introduction of prejudicial and

irrelevant testimony received during the guilt phase of Mr. Maples's trial constituted

ineffective assistance of counsel.

41.     Mr. Smith, a State witness, testified that he saw Mr. Maples shortly after

the shootings, driving Mr. Terry's vehicle in his neighborhood of Northwest Decatur.

According to Mr. Smith, Mr. Maples wanted to sell some items, including a pool cue

stick.  (R. at 1983-85, 1987, 1991-92.)  Another State witness, a pawnshop employee

named Trevor Nickens, testified that he bought the pool cue stick from Mr. Smith.  (R. at

2018-25.)  The testimony of these witnesses was irrelevant and highly prejudicial,

especially since the indictment did not charge Mr. Maples with the robbery of the pool

cue stick; it only charged Mr. Maples with the robbery of the vehicle.  Counsel should

-17-

have filed a motion in limine to prevent the introduction of this evidence of uncharged crime and should have objected to its admission at trial. Since there was no legitimate reason for the State to introduce this highly prejudicial evidence, it was ineffective for Counsel to fail to object to its introduction at trial.

42.     Various witnesses testified that Mr. Maples was showing off Mr. Terry's vehicle on July 8, 1995, the day after the shootings as if it were his new car. (R. at 1954, 2032, 2050, 2095.) The testimony of these witnesses served no legitimate purpose for the State's case and was highly prejudicial to Mr. Maples's case. The State used this evidence to inappropriately influence the jury in its determination of whether Mr. Maples had formulated the intent to rob at the time of the shootings. (R. at 2889-90.) However, since the boasting behavior occurred well after the violent event in question, its probative value regarding Mr. Maples's state of mind at the time of the event was substantially outweighed by its prejudicial impact. In light of the central importance of this issue of intent to Mr. Maples's case, this evidence should have been excluded from the jury's consideration. Yet Counsel neither objected to the introduction of this testimony nor requested a limiting instruction.

43.     Ms. Jennifer Clem, a State witness, testified that on July 8, 1995, Mr. Maples stopped at the gas station where she worked and cashed a $300 check that was made out to Mr. Terry. (R. at 1952-53.) Linda Carter, the owner of the gas station, testified that she found the cashed check in her money bag on July 9, 1995. (R. at 1963-78.) Again, this testimony should not have been allowed into evidence on relevance grounds. Since Mr. Maples was not charged with taking the check from

-18-

Mr. Terry — as mentioned previously, the indictment only charged Mr. Maples with the robbery of the vehicle — this evidence served no legitimate purpose for the State other than to prejudice the jury against Mr. Maples.  Counsel should have filed a motion in limine to prevent the introduction of this evidence of uncharged crime and should have objected to its admission at trial.

### iii.    Counsel Failed to Adequately Cross-Examine Witnesses.

44.    Counsel either failed to cross-examine or ineffectively cross-examined most of the 60 witnesses called by the State to establish Mr. Maples's guilt.  Such a failure by Counsel to adequately challenge or rebut the major part of the State's evidence through cross-examination amounted to not presenting any defense at all.  By failing to effectively cross-examine State witnesses, Counsel abdicated their constitutionally mandated responsibility to subject the State's case to adversarial testing.  See Strickland v. Washington, 466 U.S. 668 (1984).

45.    Among other things, Counsel failed to elicit testimony from Ms. Phillips about her relationships with and drug connections to Mr. Robinson, Frank Meiner (the roommate of Mr. Robinson who disappeared immediately after the shootings) or John Lansdell (another roommate of Mr. Robinson and alleged drug dealer) and whether they had any disputes with Mr. Maples over drugs.  Counsel also failed to elicit testimony from Ms. Phillips about Mr. Maples's intoxicated appearance shortly after the shootings. Counsel were already aware of the conclusive evidence of Mr. Maples's intoxicated state shortly before the shootings.  (See Paragraphs 26 to 30B.)  The additional evidence, concerning Mr. Maples's intoxicated state shortly after the shootings, would have given

-19-

rise to a very strong inference that Mr. Maples was also intoxicated at the time of the shootings. But for Counsel's failure to elicit such testimony, the outcome of the trial would have been different.

46.     Counsel made no attempt to impeach Stephen Tant (the motel manager with whom Mr. Maples resided in Nashville from approximately July 9, 1995 until his arrest on August 1, 1995) concerning his testimony that his consent to search his room was obtained voluntarily. Counsel failed to elicit testimony that Mr. Tant's coerced consent was actually the result of his being surrounded by many Nashville police with guns drawn and pointed directly at him and illegal drugs being in plain view of the police officers in the room. (See, in part, Paragraphs 68 to 69.) But for Counsel's failure to elicit such testimony, the outcome of the trial would have been different.

47.     Counsel also failed to elicit testimony from James Dobbs (a friend of Mr. Maples), one of the last people to see Mr. Robinson, Mr. Terry, and Mr. Maples together, concerning the substance of Mr. Maples's conversation with him less than an hour before the shootings and Mr. Maples's physical state and intoxicated appearance at that time, despite substantial evidence conclusively establishing Mr. Maples's intoxication prior to the shootings. (See Paragraphs 26 to 30(B).) Counsel also failed to elicit testimony concerning Mr. Dobbs's and Mr. Maples's drug dealing disputes, Mr. Dobbs's knowledge that certain people sought to harm Mr. Maples, Mr. Maples's relationship and connections to violent drug dealers and his knowledge of threats received by Mr. Maples's family from drug associates prior to Mr. Maples's arrest. Finally, Counsel failed to elicit from Mr. Dobbs that Mr. Maples had had on several

occasions access to one or more cars owned by Mr. Dobbs and that Mr. Maples never

attempted to steal any of these vehicles, although he would have had the opportunity.

Counsel failed to do so although Mr. Dobbs testified to the prosecution that he would let

Mr. Maples borrow his cars. (R. at 2087.) But for Counsel's failure to elicit such

testimony, the outcome of the trial would have been different.

48.    Counsel failed to impeach Heather Davis, a former girlfriend of

Mr. Maples, concerning statements she made at trial that were harmful to Mr. Maples and

indicated that she did not think very highly of him with evidence of letters she

subsequently wrote to Mr. Maples in jail wherein she discussed naming her unborn child

after Mr. Maples.  Clearly, Ms. Davis's regard for Mr. Maples subsequent to the

shootings was still quite high, in spite of her earlier statements to the police.  But for

Counsel's failure to elicit such testimony, the outcome of the trial would have been

different.

49.    In spite of the Counsel's knowledge of Mr. Lansdell's prior acquaintance

with Mr. Maples and Mr. Terry based on his interview with Mr. Lansdell and other

persons, Counsel failed to elicit testimony concerning any drug-related conflicts between

Mr. Maples and Mr. Lansdell and simply failed to cross-examine Mr. Lansdell after the

latter surprisingly testified that he did not know Mr. Maples. (R. at 1864.)  But for

Counsel's failure to elicit such testimony, the outcome of the trial would have been

different.

50.    [Paragraph intentionally omitted.]

-21-

51.     Counsel also failed to elicit from the Decatur police testimony that there were many more shell casings at the crime scene that were not collected or analyzed by the police.  Such a failure to elicit information about the incomplete investigation by the Decatur police prejudiced Mr. Maples and, but for Counsel's failure to elicit such testimony, the outcome of the trial would have been different.

52.     The abovementioned cumulative errors of Counsel, though not exhaustive, allowed the State to present its case essentially uncontested and win a conviction and death sentence on the basis of virtually unchallenged evidence.  But for Counsel's failure to challenge the State's theory through effective cross-examination, the outcome of the guilt phase of Mr. Maples's trial would have been different.  See Strickland, 466 U.S. at 694.

**iv.     Counsel Failed to Recognize and Adequately Object to Trial Errors.**

53.     As detailed in Paragraphs 54 to 65 Counsel's repeated failure to recognize and adequately object to trial error prejudiced Mr. Maples at trial, as well as on appeal where the appellate court repeatedly noted that, "[w]hile [counsel's] failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice." Maples v. State, 758 So. 2d 1, 16 (citing Ex parte Kennedy, 462 So. 2d 1106, 1111 (Ala. 1985)).  Thus, Counsel's failure to object to what might otherwise have been reversible errors caused the appellate court to review them under the far more stringent "plain error" standard.  See Maples v. State, 758 So. 2d at 7; Ala. R. App. P. 45A.

-22-

### a.   Juror Issues

54.   Counsel failed to object to the court excusing for cause several potential jurors who expressed reservations concerning the death penalty.  (R. at 461, 540, 541, 672, 756, 902, 919.)  Venire members Marvin Bundy, Wade Hensley, and Jimmy Rodgers were excused in part because of their views on the death penalty.  For instance, when asked by the State whether they could return a death verdict, Mr. Hensley (R. at 540) and Mr. Rodgers (R. at 541) responded "I don't know."  When asked about his opinion about the death penalty, Mr. Bundy responded "I'm opposed to capital punishment." (R. at 461.)  The exclusions of these jurors, who possessed a commonality in their reservations concerning the death penalty, violated Mr. Maples's right to a constitutional trial and violated the equal protection rights of those excluded jurors.  See J.E.B. v. Alabama, 511 U.S. 127, 140 (1994) ("[W]e have emphasized that individual jurors themselves have a right to nondiscriminatory jury selection procedures.") (citations and quotations omitted); Witherspoon v. Illinois, 391 U.S. 510 (1968) (holding that venire members cannot be properly excluded merely because they express some reservations about the death penalty).  Had Counsel objected to the unconstitutional exclusion of these potential jurors there is a reasonable probability that the outcome of the proceeding would have been different.  See Strickland, 466 U.S. at 694.

55.   Counsel failed to object to the improper briefing of the jury outside of Counsel's presence.  At the outset of Mr. Maples's trial, the court admitted that while the venire members were in another courtroom, they heard about the case from another judge.  (R. at 452.)  The court stated that "[t]his case, [as the other judge] may have told

-23-

you, may go possibly as long as three weeks." (R. at 452.) Mr. Maples was not present during the venire's appearance before this other judge, and it is unclear what else this other judge may have told the venire concerning Mr. Maples's trial. By informing the venire about the case in the absence of Mr. Maples and his Counsel, this judge violated Mr. Maples's fundamental right to be present at all stages of a capital proceeding. See e.g., Gideon v. Wainwright, 372 U.S. 335 (1963); United States v. Diaz, 223 U.S. 442, 454 (1912) (holding that a defendant is "entitle[d] to be present at all . . . stages of the proceedings"); see also Ex parte Jackson, 674 So. 2d 1365 (Ala. 1994) (holding that a capital defendant may not waive his right to be present in a capital proceeding). Had Counsel objected to the venire members being informed about Mr. Maples's case outside of Mr. Maples's presence there is a reasonable probability that the outcome of the proceeding would have been different. See Strickland, 466 U.S. at 694.

56.     Counsel failed to object to the court's failure to remove venire member Jason Wilbanks for cause because Mr. Wilbanks indicated that he would automatically vote for a sentence of death if Mr. Maples were found guilty of the capital offense charged against him. Indeed, when Counsel asked the panel whether an individual found to have "intentionally [taken] a human life . . . should lose his life automatically," Mr. Wilbanks responded "[y]es." (R. at 1088-89.) When Counsel asked Mr. Wilbanks specifically whether he would "automatically vote for the death penalty once that's proven," Mr. Wilbanks again answered "[y]es." (R. at 1093-94.) Such beliefs are not permissible among jurors hearing a capital case. See Morgan v. Illinois, 504 U.S. 719 (1992); Bracewell v. State, 506 So. 2d 354 (Ala. Crim. App. 1986). Because of the

-24-

court's failure to remove venire member Wilbanks upon Counsel's challenge for cause, Mr. Maples was compelled to use a peremptory challenge to remove Mr. Wilbanks. (R. at 1387.) This unconstitutionally reduced the number of preemptory challenges available to Mr. Maples to remove other members from the venire. See Pointer v. United States, 151 U.S. 396, 414 (1894) (holding that the right to exercise peremptory challenges is "one of the most important rights secured to the accused"); Uptain v. State, 534 So. 2d 686 (Ala. Crim. App. 1988) (granting a new trial in part because defendants were required to use peremptory challenges in order to eliminate venire persons who had been properly challenged for cause, which effectively reduced their total number of peremptory challenges); England v. State, 601 So. 2d 1108 (Ala. Crim. App. 1992). Counsel's failure to object to the court's failure to remove venire member Wilbanks raised the reasonable probability that, had Counsel objected, the outcome of the proceeding would have been different. See Strickland, 466 U.S. at 694.

57.     Counsel failed to object to the court erroneously bestowing heightened authority upon the jury foreperson in its jury instruction. The court instructed the jury to elect a foreperson before undergoing its deliberations. (R. at 3019.) The court further instructed the jury that this foreperson was to moderate the deliberations and act as the spokesperson for any communications with the court. (R. at 3019.) Such a delegation of authority to a jury foreperson lacks any basis in the law and denied Mr. Maples a fair and representative jury. See generally Ala. R. Crim. P. 12; Pace v. State, 714 So. 2d 332 (Ala. 1997) ("[T]he role of a ... foreperson in Alabama is so ministerial that even his or her failure to participate in deliberations and to vote with the panel is not fatal to the

-25-

indictment."). Had Counsel objected to this erroneous instruction and impermissible bestowal of authority there is a reasonable probability that the outcome of the proceeding would have been different. See Strickland, 466 U.S. at 694.

58.    Counsel failed to object to the jury improperly conducting a portion of its deliberations in open court. Once the jury began deliberating, they decided that they needed to review Mr. Maples's videotaped and audiotaped statements. (R. at 3044-45.) The court required the jury be brought from the deliberation room and review these statements in open court. (R. at 3045.) This review took place in front of counsel for both sides, the victims' family members and members of the public. This highly unusual procedure violated Alabama law and Mr. Maples's constitutional rights. It is axiomatic that a jury be free to deliberate and decide upon a verdict and sentence isolated from outside influence and bias. See Lowery v. State, 122 So. 603 (Ala. 1929); Voyles v. State, 596 So. 2d 31 (Ala. Crim. App. 1991); Alabama Gas Corp. v. American Furniture Galleries, 439 So. 2d 33 (Ala. 1983). Furthermore, under Alabama law, the jury has an unqualified right to view evidence in the privacy of the deliberation room upon retirement. See Ala. Code § 12-16-14 (1994) ("All instruments of evidence and depositions read to the jury may be taken out by them on their retirement.") When a court refuses to permit a jury to take evidence introduced at trial into the deliberation room, it interferes with the jury's deliberative process, and the ensuing verdict is unreliable and constitutionally infirm. See Puckett v. State, 18 So. 2d 834 (Ala. Crim. App. 1944). Had Counsel objected to this procedure, which is improper under Alabama law, and under the precepts of due process under the federal constitution, there is a

-26-

reasonable probability that the outcome of the proceeding would have been different. <u>See</u> <u>Strickland</u>, 466 U.S. at 694.

59.     Counsel failed to object to the numerous errors in the instructions given to the jury.  For example, in its initial instruction to the jury on reasonable doubt, the court stated that "to return a verdict of guilty, [the jury] must not be able to say that [they] believe the defendant is not guilty, and give a good reason why [they] believe that." (R. at 1443.)  Requiring that a "good" reason support a reasonable doubt was an improper standard and confusing to the jury's and understanding of the law.  Indeed, instructing the jury to justify a reasonable doubt with a "good" reason was not only confusing, it also was improper, as the standard "good," which can have a moral connotation, is greater than the "reasonable" standard, which merely refers to logic.  It also shifted the burden of proof, requiring that Mr. Maples provide a "good" reason why the State's case was subject to a reasonable doubt.  Holding the State to a standard of proof beyond a reasonable doubt is the keystone to the United States criminal justice system.  <u>See</u> <u>e.g.</u>, <u>Sandstrom</u> v. <u>Montana</u>, 442 U.S. 510 (1979) (holding that instructions that reduce the burden of proof by shifting it to the defendant deprive a defendant of due process and a fair trial); <u>In re Winship</u>, 397 U.S. 358, 364 (1970) (finding that proof beyond a reasonable doubt is the "prime instrument for reducing the risk of convictions resting on factual error."); <u>see</u> <u>also</u> <u>Beard</u> v. <u>State</u>, 612 So. 2d 1335 (Ala. Crim. App. 1992).  Had Counsel objected to this erroneous instruction there is a reasonable probability that the outcome of the proceeding would have been different. <u>See</u> <u>Strickland</u>, 466 U.S. at 694.

60.     The court also improperly instructed the jury concerning the finding of aggravating circumstances.  The court instructed the jury that they "should also consider any evidence that was presented during the guilt phase of the trial that is relevant to the existence of an aggravating or mitigating circumstance." (R. at 3322.)  These instructions violated the United States Constitution and Alabama law.  A jury, during the sentencing phase of capital proceedings, may consider only those aggravating circumstances contained in Section 13A-5-49 of the Alabama Code.  See Ala. Code § 13A-5-49 (1994); Beck v. State, 396 So. 2d 645 (Ala. 1980).  Here, the court instructed the jury to consider "any" evidence of aggravating circumstances, despite the applicability of only a single statutory aggravating circumstance.  This is constitutionally impermissible.  See Woodson v. North Carolina, 428 U.S. 280 (1976).

61.     As detailed in Paragraphs 59 to 60 above, had Counsel objected to the court's confusing and incorrect instruction on reasonable doubt and the court's instruction to consider "any" evidence of aggravating circumstance the reasonable probability exists that the outcome of the proceeding would have been different.  See Strickland, 466 U.S. at 694.

**b.     Evidentiary Issues.**

62.     Counsel failed to object to evidence that was introduced without the proper chain of custody established.  Numerous swatches of cloth were removed from Mr. Terry's vehicle, as well as other evidentiary items introduced at trial.  These cloth swatches were later tested by forensic laboratories and produced incriminating evidence against Mr. Maples.  Sheriff Steve Crabbe, who testified that he retrieved Mr. Terry's

-28-

vehicle from Nashville, stated that he turned the vehicle over to Morris Glen Brown, a

scientist at the Huntsville division of the Alabama Department of Forensic Sciences.

(R. at 2329.) However, the circumstances in which Mr. Brown received the custody of

the vehicle and the items therein were not clearly explained at trial. Indeed, Mr. Crabbe

indicated only that he picked up the vehicle "from a forensic sciences impound lot . . . at

the Nashville Metropolitan Police Department." (R. at 2328.) Mr. Brown did not testify

that he retrieved the vehicle in the presence of Mr. Crabbe. There was an uncertainty as

to the chain of custody. Therefore, there is a likelihood that there may have been a

critical "missing link" in the chain of custody for the vehicle, rendering the evidence

collected therefrom inadmissible at trial. See Ex parte Cook, 624 So. 2d 511 (Ala. 1993);

Ex parte Holton, 590 So. 2d 918 (Ala. 1991); Russaw v. State, 624 So. 2d 234 (Ala.

Crim. App. 1993); Laws v. State, 562 So. 2d 305 (Ala. Crim. App. 1990). Counsel's

failure to object to the introduction of this evidence, which was inadmissible under

Alabama law and the requirements of due process under the federal constitution, created

the reasonable probability that had they objected the outcome of the proceeding would

have been different. See Strickland, 466 U.S. at 694.

63.    Counsel failed to object to the court referring to evidence which would not

be presented to the jury. The court informed the jury that some of the evidence, if ruled

inadmissible, would not be seen by the jury: "There are documents and tapes that may be

offered. I don't know yet. I haven't ruled on the admissibility of all that yet, but there

are a number of documents that may be offered into evidence that you will be able to

consider." (R. at 1444.) In order to protect a criminal defendant's rights, it is established

that the prosecutor may not comment on evidence which is not educed before the jury.

See Allen v. State, 659 So. 2d 135, 137 (Ala. Crim. App. 1994) (condemning

prosecutorial statements "'which suggest and might lead the jury to believe, that there

was other evidence, not presented to them, which would prove the defendant's guilt'")

(quoting King v. State, 518 So. 2d 191, 193-94 (Ala. Crim. App. 1987) (citing Ex parte

Washington, 507 So. 2d 1360 (Ala. 1986)); Story v. State, 665 So. 2d 963 (Ala. Crim.

App. 1995) ("[C]omments can convey the impression that evidence not presented to the

jury, but known to the prosecutor, supports the charges against defendant and can thus

jeopardize the defendant's right to be tried solely on the basis of the evidence presented

to the jury.") (citations omitted).  If it is improper for the prosecutor to comment or allude

to evidence not presented to the jury, the court certainly cannot make similar references.

Counsel's failure to object to the court's improper reference to evidence the jury may not

see created the reasonable probability that had Counsel objected the outcome would have

been different.  See Strickland, 466 U.S. at 694.

64.     Counsel failed to object to the introduction of evidence of wholly

unrelated offenses allegedly committed by Mr. Maples.  For example, the State was

permitted to introduce a fingerprint card of Mr. Maples from a prior DUI arrest.

(R. 2378-81.)  In addition, Counsel filed an untimely motion for mistrial after the

testimony of police officer Harding from the Decatur Police Department, who testified

that he had booked Mr. Maples at a "prior date."  (R. at 2379.)  The State also introduced

photographs of Mr. Maples's bedroom.  Plainly visible in the photographs were stolen

highway road signs displayed on the walls of Mr. Maples's room.  Stealing road signs is a

-30-

felonious offense. See Ala. Code § 13A-8-71(c) (1994).  Such evidence is inadmissible

and impermissible in a criminal prosecution, where the general rule is that "evidence of

other separate and distinct criminal acts is not admissible since the only facts to be laid

before the jury should consist exclusively of the transaction which forms the subject of

the indictment, which alone the defendant is called upon to answer." Hinton v. State,

189 So. 2d 849, 851 (Ala. 1966) (citing Garner v. State, 269 Ala. 531, 533 (1959);

Brasher v. State, 249 Ala. 96, 98 (1947)); Old Chief v. United Sates, 519 U.S. 172

(1997).  The introduction of such evidence was especially prejudicial in this instance

because one of Mr. Maples's mitigating factors was his lack of prior criminal history.

Had Counsel objected to the introduction of this inadmissible and prejudicial evidence,

there was a reasonable probability that the outcome of the proceeding would have been

different. See Strickland, 466 U.S. at 694.

> **c.    Court Orders**

65.    Counsel failed to object to the court's contradictory and confusing orders

regarding Mr. Maples's need to give physical exemplars.  The State moved the court to

authorize the collection of physical exemplars from Mr. Maples on February 5 and 6,

1997. (Ct. R. at 340, 341.)  Mr. Maples immediately objected to the State's motion, and

properly asserted that the case was in the final stages of preparation and that granting the

State's motion would materially affect the evidentiary record in the case.  (Ct. R. at 342.)

The court initially agreed with Mr. Maples, and denied the State's request on

February 14, 1997.  (Ct. R. at 377.)  Subsequently, however, after the State was granted a

continuation, the court reversed itself and granted the State discovery of physical

exemplars. (Ct. R. at 391.) Although in some circumstances, the State may have the authority to collect physical exemplars from criminal suspects, Mr. Maples had an equivalent and countervailing right to rely on the finality of the court's rulings. See Brown v. Ohio, 432 U.S. 161 (1977); Pettway v. State, 648 So. 2d 647, 650 (Ala. Crim. App. 1994) (noting the important "element of needed finality" in a criminal case). The court's contradictory rulings in this case severely hampered Mr. Maples's ability to rebut the states evidence. Counsel's failure to object to the court's contradictory and confusing order supports the reasonable probability that had they properly objected, the outcome of the proceeding would have been different. See Strickland, 466 U.S. at 694.

**E.      Counsel Failed to Request and Use Necessary Expert Assistance.**

66.      A criminal defendant's right to the benefit of expert assistance is constitutionally recognized and protected. See Ake v. Oklahoma, 470 U.S. 68 (1985); Griffin v. Illinois, 351 U.S. 12 (1956); Gayle v. State, 591 So. 2d 153 (Ala. Crim. App. 1991). In this case, Counsel failed to protect Mr. Maples's right when they failed to request a mental health expert, a pharmacologist or other expert in drug interactions and other experts who would have assisted counsel in preparing to defend Mr. Maples.

**i.      Failure to Request and Use the Assistance of a Mental Health Expert.**

67.      There was evidence available to Counsel and to Dr. Allen Shealy, the psychologist who testified in the second stage of the trial, that would have shown that Mr. Maples had abused drugs and alcohol and that he had ingested a substantial quantity of alcohol, some marijuana and perhaps other drugs on the day of the killings. (See

Paragraphs 26 to 28.)  Evidence was also available to show that Mr. Maples had experienced an extremely abusive early childhood, suffering from both physical abuse and abandonment by his birth mother, (see Paragraphs 123 to 138), that Mr. Maples had several experiences with violent death, (see Paragraph 131) and that Mr. Maples suffered head injuries in the past (see Paragraph 158).

68.     A mental health expert would have testified during the guilt phase of Mr. Maples's trial to the effects of these experiences upon Mr. Maples's narrative style and his flat affect.  These qualities were apparent on the videotape of his statement to the police and in his courtroom demeanor.  Upon information learned from interviews with the jurors, these qualities might have made a negative impression on the jurors.  But for Counsel's failure to elicit such testimony, the outcome of the trial would have been different.

69.     Yet Counsel, who had retained a psychologist to evaluate Mr. Maples and to testify in the second stage of the trial, never asked that the psychologist view the videotaped statement.  Nor did Counsel ask the psychologist to testify in the guilt phase of the trial, although his testimony would have provided crucial information to the jury about Mr. Maples's flat affect and demeanor and his need to mask his emotions.  Such information would have permitted the jury to better understand Mr. Maples and his situation.  But Counsel did not take these steps.  Instead, Counsel allowed the entire guilt phase of the trial to be completed and the jury to be excused to deliberate without doing anything to lessen the impact of Mr. Maples's videotaped statement, or the impact of his courtroom demeanor.  Had Counsel obtained an expert to testify on these issues during

the guilt phase of Mr. Maples's trial, there is a reasonable probability that the outcome of the proceeding would have been different.  See Strickland, 466 U.S. at 694.

70.     The importance to jurors of understanding the demeanor and behavior of the defendant in a murder case is well-documented.  See, e.g., S. Sundby, The Capital Jury and Absolution:  The Intersection of Trial Strategy, Remorse, and the Death Penalty, Cornell L. Rev. 1561 (1998) ("Above all else, however, the defendant's demeanor and behavior during the actual trial shaped the jurors' perceptions of the defendants' remorse.")  In view of the fact that Mr. Maples did not testify, the failure to engage the psychologist or other mental health expert to explain Mr. Maples's flat affect and demeanor and their related causes was ineffective assistance of counsel and cannot be considered a strategic decision.

### ii.     Counsel Failed to Request the Assistance of a Pharmacologist or Other Expert in Drug Interactions.

71.     Prior to trial, there was evidence available to Counsel, including documentary and testimonial evidence from Quest Recovery Center counselors, Philip Maples, Ms. Maples and numerous other friends and relatives of Mr. Maples as well as other witnesses, that, prior to the shootings, Mr. Maples had a severe drug problem, including the abuse of alcohol, marijuana, crack, cocaine and LSD, of such severity that he had sought help for it.  There was also considerable evidence available that Mr. Maples had been relatively drug-free for several months prior to the shootings and that Mr. Maples ingested a considerable quantity of alcohol and marijuana during the day of the shootings.  With such evidence available, and with a lack of evidence suggesting

-34-

that the murder of Stacy Terry was in furtherance of a robbery, Counsel was ineffective for failing to obtain an expert to testify as to Mr. Maples's cognitive ability to form an intent to rob, and whether and to what extent that ability was impacted by his drug ingestion, especially Mr. Maples's impairment after ingesting drugs and alcohol following a relatively drug-free period.

72.    Under these circumstances, Counsel was ineffective for failing to request the services of an expert who could consult the available evidence, determine how much of which drugs Mr. Maples ingested or used prior to the shootings, and offer testimony about the effects those drugs would have had on his mental state at the time of the shootings.  Depriving Mr. Maples of his constitutionally guaranteed assistance of experts cannot be considered a strategic decision under Ake and its progeny.  But for Counsel's failure to request a pharmacologist or other expert in drug interactions and elicit testimony from that expert, the outcome of Mr. Maples's trial would have been different.

     **iii.    Counsel Failed to Request the Services of Other Experts.**

73.    In addition, Counsel never requested an expert in ballistics to help show the jury the weaknesses and meagerness of the State's evidence, as well as to conduct certain tests on the bullets not performed by the State which might establish the metallic and chemical composition of the bullets recovered from the bodies to see if they matched that of bullets taken in the search of the Maples's trailer.  Such tests could have shed light on the circumstances of the shootings.  But for Counsel's failure to request an expert in ballistics, the outcome of the trial would have been different.

-35-

74.      Similarly, Counsel never requested funds for a blood spatter expert who could have countered the State's testimony and argument seeking to emphasize and inflame the jury with the "bloodiness" of the crime.  The State introduced into evidence sixty-three photographs of the interior of Mr. Terry's Camaro.  There were also forty-four references in Howard Battles' testimony alone to bloodstains in the car, including references such as "this crusty blood all in the bottom of this door pocket." (R. 2196.)  In addition, the State introduced cuttings of the car upholstery allegedly containing the bloodstains.  Despite the imperative need to adequately address the duplicative and inflammatory evidence presented by the State, Counsel never made any attempt to request or procure a blood spatter expert who could have analyzed the evidence and testified as to the relative lack of blood in the vehicle.  But for Counsel's failure to request a blood spatter expert, the outcome of the trial would have been different.

75.      As detailed in Paragraphs 66 to 74 above, Counsel's repeated failures to procure expert assistance at trial to which Mr. Maples was constitutionally entitled could not be considered reasonable trial strategy.  Instead, such failures were derelictions of Counsel's duty to zealously represent Mr. Maples and constitute ineffective assistance of counsel.

**F.      Counsel Failed to Present, Adequately Argue and Obtain Favorable Rulings on Motions.**

**i.      Suppression Motions.**

76.      Counsel failed to move to suppress evidence resulting from the warrantless police search of Mr. Maples's hotel room and failed to object to the

-36-

admission of such evidence.  The search was performed pursuant to an involuntary

consent given by Mr. Tant, the manager of a Nashville motel where Mr. Maples stayed

for three weeks prior to his arrest. At trial, the police produced a "waiver" signed by

Mr. Tant, purportedly authorizing the search of his and Maples's room.  (R. at 2449,

2466; State's Ex. 203, 204.)  Mr. Tant testified that he signed the "waiver" while the

police officers "were just all standing there with guns pointing at me . . . ."  (R. at 2449.)

Mr. Tant also testified to having a problem with signing the "waiver."  Specifically,

Mr. Tant testified that "[t]he problem to [him] at the time was all the police officers

around [him] . . . ."  (R. at 2449.)  Consent to a search – whether given by the primary

party or as third-party consent – must be freely given.  See Windham v. State, 599 So. 2d

95 (Ala. Crim. App. 1992); Hubbard v. State, 500 So. 2d 1204 (Ala. Crim. App. 1986);

McLemore v. State, 562 So. 2d 639 (Ala. Crim App. 1989).  Due to the abovementioned

police coercion, Mr. Tant's consent to search Mr. Maples's room was not freely given

and evidence from this illegal search should have been suppressed.

77.    Mr. Tant also lacked the authority to consent to or grant a search of items

within the exclusive control of Mr. Maples, as hotel employees do not have the authority

to authorize police searches of hotel rooms.  See Stoner v. California, 376 U.S. 483, 487-

88 (1964) (the Court found the argument that the hotel clerk consented to the search of

the hotel room "unpersuasive"); Buchannon v. State, 554 So. 2d 477 (Ala. Crim. App.

1989), overruled on other grounds by, Pardue v. State, 571 So. 2d 333 (Ala. 1990).

78.    The T-shirt seized during this illegal search contained an inflammatory

and irrelevant slogan and was subsequently introduced at trial. (R. at 2533.)  This T-shirt

was the "poisoned fruit" of an illegal search, and was not admissible.  Wong Sun v.

United States, 371 U.S. 471 (1963).  Had Counsel objected to the improper admission of

Mr. Maples's T-shirt on the above mentioned grounds there is the reasonable probability

that the outcome of the proceeding would have been different.  See Strickland, 466 U.S.

at 694.  Had Counsel objected the appellate court would not have reviewed this issue

under the stringent "plain error" standard.  See Maples, 758 So. 2d at 24.

79.     Counsel failed to move to suppress Mr. Maples's videotaped statement on

the grounds that Mr. Maples's statement was coerced and involuntarily obtained after

inadequate Miranda warnings and not the result of a knowing and voluntary waiver of his

state and federal constitutional rights.  (See Paragraphs 196 to 198.)  If the videotaped

statement had not been introduced, there would have been insufficient evidence to

support the capital counts.

80.     These numerous and repeated failures of Counsel, individually and

cumulatively, denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth and

Fourteenth Amendments to the United States Constitution

### ii.     Discovery Motions.

81.     During a discovery hearing, Counsel failed to argue adequately for the

release of records from the Alabama Board of Pardons and Parole of twenty potential

witnesses, including Ms. Phillips, Ms. Davis, and Mr. Smith.  At the hearing, Counsel

(remarkably) failed to explain the relevance and materiality of these files, instead

admitting that "we are wandering in a blind alley as far as what is in these files."  (C. at

429-429a.)  What counsel should have explained is that these documents could have been

used to impeach the credibility of the witnesses, reveal criminal connections between witnesses and could have revealed exculpatory evidence, especially in light of Counsel's claim during closing argument that "what we have here . . . is that someone else was involved [in the shootings]." (R. at 2936.) Indeed, in the subsequent order denying Counsel's request, the Court noted Counsel's failure to explain the relevance and materiality of the files as "illustrative of a 'general fishing expedition.'" (C. at 429-429a). Such an apparent lack of knowledge of the law is ineffective assistance of counsel and cannot be accorded deference as a reasonable trial strategy. See Finch v. Vaughn, 67 F.3d 909, 916 (11th Cir. 1995) (holding that counsel has a constitutional duty to "know or learn about the relevant law and evaluate its application to his or her client."); Horton v. Zant, 941 F.2d 1449 (11th Cir. 1991).

82.     In view of the failures and errors of Counsel detailed in Paragraphs 76 to 81 above, Mr. Maples was deprived of his right to be tried by an impartial jury, in violation of his rights protected under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### iii.     Jury Motions.

83.     Prior to trial, Counsel moved to request that the prospective jurors be individually questioned. (C. R. at 268.) The court denied this motion (R. at 133), and venire members were questioned in group settings. Counsel were ineffective for not requesting again individual voir dire in each instance when sensitive, volatile issues including, without limitation, pretrial publicity, prior knowledge of the facts and comments on the venire members' opinions about the death penalty, required

-39-

sequestrated <u>voir</u> <u>dire</u> to prevent contamination of the entire panel and to preserve the impartiality of the jury. This was particularly critical here, where the case was subject to extensive pretrial publicity and attention. <u>See</u> <u>Jordan</u> v. <u>Lippman</u>, 763 F.2d 1265 (11th Cir. 1985); <u>see also</u> <u>Wood</u> v. <u>Woodham</u>, 561 So. 2d 224 (Ala. 1989).

84.     In this case, group <u>voir</u> <u>dire</u> tainted the jury with irrelevant and prejudicial facts about the case, thereby contaminating the entire jury venire. For example, during <u>voir</u> <u>dire</u> of the third panel, sworn venire member Thomas Tefteller gave details of pre-trial publicity he had heard about prior to being called for jury service. (R. at 966-67.) Also, during <u>voir</u> <u>dire</u> of the fourth panel, sworn venire member Shirley Sharpley stated openly and on several occasions that she did not know if she could believe some of the witnesses she already knew: "I think it would be hard for me to believe - - I don't know if I could distinguish whether they were telling the truth or not because I know their families and stuff." (R. at 1188.) In response to questions from Counsel, she repeated that "from [her] job, it would be hard for [her] to actually distinguish between whether they were telling the truth or not." (R. at 1235.) She even stated openly that she would give more weight to the testimony of police officers than to those of "the ones [the witnesses] that [she] [knew] through working." (R. at 1265.)

85.     Counsel should have immediately objected to each of the above-mentioned comments, requested that the entire third and fourth panels be struck and reiterated their request that a sequestrated <u>voir</u> <u>dire</u> be granted to guarantee anonymity and truthfulness of venire members' statements. However, Counsel failed to do so. But

-40-

for Counsel's failure to object to said comments and failure to request sequestration, the result of Mr. Maples's trial would have been different.

86.     In addition to the foregoing, Counsel requested that a jury questionnaire be sent to prospective jurors in advance of the jury selection.  (C. R. at 198.)  The court denied this motion, in part because Counsel conceded at the motion hearing that they could obtain the same information through voir dire examination without resorting to a jury questionnaire. (R. at 188.)  This admission was unnecessary, unsubstantiated and prejudicial to Mr. Maples's right to a fair jury selection.  Furthermore, in each of the situations mentioned above in Paragraph 85, Counsel should have objected and reiterated a request for jury questionnaires to prevent any outside influence on the answers given by the venire members.  But for Counsel's failure to object and failure to reiterate a request for jury questionnaires, the result of Mr. Maples's trial would have been different.

87.     Overall, the group voir dire, combined with the absence of jury questionnaires, served to improperly influence other jurors in their answers, beliefs and biases.  For instance, several venire members, like Katrina Selby (R. at 651), Susan Norwood (R. at 866-67), and Jimmy Quattlebaum (R. at 866-67), openly stated that they believed in the deterrent social effect of the death penalty.  Upon information obtained through interviews with jurors, certain jurors may have been reluctant to admit any bias, especially with respect to their beliefs about the death penalty.  And indeed, it is established that jurors "may be reluctant to admit any bias in front of [their] peers." Williams v. Griswald, 743 F.2d 1533, 1540 n.14 (11th Cir. 1984).  In Mr. Maples's case, group questioning and the denial of jury questionnaires were highly prejudicial because

venire members failed to truthfully answer all questions asked of them, thus denying Mr. Maples's right to have to an independent-minded jury.  But for Counsel's failures, the result of Mr. Maples's trial would have been different.

88.    Counsel were also ineffective for failing to challenge for cause various members of the venire who were familiar with law enforcement officers on the case, State witnesses, prospective jurors, counsel or facts of the case.  For example, juror Mr. Selby revealed that she knew Mr. Battles, the investigator who questioned Mr. Maples during his videotaped confession, and Roger Smallwood, a police officer on the case (R. at 476, 585);  juror Quattlebaum mentioned that he was acquainted with Mr. Smallwood through his work (R. at 806); juror Leroy Beard mentioned that he knew investigator Greg Bartlett (R. at 1024-25), and police officer Joe Mann (R. at 1036); juror Sharron Harper revealed she knew police officer Jep Tallent (R. at 1262); and juror Sharpley mentioned she knew police officer and witness Nadis Carlisle, who testified about the photographs introduced as evidence by the State (R. at 1253-54).  Shirley Sharpley also mentioned knowing people in the community, including Jimmy Chambers and Barbara Nicholas (R. at 1157), and some of the witnesses, such as Mr. Smith (R. 1158-59), through her work or family connections, and would not trust these witnesses, instead giving more weight to the testimony of police officers (R. at 1188, 1235, 1265); juror Peggy Keenum revealed she knew people living in the Mud Tavern area where Mr. Maples lived, including John Martin, who was announced to be a witness, and Dale McGregor, one of the witnesses and neighbor of the Maples (R. at 588-89); and juror Rebecca Sellers revealed that she knew Luke Skinner, a witness in the case (R. at

938-39).  Juror Beard revealed at <u>voir</u> <u>dire</u> that he knew venire member Quattlebaum,

having worked with him for over forty years. (R. at 989.)  Paul Shoemaker revealed that

he knew District Attorney Mr. Burrell through church.  (R. at 476.)  And

Mr. Quattlebaum mentioned that he had discussed the case with a co-worker at the time

of the shootings.  (R. at 729.)  Counsel should have struck for cause these venire

members on the basis of these statements, but failed to do so, thus depriving Mr. Maples

of his right to a fair and independent jury.

89.     These numerous and repeated failures of Counsel, individually and

cumulatively, denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth and

Fourteenth Amendments to the United States Constitution.  But for these failures there is

a reasonable probability that Mr. Maples would not have been convicted of capital

murder.

**G.     Counsel Failed to Adequately Question and Investigate Venire Members' Backgrounds.**

90.     Counsel were ineffective for failing to fully investigate facts revealed by

venire members at <u>voir</u> <u>dire</u> and question them on a number of critical issues, thus failing

to identify those of the venire members who should have been struck.  Indeed, many

jurors either knew witnesses, law enforcement officers involved in the case, State

witnesses, prospective jurors, counsel or had in one way or another heard of the case

prior to the trial.  (See Paragraph 88.)  Counsel should have inquired further into the

nature and extent of each of these connections or acquaintances and should have been

more systematic in their questioning.  For instance, while juror Mr. Beard revealed he

-43-

knew juror Quattlebaum, the latter did not disclose that he knew the former.  Such

inconsistency reveals Counsel's failure to systematically interrogate the jurors.

Appropriate and thorough investigation would also have led Quattlebaum to reveal he

was well acquainted with other venire members, including Betty Stephenson.

91.     Similarly, many venire members mentioned they had heard of the case

prior to the trial.  Jurors Leroy Beard (R. at 964, 1069-70), Franklin Harvey (R. at 965,

1069-70), Quattlebaum, (R. at 729), Selby (R. at 519, 593), and alternate juror

Ms. Sharpley (R. at 1187), all heard or read about the case prior to the trial.  Counsel

should have thoroughly questioned each of these venire members in order to determine

the exact extent of their knowledge of the facts.

92.     Had Counsel properly investigated the nature and potential impact of such

prior knowledge or bias on each of these prospective jurors' ability to remain

independent and impartial at trial, Counsel would have been able to challenge for cause

some of these venire members and would have thus guaranteed that Mr. Maples be tried

by a fair and independent jury.

**H.     Counsel Requested Verdict Forms that Were Inconsistent with the
         Strategy of the Defense.**

93.     Counsel were ineffective during the guilt phase for requesting verdict

forms that were inconsistent with the strategy of the defense.  Each of the two capital

counts on the verdict forms contained two lesser included counts that the jury could

consider in the alternative to the capital counts.  During closing argument, Counsel

suggested that the jury acquit Mr. Maples of some of these lesser included offenses.

-44-

With respect to Count One, murder of two or more persons pursuant to one course of conduct, a capital count which contained two lesser included counts of intentional murder, Counsel told the jury that "[w]e are asserting that there is at least sufficient evidence as to one murder that he's guilty of and possibly two." (R. at 2939.) With respect to count two, the murder of Mr. Terry during a robbery ("Count Two" and, together with Count One, the "Capital Counts"), a capital count which contained lesser included counts of intentional murder and first degree theft, Counsel told the jury that Mr. Maples did not rob Mr. Terry; instead the taking of the car "was a mere afterthought." (R. at 2925-26.)

94.     However, immediately after closing arguments, Counsel asked the judge to submit only guilty verdict forms to the jury for the lesser included offenses. (R. at 2943-44.) As explained *infra*, these improper verdict forms precluded the jury from doing exactly what Counsel had just urged them to do in their closing argument: find Mr. Maples guilty of one of the lesser included offenses within a Capital Count but not guilty of the other lesser included offense. Accordingly, the mechanism that Counsel purported to create through the verdict forms for jurors to give effect to their submissions was deficient and prejudicial to Mr. Maples's defense. See Penry v. Johnson, 121 S. Ct 1910 (2001); Freeman v. Class, 95 F.3d 639, 642-43 (8th Cir. 1996). But for Counsel's errors, the result of Mr. Maples's trial would have been different.

## I.   Counsel Failed to Adequately Investigate the State's Capital Murder Charge.

95.     Counsel are under an obligation to thoroughly investigate any criminal case. This obligation becomes a heightened legal, moral and constitutional duty in the context of a capital proceeding where a man's life is at stake. See Gregg v. Georgia, 428 U.S. 153 (1976). "At the very heart of effective representation is the independent duty to investigate and prepare [the client's case]." Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir. 1982). Indeed, in order to effectively prepare for a capital trial, counsel must investigate every possible avenue, challenge all assertions by the State and subject the State's case to rigorous examination and testing. See Strickland v. Washington, 466 U.S. 668 (1984); Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986) (finding ineffective assistance of counsel where defense failed to interview all potential alibi witnesses); Wade v. Armontrout, 798 F.2d 304, 306 (8th Cir. 1986) (finding ineffective assistance of counsel where the defense does "not investigate the prosecution's case, [and does] not investigate . . . defense witnesses."); Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985) ("A substantial body of . . . case law insists . . . that effective counsel conduct a reasonable amount of pretrial investigation.") But for Counsel's failure to adequately investigate the State's capital murder charge, the result of Mr. Maples's trial would have been different.

96.     Here, Counsel failed to make a complete, independent investigation of the case, and were thus reliant on the State's version of events. Counsel met with Mr. Maples on only a few occasions prior to trial. Upon information obtained from

-46-

Mr. Maples, these few brief meetings were inadequate to obtain information from

Mr. Maples about relevant witnesses and related information about the circumstances

surrounding the shooting or to adequately inform Mr. Maples as to the status and

progress of the case, in violation of the Alabama Rules of Professional Conduct.  Ala.

R. Prof'l Conduct 1.4(b) ("A lawyer shall keep a client reasonably informed about the

status of a matter and shall promptly comply with reasonable requests for information.")

And despite the fact that Mr. Maples's parents possessed information that would have

been useful to his defense, including information about Mr. Maples's drug associates and

activities, as well as mitigating circumstances important to preparing for the possibility of

a sentencing phase of the trial, Counsel briefly met with them on only two occasions and

did not ask about said relevant information.  Counsel also failed to meet with

Mr. Maples's extended family prior to trial.  Such failures either to interview adequately

or to interview at all Mr. Maples and his family members, and the failure to reasonably

inform Mr. Maples as to the status of the case, constitutes ineffective assistance of

counsel.  But for such failures by Counsel, the outcome of Mr. Maples's trial would have

been different.

   97.  Counsel failed to investigate reports by the Maples family of strangers

hiding outside their home on the night of the discovery of Barry Robinson's body.

Counsel also failed to investigate a series of threatening phone calls and break-ins of the

Maples residence that began after Mr. Terry's body was found and that continued even

after Mr. Maples's arrest.  These failures to investigate are especially ineffective in light

of Counsel's claim during closing argument that "what we have here . . . is that someone

else was involved [in the shootings]." (R. at 2936.) At a minimum, Counsel failed to investigate these matters and to present these facts at trial to challenge the State's investigation of the case, especially in light of Counsel's claim during closing argument that "what we have here . . . is that someone else was involved [in the shootings]." (R. at 2936.) But for Counsel's errors, the result of Mr. Maples's trial would have been different.

98.     Prior to trial, Mr. Maples's parents showed Counsel that there were other bullet shells and casings in front of the Maples's home in the same place where shells that were introduced at trial were found. These bullet shells and casings were present on the day of the shootings but not removed by the police. However, Counsel failed to introduce this evidence at trial to challenge the accuracy of the State's investigation. This evidence could at least have established the police did not properly investigate the crime scene.

99.     Counsel made only a cursory attempt to meet several important witnesses, including but not limited to, Mr. Meinen and Mr. Foley, although Counsel knew about possible drug-related connections between them and Mr. Maples through various interviews with other people. Mr. Meinen was the roommate of Barry Robinson, one of the victims, and was with him on the night of the murders. Upon information and belief, Mr. Meinen left town immediately after the murders. Mr. Foley was allegedly a drug associate of Mr. Dobbs and Mr. Maples. Counsel did not try to find these witnesses, aside from preparing a standard subpoena for Mr. Meinen and Mr. Foley, determine their connection to the shootings or discover whether they could provide exculpatory

-48-

information.  Thus, Counsel's failure to investigate these individuals was ineffective assistance.  See Miller v. Singletary, 958 F. Supp. 572 (M.D. Fla. 1997) (holding that counsel who failed to make further efforts to locate key witness beyond a single attempt to serve process was ineffective assistance).  But for Counsel's failure to investigate these witnesses, the outcome of Mr. Maples's trial would have been different.

100.    As detailed in Paragraphs 87 to 91 above, Counsel were constitutionally required to conduct an independent and thorough investigation of Mr. Maples's alleged involvement in the victims' deaths, and their failure to do so rendered their assistance ineffective.  See Code v. Montgomery, 799 F.2d 1481 (11th Cir. 1986) (holding that it is well settled law that failure to investigate adequately in preparation for trial constitutes ineffective assistance of counsel).

**J.     Counsel Failed To Prevent Or Even Object To Egregious Instances Of Prosecutorial Misconduct.**

101.    Counsel failed to adequately protect Mr. Maples's constitutional rights when they failed to object to the State's improper and prejudicial misconduct, including, but not limited to, improper reliance on statutory aggravating factors, highly inflammatory and prejudicial closing arguments, improper introduction of gruesome pictures and improper redirect examination of a witness.  The cloak of the State's authority that envelopes the prosecutor may induce jurors to trust the prosecutor's opinion over that of defense counsel, or even their own, and as such, has a particularly prejudicial effect in a capital trial.  See Berger v. United States, 295 U.S. 78 (1935); Walker v. Davis, 840 F.2d 834, 838 (11th Cir. 1988).

i.    **Counsel Failed to Adequately Object to the State's Improper Reliance on a Statutory Aggravating Factor During Closing Arguments.**

102.    Counsel failed to adequately object when, during the State's closing arguments, the prosecutor improperly raised a statutory aggravating factor without giving notice to Mr. Maples that such aggravating circumstance would be applied to his offense. In a capital case in Alabama, the aggravating circumstances that the State intends to use must be alleged in the indictment in order to give the accused notice. See Windsor v. State, 683 So. 2d 1027, 1037 (Al. Crim. App. 1985) (citing Beck v. State, 396 So. 2d 645, 663 (Ala. 1980)). During closing arguments, the State, without presenting any evidence on this issue, argued that Mr. Maples shot Mr. Robinson in the cheek before "lean[ing] inside the car to put in the last shot execution style in the back of his head," (emphasis added). (R. at 2901.) Alabama statute provides that aggravating circumstances include situations where "the capital offense was especially heinous, atrocious or cruel compared to other capital offenses." Ala. Code § 13A-5-49(8) (1994). Thus, the prosecutor's unsupported description of the murders "execution style" fits this aggravating factor but since the State did not charge this aggravator in the indictment, its closing argument could only serve to inflame and prejudice the jury against Mr. Maples. Nevertheless, Counsel inexplicably failed to object to this obvious instance of prosecutorial misconduct, to the greater prejudice of Mr. Maples.

### ii. Counsel Were Ineffective for Failing to Object to Numerous Improper Statements or Acts of the State.

103.    Counsel failed to object to the numerous improper statements or acts of the State during the guilt stage of Mr. Maples's trial, including, but not limited to, statements about what the truth was in this case, statements about the message the jury ought to send to the society through a verdict of guilty, repeated reading of the indictment by the State, statements of personal beliefs and convictions by the prosecutor and comments on Mr. Maples's decision not to testify.

104.    Counsel failed to object to the prosecutor telling the jury that "[t]he truth is in this case that Corey Maples [sic] is a murderer; a capital murderer." (R. at 2907.) The prosecutor also told the jury that it was his belief that Mr. Maples's case was a "death penalty case." (R. at 2950.) Such statements by the prosecutor are impermissible and prejudicial. "It is never proper for the prosecutor to state his belief in the guilt or innocence of the accused." Davis v. State, 494 So. 2d 851, 857 (Ala. Crim. App. 1986) (holding that arguments of the district attorney which include his own personal views "cross the line" of permissible argument) (citing Adams v. State, 198 So. 2d 255 (Ala. 1967); Ex parte Rieber, 663 So. 2d 999, 1014 (Ala. 1995); see also Francis v. Spraggins, 720 F.2d 1190, 1194 (11th Cir. 1983) ("[E]ven a prosecutor may not properly express such a personal opinion as to the as to the defendant's guilt.") As well, the prosecutor exerts "enormous influence" on the jury, and accordingly must never assume the role of a witness or vouch for the strength of the State's case. Gilchrist v. State, 534 So. 2d 1120 (Ala. Crim. App. 1988); Ex parte Gilchrist, 466 So. 2d 991 (Ala. 1985). Indeed, the

"mere possibility" of influence is sufficient to deprive the defendant of his right to trial by an impartial jury. Chancellor v. State, 282 So. 2d 242 (Ala. 1973).

105.    Counsel also failed to object to the prosecution's statement that the jury should, through its verdict, send a message to the community. Indeed, the prosecutor urged the jury to "return a verdict of guilty and send that message back," (R. at 2907), thus inferring that the jury should take into account its impact on society in its reaching of a verdict of guilt. Such argument was highly improper, in that it was irrelevant to the guilt or innocence of Mr. Maples and introduced inadmissible issues extrinsic to the crime. See Tucker v. Zant, 724 F.2d 882, 890 (11th Cir. 1984).

106.    Counsel further failed to object to the repeated reading of the indictment to the jury by the prosecutor. (R. at 2970.) On two separate occasions the jury was informed that the district attorney signed the indictment. This reading of the indictment in this fashion was improper and prejudicial to Mr. Maples. Twice reading the indictment to the jury, once at the beginning and once at the end of the trial, informed the jury that another group had already considered the evidence against Mr. Maples's and had found him guilty of the charges. It also implied that the prosecutor had special knowledge of the case that other individuals, including the defense, lacked. Combining these factors may have given the jury the perception that others had found Mr. Maples guilty of the charges; that the prosecutor concurred with the findings on the indictment and that the sole purpose of the trial was to verify the indictment. Alabama law prohibits the district attorney from telling the jury that he or she believes that the defendant is guilty. See Crosslin v. State, 446 So. 2d 675, 680 (Ala. Crim. App. 1983). This

-52-

proscription is imposed because the district attorney is a publicly elected official imbued

with the public trust, "and whose interest, therefore, in a criminal prosecution is not that it

shall win a case, but that justice shall be done. "As such, he is in a very definite sense the

servant of law." Berger v. United States, 295 U.S. 78, 88 (1935). There was no

legitimate purpose to twice reading the indictment to the jury; such behavior only served

to prejudice the jury against Mr. Maples.

107.    Counsel failed to object to numerous instances when the prosecutor

impermissibly stated its own views and convictions on the case, thus improperly

influencing the jury. For example, the prosecutor stated: "I submit to you . . . we've

proven the case . . . and if we haven't, I don't know if we ever would in any case," thus

resorting to his own conviction about the issue at stake and using his own prior

experience to support Mr. Maples's guilt. (R. at 2963.) The prosecutor also argued he

had "no doubt" about the purpose of Mr. Maples when he checked the pulse of the

victim, implying that this act demonstrated intent. (R. at 2903.) It is long-established

that improper suggestions, insinuations, especially assertions of personal knowledge,

notably by the prosecution, are not permissible. See Berger, 295 U.S. at 88. By doing so,

the prosecutor could only contribute to diminish the jury's sense of responsibility. See

Caldwell v. Mississippi, 472 U.S. 320 (1985).

108.    Counsel failed to object to the prosecution's improper comments, during

his guilt-phase closing arguments, on Mr. Maples's decision not to testify. The

prosecutor, referring to Mr. Maples's videotaped statement, informed the jury that

"[t]here was an eyewitness and he told you what happened on tape." (R. at 2960.) This

was a reference to Mr. Maples's silence: Mr. Maples, according to the State, was the only person present when Mr. Terry and Mr. Robinson were killed, and the only eyewitness to what occurred. Invoking Mr. Maples as the sole eyewitness to the crime and contrasting his videotaped statements with his courtroom silence was a clear allusion to his decision not to testify. See Ex parte Wilson, 571 So. 2d 1251 (Ala. 1990). Under Alabama law, "where there is a possibility that a prosecutor's comment could be understood by the jury as a reference to failure of the defendant to testify, Article I, §6 [of the Alabama Constitution] is violated." Beecher v. State, 320 So. 2d 727, 734 (Ala. 1975); Witherspoon v. State, 596 So. 2d 617, 619 (Ala. Crim. App. 1991). The Fifth Amendment protection against self incrimination is so strong that any "prosecutor who even inadvertently makes reference to the fact that the defendant can testify is inviting reversible error." Tomlin v. State, 591 So. 2d 550, 556 (Ala. Crim. App. 1991) (citing Blackmon v. State, 462 So. 2d 1057, 1060 (Ala. Crim. App. 1985)).

109.    Individually and cumulatively, Counsel's failure to object to the numerous improper statements or impermissible acts of the State indicate that Counsel "[were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. Here, "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. at 694. These failures of Counsel denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

110.    In addition, because of Counsel's failure to object to each of the above mentioned improper statements or acts of the State, the appellate court reviewed these

instances of prosecutorial misconduct under the stringent "plain error" standard and ruled that none of them amounted to the level of plain error, thus rejecting the claim. See Maples v. State, 758 So. 2d 1, 60, 72 (Ala. Crim. App. 1999). But for Counsel's failure to object to these improper statements, the outcome of Mr. Maples's trial and/or appeal would have been different.

### iii. Counsel Were Ineffective for Failing to Argue Against the Admissibility of Highly Prejudicial Gruesome Photographs.

111. Counsel failed to adequately object to the State's extensive reliance on the presentation of numerous duplicative and unnecessary gruesome photographs, including close-ups of the victims. At trial, color slides of the autopsy of the victims were used and photographs were enlarged and projected onto a screen, including photographs of the victims after their heads had been opened by the pathologist. (R. at 2271, 2278-99.) The introduction of these totally non-probative cumulative and gory photographs could only inflame and unfairly prejudice the jury against Mr. Maples. Indeed, these photographs "serve[d] little or no purpose except to arouse the passion, prejudice or sympathy of the jury" and therefore would have been excluded from evidence under Alabama law had counsel objected. Ott v. Smith, 413 So. 2d 1129, 1132 (Ala. 1982).

112. Counsel Were Ineffective for Failing to Object to the State's Improper Examination of Witnesses. On numerous occasions, Counsel failed to object to the State's improper examination of witnesses. The State asked witnesses leading questions; examined witness without proper qualification; hearsay; and elicited irrelevant testimony from witnesses. Counsel's failure to object to these improper questions caused the

appellate court to review them under the stringent "plain error" standard.  See Maples v. State, 758 So. 2d 1, 59 (Ala. Crim. App. 1999).

113.    Counsel failed to object when the prosecutor asked witnesses leading questions.  For instance, in his direct examination of Jack Kalin, the State's toxicologist, the prosecutor questioned Mr. Kalin as follows:  "You say there was no alcohol in the blood, is that right, but *there was some in the liquid in the eye*." (R. at 2338.)  Prosecutor then stated: "So that would tell you that a person had been drinking sometime ago and sort of worked it out of his blood, but it was still in his eye?" (R. at 2338.)  Arguably in appreciation that the prosecutor had effectively answered his own question, Mr. Kalin replied "Oh, you [the prosecutor] should be on the stand." (R. at 2338.)  Leading questions by prosecutors are improper as they place the prosecutor in the position of both an advocate and a witness.  See Stewart v. United States, 366 U.S. 1, 8 (1961); Tomlin v. State, 591 So. 2d 550, 558 (Ala. Crim. App. 1991).  Yet, Counsel failed to object to further leading questioning by the prosecutor.  (R. at 1848, 2114, 2347, 2361, 2369.)  As Counsel was "the only person the jury could have expected" to object to the leading questioning, Counsel's failure to object was ineffective.  Ex parte Williams, 461 So. 2d 852, 854 (Ala. 1984).  But for Counsel's failure to object to the prosecutors' improper questioning, the outcome of Mr. Maples's trial would have been different.

114.    Counsel were ineffective for failing to object to the State's solicitation of hearsay evidence throughout the guilt stage of Mr. Maples's trial.  The State's examination of witnesses was filled with hearsay that Counsel failed to object to.  (R. at 423, 1624, 1639, 1953, 2077-81, 2477, 2491, 2492.)  It was improper of the prosecutor to

elicit hearsay testimony. See Boyd v. State, 246 S.E. 2d 396, 398 (Ga. Ct. App. 1978). Counsel's conduct in failing to object to prejudicial hearsay testimony "fall[s] outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 688. But for Counsel's failure to object to hearsay evidence, the outcome of Mr. Maples's trial would have been different.

115.    Counsel failed to object when the prosecutor elicited testimony from witnesses without proper foundation. The prosecutor elicited testimony from Ms. Davis, who was not home when Mr. Maples came to her house after the killings, that blood spots on a kitchen towel were "Twinky's blood." (R. at 1876). Ms. Davis was never qualified as an expert witness, and was thus incompetent to testify whether it was truly Mr. Terry's blood that was on the towel. Ms. Davis also repeatedly characterized materials found in her house as "evidence," (R. at 1874, 1875, 1876, 1879), and she referred to her house as a "crime scene," (R. at 1880). Thus, the State elicited what was, at best, improper speculative evidence from an unqualified witness. Counsel were ineffective for failing to object to this improper testimony, and but for Counsel's ineffectiveness, the result of Mr. Maples trial would have been different.

116.    Counsel were ineffective for failing to object when the prosecutor asked questions without any proper basis. For example, during the redirect examination of Mr. Dobbs, the State asked the witness whether he would "be surprised if [he] learned as part of [Mr. Maples's] case that [Mr. Maples] was using other people to try to get to the use of their possession; trying to take advantage of people to be able to use their

possessions." (R. at 2086.) Although the prosecution lacked any proper basis for asking this question on redirect, Counsel failed to object.

117.    Counsel were ineffective for failing to object to the State's elicitation of extraneous, irrelevant testimony from witnesses.  During direct examination of Beverly Shawnbaum, who was at a bar with Mr. Maples and Mr. Terry prior to the murders, prosecutor asked, "[w]as Twinky, Stacy Terry, pretty proud of that car?" (R. at 1817.) For evidence to be relevant, it must have probative value "upon a matter at issue in the case." Phelps v. State, 439 So. 2d 727, 736 (Ala. Crim. App. 1983).  Whether or not Mr. Terry loved his car was irrelevant to the charges against Mr. Maples.  Counsel also failed to object to further irrelevant testimonies, including descriptions of Mr. Maples's tattoos, (R. at 2443), a description of Mr. Maples clothing as a "No Fear" T-shirt, (R. at 2532), and the introduction of a note from Mr. Maples thanking Mr. Tant for hosting him at the motel, (R. at 2546).  These irrelevant testimonies could only have served to arouse the passion and prejudice of the jury.  See Ott v. Smith, 413 So. 2d 1129, 132 (Ala. 1982).  Given the numerous examples of Counsel's inefficient performance, there "is a probability sufficient to undermine confidence in the outcome" of Mr. Maples trial. Strickland, 466 U.S. at 694.

118.    Individually and cumulatively, Counsel's failure to object to the numerous instances when the prosecutor improperly examined witnesses indicate that Counsel "[were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.  Here, "there is a reasonable probability that, but for Counsel's unprofessional error, the result of the proceeding would have been

different." Id. at 694. These failures of Counsel denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution

## II.    COUNSEL WERE INEFFECTIVE DURING THE PENALTY PHASE OF CORY MAPLES'S TRIAL, AND THIS INEFFECTIVENESS RESULTED IN THE UNJUST AND UNCONSTITUTIONAL IMPOSITION OF THE DEATH PENALTY.

119.    It is absolutely essential that Counsel in a capital case fully investigate the life history of the client in preparation for the penalty phase of his capital proceeding. It is constitutionally required that the court and jury consider "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978). This includes any evidence about the defendant's history and life that may be considered by the jury or judge as a mitigating factor. See Woodson v. North Carolina, 428 U.S. 280 (1976). Thus, Mr. Maples was entitled to have all aspects of his background, family life, medical history, school records and any other life experience that may be considered mitigating evidence presented to the jury and judge at the penalty phase of his capital trial. Counsel for Mr. Maples fell far short of this constitutionally required mandate.

120.    Neither of Mr. Maples's trial counsel had ever conducted a second stage in a capital trial. In order to have prepared properly for the penalty phase of Mr. Maples's capital trial, Counsel should have obtained complete and accurate information relevant to Mr. Maples's medical history, educational history, employment and training history,

family and social history, correctional history and any religious or cultural influences.
See American Bar Association, <u>Guidelines for the Appointment and Performance of
Counsel in Death Penalty Cases</u>, 11.4.1 (A)(2)(c)(adopted by the ABA house delegates
Feb. 7, 1989).

      121.    Counsel for Mr. Maples failed to meet these minimum requirements of an
adequate investigation. "At the heart of effective representation is the independent duty
to investigate and prepare [the client's case.]" <u>Goodwin</u> v. <u>Balkcom</u>, 684 F.2d 794, 805
(11th Cir. 1982). Counsel was under a clear duty to thoroughly investigate Mr. Maples's
background in preparation for the capital penalty phase, and the failure to do so precluded
the finding that absence of a penalty phase defense was strategic. <u>See</u> <u>Baxter</u> v. <u>Thomas</u>,
45 F.3d 1501 (11th Cir. 1995) (holding that counsel was ineffective for failing to request
state hospital records, school records, social service records and failing to contact
defendant's sister, neighbor or social worker); <u>Thomas</u> v. <u>Kemp</u>, 796 F.2d 1322
(11th Cir. 1986) (finding ineffective assistance of counsel where insufficient effort was
made to investigate possible sources of mitigation evidence); <u>Douglas</u> v. <u>Wainright</u>,
714 F.2d 1532, 1556 (11th Cir. 1983) ("[P]ermissible trial strategy can never include the
failure to conduct a reasonably substantial investigation.") (internal quotes omitted)
(quoting <u>Strickland</u>, 693 F.2d at 1252); <u>Blanco</u> v. <u>Singletary</u>, 943 F.2d 1477 (11th Cir.
1991) (finding that counsel did not attempt to contact family members or prepare for the
penalty phase until the trial was underway, and failed to put on any mental health
mitigating evidence); <u>Jackson</u> v. <u>Herring</u>, 42 F.2d 1350 (11th Cir. 1995) (finding a

presumption of prejudice where counsel made no effort to prepare for the penalty phase of a capital trial).

122.    In this instance, effective preparation and investigation by Counsel would have revealed a host of mitigating factors which should have been presented at the penalty phase of Mr. Maples's trial.  Among other things, Counsel would have learned of Mr. Maples's tortured childhood and history of mental illness among certain family members.  Counsel would have learned of Mr. Maples's history of depression and suicide attempts and his efforts to overcome drug abuse.  Counsel also would have learned about Mr. Maples's assistance to the police in their enforcement of the drug laws.  Also, Counsel would have learned of the care and regard Mr. Maples's family, friends and others had for Mr. Maples.  If the jury had learned of these issues, there is a reasonable probability that they would not have sentenced Mr. Maples to death.  The failure to properly investigate and prepare for the penalty phase constitutes ineffectiveness, as it cannot be characterized as strategic.

**A.    Counsel Failed to Adequately Investigate Mr. Maples's Family History and Character References.**

123.    Counsel failed at trial, primarily due to their lack of preparation, to elicit highly relevant mitigating evidence regarding Mr. Maples's early tortured upbringing at the hands of his birth mother as well as evidence indicating that Mr. Maples's birth mother and maternal grandmother probably suffered from mental illness.  Counsel also failed to elicit evidence of Mr. Maples's overall good moral character despite the challenges facing him.  Although Mr. Maples's parents spoke with counsel at length and

provided counsel with the names of several parties, including neighbors, teachers, friends, and relatives, who had witnessed the abuse Mr. Maples suffered at the hands of his birth mother and could have testified to the effects of that abuse, counsel did not interview any of these parties or call them at the mitigation stage of the trial. With the exception of Dr. Allen Shealy, the only witnesses called by Counsel -- Mr. Maples's father, step-mother, and uncle -- were those who happened to be present as observers at the trial proceedings, and Counsel did not prepare any of these witnesses at all. As a result, the testimony of these witnesses did little to convey the severely abusive circumstances of Mr. Maples's early youth. And Counsel offered nothing to convey the history of mental illness afflicting Mr. Maples's birth mother and grandmother. Had Counsel adequately interviewed the few witnesses they presented, they could have elicited important mitigating information regarding Mr. Maples's childhood and young adult life that was never adequately presented to the jury or the judge. Instead, Counsel only briefly interviewed Mr. Maples's father and step-mother and never interviewed his uncle. None of these witnesses were even aware that they might testify during the penalty phase until after the trial began, when Counsel went into the gallery during a break to inform them. This ineffective witness preparation resulted in testimony that failed to address, or only superficially addressed, many mitigating factors that, if effectively presented, would have resulted in a different verdict.

124. At trial, the testimony of Mr. Maples's natural father, Philip Maples, did not adequately convey the trauma and abuse Mr. Maples suffered at the hands of his birth mother, nor did it address at all the mental illness afflicting Mr. Maples's birth mother

and maternal grandmother.  If Philip Maples had been examined more effectively, the judge and jury would have learned that Mr. Maples's birth mother, Denise Imgrund, was mentally unstable and subject to frequent violent outbursts.  Denise would throw tantrums, often without warning or the slightest provocation, during which she would pull out her hair, scratch herself until she bled and pound the ground with her feet.  She also frequently and violently attacked Mr. Maples and Philip Maples on a number of occasions.  Once, Denise attacked Phillip Maples, without provocation, with a metal hairbrush while he was driving, causing his eye to bleed profusely.  On another occasion, while entertaining friends at home, Denise suddenly swung a butcher knife at Philip Maples in an attempt to slit his throat.  Philip Maples raised his arm to protect himself and suffered a gash from his shoulder to his elbow.  In yet another violent outburst, Denise poured a skillet full of hot grease across Philip Maples's chest while he was sleeping.  This incident finally compelled Philip Maples to leave the marriage.  Had Counsel elicited this testimony, there is a reasonable probability that the jury would not have convicted Mr. Maples of death.

125.    Philip Maples would have testified that Denise's behavior also extended to her few remaining friends, one of whom she choked, again without provocation, while drinking and socializing with a group of friends.  Counsel made no attempt to contact any former friends or associates of Denise to provide testimony substantiating her violent and unpredictable behavior.  If Counsel had elicited this testimony, there is a reasonable probability that the jury would not have sentenced Mr. Maples to death.

126.     Philip Maples would have further testified that Mr. Maples was also a frequent object of Denise's outbursts. In fact, from the time Mr. Maples was born, he became a focal point of Denise's attacks. One hot summer day when Mr. Maples was an infant, Denise locked him in a car outside a shopping mall with the car windows rolled up. A passerby saw Mr. Maples screaming and sweating and ran to find Denise, who claimed she lost track of time. On another occasion, Denise tied Mr. Maples's wrists to a chair and beat him with a broom handle. Philip Maples would also have testified that, shortly after he and Denise divorced, Mr. Maples's grandfather, Denise's father, told him to take Mr. Maples from Denise because he was afraid she would kill him. Philip Maples also could have testified that Denise attempted to sell Mr. Maples when Mr. Maples was three years old. Mr. Maples's grandfather also told Philip Maples that, when Mr. Maples was very young, he had seen Denise violently strangle him, leaving marks on Mr. Maples's throat. On another occasion, Philip Maples discovered that Mr. Maples had fingernail scratches on his face and neck from Denise's picking him up by the neck in a fit of anger. After Philip Maples took Mr. Maples in, Denise abandoned Mr. Maples, making little or no effort to contact him for the next thirteen years. At no time did Counsel attempt to contact Denise, although her testimony would have revealed extensive mitigating circumstances, including additional evidence of her severe physical and mental abuse of Mr. Maples, as well as evidence of a history of mental illness in her family. If this evidence had been presented, there is a reasonable probability that the jury would not have sentenced Mr. Maples to death.

-64-

127.    Had Philip Maples's testimony been more thorough, the judge and jury could have learned more about Denise's second abandonment of Mr. Maples.  She re-established contact with Mr. Maples when he was seventeen, and Mr. Maples eventually moved in with her.  However, Denise often acted erratically and neglected and verbally abused Mr. Maples while he stayed at her home.  Her traumatizing behavior continued until one evening, just two or three months after moving in with her, Mr. Maples arrived at her house to find that she had moved out and left all of his clothes on the steps.  Following this second abandonment, Mr. Maples was depressed and hurt.  During the brief time Mr. Maples lived with Denise, he dropped out of school.  Counsel made no attempt to determine how such an abandonment affected Mr. Maples's mental and emotional health.  Counsel's failure to present such testimony as described above prejudiced Mr. Maples and indicate that Counsel "[were] not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.  Here, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

128.    Philip Maples also would have testified that Denise's mother shared the same mental illness as Denise.  On several occasions, Philip Maples saw Denise's mother hit her husband and throw things across the room or tear things up.  Philip Maples also saw Denise behave the same way towards her mother.  These indications of a family history of mental illness/disease were never raised or pursued by Counsel.  Counsel also made no attempt to present the testimony of Mr. Maples's grandfather, who was present at many of Denise's and Denise's mother's similar violent outbursts.  If Counsel had

-65-

presented such evidence of a history of mental illness in the Maples's family, the outcome of the sentencing stage would have been different.

129.    In addition, Philip Maples could have testified to the jury and judge about Mr. Maples's good moral character despite his abusive childhood.  He would have testified that Mr. Maples played team sports like Little League baseball and Pop Warner football as a child and that he continued playing football and baseball in high school. Mr. Maples also rode quarter horses and won ribbons for riding competitions from the time he was eight years old until he was sixteen.  In addition, Mr. Maples went to church regularly until he was twelve or thirteen years of age.  Counsel made no attempt to contact any sports coaches, teammates or anyone at the Maples's church who could testify as to Mr. Maples's involvement at church, including his baptism and participation in church events.  The cumulative effect of Counsel's failures to present such evidence resulted in prejudicing Mr. Maples.  If this evidence had been presented, there is a reasonable probability that the jury would not have sentenced Mr. Maples to death.

130.    If Counsel had thoroughly interviewed Mr. Maples's step-mother, Elyse Maples, they would have learned much more about how Denise abused Mr. Maples as a child and the impact that her abuse had on Mr. Maples as he grew older.  After Philip Maples divorced Denise and began dating Ms. Maples, Denise continued to spend time with Mr. Maples occasionally.  One weekend, after Mr. Maples returned from a visit, Ms. Maples found scratches on his neck.  Mr. Maples told her that Denise had scratched him but that it was his fault.  After Denise's initial abandonment, Mr. Maples cried for his mother until his early teenage years.  Often, Ms. Maples would sit with Mr. Maples at

night because he had nightmares and would ask about his mother.  Ms. Maples also

would have provided more details about the circumstances leading up to Denise's second

abandonment of Mr. Maples.  The first weekend after Mr. Maples moved in with Denise,

Denise called Ms. Maples and told her she didn't want Mr. Maples there over the

weekend.  This happened frequently thereafter.  Denise would sometimes even throw

Mr. Maples out during the week.  During the brief time Mr. Maples lived with Denise, he

dropped out of school.

131.    In addition, Ms. Maples would have testified to Mr. Maples's history of

witnessing traumatic events, as well as to Mr. Maples's past head traumas and related

injuries requiring emergency medical treatment, including a fall off a 20-foot cliff.

Ms. Maples also would have testified that despite dropping out of school, Mr. Maples

still strove to live a successful and productive life.  He passed the high school

equivalency exam (the "G.E.D.") with high enough marks to qualify for admission to the

University of Alabama in Huntsville.  Subsequently, Mr. Maples tried to enlist in the

Army, but his drug abuse problems prevented him from successfully enlisting.  The

cumulative effect of Counsel's failures to present such evidence prejudiced Mr. Maples.

If this evidence had been presented, there is a reasonable probability that the jury would

not have sentenced Mr. Maples to death.

132.    Counsel's examination of Mr. Maples's paternal uncle, James Kenneth

Maples, was brief, cursory and ineffective, consisting primarily of the comment that

"Cory was okay."  (R. at 3190.)  Revealing an inexcusable lack of preparation, Counsel

discovered during James Maples's testimony that he did not even know Mr. Maples's

-67-

birth mother ("I met her maybe once or twice"). (R. at 3190.) If Counsel had

interviewed other relatives, such as Mr. Maples's paternal uncles Lee Daniel, Leon

Ferrell or Fred, Dale and Clint Ray, or his paternal aunts Margaret Daniel or Dianne

Ferrell, his cousin Shannon Ferrell or his brother Daniel Maples, they would have learned

about Mr. Maples's good moral character and friendliness. Family members would have

told Counsel that Mr. Maples spent many of his summers playing with his cousins and

regularly attended church. Counsel also would have learned more about Denise's erratic

nature. The Daniels could have told Counsel that until Mr. Maples reached the age of

thirteen, he would spend his summers over at the Daniels' home, where he would play

with his cousins and regularly attend church. When Mr. Maples was two, the Daniels

even considered adopting him in order to rescue him from his abusive birth mother. The

Daniels would have testified to Denise being "flaky" and "off the wall."

133.    The Ferrells have also known Mr. Maples all his life. Shannon Ferrell

would have testified that Mr. Maples could be a lot of fun and that he never looked down

on anyone. The Ferrells would have testified that Denise did not like taking care of

Mr. Maples, often leaving him with neighbors. In addition, Diane Ferrell once saw

Denise slap Mr. Maples because he was crying. The Rays would have testified that until

Mr. Maples was seventeen, he spent nearly every weekend at their home. When

Mr. Maples was younger, he would ask the Rays why his birth mother wasn't around, and

they would try to make him understand that it wasn't his fault that she left him. The Rays

also were witnesses to the effects of Denise's mental illness. Once, the Rays and Denise

were chatting in the kitchen when Denise suddenly became angry for no apparent reason,

-68-

and stormed out of the room. Dale Ray also noticed that Denise was both physically and emotionally distant from Mr. Maples. In addition, at least one family member saw Denise physically abuse Mr. Maples. Other family members saw Denise act erratically towards themselves and their friends. The cumulative effect of Counsel's failures to present such evidence prejudiced Mr. Maples. If this evidence had been presented, there is a reasonable probability that the jury would not have sentenced Mr. Maples to death.

134.    Daniel Maples would have testified that Mr. Maples was a fun, loving brother who respected his father and did what he was told to do. Daniel would also have testified that Mr. Maples looked after him and did not allow Daniel to hang around Mr. Maples's drug associates. Mr. Maples also discouraged Daniel from using drugs. Daniel also would have testified about Mr. Maples told him that, when Mr. Maples was two, Denise left him alone in a pool until Philip Maples returned from work and found him there. The cumulative effect of Counsel's failure to present such evidence prejudiced Mr. Maples. If this evidence had been presented, there is a reasonable probability that the jury would not have sentenced Mr. Maples to death.

135.    If Counsel had interviewed teachers, counselors and coaches at Mr. Maples's high school, they would have learned about Mr. Maples's strong character and morals. Gaye Lenhart, Mr. Maples's guidance counselor in high school, would have testified that, while Mr. Maples struggled academically in high school, during his senior year he dedicated himself to graduating on time and, after graduation, seeking employment in a technical trade. Mr. Maples took an extremely challenging course load during the first semester of his senior year, but unfortunately did not successfully

-69-

complete it. Subsequently, Mr. Maples dropped out at the beginning of winter term,

joining 20% of his classmates who also dropped out prior to graduation. But Mr. Maples

was hopeful he could find employment in a technical trade, having attended Brewer

Vocational School during his junior year for training in electrical engineering.

Mr. Maples had relatively few absences and very few disciplinary problems during his

time in high school. Ms. Lenhart also found Mr. Maples exceptionally easy to talk to and

very polite. If Counsel had contacted Glen Lang, Mr. Maples's high school football and

golf coach, they would have learned that although Mr. Maples was not a very good golf

player, he tried hard and always did what he was told. Mr. Lang never had a problem

with Mr. Maples and remembered that he was very friendly and polite. Not only did

Counsel fail to contact Ms. Lenhart, Mr. Lang or any other school administrator or

teacher, they never even requested Mr. Maples's academic records. The cumulative

effect of Counsel's failures to present such evidence prejudiced Mr. Maples. If this

evidence had been presented, there is a reasonable probability that the jury would not

have sentenced Mr. Maples to death.

136.    If Counsel had interviewed Mr. Maples's friends, including Chris Basden,

Kenneth Hall, Mike and Kathy Hall or Sam Frost, they would have learned how friendly

and well-mannered Mr. Maples was as a youth and how, although he became more

difficult as he battled a drug addiction, just prior to the shootings Mr. Maples seemed to

have conquered his drug problems. Mr. Basden, Mr. Maples's childhood friend, would

have testified that although Mr. Maples portrayed a "tough guy" image, he was a "softy"

on the inside. Mr. Basden stayed friends with Mr. Maples throughout Mr. Maples's drug

use and often talked to him about getting off drugs.  Mr. Basden also met Mr. Maples's

birth mother prior to her second abandonment of Mr. Maples and saw how happy he was

to finally be reunited with her.  He also watched Mr. Maples's fall into drugs after she

abandoned him the second time.  Evidence will show at the hearing that Counsel knew

about Mr. Basden through other interviews and that Counsel considered Mr. Basden

would be an appropriate witness for the second stage.  Nevertheless, Counsel failed to

contact Mr. Basden or any of Mr. Maples's friends to provide testimony as detailed

above.  If this evidence had been presented, there is a reasonable probability that the jury

would not have sentenced Mr. Maples to death.

     137.    Mr. Basden could have also revealed positive aspects of Mr. Maples's

character even during his time of drug dependence.  On one occasion he and Mr. Maples

had a disagreement that led to a fight, but less than a week later Mr. Maples came to

Mr. Basden's home and apologized for the fight and the two resumed their friendship.

Mr. Basden also would have testified that, shortly before the shootings, he saw

Mr. Maples and noticed that he seemed "normal" again, healthier and seemingly over his

drug addiction.  Evidence will show at the hearing that Counsel knew about Mr. Basden's

friendship with Mr. Maples through other interviews, that Counsel considered

Mr. Basden would be an appropriate witness for the second stage, and that nonetheless

Counsel failed to ask Mr. Basden to testify during the sentencing phase.  Kenneth Hall,

another friend since childhood, would have told Counsel that Mr. Maples looked much

healthier just prior to the shootings.  If Counsel had interviewed Mike and Kathy Hall,

Mr. Hall's parents, they would have found out that Mr. Maples was very respectful to the

Case 5:03-cv-02399-KOB   Document 1   Filed 08/29/03   Page 72 of 226

Halls and even called Ms. Hall "Mom."  Counsel would have learned that Mr. Maples

used to spend time with his friends on the Halls' property, playing baseball, basketball,

go-carts and other outdoor activities.  Mike and Kathy Hall both remembered that

Mr. Maples had some problems with drugs, but they also noticed that, just prior to the

shootings, Mr. Maples looked like he had "gotten his act together."  Mr. Frost,

Mr. Maples's high school friend and a county jailer when Mr. Maples was arrested after

the shootings, would have told Counsel that Mr. Maples was generally happy in high

school and never got into fights, and would have indicated to Counsel that Mr. Frost's

brother, Mr. Maples's classmate, Mr. Frost's grandmother and other relatives could have

testified to the same effect.  Mr. Frost could have testified that, knowing Mr. Maples's

character, he did not believe Mr. Maples could have committed the crimes.  Mr. Frost

also could have testified to Mr. Maples's demeanor after his incarceration.  Mr. Frost still

considers Mr. Maples a friend and would have been more than willing to testify on his

behalf if Counsel had asked him to do so.  Counsel's failure to present such testimony as

described in Paragraphs 115 to 128 above prejudiced Mr. Maples and indicate that

Counsel "[were] not functioning as the "counsel" guaranteed the defendant by the Sixth

Amendment."  Strickland, 466 U.S. at 687.  Here, "there is a reasonable probability that,

but for counsel's unprofessional error, the result of the proceeding would have been

different."  Id. at 694.

**B.  Counsel Failed to Adequately Investigate Mr. Maples's Drug Addiction, Depression and Attempted Recovery.**

138.   Counsel did not interview any witnesses about Mr. Maples's depression and suicidal behavior, including suicide attempts, prior to the shootings, when Mr. Maples was abusing crack cocaine, crystal methamphetamine, LSD and other drugs. Ms. Maples would have testified that Mr. Maples wrote poetry about depression and loneliness. He even left a suicide note stating that he had always been a screw-up. After discovering the note, Ms. Maples found Mr. Maples hiding in the woods. Mr. Maples's ex-girlfriend, Ms. Davis, could have testified that around 1994 she was with Mr. Maples when he took over thirty sleeping pills and drank a bottle of alcohol just before crashing Ms. Maples's car. Mr. Dobbs, a friend of Mr. Maples, also could have testified that he witnessed Mr. Maples play Russian roulette on at least one occasion, sticking a gun into his mouth and pulling the trigger. Mr. Dobbs could also testify that he saw Mr. Maples attempt suicide by slashing his wrists with a butcher knife. Both Ms. Maples and Philip Maples could have more thoroughly testified to Mr. Maples's dedication to conquering his drug problems. In 1995, Mr. Maples voluntarily applied and was admitted to Quest Recovery Center, a non-residential drug treatment program in Morgan Country. Counsel never contacted any of the counselors at Quest who interacted with Mr. Maples. If such evidence had been presented, the jury would have learned about Mr. Maples's mental state at the time of the shootings. Counsel's failure to present such evidence prejudiced Mr. Maples and, if the evidence had been presented, there is a reasonable probability that the jury would have returned a different sentence.

139.    Prior to the shootings, Mr. Maples went to Tennessee to work with a friend, Allen Birdsong, and escape the drug culture he was caught up in.  Mr. Birdsong would have gladly testified to the hard working character Mr. Maples demonstrated while he and Mr. Maples were together in Tennessee.  Mr. Maples's hardworking character also would have been a mitigating factor.  See Horton v. Zant, 941 F.2d 1449, 1463 (11th Cir. 1991) (finding that the fact that defendant was a "hard worker" was mitigating evidence), cert. denied, 503 U.S. 952 (1992).  However, Counsel failed to elicit such testimony from Mr. Birdsong during the penalty phase of Mr. Maples's trial and failed to even contact any other employer who could have testified to Mr. Maples's hard working moral character.  But for Counsel's error, there is a reasonable probability that the jury would have returned a different verdict.

140.    Counsel had in their possession Mr. Maples's application to Quest that chronicled his past drug use, his suicide attempts and his desire to improve his life, but Counsel inexplicably failed to submit the application into evidence, nor did they contact any of the counselors at Quest who interacted with Mr. Maples, including Kathy Goodwin, the director of Quest who initially interviewed Mr. Maples for admission into the program.  If Counsel had contacted Ms.  Goodwin or any other counselors at Quest and presented their testimony, there is a reasonable probability that the jury would have returned a different sentence.  Such a failure to contact and present these witnesses prejudiced Mr. Maples and, as there is a reasonable probability that the jury would have returned a different sentence if they had heard such evidence, constitutes ineffective assistance of counsel.

-74-

141.    Because Counsel failed to adequately interview and present the testimony of those few witnesses that they did call at the penalty phase and did not call many potential witnesses who were sources of important information about Mr. Maples's life, as was detailed in Paragraphs 115 to 131A, Counsel were unable to present an adequate picture of Mr. Maples's life to the jury. Thus, Counsel were unable to articulate to the jury any coherent reason why the jurors should refrain from sentencing Mr. Maples to death. If Counsel had called these witnesses and properly presented this evidence, there is a reasonable probability that the jury would not have sentenced Mr. Maples to death.

**C.      Counsel Failed to Obtain the Services of a Mitigation Expert.**

142.    [Paragraph intentionally omitted.]

143.    Counsel were also ineffective for failing to obtain the services of a mitigation expert who would have testified to the lingering psychological impact that growing up in an abusive family environment had on Mr. Maples. A mitigation expert would also have developed a social, medical and family history of Mr. Maples, identified and interviewed character witnesses, collected records, investigated possible psychological or neurological issues and helped to support motions for other experts or to develop exhibits to assist in presenting the issues to the court and jury, as well as searched for crucial mitigation witnesses such as Denise. Counsel failed to obtain these services even though a year before trial the Alabama Prison Project offered to help with providing a mitigation specialist. As mentioned earlier, neither of Mr. Maples's trial counsel had ever conducted a second stage in a capital trial. If Counsel could not investigate the issue themselves or did not have time to investigate Mr. Maples's

-75-

mitigating factors, they needed to obtain the services of a mitigation expert, as was their

right under Ake and its progeny.  Under these circumstances, where Counsel clearly

lacked the experience and ability to adequately investigate potential mitigating factors, it

was ineffective for Counsel to fail to procure the services of a mitigation expert who

specialized in obtaining the materials necessary to properly represent a client in the

second stage of a capital murder trial.  Counsel knew for well over a year before the trial

that such help was available, yet did nothing to request funds for or to hire such expert

help.  Not only did Counsel fail to hire an expert to help them or to do these things for

them, Counsel utterly failed to do these things themselves.  As a result, Mr. Maples

proceeded to the second stage of his trial with Counsel who were woefully unprepared to

present his case for mitigation to the court and the jury.  This decision was not strategic;

it was ineffective.  See Goodwin v. Balkcom, 684 F.2d 794 (11th Cir. 1982); Baxter v.

Thomas, 45 F.3d 1501 (11th Cir. 1995).  But for Counsel's failure to hire a mitigation

expert, the outcome of Mr. Maples's sentencing phase would have been different.

**D.      Counsel Failed to Present Evidence of Mr. Maples's Assisting the Police in
         Their Enforcement of Drug Law Violations.**

144.      Counsel were ineffective at the penalty phase of the trial by setting forth

mitigating factors but then failing to present any substantial evidence in support of those

factors.  In particular, Counsel failed to present any substantial evidence in support of the

non-statutory mitigating factor that Mr. Maples cooperated and assisted the police in their

enforcement of drug law violations.  Counsel failed to present any substantial evidence

even though, at least five months prior to trial, Counsel received documentation that

clearly and incontrovertibly documented Mr. Maples's assistance to the Decatur Police in

the arrest of a prominent drug dealer.  A jury can consider "*as a mitigating factor, any*

*aspect of a defendant's character or record* . . . that the defendant proffers as a basis for a

sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978) (italics included).

Given the importance of having the jury consider ANY aspect of a defendant's character

or record during the penalty phase of a death penalty case, it is inexcusable for Counsel to

possess incontrovertible evidence in support of a mitigating factor and fail to present it.

Such an unreasonable decision falls below the minimum standard of effective assistance

and cannot be considered reasonable trial strategy.  Jackson v. Herring, 42 F.3d 1350

(11th Cir. 1995).  If such evidence had been presented to the jury, there is a reasonable

probability that the jury would not have sentenced Mr. Maples to death.

145.    The only evidence Counsel presented in support of this mitigating factor

was the testimony of Mr. Maples's step-mother, who told the court that "Mr. Maples had

worked with the Decatur city police to catch somebody with some drugs."  (R. at 3184.)

No other evidence or testimony was offered.

146.    During closing, the prosecution scoffed at Counsel's attempt to present

this evidence in support of this mitigating factor:

> [Mr. Maples] didn't clean up drugs in the City of Decatur.
> If he had made a mark over there or done anything major,
> they would have police officers and narcotics officers over
> here to tell you about it.  Defense lawyers love to call
> police over here to testify.  I mean, if they can get a police
> officer to come to their side, they are just tickled pink, and
> they would have been over here by the hand full.  (R. at
> 3292-93.)

Likewise, in the sentencing order, the court judge determined that Mr. Maples had not

cooperated and assisted law enforcement authorities in their enforcement of drug laws.

"The court notes no police officer testified at trial, nor was there any corroboration of the

step-mother's testimony." (Sentencing Order at 10.)

147.    If Counsel had investigated and presented available evidence in their

possession, the court and the jury would have read a case report filed with the Decatur

Police Department, written by Lieutenant Larry Greene, detailing Mr. Maples's

assistance in the October 1994 arrest of Mark Carroll, who died before the trial, for

unlawful distribution of controlled substances.  The case report includes transcripts of

conversations recorded by Mr. Maples over the course of several weeks, between himself

and Mr. Carroll, including a conversation in which Mr. Maples purchased the drugs from

Mr. Carroll that resulted in his immediate arrest.  The case report lists many other officers

involved in this transaction who could have testified on Mr. Maples's behalf, including,

but not limited to, Detective Greene, Sergeant Larry Glover, Lieutenant Frank DeButy,

Investigator Chris Matthews, Officer Denise Stogner, Officer Proncey Robertson and

Investigator Faron White, along with other investigators of the Decatur Police Narcotics

Unit and the Morgan County Drug Unit.  If this evidence had been presented to the jury,

there is a reasonable probability that the jury would not have sentenced Mr. Maples to

death.

148.    As detailed in Paragraphs 143 to 146, Counsel's failure to advocate for

their client at sentencing, when the sentence was death, was equivalent to providing no

representation at all at a critical stage of his trial.  See United States v. Cronic, 466 U.S.

-78-

648, 659 (1984). Had the jury and court heard this evidence, they would have been less inclined to impose death, and much more inclined to impose a sentence of life without the possibility of parole.

**E.      Counsel Failed to Procure a Competent Psychological Evaluation.**

149.    Counsel hired a psychologist to evaluate Mr. Maples's mental state both at the time of the crime and at the time of his arrest. The psychologist's evaluation, as detailed in Paragraphs 141 to 146 below, was woefully inadequate, which should have been apparent to Counsel. In addition, Counsel's presentation of the psychological evaluation to the jury was confusing and misleading and, upon information obtained through interviews with jurors, may have resulted in the jury's discounting much, if not all, of the psychologist's testimony.

150.    Counsel failed to inform the psychologist of important facts and circumstances in Mr. Maples's background (See Paragraphs 123 to 139A, 155 to 158), thereby assuring that even if the psychologist had done his job properly, he could not have done it well.

151.    The psychologist retained by Counsel spent very little time with Mr. Maples. And he spent no time at all with any family members or people who knew Mr. Maples other than a former schoolmate who -- fortuitously for the psychologist -- happened to be working in the jail the afternoon the psychologist went to the jail to interview Mr. Maples. According to the psychologist's testimony, he spent only four hours at the jail, conducted only two tests -- one a simple intelligence test -- and based his

-79-

entire evaluation only on Mr. Maples's direct reporting to him.  And even that reporting was skimpy and incomplete because of the psychologist's superficial interaction and failure to probe, as was apparent during his confusing and inadequate testimony.

152.    As a result, the psychologist failed to discover, for example, that Mr. Maples had suicidal thoughts and had, in the past, attempted suicide.  He failed to discover that Mr. Maples was being given an anti-depressant while he was in the Morgan County jail and failed to learn the reasons why Mr. Maples had been prescribed such medication.  He failed to discover more instances of his birth mother's physical abuse and abandonment when he was a small child, instances Mr. Maples had suppressed, but which were well known by his father and other family members.  He failed to discover the long-standing pattern of self-destructive and abusive behavior by Mr. Maples's birth mother and maternal grandmother, possibly indicative of genetic mental illness or disease.  He failed to probe Mr. Maples's feelings about his birth mother, either as he remembered her from his childhood, or when he met her again as a teenager.  He also failed to probe Mr. Maples's feelings when she abandoned him a second time as a teenager.  And, of course, he could not have known many other facts about Mr. Maples's background, as outlined in Paragraphs 123 to 139A and 155 to 158, because Counsel never informed him of those facts.

153.    Based on this superficial and inadequate psychological evaluation, which Counsel should have recognized as superficial and inadequate, the psychologist incorrectly concluded and testified that Mr. Maples had passive-aggressive personality disorder.  (R. 3149.)  Equally damaging to Mr. Maples's defense was the defense

psychologist's assertion, on both direct and cross-examination, that there was virtually no difference between his evaluation and the prosecution psychologist's evaluation of anti-social personality disorder. (R. 3158.) He testified to this in spite of the fact that the prosecution psychologist's evaluation was patently incorrect under the diagnostic criteria set forth in the standard psychological manual, the Diagnostic and Statistical Manual IV.

154.    Counsel should have engaged a psychologist who could carefully and thoroughly evaluate Mr. Maples's mental state and who could explain that mental state and its causes to the jury. In addition, Counsel should have thoroughly investigated Mr. Maples's family, social, medical and life history and shared all they learned with the psychologist. But Counsel did neither of these things, and as a result, they obtained a severely limited and compromised psychological evaluation. In addition, their inadequate preparation of the psychologist to testify resulted in his testimony being confusing, difficult to follow, misleading and completely devoid of any explanation of Mr. Maples's flat affect. Upon information learned from interviews with jurors, because of the superficiality of the psychologist's evaluation, and the inadequate presentation of his testimony by Counsel, some of the jurors may have discounted the psychologist's testimony.

155.    It was Counsel's legal obligation to obtain, adequately prepare, and properly question an expert for the mitigation phase of Mr. Maples's trial. They failed completely in this task. Such a failure cannot be strategic. Instead, Counsel's failure was ineffective assistance of counsel and deprived Mr. Maples of his right to a reasonably

substantial penalty phase investigation. See Goodwin v. Balkcom, 684 F.2d 794 (11th Cir. 1982); Baxter v. Thomas, 45 F.3d 1501 (11th Cir. 1995).

**F.      Counsel Failed to Investigate Mr. Maples's Post-Arrest Behavior.**

156.    Counsel also failed to investigate Mr. Maples's good behavior while in jail. If Counsel had investigated this issue, they would have discovered that Mr. Maples had been consistently well-behaved during more than two years of incarceration in the Morgan County jail from his arrest in 1995 to his trial in 1997. Records of Mr. Maples's incarceration would have shown that his behavior was good throughout his time in the county jail. At trial, witnesses from the county jail staff would have testified to the accuracy of the records and to Mr. Maples's good behavior. In particular, Mr. Frost, a jailer during Mr. Maples's incarceration, whom Counsel never attempted to contact although he knew about Mr. Frost and his friendship with Mr. Maples, would have testified as to Mr. Maples's good behavior in jail after his arrest. Such evidence clearly constitutes a mitigating circumstance as a matter of law. See Skipper v. South Carolina, 476 U.S. 1, 4 (1986) (holding that defendant's prior good behavior while incarcerated is a mitigating factor); Lockett v. Ohio, 438 U.S. 586 (1978).

157.    Mr. Maples's good behavior is especially significant because county jails are not intended as places for such long term incarceration and consequently are not usually equipped with facilities and resources for activities and outdoor exercise. Nor do they provide any other way for the prisoners to relieve the tedium of their confinement. That a young, vigorous man could remain a good prisoner under these conditions would have been important for the jury to hear and consider and, but for Counsel's failure to

investigate and present evidence of such behavior to the jury, there is a reasonable probability that Mr. Maples's would have been sentenced to life without the possibility of parole rather than death.

**G.      Counsel Failed to Investigate Post-Arrest Medical Issues.**

158.    Had Counsel investigated, they would have learned that Mr. Maples had such extreme nightmares while in the county jail that he was prescribed the anti-depressant Elavil for six months.  This information, too, would have been important for the jury to know, especially in light of the fact that Counsel did not explain to the jury Mr. Maples's flat affect, which, upon information obtained from interviews with jurors, may have negatively impacted some jurors.  In addition, this information would have been important because the State disputed Mr. Maples's claim of remorse over the shootings.  The State argued, in response to Mr. Maples's claim that he was haunted by images of the murders, that it "sounds good but there has not been any evidence to support that; not one bit."  (R. at 3287-88.)  Counsel's failure to investigate these post-arrest medical issues prejudiced Mr. Maples; if this information had been available to the jurors, there is a reasonable probability that a different verdict would have resulted.

**H.      Counsel Failed to Investigate Mr. Maples's Physical Trauma.**

159.    Counsel were ineffective for failing to discover that Mr. Maples had suffered a number of traumatic head injuries, including, a fall off a twenty foot cliff onto rocks when he was a teenager and having been hit with a baseball bat during an attack on him the year before the shootings.  Although documentary and other evidence in the form of hospital records and oral testimony from Ms. Maples and from friends who were with

-83-

Mr. Maples during these incidents was available, Counsel did not use this information in any way. If the jurors had been aware of these traumas, or if the psychologist had adequately explained the impact of these traumas upon Mr. Maples's behavior and mental state, there is a reasonable probability that Mr. Maples would not have been sentenced to death.

I.      **Counsel Failed to Prevent or Otherwise Object to Egregious Instances of Prosecutorial Misconduct.**

160.    Counsel failed to adequately protect Mr. Maples's constitutional rights when they failed to prevent or otherwise object to the State's highly improper and prejudicial misconduct, including, but not limited to, highly inflammatory and prejudicial closing arguments consisting of telling the jury what they should think, improper invocation of the social value of Mr. Maples's death, improper invocation of the victim's family's views on the case, numerous misstatements of the law, repeated accusations by the State that Mr. Maples lied and improper comments on Mr. Maples's courtroom demeanor and decision not to testify. By virtue of the authority vested in their office, opinions and statements by prosecutors are highly relied upon by jurors; improper suggestions and insinuations are thus particularly prejudicial to the accused. See Berger v. United States, 295 U.S. 78 (1935); Walker v. Davis, 840 F.2d 834, 838 (11th Cir. 1998).

161.    Counsel failed to object to the State telling the jury what they should think. The prosecutor improperly told the jury what he believed the jurors thought about certain aspects of the case. With respect to a 911 phone call allegedly made by

Mr. Maples shortly after the shootings, the prosecutor argued that "there is no question that he made that phone call, I don't think, and I don't think this is in *your* minds either," (emphasis added).  (R. at 3292.)  Furthermore, the prosecutor told the jury that they had to believe that the death penalty is a deterrent: "you *have* to believe that [the death penalty] deters other criminal conduct, at least sometimes," (emphasis added).  (R. at 3304.)  If the prosecutor is barred from telling the jury what he or she believes, then he is also barred from telling the jury what *the jurors* should believe.  However, Counsel failed to object to the prosecutor's highly improper and prejudicial closing arguments.  See United States v. Young, 470 U.S. 1, 8 n.6 (1985) (finding that trial counsel's failure to object to prosecutor's expressions of personal opinion has a tremendous influence on the jury and constitutes ineffectiveness).

162.    Counsel failed to object to the improper and prejudicial argument of the prosecution that Mr. Maples's death was more useful than a life in prison, because of the alleged deterrent effect of the death penalty.  The prosecutor stated that, in the context of death sentences, "deaths [are not] completely in vain," that Mr. Maples's "life was much more valuable to lose than for him to keep," and that "his death might save one person somewhere sometime."  (R. at 3304.)  Such allegations of the social deterrent effect of the death penalty, which was not supported by any evidence, minimized the awesome sentencing decision the jurors are required to make.  See Caldwell v. Mississippi, 472 U.S. 320, 341 (1985); Taylor v. State, 666 So. 2d 36, 50 (Ala. Crim. App. 1994) (finding that comments that lessen the jury's sense of responsibility "tend[ed] to encourage irresponsibility on the part of the jury in reaching its sentencing

-85-

recommendation"). Nevertheless, Counsel failed to object to these improper and prejudicial closing arguments of the prosecution.

163. Counsel failed to object to the State's improper comment on Mr. Maples's failure to offer specific witnesses. The prosecutor rebutted the invocation by the defense of Mr. Maples's cooperation with the police as a mitigating circumstance by arguing that the defense failed to provide the testimony of police and drug enforcement officers corroborating the facts: "if [Mr. Maples] had made a mark over there [the Decatur police], [the defense] would have police officers and narcotics officers over here to tell you about it." (R. 3292-93.) Under Alabama law, the defense has the burden to "interject" mitigating facts, but then "once it is interjected the State [has] the burden of disproving the factual existence of that circumstance by a preponderance of the evidence." Ala. Code §13A-5-45(g) (1994); see also Dill v. State, 600 So. 2d 343 (Ala. Crim. App. 1991); Williams v. State, 710 So. 2d 1276 (Ala. Crim. App. 1996). Here, Counsel properly "interjected" the mitigating fact by providing Ms. Maples's testimony. (R. at 3184.) The State then decided not to cross-examine this witness. (R. at 3187.) However, the burden of proof shifted to the State upon interjection by the defense of the mitigating circumstance. It was thus improper for the State to make the above mentioned comment when it openly refused to challenge the evidence provided by the defense to support the mitigating factor.

164. Counsel also failed to object to the improper invocation by the prosecutor of the victim's family's views on the appropriate punishment. (R. at 3303.) It is established that the views of the victim's family about the desired sentence cannot be

-86-

introduced in a capital trial.  See, e.g., Payne v. Tennessee, 501 U.S. 808 (1991); see also Babour v. State, 673 So. 2d 461 (Ala. Crim App. 1994), aff'd, 673 So. 2d 473 (Ala. 1995) (holding that opinions of the victim's family on the appropriate punishment may not be considered in capital sentencing proceedings); Ex parte Williams, 640 So. 2d 1015 (Ala. 1995) (holding that the court may not consider victim's family's views on the defendant, the crime or the appropriate punishment.)  As such, prosecution's comments were prejudicial.

165.    Counsel failed to object to the State's numerous misstatements of the law when addressing the jury.  It is a cornerstone of the United States judicial process that the State "must not misstate the law when addressing the jury."  Davis v. State, 494 So. 2d 851, 855 (Ala. Crim. App. 1986).  Here, the State violated this principle but Counsel failed to object.

166.    For example, the State erroneously told the jury that they could consider the "particularly violent nature of these murders" as going to the aggravating circumstances of the homicides.  (R. at 3298.)  This comment was highly improper because the heinous, atrocious or cruel aggravating circumstance, which is a statutory aggravating factor (Ala. Code § 13A-5-49(8) (1994)), was not charged in the indictment. In a capital case in Alabama, the aggravating circumstances that the State intends to use must be alleged in the indictment in order to give the accused notice.  See Windsor v. State, 683 So. 2d 1027, 1038 (Ala. Crim. App. 1994) (citing Beck v. State, 396 So. 2d 645, 663 (Ala. 1980)).  Therefore, Mr. Maples did not have notice, as required under Alabama law, that such aggravating factor was applicable to his case.

167.    The State also misstated the law on mitigating factors in its closing arguments.  Counsel asserted as a mitigating factor that Mr. Maples suffered "from a diagnosed mental personality disorder" that caused him to "snap and murder."  (R. at 3086-87.)  Under Alabama law, committing a capital offense "while the defendant [is] under the influence of extreme mental or emotional disturbance" constitutes a mitigating factor.  Ala. Code § 13A-5-51(2) (1994).  The prosecutor rebutted this allegation of a mitigating circumstance by alleging that in this case there was "no plea of *not guilty* by reason of insanity" and that Mr. Maples "[said] he didn't do it [the murders]," (emphasis added) (R. at 3290.)  Such assertion was neither proper nor correct under the law. Indeed, it is established that the court and jury should consider "as a mitigating factor, any aspect of a defendant's character or record and *any of the circumstances* of the offense that the defendant proffers as a basis for a sentence less than death."  Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis added).  On the other hand, the affirmative defense of insanity is strictly defined under Alabama law as the inability of the defendant, as a result of severe mental disease or defect, to appreciate the nature and quality or wrongfulness of his acts.  See Ala. Code § 13A-3-1(a) (1994).  Therefore, the standards required to establish an affirmative defense of insanity are not applicable to the allegation by Counsel of the mitigating factor of extreme mental or emotional disturbance.  Such comment of the State was both incorrect and confusing to the jurors' minds.

168.    The prosecutor further stated that Mr. Maples's age was not a mitigating factor and stated that if Mr. Maples had been fourteen at the time of the offense, then his age would be a mitigating factor in this case.  "If he was fourteen, I would be . . . telling

you . . . that this is a mitigating circumstance because that would be." (R. at 3254.)

However, under Alabama law, "the age of the defendant at the time of the crime"

constitutes a mitigating circumstance. Ala. Code § 13A-5-51(7) (1994). It is further

established that the court and jury should consider "as a mitigating factor, any aspect of a

defendant's character or record and any of the circumstances of the offense that the

defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604.

Thus, the age of fourteen is neither a recognized standard, nor relevant to the

establishment of a mitigating factor. Such comment of the State was both incorrect and

confusing to the jurors.

169.    The prosecutor, to rebut the defense's presentation of mitigating factors

other than the lack of prior criminal history, stated that such mitigating circumstance did

exist in this case only because it relied on true facts: "the statutory mitigating factor [the

lack of criminal history] . . . that we admit *because it is the truth*." (R. at 3253.) The

prosecutor thus implied that Counsel would not be truthful in their presentation of other

mitigating factors, and that the jury should not trust them. This comment of the

prosecution was improper and disrespectful of Counsel. It is established that the function

of counsel is almost as important as that of the judge, therefore, counsel is entitled to

courtesy and respect. See Zebouni v. United States, 226 F.2d 826, 827 (5th Cir. 1955).

Thus, to discredit Counsel in front of the jury is improper, and it has been recognized that

subsequent jury instructions aimed at rectifying this error may not ensure that these

disparaging remarks have not already deprived the defendant of a fair trial. See United

States v. McLain, 823 F.2d 1457, 1462 (11th Cir. 1987).  Thus, Counsel should have objected to this improper prosecutorial comment.

170.    The State further misrepresented the law on aggravating and mitigating factors, when the prosecutor argued that *mitigating* circumstances would never outweigh *aggravating* circumstances.  (R. at 3255.)  However, Alabama law states the exact opposite test, that "the trial court shall determine whether the *aggravating* circumstances it finds to exist outweigh the mitigation circumstances it finds to exist." Ala. Code § 13A-5-47(e) (1994) (emphasis added); see, e.g., Ex parte Stewart, 659 So. 2d 122, 125 (Ala. 1993).  Thus, the State argued a standard directly in conflict with the established law of Alabama, unconstitutionally placing the burden on Mr. Maples's to establish that his mitigating factors outweigh the aggravating factors.  Counsel should have objected to this misrepresentation by the State that, upon information and belief, may have confused several jurors.

171.    The prosecutor also improperly told the jury that, "[y]ou all said you were in favor of the death penalty" and that "[i]f you hadn't said that, you wouldn't be on the jury."  (R. at 3306.)  However, the law states that favoring a sentence of death is not a prerequisite for sitting on a jury.  See e.g., Witherspoon v. Illinois, 392 U.S. 510, 519 (1968) (holding that "[a] man who opposes the death penalty . . . can make the discretionary judgment entrusted to him . . . and can thus obey the oath he takes as a juror."); see also Wisenhant v. State, 555 So. 2d 235 (Ala. 1989).  Counsel failed to object to this misrepresentation by the prosecutor.

172.   Counsel failed to object to the State's accusations that Mr. Maples was a liar. (R. at 3288, 3292.)  The State argued that Mr. Maples lied to his psychologist and thus implied that the jury should disregard all the psychologist's testimony.  It is established that "arguments which lack support in the evidence, or seek to play upon the jury's undifferentiated fear or hatred of violence, are impermissible, as they encourage arbitrariness in the imposition of sanctions and preclude the individualized judgment required by the Constitution."  Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985); Houston v. Estelle, 569 F.2d 372 (5th Cir. 1978) (holding that prosecutor's repeated unsupported references to the defendant as a liar and drug dealer was impermissible); see also Crosslin v. State, 489 So. 2d 680, 684 (Ala. Crim. App. 1986) (holding that "[t]he practice of assuming in questions of fact not proven is, not only improper and unfair, but . . . must result in reversal of the case.")  (citations omitted).  Thus, the prosecutor's comments were improper and only served to inflame the passions and the prejudices of the jury.  Nevertheless, Counsel failed to object.

173.   Counsel were ineffective for failing to object to the State's improper comments on Mr. Maples's decision not to testify.  In closing arguments at the penalty phase, the State impermissibly commented on that fact when the prosecutor repeatedly told the jury that Mr. Maples never said a word about being sorry for the murders.  (R. at 3286-88.)  The State further argued, in response to Mr. Maples's claim that he was haunted by images of the murders, that it "sounds good but there has not been any evidence to support that; not one bit."  (R. at 3287-88.)  The prosecutor may not in any way comment on a defendant's failure to testify at trial.  See Griffin v. California,

-91-

380 U.S. 609, 615 (1965) (holding the "Fifth Amendment prohibits comment on the defendant's silence); Ex parte Wilson, 571 So. 2d 1251, 1261 (Ala. 1990) (citing Ala. Code § 12-21-220 (1994) stating that a defendant's failure to be a competent witness for himself "shall not . . . be subject to comment by counsel.")  According to the appellate courts in Alabama, a statement that a particular aspect of the State's case is undisputed or that the defense offered no evidence on a particular issue will be deemed a comment on the defendant's failure to testify when "the only person the jury could have expected to rebut the State's evidence" on the challenged point "was the defendant."  Ex parte Williams, 461 So. 2d 852, 854 (Ala. 1984).  Thus, although the State's arguments on Mr. Maples's silence violated his Fifth Amendment right not to testify, and clear Alabama law, Counsel failed to object to any of these comments.

174.    Similarly, Counsel were ineffective for failing to object to the State's improper comments on Mr. Maples's flat affect and courtroom demeanor.  (R. at 3295.) It is established that the State cannot comment on a defendant's appearance and court demeanor.  See Chamberlain v. State, 247 So. 2d 683, 684 (Ala. Crim. App. 1971).  In addition, the State's comments on the demeanor and appearance of the accused have been ruled as highly improper.  See Hughes v. State, 437 A. 2d 559 (Del. 1981).  Thus, Counsel should have objected to comments as improper and prejudicial to Mr. Maples.

175.    Individually and cumulatively, Counsel's failure to object to the numerous instances of prosecutorial misconduct described above prejudiced Mr. Maples and indicate that Counsel "[were] not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  Here, "there is a reasonable

probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. at 694.  In addition to the repeated instances of Counsel's ineffectiveness prejudicing Mr. Maples at trial, Counsel's failure to object to each of these improper comments or instances of prosecutorial misconduct severely prejudiced Mr. Maples on appeal.  Indeed, had Counsel objected to the State's improper comments at trial, the issues of prosecutorial misconduct would have been reviewed by the appellate court under more deferential standards and would have resulted in a reversal on appeal. See Ex parte Thomas, 766 So. 2d. 975, 979 (Ala. 2000).  These failures of Counsel denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  This Court must now grant the requested relief.

176.    [Paragraph intentionally omitted.]

**J.    Counsel Failed to Recognize or Adequately Object to Trial Error During the Sentencing Phase.**

177.    Counsels' repeated failure to recognize and adequately object to trial error prejudiced Mr. Maples at trial, as well as on appeal where the appellate court repeatedly noted that, "[w]hile [counsel's] failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice." Maples, 758 So. 2d at 16.  Thus, Counsel's failure to object to what might otherwise have been reversible errors caused the appellate court to review them under the far more stringent "plain error" standard. See Maples, 758 So. 2d at 21.

178.    Counsel failed to object to the court impermissibly instructing the jury to find that an aggravating circumstance existed in Mr. Maples's case.  During the penalty phase, the court announced that it was going to instruct the jury that an aggravating circumstance was found to exist and later reiterated its plan.  (R. at 3064.)  Mr. Maples properly objected that such an instruction from the court was an impermissible comment on the evidence, but was overruled.  (R. at 3231-32.)  Despite acknowledging its impropriety, the court instructed the jury that they "ha[d] already found the State ha[d] satisfied its burden of proof beyond a reasonable doubt as to the aggravating circumstances at issue *in this* phase of the trial."  (R. at 3231.)  In capital trials, the jury is called upon to make two sets of fact-finding decisions; first, whether the defendant is guilty of capital murder beyond a reasonable doubt, and second, whether aggravating circumstances exist and, if so, whether they outweigh mitigating circumstances.  The court's instruction clearly invaded the province of the jury, and rendered Mr. Maples's sentence of death unreliable, in that the State was thus relieved of its burden of proof. See Re Winship, 397 U.S. 358 (1970); Sandstrom v. Montana, 442 U.S. 510 (1979). Counsel's failure to object to the court's instruction created the reasonable probability that had they objected the outcome of the proceeding would have been different.  See Strickland, 466 U.S. at 694.

179.    Counsel failed to object to the court improperly sentencing Mr. Maples to death after rejecting evidence of three statutory mitigating circumstances.  Counsel introduced evidence to support the mitigating circumstance 1) that the capital offense was committed while Mr. Maples was under the influence of extreme mental or emotional

-94-

disturbance, (Ala. Code § 13A-5-51(2) (1994)); 2) that the capacity of Mr. Maples to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, (Ala. Code § 13A-5-51(6) (1994)) and; 3) that Mr. Maples's age at the time of the offense constituted a mitigating circumstance, (Ala. Code § 13A-5-71(7) (1994)).  The court rejected each of these mitigating circumstances. (C. at 560-562 [sentencing order at 7-9.])  Consideration of these mitigating circumstances – when applicable – is mandatory. See Ala Code § 13A-5-51 ("Mitigating circumstances shall include . . . .") (emphasis added).  Counsel's failure to object to the court's rejection of these statutory mitigating circumstances created the reasonable probability that had they objected, the outcome of the proceeding would have been different. See Strickland, 466 U.S. at 694.

## III.    OVERALL PERFORMANCE OF COUNSEL.

### A.    Counsel Were Ineffective for Using Contradictory Strategies in the Guilt and the Penalty Phases of the Trial.

180.    Counsel were ineffective for using different and contradictory strategies about Mr. Maples's intoxication during the guilt and penalty phases of Mr. Maples's trial. Presenting affirmative evidence that is internally inconsistent renders Counsel's performance ineffective. See Waters v. Thomas, 46 F.3d 1506, 1530 (11th Cir. 1995) (Tjoflat, J. dissenting) ("Because the guilt phase and penalty trials are integrally related, devising one strategy for the guilt phase and a separate one for the penalty phase is also insufficient.  In order to be effective, a capital defense attorney must develop a consistent theory to be used at the guilt and penalty phases.") (quoting Welsh S. White, Effective

-95-

Assistance of Counsel in Capital Cases: The Evolving Standard of Care, 1993 U. Ill. L. Rev. 323, 356 (1993)); Sobel v. State, 564 So. 2d 1110 (Fla. Dist. Ct. App. 1990) (holding that counsel was ineffective when he called witnesses who gave testimony adverse to the insanity defense he had asserted).  Conflicting evidence also confuses the jurors and causes them to distrust all evidence presented by Counsel, thus undermining Mr. Maples's credibility.  See generally, White, supra.

181.    During the guilt phase of the trial, the State introduced substantial evidence proving that Mr. Maples was intoxicated by the time he went to a pool hall shortly before the shootings.  (See Paragraph 27.)

182.    The State also introduced evidence that Mr. Maples used crack and crystal methamphetamine on the night of the shootings.  (See Paragraph 28.)

183.    In stark contrast, during the guilt phase Counsel attempted to establish through cross-examination that Mr. Maples was neither intoxicated nor under the influence of drugs at the time of the shootings.  Counsel also called several witnesses in a misguided attempt to show that Mr. Maples was not intoxicated prior to the shootings. Inexplicably, while summarizing the cross-examination and direct examination testimony during his closing argument, Counsel inaccurately told the jury that "[t]here is no evidence that he consumed drugs that night."  (R. at 2920.)

184.    However, during the penalty phase, Counsel employed a strategy directly contradictory to his guilt phase strategy.  In Counsel's opening statement at the penalty phase, Counsel expressly contradicted their argument in the guilt phase and substantially undercut their own credibility, as well as Mr. Maples's credibility, by stating that "there

-96-

was at least evidence of at least alcohol usage on this occasion . . . but there was also drug usage." (R. at 3085.)  Counsel further stated that Mr. Maples was so intoxicated and under the influence of drugs at the time of the offense that "but for the alcohol and for the drug usage on this occasion, this would probably not have happened.  That is a mitigating factor." (R. 3085-86.)  Counsel then introduced evidence of Mr. Maples's alcohol and drug usage to support at least two mitigating factors: (1) that the shootings occurred while Mr. Maples was under the influence of extreme mental or emotional disturbance due to his use of drugs and alcohol prior to the shootings (Ala. Code § 13A-5-51(2) (1994)) and (2) that the capacity of Mr. Maples to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired by drug and alcohol use (Ala. Code § 13A-5-51(6) (1994)).

185.    Dr. Allen Shealy, a psychologist, testified that Mr. Maples was drinking steadily for a period of approximately ten hours just prior to the shootings, in addition to smoking at least some marijuana during this time (a marijuana joint and 2/5th of whisky and some beer before 5 p.m., 7-8 additional beers by 7:30 p.m., then funneling (quickly drinking) at least 2 more beers prior to meeting friends at a bar where he drank 7-8 White Russian mixed drinks, (R. at 3109-24).  This pattern of alcohol and marijuana abuse served as a trigger that, along with an internal stimulus due to emotional instability, contributed to a state of extreme mental or emotional disturbance.  (R. at 3168.)  It also impaired Mr. Maples "in terms of his capacity to behave in a normal fashion or to conform his behavior to the requirements of the law." (R. at 3155.)  Thus, Counsel provided evidence at the penalty phase of the trial in order to support two of

-97-

Mr. Maples's mitigating factors that directly contradicted evidence they presented at the guilt phase.

186.    As instructed by the trial judge during the penalty phase, the jury can consider evidence introduced by either party during both the guilt phase and the penalty phase. (R. at 3318-19.) Counsel's conduct in presenting contradictory evidence severely damaged Mr. Maples's case by undermining his credibility and confusing the jurors, thus strengthening the State's case and leaving the jury little alternative but to sentence Mr. Maples to death. "Such conduct . . . brings into question the fundamental fairness of the trial and shows a collapse of the adversarial process." Ex parte Womack, 541 So. 2d 47, 68 (Ala. 1988); Freeman v. Class, 95 F.3d 639, 642-43 (8th Cir. 1996) (holding that counsel was ineffective under Strickland when counsel introduced into evidence documents that directly inculpated the defendant).

187.    This error of contradictory strategies fell far below the standard of reasonable performance and demonstrated such a failure to know or understand the law that it cannot be considered permissible trial strategy.  Counsel even admitted at the beginning of the penalty phase that they lacked knowledge of the law with respect to how to conduct an effective penalty phase defense, telling the court, "I don't know . . . I'm unfamiliar with this process." (R. at 3064.)  However, lack of knowledge of the law cannot be considered a trial strategy.  See Horton v. Zant, 941 F.2d 1449 (11th Cir. 1991).  Here, Counsel's deficient performance prejudiced the jury against Mr. Maples, resulting in a conviction of death that the jury would not otherwise have returned.  See Strickland v. Washington, 466 U.S. 668 (1984).

IV.   **THE PROSECUTOR IMPROPERLY AND UNCONSTITUTIONALLY COMMENTED ON MR. MAPLES' DECISION TO NOT TESTIFY**

188.   During closing arguments of the guilt stage, and then again at the penalty phase, the prosecutor improperly commented on Mr. Maples' decision to not testify. (R. 2960, 3286-3288) The commentary on Mr. Maples' silence was repeated: pointed, and deliberately crafted to impugn and prejudice Mr. Maples for his silence. The prosecutor's arguments clearly drew the jury's attention to the fact that Mr. Maples had not testified, highlighted the fact that Maples had not shown his remorse for a crime to which he plead not guilty, and exhorted the jury to accordingly impose a death sentence. This is constitutionally impermissible. Doyle v. Ohio, 428 U.S. 610 (1976); Griffen v. California, 380 U.S. 609 (1965).

189.   To protect this critical right, it is firmly established that once a defendant chooses to not testify at his trial, that choice cannot be subject to comment by the prosecution. Griffin v. California, 380 U.S. 609 (1965).

190.   In this instance, the prosecution not only "overstepped the mark," but crossed the mark by an easy mile. The state repeatedly argued that Mr. Maples had not shown to the jury that he was remorseful, and made it clear that he should have *testified.* The comments came at the guilt stage of Mr. Maples' trial, and then again, with even greater force, at the penalty phase.

191.   At the guilt stage of Mr. Maples' trial, the prosecutor informed the jury that "[t]here was an eyewitness and he told you what happened on the tape." (R. 2960) This was a clear reference to Mr. Maples' silence: Maples, according to the state, was

the only person present when Mr. Terry and Mr. Robinson were killed. He was the only

eyewitness. Mr. Maples was thus the only person who could testify to what occurred

when Robinson and Terry were killed. Invoking Mr. Maples' as the sole eyewitness to

the crime and contrasting his videotaped statement with his courtroom silence was a clear

allusion to his silence. Ex parte Wilson, 571 So.2d 1251 (Ala. 1990).

     192.    At the penalty phase, the prosecutor returned to his theme of Mr. Maples'

silence as establishing culpability:

> In parts, like the part you just heard [of the videotape],
> absolutely drags for seconds if not minutes, with anybody
> having an opportunity to talk. We've heard from the
> psychologist for about an hour who told you what Corey
> Maples had told him, and we've also heard from Howard
> Battles and from the video tape about what the defendant
> told him, but the one thing we have not heard one time in
> this case; this tape that shows so much remorse, when he
> asked him there, 'do you have anything else you want to
> tell us about this,' he sits there and says 'well, no, I guess
> that's about it.' When did he say I'm sorry one time?
> When did he say I hate it, one time? When did he say I feel
> sorry for the families, one time? Not one iota of remorse;
> and they want to tell you that the tape shows remorse. You
> have seen the tape and you have heard the psychologist.
> When did he tell you how broken up he was and how sorry
> he was? He talked a lot about what a bad childhood he had.
> Did he tell you about what a bad impact these two killing
> had on him since? Not a word. The only thing that could
> even halfway arguably be called remorse is him (sic)
> talking about being haunted by these images. I guess he
> was haunted by these images up there at the Kentucky State
> Fair. I guess he was haunted by these images after he got
> the car fixed. He carried the dead man's car and got a new
> engine put in it on their warranty and was driving around
> and partying and going out like a young man would. He
> was tickled to get his car back. Haunted by these images?
> That sounds good but there hasn't been any evidence to
> support that; not one bit.

(R. 3286-3288) (emphasis supplied). The argument of the prosecutor was a detailed and pointed commentary on Mr. Maples' constitutionally protected decision to not testify. The point of the prosecutor's argument is clear: Mr. Maples did not testify at trial.

193.    This is not simply a question of the state commenting on Mr. Maples' lack of remorse (which, standing alone constitutes an improper argument, *infra*), for the state's commentary came both at the guilt and penalty phases. Nor is it a question of whether the state's arguments were invited by the defense "opening the door" to such commentary: *not once* during the closing argument of the penalty phase did the defense argue that Mr. Maples was remorseful. Rather, the state's argument was a direct and pointed commentary on Mr. Maples' silence at trial.

194.    The arguments of the state, taken as a whole, clearly led the jury to critically note that Mr. Maples' had remained silent and to draw an adverse inference therefrom. Greathouse v. State, 624 So.2d 202, 207 (Ala. Crim. App. 1992); United States v. Bodolato, 701 F.2d 915 (11th Cir. 1983). Though the argument as a whole unequivocally directed the jury to consider to Mr. Maples' silence, to fully elucidate why the jury necessarily interpreted the district attorney's arguments as a comment on silence, it is necessary examine the improper state arguments in some detail.

195.    First, and perhaps most significantly, the prosecutor repeatedly argues about what "we" *have not heard throughout the case.* For example, the prosecutor argues that "We've heard from the psychologist for about an hour who told you what Corey Maples had told him and we've also heard from Howard Battles and from the video tape about what the defendant told him, but the one thing we have not heard one time in this

-101-

*case* [is remorse]." (R. 3287) (emphasis supplied). The point of the state's argument is clear: throughout the trial, "we" have heard evidence from numerous sources — the psychologist, Howard Battles, and the videotape — but have not heard from the one source that matters: Mr. Maples didn't testify. The prosecutor is not commenting only on the videotape, and he tells the jury as much: he tells them that they have not heard evidence in the *case;* clearly, the use of "case" indicated to the jury that the state was impugning Mr. Maples for his continuing silence throughout the "case," and not just on what he may or may not have addressed in his statement.

196.    Later, the prosecutor's criticism of Mr. Maples' decision to not testify takes a very pointed turn: "Did he tell you about what a bad impact these two killings had on him *since.* Not a word." (R. 3287) This is a clear and highly improper comment on Mr. Maples' silence. *"Since"* plainly refers to Mr. Maples silence *since* his videotaped statement; the only opportunity Mr. Maples had to speak to his remorse or any other aspect of the offense *since* his statement is *at trial*. There is simply no other reasonable interpretation of the prosecutor's arguments. The prosecutor then drives this point home: "not a word." The prosecutor is correct in his assertion: Mr. Maples said "not a word" *since* his videotaped statement: Mr. Maples invoked his Fifth Amendment right to silence. This is simply an outrageous commentary on that silence, and constitutes constitutional error.

197.    The prosecutor continues his argument, and continues to impugn Mr. Maples for not testifying: "Haunted by images? That sounds good but there hasn't been any evidence to support that, not one bit." (R. 3287) (emphasis supplied). The only

-102-

possible source for this evidence is from Mr. Maples himself.  No other person could testify to what images occupy Mr. Maples' brain.  And just as clearly, the prosecutor is rejecting Mr. Maples' videotaped assertions that he is "haunted by images," and draws the jury's attention to the fact that Mr. Maples had not testified at trial to corroborate his videotaped statement that he is haunted by images.  Such an argument has no other reasonable interpretation, and the jury would have necessarily inferred from this argument that Mr. Maples had remained silent at trial.

**B.      The Arguments Of The State Were An Improper Comment On Mr. Maples' Remorse And His Decision To Not Testify To His Remorse**

198.    In addition to drawing the jury's attention to Mr. Maples' silence during trial, the arguments were also prejudicial and constitutionally intolerable because they drew the jury's attention to Mr. Maples' failure to establish remorse.  The only person who could establish remorse is Mr. Maples himself.  The arguments of the state, apart from the other direct attacks on Mr. Maples' silence, were designed to further draw the jury's attention to Mr. Maples silence at trial.  For example, prosecutor argues that the silences in the videotaped statement should have been used by Mr. Maples as an opportunity to talk about his remorse about the offense.  According to the prosecutor, there were silences "with anybody having an opportunity to talk."  Later, the prosecutor further impugns Mr. Maples for not *sua sponte* talking about his remorse, either in the videotape or on the stand:  "When did he say I'm sorry one time?  When did he say I hate it, one time?  When did he say I feel sorry for the families, one time?  Not one iota of remorse."

199.    Thus, to meet the prosecutor's challange, Mr. Maples would have had to take the stand, admit culpability, and then testify about his sorrow and remorse. This is a fundamental contravention of Mr. Maples' right to plead innocent and remain silent.

200.    Further, the prosecutor argues that Mr. Maples should have talked about his remorse on his own initiative during his questioning. Mr. Maples was not once *asked* whether he was remorseful during his interrogation. Mr. Maples, of course, *did not have to talk at all* during his interrogation. Miranda v. Arizona, 384 U.S. 436 (1966); Edwards v. Michigan, U.S. CONST. fifth amend. Those topics on which Mr. Maples chose to remain silent — during his interrogation or during trial — are simply not subject to argument by the prosecutor. Merely because Mr. Maples gave a videotaped statement does act as a waiver of all Fifth Amendment privileges. As Mr. Maples choose to not speak about his emotional state during or after the crime, the prosecutor cannot penalize him for this limited silence, anymore than a suspect's complete invocation of the right to silence would be barred from commentary. Doyle v. Ohio, 426 U.S. 610 (1976).

201.    Considered individually, these arguments require reversal. Taken in sum, they constitute an unmistakable and impermissible commentary on Mr. Maples' constitutionally protected decision to not testify. These comments clearly "overstepped the mark" and violated Mr. Maples' right to be free of state commentary about this most fundamental privilege.

202.    The state's arguments in this instance were so forceful, repeated, and pointed that there can be no doubt about the jury's inference: Mr. Maples did not testify about his remorse, and thus he must not be remorseful. The jury subsequently returned a

10-2 death recommendation.  (R. 3346)  The arguments of the state violated Mr. Maples'

rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution.

**V.     NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT
          DENIED MR. MAPLES A FAIR TRIAL AND AN ACCURATE
          SENTENCE DETERMINATION**

**C.     The Prosecutor Made Numerous Highly Improper
          Arguments During The Penalty Phase Of Mr. Maples'
          Trial**

203.     Clearly, the most prejudicial and improper misconduct of the prosecutor

were his comments on Mr. Maples' silence.[3]  In addition to this prejudicial and

impermissible argument, the prosecutor also made numerous other improper arguments

that require this Court to reverse Mr. Maples sentence of death and remand for a lawful

penalty phase unmarred by such egregiously improper arguments of the prosecutor.

**i.     The Prosecutor Improperly Commented On Mr. Maples' Failure
          To Call Witnesses**

204.     The prosecutor extensively commented on Mr. Maples' "failure" to call

witnesses, and urged the jury to draw a negative inference therefrom.  Indeed, the

prosecutor asked the jury to reject one of Mr. Maples' mitigating circumstances simply

because it was not — in the prosecution's mind — sufficiently corroborated with

witnesses that Mr. Maples could have purportedly called.  This is highly improper, and

cannot be tolerated by this Court.

---

[3]       This misconduct is discussed, *supra.*

205.   The arguments of the prosecutor could not have been more explicit or improper. Mr. Maples offered his cooperation with drug enforcement officers as a non-statutory mitigating circumstance. (R. 3184) Elyse Maples, Corey Maples' mother, testified that Mr. Maples had assisted the Decatur police apprehend drug dealers, and as a result of this assistance, started to receive threats from angry drug dealers. (R. 3184) The state choose not to cross examine this witness. (R. 3187) Instead, the state argued that this nonstatutory mitigating circumstance was not sufficiently established, because Mr. Maples had not called any police to testify on his behalf. The prosecutor's argument was explicit and highly improper:

> Prior drug cooperation with the City of Decatur. He didn't clean up drugs in the City of Decatur. If he had made a mark over there or done anything major, <u>they would have police officers and narcotics officers over here to tell you about it. Defense lawyers love to call police over here to testify.</u> I mean, if they can get a police officers to come to their side, they are just tickled pink, and <u>they would have been over here by the hand full.</u> As I understood the testimony, he helped them with one drug person.

(R. 3292-3293) (emphasis supplied). This is a blatantly improper argument. The state, to properly attempt rebuttal of this mitigating circumstance proffered by Mr. Maples, should have called the Decatur police officers:  they were presumably as available to the state as to the defense. The prosecutor's argument is clear — the mitigating circumstance does not exist, for if it did, Mr. Maples would have called Decatur police officers.

206.   The state's argument, besides impermissibly impugning Mr. Maples for not calling witnesses, is also inconsistent with clear Alabama law, which places a burden on capital defendant to "inject" mitigating facts, and thereafter the burden then shifts to

-106-

the state to disprove "injected" mitigating circumstances, if it can do so. Ala. Code §13A-5-45(g) (1975). Mr. Maples clearly injected the issue when Elyse Maples testified about Mr. Corey Maples' assistance to the Decatur police. The burden was then on the state to disprove this injected issue by, perhaps, calling the Decatur police to show that Mr. Maples had not offered any significant assistance. Instead, the state assailed Mr. Maples for not calling witnesses it believed Mr. Maples should have called. Such arguments are improper as a matter of constitutional law in a capital case.

### ii.     The Prosecutor Improperly Commented on Mr. Maples' courtroom demeanor

207.     The prosecutor in this case commented on Mr. Maples' courtroom demeanor, and argued that the mere ordinariness of Mr. Maples warranted death:

> [Y]ou read about a case where somebody in a spectacular murder case comes in a laughs at the jury or dares the jury to convict them. There was one not long ago where the defendant gave the finger to the daddy of the victim in a horrible case, but that is once every year or two in the whole country. That just doesn't happen. These cases try just like this; the defendant over there behaving himself and doing nothing to alienate the jury. We don't try monsters very often; coming in and diabolically laughing at the jury and daring them to put them to the electric chair. If that's the only way they went to the electric chair, we wouldn't be here.

(R. 3295) (emphasis supplied). This argument of the prosecutor was highly improper and prejudicial: the state urged that Mr. Maples should be sentenced to death because of his pedestrian mien. Indeed, the state's argument indicates that Mr. Maples' courtroom demeanor was a mere stratagem designed to deceive the jury; that he truly deserves death, and the jury should not be fooled into returning a life verdict because he appears

-107-

ordinary and has not been disruptive throughout the trial. This violated Mr. Maples'

rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

Constitution.

### iii.    The Prosecutor Told The Jury What To Think

208.    The prosecutor is not to give his own opinions in a criminal trial, and

certainly not in a capital murder trial. See, e.g., United States v. Young, 470 U.S. 1

(1985); Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985); United States v. Rodriguez, 585

F.2d 1234 (5th Cir. 1978). The prosecutor not only violated this basic rule, but took it one

step further: he told the jury what *he* thought the jury was thinking about some aspects of

the case. For example, at one point the prosecutor argued that "[t]here is no question that

he made that phone call, I don't thin[k], and I don't think it is in your minds either. You

can clearly tell its his voice on the tape." (R. 3292)

209.    On another occasion, the prosecutor told the jury that they *had* to believe

that the death penalty is a deterrent: "you have to believe it [the death penalty] deters

other criminal conduct, at least sometimes." (R. 3304) This is impermissible: if the

prosecutor is barred from telling the jury what he or she believes, the prosecutor certainly

cannot tell the jury what *they* have to believe. The jury, obviously, doesn't have to

believe *anything,* but only has to be prepared to follow the laws of Alabama. For the

prosecutor to tell the jury that they have to believe that the death penalty is a deterrent is

simply impermissible. (R. 3304) Further, the argument of the prosecutor is not true:

study after study has shown that the death penalty is *not* a deterrent. See, e.g., Decker

and Kohfield, CAPITAL PUNISHMENT AND EXECUTIONS IN THE ONE STAR STATE: A

DETERRENCE STUDY, 3 Crim. Just. Research Bulletin, No. 12, at 6 (1988) ("there is no evidence of a deterrent effect of executions in the state of Texas"); Georgia State Department of Offender Rehabilitation, CAPITAL PUNISHMENT IN GEORGIA:  AN EMPIRICAL STUDY 1943-1965, at 451 (1972) ("the death penalty is not effective as a deterrent"); THE DETERRENT EFFECT OF THE DEATH PENALTY:  FACTS V. FAITHS, 1976 Supreme Court Review, 317 (1976); compare with THE HARRIS SURVEY:  SIZABLE MAJORITIES AGAINST MANDATORY DEATH PENALTY (Feb. 10, 1983) (63% of public — potential jurors — believe in deterrence effect, and would therefore be influenced by improper argument).  The prosecutor's argument was accordingly doubly pernicious:  he instructed them that they *have* to believe something, and that they *have* to believe something that *is not true*.  Such arguments are not tolerable in a capital case and, in this case, violated Mr. Maples' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### iv.    The Prosecutor Improperly Speculated About What Punishment The Victim's Family Wanted

210.    The prosecutor improperly invoked the parents of Mr. Terry when arguing that death was the proper sentence for Mr. Maples.  The law is quite clear:  the views of the victim's family about their desired sentence are not relevant, and cannot be introduced at a capital trial.  Payne v. Tennessee, 501 U.S. 808 (1991).  Nonetheless, the prosecutor in this case directly invoked the victim's family's views on the appropriate punishment:

> They [defense counsel] talk about being down there in that penitentiary and how awful it would be dying in that

> penitentiary and how terrible it would be to be down there
> the rest of his life.  <u>I'll bet you this; I'll bet you Mr. Terry
> doesn't think its a tougher punishment than death.  Don't
> you think the Terry's would be tickled to go to the
> penitentiary this weekend and visit with their son?</u>

(R. 3303) (emphasis supplied). This was highly improper argument, and cannot be

countenanced by this Court.

211.    In <u>Payne</u>, which substantially modified the Supreme Court's previous

rulings on the admissibility of victim impact testimony, the Court left *undisturbed* the

rule that the state cannot introduce evidence about the views of the victim's family on the

appropriate punishment.  <u>Payne v. Tennessee</u>, 501 U.S. 808, n. 2 (1991).

212.    In addition to improperly invoking the victim's family on their punishment

preferences, this argument of the state improperly contrasted Mr. Maples' constitutional

rights with those of the victim.  Such comparisons are impermissible and constitute

reversible error.  <u>Brooks v. Kemp</u>, 762 F.2d 1383, 1411(11th Cir. 1985), <u>vacated on other</u>

<u>grounds</u>, 478 U.S. 1016 (1986) ("[I]t is wrong to imply that the system coddles criminals

by providing them with more procedural protections than their victims.").

213.    The arguments in this instance similarly directed the jury to consider and

compare the rights of Mr. Maples with those of the victims, and to reach a verdict on the

basis of such a comparison.  This is highly improper and prejudicial, and violated Mr.

Maples' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United

States Constitution.

### v.     The Prosecutor Improperly Argued That Mr. Maples' Life Was More Valuable To Lose

214.     In a truly macabre and improper argument, the prosecutor argued that Mr. Maples' life was more valuable to lose than to keep. The prosecution argued that Mr. Maples was "not going to accomplish anything for anybody anywhere in the penitentiary for the rest of his life" and that therefore his death was more useful, because of an alleged deterrent effect. (R. 3304) This is an absurd argument, and completely contravenes American death penalty jurisprudence. It is fundamental that "death is different" and a much more severe punishment than any other. McGautha v. California, 402 U.S. 183, 208 (1971) ("jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision."). A prosecutor cannot make arguments which minimize the awesome sentencing decision jurors are required to make at a capital case, and cannot undermine the gravity of their decision. Caldwell v. Mississippi, 472 U.S. 320, 332 (1985) ("for a sentencer to impose a death sentence out of a desire to avoid responsibility for its decision presents the specter of the imposition of death based on a factor wholly irrelevant to legitimate sentencing concerns"); Taylor v. State, 666 So.2d 36, 50 (Ala. Crim. App. 1994) (comments that lessen the jury's sense of responsibility "tend[] to encourage irresponsibility on the part of the jury in reaching its sentence recommendation").

215.     By arguing that the jury would take the societally efficient or valuable approach if they sentenced Mr. Maples to death, the prosecutor contravened the Supreme

-111-

Court's admonition in Caldwell, which required that "a capital sentencing jury recognize[] the gravity of its task and proceed[] with the appropriate awareness of its 'truly awesome responsibility.'" Caldwell v. Mississippi 472 U.S. at 341. The prosecutor argued that if the jury were to impose death, the sentence would benefit all; that it was therefore the easier, less difficult, and more just sentence. This is impermissible. See e.g., United States v. Mandelbaum, 803 F.2d 42, 44 (1st Cir. 1986) (improper for a prosecutor to urge the jury to do its job); Wallace v. Kemp, 581 F. Supp. 1471 (M.D. Ga. 1984), aff'd 757 F.2d 1102 (11th Cir. 1985) ("The fears and passions of a jury cannot be excited by speculation as to what might happen if the death penalty is withheld.").

### vi. The Prosecutor Misstated The Law During His Closing Argument

216.     The jury was repeatedly led astray by the prosecutor in this case. First, the prosecutor told the jury that intoxication was not a defense to the crime. (R. 3290) This is quite simply incorrect under Alabama law. Fletcher v. State, 621 So.2d 1010 (Ala. Crim. App. 1993); Ashley v. State, 651 So.2d 1096 (Ala. Crim. App. 1994). During his first closing argument, the prosecutor argued that voluntary intoxication is "not a defense to a crime." (R. 3290) This is simply incorrect: the law in Alabama is quite clear: voluntary intoxication may be a defense to a specific intent crime.

217.     The prosecutor also erroneously told the jury that all they had heard during the trial could be considered in weighing the aggravating circumstance. (R. 3298) In fact, the prosecutor informed the jury that they could consider the "particularly violent nature of these murders" as going to the aggravating circumstances of the homicides.

-112-

(R. 3298) This is highly improper: the heinous, atrocious, or cruel aggravating circumstance did not apply in this case, and therefore the manner of the victim's death was completely irrelevant to the jury's consideration of the appropriate sentence. A jury may not consider non-statutory or non-applicable aggravating circumstances. Espinoza v. Florida, 505 U.S. 1079 (1992) (weighing of invalid aggravating circumstance violates the Eighth Amendment); Coulter v. State, 438 So.2d 336 (Ala. Crim. App. 1982) (Alabama law prohibits the consideration of non-statutory aggravating circumstances); Keller v. State, 380 So.2d 926 (Ala. Crim. App. 1979), cert. denied, 380 So.2d 938 (Ala. 1980) (It is imperative that the trial courts strictly follow the wording of the list of aggravating circumstances; any tendency to gradually broaden the scope of the section's application will eventually lead to the unconstitutional application of the statute).

218.    The prosecutor also argued that the jury should reject Mr. Maple's injected mitigating circumstances because the amounted to a "devil made me do it" defense. (R. 3290) Indeed, the prosecutor urged the jury to reject the defense's mental health mitigating circumstances because Mr. Maples had not pled insanity to the offense. (R. 3290) Of course, radically different standards guide a determination of insanity compared with the standards of mitigating circumstances under § 13A-5-51 (1975).

219.    The prosecutor also improperly argued that Mr. Maples' age was not a mitigating circumstance, and, in support of its argument, informed the jury that if Mr. Maples were fourteen and tried for capital murder, then *the age of fourteen* would be a mitigating circumstance, and he would concede that. (R. 3254) This argument is outrageous: the prosecutor fabricated the law of Alabama, and contrasts the fabricated

-113-

law — and the imaginary capital punishment of a fourteen year old — with what he perceives to be the jury's proper course of action in this case: the rejection of Mr. Maples' age as a mitigating circumstance. Of course, no fourteen-year-old has ever been — nor could be — convicted of a capital offense and sentenced to death during Alabama's modern era. Thompson v. Oklahoma, 487 U.S. 815 (1988) (Eighth Amendment prohibits imposition of death sentence on juveniles less than the age of sixteen). For the prosecutor to argue that this is a possibility, and that this possibility is the only type of situation in which age may be considered a mitigating circumstance, is highly improper, and should not be tolerated by this Court.

220.    In addition, the prosecutor improperly argued that Mr. Maples' counsel, by presenting evidence in mitigation, was lying or distorting the truth. The state conceded that Mr. Maples' had no prior significant criminal history. After making this concession, the prosecutor stated "[i]n addition to the statutory mitigating circumstance that I have mentioned to you that we admit because it's the truth . . . I anticipate that they [the defense] is going to argue [that age is a mitigating circumstance]." (R. 3253) (emphasis supplied). The implication is clear: any mitigating circumstances besides lack of criminal history must be rejected by the jury, for they do not exist or are not "truthful" because the state will not admit that they exist. The state argues that it admits "truthful" mitigating circumstances; as it admits that Mr. Maples' lack of significant prior criminal history is a mitigating circumstance, by analogy the remaining mitigating circumstances — to which the state does not admit — are untruthful. The remaining mitigating

-114-

circumstances are mere fabrications of defense counsel, according to the state's improper argument.

221.    The prosecutor also misstates the law on weighing mitigating and aggravating circumstances.  At the end of the state's first closing argument, the prosecutor argues that the mitigating circumstances "will never" <u>outweigh</u> the aggravating circumstances and that death is therefore the appropriate sentence.  (R. 3255) This misstates the law.  Under the Alabama Code, aggravating circumstances must outweigh mitigating circumstances.  Ala. Code 13A-5-47(d-e) (1975)  Numerous opinions from this Court and the Court of Criminal Appeals have affirmed this basic principal of the law guiding penalty phases in Alabama.  <u>See e.g.</u>, <u>Ex parte Stewart</u>, 659 So.2d 122, 125 (Ala. 1993) (determination of sentence depends on whether aggravating circumstances *outweigh* mitigating circumstances); <u>Ex parte Ford</u>, 515 So.2d 48 (Ala. 1987) (sentence was appropriate, because aggravating circumstances greatly outweigh mitigating circumstances); <u>Williams v. State</u>, 601 So.2d 1062 (Ala. Crim. App. 1991) ("for the death penalty to be imposed in Alabama . . . the aggravating circumstances must simply *outweigh* the mitigating circumstances") (emphasis supplied).  The prosecutor reversed the standard:  to find a life sentence, under the prosecutor's scheme, the defense would have to show that mitigating circumstances outweigh aggravating circumstances. This imposed a greater burden on Mr. Maples, and rendered the jury recommendation and the subsequent death sentence unreliable and unconstitutional.

222.    The prosecutor told the jury that only people who supported the death penalty could be on the jury.  (R. 3306)  This, of course, is not true.  Jurors who can

follow the law — regardless of personal views on the death penalty — are qualified to sit on capital juries. Witherspoon v. Illinois, 391 U.S. 510 (1968); Wisenhant v. State, 555 So.2d 235 (Ala. Crim. App. 1988) (standard for determining whether juror should be disqualified from serving in death penalty case in Alabama is whether views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath."). There is no requirement that jurors "support" the death penalty before they are eligible to sit on a capital jury.

223.    For the prosecutor to inform the jury that their support of the death penalty was a prequalifying requirement to sit on a capital jury is tantamount to informing the jury that they had an obligation or that it was their job to impose death. This is highly inflammatory and impermissible. United States v. Young, 470 U.S. 1, 6, 8-9 (1985) (argument by the prosecutor that the jury has to do its "job" has "no place in the administration of justice."); see also United States v. Phillips, 664 F.2d 971, 1029-1030, n. 90 (5th Cir. 1981).

224.    The prosecutor also improperly told the jury that they had already found an aggravating circumstance — that the murder occurred during the course of a robbery. (R. 3252) This was improper: the jury had *not* yet found that the murder in the course of a robbery was an *aggravating circumstance*. Indeed, the jury had not found any aggravating circumstances, and would not find any aggravating circumstances until they began their deliberations and rendered their sentence. For the prosecutor to inform that jury that they had already found an aggravating circumstance before they had begun their deliberations is simply incorrect, and improperly intimidated the jury.

-116-

vii.    **The Prosecutor Accused The Defendant Of Lying**

225.    The prosecutor accused the defendant of being a liar.  (R. 3288, 3292)
The prosecutor also argued that Mr. Maples lied to his psychologist, and that the jury
should therefore reject all the testimony of the psychologist, solely on the basis that
Mr. Maples did not talk about his drug consumption during his statement given to the
police, and because the psychologist got his "notes mixed up."  (R. 3288-3292)  This
argument improperly informed the jury that they should reject the mitigating evidence
Mr. Maples proffered simply on the basis of the district attorney's exhortations.

D.      **Prosecutorial Misconduct During The Guilt Stage Of The Trial Violated
Mr. Maples' Due Process Rights And Requires A New Trial**

226.    In addition to the prosecutor's comment on Mr. Maples' courtroom
silence, the prosecution made numerous other improper arguments during the guilt stage
of Mr. Maples' trial.

i.    **The Prosecutor Inserted His Own Views On Mr. Maples' Guilt**

227.    The prosecutor instructed the jury that the "truth" is that Mr. Maples is
guilty:  "The truth is in this case that Corey Maples is a murderer; a capital murderer."
(R. 2907)  Later, the prosecutor informed the jury that "we [the prosecution] believe,
based on the evidence that you have heard, that is exactly what this is, is a death penalty
case."  (R. 2950)  Besides improperly injecting his personal views, the district attorney
also raised the specter of punishment during the guilt stage, by calling it a "death penalty"
case.  This was not a relevant consideration to the jury at this stage of the proceedings,
and it was constitutional error for the prosecutor to invoke this consideration at the guilt

stage of Mr. Maples' trial. Such an argument by the prosecutor is impermissible. <u>United States v. Young</u>, 470 U.S. 1 (1985).

228.    By vouching for the state's case and telling the jury that it was clearly a capital case, the prosecutor essentially testified as an expert witness, and argued that the crime allegedly committed by Mr. Maples is particularly deserving of death. <u>See United States v. Dack</u>, 747 F.2d 1172, 1176, n. 5 (7th Cir. 1984). The prosecutor, as a "public official occupying an exalted station," has the unique ability to "imping[e] on the jury's function." <u>United States v. Morris</u>, 568 F.2d 396, 402 (5th Cir. 1977); <u>see also</u> <u>United States v. McKoy</u>, 771 F.2d 1207, 1210-1211 (9th Cir. 1985) ("The rule that a prosecutor may not express his personal opinion of the defendant's guilt or his belief in the credibility of the witnesses is firmly established.").

229.    As a result of this exalted position, "improper suggestions, insinuations, and especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." <u>Berger v. United States</u>, 295 U.S. at 88 (1935). <u>Walker v. Savis</u>, 840 F.2d 834, 838 (11th Cir. 1988) ("arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury").

230.    In this case, the prosecutor's arguments were particularly pernicious, for the jury had been informed, through the erroneous actions of the trial court, that other evidence existed to which they were not privy. In this context, the statement by the prosecutor that the "truth" is that Mr. Maples is guilty of capital murder induced the jury to improperly infer that the state possesses additional information which unequivocally

-118-

established that Mr. Maples is guilty of capital murder.  Such an inference, fueled by the

improper arguments of the prosecutor was violative of Mr. Maples' constitutional rights.

### ii.  The Prosecutor Urged The Jury To Send A Message

231.    The jury's job is to ascertain guilt or innocence.  The jury and its verdict is

not a vehicle with which the state can "send messages" to the community.  This sound

principle is recognized by the United States Supreme Court.  See, e.g., Woodson v. North

Carolina, 428 U.S. 280 (1976) (extraneous considerations that have nothing to do with

the "individualized determination" that the jury is called upon to make are not proper

considerations in a capital proceeding).  Nonetheless, the prosecutor urged the jury to

send "a message" with their guilty verdict in this case:  "return a verdict of guilty and

send that message back."  (R. 2907)  The jury's verdict cannot be influenced by

considerations wholly irrelevant to Mr. Maples' guilt or innocence.  Sending a message

to the community is precisely the type of extraneous consideration with which the jury

should not concern themselves during their deliberations.  Tucker v. Zant, 724 F.2d 882,

888 (11th Cir. 1984) ("The constitution will not permit arguments on issues extrinsic to

the crime or the criminal aimed at inflaming the jury's passions, playing on its fears, or

otherwise goading it into an emotional state more receptive to the call for imposition of

death . . .").  The prosecutor, by urging the jury to "send that message" by convicting

Mr. Maples of capital murder, is playing on the jury's fears that Morgan county is awash

in potential murderers, and that "messages" sent via jury verdicts must be sent to the

potential scofflaws.  Such arguments have "no place in the administration of justice."

United States v. Young, 470 U.S. 1, 6, 8-9 (1985).

### iii.    The Prosecutor Inserted His Own Views On The Facts Of The Case

232.    The prosecutor's role is to present evidence to support criminal charges, and the prosecutor's arguments must be restricted to evidence that is presented at trial. Yet in this case, the prosecutor used his "exalted station" to expound that he believed that Mr. Maples was guilty, and that this case was as strong as any he had tried. United States v. Morris, 586 F.2d 396 (5th Cir. 1977). This is highly improper. "[I]mproper suggestions, insinuations, and especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Berger v. United States, 295 U.S. 78, 88 (1935). For position of the prosecution, as an agent of the state government, allows him "to impress on the jury that the government's vast investigative network, apart from the ordinary machinery of trial, knows that the accused is guilty or has non-judicially reached conclusions on relevant facts which tend to show he is guilty." Hall v. United States, 419 F.2d 582, 583-584 (5th Cir. 1969). In this case, the prosecutor injected his own belief in regard to critical issues at trial.

233.    For example, the prosecutor told the jury that "*I* don't think there is any question that Mr. Terry was shot first." (R. 2959) The prosecutor later informed the jury that they had established Mr. Maples' guilt beyond a reasonable doubt: "*I* submit to you in this case we've proven the case to you beyond a reasonable doubt; and if we haven't, *I* don't know whether we ever would in any case." (R. 2963) This is highly improper: besides telling the jury that the prosecutor believe that the ultimate issue of the case is established, the prosecutor also told the jury that the proof in this case is as good as it is in any case. This argument informs the jury that based on the prosecutor's experience,

-120-

Mr. Maples' guilt is well-proven, and greatly diminished the jury's sense of responsibility. Caldwell v. Mississippi, 472 U.S. 320 (1985). It is imperative that each juror recognize "the truly awesome responsibility of decreeing death for a fellow human [such that they] will act with due regard for the consequences of their decision." McGautha v. California, 402 U.S. 183, 208 (1971).

234.   In fact, according to the prosecutor, Mr. Maples' guilt is as well proven as in any case *ever* tried by the prosecution.  Surely the jury — comprised of citizens of Morgan County — recognized that the prosecutor's office had enforced the law and secured many criminal convictions in Morgan County.  Against the backdrop of this common knowledge, it was highly improper for the prosecutor to argue that the proof *in this particular case is as good as it is any case,* for such an argument pits any doubt held by jurors about Mr. Maples' with all previous juries that have sat on cases prosecuted in Morgan County.  Such arguments, based on the unique perspective of the prosecutor and invoking such a wealth of experience and history of criminal prosecutions, influenced the jury's deliberation, and rendered their verdict unreliable and constitutionally infirm.

235.   On yet another occasion during the state's first closing argument, the prosecutor stated that there is "no doubt" about the purpose of Mr. Maples' checking the pulses of Mr. Terry and Robinson.  (R. 2903)  According to the prosecutor, Mr. Maples checked the pulse to ensure that they were both dead:  a strong indicator of intent.  The prosecutor lacked any rational basis for this argument, and simply lent his own personal opinion to the purpose of Mr. Maples' actions.  This greatly increased the strength of the state's case on the single most critical issue before the jury:  Mr. Maples' intent.  This is

-121-

improper. <u>United States v. Young</u>, 470 U.S. 1 (1985); <u>Brooks v. Kemp</u>, 762 F.2d 1383 (11th Cir. 1985).

### iv.  The Prosecutor Speculated About Events For Which There Was No Evidence

236.  The prosecutor argued "facts" to the jury for which there was simply no evidence. This is not tolerable. <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974); <u>United States v. Warren</u>, 550 F.2d 219 , <u>rev'd on other grounds</u>, 578 F.2d 1058 (5th Cir. 1977); <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986). Fundamental Due Process requirements necessitate that a defendant not be sentenced to death on the basis of information which he or she had no opportunity to explain or deny. <u>Skipper v. South Carolina</u>, 476 U.S. 1, n. 7 (1986). A prosecutor's arguments must be confined to the evidence, and that it is improper for the state to argue facts that are not in evidence. <u>Sasser v. State</u>, 494 So.2d 857 (Ala. Crim. App. 1986); <u>Sanders v. State</u>, 423 So.2d 348 (Ala. Crim. App. 1982).

237.  In this case, the prosecutor argued that Mr. Maples' intentionally killed Terry and Robinson: he stated that Mr. Maples' intentionally cocked the gun before shooting it. (R. 2965) There was simply no evidence in support of this argument. It was particularly harmful in this instance, for whether Mr. Maples intentionally cocked the rifle is a critical element that may have swayed the jury to conclude that Mr. Maples acted with specific intent to kill. Such an argument was highly prejudicial. <u>United States v. Warren</u>, 550 F.2d 219 (5th Cir. 1977). Flights of fancy such as this, especially where they are designed to support a critical matter such as intent, cannot be tolerated; this

argument encouraged the jury to return a guilty verdict based on a scenario that was not supported by the evidence.

### v. The Prosecutor Improperly Solicited Hearsay and Incompetent Testimony

238.    The prosecutor repeatedly solicited hearsay evidence throughout the guilt stage of Mr. Maples' trial.  The law is quite clear:  hearsay is simply not constitutionally admissible against a defendant at a criminal trial because it abrogates the defendant's right to confrontation and cross-examination.  Pointer v. Texas, 380 U.S. 400, 405 (1965) ("the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.").

239.    Despite that prohibition, the prosecutor in this case elicited hearsay on numerous occasions.  (R. 1624, 1639, 1828, 1874, 1931, 1933, 1956, 1957, 1969, 2059, 2545, 2979).  Although the defense objections to some of these attempts by the prosecutor to elicit hearsay were sustained, the jury nonetheless heard a case which was colored by incompetent and inadmissible evidence.  For example, the prosecutor elicited hearsay testimony about what one witness said upon hearing a audiotape purportedly containing Mr. Maples' voice.  (R. 2078).

240.    On another occasion, the prosecutor elicited testimony from a witness that Mr. Maples called the crime scene after the Robinson's body had been discovered. (R. 1526-1529)  This testimony was about events that the witness had not seen, and was based entirely on hearsay evidence.  Although defense objections were sustained to some of the testimony, the prosecutor persisted, and eventually succeeded in eliciting the

-123-

improper and inept hearsay testimony.  (R. 1529)  This method of presenting a case, through repeated attempts to elicit hearsay testimony, have "no place in the administration of justice." United States v. Young, 470 U.S. 1, 6, 8-9 (1985).

### vi.     The Prosecutor Improperly Led Witnesses On Direct Examination

241.    A prosecutor may not lead its witnesses on direct examination:  such techniques place the prosecutor in the position of both an advocate and a witness. Gajewski v. United States, 321 F.2d 261 (8th Cir. 1963); Walker v. State, 840 F.2d 834 (11th Cir. 1988) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury.")  Further, by leading witnesses on direct examination, the prosecutor informs the jury that he is privy to more information than that which is being presented at trial.  See Skipper v. South Carolina, 476 U.S. 1, 7 n. 1 (1986) (due process forbids death sentence "on the basis of information which he had no opportunity to deny or explain.")  In this case, the prosecutor lead witnesses in order to elicit prejudicial and inadmissible evidence that the jury would not have heard but for the impermissible leading.  (R. 2338, 2347, 2361, 2369).  This was improper, and requires this Court to reverse.

### vii.    The Prosecutor Vouched For The Veracity Of His Witnesses

242.    It is improper for the prosecution to vouch for the honesty or veracity of its witnesses.  Gradsky v. United States, 373 F.2d 706 (5th Cir. 1967).  Nonetheless, in this case, the state vouched for the veracity of the witnesses it called to convict Mr. Maples' of death.  For example, the prosecution vouched for one witness, and argued that his testimony was credible simply because "[h]e tried to be truthful." (R. 2953)

243.    Such state vouching for its witnesses is impermissible.  Abuse of the

prosecutor's "exulted station" "unfairly plays upon the jury's susceptibility to credit the

prosecutor's viewpoint." Brooks v. Kemp, 762 F.2d 1385, 1410 (11th Cir. 1985).

    **viii.**    **The Prosecutor Improperly Introduced Victim Impact Evidence**

244.    In this case, the prosecutor improperly drew the jury's attention to the

presence of the victim's family in the courtroom.  This unduly inflamed the passions and

prejudices of the jury, and increased the likelihood that they would convict and sentence

Mr. Maples to death on the basis of an arbitrary and irrational factor.  See Payne v.

Tennessee, 501 U.S. 808, n. 2. (1991).

245.    The prosecution, despite the clear law which prohibits invoking sympathy

or passion by eliciting information about the victim and his family, repeatedly invoked

the family of Mr. Terry during the trial.  Mr. Terry was introduced to each voir dire

panel. (R. 475, 748, 930, 1153)  This was wholly irrelevant to anything that was

occurring during voir dire.  The trial court exacerbated the error when it introduced the

victim's family to the jury immediately prior to the testimony of the state's pathologist,

clearly the most gruesome and disturbing portion of Mr. Maples' trial.  (R. 2277)

Mr. Terry then sat at the state's table throughout the duration of the trial, which

doubtlessly further heightened the jury's passions and dulled their ability to reach a

considered, dispassionate verdict.

ix.    **Numerous Other Instances of Prosecutorial Misconduct Denied Mr. Maples a Fundamentally Fair Trial.**

246.    The State engaged in numerous additional instances of prosecutorial misconduct during both phases of the trial.  In so doing, the State violated its duty to refrain from improper methods calculated to produce a wrongful conviction. Berger v. United States, 295 U.S. 78, 88 (1935).  These repeated violations denied Mr. Maples his rights under the Fifth, Sixth, Eighth and Fourteenth Amendment to the United States Constitution.

247.    The State engaged in prosecutorial misconduct when, among other things, the prosecutor improperly introduced at trial gruesome pictures, improperly examined witnesses, made highly inflammatory and prejudicial closing arguments, both at the guilt and the penalty phase, consisting of, but not limited to, statements about what the truth was in this case, statements about the message the jury ought to send to the society through a verdict of guilty, repeated reading of the indictment, statements of personal beliefs and convictions by the prosecutor, implications about what the jury ought to think, improper invocation of the social value of Mr. Maples's death, improper invocation of the victim's family's views on the case, numerous misstatements of the law, repeated accusations that Mr. Maples lied and improper comments on Mr. Maples's courtroom demeanor and decision not to testify.

248.    Additionally, the State improperly relied on a statutory aggravating factor during closing arguments of the guilt phase, when the prosecutor referred to the "execution style" murder of Mr. Robinson without, at the same time, providing Counsel

-126-

notice of the corresponding aggravating factor in the indictment.  Not only was there no

evidence in support of such argument, but this implication of an aggravating factor

without notice violated not only Alabama statutes on the use and allegation of

aggravating factors in capital cases but also federal constitutional guarantees of due

process and federal constitutional proscriptions against cruel and unusual punishments.

Also, the State's improper closing argument only served to inflame the jury against

Mr. Maples and prejudiced Mr. Maples's right to be tried by a fair and independent jury.

This violated Mr. Maples rights under the Fifth, Sixth, Eighth and Fourteenth

Amendment to the United States Constitution.

## VI.  THE EVIDENCE OF CAPITAL MURDER DURING A ROBBERY WAS INSUFFICIENT TO SUSTAIN A CAPITAL MURDER CONVICTION AND SENTENCE OF DEATH AS A MATTER OF LAW.

249.   It is axiomatic that the State has the burden of proving each element of the

charged crime beyond a reasonable doubt.  See In re Winship, 397 U.S. 358 (1970).  This

burden requires that the State convince the jury that Mr. Maples was guilty beyond a

reasonable doubt of each charged element of the offense; and on appeal, the evidence

must be sufficiently strong to overcome any "reasonable hypothesis" of Mr. Maples's

innocence of the crime, as is required in circumstantial cases.  Ex parte Brown, 499 So.

2d 787, 789 (Ala. 1986); Ex parte Mauricio, 523 So. 2d 87 (Ala. 1987).  In Mr. Maples's

case, the State failed to meet this heavy burden.

250.   The State sought and obtained a conviction on the second count of the

indictment, murder during the course of a robbery.  See Ala. Code §13A-5-40(a)(2)

(1994). However, the State failed to introduce sufficient evidence to support a conviction on that count.

251.    This is insufficient evidence to support a capital murder conviction. The onus rests with the State to meet its constitutional obligation of proving each element beyond a reasonable doubt, to the exclusion of every other reasonable hypothesis. The State's failure to meet this obligation violated Mr. Maples's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. See Jackson v. Virginia, 443 U.S. 307 (1979).

## VII.    IRRELEVANT AND PREJUDICIAL EVIDENCE WAS INTRODUCED AT TRIAL THAT DENIED MR. MAPLES A FAIR TRIAL AND A FAIR PENALTY DETERMINATION.

252.    It is axiomatic that only relevant, probative evidence is properly admissible at trial. See Ala. R. Evid. 402; Old Chief v. United States, 519 U.S. 172 (1997). During the guilt phase of Mr. Maples's trial, the State introduced testimony about events that happened after the shootings. See Paragraphs 40 to 43. All of this testimony should have been excluded from the trial because of its devastating prejudicial impact when compared to its minimal probative value to the prosecution. This was prejudicial and denied Mr. Maples a fair trial and an accurate penalty phase determination. Such testimony was thus inadmissible and denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## VIII.   THE TRIAL COURT UNCONSTITUTIONALLY ADMITTED PHOTOGRAPHS AND ALLOWED A SLIDE SHOW FOR NO PURPOSE BUT TO INFLAME THE PASSIONS OF THE JURY

253.    It is clear from the record that color slides of the autopsies of Terry and Robinson were shown to the jury. (R. 2271)  These transparencies, which apparently depicted the wounds and the autopsy of the victims, were admitted into evidence and shown to the jury over repeated defense objections.  (R. 2271, 2291)  Trial counsel objected to their introduction as unduly prejudicial, and argued that the limited probative value of the photographs was grossly outweighed by their prejudicial effect.  (R. 2271)

254.    These photographs served little or no purpose except to arouse the passion prejudice, or sympathy of the jury and therefore should have been excluded from evidence.  The trial court's admission of these two photographs was error violated Mr. Maples' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## A.    Photographs Were Admitted That Served No Purpose But To Inflame The Passion Of The Jury

255.    Mr. Maples filed a motion *in limine* to preclude the state from admitting prejudicial photographs at trial. (C. 213)  Nevertheless, the court admitted numerous photographs which served no purpose other than to arouse the passion and prejudice of the jury. Some of the photographs were close-ups of the victims, others revealed unrelated prior offenses.  Many were duplicative and entirely lacking probative value. Indeed, so nasty were some of the photographs that the district attorney admitted that the jury may not want to view them before lunch, presumably because the photographs would produce nausea in the jury.  (R. 1711)  Further, the state admitted at trial that the jury probably couldn't tell much from some of the photographs. (R. 1735).

256.    Several of the photographs depicted the victims after the autopsy had

begun, and the body had been intubated, shaved, and washed.  In a capital case, such

photographs create a grave risk that a death sentence will be "imposed under the

influence of passion, prejudice, or [an] arbitrary factor" in violation of Alabama law.  See

Ala. Code §13A-5-53(b) (1) (1975).  Further, where capital punishment is a possibility,

prejudicial and inflammatory photographs lessen the "reliability in the determination that

death is the appropriate punishment in the specific case."  Woodson v. North Carolina,

428 U.S. 280, 305, (1976), accord, Gardner v. Florida, 430 U.S. 349, 357-358 (1977);

Lockett v. Ohio, 438 U.S. 586, 604 (1978); Beck v. Alabama, 447 U.S. 625, 637-63 8

(1980).

257.    The photographs were admitted into evidence and available to the jury

during their deliberations and were likely to arouse the jury's passions.  Further, the

photographs were unnecessary, for the crime scene and autopsy were described in detail

by the medical examiner, police officers, and the pathologist. (R. 2274-2323, 1531-1542,

1635-1648, 1681-1690, testimony of Howard Battles, seriatim).  Their introduction

violated Mr. Maples' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to

the U.S. Constitution.

**B.      The Courtroom Slide Show Served No Purpose Other
         Than To Inflame The Passion Of The Jury**

258.    In addition to introducing gory photographs, the state transformed some

photographs into slides, and projected the image onto a screen.  (R. 2278-2299)  This

transformed each inflammatory 8" x 10" photo into a 6' x 8' gruesome spectacle. Such

enlargement and projection served no rational purpose, and was only to unfairly prejudice Mr. Maples. Courts which have addressed the propriety of courtroom slideshows have found such displays impermissible. See, e.g., Stringer v. State, 500 So.2d 928 (Miss. 1986); Driskell v. State, 659 P.2d 343 (Okl. Cr. App. 1983); State v. Poe, 441 P.2d 512 (Utah 1968). In Stringer, the Mississippi court found that the photographs were not overly gruesome, but that the slide show was irrelevant and thus combined with other tactics, constituted reversible error: As in Stringer, the slide show during Mr. Maples' trial was both unnecessary and prejudicial. Mr. Maples was thereby denied his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## IX.     THE TRIAL COURT CONSTITUTIONALLY ERRED WHEN IF REFUSED TO REMOVE TWO VENIREMEMBERS WHO AUTOMATICALLY WOULD IMPOSE A DEATH SENTENCE UPON CONVICTION OF CAPITAL MURDER

259.     The trial court refused to remove two jurors for cause, despite their unambiguous statements that they would automatically impose the death penalty if Mr. Maples was convicted of capital murder. This violated the United States Constitution. Morgan v. Illinois, 504 U.S. 719 (1992). Because these veniremembers were not removed for cause, Mr. Maples had to use his first two peremptory strikes to remove these two "automatic death" veniremembers.

260.     The United States Supreme Court has similarly found that a veniremember who will automatically impose death must be excused for a capital jury by the court. Morgan v. Illinois, 504 U.S. 719 (1992); Adams v. Texas, 448 U.S. 38 (1980);

-131-

Wainwright v. Witt, 469 U.S. 810 (1985); see also Johnson v. Mississippi, 486 U.S. 578,

584 (1988) (need for heightened reliability "in the determination that death is the

appropriate punishment in any capital case.") (quotations omitted).

261.   In this case, the trial court erred for not removing two veniremembers who

clearly stated that they would automatically impose the death sentence upon conviction of

intentional murder.  Because the trial court refused to remove these jurors for cause, the

defense was improperly compelled to use its first two peremptories to remove them.

**A.   Veniremember Laura Sivley**

262.   Veniremember Laura Sivley was extraordinarily ill-qualified to sit on a

capital jury.  Her views on the appropriateness of a death sentence were clear:

> MR. MITCHELL:  . . . The Bible, as I understand it, says
> 'an eye for an eye, a tooth for a tooth, and a life for a life.'
> Is there anybody that subscribes to that as a moral principal
> of their own? 'An eye for an eye, a tooth for a tooth, and a
> life for a life.'
>
> . . .
>
> JUROR SIVLEY:  The only problem I would have in
> giving somebody the death penalty is if they did it in self
> defense.  If they killed somebody in self defense, I would
> have a problem giving them the death penalty; but if
> somebody killed somebody just to be killing them or just
> kill[ed] them in cold blood, I would not have a problem
> with that.
>
> MR. MITCHELL:  Would that — let me put it this way.  If
> you heard evidence from the witness stand and you were
> convinced beyond a reasonable doubt that someone
> intentionally killed another, you're saying that they would
> automatically deserve the death penalty?
>
> JUROR SIVLEY:  I would consider it.  Yeah, I do.  I
> believe if you kill somebody just to kill somebody and

> you're not doing it because you're defending yourself of defending —you know, like if you have a child and you're defending that child in self defense, I believe I could not give somebody the death penalty. Just killing somebody like robbing them and killing them or just killing them because you hate them, <u>I would have no problem whatsoever.</u>
>
> MR. MITCHELL: <u>And that would be automatic?</u> If you heard from the witness stand; if you were convinced beyond a reasonable doubt that someone intentionally killed another, <u>that they would automatically deserve the death penalty?</u>
>
> JUROR SIVLEY: <u>If it was not in self defense, yes.</u>

(R. 843-846) (emphasis supplied). As Ms. Sivley makes clear, she would clearly impose

the death sentence for anyone who commits an intentional murder. Indeed, according to

Ms. Sivley, any homicide other than in self-defense deserves the death sentence. <u>Id.</u>

263.    Later, Ms. Sivley reiterated her views on the mandatory use of the death

penalty:

> MR. MITCHELL: Do you feel personally like the death penalty should be used more often as a crime deterrent?
>
> JUROR SIVLEY: In murder cases, yes. I believe <u>any time somebody murders somebody else and it is not for self-defense, then I believe the death penalty should be used.</u>

(R. 865-866) (emphasis supplied). Again, this statement reveals Ms. Sivley's belief that

death should always be imposed for convicted murderers. Ms. Sivley, upon further

questioning by the court, stuck to her belief, and asserted that death was the appropriate

sentence in any intentional murder case. After the court provided a lengthy explanation

of the bifurcated nature of capital trials and the necessity of considering aggravating and

mitigating circumstances, the trial court asked

-133-

"Is there anybody on this panel that is going to vote for death regardless of what I say about the law and how it should be allowed?

(Hand raised)

     THE COURT:  Ms. Sivley?

JUROR SIVLEY:  The way I feel about that is if I am convinced beyond a shadow of a doubt —

     THE COURT:  That's not the standard, you understand?

JUROR SIVLEY:  That he killed somebody for any reason other than self defense, <u>my personal feelings about it is I would find it hard not to give him the death penalty.</u>

(R. 882-883) (emphasis supplied).  These statements of Ms. Sivley clearly and unequivocally establish that she believed in the propriety of the death sentence for any homicide other than self defense.  This rendered her unfit to serve as a juror on a capital case.  <u>Morgan v. Illinois</u>, 504 U.S. 719 (1992).

    264.   In response to coercive and repeated questions from the trial court, Ms. Sivley finally stated that she *could* follow the law and weigh aggravating and mitigating factors.  (R. 883-884)  This final statement that she could follow the law must be rejected by this Court.  A court may not, when faced with contrary statements, rely on a juror's assertions as to his or her impartiality or fitness to serve as a juror, even if some of the assertions are arguably unequivocal.  <u>Irvin v. Dowd</u>, 366 U.S. 717, 728 (1961) (juror's statements of their own impartiality to be given "little weight" due to "unconscious mental processes"); <u>Coleman v. Kemp</u>, 778 F.2d 1487 (11th Cir. 1985) ("conclusory protestations of impartiality in the voir dire" were not sufficient to relieve

-134-

burden on court to remove veniremember); Jordan v. Lippman, 763 F.2d 1265, 1274

(11th Cir. 1985) ("The juror is poorly placed to make determination of his own

impartiality") (quoting United States v. Davis, 583 F.2d 190 (5th Cir. 1978).

     265.    Further, Ms. Sivley gave other responses that established her lack of

fitness to serve on Mr. Maples' jury.  She stated — in response to the state's questions —

that she saw no need for a trial when there is a confession:

> MR. MITCHELL:  Anybody here that feels that if there
> was a confession in this case, if those facts were presented,
> that a trial would be a complete waste of time; there would
> be no reason to have a trial? Yes, ma'am, Ms. Sivley?
>
> JUROR SIVLEY:  I do.
>
> MR. MITCHELL:  You feel like if that was the case, there
> would be absolutely no reason; and we would all be
> wasting our time to have a trial?
>
> JUROR SIVLEY:  If he confessed to is, I think it would be.

(R. 823-824).  Later, Ms. Sivley stated that if a defendant confessed, "then that would

make up my mind right there."  (R. 829)  Still later during voir dire, Ms. Sivley was

further questioned about her consideration of a confession, and asserted that any

confession would "wipe out" any doubts.  (R. 878)  Ms. Sivley later stated that she would

consider "everything" that was said, but only after the trial court led Ms. Sivley to such

an extent that she could do little but agree with the trial court.  (R. 879-880)  Such

statements are virtually valueless for assessing a veniremember's fitness to serve on a

jury.  Irvin v. Dowd, 366 U.S. 717, 728 (1961).

     266.    This case involved a lengthy statement by Mr. Maples wherein he admits

responsibility for the homicides.  According to Sivley, this videotape "would make up

[her] mind right there," rendering the remaining aspects of the trial a "waste of time."

Ms. Sivley would then, by her own admission, automatically impose a death sentence.

The defense motion to strike her for cause was clearly due to be granted, and the defense

use of a peremptory to remove her from the jury violated Mr. Maples' due process rights.

**B.      Veniremember Dutch Wilbanks**

267.    A second veniremember similarly believed that the death penalty should

always be imposed in the case of an intentional murder.  Police Officer Dutch Wilbanks

clearly articulated his belief that death should be imposed in all such cases:

> MR. CRAIG:  . . . . They [some individuals] just believe if
> its proven beyond a reasonable doubt that he intentionally
> took a human life, it doesn't matter how or when or why or
> what kind of guy he was before that or what his history was
> or how neglected he was as a child or whatever.  None of
> that stuff matters.  Its over.  He should lose his life
> automatically.  Does anybody here believe that way?  I'm
> not going to question that belief.  I just need to know.
>
> (Hand raised)
>
> . . . .
>
> JUROR WILBANKS: Yes.

(R. 1088-1089).  Later, Officer Wilbanks further clarified his views:

> MR. CRAIG: Mr. Wilbanks, let me ask you that same
> question.  Assume its proven and he is lawfully convicted
> beyond a reasonable doubt of intentional murder, meaning
> someone didn't accidentally kill, they intended to kill,
> that's one of the elements to prove, <u>you would
> automatically vote for the death penalty once that's proven</u>?
>
> JUROR WILBANKS: Yes.

-136-

(R. 1093-1094) (emphasis supplied).  Mr. Wilbanks later stated that if the law allowed

the death penalty, he would impose it.  (R. 1099)  These statements of Mr. Wilbanks, like

those of Ms. Sivley, established that he believed in the propriety of the death sentence for

any intentional homicide.  Such beliefs are not permissible among jurors hearing a capital

case.  Morgan v. Illinois, 504 U.S 719 (1992).

268.   Later, in response to a leading question from the trial court, Officer

Wilbanks summarily stated that he could follow the trial court's instructions.  (R. 1103)

In light of Wilbanks previously stated views on the necessity and propriety of imposing

the death penalty for all intentional murders, this assertion must be rejected by this Court.

See Irvin v. Dowd, 366 U.S. 717, 728 (1961) (juror's statements of their own impartiality

to be given "little weight" due to "unconscious mental processes"); see also Coleman v.

Kemp; Jordan v. Lippman, supra.

269.   In addition to Mr. Wilbanks' strict views on the necessity of imposing the

death penalty for intentional murders, Mr. Wilbanks was a local police officer who knew

about the case, and was privy to confidential information about the case pursuant to his

functions as a police officer.  (R. 924, 940, 970-971)  Officer Wilbanks was working in a

local police department, and knew who was going to be subpoenaed by the state and the

defense weeks prior to trial.  (R. 970-971)  It is clear that Officer Wilbanks was privy to

information about the case: "it was about a month ago when they sent a fax out to the

police department saying who was subpoenaed and giving the dates an all that.  It was a

big fax from the county."  (R. 970-971)  Further, Officer Wilbanks had worked with

investigators who were critical to the Maples' investigation, and Wilbanks stated that he

was about to work with those investigators again. (R. 1063-1064) Such a close connection to the officers responsible for investigating the offense, considered in context to Officer Wilbanks' stance on the mandatory use of the death penalty and his access to privileged information about the case rendered him clearly unfit to serve as a juror in Mr. Maples' trial. The trial court erred when it denied the defense motion to strike officer Wilbanks for cause. (R. 1138)

270.    Mr. Maples' was compelled to use his first and second peremptory challenges to remove Wilbanks and Sivley. (R. 1387) This unconstitutionally reduced the number of peremptories that were available to Mr. Maples to remove other people from the venire.  Pointery v. United States, 151 U.S. 396, 414 (1894) (the right to exercise peremptory challenges is "one of the most important rights secured to the accused"). Under the authority of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the trial court was required to remover veniremembers Sivley and Wilbanks. The trial court failed in this obligation.

## X.    THE TRIAL COURT IMPROPERLY EXCLUDED JURORS WHO EXPRESSED RESERVATIONS ABOUT THE DEATH PENALTY

271.    During jury selection, the court excused for cause several jurors who expressed reservations about applying the death penalty. (R. 461, 540, 666, 671, 756, 902, 919) Jurors Aycock, Bundy, Hensley, and Rodgers were excused in part for their views on the death penalty. The removal of these jurors because of expressed reservations about the propriety of the death penalty violated Mr. Maples' right to a representative and impartial jury.  Witherspoon v. Illinois, 391 U.S. 510 (1968). The United States Supreme

Court has embraced an ever widening definition of groups cognizable under the equal

protection clause of the Fourteenth Amendment in the Batson context. See, e.g., J.E.B. v.

Alabama, 511 U.S. 127 (1994). The Supreme Court has also considered the cognizability

of individuals who possess a commonality that makes them a distinct and recognizable

group in the Batson context. See, e.g., Lockhart v. McCree, 476 U.S. 162 (1986).

Exclusion of individuals who have particular views on the death penalty — the very

subject the jury was convened to deliberate — denied Mr. Maples a representative jury.

272.    The exclusion of these jurors during the capital trial of Mr. Maples not

only violated Mr. Maples' right to a constitutional trial, but also violated the equal

protection rights of the excluded jurors. J.E.B. v. Alabama, 511 U.S. 127 ("we have

emphasized that individual jurors themselves have a right to nondiscriminatory jury

selection procedures") (citations and quotations omitted). Veniremembers cannot be

properly excluded merely because they express some reservations about the death

penalty, Witherspoon v. Illinois, 391 U.S. 510 (1968). The exclusion of these jurors

violated Mr. Maples' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to

the United States Constitution.

## XI.    JURY ISSUES

### A.    The Court Failed to Remove for Cause Venire Members Who Could Not Be Impartial and Thus Deprived Mr. Maples of a Fair Trial by an Impartial Jury.

273.    At *voir dire*, some of the venire members made it clear they were fully

committed to the death penalty and would automatically impose a death sentence upon

showing of guilt:

-139-

        a.        Laura Sivley, (R. at 843-46, 882-83),

        b.        Dutch Wilbanks, (R. at 1088-89, 1093-94, 1099) and

        c.        Jimmy Quattlebaum, (R. at 849-51).

274.    Counsel requested that each of these venire members be struck for cause on the grounds of the aforementioned statements. However, the court refused to excuse each of these venire members.

275.    It was error for the court to refuse to remove these venire members for cause and to overrule Counsel's objections to venire members who could not properly consider this case. Therefore, Mr. Maples was deprived of the opportunity to select a fair and impartial jury, thus violating his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**B.**    **Mr. Maples Was Deprived of His Right to a Jury Trial by Fair and Impartial Jurors Because Sworn Venire Members (Including Deliberating Jurors) Failed to Disclose Material Information.**

276.    Mr. Maples was deprived of the opportunity to select a fair and impartial jury because, during *voir dire*, some of the venire members gave false or materially misleading information, failed to truthfully answer questions put to them or failed to reveal material information asked of them.

277.    Despite direct and unambiguous questions from Counsel, one or more jurors failed to disclose that they were strongly committed to the automatic imposition of the death penalty if Mr. Maples was found guilty of capital murder. One juror also failed to disclose that he had served as a juror on a previous civil case, despite a question from the trial judge as to whether any of the panel members had previously served in a trial.

-140-

The failure of these jurors to truthfully answer questions at *voir dire* denied Mr. Maples

his right to a fairly selected jury. Indeed, absent effective disclosure by jurors of all

relevant information during the course of their selection, Mr. Maples had no other way of

obtaining this information, which was learned among other things from recent interviews

with jurors.

278. The failure of certain prospective jurors to truthfully disclose critical

material information was highly prejudicial to Mr. Maples. Mr. Maples was thereby

deprived of the opportunity to select a fair and impartial jury, thus violating his rights

under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution.

**C.     Mr. Maples Was Deprived of His Right to a Trial by Fair and Impartial
         Jurors Because the Jury Verdict Was Tainted by Improper Jury
         Communications.**

279. Prior to commencement of deliberations, two or more sworn jurors may

have discussed the facts of the case outside the courtroom. Upon information learned

from interviews with jurors, at least one of these conversations, between Mr. Legg, the

foreperson, and another juror while they were at the hotel where the jury was

sequestered, was noticed by several jurors and the bailiff, who reportedly stopped the

conversation but unlawfully failed to report such event to the judge. Indeed, at the end of

the trial, the judge stated, in connection with the jury: "According to my bailiffs, there

have been zero problems and that is not often the case with a sequestered jury." (R. at

3351.) As a result of these discussions outside of the deliberations, Mr. Maples was

deprived of his right to a fair and impartial trial by jury. This conduct, which violated the

-141-

court's express instructions, was simply impermissible and Mr. Maples was prejudiced by such misconduct.

280.    In addition, upon information and belief based on interviews with jurors, the entire jury may have been exposed to facts not in evidence. During the deliberations, at least one juror, Mr. Beard, related his own personal belief and experiences, referring to his own children as an example, in order to convince the other jurors to sentence Mr. Maples to death. These experiences were extraneous to the evidence in the case and thus were inappropriate to interject into the deliberations. Accordingly, Mr. Maples was denied his right to confront the evidence against him, in violation of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**D.    Mr. Maples Was Deprived of His Right to a Trial by Fair and Impartial Jurors Because One Juror Knew Personally a Witness and the Court Failed to Excuse this Witness When the Juror Revealed That She Knew the Witness Personally.**

281.    Upon information and belief based on recent interviews with jurors, Ms. Selby knew personally Darrell Jones, the paramedic who picked up Mr. Robinson's body. The name of Mr. Jones had not been mentioned during voir dire, therefore the juror was given no chance to know that Mr. Jones would testify and to reveal to the Court that Mr. Jones was a very close friend. When Mr. Jones came to the stand to testify, Ms. Selby reportedly informed the Court that she knew Mr. Jones. The Court determined that the friendship did not constitute a problem and that the witness should proceed with his testimony.

282.    This decision, and the prejudice that resulted therefrom, deprived

Mr. Maples of his right to a trial by fair and impartial jurors.

## XII.    MR. MAPLES WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS WHEN THE TRIAL COURT DENIED DEFENSE DISCOVERY OF DNA EVIdENCE

283.    DNA evidence is extraordinary in two respects:  it can have extreme

inculpatory or exculpatory power, and it is among the most complicated evidence

introduced in criminal trials.  From the moment that DNA evidence began to appear in

criminal trial, courts have wrestled with the circumstances under which it may be

properly admitted.  Compare Commonwealth v. Curnin, 565 N.E. 2d 440, 409 Mass. 218

(Mass. 1990); State v. Quatrevingt, 670 So.2d 197 (La. 1996); United States v. Jakobetz,

955 F.2d 786 (2nd Cir. 1992); Caldwell v. State, 393 S.E. 2d 436, 260 Ga. 278 (Ga.

1990); Minnesota v. Schwartz, 447 N.W. 2d 422 (Minn. 1989); State v. Bible, 858 P. 2d

1152 (Ariz. 1993); United States v. Chischilly, __ F.2d __, No. 92-10619 (9th Cir. 1992);

State v. Bloom, No. C9-94-55 (Minn. April 29, 1994); Commonwealth v. Crews, No. 94

(Pa. April 21, 1994); Husske v. Commonwealth, 448 S.E. 2d 331 (Va. Ct. App. 1994);

Taylor v. State, 889 P. 2d 319 (Okl. Ct. App. 1995); People v. Mohit, 579 N.Y.S. 2d 990

(N.Y. Co. Ct. 1992).

284.    Despite repeated and specific requests for discovery of such DNA

evidence, the state did not provide Mr. Maples with the necessary DNA-related

documents.  The trial court inexplicably overruled Mr. Maples' timely and repeated

requests for discovery of the DNA evidence and ordered the Frye hearing to proceed

without the critical DNA discovery.  (R. 2562)  Mr. Maples' counsel thus had to defend

Mr. Maples at the Frye hearing *and at the trial* without critical DNA discovery.  This

rendered the state's DNA evidence untested and unreliable.

285.    Since DNA evidence can be potential devastating, a rigorous adversarial

process is essential.  The ruling of the trial court blocked the defense from mounting this

rigorous adversarial process.  The subsequent conviction and death sentence of

Mr. Maples is thus constitutionally unreliable and violated his rights under the Fifth,

Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**A.      Exacting Requirements Guide The Discovery and
          Introduction Of DNA Evidence In A Criminal Trial**

286.    Regardless of when and by whom the reliability of proferred DNA

evidence must be determined through an adversarial process.  "Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible

evidence." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596 (1993).

287.    Elemental to the required "vigorous" adversarial process is full and

adequate discovery of DNA evidence.  Only through discovery can a criminal defendant

evaluate the state's techniques, methods, and possible flaws of DNA forensic analysis, or

understand the means by which the proponent arrived at a particular conclusion.  Only

through discovery can the defendant then be equipped to examine the state's DNA

expert(s), either at the Frye hearing or during trial.  Only through discovery can the cross-

examination be informed, meaningful, reliable, and helpful to the factfinder.  And only

-144-

through discovery can the decision maker — be it the judge or the jury — reach an informed opinion about the DNA evidence, and make an informed decision about the weight to assign such evidence.

## B.    The Defense Requested Discovery Of DNA Evidence

288.    Mr. Maples' trial counsel specifically and repeatedly requested discovery of DNA evidence.  In one of its initial filings with the trial court, the defense requested all documents relating to any biological, biochemical, criminalisitic, forensic, or scientific investigations conducted in the case, and specifically requested documents and tests conducted by the Alabama Department of Forensic Sciences.  (See MOTION FOR DISCOVERY OF PROSECUTION FILES, RECORDS, AND INFORMATION NECESSARY TO A FAIR TRIAL, C. 93, 101 and 105)  This motion was filed nearly two years prior to trial. Eighteen months later, and only a few days after it became apparent that the state intended to use DNA evidence against Mr. Maples, counsel for Mr. Maples filed a second discovery motion, wherein it renewed the discovery motion of December, 1995, and specifically requested discovery of the state's DNA evidence to enable them to "test the admissibility and sufficiency of the State's evidence which this defendant is entitled to do and which must be done prior to and as prerequisite to" the admission of DNA evidence. (MOTION FOR EXPEDITED DISCOVERY AND ATTENDANT RELIEF INCLUDING SUPPRESSION OF EVIDENCE, C. 423, 425)

289.    Each of these pretrial motions plainly requested discovery of forensic evidence, and evidence of any tests or analyses that were performed by state laboratories, and specifically listed the Department of Forensic Sciences laboratories from which

Mr. Maples sought discovery.  Further, the second motion specifically requested that the

state provide DNA discovery.  Further, the state's discovery failure was raised at the

outset of the Frye hearing.

## C.     The Prosecutor Did Not Provide Discovery Of The Required DNA Evidence, And The Trial Court Did Not Order Proper Discovery

290.    The state's failure to provide discovery to the defendant was again raised

by defense counsel at the outset of the Frye hearing.  Counsel objected that the state had

not provided them with the requested discoverable items.  Counsel argued that it could

not proceed with the hearing unless it had discovery of the items enumerated in the

discovery request, and that they could not proceed without full discovery of the necessary

DNA evidence:

291.    Because the state hasn't provided that [the requested and required DNA

evidence] to us, we cannot be in a position consistent with the due process clause to

competently cross examine this witness of the State regarding the matters that must be

examined in this *Hutcherson* or *Perry* hearing that we are having today.

292.    (R. 2560) The requested materials were essential to enable the defense to

perform the required "vigorous" adversarial testing of the state's proffered DNA

evidence.

293.    Despite the timely and detailed discovery motions (C. 93, 423), the

articulated need for the discovery, (R. 2558-2560), and well-founded defense objections

to having to proceed without the discovery, (R. 2560, 2562), the trial court inexplicably

denied the discovery motions, denied the defense objections, and ordered that the hearing

-146-

continue, without the critical discovery being provided to the defendant.  The trial court

merely stated that it believed that the discovery order "has been complied with" and

ordered the parties to proceed.  (R. 2562)  The admissability hearing was thus conducted

without the defense having the benefit of the DNA material it had requested.  (R. 2562-

2597)

294.    As surely as Paris fell Achilles with a single well-placed arrow,

Mr. Maples was crippled.  He could not effectively challenge the state's DNA evidence;

the admission of the evidence by the trial court was a foregone conclusion.  (R. 2636)

The state then introduced the DNA evidence at trial the following day.  Mr. Maples —

crippled without the discovery — was unable to challenge the inculpatory evidence.

(R. 2661)  The state expert expounded that blood samples matched with a certainty

ranging from 1 in 50,000 to 1 in 775,000 people.  (R. 2690)  *These assertions could not*

*be tested:*  the defense did not have the tools to examine the state's methods or

conclusions.  The necessary "vigorous" adversarial testing of the inculpatory DNA

evidence did not occur in this case, either at the Frye hearing or at trial.

**D.      The Discovery Violations Prevented Mr. Maples**
**From Effectively Rebutting The State's Inculpatory**
**DNA Evidence And Crippled Mr. Maples' Defense**

295.    The discovery violations were prejudicial to Mr. Maples.  Without the

necessary and discoverable materials the state's assurances that the tests were "accurate,"

"reliable," and "generally accepted" were rendered unreliable.

296.    The admissibility hearing on the DNA was not full, fair, or reliable:  in

effect, it tested nothing at all.  Nonetheless, the jury heard DNA evidence which was

-147-

incredibly incriminating to Mr. Maples. The state's expert testified that the samples matched with a certainty of 1 in 50,000 and 1 in 653,000. (R. 2623-2624) But without discovery, the techniques and analyses — laboratory, statistical, or otherwise — this assertion could not be examined. The numbers might as well have been plucked from a hat, as far as Mr. Maples could determine.

297.    The state relied heavily on the DNA evidence in their effort to obtain a conviction. Indeed, the state devoted a considerable portion of its closing argument to explaining and highlighting the significance of the DNA evidence. (R. 2895-2897 and 2958-2959)

298.    The state's heavy reliance upon the DNA evidence belies its critical importance to the state's proof. Further, it was critically damaging to Mr. Maples' defense.

299.    The DNA evidence went directly to proving that Mr. Maples committed *capital* murder, and not just intentional murder. Mr. Bogle testified that he was at the bridge and creek between the time of the killing and the time that Robinson's body was found at the creek. (R. 2347) He testified that he was certain that Robinson's body was not there at the time. (R. 2351, 2353) Mr. Maples used this testimony to argue that someone else may have been involved in the killing, (R. 2933-2934, 2936) and that the two shootings did not occur at the same time. (R. 2937) The state used its wrongfully admitted DNA evidence to refute this defense, and to argue that both killings occurred at the same time.

-148-

300.    While there admittedly was other evidence to show that Mr. Maples was guilty of *something,* there was not evidence which proved that Mr. Maples was guilty of *capital* murder.  The state's reliance on wrongfully admitted evidence belies its harmful and prejudicial nature.  Mr. Maples was grossly prejudice by the DNA evidence.

301.    Mr. Maples could not test the state's assurances of the reliability and accuracy of the DNA evidence and techniques without the discoverable DNA materials. The fact-finder therefore could not make its determination of the probative value of the state's DNA evidence based on a "vigorous" defense challenge.  The trial court's overruling of defense discovery requests violated Mr. Maples' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

## XIII.    MR. MAPLES WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS WHEN THE TRIAL COURT FAILED TO GIVE AN INTOXICATION OR A MANSLAUGHTER INSTRUCTION DESPITE EXTENSIVE EVIDENCE THAT INDICATED MR. MAPLES WAS USING DRUGS AND ALCOHOL ON THE DAY OF THE OFFENSE

302.    During the course of Mr. Maples' trial, it became apparent that this was not an ordinary homicide case.  A succession of witnesses testified that Mr. Maples was very good friends with the decedents Stacey Terry and Barry Robinson, that the three of them spent the night of their death socializing and drinking together, that Mr. Maples had a drug problem and frequently used illegal drugs, and that Maples drank and used drugs on the night Terry and Robinson were killed.  All of this information was brought forward at Mr. Maples' trial.

303.    Despite the evidence of Mr. Maples' drinking and drug use, despite the inexplicable circumstances surrounding the death of Mr. Robinson and Mr. Terry which

suggested a drug- and alcohol-induced cause, despite counsel's admission that

Mr. Maples was responsible for the death of Terry and Robinson, despite a theory of

defense that relied on a finding that Mr. Maples lacked the requisite specific intent

necessary to support a capital murder conviction, and despite ironclad law that require an

intoxication and manslaughter instruction whenever there is evidence of drug or alcohol

use, the trial court did not give an intoxication instruction, and never gave the jury a

lesser-included manslaughter instruction.  This was constitutional error.  Beck v.

Alabama, 447 U.S. 625 (1980).  Under the facts of this case, where Mr. Maples was

convicted of shooting two good friends without any plausible explanation, this

instructional failure clearly deprived Mr. Maples of a fair trial and a reliable verdict.  This

violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

304.    Because the facts relating to the background of the offense and to Maples'

drinking throughout the day and evening of the homicides is critical to understanding

why these instructions were necessary, they are presented in some detail here.

**A.    Maples, Terry, and Robinson Were Friends, And
Maples Had No Motivation To Kill Terry And
Robinson**

305.    Every witness who testified at Mr. Maples' trial — whether called by the

prosecution or the defense — testified that Mr. Maples and Mr. Terry had spent a lot of

time together, and that they always got along well.  A succession of witnesses — Phillip

Shell, Le Ann Clemmons, Beverly Shawnbaum, Jason Dean Boyd, Heather Davis, James

Dobbs, Tatum Terry, Alan Birdsong, and Daniel Maples — testified at Mr. Maples' trial,

and each stated that they knew Mr. Maples, Terry, and Robinson to be friends, and that they had never witnessed any animosity among them.

306.    Phillip Shell, a friend of Mr. Maples' younger brother, testified that Maples and Terry always got along well. (R. 1489) He saw Maples and Terry together at a party together that evening, and testified that they had they were socializing together. (R. l484-1485) Le Ann Clemmons, who saw Maples and Terry together the night Terry was killed, testified that Maples and Terry arrived at a party together, that they got along well together while at the party, and that they left together. (R. 1798, 1806) She also testified that Maples and Terry were together all the preceding week. (R. 1809) Similarly, Beverly Shawnbaum testified that she saw Maples and Terry together that evening, and that they seemed to get along, and that they were traveling together in Terry's car. (R. 1813-1816) Jason Dean Boyd, who played pool with Maples on the night of the shooting, testified that he never saw any friction between Maples and Terry. (R. 1851) Heather Davis testified that Maples, Terry, and Robinson all had mutual friends, and had spent time with one another. (R. 1870) James Dobbs testified that he saw Terry, Maples, and a young person together that evening to socialize, and that he didn't know of any problems between Mr. Maples and Mr. Terry. (R. 2072, 2090) Tatum Terry, who is related to one of the victims, testified that Mr. Maples and Mr. Terry were friends, and that they were "hanging out" together and appeared to get along well. (R. 2739-2741)

307.    All the state witnesses, when asked, testified that Mr. Maples was known neither as a dangerous nor a criminally-inclined person. Danny Mayberry testified that

the charges levied against Mr. Maples did not comport with his knowledge of Mr. Maples or his behavior during the preceding three or four months. (R. 2041) James Dobbs — upon whom, according to the state, Mr. Maples attempted to pin the blame for the murders by fabricating a phone call to the police from Dobbs — testified that Mr. Maples did not have violent tendencies, and that the charges were very surprising. (R. 2082) And yet another person testified that the charges against Mr. Maples did not reconcile with his knowledge of Mr. Maples. (R. 2748-2749) Indeed, the state conceded that Mr. Maples did not have any prior criminal history. (R. 3296)

308.    The state's sole rationale to support its theory that Mr. Maples' suddenly shot two of his friends was that he intended to steal Mr. Terry's car, and that Mr. Robinson was simply in the wrong place at the wrong time. (R. 1456, 2887, 2898) This theory was tenuous, at best: Mr. Maples had sole unsupervised possession of the keys to the automobile earlier that evening, and had apparently been driving the car that very night. (R. 1809) Le Ann Clemmons testified that when she was at a bar that evening, Mr. Terry entered first, and then, a few minutes later, Mr. Maples entered, <u>with the keys to Terry's car</u>. (R. 1809) The significance of this testimony cannot be over-emphasized: Mr. Maples was alone outside with the keys to the very car that the state contended he committed double murder to obtain. Further, he was alone with the car and the keys the *very night* he purportedly committed the double homicide.

309.    Similarly, another witness, James Dobbs, testified that he would loan his cars to Mr. Maples whenever Maples requested a vehicle. (R. 2087) A third person testified that on previous occasions, Mr. Maples had access to his vehicles and as much

as $9,000 cash, and that Mr. Maples had been consistently trustworthy. (R. 2748) If Mr. Maples had intended to steal Mr. Terry's vehicle, as contended by the state, then Mr. Maples had ample opportunity to do so that very night, and had amply opportunity to steal vehicles in the recent past. Robbery was simply not a motivating factor in the double homicide.

310.    The friendship of Mr. Maples with the victims and his ready access to the vehicle that evening establish that the state's presentation was not a complete portrait of the offense. Something else occurred that night to lead to the deaths of Terry and Robinson. That something else was drugs and alcohol.

**B.    There Was Clear Evidence That Mr. Maples Used Alcohol And Drugs**

311.    Mr. Maples spent the late afternoon and evening of July 7, 1995 going from one social gathering to the next, drinking. The early evening started off for Mr. Maples at a cookout at a friend's house, where he had a "few beers." (R. 2738-2739) While at the cookout, Maples arranged to meet Terry at a party, so they could then go out later that evening. (R. 2739) They indeed met at the party, and after staying awhile, left together. (R. 2741) While at the house, Maples and Terry got along well together and drank more alcohol. (R. 2740; Statement of Mr. Maples). Mr. Maples and Mr. Terry were next seen at a bar. Le Ann Clemons and Beverly Shawnbaum each testified that they were at a bar drinking with Maples and Terry between 8:30 or 9:00 p.m. until approximately 10:30 or 11:00 p.m. (R. 1795-1821) Le Ann Clemons testified that

Mr. Maples was drinking throughout that period. (R. 1801) She further testified that they had run up a bar tab, which was paid by Mr. Maples. (R. 1810)

312.   Later, Mr. Maples and Mr. Terry were seen together at a pool hail where Mr. Maples appeared drunk to some of those present. A witness at the pool hall testified that Mr. Maples was acting "[j]ust loud in general, you know, <u>like a drunk person would act when they get too much in them or something</u>." (R. 1858, 1860) (emphasis supplied). Jason Boyd, who was at the pool hall and played pool with Mr. Maples, testified that Maples "wasn't shooting [pool] as well [as normal] and he seemed like he was a little hyper, but that was about it" and that it was possible that he was affected by "something." (R. 1848)[4] Other testimony indicated that it was expected that the group — Terry, Maples, and Robinson — were so intoxicated that it was likely that they were passed out: when neighbors came across Mr. Terry's body, they initially assumed that he was "passed out" in the driveway, presumably from intoxication. (R. 1481, 1497)

313.   All of this evidence, individually and cumulatively, established that Mr. Maples was drinking that evening, and that he drank alcohol over a sustained period of time. Alcohol, however, was not the only drug ingested by Mr. Maples that evening: he also used crack cocaine and crystal methamphetamine on the night of the shooting. Most critically, a crack pipe used by Mr. Maples that evening was introduced at trial. An investigating officer testified that a RC Cola can introduced at trial was shaped into a crack pipe by punching holes in the can and bending it on one side. (R. 2516-2517) In

---

[4]   Even Mr. Terry, who apparently rarely drank, had alcohol in his system when he died, (R. 2339), and Robinson had marijuana metabolites in his blood, indicating that he had recently smoked marijuana.

addition, a witness testified that Mr. Maples had illegal drugs with him on the night of the offense, that she saw Mr. Maples with drugs in his hand, and that he told her that "he had been doing crystal meth and crack" that evening. (R. 1894, 1910-1911; 1915)  Further, Mr. Maples was seen on the very night of the offense in "cracktown" buying crack cocaine. (R. 1458, 1983, 1986)  Another witness testified that Mr. Maples and Mr. Terry had been "doing stuff" together all week, including drinking alcohol. (R. 2090)

314.    Mr. Maples was intoxicated and using drugs with his friends on the night that Terry and Robinson died, but the jury was never instructed how to properly consider Maples' intoxication. The jury was accordingly denied the opportunity to give effect to this evidence and possibly sentence Mr. Maples to a lesser-included offense. This was constitutional error. Beck v. Alabama, 447 U.S. 625 (1980).

**C.    The Trial Court Reversibly Erred When It Did Not Give A Manslaughter Instruction**

315.    Capital murder is a specific intent crime in Alabama. Ala. Code §13A-5-40(b) (1975); Bankhead v. State, 585 So.2d 97 (Ala. Crim. App. 1989); Ex parte Kyzer, 399 So.2d 330 (Ala. 1981).  Also, in Alabama, intoxication and drug consumption may negate the specific intent required for capital murder. See Ala. Code §13A-3-2 (1975); Ex parte Scott, __ So.2d __, *34, No. 1961460 (Ala. March 20, 1998); Owen v. State, 611 So.2d 1126 (Ala. Crim. App. 1992); Ashley v. State, 651 So.2d 1096 (Ala. Crim. App. 1994).

316.    Despite the clear law that mandates an instruction on manslaughter when there is evidence of intoxication, the jury was never so instructed.  They were never told

how Mr. Maples' intoxication may have influenced his ability to form the specific intent essential to sustain a capital murder conviction. This clearly violated Mr. Maples' rights under the United States Constitution. Beck v. Alabama, 447 U.S. 625 (1980).

317.   Indeed, the only lesser included offense upon which the jury was instructed was intentional murder, which would have still required a finding of specific intent to kill. The intentional murder instruction did not permit the jury to give effect to Mr. Maples' intoxication. The jury was not given any instruction to permit a conviction if they concluded that Mr. Maples did not have the capacity to form a specific intent to kill, and this encouraged "the jury to convict for an impermissible reason." Beck v. Alabama, 447 U.S. 625 (1980). In this case, that likelihood was particularly great where defense counsel admitted that Mr. Maples was responsible for the homicides. It was federal constitutional error not to permit the jury to consider Mr. Maples' drug use as relevant to mental state.

## XIV.   THE TRIAL COURT APPLIED IMPROPER FEDERAL CONSTITUTIONAL LAW WHEN IT SENTENCED MR. MAPLES TO DEATH

318.   The trial court simply did not understand or apply the applicable constitutional law guiding the consideration of mitigating and aggravating evidence in capital sentencing proceedings. In its sentencing order, the trial court made this misunderstanding explicit, and repeatedly rejected mitigating circumstances that had properly been introduced by Mr. Maples in support of a life sentence. The trial court rejected the mitigating circumstances because it improperly concluded that each mitigating circumstance did not relieve Mr. Maples of his responsibility for the offense.

This is simply not the inquiry at the penalty phase of a capital trial.  Rather, the proper

purpose of mitigating circumstances is to ensure that the sentencer consider "as a

mitigating factor, any aspect of the defendant's character or record and any of the

circumstances of the offense that the defendant proffers <u>as a basis for a sentence less than

death</u>."  <u>Lockett v. Ohio</u>, 438 U.S. 37 (1978) (emphasis supplied).

      319.    Nonetheless, the trial court simply rejected many of Mr. Maples'

mitigating circumstances simply because they did not relieve Mr. Maples of

responsibility for the offense.  This is the incorrect standard and its application by the

trial court deprived Mr. Maples of his rights under the Fifth, Sixth, Eighth and Fourteenth

Amendments to the United States Constitution.

**A.**    **The Trial Court Improperly Rejected Three Statutory Mitigating
Circumstances**

      320.    The Alabama Code lists seven statutory mitigating circumstances.  Ala.

Code 13A-5-51(1)-(7) (1975).  Consideration of these mitigating circumstances — when

applicable — is mandatory ("Mitigating circumstances <u>shall</u> include . . .").  <u>Id</u>.  At the

penalty phase of Mr. Maples' trial, the defense offered evidence in support of four of the

statutory mitigating circumstances.  The state offered no evidence to rebut any of the

defense evidence, and conceded that one of the mitigating circumstances existed:  that

Mr. Maples did not have a significant history of prior criminal activity.  Ala. Code 13A-

5-51(1) (1975).

      321.    In addition to his lack of prior criminal history, Mr. Maples introduced

evidence to support the mitigating circumstance that 1) the capital offense was committed

while the defendant was under the influence of extreme mental or emotional disturbance, Ala. Code 13A-5-51(2) (1975); 2) that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, Ala. Code 13A-5-51(6) (1975); and 3) the age of Mr. Maples at the time of the offense, Ala. Code 13A-5-51(7) (1975).  Though the evidence to support each of these statutory mitigating circumstances was uncontradicted by any state evidence, the trial court rejected each, and, most critically, *applied the wrong law when it rejected each proffered mitigating circumstance.*

### i.    Mr. Maples Suffered From Extreme Mental Or Emotional Disturbance

322.    There was clear and uncontroverted evidence that Mr. Maples suffered from an extreme mental or emotional disturbance at the time of the offense.  Ala. Code 13A-5-51(2) (1975).  Testimony presented by a forensic psychologist established that Mr. Maples suffered from a mental disturbance based, *inter alia*, on his alcohol and drug usage on the night of the offense.  (R. 3159-3160)  The state presented no evidence that this mitigating circumstance did not exist, and merely urged the jury and the trial court to reject this circumstance.  (R. 3290-3292, 3385)  The trial court followed the state's exhortions, and concluded that this mitigating circumstance did not apply.  (C. 561)  In rejecting this circumstance, the trial court applied the wrong law:  it concluded that Mr. Maples "knew the difference between right and wrong" and that therefore this

aggravating circumstance did not apply.  (C. 561)[5]  The Court of Criminal Appeals erroneously found that trial court considered this mitigating circumstance.  Maples v. State, slip op. at 37-38.

323.    Knowing the "difference between right and wrong" is a *competency* issue, and does not address the issue of wether the defendant was suffering from a mental or emotional disturbance.  Quite simply, the trial court applied the wrong — and much higher — standard in its evaluation of this statutory mitigating circumstance.  Ala. Code § 13A-5-51(2) (1975).  The distinction between legal competency premised on an emotional or mental disturbance and mitigation based premised on a mental or emotional disturbance has been long recognized.  The mitigating circumstance of mental or emotional disturbance need not rise to the level of insanity Eddings v. Oklahoma, 455 U.S. 104 (1982).

324.    As in Eddings, the trial court in this instance applied the wrong standard. If Mr. Maples did not know the difference between right and wrong, he would not have been *tried for capital murder at all,* as the trial court would have been required to find him incompetent to stand trial.  Ala. Code § 13A-3-1 (1975).  By way of contrast, a mental or emotional disturbance is a mitigating factor that augurs for the imposition of a sentence of life imprisonment without the possibility of parole.  Ala. Code §13A-5-51(1975).  It was this issue that was before the court at the sentencing hearing.

_____

[5]    The trial court notes that Mr. Maples denied drug usage in his videotaped confession, and this denial is then used by the trial court as a further reason to reject this aggravating circumstance.  In effect, the trial court penalizes Mr. Maples for his unwillingness to incriminate himself by rejecting this mitigating circumstance.

Nonetheless, the court applied the competency standard — "knows the difference

between right and wrong" — and thus sentenced Mr. Maples to death without giving

proper consideration to this statutory mitigating circumstance.  If the trial court had

examined these mitigating circumstances under the proper standards, the court would

have found them to exist.  This would have affected the court's "weighing process" and

would have resulted in a sentence of life without parole for Mr. Maples.

<div style="margin-left:2em">

**ii.      Mr. Maples was Impaired in His Ability to Conform His Conduct to The Requirement of the Law**

</div>

325.      In addition to the "mental or emotional" disturbance statutory mitigating

circumstance, unrebutted evidence presented at trial indicated that Mr. Maples' ability to

appreciate the criminality of his conduct or to conform his conduct to the requirements of

law was substantially impaired.  Ala. Code 13A-5-51(6) (1975).  A clinical psychologist

found that Mr. Maples' drug and alcohol use, in combination with his mental

impairments, substantially impaired Mr. Maples' abilities.  (R. 3108-3117, 3155)  The

mental health expert clearly stated that he found Mr. Maples' ability to conform his

conduct to the requirements of the law was substantially impaired:  "Q [of counsel]: His

impairment affected his ability to conform his conduct to the requirements of law? Is that

what you are saying?  A. Yes."  (R. 3155)  This testimony was sufficient to interject this

mitigating circumstance.  Inexplicably, the trial court rejected this statutory mitigating

circumstance, noting that "the Defense never specifically addressed this particular

mitigating circumstance."  (C. 562)  This is simply incorrect.  Mr. Maples clearly

presented evidence in support of this mitigating circumstance.  (R. 3108-3117, 3155)

The trial court did not address this evidence *at all*, and therefore improperly rejected the mitigating circumstance.

326.    Extreme mental or emotional impairment is a well-defined mitigating circumstance, and should have been properly evaluated as such by the trial court in reaching its sentence determination.  Magwood v. State, 791 F.2d 1438 (1st Cir. 1986); Jackson v. Thigpen, 752 F. Supp. 1551 (N.D. Ala. 1990); Ala. Code § 13A-5-51(6)(1975).  The trial court's rejection of this mitigating circumstance, based on an erroneous belief that the evidence was not presented at trial, denied Mr. Maples an accurate sentence determination.  This violated Mr. Maples' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### iii.    Mr. Maples Was A Young Adult At The Time Of The Offense

327.    A well-defined mitigating circumstance is the age of the defendant at the time of the offense.  Ala. Code §13A-5-51(7) (1975).  This mitigating circumstance has been found in numerous Alabama cases.  Ex parte Henderson 616 So.2d 348 (Ala. 1992) (defendant's age of twenty-one is a mitigating circumstance); Ex parte Godbolt, 546 So.2d 991 (Ala. 1987) (same); Dobyne v. State, 672 So.2d 1353 (Ala. Crim. App. 1994) (defendant's age of twenty-two at time of offense is a mitigating circumstance); Floyd v. State, 486 So.2d 1309 (Ala. Crim. App. 1985) (age of twenty-five is a mitigating circumstance).

328.    Mr. Maples was twenty-one at the time of the offense, and offered this as a mitigating circumstance.  (R. 3276)  The trial court completely rejected this mitigating circumstance and again applied the wrong standard when it concluded that it did not

-161-

exist. The trial court noted that "[a]lthough the age of an offender may be an important consideration in deciding punishment, a 21-year old offender is not so youthful the Court should treat him different than other adults." (C. 562) (emphasis supplied). The court makes its misunderstanding of the law explicit: while it acknowledges that age may be an important punishment consideration, it then rejects the mitigating circumstance on the reasoning that Mr. Maples should be treated as an adult.

329.    There can be no question that Mr. Maples is an adult for trial purposes. Indeed, the age at which the courts no longer treat youths differently from adults is eighteen; that is not the issue at this stage. Rather the trial court should have examined whether Mr. Maples' relatively young adult age supported an *adult* sentence of life without parole or death. Both are adult sentences. Both require that a capital offender be tried as an adult. The trial court misunderstood the law. Age at the time of the offense — when offered as a mitigating circumstance — is not to relieve a defendant of his adult-level culpability, but reflects the societal belief that a young adult may be deserving of something less than society's most draconian punishment. The trial court's erroneous understanding of the law blocked this mitigating circumstance from consideration and violated Mr. Maples' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

330.    By rejecting three statutory mitigating circumstances without giving them consideration for their proper purpose, the trial court vitiated any reliability from Mr. Maples' sentence of death. The Court of Criminal Appeals failed to address the errors of the trial court, and simply reached the erroneous conclusion that the sentencing

court considered "all" the mitigating evidence presented.  Tellingly, the Court of

Criminal Appeals *does not* find that the sentencing court "properly" considered all the

mitigating evidence.  Maples v. State, slip op. at 37.  This appears to be a tacit admission

of error.  It is axiomatic that improper consideration of "all" the mitigating evidence does

not comport with the law of this State or the United States Constitution.  Godfrey v.

Georgia, 446 U.S. 420 (1980) (capital sentence must be rationally reviewable).

**B.      The Trial Court Improperly Rejected Non-Statutory
          Mitigating Circumstances**

331.    In addition to rejecting three statutory mitigating circumstances under the

wrong standard, the trial court also rejected numerous non-statutory mitigating

circumstances.  The non-statutory mitigating circumstances clearly had been injected by

the defense, and clearly existed as unrebutted non-statutory mitigating circumstances.  As

relevant mitigating evidence, they must be taken into consideration.  Lockett v. Ohio, 438

U.S. 586 (1978).  Nonetheless, the trial court rejected each of them, and again applied the

incorrect legal standard.

332.    Mr. Maples presented evidence in support of several non-statutory

mitigating circumstances:  his abusive family history (R. 3262); his suffering from drug

dependency and his attempt to cure himself of his addiction (R. 3278-3279); his

cooperation with law enforcement in apprehending drug dealers (R. 3279); his abuse

from his mother (R. 3280); and his acceptance of responsibility for the crime.  (R. 3281)

333.    Some of these non-statutory mitigating circumstances where improperly

rejected by the trial court.  For example, when discussing the mitigating circumstance

that Mr. Maples assisted police officers apprehend drug dealers, the trial court noted that

the defendant did not call any officers, and that he relied exclusively upon the testimony

of a family member.  The trial court thus condemned Mr. Maples for not calling

witnesses or testifying on his own behalf in support of this mitigating circumstance,

directly contradicting Mr. Maples' Fifth Amendment rights, and following the state's

highly improper arguments. (C. 563)  The court subsequently found that this mitigating

circumstance does not exist, *despite any contrary evidence*.  The evidence was clearly

sufficient to "inject" this mitigating circumstance; and the burden then shifted to the state

to disprove its existence, which it did not attempt to do.

  334. This procedure violated the defendant's rights under the Fifth, Sixth,

Eighth and Fourteenth Amendments to the United States Constitution.  See Lockett v.

Ohio, 438 U.S. 586 (1976).

## XV. THE WARRANTLESS POLICE SEARCH OF MR. MAPLES' ROOM WAS NOT PERFORMED PURSUANT TO A VOLUNTARY CONSENT, AND THE ITEMS SEIZED PURSUANT TO THE ILLEGAL SEARCH WERE THUS INADMISSIBLE AT TRIAL

  335. The Fourth Amendment of the United States Constitution provides that

"[t]he right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated."  U. S. CONST, amend IV.

The United States Supreme Court has held that it is "a basic principle of Fourth

Amendment law that searches and seizures inside a home without a warrant are

presumptively unreasonable." Payton v. New York, 463 U.S. 765 (1983).  This

fundamental constitutional principal was violated in this case when the police conducted

a warrantless search of Mr. Maples' hotel room without a warrant, valid consent, or any

exigent circumstance to suspend the constitutional protection.  An extremely prejudicial

t-shirt was seized during this illegal search, and was subsequently introduced at trial.

(R. 2533)  This shirt was the "poisoned fruit" of an illegal search, and was not

admissible.  Wong Sun, 371 U.S. 471 (1963).  Its introduction at trial clearly violated

Mr. Maples' rights guaranteed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth

Amendment of the United States Constitution.  See Mapp v. Ohio, 367 U.S. 643 (1961);

Bumper v. North Carolina, 391 U.S. 543 (1968).

336.    Once Mr. Maples was arrested and in custody at a Nashville police station,

the police twice searched his hotel room.  During the second search, the police recovered

an extremely prejudicial "No Fear" t-shirt.  "It is well settled under the Fourth and

Fourteenth Amendments that a search conducted without a warrant issued upon probable

cause is *per se* unreasonable . . . subject to only a few specifically established and well-

delineated exceptions."  Schneckloth v. Bustamonte, 412 U. S. 218, 219 (1973)

(quotations omitted); Katz v. United States, 389 U.S. 347, 357 (1967); Coolidge v. New

Hampshire, 403 U.S. 443, 454-455 (1971).  Mr. Maples did not give his consent to the

searches and no exigent circumstances justified the warrantless search.  Compare United

States v. Chadwick, 433 U.S. 1 (1977) (exigent circumstances exception cannot be

overextended:  if police can maintain control of item until warrant is obtained, then no

exigent circumstance exception applies); and California v. Acevedo, 111 5. Ct. 1982

(1991) (the mobility of an vehicle is the exigent circumstance that justifies warrantless

automobile searches); see also Agnello v. United States, 269 U.S. 20 (1925) (a search can

-165-

be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest).

## A.   Third Party "Consent" Was Invalid

337.   The state attempted to justify its warrantless search of Mr. Maples' room pursuant to a third-party consent.  In certain situations, a third party may have the authority to grant consent to a search.  United States v. Matlock, 415 U.S. 164 (1974).  In this case, however, the record affirmatively establishes that neither prerequisite of a valid third party consent was present here.  This rendered the successive searches unconstitutional, and the evidence seized therefrom inadmissible.

### i.   The Third Party Was Coerced To Consent To The Search

338.   Consent to a search — whether given by the primary party or as a third-party consent — must be freely and voluntarily given.  The burden rests with the state to prove voluntariness.  "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1973) (quoted in Schneckloth v. Bustamonte, 412 U.S. at 860.)

339.   The state fell far short of its burden in this case.  Mr. Maples was living at a hotel in Nashville when arrested.  (R. 2466, 2476)  He shared his room with Steven Tant.  (R. 2439)  At trial, the police produced a "waiver" signed by Mr. Tant, purportedly authorizing the search of his and Maples' room.  (R. 2449, 2466; State's exhibit 203 and 204).  Mr. Tant testified at trial, and described in stark detail the manner in which he was compelled to sign the "consent" form:

-166-

> Q.  Did they [the police] give you any problem about signing that or threaten you or coerce you in any fashion?
>
> A.  No.  <u>The problem to me at the time was all the police officers around me</u>, they didn't want to do anything and it was my suggestion that — I just came out and asked them what if I signed a piece of paper or something saying I give them permission; and they said oh, yeah, okay.  They came out with some papers like this, and <u>they were just all standing there with guns pointing at me so they came out with this and I signed it</u> and then they got to searching and an officer took me downtown.

(R. 2449) (emphasis supplied).  Mr. Tant's testimony paints a stark portrait of a coerced "waiver."

340.    Although Mr. Tant replied "no" to the prosecution's question of whether the police gave him problems about signing the form, Mr. Tant then stated that there *was a problem:*  "The <u>problem</u> to me at the time was all the police officers around me. . . ."  Clearly, Mr. Tant saw this as a problem.  He then continued, and stated that the police were standing there, "<u>with guns pointing at me</u>."  Mr. Tant's initial "no" reply is immediately undermined by his subsequent explanation.  Indeed, he says that there was a problem:  "the <u>problem</u> to me. . . ." and then describes what quite clearly was a problematic and coercive situation:  the police wanted to search his room, were standing around him with guns trained on him, and they came out with papers for him to sign "authorizing" the search.  The events described by Mr. Tant describe a coerced waiver.  The conduct of the police was outrageous and vitiates Mr. Tant's signature of any significance.

341.    Taken literally, Mr. Tant's initial "no" response is a logical antecedent to the subsequent exchange:  the police did not harass or intimidate him *because he gave*

*them exactly what they wanted:* a signed "consent" form.  The form of the question —

"did they give you any kind of problem about signing that" — demands a 'no' response.

The police clearly would not harass or intimidate Mr. Tant about *signing* the form; they

would have harassed and intimidated him if he had *not signed* the form.  This he did not

do:  the threat of weapons trained upon him was sufficient to overcome any reluctance he

may have had consent to the search.

      342.   The context in which the police extracted the signed "waiver" is also

relevant.  To determine whether consent to a search was free and voluntary, the reviewing

court must take into account "coercive police questions, as well as the possibly

vulnerable state of the person who consents."  Schlecknoth v. Bustamante, 412 U.S. at

229; see also United States v. Garcia, 890 F.2d at 360.  The searches were performed late

at night:  the first "waiver" form was signed at 11:00 p.m., and the second search was

conducted at 6:00 in the morning.  (State's exhibit 203, 204)  Mr. Tant had no suspicion

that Mr. Maples was a homicide suspect.  (R. 2448)  The police descended upon him,

without warning, without explanation, with guns drawn, and wanted to search the room.

Mr. Tant did not know the purpose of the search, did not know of any illegal activities of

Mr. Maples, and was presumably traumatized and terrified by the phalanx of policemen

with drawn guns.  Doubtless, this was traumatic, and made all the more so because he

had no idea of the reason behind the police actions.  In addition, Mr. Tant did not know

that he didn't have to give consent to the search, and nothing suggests that he read,

understood, or agreed to the terms of the waiver form.  The "waiver," under these

circumstances, constitutes no waiver at all, and does not constitutionally legitimate the

warrantless search of Mr. Maples' room.  The state fell far short of its burden to prove

voluntariness.

### ii.   The Third Party Did Not Have Authority To Consent To The Police Search Of Items Exclusively Within The Control Of Mr. Maples

343.   Even if this Court finds that Mr. Tant voluntarily consented to the search

of Mr. Maples' hotel room, this Court must nonetheless find that Mr. Tant did not have

*authority* to grant the police permission to conduct the type of search performed.  Though

a third party may have authority to grant the police permission to conduct a search in

some circumstances, it is a circumscribed authority, and does not bestow on third parties

the right to willy-nilly authorize police searches.  The United States Supreme Court has

made it clear that a valid consent to search may be given by a third party who

"possesse[s] common authority over or other sufficient relationship to the premises or

effects sought to be inspected."  United States v. Matlock, 415 U.S. 164, 171 (1974); see

Bumper v. North Carolina, 391 U.S. 543 (1968); Stoner v. California, 376 U.S. 483

(1964).

344.   Mr. Tant could not authorize a police search of Mr. Maples' possessions

that were exclusively within Mr. Maples' control.  The "No Fear" t-shirt was located in

Mr. Maples' duffel bag.  Mr. Maples was the sole person with access to the duffel bag,

and the sole person with control over the duffel bag.  As such, Mr. Tant could not

authorize the search of the bag.  This case is inversely analogous to Frazier v. Cupp, 394

U.S. 731(1969), where a third party granted consent to the police to search a duffel bag to

which *both* the third party and the suspect had access.  In Frazier, the third party consent

was valid because the third party was a "joint user of the bag" and therefore "clearly had authority to consent to its search." Frazier v. Cupp, 394 U.S. at 740.

345. Here, Mr. Tant was clearly *not* a joint user of the bag, and therefore could not authorize the search of the duffel bag which eventually yielded the No Fear t-shirt. The coercive police methods of electing a "waiver" from Mr. Tant, and Mr. Tant's lack of authority to grant even a willing, non-coerced waiver, rendered the subsequent search illegal.

### iii.     The Third Party Lacked Authority To Grant Consent

346. In addition, Mr. Tant's position as a hotel employee meant that he did not have the authority to grant consent to Mr. Maples room or possessions.  (R. 2449, 2466) The law is quite clear:  hotel employees do not have the authority to authorize police searches of hotel rooms.  Stoner v. California, 376 U.S 483, 487-488 (1964) (the prosecution argued that the "search of the hotel room, although conducted without the petitioner's consent, was lawful because it was conducted with the consent of the hotel clerk.  We find this argument unpersuasive"); Lustig v. United States, 338 U.S. 74 (1948); United States v. Jeffers, 342 U.S. 48 (1951).  Quite simply, "a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." Stoner v. California, 376 U.S. at 490 (citing Johnson v. United States, 333 U.S. 10 (1948).  Mr. Tant, as a night clerk at the hotel where Mr. Maples was staying, could not consent to the search of Mr. Maples' hotel room.

347. Mr. Tant's "consent" to search the hotel room he shared with Mr. Maples was robbed of any voluntariness when he was required to sign a waiver at the threat of

armed police.  In addition, Mr. Tant lacked the authority to grant police permission to search Mr. Maples' duffel bag which was exclusively within Mr. Maples' control. Further, Mr. Tant, as an employee of the hotel where Mr. Maples was staying, did not have the authority to permit a police search of Mr. Maples' room.  Furthermore, the introduction of the t-shirt seized during this search denied appellant his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## XVI.  THE TRIAL COURT CONSTITUTIONALLY ERRED WHEN IT DENIED DEFENSE DISCOVERY MOTIONS, AND THEN REFUSED TO VIEW THE WITHHELD DOCUMENTS *IN CAMERA*

348.    The trial court critically curtailed the capacity of the defense to mount a challenge to the state's evidence.  Repeated and various discovery motions were all denied by the defense, and Mr. Maples' counsel was therefore unable to challenge, sift, and analyze the state's evidence against Mr. Maples.  It is well-recognized that defense discovery is a critical component of ensuring that a trial is full and fair fact finding process.  Brady v. Maryland, 373 U.S. 83 (1963).  Despite this well-established rule of law, and constitutional mandate, the trial court in this instance repeatedly prevented Mr. Maples from obtaining critical and necessary discovery.  This obfuscation of the truth and fact-finding necessary to a fair trial denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

349.    The trial court roundly denied defense discovery during Mr. Maples' trial. In addition to the denial of DNA discovery, detailed *infra*, and the refusal of the trial

court to properly explore biases and prejudices of the jury, the trial court refused to grant

(1) defense discovery of institutional files and records that were necessary to prepare for

the penalty phase of Mr. Maples' trial; (2) a defense motion to discovery the records

documenting selection of the jury; (3) a defense motion for production of evidence, and

further denied a defense motion for an *in camera* inspection of the evidence; (4) a

defense motion for discovery of evidence that would support the change of venue motion.

Each of these discovery violations will be discussed in turn.

A.     **The Trial Court Refused To Grant Discovery Of**
       **Evidence Critical To Mr. Maples For The Penalty**
       **Phase**

350.    It is well-established that a defendant is entitled to put on any aspect of his

character or record in support of a sentence less than death. <u>Lockett v. Ohio</u>, 438 U.S.

586 (1978). It is axiomatic that in order for this right to have any meaning, a capital

defendant be enabled to gather information that may be offered in mitigation. Much of

information is in the possession of organizations and state agencies which will not release

the information without a court order. Accordingly, Mr. Maples filed a motion for

discovery of institutional files and records, requesting, *inter alia*, records from various

state agencies that may maintain records on Mr. Maples. (C. 107) Despite Mr. Maples

manifest need to present mitigating evidence during the penalty phase, and despite his

motion to discover evidence essential to presenting mitigating evidence, the trial court

refused to authorize access to numerous records. (R. 217) Indeed, the trial court granted

the motion only insofar as it accorded with previous discovery order. (R. 217) The

court's previous discovery order, however, fell far short of protecting Mr. Maples' right to collect and present "any evidence" in support of mitigation.

351.    The trial court's restriction of Mr. Maples' discovery of evidence necessary for a full and fair penalty phase denied Mr. Maples a fair penalty determination, and violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**B.    The Trial Court Denied Discovery Of Jury System Records**

352.    Mr. Maples sought discovery on the selection and formation of the Grand and petite juries. (C. 171)  It is quite clear that the United States Constitution does not countenance the formation of a jury venire infected by improper discrimination or underrepresentation of a cognizable group. Swain v. Alabama, 380 U.S. 202 (1965); Vasquez v. Hillery, 474 U.S. 254, 263-264 (1986) ("discrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless error review"); Duren v. Missouri, 439 U.S. 357(1979).

353.    Accordingly, Mr. Maples moved for discovery of information that was critical to making his showing that discrimination had occurred in the selection and formation of the grand and petite juries. (C. 171) Despite the clear cognizability of Mr. Maples' claims of discrimination, and despite clear law that placed the burden on him to prove his claims of discrimination, the trial court denied Mr. Maples motion to discover the jury system records necessary to prove his claims. (R. 199) This prevented Mr. Maples from establishing that the juries in Mr. Maples' capital case were selected from jury lists that discriminated against cognizable groups, and thus denied Mr. Maples'

-173-

right to a fair trial under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. <u>Test v. United States</u>, 420 U.S. 28 (1975).

354. In addition to denying discovery of the grand and petite jury venire records, the trial court also denied Mr. Maples funds for expert assistance to assist his preparation and presentation of the claims to the court. (R. 123, 199) The trial court's rulings, considered in combination, completely barred Mr. Maples from presenting his claim that the formation of the venires discriminated against African-Americans, women, or other cognizable groups: he could neither procure the records that were essential to make such a showing and nor could he afford to hire an expert that could analyze and interpret the records to assess whether they revealed a pattern of discrimination and underrepresentation.

## C. The Trial Court Refused To Order Discovery Of Evidence Crucial To Mr. Maples' Defense

355. Mr. Maples sought to discover whether the state possessed exculpatory evidence in regard to several state witnesses, as well as possible exculpatory evidence arising from an unrelated homicide which was unsolved at the time of Mr. Maples' trial. (C. 242) Accordingly, Mr. Maples filed, in addition to his initial discovery motions, an additional discovery motion specifically detailing the sought-after discovery. The trial court doubly erred in ruling on this motion: it denied the motion, and then denied Mr. Maples motion that the evidence in the possession of the state be reviewed *in camera* to determine whether the evidence was discoverable by Mr. Maples.

### i.     The Trial Court Erred When It Denied Specific Requested Discovery

356.     The law is quite clear:  a defendant is entitled to discovery of any exculpatory or impeachment evidence in the possession of the state.  <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Ex parte Monk</u>.  Part of a defendant's right to discovery, however, is that requirement that the defendant specifically put the state on notice of the evidence which the defendant seeks. Accordingly, Mr. Maples, in addition to filing an initial and very detailed discovery motion, filed a motion in which he detailed that he was seeking specific discovery on, *inter alia,* (1) the Chula Vista murder, about which the police apparently interrogated Mr. Maples; (2) criminal records on a likely state witness (Foley); (3) criminal records on another state witness (Dobbs) who had contact with Mr. Maples on the night of the offense; and (4) evidence implicating either Dobbs or Foley in the instant offense.

357.     Clearly, considered in light of the charges pending against Mr. Maples, he was entitled to discovery of evidence which would indicate, or tend to indicate, that another individual was involved in some manner in the offense, particularly in light of the fact that part of Mr. Maples defense was that other individuals may have been involved in the homicides.  (R. 2936) In this case, Mr. Maples clearly and specifically put the state on notice of the individuals about whom he sought information, and then backed this motion up with a clearly articulated argument in support of his discovery motion.  (R. 167-168, 171-172).  Despite the limited nature of Mr. Maples' discovery motion, and his clear articulation of the basis for his belief that the files would contain exculpatory or

-175-

impeachment evidence that would be integral to Mr. Maples' defense, the trial court

denied his discovery motion. (R. 169, 173) This clearly impinged Mr. Maples' ability to

mount an effective defense. Brady v. Maryland; Duncan v. State, *supra*. Mr. Maples had

an unmistakable right to discover the requested evidence, and the trial court erred when it

denied his motions.

### ii.     The Trial Court Further Erred when it Denied Mr. Maples' Motion for an in camera review of the withheld evidence

358.    In an effort to ensure that the state did not withhold critical exculpatory or

impeachment evidence in light of the trial court's refusal to order the necessary

discovery, the defendant moved that the trial court review the withheld records *in camera*

to determine whether the evidence should be produced for the defense. The trial court

denied this motion. (R. 173) United States v. Panton, 846 F.2d 1335 (11th Cir. 1988) (an

*in camera* review should be held by the trial court to determine whether the state should

provide evidence to the defense); United States v. Rivera Pedin, 861 F.2d 1522 (11th Cir.

1988) (prosecutor exceeded authority when it unilaterally decided what to produce to the

defense; the district court was required to conduct an *in camera* inspection of evidence);

United States v. Nixon, 418 U.S. 683 (1974); Palermon v. United States, 360 U.S. 343

(1960); United States v. Rodriguez, 765 F.2d 1546 (11th Cir. 1985).

359.    Indeed, in the specific context of Brady, the trial court must conduct an *in

camera* review of evidence in the state's possession to assess the merits of a defendant's

discovery motion. Despite the clear law on this issue, the trial court denied Mr. Maples'

motion that the prosecutor provide the requested information to the trial court so that the

court could review the evidence *in camera,* and thus determine whether the defense was entitled to the exculpatory or impeaching evidence. This prevented Mr. Maples' from protecting his constitutional rights, presenting constitutionally protected claims before the trial court or this Court, and denied him his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### iii.   The Trial Court Erred When it Denied Other Discovery Motions

360.   In addition to the discovery motions discussed above and elsewhere, Mr. Maples filed other discovery motions that were denied by the trial court, including a motion to depose state expert witnesses. (C. 304) This motion was denied. (R. 114) Deposition of state expert witnesses was necessary in light of the "'need for reliability in the determination that death is the appropriate punishment' in any capital case" and to enable Mr. Maples to effectively cross-examine the state's experts on their theories and testimony. <u>Johnson v. Mississippi</u>, 486 U.S. 578 (1988) (citations omitted). As noted in Mr. Maples' brief, "exacting standards must be met to assure that [Maples' trial] is fair," and "[w]ithout some preliminary access to the state's expert witness, the defendant's right to confrontation and cross-examination become meaningless." (C. 305-306) In this case, the trial court's refusal to grant Mr. Maples an opportunity to depose the state's experts was particularly prejudicial in light of the DNA discovery violations that occurred -- in effect, Mr Maples was doubly prevented from protecting his rights and testing the testimony, theories, and results presented by the state's experts.

**D.    The Trial Court Reversibly Erred When It Denied Necessary Discovery To Document The Media Saturation-Coverage Of The Offense**

361.    Due to the extraordinary level of press coverage of the event, Mr. Maples sought to show that the citizen-jurors of Morgan county had been exposed to prejudicial publicity, and that Mr. Maples' trial accordingly had to be moved to another court. (R. 134 et. seq., C. 263)  The law is quite clear:  a change of venue is necessary whenever pretrial publicity has saturated a community and makes it impossible for a defendant to receive a fair trial.  Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985) (conviction reversed where judge denied change of venue motion despite pretrial publicity that allowed a finding of presumed prejudice).  Further, it is equally clear that a defendant has the right to extensive discovery on this matter, to allow a showing that the pretrial publicity has reached a point where a change of venue motion is necessary to protect a defendant's right to a fair trial.  See Ex parte Monk, 557 So.2d 832 (Ala. 1989); See Ex parte Longmire, 584 So.2d 503, 505 (Ala. 1991)  The trial court refused to grant Mr. Maples the necessary discovery to show that a fair trial in Morgan county was not possible under the Due Process clause of the Fourteenth Amendment of the United States Constitution.  This was constitutional error.

362.    It is well-established that Due Process requires a change of venue whenever pretrial publicity prevents the selection of a fair and impartial jury.  Rideau v. Louisiana, 373 U.S. 723 (1963); U.S. CONST. amend VI.  See also Isaacs v. Kemp, 778 F.2d 1482 (11th Cir. 1985) (conviction vacated where pretrial publicity saturated small community prior to trial).

363.    It is similarly well-established that the burden rests with the defendant to prove that he is entitled to a change of venue.  To prove that a movant is entitled to a change of venue Mr. Maples sought to demonstrate that pretrial publicity has saturated the community pursuant to the first method enunciated above.  (C. 263)  Accordingly, he moved for discovery from news organizations which would allow him to meet his necessary burdens of proof.  (C. 263)  This motion was filed nearly ten months before trial, and Mr. Maples then reiterated his need for such discovery at a motions hearing on January 10, 1997.  (R. 134 *et seq.*)  Nonetheless, the trial court denied Mr. Maples motion for discovery of information from news organizations which would have allowed him to document the media saturation necessary to support his change of venue motion.

(R. 148)

364.    Considered individual, each of these discovery denials prevented Mr. Maples from presenting a defense.  Considered in sum, the trial court shut-down Mr. Maples' ability to defend himself, and completely transformed the trial and penalty phase from an adversarial fact-determining process to an inquisitorial process where the outcome was a foregone conclusion.  This violated Mr. Maples rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## XVII. THE TRIAL COURT CONSTITUTIONALLY ERRED WHEN IT ADMITTED A HIGHLY INFLAMMATORY T-SHIRT THAT HAD NO PROBATIVE VALUE

365.    Over vigorous defense objections, the state introduced a highly prejudicial

t-shirt purportedly belong to Mr. Maples.[6]  Inscribed on the front of the shirt was the

name of an athletic apparel company, "NO FEAR," and written across the back, in large

and very visible lettering, was the slogan: "You Gonna do Somethin' or Are You Gonna

Just Stand There and Bleed?  No Fear." (State's exhibit 198).  As part of the shirt's

design, the lettering on the back of the garment was covered with simulated blood

splatters. (State's Exhibit 198; see also state's exhibit 216 and 217)  Despite the

outrageous prejudicial value of this shirt and its evanescent probative value, the trial court

overruled repeated defense motions to prevent the jury from being exposed to such

inflammatory "evidence" and admitted the shirt.  (R. 2533)  The prosecutor subsequently

displayed the shirt to the jury at the penalty phase of the trial, for no purpose but to

prejudice Mr. Maples.  Introduction of this shirt was erroneous in that it deprived Mr.

Maples of a fair trial and a fair sentence proceeding in violation of his rights under the

Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

366.    Trial courts must exclude evidence that has limited probative value and

great prejudicial effect.  The United States Supreme Court made this clear in Kyles v.

Whitley, where the Court emphasized the need to prevent unfair prejudice to the criminal

defendant.  "The term 'unfair prejudice,' as to a criminal defendant, speaks to the

capacity of some concededly relevant evidence to lure the factfinder into declaring guilt

---

[6]     The shirt was seized during an illegal search of Mr. Maples room, and was thus also inadmissible
as "poisoned fruit" of an illegal search.  See supra.

on a ground different from proof specific to the offense charged." <u>Old Chief v. United</u>

<u>States</u>, __U.S.__, 117 S. Ct. 644, 136 L. Ed. 2d 574, *16 (1997).

367.    The logo on the shirt had *no* probative value:  it added nothing to the

state's case but unfair prejudice to Mr. Maples.  If the trial court had performed any

weighing, it would have clearly found the evidence inadmissible.  Not one of the state's

fifty-eight witnesses testified that they saw Mr. Maples wearing the shirt on the day of the

offense.  None of the people who knew Mr. Maples, saw him before, during or after the

offense made any mention of the shirt.  The shirt was thus not introduced to establish

Mr. Maples' identity at any location.  Mr. Maples' identity was not an issue in this case,

for the sole issue before the jury was whether Mr. Maples committed capital murder or a

lesser degree homicide.  The prejudicial logo on the shirt was thus not critical to

establishing that the shirt belonged to Mr. Maples or that anyone saw Mr. Maples

wearing the shirt.  There was simply no need to introduce the garment for its logo.

Admittedly, the state's evidence technician claimed to have matched to Mr. Robinson's

blood with blood on the shirt.  The trial court, if it found that the attenuated nexus

between Mr. Maples, the garment, and the offense was probative, should have admitted a

portion of the shirt or otherwise prevented the jury from viewing the logo on the garment:

the prejudicial logo simply had no probative value.

368.    The garment's lack of probative value was overwhelmed by the prejudicial

effect of the shirt.  In this case, where Mr. Maples was accused of shooting two friends

while they allegedly sat in their vehicle, the shirt's logo was particularly prejudicial.

Combined with the state's scenario of the offense with the cumulative and remorseless

evidence of blood in the car, on the contents of the car, and on later passengers in the car, the shirt's logo — "You gonna do somethin' or are you gonna just stand there and bleed? No Fear" — was horribly prejudicial to Mr. Maples. On the basis of a garment that Mr. Maples purportedly wore at some point, the jury was likely to infer that Mr. Maples was indifferent to the offense and found the bleeding and suffering of others something to be mocked and scorned.

369.   The effect of the shirt on the jury during the penalty phase was likely even greater. The prosecutor extensively relied upon the shirt during the closing arguments of the penalty phase, yet the shirt was completely irrelevant to either the state's sole aggravating circumstance or any of the defense mitigating circumstances. (R. 3305, 3310) The shirt was, in short, completely irrelevant at the penalty phase, and doubtless distracted the jury from their duty of weighting and comparing proper mitigating and aggravating circumstances. The prejudicial value of the shirt cannot be underestimated. Even the prosecutor — who encounters gore and violence on a daily basis — admitted that he had a visceral reaction every time hears the words on the shirt: "I'm going to wave these words [on the shirt] that I just cringe every time I hear." (R. 2879) The effect on the jury was doubtless greater. Nonetheless, the prosecutor made the most of this evidence to unfairly prejudice Mr. Maples. Photographs of the shirt were introduced and shown to the jury, (R. 2484-2485), and during closing arguments, the prosecutor displayed the back side of the t-shirt to the jury for approximately 45 seconds. (R. 3305, 3310) Defense counsel objected to the state's argument and behavior, and gave an uncontradicted account of the prosecutor's actions:

-182-

370.   I wanted to establish what portion of his argument we feel like is objectionable regarding the t-shirt.  During the course of his argument he said 'wearing this t-shirt,' and he displayed it to the jury for forty-five seconds maybe, but for a prolonged period of time displaying to the jury the back side of the t-shirt containing the language that is subject to our challenge.  That was the portion that we had sought to preclude in limine.  The Court overruled us on that, but I wanted to clarify that was part that indeed did manifest itself during the argument, and we move for a mistrial on that basis.

371.   (R. 3309-3310). The trial court overruled this motion, and all previous defense motions to suppress the logo on the tee-shirt. (R. 1419, 2479-2482, 3236, 3310) The trial court also rejected defense objections to the introduction of the tee-shirt when they were renewed at the sentencing phase.  (R. 3364, 3366-3369)  Its admission at trial constituted clear constitutional error.

## A.   The Admission Of The Shirt's Slogan Violated Mr. Maples' First Amendment Rights

372.   Even if this Court finds that the shirt was admissible under a properly applied Rule 403, this Court must still conclude that the admission of the slogan on the t-shirt violated Mr. Maples' rights as guaranteed by the First Amendment to the United States Constitution.  The slogan on the shirt was completely irrelevant to the sole aggravating circumstance that the state was seeking in this case.[7]  Nonetheless, the prosecution displayed the shirt to the jury for approximately forty-five seconds during its

---

[7]   The state relied entirely upon the aggravating circumstance that the murder occurred in the course of a robbery.

-183-

closing argument.  (R. 3305, 3310)  This display of the writing on Mr. Maples' shirt was a clear violation of Maples' First Amendment rights.  Dawson v. Delaware, 503 U.S. 159 (1992).

373.    The constitution does not permit the admission of evidence of beliefs, membership, or views at trial, where such evidence proves nothing more than an abstract adherence to those beliefs which society as a whole may find offense.  Dawson v. Delaware, 503 U.S. 159 (1992).  Indeed, Dawson is directly controlling in this case.  In Dawson, the state sought to introduce evidence of membership in a racist organization.  Upon defense objection, the state and the defense entered into stipulation that the state would present limited evidence describing the racist organization.  Dawson v. Delaware, 503 U.S. at 162 and 167.  The state did not attempt to explain the significance or the relevance of the evidence, and consequently "one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible."  Dawson v. Delaware, 503 U.S. at 167.  The Supreme Court thus concluded that because the state failed to connect the prejudicial evidence to any relevant consideration, "we cannot find the evidence was properly admitted as relevant character evidence."  Dawson v. Delaware, 503 U.S. at 167.

374.    In this case, the state and the trial court performed similarly constitutionally impermissible stunts.  The court overruled defense objections and ruled that the state could introduce the shirt in evidence, but barred any commentary or argument on the slogan.  (R. 1419)  Accordingly, the state displayed the shirt's slogan to the jury for an extended period during the guilt phase and again at closing arguments of

the penalty phase.  (R. 2484-2485, 3305)  The significance of the shirt's slogan, though displayed to the jury and clearly visible to the jury, was never explained.  (R. 1419, 3310) Accordingly, the shirt's slogan was displayed "simply because the jury would find these beliefs morally reprehensible."  Dawson v. Delaware, 503 U.S. at 167.

375.    The slogan on the shirt is patently offense, particularly in the context of the offense for which Mr. Maples stood trial.  This offensiveness, however, did not render the slogan admissible.  The slogan had to be relevant to some aspect of the case that was in issue.  Instead, it was merely prejudicial, and created "'an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"  Averette v. State, 469 So.2d 1371 (Ala. Crim. App. 1985) (quoting State v. Forbes, 445 A. 2d 8, 12 (Me. 1982); cf. Texas v. Johnson, 491 U.S. 397, 414 (1989) ("the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable").

376.    Admission of this shirt improperly impugned Mr. Maples for his association.  In the context of this case, the slogan on the shirt and Mr. Maples' associations were completely irrelevant to any issue at trial.  The admission of the No Fear shirt and its accompanying logo constituted reversible error, and violated Mr. Maples' Rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## XVIII. MR. MAPLES'S STATEMENTS SHOULD HAVE BEEN SUPPRESSED BECAUSE THEY WERE GIVEN INVOLUNTARILY AND UNDER COERCION, IN VIOLATION OF HIS FOURTH, FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

377.    The threshold for admissibility of any criminal defendant's statement is voluntariness. See Rhode Island v. Innis, 446 U.S. 291 (1980). Extrajudicial confessions are *prima facie* inadmissible because they are presumed to be involuntary. See Ex parte Williams, 627 So. 2d 999, 1002-03 (Ala. 1994). Before an accused's statement may be admitted, the State has to overcome the presumption of involuntariness by proving a Miranda predicate and voluntariness. Courts must use a "totality of the circumstances" analysis in determining whether a statement was given voluntarily, and the court must "indulge in every reasonable presumption against waiver." Tinsley v. Purvis, 731 F.2d 791, 794 (11th Cir. 1984) citing Brewer v. Williams, 430 U.S. 387 (1977).

378.    A custodial suspect must be informed of his constitutional right to silence and the assistance of counsel. Miranda v. Arizona, 384 U.S. 486 (1966). Only after a custodial suspect is fully informed of his constitutional rights, and has knowingly and voluntarily waived those rights, may the police interrogate a suspect, and even then, the interrogation cannot be coercive or intimidating. In this case, the state violated each of these fundamental requirements by introducing at trial two sets of statements obtained from Mr. Maples after his arrest.

379.    The Miranda protections "may be waived, provided that the waiver is voluntary and constitutes a 'knowing and intelligent relinquishment or abandonment of a know right or privilege.'" Edwards v. Arizona, 451 U.S. 477, 482 (1981)).

380.    Any involuntary custodial statement is inadmissible. Rhode Island v. Innis, 466 U.S. 291 (1980). To properly assess voluntariness, the reviewing court must determine (1) the conduct of the officials in creating pressure on the custodial suspect,

and (2) the capacity of the suspect to resist the pressure. Colorado v. Connelly, 479 U.S.

157 (1986).  In this instance, police officers interrogated Mr. Maples under coercive

circumstances despite the absence of a valid Miranda waiver.  Further, Mr. Maples was

ill-equipped to resist the all-night police interrogation, given the marathon duration pf the

interrogation and the clear statements of the officers that regardless of Mr. Maples'

actions, they would extract a statement from him.

**A.     An Incomplete Miranda Warning Was Nullified By
         Subsequent Actions Of The Arresting Officer**

381.    Mr. Maples was arrested in a hotel lobby in Nashville, Tennessee.

Immediately after he was handcuffed, Mr. Maples was given an incomplete Miranda

warning.[8]  In addition to the incomplete Miranda warning, Mr. Maples never had the

opportunity to invoke his Miranda rights.  Instead, the arresting officer *informed*

Mr. Maples that they were going to take him to a police station, and that they *would* take

a statement from him once at the station:

> I asked him if he understood what his rights were and he
> indicated that he did.
>
> Q.  Did you have any other question with him at that time?
>
> A.  At that time I asked him, I said "do you know what this
> is about" and he said "yes."  I said, "well, when we get
> back up to the office I'll talk to you and get a statement
> from you then."  He was then taken at that point and placed
> in a patrol car.

(R. 2477) (emphasis supplied).  The very purpose of the Miranda warning is to inform a

custodial suspect of his constitutional right to silence and his right to an attorney, and

---

[8]      The incomplete Miranda warning is discussed *infra*.

allow the suspect to invoke those rights if so desired.  <u>Miranda</u>.  In this instance, the

arresting officer did not permit Mr. Maples' to invoke his <u>Miranda</u> rights, and instead

informed him that regardless of his constitutional rights, the police were going to take a

statement from him *when* they got to the "office."  The officer remained true to his word:

once at the police station, several incriminating statements were extracted from

Mr. Maples prior to the videotaped statement given to Alabama police officers.

382.    The law is clear: an custodial suspect must be given an opportunity to

invoke his <u>Miranda</u> rights:  a mere recitation of the <u>Miranda</u> warning does not suffice.

Such is required by the very language of <u>Miranda</u> itself:  after enunciating the now

familiar <u>Miranda</u> warning, the Supreme Court held that an "[o]pportunity to exercise

these rights must be afforded to [the suspect] throughout the interrogation.  After such

warnings have been given, and such opportunity afforded him, the individual may

knowingly and intelligently waive these rights and agree to answer questions or makes a

statement."  <u>Miranda v. Arizona</u> at 726; <u>see also</u> <u>Trott v. State</u>, 282 So.2d 392 (Ala. Crim.

App. 1973); <u>United States v. Johnson</u>, 455 F.2d 311 (5th Cir. 1972).  The Court then

continued, and noted that unless this right is afforded the custodial suspect, the statement

must be suppressed.  <u>Id</u>.

383.    Quite simply, Mr. Maples never was given an opportunity to invoke his

<u>Miranda</u> rights.  This violates the clear <u>Miranda</u> requirement that a suspect waive

<u>Miranda</u> rights before being subject to interrogation.  Further, the burden on proving that

a custodial suspect waived his rights rests with the state.  <u>Arizona v. Fulminante</u>, 499

U.S. 279 (1991).  The state failed miserably in meeting this burden; indeed, no effort was

-188-

made at all to show that Mr. Maples waived his <u>Miranda</u> rights before being interrogated by the arresting officer. Accordingly, the statements made to this officer are due to be suppressed.

### i. Mr. Maples' was Subject to Interrogation Without a <u>Miranda</u> Waiver

384.   It is clear that Mr. Maples was interrogated at the Nashville police station prior to the arrival of Alabama police officers. After Mr. Maples was transported to the Nashville police station, the arresting officer informed Mr. Maples that he was *not* going to interrogate Mr. Maples, because police from Decatur were on their way to the Nashville station. (R. 2490-2491) This, however, was simply not true. Once at the police station, the officer then proceeded to interrogate Mr. Maples, asking him "Well, yeah, I'm curious as to what happened because I [the arresting officer] didn't know the details of the case." (R. 2497) This question was not in response to any question, statement, or waiver of Mr. Maples, and Mr. Maples then proceeded to tell the officer about the offense. (R. 2498) The statement so extracted from Mr. Maples was inculpatory, and was improperly admitted at Mr. Maples' trial.

385.   Such actions by a police officer constitute interrogation. <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980) (Interrogation under <u>Miranda</u> refers not only to express questioning but also to any words or actions on the part of the police that are reasonably likely to elicit an incriminating response).

386.   The police made a "particularly evocative" statement that was expressly designed to elicit an incriminating statement from Mr. Maples. <u>Rhode Island v. Innis</u>.

-189-

Mr. Maples then made an inculpatory statements to the officer: he told the officer that he killed two people, that he shot them in the car, and that the gun used in the shooting was in a safe place. (R. 2492)  This statement was given after the arresting officer informed Mr. Maples that they would take a statement from him, was the product of custodial interrogation, and was taken from Mr. Maples despite the absence of any Miranda waiver.  As such, the statement was facially inadmissible, and the trial court reversibly erred when it admitted the statement at Mr. Maples' trial.  Further weighing against a finding of admissibility, the statement was made subsequent to an incomplete Miranda warning.

### ii.    The Miranda Warning Given To Mr. Maples At The Scene Of His Arrest Was Incomplete And Unconstitutional

387.    The sole Miranda warning given to Mr. Maples prior to his statement to the Nashville police officer was at the scene of his arrest.  This warning was incomplete. Mr. Maples was never told that if he wished to discontinue questioning, that he could do so at any time.  This is a critical component of the required Miranda warning, and in this case vitiated the alleged voluntariness of Mr. Maples' subsequent statements.  (R. 2476) The error in this instance was further compounded by the officer's subsequent statement that they *would* take a statement from Mr. Maples once they transported him to the police station.  Mr. Maples, throughout this process, never informed the interrogating officer that he wished to waive any of his Miranda rights.  The United States Supreme Court has specifically found that a suspect may answer questions if he wishes, but he may stop at any time.  The failure of the arresting officer to inform Mr. Maples' of this right vitiated

-190-

the subsequent statement of the reliability and voluntariness that is required before such a statement can be introduced at trial.

**B.     The Videotaped Confession Was Not Knowingly and Voluntarily Given**

388.    Mr. Maples' videotaped statement was not knowingly and voluntarily given.  The burden rests with the prosecution to show that a suspect is fully appraised of his or her rights prior to a custodial interrogation.  <u>Miranda v. Arizona</u>.  Only if the state succeeds in meeting this heavy burden is a statement admissible at trial.  <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991).  In this instance, the police did not fully and adequately give Mr. Maples' a <u>Miranda</u> warning.  The videotape clearly depicts the inadequacy of the police warning:  Mr. Maples was never told that he could discontinue questioning at any time.  (State's exhibit 230 and 231)  A <u>Miranda</u> warning must be complete to be valid.  <u>Miranda v. Arizona</u>; <u>Ex parte Comer</u>, 591 So.2d 13 (Ala. 1991).

389.    In addition, and perhaps more critically, the police demanded that Mr. Maples waive his rights *before* he was fully appraised of them.  The police, before informing him that he had the right to a court-appointed attorney, demanded that he decide whether he wished to remain silent.  An uniformed waiver is not a meaningful waiver.  <u>Miranda</u>.  In this case, Mr. Maples' waiver can scarcely be considered informed, for he didn't know that he had the right to counsel until after he agreed to speak to the officers.  Further, Mr. Maples was never told that he could revoke his waiver once he was informed that he did have the right to a court-appointed attorney.  The entire purpose of <u>Miranda</u> is to ensure that a criminal suspect give up his rights — if at all — in a knowing

and willful manner.  Here, the police demanded that Mr. Maples give up his rights

without a full Miranda warning.  Such a waiver is no waiver at all.  Thus, the videotaped

statement should have been suppressed, and defense suppression motions were

improperly and unconstitutionally denied by the trial court.  (R. 2654)

390.    Further weighing against a finding of willfulness and voluntariness, the

police began their interrogation of Mr. Maples at 3:20 a.m., and continued uninterrupted

for nearly three hours.  Mr. Maples, throughout the interrogation, was repeatedly yawning

and stating that he was tired and wanted to get some sleep.  These requests were ignored

by the interrogating officers.  The time and duration of an interrogation weigh heavily

against a finding of voluntariness.  Exhaustion of a custodial suspect weighs against a

finding of voluntariness.  Stokes v. Singletary, 952 F.2d 1567 (11th Cir. 1992).  Here,

where an interrogation commences at three in the morning, and continues until dawn, the

exhaustion of the defendant clearly weighs heavily against a finding of voluntariness.

The state simply fails to meet its burden that Mr. Maples knowingly and intelligently

waived his right to remain silent.

391.    An additional factor weighing against a finding of voluntariness —

besides the inadequate Miranda warning, the demand that Maples waive his rights before

he was fully informed of them, the ridiculous hour of the interrogation, and the

exhaustion of Mr. Maples — is Mr. Maples' lack of experience with the criminal justice

system.  Fikes v. Alabama, 352 U.S. 191 (1957).  The state admitted during the trial that

Mr. Maples' did not have any prior history of criminal conduct.  (R. 3296)  Thus,

Mr. Maples was subject to his first custodial interrogation, under coercive and

-192-

intimidating circumstances in the middle of the night.  Under such circumstances,

Mr. Maples' decision to give a statement can scarcely be considered knowing and

voluntary.

392.    Mr. Maples statement was inadmissible, and its admission at his trial

denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution.

## XIX.  THE TRIAL COURT IMPROPERLY INFORMED THE JURY THAT THERE WAS OTHER EVIDENCE WHICH WAS NOT PRESENTED TO THEM

393.    It is axiomatic that a jury does not view any and all evidence in a criminal

case, simply because some evidence is too prejudicial, not probative, too time consuming,

completely irrelevant, or the product of state malfeasance.  See, e.g., Ala. R. Evid. 403;

Wong Sun v. United States, 371 U.S. 471(1963); Miranda v. Arizona.  In order to protect

a criminal defendant's rights, it is similarly well-established that the prosecutor may not

comment on evidence which is not educed before the jury.  See, e.g.:  Ex parte

Washington, 507 So.2d 1360 (Ala. 1986).  If it is improper for the prosecutor to comment

or allude to evidence not presented to the jury, the trial court certainly cannot

constitutionally make similar reference.

394.    In this case, the jury was repeatedly informed that there was other

evidence in the case which they were not going to view.  The trial court informed the jury

that some of the evidence, if ruled inadmissible, would not be seen by the jury:  "There

are documents and tapes that may be offered.  I don't know yet.  I haven't ruled on the

admissibility of all that yet, but there are a number of documents that *may* be offered into

evidence that you will be able to consider. . ." (R. 1444)  The implication was clear: whatever the jury gets to see, there is likely going to be *other* evidence which implicates Mr. Maples that they will not be able to see.

395.    As the trial proceeded, this logical supposition of the jury was borne out. For example, the judge went to extraordinary lengths to later explain that some evidence may not be heard by the jury, and thereby undermined the entire purpose of baring the admission of evidence.  At one point during the trial, the court instructed the jury that "the law says I have to review it before it can be offered to the jury; so I'm going to do that this afternoon . . . you will get to hear the testimony that I hear this afternoon if it's admitted." (R. 2554)  The jury was thus told that there was additional evidence that they may not hear.

396.    The trial court continued to instruct the jury that there was evidence which they were not going to hear, and made this particularly explicit when the jury was viewing the videotaped statement of Mr. Maples.  The trial court noted that they would have to make an "alteration" to the tape, and prevent the jury from seeing about a minute's worth of testimony. (R. 2710)  Shortly thereafter, the judge informed the jury that the parts of the videotaped statement were going to be fast-forwarded so that the jury would not view those portions. (R. 2713)

397.    The effect of these repeated allusions was obvious:  the jury would believe that other evidence further supported Mr. Maples' guilt, and this therefore greatly increased the probability that they convict Mr. Maples.  This denied Maples his rights

-194-

under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## XX.   THE TRIAL COURT UNCONSTITUTIONALLY ADMITTED EVIDENCE OF DNA WITHOUT A PROPER SHOWING OF RELIABILITY

398.    In addition to unconstitutionally hobbling the defense by ruling that the state did not have to provide discovery of DNA evidence, the trial court additionally erred, constitutionally, when it ruled that the prosecution had adequately explained the population statistic methodology used to obtain the astronomically high numbers inculpating Mr. Maples.

399.    This critical failure meant that the jury heard testimony that blood spots matched to astronomically high numbers without any assurance that the figures had any reliability whatsoever.  Such untested — and unreliable — evidence was grossly prejudicial to Mr. Maples.  The state simply failed to meet its burden in this case:  its population frequency methodology was largely unexplained and remained unknown to the jury.

400.    The state's failure to meet its burden in this case, combined with the trial court's erroneous ruling that the state did not have to provide critical DNA discovery to the defense, meant that it is simply unknown what occurred during the state's statistical analysis of the DNA evidence.  This unknown is critical for a subject matter as complicated as DNA population frequency statistics.  The jury, the trial court, and this Court simply have no means of assessing the state's assurance of accuracy of its DNA frequency matching statistics.

401.    Population frequency statistical methodology is conceptually a very simple idea.  In this case, for example, the state used DNA analysis to analyze nine blood samples collected from the vehicle, garments, Terry, Maples, and Robinson.  (R. 2675) The DNA was extracted from the blood samples, quantified, and then amplified. (R. 2671-2672)  Through a series of laboratory steps, critical portions of the DNA are examined, and technicians can determine whether a sample contains DNA of a certain type at a particular position on the genome.  (R. 2672-2673)  In this case, the state examined seven positions on the DNA.  (R. 2678)  A discrete range of variability is observed for each loci examined by the state.  Thus, for example, one of the loci examined by the state has 26 different permutations in the human population.  (R. 2681) Theoretically, DNA technicians can determine the likelihood of a match to extraordinarily high numbers by examining a number of different loci.

402.    For example — and to grossly simplify — if one locus has twenty-six different permutations, and another locus has twenty five different permutations, and a particular permutation was found for both loci in two different blood stains, a population frequency statistician could conclude that the samples match to a high certainty:  $1/26$ x $1/25 = 1/650$.  Thus, the statistician could testify that the two samples in this hypothetical example come from the same individual with a certainty of 1 in 650; that is to say, only one person in six hundred and fifty would have the same two permutations at these two loci.  Of course, if more loci were examined, the probabilities increase dramatically, and quickly climb into the hundreds of thousands or higher.

-196-

403.    But in practice, DNA population frequency statistical analysis is not quite so simple. DNA loci frequencies cannot simply be multiplied to yield a DNA "match" value. This multiplicative approach to DNA matching fails for several reasons. First, it would require that DNA is randomly assorted among the genome. This is simply not the case. DNA is both "discrete" and "clumped," and large portions of the genome is transmitted from generation to generation in large clumps, essentially unchanged. Within each "clump," the likelihood that the DNA is matched from locus to locus increases dramatically. This means that the loci frequency can not be simply multiplied. For example, if an individual has only 2% chance of having trait "A" at one loci, and a 2% chance of having trait "a" at a second loci, a simple multiplicative approach would indicate that the there is only a .04% chance that an individual would have both traits "A" and "a." However, if traits "A" and "a" are not randomly assorted, but co-vary in their distribution throughout the population, then a person with trait "A" may have a 50% chance of having trait "a" at the second locus. Thus, if a statistician were to apply the proper analysis, then there is a 1% chance that an individual would have both traits. This number is several magnitudes higher than the number yielded by the primitive multiplicative approach and can have profound mathematical and evidentiary implications when several loci are examined.

404.    Second, the multiplicative approach requires that the population be in Hardy-Weinberg equilibrium. Stated simply, this principle requires that any breeding population be discrete and *randomly* mating. Clearly, such assumptions are invalid when applied to a human population, which is neither discrete nor randomly assorted.

-197-

Corrections can be made for a population that is not in Hardy-Weinberg equilibrium, but they are complicated, unreliable, and infrequently applied in the field of forensic DNA analysis.

405.   Third, a "pooling" effect can affect the frequency with which particular traits appear in a population: variation at loci may appear with much higher than anticipated frequency among groups of individuals that are even very distantly related. Obviously, this occurs with much greater frequency in rural areas and regions that do not have a large immigrant populations.  In addition to these considerations, there are numerous other variables that affect loci frequency, and must be accounted for in any statistical analysis of loci type.

406.   All of this is information is relevant to the error of the trial court in this instance.  It is simply not known whether the state's methods accounted for these — and numerous other — variables when the state's expert forwarded its "match" values.  At the pre-trial hearing and at trial, the state's expert didn't discuss its population frequency methodology at all, and, instead, merely described the method in the most general and incomplete terms.  (R. 2590-2591, 2689-2690)  The expert later testified that the claimed matches found for the samples were astronomically high:  1:50,000 up to 1:346,000,000.  (R. 2623-2624)  Defense counsel properly objected that the state had not met its burden of proving that the accuracy of its population frequency methodology, that the state technician's testimony was grossly inadequate for such a purpose, that the state failed to inform the court or the defense of its methods, and that it failed to support its claim of reliability. (R. 2633)

407.    As numerous courts have recognized, DNA evidence has extreme

probative and prejudicial potential.  To allow the state to offer essentially unsubstantiated

and untested DNA testimony about the probability that the DNA samples matched denied

appellant his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to

the United States Constitution.

## XXI.   CONTITUTIONAL ERROR OCCURRED WHEN THE JURY WAS BRIEFED ON THE CASE OUTSIDE THE PRESENCE OF MR. MAPLES OR HIS COUNSEL

408.    At the outset of Mr. Maples' trial, the trial court admitted that the

veniremembers had been in another courtroom, where they heard about the case *from*

*another judge*.  (R. 452)  The trial court stated that "[t]his case, Judge Brown may have

told you, may go possibly as long as three weeks."  (R. 452)  Mr. Maples was not present

during the venire's appearance before Judge Brown, and it is unclear what else Judge

Brown may have told the venire about Mr. Maples' trial.  Such *ex parte* contact with

another judge, where the judge was telling the jury about the pending case, is highly

improper.

409.    Mr. Maples also had a fundamental right to be represented by counsel at

all stages of his capital proceedings, including jury selection.  See e.g., Gideon v.

Wainwright, 372 U.S. 335 (1963).  Elemental to this right is the corollary that counsel

and defense be present during all proceedings.  It has long been the rule that a defendant

"is entitled to be present at all . . . stages of the proceedings."  United States v. Diaz, 223

U.S. 442, 454 (1912); see also Proffitt v. Wainwright, 685 F.2d 1227, 1258, modified on

rehearing, 706 F.2d 311 (11th Cir. 1983) ("a capital defendant's right to be present is

nonwaivable."); <u>Johnson v. Mississippi</u>, 486 U.S. 578 (1988) (need for heightened

reliability in a capital proceeding).  Indeed, in order to protect this right, Mr. Maples filed

a notice of assertion of right to be present, which was granted by the trial court. (C. 291,

R. 117)

      410.    For a judge to inform the venire about the case, in the absence of

Mr. Maples and his counsel, fundamentally violates Mr. Maples' right to be present at all

stages of a capital proceeding.  The implications of the *ex parte* judicial contact are

alarming:  Judge Brown could have informed the jury of a great deal of information about

the case, about counsel, or about the evidence.  To allow such contact in Mr. Maples'

absence violated his fundamental rights under the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution.

## XXII.  THE TRIAL COURT CONSTITUTIONALLY ERRED WHEN IT BLOCKED EXPLORATION OF POSSIBLE DISCRIMINATION IN THE SELECTION OF THE VENIRE, AND PREVENTED MR. MAPLES FROM DISCOVERY BIASES AMONG POTENTIAL JURORS

      411.    In light of the sensation and well-publicized nature of the offense, and the

serious nature of the charges levied against Mr. Maples, defense counsel made numerous

motions to ensure that the jury which was eventually impaneled was not biased or

prejudiced against Mr. Maples and fairly represented the citizens of Morgan County.  The

trial court refused each of these motions, and denied Mr. Maples a fair trial and a reliable

verdict as required by Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

States Constitution.  <u>Duren v. Missouri</u>, 439 U.S. 357 (1979); <u>Lockett v. Ohio</u>, 438 U.S.

586 (1978).

**A.     The Trial Court Refused To Grant Funds For
Investigation Of Jurors**

412.     A constitutionally composed jury is a fundamental element of any criminal justice proceeding, and it is essential that group bias be discovered and revealed.  To successfully explore biases relevant to Mr. Maples' capital trial, Mr. Maples requested funds for an investigator, a statistician, and a sociologist.  (C. 279-283)  The expert assistance of an investigator was essential for investigating records relevant to "race, sex, and other group data."  (C. 281)  Likewise, the assistance of an investigator was integral to analyzing the data collected by the investigator.  See, e.g., Swain v. Alabama, 380 U.S. 202 (1965) (using absolute disparity statistics); United States v. Maskeny, 609 F.2d 183 (5th Cir. 1980) (absolute statistical analysis); Turner v. Fouche, 396 U.S. 346 (1970) (comparative).  In addition, a sociologist was necessary to allow Mr. Maples to demonstrate to the court how the underrepresented or excluded group is cognizable.  See Willis v. Zant, 720 F.2d 1212 (11th Cir. 1983).

413.     Although Mr. Maples was indigent in the proceedings, the trial court denied the funds motion.  (R. 123, 199)  Mr. Maples was clearly entitled to the funds for the expert assistance, and the trial court constitutionally erred when it refused to grant Mr. Maples the funds necessary to present his claims.  Ake v. Oklahoma, 470 U.S. 68 (1985); Gideon v. Wainwright, 372 U.S. 335 (1963); Griffin v. Illinois, 351 U.S. 12 (1956).

**B.     The Trial Court Denied Mr. Maples' Motion For State
        Disclosure Of Information Favorable To The Defense**

414.    Mr. Maples, as part of his effort to ensure that the jury deliberating his

guilt or innocence was representative of the community and unbiased in its views, moved

the trial court to order the prosecution to disclose information favorable to the defense.

(C. 300) Mr. Maples was plainly entitled to such discovery. Brady v. Maryland, 373

U.S. 83 (1963); United States v. Bagley, 473 U.S. (1985); Nonetheless, the trial court

denied the defense motion for state disclosure of information helpful to the defense.

(R. 115) This denial directly contradicted Brady and its long line of State and Federal

progeny. The ruling of the trial court denied appellant his rights under the Fourth, Fifth,

Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**C.     The Trial Court Erred When It Denied Mr. Maples'
        Motion For a Jury Questionnaire**

415.    Mr. Maples moved that the trial court authorize jury questionnaires in

order to better discover veniremembers relationships, prejudices, biases and beliefs.

(C. 198) Mr. Maples' need for a jury questionnaire in this case was considerable, in light

of the widespread and prejudicial publicity the homicides had received.  The motion was

well supported by state and federal law, and should have been granted by the trial court.

Turner v. Murray, 476 U.S. 28 (1986); Huntley v. State, 627 So.2d 1013 (Ala. 1992).

Nonetheless, the trial court denied the defense motion.  (R. 191)

416.    In a capital case, it is vital that information available to the defendant is

complete and thorough. Jordan v. Lippman, 763 F.2d 1265 (11th Cir. 1985) (jury

selection procedures must be adequate to unearth prejudice; failure to expose potential

-202-

prejudice of jurors requires reversal of conviction); Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985). The Supreme Court has held that voir dire in a capital case must be particularly thorough, and the refusal of the trial court to permit searching examinations of veniremembers constitutes reversible error. Turner v. Murray, 476 U.S. 28 (1986).

417. A jury questionnaire was critical to Mr. Maples and the court, as it would have provided information that was relevant to the court's use of for cause excusals and Mr. Maples' use of peremptory challenges. The trial court erred when it did not grant the motion, and denied appellant his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**D.      The Trial Court Denied Mr. Maples' Motion For Individual Voir Dire**

418. As part of his continued fight for full examination of veniremembers, Mr. Maples moved the trial court to permit individual voir dire. (C. 268) Though the motion was well-based on state and federal law, and despite the extensive pretrial publicity that had attended the case since the homicides, (C. 160-170), the trial court denied the motion and required that Mr. Maples examine the veniremembers solely in a group setting. (R. 133) This ruling prevented Mr. Maples from adequately discovering biases of the veniremembers, and denied appellant his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

419. The need for an impartial and unbiased jury in a capital case is well-established. Turner v. Murray, 476 U.S. 28 (1986). Indeed, the veniremembers' initial replies to voir dire questions are not necessarily honest: a searching inquiry is mandated.

Murphy v. Florida, 421 U.S. 794, 800 (1975) ("the juror's assurance that he is equal to [the] task cannot be dispositive of the accused's rights").  Indeed, in instances where pretrial publicity is great, trial courts "must take strong measures to ensure that the balance is never weighed against the accused."  Sheppard v. Maxwell, 384 U.S. 333, 362 (1966).  "Strong measures" include the use of individual voir dire.

420.    Through individual voir dire, the defendant is in a better-informed position to exercise his constitutionally-protected use of peremptory challenges.  Through the intelligent and informed use of peremptory challenges, the defendant can help insure that the jury is impartial.  Ham v. South Carolina, 409 U.S. 524 (1973).  The right to peremptory challenges is meaningless without a full and adequate voir dire.  Ham v. South Carolina; Swain v. Alabama, 380 U.S. 202 (1965).  Further, trial judges must adopt procedures for voir dire that provide a "reasonable assurance that prejudice would be discovered if present."  United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976); see also United States v. Nash, 910 F.2d 749, 753 (11th Cir. 1990) (citations omitted) (same).  The trial court's denial of a Mr. Maples' motion for individual voir dire was an unreasonable restriction on Mr. Maples' right to discover possible prejudice or biases of jurors, and rendered Mr. Maples' right to informed peremptory challenges nugatory.

## XXIII. THE TRIAL COURT CONSTITUTIONALLY ERRED WHEN IT ADMITTED EVIDENCE OF EXTRINSIC UNCHARGED OFFENSES

421.    The prosecutor introduced evidence of an unrelated offense previously committed by Mr. Maples.  (R. 2379)  This violated Mr. Maples' constitutional rights. Spencer v. Texas, 385 U.S. 554, 575 (1967) ("It is surely ingrained in our jurisprudence

that an accused's reputation or criminal disposition is no basis for penal sanctions.").

"'Courts that follow the common-law tradition almost unanimously have come to

disallow resort by the prosecution to any kind of evidence of a defendant's evil character

to establish a probability of guilt.'" Old Chief v. United States, _U.S._, 136 L. Ed. 2d

574, 117 &. Ct. 644, slip op. at *16 (1997) (quoting United States v. Moccia, 681 F.2d

61, 63 (1st Cir. 1982)).

422.    Despite this well-developed law, the prosecution was permitted to

introduce a fingerprint card of Mr. Maples from a prior DUI arrest. (R. 2379) This

fingerprint card informed the jury in clear and unmistakable terms that Mr. Maples had

been arrested on a previous occasion. This was particularly prejudicial in the context of

this trial, for one of Mr. Maples' proffered mitigating circumstances was his lack of a

prior criminal history. The jury, armed with the knowledge that Mr. Maples had been

arrested on a previous occasion, would possibly have rejected this mitigating

circumstance, and sentenced Mr. Maples to death.

423.    When the state introduce the evidence of the prior offense, defense

counsel immediately objected, moved for a mistrial, and moved to strike the testimony

from the record. (R. 2381) The state merely responded that the jury could have inferred

that his arrest and booking was for the instant offense. (R. 2382) Such an inference was

foreclosed by the testimony of the technician himself, who stated that he took Mr. Maples

prints on a "prior date" when Maples was arrested and booked. Other testimony clearly

established that Mr. Maples was *not* arrested in Alabama. (R. 2472 *et seq.*) Thus, the

jury, informed that this fingerprint was taken pursuant to Mr. Maples' *arrest* and booking

from a "prior date," would have inferred that Mr. Maples had previously been arrested.

424.     In addition to evidence of Mr. Maples' arrest on a previous unrelated

offense, the prosecution introduced evidence of other criminal offenses which were

wholly unrelated to the instant offense.  Most particularly, the prosecution introduced

photographs of Mr. Maples' bedroom and house.  Plainly visible in many of the

photographs were stolen highway road signs.  (State's Exhibits 41-43).  These signs were

clearly stolen from county and state highways and displayed in Mr. Maples' room.

Stealing roadsigns is a felonious offense.  Ala. Code 13A-8-71(c) (1975); 13A-8-72

(1975).  It was highly improper and prejudicial for the jury to view the fruits of previous

felonious activity when such activity was wholly unrelated to the capital murder charges

for which Mr. Maples was standing trial.

425.     A conviction obtained on the basis of such "evidence" violated

Mr. Maples' rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to

the United States Constitution.  See generally Old Chief v. United States, _U.S._, 136 L.

Ed. 2d 574, 117 S. Ct. 644 (1997); Johnson v. Mississippi, 486 U.S. 578 (1988) (need for

heightened reliability in a capital proceeding).

## XXIV. THE JURY WAS IMPROPERLY AND UNCONSTITUTIONALLY REQUIRED TO CONDUCT A PORTION OF THEIR DELIBERATIONS AND REVIEW OF THE EVIDENCE IN OPEN COURT

426.     In this case, the jury was not allowed to evaluate the evidence in an

environment protected from outside influence:  while deliberating, they decided that they

needed to review some critical evidence introduced at trial.  Instead of making this

evidence available to them in the deliberation room, the trial court required them to review the evidence in open court. This was a highly improper.

427.    Once they had begun deliberations, the jury decided that they needed to review Mr. Maples' videotaped and audiotaped statements. (R. 3044-3045)  The trial court required that they view the video tape in the open courtroom and the jurors were accordingly brought from the deliberation room to the courtroom, where they then had to review the videotaped statement. (R. 3045)  During this process, the courtroom was "open" and filled with counsel, victim's family members, and members of the public. This procedure violated clear Alabama law, and denied appellant his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## XXV.  THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY ON THE LAW

428.    One of the duties of the trial court is to properly instruct the jury as to the proper law in any criminal proceeding.  In this case, the trial court committed numerous instructional errors that rendered the proceedings violative of constitutional law.

### A.    The Trial Court Gave a Confusing and Incorrect Definition Of Reasonable Doubt

429.    The trial court improperly instructed the jury on the reasonable doubt standard. In the court's initial instruction, it gave a baffling and utterly confusing explanation of the reasonable doubt standard:

> That burden, we have talked about in the voir dire process,
> is to satisfy you of the defendant's guilt beyond a
> reasonable doubt. In other words, by the close of this case,

-207-

> in order for you to return a verdict of guilty, you must not
> be able to say that you believe the defendant is not guilty,
> and give a good reason why you believe that, if you are
> going to convict him.  If after the close of the case, you still
> have some doubt or doubts for which you can articulate or
> give a reason, not an imaginary or a fanciful reason, but a
> legitimate reason, then you should acquit the defendant.

(R. 1443) This was an utterly confusing definition of reasonable doubt and is incorrect as a matter of law.

430.    Holding the state to a standard of proof beyond a reasonable doubt is the keystone to the United States criminal justice system.  See, e.g., In re Winship, 397 U.S. at 364 (proof beyond a reasonable doubt is the "prime instrument for reducing the risk of convictions resting on factual error."); Sandstrom v. Montana, 442 U.S. 510 (1979) (instructions that reduce the burden of proof by shifting it to the defendant deprive a defendant of due process and a fair trial).

431.    In this instance, the trial court impermissibly lowered the state's burden of proof and violated Mr. Maples' most fundamental right by instructing the jury that to convict, "you must not be able to say that you believe the defendant is not guilty, and give a good reason why you believe that:  (R. 1443) This instruction, which the court gave twice, violated Winship and Sandstrom.  By instructing the jury that they need a "good" reason to doubt the state's case, the prosecutor shifted the burden of proof to Mr. Maples, for Mr. Maples, pursuant to this incorrect instruction, was obligated to provide "good" reasons why the state's case was subject to reasonable doubts.  This instruction denied Mr. Maples due process and a fair trial under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**B.     The Trial Court Improperly Instructed The Jury That
        They Could Consider Any Circumstances In
        Aggravation**

432.    The trial court instructed the jury that they "should also consider any

evidence that was presented during the guilt phase of the trial that is relevant to the

existence of an aggravating or mitigating circumstance." (R. 3322) These instructions

violate the United States Constitution and state law. A jury during the sentencing phase

of a capital proceeding may only consider those aggravating circumstances contained in

the Alabama Code. § 13A-5-49 (1975).

433.    Here, the trial court invited the jury to consider "any" aggravating

circumstance and evidence, despite the applicability of only a single aggravating

circumstance. This is constitutionally intolerable. Woodson v. North Carolina, 428 U.S.

280 (1976). In this circumstances, the error was particularly harmful, for the prosecutor

similarly instructed the jury that they could consider "any evidence" in reaching a verdict,

and then made extensive arguments based on irrelevant and non-existent evidence. This

instruction denied Mr. Maples due process and fair trial under the Fourth, Fifth, Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution.

**XXVI. THE TRIAL COURT CONSTITUTIONALLY ERRED WHEN IT
       REFUSED TO GRANT THE DEFENSE MOTION TO PREVENT THE
       STATE FROM DIMINISHING THE JURY'S ROLE IN A CAPITAL CASE**

434.    It is a fundamental constitutional requirement that neither the state nor the

court diminish the jury's sense of responsibility in a capital proceeding. Caldwell v.

Mississippi, 472 U.S. 320 (1985). "It is constitutionally impermissible to rest a death

sentence on a determination made by a sentencer who has been led to believe that the

responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell v. Mississippi, 472 U.S. at 328-329. Indeed, even when the assertions of the state and the trial court are "technically accurate" the "danger exists that the jurors . . . were misinformed as to the importance of their judgement call." Mann v. Dugger, 844 F.2d 1446, 1457 (11th Cir. 1988). Accordingly, the defense filed a pretrial motion to prevent diminution of the jury's sense of responsibility. (C. 174)  Despite the clear law to support the defense motion, the trial court denied the motion. (R. 198) Though the court later granted a renewed motion to prevent the state from diminishing the jury's awesome responsibility, it failed to enforce the order: both the court and the prosecutor repeatedly instructed the jury that their sentence was a "recommendation." Caldwell v. Mississippi, 472 U.S. 320 (1985).  These repeated statements were prejudicial, and flowed directly from the trial court's refusal to giant Mr. Maples' pretrial motion to forestall exactly such arguments.  The trial court's failure violated Mr. Maples' rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## XXVII.   THE TRIAL COURT CONSTITUTIONALLY ERRED WHEN IT DENIED DEFENSE MOTIONS FOR A CHANGE OF VENUE

435.   The double homicide of Mr. Terry and Mr. Robinson received extensive coverage in the local media. As a natural consequence of the media coverage, the largely rural community of Morgan County was well-acquainted with the offense, Mr. Maples' alleged involvement, and his arrest in Tennessee.  Accordingly, Mr. Maples moved for a

change of venue to a jurisdiction where the venire would not be contaminated by extraneous information.  (C. 154)

436.    The trial court denied the defense motion. (R. 1361-1365); Ala. R. Crim. P. 10.1.  As a result, Mr. Maples was convicted and sentenced to death by a jury which had extensive pretrial exposure to prejudicial and incompetent information about the offense.  Conviction and sentence by such a jury denied appellant Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

437.    Change of venue is constitutionally required whenever it is demonstrated that jurors called for the case entertain an opinion on guilt or punishment and are unable to lay aside their opinions and render a verdict based solely on the evidence educed at trial.  Irvin v. Dowd, 366 U.S. 717 (1961); Coleman v. Zant, 708 F.2d 541 (11th Cir. 1983).  When pretrial publicity precludes seating an impartial jury, due process requires that the trial court grant defendant's motion to change venue.  Richeau v. Louisiana, 373 U.S. 723 (1963).

438.    Mr. Maples, in support of his change of venue motion, documented some of the extensive pretrial publicity that surrounded the crime, Mr. Maples' arrest, and the pending trial.  This showing included documentation of the print and television coverage of the crime.  (C. 160-170; 238-368)  The coverage surrounding the homicides and Mr. Maples involvement therein was overwhelming:  over 150 pages of press coverage of the event was introduced by Mr. Maples in support of the change of venue motion.  This press coverage included damaging and inadmissible evidence that characterized

-211-

Mr. Maples as being on the run, as a dangerous and wanted man, and as someone with satanic tattoos. Further, the press reports contained extensive quotes from investigators working on the case.

439.    Not surprisingly, many of the veniremembers had heard about the case. Mr. Maples demonstrated to the court that of the sixty potential jurors on Mr. Maples' venire, a full 50% of them had heard about the case, either through press coverage of from their conversations with neighbors and friends. (R. 1362-1363) Many of the jurors recalled specific details of the offense, and several candidly admitted that it would be difficult for them to set aside that which they had heard from extra-judicial sources. Nonetheless, despite this thorough documentation, the trial court denied Mr. Maples' motion for a change of venue. (R. 1369) Accordingly, Mr. Maples was forced to select a jury from a panel where a full half of its members admitted to having heard about the case. Under such circumstances, Mr. Maples could not have selected a fair and impartial jury. The trial court's ruling denied Mr. Maples his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## XXVIII.    THE TRIAL COURT REVERSIBLY ERRED WHEN IT REFUSED TO CONTROL PRETRIAL PUBLICITY

440.    Mr. Maples' attempted to restrict the flow of prejudicial publicity available to potential jurors in his case. He filed two separate motions designed to limit the release of prejudicial information to the press: a motion to seal the file until the jury is sequestered, and a motion to control pretrial publicity. (C. 223, 235) Both of these motions were denied by the trial court. (R. 179, 186) The trial court erred when it denied

-212-

these motions, for the venire was then exposed to prejudicial publicity about the case due to the trial court's refusal to control the information that flowed to the community.

441.   The double homicide received extensive publicity in the print and television media when it occurred, and continued up until trial. (C. 160-170; 238-368) Mr. Maples documented this media blitzkrieg for the circuit court, and moved that the court close the proceedings until the jury was sequestered. (P. 223) The law guiding closure of court proceedings is quite clear: a trial court must undertake "strong measures" to ensure that the defendant's rights to a fair trial free of prejudicial publicity and bias are protected. Sheppard v. Maxwell, 384 U.S. 333 (1966). Accordingly, "the presence of the press at judicial proceedings must be limited when it is apparent that the accused might otherwise be prejudiced or disadvantaged." Sheppard v. Maxwell, 384 U.S. at 358. The Supreme Court has noted that "pretrial [coverage] can create a major problem for the defendant in a criminal case. Indeed, it may be more harmful than publicity during the trial for it may well set the community opinion as to guilt or innocence." Estes v. Texas, 381 U.S. 532 (1965); see also Gannett v. DePasquale, 443 U.S. 368 (1979).

442.   In this case, the media coverage of the pretrial events was extensive and inflammatory. The coverage of the case resulted in 50% of the venire panel knowing about the case. The trial court reversibly erred when it did not close the proceedings until the jury was sequestered. The trial court similarly erred when it denied Mr. Maples' motion to control prejudicial publicity before and during the trial. These rulings on

-213-

Mr. Maples' motions denied him his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## XXIX. THE APPELLANT WAS SUBJECT TO DOUBLE JEOPARDY WHEN THE SAME EVIDENCE WAS USED TO ELEVATE THE INTENTIONAL MURDER AND THEN USED IT AS THE SOLE AGGRAVATOR TO IMPOSE THE DEATH PENALTY

443.    At the penalty phase of the trial, the State used as its sole aggravating circumstance that Mr. Maples had been found guilty of committing an intentional murder while in the course of a robbery, one of the enumerated circumstances necessary to elevate intentional murder to a capital offense. (C. 530, 533) Defense counsel strenuously objected to the state's double counting (R. 3068-3074; R. 3092) Despite the "eloquent" objection of defense counsel, the trial court denied the motion and overruled the objection. This "double counting" violated Mr. Maples' right to due process of law and violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

444.    Double counting in this instance resulted in an arbitrary and capricious imposition of a death sentence, in violation of state and federal law. See Gregg v. Georgia, 428 U.S. 153 (1976). As articulated by Mr. Maples' trial counsel, double counting in this case undermined the narrowing function of aggravating circumstance. (R. 3069 et seq.)

445.    Second, double counting in this case undermined the guiding function that aggravating circumstances are supposed to play, resulting in an arbitrary imposition of the death penalty. See, e.g., Gregg v. Georgia, 428 U.S. 153 (1976), Zant v. Stephans,

462 U.S. 862, 877 (1983). Double counting in this case failed to narrow the class of cases eligible for the death penalty as required by state and federal law, and the United States Constitution.

446.   Third, double counting subjected Mr. Maples to two punishments for the same act. He was *made eligible for* the death penalty solely on the basis of the murder in the course of the robbery conviction, and then he was *subject* to the death penalty solely on the basis of his murder in the course of a robbery conviction. Thus, Mr. Maples was twice punished for the same crime, in clear violation of the double jeopardy clause of the Fifth Amendment to the United States Constitution. See People v. Brown, 67 N.Y. 555 (1986), cert. denied, 117 S. Ct. 1093 (1987) (dismissal of a criminal use of a firearm conviction is mandated, as a matter of law, because the use or display of that same firearm had been used twice in prosecution of the crime: first to elevate the robbery conviction to a class B violent felony, and then to satisfy, the "use or display" element of the same offense); see also North Carolina v. Pearce, 395 U.S. 711 (1969).

447.   For each of these reasons, the unconstitutional "double counting" was erroneous; considered collectively, they denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## XXX. THE TRIAL COURT AND THE PROSECUTOR REPEATEDLY READ THE INDICTMENT TO THE JURY AND THEREBY PREJUDICED MR. MAPLES AND RELIEVED THE STATE OF ITS BURDEN OF PROOF

448.    The jury was read the indictment on several occasions, by the court and

the state.  (R. 1461, 2970)  On two occasions, the jury was informed that the district

attorney signed the indictment.  This ritual prejudiced Mr. Maples in several ways.

449.    First, it informed the jury that another group of individuals has already

considered the evidence and concluded that Mr. Maples committed the charged crime.  By

further informing the jury that the district attorney signed the indictment, the trial court

bolstered the jury's perception of the prosecutor, and implied that he had a special

knowledge of the case that other individuals — namely defense counsel and the jury —

lack.  Further, the trial court read the indictment at the beginning and end of the trial,

which emphasized that others had found Mr. Maples to have committed the crime, that

the prosecutor concurs in that finding, and that the purpose of the trial was to verify the

indictment.

450.    Second, the court informed the jury that the district attorney believed

Mr. Maples guilty.  Constitutional law prohibits the district attorney from telling the jury

that he or she believes that the defendant is guilty.  This proscription is imposed because

the district attorney is a publicly elected official imbued with public trust, "and whose

interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice

shall be done.  As such, he is in a very definite sense the servant of the law."  Berger v.

United States, 295 U.S. 78 (1935).  Thus, when the jury is informed that the prosecutor

believes the defendant guilty, this disclosure is given great credence by the jury.  This is

exactly what occurred here when the judge *twice* informed the jury that the district

attorney signed the indictment.  By reading the indictment to the jury, the trial court

-216-

informed the jury that the district attorney believed in Mr. Maples' guilt. Further, the

district attorney also read the indictment, and thereby personally informed the jury that he

believed in Mr. Maples' guilt. This is improper, and requires reversal.

451.    Third, jurors recognize that a prosecutor, by his or her very position,

knows more about a case than that which is contained in the evidence presented to them.

Thus, it is highly prejudicial for the judge to inform the jury that the prosecutor signed

the indictment, for it reveals that the district attorney — privy to more evidence than that

presented to the jury — believes the defendant guilty. In this case, where the trial court

also informed the jury of other evidence, this procedure was particularly harmful. Such a

disclosure relieves the jury of their responsibility of impartially determining the guilt or

innocence of the accused.

## XXXI. MR. MAPLES WAS UNCONSTITUTIONALLY REQUIRED TO GIVE PHYSICAL EXEMPLARS

452.    The trial court issued contradictory and confusing orders regarding

Mr. Maples' need to give physical exemplars.  Though in some circumstances, the state

may have the authority to collect physical exemplars from criminal suspects, Mr. Maples

had an equivalent and contravailing right to rely upon the finality of the trial court's

rulings. Brown v. Ohio, 432 U.S. 161 (1977). The trial court's contradictory rulings in

this case severely hampered Mr. Maples' ability to rebut the state's evidence.

453.    The state moved the trial court to authorize the collection of physical

exemplars from Mr. Maples on February 5 and 6, 1997. (C. 340, 341)  Mr. Maples

immediately objected to the state's motion, and properly asserted that the case was in the

final stages of preparation and that granting the state's motion would materially affect the evidentiary record in the case. (C. 342) The trial court initially agreed with Mr. Maples, and denied the state's request on February 14, 1997. Subsequently, however, the trial court reversed itself, and granted state discovery of physical exemplars. (C. 391) These contradictory and unpredictable actions of the trial court denied Mr. Maples a fair and reliable capital proceeding and sentence. Gregg v. Georgia, 428 U.S. 123 (1976). Further, the state failed to show that the state's interest in obtaining the physical exemplars outweighed Mr. Maples' right to be free of such serious intrusions as collecting blood and other physical exemplars. These procedures denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### XXXII.    THE TRIAL COURT UNCONSTITUTIONALLY INVADED THE PROVINCE OF THE JURY, AND INSTRUCTED THE JURY THAT THEY HAD TO FIND AN AGGRAVATING CIRCUMSTANCE

454.    In capital trials, the jury is called upon to make two sets of fact-finding decisions: first, whether the defendant is guilty of capital murder beyond a reasonable doubt, and second, whether aggravating circumstances exist and, if so, whether they outweigh mitigating circumstances. In this case, the trial court subsumed the role of the jury, and instructed the jury that they were to find that an aggravating circumstance existed. This clearly deprived Mr. Maples of his right to have aggravating and mitigating circumstances considered and evaluated by a jury, and rendered his death sentence constitutionally infirm under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

455.    During the penalty phase, the trial court announced that it was going to instruct the jury that an aggravating circumstance was found to exist and later reiterated its plan. (R. 3064) Maples properly objected that such an instruction from the trial court was an impermissible comment on the evidence, but was overruled.  (R. 3231-3232)

456.    Indeed, the trial court apparently recognized the impropriety of its instruction, but plunged ahead anyway: "By the law of this State, the trial Judge cannot comment on the evidence in this case.  However. . . you, the jury, have already found the State has satisfied its burden of proof beyond a reasonable doubt as to the aggravating circumstances at issue in this phase of the trial."  (R. 3331) (emphasis supplied).  This clearly invaded the province of the jury, and renders Mr. Maples' sentence of death unreliable:  the state was relieved of its burden of proof. In Re Winship, 397 U.S. 358 (1970); Sandstrom v. Montana, 442 U.S. 510 (1979). In addition, the trial court's instruction resulted in "double counting" which rendered Mr. Maples sentence unreliable and unconstitutional.  This violated Mr. Maples' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

## XXXIII.    THE VERDICT FORM IMPROPERLY LIMITED THE FREEDOM OF THE JURY TO ACQUIT MR. MAPLES OF A LESSER INCLUDED OFFENSE.

457.    For the capital murder count of killing two or more persons pursuant to one course of conduct (Count One) and for the capital murder count of killing Mr. Terry during a robbery in the first degree (Count Two), the court submitted both **guilty** and **not guilty** verdict forms to the jury.  (R. at 3015-16.)  However, for the two lesser included offenses subsumed in Count One—the intentional murder of Mr. Robinson and the

-219-

intentional murder of Mr. Terry—the court submitted only **guilty** verdict forms. (R. at 3017.) The court also provided the jury with only **guilty** verdict forms for the two lesser included offenses subsumed in Count Two: the intentional murder of Mr. Terry and theft in the first degree. (R. at 3018.) The court instructed the jury to use the not guilty verdict forms provided for the capital counts if the jury intended to return a **not guilty** verdict with respect to the lesser included offenses of the capital counts. (R. at 3017.)

458.    By not providing the jury with individual **not guilty** verdict forms for the lesser included offenses, the court made it impossible for the jury to return a verdict of not guilty with respect to one lesser included offense but not the other. For example, with respect to Count Two, the jury could not find Mr. Maples **guilty** of intentional murder but **not guilty** of first degree theft. Instead, Mr. Maples could only be found guilty of the capital count, guilty of intentional murder AND first degree theft or not guilty with respect to all counts charged. Therefore, the verdict forms were deficient and prejudicial to Mr. Maples. See Beck v. Alabama, 447 U.S. 625 (1980) (striking down Alabama law that forced the jury either to convict the defendant of the capital crime or to acquit him of all charges and allow him to go free).

459.    In addition, the absence of separate **not guilty** verdict forms for the lesser included offenses gave the impression that the jury was precluded from returning a not guilty verdict as to the lesser included offenses. Due to the improper verdict forms and the confusing jury instructions, Mr. Maples's conviction must be reversed.

460.    Counsel admitted their lack of experience in drafting verdict forms. "I don't have enough experience to know how this is handled, Judge." (R. at 2944.)

-220-

However, a failure to know or understand the law cannot be accorded deference as a reasonable trial strategy, therefore Counsel rendered ineffective assistance. See Horton v. Zant, 941 F.2d 1449, 1463 (11th Cir. 1991); People v. Carter, 354 N.E.2d 482, 485 (Ill. App. Ct. 1976) (citing United States v. Bella, 353 F.2d 718, 719 (7th Cir. 1965)).

## XXXIV.   THE CUMULATIVE EFFECT OF ALL OF THE ABOVE LISTED ERRORS CONSTITUTED CONSTITUTIONAL ERROR.

461.   The cumulative effect of the errors of Federal constitution law discussed above violated Mr. Maples's rights to a fair trial protected by the Fourth, Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution. See Kyles v. Whitley, 514 U.S. 419 (1995) (holding that the cumulative effect of violations must be considered by court); Daniel v. Thigpen, 742 F. Supp. 1535 (M.D. Ala. 1990) (finding that the cumulative effect of Counsel's errors resulted in defendant being deprived of his right to effective assistance of counsel); Derden v. McNeel, 978 F.2d 1453 (5th Cir. 1992) (holding that in limited situations relief may be granted for cumulative errors at trial where individual errors involved matters of constitutional dimension and errors infected the trial and violated due process), cert. denied, 508 U.S. 960 (1993). For all the reasons cited above, we request that this Court grant the requested relief.

## XXXV.   CONCLUSION

462.   For all of the foregoing reasons, Mr. Maples was deprived of rights protected by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The state court adjudications of these claims resulted in decisions that were contrary to, and involved an unreasonable application of, clearly established

Federal law, as determined by the United States Supreme Court.  Furthermore, the state court adjudications resulted in decisions that were based on unreasonable determinations of facts in light of the evidence.

### XXXVI.    PRAYER FOR RELIEF

463.    For all of the above stated reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Cory R. Maples respectfully asks this Honorable Court to grant him the following relief:

(a)    afford petitioner an opportunity to reply to any responsive pleading filed by respondent;

(b)    grant petitioner discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct discovery, and further grant petitioner authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(c)    grant petitioner an evidentiary hearing at which additional proof may be offering supporting the allegations set forth in this petition;

(d)    permit petitioner after additional factual development an opportunity to brief and argue the issues presented in this petition;

(e)    issue a writ of habeas corpus granting Mr. Maples relief from his unconstitutionally obtained conviction and sentence of death; and

(f)    grant such further and other relief as may be appropriate

Respectfully submitted,

Mark De Leeuw[*]
125 Broad Street, 32nd Floor
New York, NY  10004
(212) 558-4217

Gary A. Alexion[*]
c/o The Legal Aid Society
Capital Division
1 Battery Park Place, 22nd Floor
New York, NY  10004
(212) 577-3427


John G. Butler[*]
McDaniel & McDaniel
223 East Side Square
Huntsville, AL  35802
(256) 534-3018


COUNSEL FOR MR. MAPLES


Dated:  August 28, 2003

---

[*]     Mr. Butler is admitted to the bar of the United States District Court for the Northern District of Alabama.  Mr. DeLeewu and Mr. Alexion are admitted to the bar of the State of New York and one or both of us will apply to appear pro hac vice on this matter within ten days of this filing pursuant to Local Rule 83.1(b).

## ATTACHMENT A

**Cory Maples's Prison Number: Z-624/4D13**

**Trial Attorneys:**

| | |
|---|---|
| Mark Craig | Craig & Craig<br>1408 Fifth Avenue<br>Suite 3<br>Decatur, AL  35601 |
| Phil Mitchell | Edwards, Mitchell & Reeves<br>123 Lee Street, NE<br>Suite A<br>Decatur, AL  35601 |

**Direct Appeal Attorneys:**

| | |
|---|---|
| Clint Brown Jr. | 118 E. Moulton Street<br>Decatur, AL  35601 |
| James R. Mason | P.O. Box 1458<br>Decatur, AL  35602 |
| Denise Hill | 116 Lee Street, NE<br>Decatur, AL  35601 |

## ATTORNEY'S VERIFICATION

I affirm under penalty of perjury that, upon information and belief, this Petition

for Writ of Habeas Corpus is true and correct. Executed on August 28, 2003.

Gary A. Alexion

<u>CERTIFICATE OF SERVICE</u>

I certify that on August 28, 2003, a copy of the attached document was served by

first-class mail on:

> Bill Pryor
> Office of the Attorney General
> Alabama State House
> 11 South Union Street
> Montgomery, AL  36130


Gary A. Alexion