FILED

2005 Dec-19  PM 07:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| CORY R. MAPLES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. CV 03-B-2399-NE |
| vs. | ) | |
| | ) | |
| DONAL CAMPBELL, | ) | |
| | ) | |
| Commissioner, Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

**CORY MAPLES' REPLY BRIEF AND REQUEST FOR AN
EVIDENTIARY HEARING PURSUANT TO MARCH 9, 2005 ORDER**

December 19, 2005

# TABLE OF CONTENTS

Page

Preliminary Statement...................................................................................................1

BACKGROUND ...........................................................................................................4

    A.    Factual Background ........................................................................4

    B.    Procedural Background...................................................................10

ARGUMENT ...............................................................................................................12

I.    RESPONDENT MISSTATES THE STANDARD APPLICABLE HERE...........12

    A.    Mr. Maples Satisfied the Pleading Standard Here .....................................13

    B.    Mr. Maples Is Entitled to an Evidentiary Hearing.....................................14

II.    MR. MAPLES' CLAIMS ARE NOT SUBJECT TO THE
EXHAUSTION OR PROCEDURAL DEFAULT BAR .......................................19

    A.    Respondent Expressly Waived the Exhaustion Requirement....................20

    B.    The Judicial Estoppel Doctrine Precludes Respondent From
Arguing That Mr. Maples Has Not Exhausted His Claims .......................21

    C.    The Alabama Rule Allowing Out-Of-Time Appeals
Has Been Inconsistently Applied................................................................23

    D.    Mr. Maples Has Demonstrated Cause and Prejudice for
Any Procedural Default ...............................................................................27

    E.    The State Court Ruled That Mr. Maples
Adequately Pleaded His Claims...................................................................29

III.    MR. MAPLES HAS VALID CLAIMS FOR RELIEF........................................31

    A.    The Failure of Trial Counsel To Present Substantial
Mitigation Evidence During the Penalty Phase (Claim II)
Mandates Habeas Relief ..............................................................................31

        1.    Trial Counsel Failed To Investigate and Present
Evidence of Physical and Emotional Abuse by
Mr. Maples' Father and Step-Mother ............................................34

2.      Trial Counsel Failed To Investigate and Present
        Evidence of Mr. Maples' Social and Family
        History and  Emotional Disorders....................................36

3.      Trial Counsel Failed To Investigate and Present
        Evidence of (A) Mr. Maples' Attempts To Recover
        From His Drug Abuse, (B) His Assistance to Law
        Enforcement, and (C) Threats Against Mr. Maples and
        His Family Because He Assisted Law Enforcement ....................42

4.      Trial Counsel Failed To Investigate and Present
        Evidence of Mr. Maples' Good Character During
        His Incarceration and Failed To Present Available
        Character Testimony From Law Enforcement
        Officers and Friends and Family....................................44

5.      Trial Counsel's Failure To Investigate and Present
        Substantial Mitigation Evidence Was Not a
        Reasonable Strategic Decision......................................45

        a.      Trial counsel's decision not to investigate
                and present mitigating evidence was not a
                reasonable strategic decision under
                Supreme Court precedent....................................45

        b.      Trial counsel's mitigation case and preparation
                was materially indistinguishable from the
                mitigation case and preparation that the
                Supreme Court found deficient in *Williams*......................46

6.      The State Court Unreasonably Applied Supreme Court
        Precedent to the Facts of Mr. Maples' Case .................................48

7.      The Writ Should Issue Because There Is a Reasonable
        Probability That But for Counsels' Errors, the Jury
        Would Not Have Recommended Death.........................................50

B.      The Failure of Trial Counsel To Present Evidence
        Responding to the Capital Murder Charge and Obtain a
        Mental Health Expert and a Pharmacologist To Assist
        Mr. Maples' Defense During the Guilt Phase of Trial (Claim I)
        Mandates Habeas Corpus Relief..............................................52

C.    The Failure of the Trial Court To Give an Intoxication or
      Manslaughter Instruction (Claim XIII) Mandates
      Habeas Corpus Relief ...................................................................53

      1.    The State Court's Decision ...........................................54

      2.    The State Court's Factual Determination ......................55

D.    Mr. Maples' Claim Relating to His Post-Arrest Statements
      (Claim XVIII) Mandates Habeas Corpus Relief.........................56

      1.    The Issue on Direct Appeal...........................................56

      2.    The Relevant Facts........................................................57

      3.    The Alabama Court's Decision......................................57

E.    Other Claims Set Forth in the Petition
      Mandate Habeas Corpus Relief ...................................................58

CONCLUSION..............................................................................................59

### CORY MAPLES' REPLY BRIEF AND REQUEST FOR AN
### EVIDENTIARY HEARING PURSUANT TO MARCH 9, 2005 ORDER

Pursuant to Paragraph V of this Court's March 9, 2005 Order as amended by subsequent orders, Petitioner Cory R. Maples respectfully submits this reply brief in response to the Respondent's Answer, dated October 4, 2005 ("Answer") and Motion To Dismiss With Prejudice, also dated October 4, 2005, and further to his Amended Petition for Writ of Habeas Corpus By Prisoner in State Custody Under Death Sentence, dated May 23, 2005 ("Petition"), and request for an evidentiary hearing.[1]

### Preliminary Statement

As set forth in the Petition, Mr. Maples is facing the penalty of death without any court conducting an analysis of many of his Constitutional claims.  Despite this, Respondent asks this Court to dismiss the Petition without any substantive analysis of the merits of Mr. Maples' claims or any fact-finding whatsoever.  There is no legal basis for such an extreme, and unfair, result.

It is well established in the Eleventh Circuit and elsewhere that a habeas petitioner is entitled to an evidentiary hearing if he alleges facts that, if proven at the hearing, would entitle him to relief.  A petitioner is *not* required — indeed it is discouraged — to set forth in his pleading a detailed legal analysis or the evidence that might be used to prove a claim.  Here, Mr. Maples has, as is required, set forth both the

---

[1]  In his Answer (¶ 46), Respondent purportedly "reserve[s] the right" to address the substance of Mr. Maples' claims at a later time.  This is inconsistent with the Court's March 9, 2005 Order, which required Respondent to set forth his reasons for rejecting the Petition in his Answer.  Of course, Mr. Maples cannot address arguments that Respondent has not yet supplied, and will not attempt to do so herein.

legal grounds and factual bases for numerous claims of Constitutional violations that, if proven, would entitle him to relief.

Just by way of example, Mr. Maples claims that his Sixth Amendment right to counsel was violated because he did not receive effective assistance of counsel. As the Petition explains and the evidence will prove, Mr. Maples' trial counsel did almost nothing to defend him from conviction for capital murder or a death sentence. Faced with a videotaped confession and an intelligent defendant who could not explain the crime, counsel did not attempt to do anything of the sort that could be expected of effective counsel: Counsel did not investigate Mr. Maples' family or mental history that could have been used to defend against the charge of intentional murder or for mitigation evidence at sentencing; did not investigate or present any evidence of intoxication of Mr. Maples at the time of the crime; failed even to request a lesser included offense charge that could have been based on intoxication evidence; failed to investigate Mr. Maples' history or reaction to drugs and/or alcohol; and failed to have experts investigate the very important mental health issues that could have been relevant to evidence submitted by Mr. Maples in both the guilt and sentencing phases of the trial. As pleaded and as the evidence will show, had counsel engaged in any of these reasonable steps, the evidence before the jury in both the guilt phase and, if necessary, the sentencing phase of the trial would have been quite different. Had counsel provided effective assistance, Mr. Maples would not now be facing the possibility of being executed by the State of Alabama. Mr. Maples only asks here that this Court consider — for the first time by any court — the facts and merits of that claim.

Apparently recognizing that claims such as Mr. Maples' pleading provides the basis for an evidentiary hearing and, if proven, relief, Respondent argues that Mr. Maples cannot pursue many of his claims because he failed to exhaust them in state court by failing to appeal the dismissal of his Rule 32 petition in a timely fashion.  This is wrong, for at least four independent reasons.

First, Respondent's counsel expressly waived reliance on the exhaustion defense, representing to the Alabama court that, even if an out-of-time appeal was not permitted by that court, "Maples may still present his postconviction claims to th[e federal] court."  Pursuant to statute, such an express waiver precludes reliance on the exhaustion defense in federal habeas proceedings.

Second, Respondent is precluded from relying on the exhaustion defense pursuant to the judicial estoppel doctrine.  As the Eleventh Circuit has held, that doctrine "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  That is exactly what Respondent seeks to do here, by convincing the Alabama courts that they need not grant an out-of-time appeal because Mr. Maples' claims could be heard by this Court, and arguing now that this Court cannot hear those same claims.

Third, Respondent cannot rely on Alabama's decision not to grant Mr. Maples an out-of-time appeal because Alabama courts have not applied that rule consistently.  The Alabama appellate court that denied Mr. Maples an out-of-time appeal granted such an appeal in a factually indistinguishable case, and has often explained that petitioners like Mr. Maples who fail to appeal on a timely basis through no fault of their own (as here) may be allowed an out-of-time appeal.  Indeed, apparently recognizing the

patchwork application of its rules, the Alabama Supreme Court recently adopted a new rule that — although not applicable to Mr. Maples — permits petitioners in the exact same situation an extra six months to appeal dismissal of a Rule 32 petition.

Fourth, even if there was a basis for an exhaustion or procedural default defense— there is not — Mr. Maples clearly has shown "cause and prejudice" to excuse such a default.  In the circumstances presented here — Mr. Maples was unable to appeal dismissal of his Rule 32 petition solely because his primary counsel, who had been instructed to appeal, did not receive the dismissal order — there is cause for a failure to appeal.  And, if the default rule operated to preclude his claims, Mr. Maples clearly would be prejudiced by the Constitutional errors pleaded in the Petition.

In short, Mr. Maples has pleaded numerous claims that, if proven, would entitle him to habeas relief.  Many of those claims have never been heard by any court. This Court should permit Mr. Maples to provide the evidence to support his claims at an evidentiary hearing.

## BACKGROUND

### A.   Factual Background

The factual background of this case is set forth in the Petition.  Without restating much of that here, the following describes some of the factual information that was not introduced at trial, which constitutes perhaps the most striking deficiency in Mr. Maples' trial counsel representation — a failure to investigate or introduce Mr. Maples' family and medical/mental history, all of which could have been used as evidence in the guilt phase of trial (as a means of arguing that Mr. Maples could not form the requisite intent) or, if necessary, as mitigation evidence in sentencing.  This evidence

— learned for the first time after the reasonable investigation that trial counsel did not conduct — would be introduced at a hearing, through both fact and expert witnesses, to substantiate Mr. Maples' claim of ineffective assistance of counsel.

As an infant, Cory Maples was physically abused and abandoned by his teenage mother, Denise Maples, and physically and emotionally abused by his father and step-mother, Phillip and Elyse Maples. Denise Maples, by her own admission, never bonded with her son. Indeed, none of Cory's maternal relatives ever formed any sort of attachment or relationship with him. His maternal grandparents insisted that their daughter put Cory up for adoption. As a result, Cory's mother left him for the first time very shortly after his birth, only to return four weeks later.

Denise Maples suffered violent outbursts. She often threw tantrums, banging her fists on her thighs, pulling out chunks of her hair, pounding her feet on the floor and scratching herself until she bled. And during Denise's and Phillip's short marriage, there were many violent situations; Cory witnessed many, if not all, of them.

For instance, in 1974, Denise attacked Phillip Maples with a metal hair brush while he was driving, causing his eye to bleed. Phillip responded with physical violence. In 1977, Phillip and Denise were entertaining friends when Denise suddenly jumped up and threw a drink in her friend's face. She grabbed the woman's hair, shouted that she hated her and stormed out of the room, shocking everyone. And on another occasion in 1977, Phillip and Denise were entertaining friends when Denise advanced on Phillip with a knife. Phillip, believing that she was trying to cut his throat, hit her hard in the face. Nevertheless, she stabbed him in the arm with the knife.

About three months later, Phillip was laying in bed and Cory was watching cartoons when Denise went to the kitchen to make breakfast.  She returned to the bedroom with a pan, pulled the sheets off of Phillip and poured hot grease over his chest and stomach.  Denise's father took her home with him.  Phillip, in turn, took Cory to his parents' home.

Denise's violence was directed at Cory as well.  Denise slapped Cory when he was a newborn.  When Cory was approximately six months old, Denise locked Cory in a car.  A passerby who saw Cory screaming and sweating retrieved Denise, causing her to release him.  She also tied Cory's wrists to a chair and beat him with a broomstick.  In 1977, when Cory was three years old, Denise tried to sell him to a neighbor.

After Denise poured hot grease on Phillip, he left, leaving Cory (who was then 1½ years old) with Denise.  Cory, an already fidgety child, immediately became very clinging and engaged in chronic scratching.  Denise was left with a child with whom she had never bonded and wanted to put up for adoption.  In short, Denise Maples, a young woman with severe emotional disorders, had to care for a child that was exhibiting symptoms of his own emotional and mental disorders.

Significantly, Denise's family history is replete with instances of learning disabilities, physical and emotional disorders and substance abuse.  Denise has first cousins with Tourette's Syndrome and dyslexia.  Diabetes and heart problems exist on her father's side of the family.  Her 39-year-old brother suffers from bouts of depression and social isolation and still lives with his father.  Her maternal grandfather and paternal great grandfather were both alcoholics, and so is her father.

Alcoholism is rampant in Cory's father's family as well.  Cory's father, Phillip, is an alcoholic.  Phillip's mother was raised by her alcoholic grandfather.  And Phillip's two brothers are alcoholics.

Denise directed her anger and outbursts to Cory, a child she never wanted.  She violently strangled him, using force so hard that she left visible marks on his throat.  And on yet another occasion, she lifted him by his neck in a fit of anger, leaving scratches on his face and neck.  Finally, Cory's maternal grandfather went to Phillip and told him to take Cory or Denise would kill him.

Phillip and Elyse Maples married in 1977, and Cory lived with them.  Denise visited Cory at Elyse's trailer twice.  In 1977, Denise, Cory and Denise's father went to the park.  Cory returned home with scrapes and scratches on his knees and neck.  When Phillip and Elyse asked Cory what happened, he told them that Denise did it, but it was his fault.

In 1978, Elyse became pregnant with Phillip and Elyse's child.  Elyse became so ill that Phillip and Elyse sent Cory to his paternal aunt, Margaret.  This was Cory's fourth household and family in as many years.  Cory returned to Phillip and Elyse's home sometime after their son Daniel's birth in October 1978.  Cory still had occasional contact with Denise, but by age five Phillip told Denise that she could not see Cory anymore, and she did not for approximately eleven years.

Cory often cried for his mother until he became ill.  He also experienced nightmares.  Cory was often "down" about not having his mother in his life, and this continued until Denise returned in 1991.

Sadly, Cory's abuse did not end with his mother's abandonment.  Both Phillip and Elyse physically and emotionally abused Cory throughout his life.  Phillip and Elyse beat Cory with belts and tree branches, leaving welts and cuts on his body.  Elyse, by her own admission, continued this practice until Cory was about six years old.  Phillip's beatings, on the other hand, continued throughout Cory's life.  And Phillip's abuse was not limited to beatings.  On one occasion, Phillip forced Cory to ingest a pack of cigarettes and would not relent even when Cory became violently ill and started vomiting.  The event was so horrific, it even caused Elyse, who witnessed it but failed to intercede, to vomit.

Phillip often ejected Cory from their house because he was unsatisfied with the way Cory completed a chore.  Cory, as one witness put it, was unwelcome in his own home.  Cory would sleep in the woods behind the family trailer, knocking on his younger brother's window at night for a blanket for warmth or something to eat.

And both Phillip and Elyse repeatedly emotionally abused Cory.  They worked Cory, who was by all accounts a hard worker, "like a dog."  They clearly favored their biological child.  They repeatedly told Cory that his mother abandoned him and referred to Cory's mother as "the crazy bitch."  They constantly berated and shamed Cory, telling him that his mother did not want him, nothing he did was ever any good, his friends were no good, and sadly, he was just no good.

In addition, Phillip was, by all accounts, an alcoholic.  He spent little or no time with Cory, opting to spend his weekends and spare time in bars.  Unable to cope with his emotions, Cory, similar to his birth mother, engaged in self-mutilation.  For example, Cory often cut himself with razor blades until he bled.  Notably, Cory felt

overwhelming emotional relief after doing so.  Despite this, Cory, according to everyone who knew him, was never violent with anyone else.

Indeed, Cory's friends report that Cory's emotional turmoil was always directed inward.  He often cried for no reason, indicating his severe depression.  And Cory often talked and wrote about suicide, and even played Russian Roulette on one occasion.

Everyone reports that Cory was a polite, non-violent person.  Even Officer Larry Greene, for whom Cory did undercover work, said that Cory was a polite, punctual person.  In his undercover work for the Decatur police department, Cory assisted with a significant drug bust.  And Sam Frost, a jailer at the county jail where Cory was incarcerated before and during his trial, stated that Cory was well-behaved during his incarceration and had been a very nice, non-violent person his entire life.

Sadly, these are just a few of the tragic and important facts about Cory Maples' life that were either never adequately developed or reported during his trial. Nonetheless, Cory Maples — a non-violent, polite, hard-working person with an extensive history of abuse and abandonment, self-mutilation, depression and suicidal ideations — has been sentenced to death without any court having considered extensive, reasonably available mitigating evidence of his family and social history, his assistance to the police and his ability to adjust to prison life.  Such treatment is both contrary to and an unreasonable application of Supreme Court precedent.

**B.** **Procedural Background**

The procedural background of this matter is also set forth in detail in the Petition. (¶¶ 1-13a.) The proceedings in Alabama state court on Mr. Maples' request for post-conviction relief are of particular importance here, and are described below.

On August 1, 2001, Mr. Maples sought collateral review of his conviction and death sentence by filing a petition (R-47) pursuant to Alabama Rule 32 with the Circuit Court of Morgan County, Alabama. On September 27, 2001, Respondent filed a motion to dismiss that petition, arguing that Mr. Maples had failed to plead a claim entitling him to relief from his conviction and sentence. Attached to Respondent's motion was an 86- page proposed order dismissing the petition on every claim without any development of a factual record or a hearing. (State's Answer to Rule 32 Petition (R-48).)

Mr. Maples opposed Respondent's motion. (Maples' Response to State's Answer and Motion to Dismiss or Deny Maples' Claims (R-50).) In addition, Mr. Maples asked in his petition (p. 91) for discovery that could be used to develop an adequate factual record for an evidentiary hearing.

On December 27, 2001, the Alabama Circuit Court denied Respondent's motion. The court held that Mr. Maples had adequately pleaded his Rule 32 claims. *Cory Maples* v. *State of Alabama*, CC-95-842.60, dated Dec. 27, 2001 (attached hereto as Exhibit 1).

The Alabama Circuit Court did not rule on Mr. Maples' request for discovery or schedule a hearing. Rather, the case sat dormant while all parties awaited the court's scheduling of further proceedings or a hearing.

On May 22, 2003, more than one and a half years after the court had denied the motion to dismiss and without any warning or further proceedings, the Circuit Court issued a *sua sponte* denial of Mr. Maples' Rule 32 petition.  In doing so, the court merely adopted the Respondent's proposed order that had been supplied and rejected in 2001.  *Cory R. Maples* v. *State of Alabama,* CC-95-842.60, dated May 22, 2003.  No explanation was given for this unusual, and highly prejudicial, turn-around.

Moreover, and as further evidence of the non-substantive review of Mr. Maples' claims, the Circuit Court did not dismiss the Rule 32 petition that was before it.  Instead, the court dismissed was the *original* petition Mr. Maples filed, not the *amended*, and therefore operative, petition that the very same court had sustained as adequately pleaded in December 2001.  In essence, the Circuit Court *never* addressed the claims raised in the amended petition, as it should have.

The Clerk for the Circuit Court mailed copies of the order dismissing the petition to Mr. Maples' New York attorneys, who were primarily responsible for his representation, as well as local counsel.  (Petition ¶¶ 7-10.)  While the order was received by local counsel, the copies mailed to the New York attorneys were returned unopened to the clerk's office and one was marked "left firm."  (In the interim 1½ years, other lawyers at the same law firm had assumed responsibility for Mr. Maples' case.)  As the New York attorneys had assumed primary responsibility for the defense, local counsel did not take any action and did not inform Mr. Maples that his petition had been denied.  (Petition ¶¶ 10-11.)  Meanwhile, the Circuit Court Clerk's office, when it received the returned mail that had been sent to the New York lawyers, did not notify Mr. Maples that his petition had been denied, or inform local counsel that the notice to Mr. Maples' New

York lawyers had been returned.  As a result, Mr. Maples did not learn that his petition had been denied until August 2003 — after the time for appeal of the Circuit Court's decision had run — when he was informed of the denial by the Alabama Attorney General's Office.  (Petition ¶¶ 11-12.)

Once he became aware that his Rule 32 petition had been denied, Mr. Maples immediately instructed his counsel to appeal.  His counsel filed a motion in the Circuit Court requesting that the court vacate and reissue its May 2003 order so that Mr. Maples could file a timely notice of appeal.  The court denied that motion.  Then, pursuant to recent Alabama case law explaining the manner that such an out-of-time appeal should be sought, Mr. Maples filed a petition for writ of mandamus requesting an out-of-time appeal, which was denied by the Alabama Court of Criminal Appeals (*Ex parte Cory R. Maples,* 885 So. 2d 845 (Ala. Crim. App. Jan. 23, 2004)), and that decision was affirmed by the Alabama Supreme Court on Sept. 3, 2004 (R-68).

## ARGUMENT

### I.   RESPONDENT MISSTATES THE STANDARD APPLICABLE HERE.

In his Answer and Motion To Dismiss, Respondent asks this Court to dismiss the Petition without any substantive analysis of the merits of Mr. Maples' claims or any evidentiary hearing.  The arguments set forth in those papers, however, misstate the standards applicable to such a far-reaching request.  First, Mr. Maples is not required in the Petition to argue every point of law and proffer all potential evidence that would support his position.  Second, Mr. Maples is entitled to an evidentiary hearing prior to this Court's ruling on many of the claims in the Petition.  Both points are explained in further detail below.

A.      **Mr. Maples Satisfied the Pleading Standard Here.**

It is well established that habeas relief should be granted if a state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see*, *e.g.*, *McNair* v. *Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005). Respondent contends that Section 2254(d) offers no assistance here because Mr. Maples did not cite to the statute in his Petition (Answer ¶ 37), and that, because language appears in both the state appeal brief and in the Petition (or is "cut and pasted"), it is "impossible" that Mr. Maples' made an adequate showing under that statute (Answer ¶¶ 38-39).  These arguments misunderstand the applicable standard here.

Pursuant to Rule 2(c) of the Rules Governing Section 2254 Petitions, Mr. Maples was required in his habeas petition to "specify all the grounds for relief available" to him, "state the facts supporting each ground" and "state the relief requested."  28 U.S.C. § 2254, Rule 2(c); *see Benjamin* v. *Sec'y for the Dep't of Corrs.*, No. 04-16438, 2005 WL 2402735, at *3 (11th Cir. Sept. 29, 2005).  Thus, the Eleventh Circuit has stated, "[a]lthough the habeas rules require more than notice pleading, and some factual specificity will often be helpful, or even necessary, a habeas petition should not resemble a treatise."  *Spaziano* v. *Singletary*, 36 F.3d 1028, 1031 n.2 (11th Cir. 1994). "All that habeas petitioners are required to do in their pleadings is to set out facts which, if found to be true, would entitle then to some legal conclusion of which they are seeking the benefit.  There is no requirement that evidence be pleaded in habeas cases."  *Weeks* v. *Bowersox*, 119 F.3d 1342, 1357 (8th Cir. 1997) (Arnold, J., dissenting).  Indeed, the Eleventh Circuit has stated that habeas petitions that offer *too much* information often

-13-

"do a disservice not only to the courts but also to their clients."  *Spaziano*, 36 F.3d at 1031 n.2.

As required, the Petition specifies the grounds for each of Mr. Maples' claims (the clearly established federal law at issue), summarizes the facts supporting each ground and specifies the relief requested.  The Petition details numerous violations of federal law, as established by both the Supreme Court and the United States Constitution, and the facts that are needed to understand these claims.

The State's suggestion that Mr. Maples needed to supply this Court with *more* than the 219 pages of information in the Petition is directly contrary to the habeas rules and Eleventh Circuit precedent.  Both require that a petitioner explain the nature of his requested relief and the relevant facts.  Mr. Maples was not required to write an even-more-lengthy "trial brief" or to set forth all of the evidence that could be used to support his claims.  That is the function of discovery and an evidentiary hearing, not a pleading.  In any event, as described in more detail in Section III *infra*, Mr. Maples clearly sets forth claims that, if proven, would require habeas relief.

**B.      Mr. Maples Is Entitled to an Evidentiary Hearing.**

For similar reasons, Mr. Maples is entitled to an evidentiary hearing.  "It is well established that a habeas petitioner is entitled to an evidentiary hearing on a claim if he or she alleges facts that, if proved at the hearing, would entitle the petitioner to relief." *James* v. *Singletary*, 957 F.2d 1562, 1574 n.17 (11th Cir. 1992); *accord*, *e.g.*, *Cave* v. *Singletary*, 971 F.2d 1513, 1516 (11th Cir. 1992).  "[E]videntiary hearings are particularly important in capital cases . . . , where the 'irremediable' penalty demands fact-finding at a 'heightened standard of reliability.'" *Parkus* v. *Delo*, 33 F.3d 933, 939

n.6 (8th Cir. 1994); *accord Cunningham* v. *Zant*, 928 F.2d 1006, 1012 (11th Cir. 1991)

("factfinding procedures aspire to a higher standard of reliability in capital cases").  This

is particularly true where, as here, the state court has never held a hearing on Mr. Maples'

claims.  *See Green* v. *Zant*, 715 F.2d 551, 557 (11th Cir. 1983) ("Where facts necessary

to support a constitutional claim have not been adequately developed in the state courts, .

. . , a federal evidentiary hearing is necessary."); *Thomas* v. *Jones,* 742 F. Supp. 598, 603-

04 (S.D. Ala. 1990) ("[T]he Court must hold a hearing [when]. . . the fact-finding

procedure employed by the state court was not adequate to afford a full and fair hearing"

or "it appears that the state trier of fact did not afford the habeas applicant a full and fair

hearing.").

   The Eleventh Circuit has indicated that an evidentiary hearing is

appropriate if it "would [ ] assist in the resolution of [a petitioner's] claims."  *Herring* v.

*Sec'y, Dep't of Corrs*., 397 F.3d 1338, 1351 (11th Cir. 2005).  Here, that is clearly true.

This Court must determine if Mr. Maples' counsel was Constitutionally ineffective

because, *inter alia*, they failed to present mitigating evidence during trial.  This is a fact-

specific inquiry and requires the court to "look at the mitigating circumstance evidence

that was not presented, along with that which was, and consider the totality of it against

the aggravating circumstances that were found."  *Hardwick* v. *Crosby*, 320 F.3d 1127,

1166 (11th Cir. 2003).  Thus, in *Hardwick*, the Eleventh Circuit directed the district court

to "conduct an evidentiary hearing" to determine whether the state court was "afforded

the opportunity to weigh fairly and accurately all of the mitigating evidence in this case

against the aggravating evidence, as is constitutionally required."  320 F.3d at 1185.

Federal courts regularly hold hearings to make fully informed judgments regarding ineffective assistance of counsel claims. *See*, *e.g.*, *Jackson* v. *Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) (affirming grant of relief following evidentiary hearing on ineffectiveness claim where trial counsel presented little evidence of alcohol abuse and other mitigation); *Horton* v. *Zant*, 941 F.2d 1449, 1461-62, 1467 (11th Cir. 1991) (relief granted on ineffective assistance of counsel claim after evidentiary hearing on failure to investigate mitigation). Indeed, the Eleventh Circuit has remanded cases to district courts that failed to hold an evidentiary hearing on ineffectiveness claims. *See*, *e.g.*, *Clisby* v. *Alabama*, 26 F.3d 1054, 1055 (11th Cir. 1994); *Porter* v. *Wainwright*, 805 F.2d 930, 943 (11th Cir. 1986).

In this case, the merits of the factual dispute about counsel's ineffectiveness, discussed more fully *infra*, were not adequately resolved in the state court proceedings. In his Rule 32 proceedings, Mr. Maples was denied the opportunity to develop or present evidence to support his claims. Because the state court failed to make any findings with respect to the factual issues surrounding Mr. Maples' claims, this Court cannot rely on the state court proceedings and should conduct an evidentiary hearing. *See Cave*, 971 F.2d at 1516 (district court held evidentiary hearing when state court failed

to make adequate findings of fact to support denial of relief); *Cunningham*, 382 F.2d at 1012.[2]

The statutory prohibition of evidentiary hearings in certain circumstances — which Respondent does not contend applies here — only confirms the need for a hearing in this case. Section 2254(e)(2) of Title 28 prohibits a federal court from holding an evidentiary hearing unless "the applicant has failed to develop the factual basis of a claim in State court proceedings." In *Williams* v. *Taylor*, 529 U.S. 420, 435 (2000), the United States Supreme Court held that Section 2254(e)(2) means that a federal habeas petitioner is barred from obtaining an evidentiary hearing in federal court only if he has failed to exercise diligence in pursuing his rights in state court. The Court explained that diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id*. The Court also noted that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court." *Id*. at 437. Therefore, the Court concluded, "only a prisoner who has neglected his rights in state court need satisfy these conditions" of Section 2254(e)(2)(A)(ii). *Id.* at 435.

In the case at bar, Respondent does not dispute that Mr. Maples made a "reasonable attempt to investigate and pursue" to develop the factual basis for his claims in state court. *McNair*, 416 F.3d at 1298. Mr. Maples argued that the trial court should

---

[2]  Federal courts have discretion to conduct evidentiary hearings even when the state court has already done so. *See*, *e.g.*, *Meeks* v. *Singletary*, 963 F.2d 316, 319 (11th Cir. 1992) ("The mere occurrence of a full and fair hearing in the state court, however, does not neutralize petitioner's right to an evidentiary hearing in federal court.").

not dismiss his claims before providing him with an opportunity to prove them.

Mr. Maples asked for discovery and repeatedly urged the Alabama court to hold an

evidentiary hearing on his claims.  (*See*, *e.g.*, Response to State's Answer and Motion to

Dismiss or Deny Mr. Maples's Claims, dated December 7, 2001, at ¶ 21 (R-50) ("The

State's Motion ignores Alabama law in seeking a summary dismissal without a

hearing."); *id*. ("Because Mr. Maples' petition is meritorious on its face, Alabama law

requires an evidentiary hearing."); *id*. at ¶ 23 ("Because the specific factual allegation of

Mr. Maples' Rule 32 Petition, if true, entitle him to relief, Mr. Maples' Petition is

meritorious on its face.  Accordingly, this Court should hold an evidentiary hearing.").)

Because the state court dismissed Mr. Maples' claims *sua sponte* before

conducting an evidentiary hearing, any failure to develop evidence in support of his

claims could not be attributed to a lack of diligence from Mr. Maples.  "[C]omity is not

served by saying a prisoner has failed to develop the factual basis of a claim where he

was unable to develop his claim in state court despite diligent effort."  *Williams*, 529 U.S.

at 437 (internal quotations omitted).  Indeed, where as here the court "signed, without

change, the state's proposed order denying the defendant an evidentiary hearing and

denying his [post-conviction relief] motion," the Eleventh Circuit has held that an

evidentiary hearing was warranted.  *LeCroy* v. *Sec'y, Dep't of Corrs.*, 421 F.3d 1237,

1256-57 (11th Cir. 2005); *accord*, *e.g.*, *Breedlove* v. *Moore*, 279 F.3d 952, 960 (11th Cir.

2002) ("§ 2254(e)(2) does not preclude an evidentiary hearing" where the record is clear

that petitioner "sought an evidentiary hearing . . . at every stage of his state proceedings"

and the state court "denied him the opportunity to present evidence"); *Cardwell* v.

*Greene*, 152 F.3d 331, 337 (4th Cir. 1998) ("where an applicant has diligently sought to

develop the factual basis of a claim for habeas relief, but has been denied the opportunity to do so by the state court, § 2254(e)(2) will not preclude an evidentiary hearing in federal court").[3]

Mr. Maples has never has a chance to provide *any* court with the factual basis for his Constitutional claims.  As numerous courts including the Eleventh Circuit have held, before the ultimate sanction — death — is imposed on him, at least one court in our country should hear those facts in an evidentiary hearing.

## II.   MR. MAPLES' CLAIMS ARE NOT SUBJECT TO THE EXHAUSTION OR PROCEDURAL DEFAULT BAR.

In the Answer, Respondent argues that several of Mr. Maples' claims should be dismissed because they have not been exhausted — because he says they are subject to the procedural default doctrine, which Respondent says is "intertwined in this case" with the exhaustion requirement (Answer ¶ 27) — because Mr. Maples failed to appeal the dismissal of his Rule 32 petition on a timely basis.  (Answer ¶¶ 19-28.)  For at least four independent reasons — each of which is described below — the exhaustion (and procedural default) doctrines cannot preclude Mr. Maples' claims here.

---

[3]  *See also Greer* v. *Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) ("In the case before us, petitioner pursued his ineffective assistance of appellate counsel claim with proper diligence, raising it first—albeit prematurely—in his petition for post-conviction relief and then in his motion for delayed reconsideration.  Both of these pleadings requested an evidentiary hearing, which was never afforded by the Ohio courts.  Consistent with *Williams* v. *Taylor*, therefore, we conclude that petitioner is not precluded from an evidentiary hearing as he exercised the necessary diligence in attempting to establish the factual record in state court.  Accordingly, we remand this matter to the district court with instructions to accord petitioner an evidentiary hearing . . . .").

In addition, Respondent's argument that Mr. Maples' Rule 32 petition was insufficiently pleaded is wrong on the facts and law.  That ground too cannot serve the basis for a procedural default.

### A. Respondent Expressly Waived the Exhaustion Requirement.

As set forth by statute, exhaustion is an affirmative defense that a state may waive "through counsel, expressly."  28 U.S.C. § 2254(b)(3).  Here, Respondent unequivocally and expressly waived his affirmative defense of exhaustion when opposing Mr. Maples' petition for writ of mandamus.

On Jan. 26, 2004, Mr. Maples petitioned the Alabama Court of Criminal Appeals for a writ of mandamus to permit an out-of-time appeal of the Circuit Court's dismissal of Mr. Maples' Rule 32 petition.  (R-51.)  In opposing that petition, Respondent told the Alabama court that Mr. Maples' argument that he could "very well be executed despite valid post-conviction claims merely because he was denied the opportunity to timely appeal the dismissal of his Rule 32 dismissal" was "misleading and erroneous." (State of Alabama's Response to Cory R. Maples's Petition for Writ of Mandamus to the Circuit Court of Morgan County, Alabama, filed May 7, 2004, at 22 (attached hereto as Exhibit 2).)  Respondent explained that the Alabama court could reject Mr. Maples' petition for an out-of-time appeal because his claims could still be presented in federal court:

> Further this is misleading because Maples filed a petition for writ of habeas corpus in federal court, with the proceedings stayed until this matter is disposed of.  ***Maples may still present his postconviction claims to that court.***

(Ex. 2 at p. 22 n.4 (emphasis added).)

Respondent told the Alabama courts that, even if an out-of-time appeal was denied, Mr. Maples could present his Constitutional claims in federal court.   In doing so, he left no doubt that he expressly waived any reliance on the exhaustion doctrine.  Thus, pursuant to 28 U.S.C. § 2254(b)(3), he cannot rely on the exhaustion defense here.  *See*, *e.g.*, *Gonzalez* v. *McKune*, 279 F.3d 922, 926 n.8 (10th Cir. 2002); *Guy* v. *Cockrell*, No. 01-10425, 2002 WL 32785533, at *1 n.3 (5th Cir. July 23, 2002).

### B.     The Judicial Estoppel Doctrine Precludes Respondent From Arguing That Mr. Maples Has Not Exhausted His Claims.

In addition to expressly waiving the exhaustion requirement, Respondent is also barred from raising exhaustion or procedural default as a defense by virtue of the judicial estoppel doctrine.  As the Eleventh Circuit has explained, that doctrine "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *Cruz-Lovo* v. *Ryder Sys., Inc.*, No. 03-11247, 2003 WL 23150113, at *2 (11th Cir. Nov. 5, 2003); *see also Carver* v. *Carver*, No. 1040910, 2005 WL 3082254, at *8 (Ala. Nov. 18, 2005) ("The law is settled in Alabama that a party who has, with knowledge of the facts, assumed a particular position in a judicial proceeding is estopped from assuming a position inconsistent to the first one to the prejudice of an adverse party."); *Selma Foundry & Supply Co.* v. *Peoples Bank & Trust Co.*, 598 So. 2d 844, 846 (Ala. 1992) ("[T]he doctrine of judicial estoppel 'applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted.'" (quoting *Oneida Motor Freight, Inc.* v. *United Jersey Bank,* 848 F.2d 414, 419 (3d Cir. 1988)).

The United States Supreme Court has held that, for judicial estoppel to apply, (1) "a party's later position must be 'clearly inconsistent' with its earlier position," (2) the party must have been successful in the prior proceeding "so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or second court was misled,'" and (3) the party seeking to assert an inconsistent position must "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire* v. *Maine*, 532 U.S. 742, 750 (2001). Alabama courts have also "embrac[ed] the factors set forth in *New Hampshire v. Maine*, and join[ed] the mainstream of jurisprudence in dealing with the doctrine of judicial estoppel." *Ex parte First Ala. Bank,* 883 So. 2d 1236, 1246 (Ala. 2003).

All three requirements are clearly satisfied here. *First*, Respondent's position in May 2004, as represented to the Alabama state court, was that "Maples may still present his postconviction claims to th[e federal] court." (Ex. 2 at p. 22 n.4.) That statement directly contradicts and is "clearly inconsistent" with Respondent's present argument to this Court that Mr. Maples' failure to exhaust many of his claims in the state courts of Alabama precludes their presentation to this Court.

*Second*, there is no debate that Respondent prevailed in Alabama state court. The Alabama courts rejected Mr. Maples' petition for a writ of mandamus and did not permit him to pursue an out-of-time appeal.

*Third*, Respondent clearly would receive an unfair advantage if permitted to raise contradictory arguments to prevail in two different courts. Respondent would receive the benefit of prevailing in both state and federal courts by arguing in the former that Mr. Maples exhausted his state remedies and in the latter that he did not exhaust

-22-

those same state remedies.  As a result, Mr. Maples would be deprived of both redress in state court and in federal court and, ultimately, face execution.  Indeed, if Respondent is permitted to take such contradictory positions, there could be no doubt that either or both the Alabama state court and this Court was misled.

In addition to his waiver of the exhaustion requirement, the doctrine of judicial estoppel precludes Respondent from taking contradictory positions in this proceeding.  Accordingly, Respondent is estopped from relying on the exhaustion or procedural default defenses.  *New Hampshire* v. *Maine*, 532 U.S. at 750; *Cruz-Lovo*, 2003 WL 23150113, at *2; *Carver*, 2005 WL 3082254, at *8; *Ex parte First Ala. Bank*, 883 So. 2d at 1246; *Selma Foundry & Supply Co.*, 598 So. 2d at 846.

### C.   The Alabama Rule Allowing Out-Of-Time Appeals Has Been Inconsistently Applied.

Respondent asserts that Mr. Maples is not entitled to obtain habeas relief on various claims because he has failed to exhaust the remedies available in Alabama state court because by not appealing the dismissal of his Rule 32 petition on a timely basis.  (Answer ¶ 19.)  In general, where a habeas petitioner fails to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would find the claims procedurally barred, the petitioner's claim is procedurally defaulted for federal habeas purposes.  *Coleman* v. *Thompson*, 501 U.S. 722, 722-23 (1991).

It is well established, however, that a state procedural rule bars consideration of a federal habeas petition only if it is consistently and regularly applied. *Johnson* v. *Mississippi*, 486 U.S. 578, 587 (1988); *Cochran* v. *Herring*, 41 F. 3d 1404

(11th Cir. 1995).  Accordingly, Mr. Maples' failure to file a timely appeal to the denial of his Rule 32 petition in Alabama courts does not preclude his seeking federal habeas relief because the procedural bar prohibiting out-of-time appeals where the petitioner has missed the deadline through no fault of his own has not been consistently and regularly applied by Alabama courts.  *See*, *e.g.*, *Marshall* v. *State*, 884 So. 2d 898, 898-99 (Ala. Crim. App. 2002) (granting an out-of-time appeal under materially identical circumstances); *Clayton* v. *State*, 867 So. 2d 1150, 1152 (Ala. Crim. App. 2003).

The Alabama courts held that Mr. Maples is procedurally barred from bringing an out-of-time appeal to the denial of his Rule 32 petition, despite the fact that — as explained at pp. 11-12, *supra* — he was unaware that his Rule 32 petition had been denied until after his time to appeal had run, and the failure to appeal was through no fault of his own.  The Alabama courts have not consistently applied the procedural bar to out-of-time appeals in cases where the failure to perfect the appeal was through no fault of the petitioner.

In *Marshall* v. *State*, when presented with facts materially identical to those presented in Mr. Maples' case, the Alabama Court of Criminal Appeals granted an out-of-time appeal.  884 So. 2d at 898-99.  In *Marshall*, the petitioner, represented by counsel, filed a Rule 32 petition that the circuit court denied.  The clerk informed counsel that the petition had been denied, but did not assume a duty to notify the petitioner of the status of his petition and thus did not send him a copy of the court's dismissal.  *Id*.  As in Mr. Maples' case, Marshall's attorney "fail[ed] to inform him that his first Rule 32 petition had been dismissed." *Id*. at 899.  The Alabama Court of Criminal Appeals held that the petitioner had the right to an out-of-time appeal.  *Id*.  (On appeal, the Alabama

Supreme Court reversed and remanded on technical grounds, holding that the appropriate mechanism to bring an out-of-time appeal was a petition for a writ of mandamus. *Marshall* v. *State*, 884 So. 2d 900, 905 (Ala. 2003).[4])

While *Marshall* is the most factually similar case, there are numerous other Alabama cases in which out-of-time appeals were granted where the petitioner failed to appeal within the prescribed time through no fault of his own.  For example, Alabama courts have consistently permitted out-of-time appeals where the deadline for appeal is missed because the clerk's office failed to notify the petitioner that his petition was denied.  *See*, *e.g., Ex parte Johnson*, 806 So. 2d 1195, 1197 (Ala. 2001) (petitioner entitled to an out-of-time appeal where he was not notified that his Rule 32 petition was denied); *Ex parte Miles,* 841 So. 2d 242, 244-45 (Ala. 2002) (petitioner entitled to out-of-time appeal where he did not receive notice of denial until 49 days after the petition had been denied).

In addition, it is well established in Alabama that where a petitioner fails to appeal in a timely fashion because of his counsel's mistake, an out-of-time appeal should be granted.  *See*, *e.g*., *Clayton*, 867 So. 2d at 1152 (petitioner entitled to an out-of-time appeal where counsel failed to timely appeal after being instructed to do so); *Brewster* v. *State*, 875 So. 2d 1230, 1230-31 (Ala. Crim. App. 2003) (petitioner entitled to an out-of time appeal where counsel failed to timely file after being instructed to do so); *Seay* v. *State*, 881 So. 2d 1065, 1067 (Ala. Crim. App. 2003) (petitioner entitled to an out-of-time appeal where counsel represented that he would appeal and failed to do so);

---

[4]  Ultimately, when Mr. Marshall filed a writ of mandamus, it was dismissed as untimely filed.  *Marshall* v. *State,* CR-01-0204 (Apr. 8, 2004).

*Johnson* v. *State*, 848 So. 2d 282, 283 (Ala. Crim. App. 2002) (petitioner entitled to an out-of-time appeal where counsel failed to timely perfect an appeal).

As a result of the ample case law in Alabama permitting him relief and the holding in *Marshall*, Mr. Maples brought an application to bring an out-of-time appeal by seeking a writ of mandamus.  (R-51.)  Despite the materially identical facts to *Marshall* and other precedent supporting it, the Alabama Court of Criminal Appeals denied Mr. Maples' request.  The difference between the Alabama Court of Criminal Appeals' holding in *Marshall* and other cases and the instant matter is just the sort of inconsistent application of the procedural bar rule that cannot preclude habeas review.  Yet Alabama's inconsistency in dealing with similar situations has only increased since.

In January 2005, the Alabama Supreme Court amended its Rule 32.2(c) to provide that "the time for filing a petition under Rule 32.1(f) to seek an out-of-time appeal from the dismissal or denial of a petition previously filed under any provision of Rule 32.1 shall be six (6) months from the date the petitioner discovers the dismissal or denial."  This rule does not apply retroactively, but there can be no dispute that, if it did, Mr. Maples would be entitled to an out-of-time appeal.  Thus, Mr. Maples' case arose in the narrow band of time between the Alabama Court of Criminal Appeals granting of Mr. Marshall's out-of-time appeal in virtually identical circumstances and the change in Rule 32 to permit out-of-time appeals in circumstances such as that occurred here. It is clear that Alabama courts have not consistently and regularly applied a procedural bar on out-of-time appeals where the petitioner missed the deadline to appeal through no fault of his own and in particular because he was unaware that his petition had been denied.  As a result, the procedural bar on Mr. Maples out-of-time appeal cannot

-26-

constitute a procedural default that would bar his federal habeas petition from proceeding.

     **D.**    **Mr. Maples Has Demonstrated Cause and Prejudice for Any Procedural Default.**

Even if Mr. Maples' federal habeas claims are procedurally defaulted — they are not — they should nevertheless be considered because Mr. Maples has demonstrated "cause and prejudice" for any such default. The Eleventh Circuit has repeatedly held that a showing of cause and prejudice excuses a procedural default. *See*, *e.g.*, *McNair*, 416 F.3d at 1304 n.9; *Henderson* v. *Campbell*, 353 F.3d 880, 892 (11th Cir. 2003); *Baldwin* v. *Johnson*, 152 F.3d 1304, 1319 (11th Cir. 1998).

Cause is shown when "some objective factor external to the defense impede[s] counsel's [or petitioner's] efforts to comply with the State's procedural rule." *Strickler* v. *Greene*, 527 U.S. 263, 283 n.24 (1999); *Roberts* v. *Sutton*, 217 F.3d 1337, 1340 (11th Cir. 2000). In this instance, as set forth in the Petition (¶¶ 8-12) and *supra* (pp. 11-12), the order dismissing Mr. Maples' Rule 32 petition — which was issued by the Court *sua sponte* more than 1½ years after it had denied Respondent's motion to dismiss and at a time when the parties expected scheduling of further proceedings or a hearing — never reached Mr. Maples, individually or through his primary counsel. The order that was sent to Mr. Maples' lawyers in New York (who were primarily responsible for his representation) was returned to the state court with the words "Return to Sender – Left Firm" written prominently on its envelope. (Petition ¶ 10.) The state court made no attempt to have the order forwarded to Mr. Maples or to contact local counsel to clear up

any ambiguity regarding Mr. Maples' representation or the appropriate mechanism for delivery of this time-sensitive document.

Cause is demonstrated here by the very fact that Mr. Maples never received a copy of the State's *sua sponte* order dismissing his Rule 32 petition.  *See Bailey* v. *Nagle*, 172 F.3d 1299, 1306 (11th Cir. 1999) (cause exists for failure to timely appeal dismissal of Rule 32 Petition where petitioner never received notice of the dismissal order).  Cause exists when a court fails properly to deliver the required documents so that a petitioner timely may effect an appeal.  *See*, *e.g.*, *Dorman* v. *Wainwright*, 798 F.2d 1358, 1370 (11th Cir. 1986) ("state's failure to provide [petitioner] with a trial transcript within a reasonable time to perfect his appeal constitutes an external factor out of [petitioner's] control that suffices as cause"); *Johnson* v. *Champion*, 288 F.3d 1215, 1227-28 (10th Cir. 2002) (where petitioner failed to timely appeal, cause existed because the court clerk failed to mail the petitioner a certified copy of its order and the petitioner "lacked reasonable means" to obtain the order within the 30-day time frame to file an appeal because of his status as a prisoner).  Because Mr. Maples appeal "was frustrated through no fault of his own," he "has cause to excuse his default." *Roberts*, 217 F.3d at 1341.

The second prong of the "cause and prejudice" exception to procedural default — prejudice — is clearly satisfied here.  Prejudice exists when "the errors . . . giving rise to the constitutional claim actually and substantially disadvantaged [petitioner's] defense so that that he was denied fundamental fairness." *Roberts*, 217 F.3d at 1341.  For example, prejudice is shown with respect to an ineffective assistance of counsel claim when "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Hollis* v. *Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991). Prejudice exists here because, as explained in his detailed 219-page Petition and *infra*, there were numerous Constitutional errors at trial and Mr. Maples was deprived of his Sixth Amendment right to effective assistance of counsel. As discussed in the Petition and *infra*, these errors clearly impacted the course of the trial and the death sentence rendered by the Judge. For example, if counsel for Mr. Maples had provided Constitutionally effective assistance, he would have introduced mitigation evidence at trial for which the Judge or jury "might have weighed the mitigating factors against the aggravating factors differently and decided on a life sentence instead of death." *Hardwick*, 320 F.3d at 1190. The sentence of death — imposed without any substantive examination of trial counsel's effectiveness by the Alabama courts — is just the type of prejudice that the "cause and prejudice" standard seeks to avoid. *See, e.g.*, *Daniel* v. *Thigpen*, 742 F. Supp. 1535, 1553 (M.D. Ala. 1990) (holding that where Constitutional errors occurred at trial, "[t]here could be no greater prejudice to the petitioner than being sentenced to death" when otherwise the jury "may well have imposed a different sentence"); *cf. Gardner* v. *Florida*, 430 U.S. 349, 357 (1977) ("death is a different kind of punishment from any other which may be imposed in this country").

> **E.     The State Court Ruled That Mr. Maples**
> **Adequately Pleaded His Claims.**

Respondent contends that Mr. Maples did not sufficiently plead his claims in the Rule 32 petition in Alabama state court as is required by Rule 32.6 of the Alabama

Rule of Criminal Procedure, and that this is grounds for procedural default.  (Answer ¶ 31.)

In making this argument, Respondent conveniently ignores the Order of the Circuit Court of Morgan County, Alabama, in which the court found that Mr. Maples' claims were adequately pleaded.  In denying Respondent's motion in December 2001, the Court stated:

> At the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims be a preponderance of the evidence.  Rather at the pleading stage, a petitioner most [sic] only provide 'a clear and specific statement of the grounds upon which relief is sought.' Rule 32.6(b), Ala.R.Crim.P."  <u>Johnson v. State</u>, [Ms. CR-00-1845, Nov. 30, 2001] __ So.2d __ (Ala.Crim.App.2001).  ***The Court finds that the Petition is sufficiently pled***.

(Order, dated Dec. 27, 2001, Ex. 1 (emphasis added).)  Clearly, the state court disagreed with Respondent's arguments concerning the sufficiency of Mr. Maples' claims.  Instead of relying on the only order of the Alabama courts on the pleading issue, Respondent relies on the Alabama court's decision denying Mr. Maples' Rule 32 petition. But, as explained *supra* (pp. 10-11), that order was purely the by-product of the court signing the proposed order proffered by Respondent.  The decision did not even attempt to address the pleading standard in Alabama — as the court did in its December 27, 2001 order — or explain the reason for the different conclusion.  In view of the inconsistent application of the law and the prior determination of the state court that Mr. Maples' claims were adequately pleaded, Mr. Maples' claims could not be procedurally defaulted on the basis of inadequate pleading.  If they were, that would clearly violate Mr. Maples' right to due process of law.

### III.    MR. MAPLES HAS VALID CLAIMS FOR RELIEF.

As amply demonstrated in the Petition, Mr. Maples has sufficiently pleaded numerous Constitutional claims that, if proven, would entitle him to habeas relief.  Set forth below are explanations of some of the most critical claims of Constitutional violations and the facts that would be used to support those claims.

### A.    The Failure of Trial Counsel To Present Substantial Mitigation Evidence During the Penalty Phase (Claim II) Mandates Habeas Relief.

In *Williams* v. *Taylor*, 529 U.S. 362 (2000), the United States Supreme Court had occasion to interpret the Antiterrorism and Effective Death Penalty Act ("AEDPA") in the context of a *Strickland*[5] ineffective assistance claim.  The Supreme Court held that, in assessing counsel's performance under *Strickland*, the AEDPA requires that in determining whether a state decision was either contrary to or an unreasonable application of Supreme Court precedent, a court should consider whether the state court either identifies the wrong governing legal rule or arrives at a result opposite that of the Supreme Court when confronted with facts materially indistinguishable from a relevant Supreme Court precedent.  529 U.S. at 405.  This is a case of the latter.  Petitioner, Cory Maples, labors under a death sentence under facts materially indistinguishable from those in *Williams*.[6]

---

[5]  Pursuant to *Strickland*, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that but for counsel's deficient performance the result of the proceeding would have been different.  *Strickland* v. *Washington,* 466 U.S. 668, 688, 694 (1984).

[6]  Mr. Maples notes that Respondent has made no merits arguments, instead generally claiming that Mr. Maples' claims are not contrary to Supreme Court precedent.  (*See* Answer at 17-24.)  As set forth herein, that general claim is wrong.

At the mitigation stage, Williams' trial counsel presented testimony of his mother and two neighbors, one of whom happened to be present, and an unhelpful statement from a psychiatrist. 529 U.S. at 369. Mr. Williams argued that his counsel's performance was deficient, under the *Strickland* standard, for failing to investigate and present substantial mitigating evidence. *See id.*

The United States Supreme Court agreed that Mr. Williams' counsel's performance was deficient and, based on the record developed in both the state and federal evidentiary hearings, identified five categories of mitigating evidence that trial counsel improperly failed to investigate and present. Specifically, the Supreme Court found that counsel failed to investigate and present mitigating evidence of (1) Williams' background, (2) parental abuse, (3) Williams' good conduct during his incarceration, (4) Williams' borderline mental retardation, and (5) the existence of a well-respected character witness. *Id.* at 372-73 n.4, 395-96. The Court also found that Mr. Williams' trial counsel failed to obtain state records detailing Mr. Williams' background, not because of any strategic choice, but because trial counsel did not know that he could access them. *See id.* at 395.

Mr. Maples' case is identical in all material respects to *Williams.* During Mr. Maples' penalty proceeding, his counsel offered the unprepared and unplanned testimony of Mr. Maples' father and step-mother, and an uncle who happened to be present in the courtroom. Trial counsel also proffered the woefully inadequate testimony of a psychologist who testified without the benefit of Mr. Maples' social/family history. In other words, just like Mr. Williams' trial counsel, Mr. Maples' trial counsel presented an *ad hoc* mitigation case, not because of a strategic choice made after a reasonable

investigation, but because of their complete lack of preparation.  *See Wiggins* v. *Smith,*

539 U.S. 510, 522 (2003) (counsel has an "obligation to conduct a thorough investigation

of a defendant's background") (citations omitted).

And similar to *Williams*, Mr. Maples' trial counsel failed to investigate

and present substantial evidence of Mr. Maples' (1) family/social history, (2) abuse by

his father and step-mother, (3) good conduct during incarceration, (4) emotional

disorders, (5) the existence of well-respected character references, including two law

enforcement officers, and (6) assistance to law enforcement.  (R-49 at 55-78.)

Nonetheless, *the* state court, confronted with facts materially

indistinguishable from those in *Williams*, determined, without a hearing, that Mr. Maples'

trial counsel's performance was not deficient, and therefore, Mr. Maples' claim was

without merit.[7]  (R-66 at 48-49, 51-57.)  As the substantial and available mitigating

---

[7]  The state court clearly addressed the merits of Mr. Maples' claim that trial counsel
were ineffective for failing to investigate and present substantial mitigating evidence.  It
specifically and repeatedly held that Mr. Maples' claim was without merit because
counsel's performance was not deficient or prejudicial under *Strickland*.  (R-66 at 48-49,
51-57.)  Because the state post-conviction court expressly addressed the merits of Mr.
Maples' claim, this Court may also review the merits of that claim.  *See*, *e.g.*, *Horsley* v.
*Alabama*, 45 F.3d 1486, 1489-90 (11th Cir. 1995).  In addition, to the extent that the state
court's decision includes an implicit finding that available mitigation evidence was
presented or that sufficient mitigation evidence was presented, that finding is not entitled
to a presumption of correctness.  Generally, courts do not assess ineffective assistance
claims on the basis of the trial record because such claims are unlikely to find any factual
support in the record.  *See U.S.* v. *Brooks,* 125 F.3d 484, 495 (7th Cir. 1997)*.*  The state
post-conviction court, nonetheless, held that Mr. Maples' ineffective assistance claim was
refuted by the record.  (R-66 at 49-50.)  The court's determination, however, is not fairly
supported by the record as a whole because Mr. Maples' has alleged substantial new
evidence.  *See Townsend* v. *Sain*, 372 U.S. 293, 313 (1963).  In addition*,* the merits of
Mr. Maples' claims were not resolved in the state court since the state court failed to
actually consider the facts before it.  *See id.*  The state court unreasonably assessed the
claims and facts in Mr. Maples' initial petition and not his Amended Rule 32 Petition.
Finally, the state court did not afford Mr. Maples any hearing on claims that generally are

evidence set forth below demonstrates, the state court reached a result opposite that of the Supreme Court in *Williams* on materially identical facts.  That decision is therefore contrary to clearly established Supreme Court precedent.

> **1.     Trial Counsel Failed To Investigate and Present Evidence of Physical and Emotional Abuse by Mr. Maples' Father and Step-Mother.[8]**

During the sentencing phase of Mr. Maples' trial, the jury heard only that Mr. Maples' birth mother abused him at a young age and abandoned him.  Had trial counsel conducted an adequate investigation or even interviewed Philip and Elyse Maples about their treatment of Mr. Maples, the jury would have learned that Mr. Maples was physically and emotionally abused throughout his life by all of the adults close to him.

Philip and Elyse Maples beat Mr. Maples with belts and tree branches. The beatings were so severe that the buckles and branches left welts and cuts on Mr. Maples' body.  Elyse Maples continued this practice until Mr. Maples was five or six years old.  Elyse Maples admits that Mr. Maples' father was rarely at home, but when he was, he was "horrible" with Mr. Maples.

Chris Basden, Mr. Maples friend since the third grade, would have testified to being present at one such beating and seeing the resulting cuts and scars on Mr. Maples' body when they were teenagers.  Heather Davis, who testified at the trial,

---

evaluated on the basis of facts not found in the trial record.  Mr. Maples, therefore, has not had a full and fair hearing.  *See id.*  Consequently, the state is not entitled to a presumption of correctness.

[8] The information offered here is merely a proffer of some evidence from the more complete presentation of Mr. Maples' background that he would present at an evidentiary hearing.

has reported that Mr. Maples' back was covered with scars from belts and whips and wires.

Philip Maples' abuse was not limited to beatings. Elyse Maples could have testified that Philip Maples forced Mr. Maples to ingest a pack of cigarettes and would not relent even when Mr. Maples became violently ill and started vomiting. The event was so horrific, it even caused Elyse Maples, who witnessed it but failed to intercede, to vomit.

In addition, Philip Maples would regularly throw out Mr. Maples from the family home. Mr. Maples, as one witness put it, was unwelcome in his own home. Mr. Maples often slept in the woods behind the family trailer, knocking on his younger brother's, Daniel, window at night for a blanket for warmth or something to eat.

And both Philip and Elyse Maples repeatedly emotionally abused Mr. Maples. According to Chris Basden, they worked Mr. Maples, who was by all accounts a hard worker, "like a dog" and clearly favored their biological child, Daniel Maples. They repeatedly told Mr. Maples that his mother abandoned him. They referred to Mr. Maples' mother as "the crazy bitch." They constantly berated and shamed Cory Maples in the presence of others. They relentlessly told Mr. Maples that absolutely nothing he ever did was any good, his friends were no good, and sadly, that he was just no good. Heather Davis would have testified that despite all of this, Mr. Maples desperately wanted Philip and Elyse Maples to love and approve of him.

Trial counsel's error in failing to investigate and present this information was even more egregious than counsel's error in Williams. Mr. Maples' counsel had only to discuss Mr. Maples' background with friends and family, who were readily

available, not uncover state records like Williams' counsel.  Had trial counsel merely

interviewed Mr. Maples' friends and family, there is a reasonable probability that the

result here would have been different.

> **2.     Trial Counsel Failed To Investigate and Present Evidence of
> Mr. Maples' Social and Family History and
> Emotional Disorders.**

As an infant, Cory Maples was both abused and abandoned by his teenage

mother, Denise Imgrund.  Ms. Imgrund, by her own admission, never bonded with her

son.  Indeed, none of Mr. Maples' maternal relatives ever formed any sort of attachment

or relationship with Mr. Maples.  His maternal grandparents insisted that their daughter

put Mr. Maples up for adoption.  But in an effort to break away from her own mother and

their tumultuous relationship, Ms. Imgrund ignored them and married Philip Maples right

after she graduated high school.  Mr. Maples was born on January 21, 1974.  Witnesses

have reported that Ms. Imgrund actually left Mr. Maples for the first time right after his

birth, returning four weeks later.

Ms. Imgrund and Philip Maples had a violent and dysfunctional marriage.

And Mr. Maples witnessed everything.  Philip Maples was consistently absent from the

home, drinking heavily and having many, many relationships with other women,

including Mr. Maples' stepmother, Elyse Maples.  Phillip Maples often took Mr. Maples

with him to visit Elyse during his marriage to Ms. Imgrund.

Mr. Maples witnessed his birth mother's violent outbursts and self-

mutilation.  Ms. Imgrund would bang her fists on her thighs, pull out chunks of her hair,

pound her feet on the floor and scratch herself until she bled.  In Mr. Maples' presence,

Ms. Imgrund attacked Philip Maples with a metal hair brush while he was driving,

causing his eye to bleed.  Phillip Maples responded by hitting Ms. Imgrund hard across her face with the back of his hand.[9]

Mr. Maples was also present when his mother attacked his father with a knife.  In defense, Phillip Maples punched Ms. Imgrund in the face, but not before Ms. Imgrund somehow managed to stab Philip in the arm.  About three months later, while Phillip Maples was laying in the bed and Mr. Maples was watching cartoons, Ms. Imgrund entered the bedroom with a pan, pulled the sheets off of Phillip Maples and poured hot grease over his chest and stomach.  Ms. Imgrund then left the family home, leaving Mr. Maples with his father.  Philip Maples, in turn, left Mr. Maples with his paternal grandparents.

Ms. Imgrund's violence was directed at Cory Maples as well.  Ms. Imgrund slapped Cory when he was just an infant.  When Cory was approximately six months old, Ms. Imgrund locked him in the car.  A passerby who saw Cory screaming and sweating retrieved Ms. Imgrund, causing her to release him.  Ms. Imgrund also tied Mr. Maples' wrists to a chair and beat him with a broomstick.  In addition, in 1977, when Cory was only three years old, Ms. Imgrund tried to sell him to a neighbor.

Ms. Imgrund and Philip Maples formally separated after the hot-grease incident. Philip Maples left Cory with Ms. Imgrund.  Ms. Imgrund reports that at that time Cory, who was already a "fidgety" child, immediately became very clingy and

---

[9]  Although Ms. Imgrund's violence against both Mr. Maples and Philip Maples was briefly brought out during Mr. Maples trial, it bears repeating here.  *See Williams,* 529 U.S. at 397 (the state's prejudice determination was unreasonable because "it failed to evaluate the totality of the available mitigation evidence--both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation").

engaged in chronic scratching.  Moreover, Ms. Imgrund was left with a child with whom she had never bonded and had deep down inside wanted to put up for adoption. Ms. Imgrund, a young woman with severe emotional disorders, had to care for a child that was exhibiting symptoms of his own emotional disorder.

Significantly, Ms. Imgrund's family history is replete with instances of learning disabilities, emotional disorders and substance abuse.  Ms.  Imgrund has first cousins with Tourette's Syndrome and dyslexia.  Her 39-year-old brother has suffered from bouts of depression and social isolation.  Her maternal grandfather and paternal great-grandfather were both alcoholics, and so is her father.  And her mother, according to Ms. Imgrund, suffered from "mood swings."

Ms. Imgrund moved back to her parents' home with Cory Maples.  During this time, Ms. Imgrund's mother was dying from cancer.  Ms. Imgrund tried to go to nursing school but dropped out.  She also had health issues, experiencing two weeks of blindness and severe headaches as a result of optic nerve damage.  Ms. Imgrund often left Mr. Maples with her mother, a woman afflicted with cancer, who never showed any interest in Mr. Maples and had wanted her daughter to put him up for adoption.

Ms. Imgrund continued to direct her anger and violence at the child that she never wanted.  She violently strangled him, using force so hard that she left visible marks on his throat.  And on yet another occasion, she lifted him by his neck in a fit of anger, leaving fingernail scrapes and scratches on his face and neck.  Finally, Mr. Maples' maternal grandfather went to Phillip Maples and told him to take Mr. Maples or Ms. Imgrund would kill him.  Phillip Maples did so.  By the time Cory was three years old, he had lived in as many households with as many different families.

Phillip and Elyse Maples married in mid-1977, and Cory Maples initially lived with them.  Ms. Imgrund and her father on occasion either visited Cory or took him for a visit.  The visits stopped when Cory returned from a visit with scratches on his knees and neck.  When Phillip and Elyse Maples asked Cory what had happened, he told them that Ms. Imgrund had done it, but it was his fault.  Ms. Imgrund's father never called again.

In 1978, when Elyse Maples became pregnant with Phillip and Elyse's child, Elyse Maples became so ill that they sent Cory for an extended visit with his paternal aunt.  This was now Cory Maples' fourth household and family in four years.  Cory returned to Phillip and Elyse Maples' home sometime after their son Daniel's birth in October.

During this time, Cory still had occasional contact with Ms. Imgrund.  But by age five, Phillip Maples told Ms. Imgrund that she could not see Cory anymore.  Ms. Imgrund left and did not see or contact Cory for approximately thirteen years.  As a child, Cory regularly cried for his mother until he became ill.  He would often ask why she was not around.  And he had nightmares about his mother.  His friends have reported that, as an adolescent and a teen, he was often "down" about not having his mother in his life, often saying that no one wanted him.  In short, Cory Maples was deeply affected by his birth mother's abandonment.

Cory continued to exhibit symptoms of an emotional disorder.  He was initially distant with people and then clingy.  He was also "fidgety" and lacked concentration.  He was unable to sit still for any period of time, and if required to do so, he was disruptive, always talking and not listening.  In an effort to contain this fidgety,

disruptive, talking child that lacked concentration, Phillip and Elyse were, by their own admission, very hard on Cory.

Significantly, according to them, Philip and Elyse Maples' treatment of Cory was not pursuant to an evil motive. Philip and Elyse Maples were both misguided and frustrated. They sincerely believed that they were doing what was right for Cory. Indeed, Philip Maples punished his son the same way that he had been punished. His father similarly whipped him and left him and his brother out of doors. In other words, he just continued the cycle of abuse.

And Elyse Maples admits that she was often frustrated with Cory Maples' behavior. Moreover, Philip and Elyse Maples' love for Cory lent credibility, in Cory's eyes, to their actions and statements. In other words, Cory easily could have believed that his parents would not have beat him and told him that he was no good, if it was not true.

At age nine or ten, Cory Maples began to suffer from debilitating headaches, similar to his birth mother. The pain would start in his neck and travel up into his head and eye causing his nose to bleed and blurred vision. Mr. Maples continues to suffer from these headaches today, which reduce him to a fetal position.

In addition, Mr. Maples was hereditarily predisposed to substance abuse. Mr. Maples' great-great-grandfather, great-grandfather and grandfather on his mother's side were all alcoholics. Furthermore, Philip Maples is an alcoholic with a family history of alcoholism. His father was an alcoholic. His mother was raised by her alcoholic grandfather. And he has two brothers that are alcoholics. Indeed, Phillip Maples gave Cory Maples his first drink of beer at age five or six.

Mr. Maples started self-medicating at a very early age.  By eleven or twelve, Mr. Maples was taking beer from the refrigerator.  He started smoking marijuana at age thirteen.  And by age fourteen he was drinking regularly.  Drinking helped ease his emotional turmoil.  He also self-mutilated.  He often cut himself with razor blades to ease his emotional stress.

In addition to the emotional stress caused by the loss of his mother, Mr. Maples suffered additional, substantial losses in his young life.  His maternal grandmother died when he was an infant.  His paternal grandfather, with whom he and his father had lived  for a short while, died when Mr. Maples was ten years old.  Mr. Mr. Maples also suffered sudden and traumatic losses when three of his friends died in tragic accidents. His friend Jared died in a car accident; his friend Brad Wadsworth burned to death in a car accident; and his friend Jamie Kennedy died in a motorcycle accident.

On the heels of those losses, in 1991, Ms. Imgrund returned to Cory Maples' life, only to abandon him again.  Ms. Imgrund returned to Decatur and asked to meet Mr. Maples.  Phillip and Elyse Maples agreed, and Mr. Maples and his birth mother began spending time together.  Ms. Imgrund took Mr. Maples to Kentucky to her father's house and to Pennsylvania to meet the rest of the family for Thanksgiving.  She took him Christmas shopping.  She bought him gifts.  And in or around January 1992, when Mr. Maples was seventeen, his birth mother asked him to live with her.  He immediately moved into her apartment.  Approximately five months later, they moved to a new apartment.  And then just four short days later, upon returning home, Mr. Maples discovered that his mother had moved, leaving no note or explanation.

Mr. Maples' friends and family, specifically Chris Basden and Shannon Ferrell, have reported that after being abandoned and betrayed by his mother a second time, Mr. Maples delved heavily into substance abuse.  He used cocaine, meth-amphetamine, Valium, Ecstasy, Percodan, Xanex and PCP, and injected heroine at least once.

Mr. Basden and Ms. Farrell would have testified that Mr. Maples was both chronically depressed and suicidal.  He spoke often of committing suicide.  He wrote poems extolling the virtues of suicide.  And he played Russian Roulette on at least one occasion.  Indeed, Mr. Basden was even aware of Mr. Maples' self-mutilation.

> **3.    Trial Counsel Failed To Investigate and Present Evidence of (A) Mr. Maples' Attempts To Recover From His Drug Abuse, (B) His Assistance to Law Enforcement, and (C) Threats Against Mr. Maples and His Family Because He Assisted Law Enforcement.**

In late 1994, Mr. Maples assisted the Decatur police in their drug operations by working undercover.[10]  According to the police's report, Mr. Maples contacted the Decatur Police Department and offered his assistance.  On September 29, 1994, Mr. Maples met with the police at a phone booth and placed a call to Mark Carrell, a known drug dealer.  The police recorded the conversation.  Mr. Maples and Mr. Carrell arranged for the sale and purchase of drugs.  The police provided Mr. Maples with the funds to make the purchase.  Mr. Carrell, however, was unable to get the drugs that night.

The next day, the police "wired" Mr. Maples and had him call Mr. Carrell.  Mr. Maples again agreed to a drug transaction and again Mr. Carrell was unable to obtain

---

[10]  Attached as Exhibit 3 is a copy of the Decatur police report which details Mr. Maples' assistance.

the drugs.  On October 5, 1994, Mr. Maples and Mr. Carrell agreed to another drug transaction.  On that date, Mr. Carrell arrived at the designated location with the drugs. He and Mr. Maples made the negotiated exchange.  Mr. Maples left the scene, and the police arrested Mr. Carrell.  The entire transaction was recorded.[11]

   After assisting the police, Mr. Maples continued to struggle to change his life.  He tried to recover from his depression, suicidal ideations and drug abuse.  Phillip and Elyse Maples took him to a treatment facility in Madison County called Bradford. But the price was $4,000, and they could not afford it.  Despite being turned away, Mr. Maples, on his own, stopped using drugs.  But he never received any treatment for the emotional disorders that had plagued him since childhood.

   At or around this time, the Maples family began receiving threats.  An individual named Brandon Barbie, a close friend and associate of Mr. Carrell's, cut up Mr. Maples' clothes and discarded them in the street in front of the Maples' home as a warning to Mr. Maples.  Elyse Maples reported to the police that she observed someone with a gun pointed at Mr. Maples and his brother's bedroom.  And on yet another occasion, Mr. Barbie called the Maples' home and threatened Daniel Maples.

   In or around January or February 1995, in fear for their lives and their children's lives, Phillip and Elyse Maples sent Mr. Maples to Tennessee to live with his uncle.  Mr. Maples remained there, drug-free, until July of 1995 when he returned to Decatur.

---

[11]  Notably, in the *Williams* case, Mr. Williams likewise assisted prison officials in busting up a prison drug ring, and his counsel failed to present that evidence in mitigation.  *See* 529 U.S. at 396.

      **4.**      **Trial Counsel Failed To Investigate and Present Evidence of Mr. Maples' Good Character During His Incarceration and Failed To Present Available Character Testimony From Law Enforcement Officers and Friends and Family.**

When Mr. Maples assisted the Decatur Police Department, he worked very closely with Officer Larry Greene.  Officer Greene could have testified about Mr. Maples' assistance and his good character.  Officer Greene has stated that during the investigation, Mr. Maples was very nice, polite and punctual.  Indeed, Officer Greene repeatedly referred to Mr. Maples as a "straight-up guy" who kept his word.

And Sam Frost, who is a Sheriff's Officer, would have testified on Mr. Maples' behalf.[12]  (Ex. 4, ¶ 13.)  Mr. Frost was a jailer at the county jail where Mr. Maples' was incarcerated for two years while awaiting trial.  (*See id.*, ¶ 5.)  Mr. Frost was not contacted by trial counsel or the defense's psychologist.  (*See id.*, ¶ 11.)  Had he been contacted, he would have testified that Mr. Maples presented no problems to jail personnel.  (*See id.*, ¶ 9.)  Indeed, Mr. Maples' behavior toward other inmates and personnel was always correct and polite.  (*See id.*)  Mr. Frost also would have testified about Mr. Maples' non-violent character during high school.  (*See id.*, ¶¶ 4, 14.)  According to Mr. Frost, Mr. Maples never had any physical altercations in high school.  (*See id.*, ¶ 4.)  In addition, both Shannon Ferrell and Chris Basden would have testified that Mr. Maples was a non-violent person, having had maybe one fight his entire life**.**

---

[12]  Attached hereto as Exhibit 4 is a declaration from Mr. Frost.

5.    **Trial Counsel's Failure To Investigate and Present Substantial Mitigation Evidence Was Not a Reasonable Strategic Decision.**

a.    **Trial counsel's decision not to investigate and present mitigating evidence was not a reasonable strategic decision under Supreme Court precedent.**

The Supreme Court has held that the decision not to introduce mitigating evidence must be itself reasonable. *Wiggins*, 539 U.S. at 523. In order for counsel's strategic decision to be reasonable, it must be based upon information that counsel has obtained after conducting a reasonable investigation. *See id*. at 519. This, however, is not a case where trial counsel made a strategic decision not to present mitigating evidence after conducting a reasonable investigation. Lead trial counsel has admitted to Mr. Maples' current counsel that he was wholly unprepared for the penalty phase of the trial. In other words, he conducted no investigation that would have permitted him to make a strategic decision not to introduce mitigating evidence.

Thus, trial counsel's failure to present such evidence cannot be deemed a reasonable strategy. Indeed, realizing the deficiency in his performance, lead trial counsel has stated that he did not know how to prepare a mitigation case. His only other capital murder trial never advanced to that stage. Trial counsels' partial presentation of a mitigation case was therefore the result of inattention and incompetence, not reasoned strategic judgment. *See Wiggins*, 539 U.S. at 534. Moreover, the state court's decision cannot stand because "deferring to counsel's decision not to pursue a mitigation case despite their unreasonable investigation" constitutes an unreasonable application of Strickland. *Wiggins*, 539 U.S. at 534.

> **b.**   **Trial counsel's mitigation case and preparation was materially indistinguishable from the mitigation case and preparation that the Supreme Court found deficient in *Williams*.**

The mitigation case proffered by Mr. Maples' counsel is materially indistinguishable from the mitigation case presented in Williams. Williams' counsel prepared for the mitigation phase one week before its presentation. Williams' trial counsel offered the testimony of Williams' mother, two neighbors, one of whom just happened to be in the courtroom that day and a taped excerpt from a statement by a psychiatrist. *See Williams*, 529 U.S. at 369.

Likewise, the evidence offered by Mr. Maples' trial counsel consisted of the testimony of Philip and Elyse Maples, Mr. Maples' paternal uncle, James Kenneth Maples, who just happened to be in the courtroom that day, and Dr. Allen Shealy. Trial counsel never prepared the Mr. Maples, father and step-mother to testify. In addition, trial counsel was wholly unprepared for the psychologist's testimony. He allowed Dr. Shealy to testify without providing him with significant background information. Moreover, he failed to grasp the substance of Dr. Shealy's testimony, which was pro-prosecution.

The penalty phase of Mr. Maples' trial lasted one and one-half days. Trial counsel had failed to prepare either Philip, Elyse or James Maples to testify. Indeed, trial counsel informed them that they would be testifying during a break. Unaware and unprepared, the Maples family members basically testified that Mr. Maples was a nice boy. Philip discussed the abuse by Ms. Imgrund in the most cursory manner. James Maples admitted on the stand that he did not even know Mr. Maples' birth mother, and so

was no help in that regard.  And, similar to the Williams case, no one discussed the

lifetime of physical and emotional abuse suffered by Mr. Maples' at the hands of his

father and step-mother.

Elyse Maples, to her credit, mentioned Mr. Maples's assistance to law

enforcement.  But trial counsel was wholly unprepared for this revelation, not having

prepared or even interviewed Elyse Maples about this information.  Consequently, trial

counsel offered no corroboration and the prosecution scoffed at this important mitigating

factor.

> [Mr. Maples] didn't clean up drugs in the City of Decatur.  If he had made
> a mark over there or done anything major, they would have police officers
> and narcotics officers over here to tell you about it.  Defense lawyers love
> to call police over her to testify.  I mean, if they can get a police officer to
> come to their side, they are just tickled pink, and they would have been
> over here by the hand full.

(R-30 at 3292-93.)  Indeed, the trial court disregarded this important mitigating factor

because trial counsel had submitted nothing to corroborate Elyse Maples' testimony.

(R-34 at 10.)

Similar to the *Williams* case, trial counsel's lone attempt to present a

mitigation case consisted of offering the testimony of a psychologist, Dr. Allen Shealy.

But also similar to the Williams case, the mental health testimony here was woefully

inadequate.  Dr. Shealy prepared and delivered his evaluation without the benefit of a

complete social history.  And although Dr. Shealy interviewed Mr. Maples, he has

admitted to habeas counsel that, if he had it to do over, he would have gathered a detailed

social history from collateral sources.

Dr. Shealy has also admitted to habeas counsel that his evaluation did not take into account the physical and emotional abuse that Mr. Maples' suffered at the hands of Philip and Elyse Maples. It did not take into account the statements that Mr. Maples was a polite, well-mannered, non-violent person. He further admitted that his evaluation of Mr. Maples did not uncover any typical anti-social personality disorder precursors such as firesetting, violence, animal cruelty and extensive criminal history. And he readily acknowledged that his evaluation would have benefited from the extensive social history now available.

In short, trial counsel presented a mitigation case materially indistinguishable from that presented by trial counsel in *Williams* and found deficient by the Supreme Court. 529 U.S. at 395-96. The state court's conclusion that counsels' performance here was not deficient is thus contrary to Supreme Court precedent.

### 6.     The State Court Unreasonably Applied Supreme Court Precedent to the Facts of Mr. Maples' Case.

A state court decision that identifies the correct governing legal principal but unreasonably applies it to the facts of the case qualifies as an unreasonable application. *See Williams*, 529 U.S. at 407-08. Indeed, the failure to consider facts which should be considered renders the state conclusion unreasonable. *See id.* at 416 (the state court's failure to consider the totality of the omitted mitigation evidence involved an unreasonable application of Supreme Court precedent) (O'Connor, J., concurring); *cf.*, *Wiggins*, 539 U.S. at 527 (the state court merely assumed that counsel's investigation was adequate without considering whether the failure to investigate further was reasonable).

-48-

The state post-conviction court determined that Mr. Maples' claim that counsel failed to adequately investigate and present mitigating evidence was without merit.  (R6 at 48-67.)  But the court's order fails to address the claims and facts alleged in Mr. Maples' Amended Rule 32 Petition.  (R-49.)  Instead, the state court unreasonably applied the law to the claims and facts in Mr. Maples' initial Rule 32 Petition.  (R-47.)

For example, the court's opinion assesses Mr. Maples' claim that trial counsel failed to present mitigating testimony from former teachers, coaches and friends.  (R-66 at 57-58.)  The state court held that there was no Strickland violation because Mr. Maples failed to identify specific teachers, coaches and friends and the substance of their testimony.  (*See id*. at 58.)  Although it is not required, this conclusion was wrong as a factual matter.  While Mr. Maples' initial Rule 32 petition did not identify witnesses and the substance of their testimony (*see* R-47, ¶¶ 127-29), Mr. Maples' Amended Rule 32 Petition, which was before the court at the time that the court entered its order, specifically identified witnesses and the substance of their testimony.

Mr. Maples told the state court that his guidance counselor, Gaye Lenhart would testify as to his good character and how he took a challenging course load.  (R-49, ¶ 127.)  She would have testified that Mr. Maples had few absences and few disciplinary problems.  (*See id*.)  Mr. Maples told the state court that Coach Glen Lang would have testified that Mr. Maples was friendly and polite.  (*See id*.)  Mr. Maples specifically told the state court  that Chris Basden, Kenneth Hall, his parents, Mike and Kathy Hall and Sam Frost would have testified that Mr. Maples was well-mannered and non-violent.  (*See id*.)  Mr. Maples also told the state court that Chris Basden would have testified

about how happy Mr. Maples was to be reunited with his birth mother, and how he fell deeply into drugs when she abandoned him again.  (*See id*.)

The Court, similarly, unreasonably applied facts concerning counsel's failure to present evidence that Mr. Maples assisted law enforcement.  The state court specifically found, again, that Mr. Maples failed to provide the names of officers that could attest to his assistance.  (R-66 at 61.)  Mr. Maples' Amended Rule 32 Petition, however, presented the court with a laundry list of officers involved in Mr. Maples' undercover work.  (R-49, ¶ 138.)

The trial court identified Strickland as the correct governing legal rule.  But its opinion reveals a glaring failure to consider the totality of the mitigation facts before it.  Pursuant to *Williams*, the state court's failure to consider evidence that should have been considered in addressing a constitutional claim renders that court's conclusion unreasonable.

### 7.   The Writ Should Issue Because There Is a Reasonable Probability That But for Counsels' Errors, the Jury Would Not Have Recommended Death.

To succeed on an ineffectiveness of counsel claim, a petitioner must show that counsel's failures prejudiced his defense.  *See Wiggins*, 539 U.S. at 534.  The mitigating evidence in this case is powerful.  Mr. Maples spent a lifetime physically and emotionally abused by all of the adults in his life.  He was abandoned by his birth mother no less than three times and spent his very early years in a violent, dysfunctional home.  As an infant he exhibited symptoms of a emotional disorder that his parents unwittingly treated with abuse.  During the first four years of his life, he lived in as many households.  He was often left in the care of family members that had absolutely no affinity for him.

And he was regularly discarded from his family home and forced to sleep and eat in the woods.

Mr. Maples spent his life believing that he was unworthy and substandard. He self-mutilated to relieve his emotional stress.  He was chronically depressed and extolled the virtue of suicide.  Nonetheless, he consistently managed to treat others with kindness and respect.  And he risked his life and the lives of his family to assist police officers.

Evidence about a defendants' background and character is relevant because of this society's belief that "defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Eddings* v. *Oklahoma*, 455 U.S. 104, 112 (1982).  Here, there is a reasonable probability that counsel's unreasonable failure to investigate and present substantial mitigating evidence, as outlined above, led the jury to believe that Mr. Maples was a member of the latter  rather than the former group.

Mr. Maples' jury found only one aggravating factor:  murder of Mr. Terry in the course of a robbery.  The jury recommendation in his case was 10-2.  There is a reasonable probability that at least one juror and the judge would have viewed the death penalty differently had he or she known of Mr. Maples' tortured life, non-violent nature and assistance to the police, which was corroborated by official records.  And that probability is sufficient to undermine confidence in the outcome of Mr. Maples' sentencing proceeding.  *See Strickland*, 466 U.S. at 694.  Consequently, the writ should issue.

**B.      The Failure of Trial Counsel To Present Evidence Responding to the Capital Murder Charge and Obtain a Mental Health Expert and a Pharmacologist To Assist Mr. Maples' Defense During the Guilt Phase of Trial (Claim I) Mandates Habeas Corpus Relief.**

Trial counsels' performance during the guilt phase of trial was also deficient.  During the guilt phase, counsel was faced with a videotaped confession and physical evidence placing Mr. Maples in extremely close proximity to the murders. Thus, counsel was required to focus on the requirements for capital murder.  Counsel did no such thing.

There was little evidence supporting the State's capital theory of the crime, *i.e.*, that Mr. Maples murdered Mr. Terry in order to steal Mr. Terry's vehicle. Counsel did not focus the defense at all on that deficiency.  Moreover, there was evidence available that showed that Mr. Maples had unfettered access to Mr. Terry's vehicle and that Mr. Maples sincerely considered Mr. Terry his best friend.  This evidence would have undermined the State's capital theory, but Mr. Maples' counsel did not direct the jury to this evidence.

There was also extensive information available to counsel showing that Mr. Maples had suffered severe physical and emotional abuse and suffered from depression, suicidal ideations and self-mutilation.  Under these circumstances, reasonable counsel would have consulted an expert to assess the effect that Mr. Maples' circumstances had on his behavior.  *See Strickland*, 466 U.S. at 688.

Moreover, counsel was aware of Mr. Maples' prior drug history and knew that Mr. Maples had ingested a considerable quantity of alcohol on the day of murders after having been clean for a substantial period of time.  With such evidence available,

and with a lack of evidence suggesting that the murder of Stacy Terry was in furtherance of a robbery, counsel was ineffective for failing to obtain an expert to testify about Mr. Maples' ability to form the intent to rob and precisely what impact his background, drug history and the alcohol that he ingested that evening had on the events of that night. In other words, expert testimony would have negated the specific intent needed to convict Mr. Maples of capital murder.

There is thus a reasonable probability that, but for counsels' errors, the result of Mr. Maples' trial would have been different.  *See Strickland*, 466 U.S. at 694. Counsel here, effectively, gave the jury no alternate explanation for the murders.  But providing the jury with evidence of Mr. Maples' friendship with Mr. Terry and competent psychological and pharmacological testimony would have rebutted the State's evidence that Mr. Terry's murder was committed in furtherance of a robbery. Consequently, there is a reasonable probability that the jury would not have found Mr. Maples guilty of capital murder but for counsel's ineffectiveness, and granting habeas relief is appropriate.

   **C.     The Failure of the Trial Court To Give an Intoxication or
            Manslaughter Instruction (Claim XIII) Mandates
            Habeas Corpus Relief.**

Respondent does not allege that this claim is unexhausted or procedurally barred.  He implicitly acknowledges that the claim was properly presented to the Alabama courts and that it was decided against the petitioner.  Furthermore, Respondent does not refute the detailed factual allegations of this claim as set forth in the Petition. Indeed, the facts related to this issue, which relate to Mr. Maples' intoxication and drug usage at the time of the criminal incident, were well-established at the Morgan County

trial.  (*See* Petition ¶¶ 302-17 & references to trial record cited therein.)  In fact, much of the testimony related to the intoxication and drug usage was revealed during the course of the prosecution's case against Mr. Maples.

Contrary to the Respondent's assertions, the Petition sets forth clearly that the decision of the Alabama courts on this issue was contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.  Also, as set forth below, the decision of the Alabama courts on this matter was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### 1.        The State Court's Decision

On direct appeal to the Alabama Court of Criminal Appeals, Mr. Maples argued that the Supreme Court holding of *Beck* v. *Alabama*, 447 U.S. 625 (1980), required that the conviction and death sentenced be reversed on the grounds that the trial court, in the face of clear evidence of intoxication and drug usage during the hours preceding the criminal incident, failed to instruct the jury on the matter of intoxication and the lesser included offence of manslaughter.

The Alabama court, notwithstanding the overwhelming evidence of intoxication, refused to follow the mandate of *Beck*.  At the trial of Mr. Maples, as in that of *Beck*, there was evidence that the defendant, even if criminally culpable in the death of the victim, might not have been guilty of the capital charge of murder.  As in the case of Mr. Maples, the trial court in *Beck* failed to instruct the jury so as to allow it to consider the lesser offense.  The Supreme Court's *Beck* decision clearly established the rule that, where there is evidence to support a verdict of guilt of a lesser included noncapital

-54-

offense, it is constitutional error not to instruct the jury to consider it.  447 U.S. at 646.

The refusal of the Alabama court to follow the clear constitutional precedent of *Beck*

mandates habeas relief.  *Williams*, 529 U.S. 362.

### 2.      The State Court's Factual Determination

The decision of the Alabama court on this matter was based on an

unreasonable determination of the facts in light of the evidence presented in the State

court proceeding.  As set forth in the Petition (*see*, *e.g.*, ¶¶ 311-14) and above, the

evidence of Mr. Maples' intoxication and drug usage was overwhelming.  And as set

forth in the Petition, much of this evidence was conceded by the prosecution.  It was,

after all, through the prosecution's witnesses that most of the evidence of intoxication and

drug usage was revealed to the jurors.  Notwithstanding this factual showing of

intoxication and drug usage, the Alabama Court of Criminal Appeals dealt with the

factual part of this issue by simply stating that: "[t]he testimony at trial did not establish

that the appellant was intoxicated at the time of the murders."  758 So. 2d at 24.

Given the evidence on the subject presented at trial, the Alabama court's

factual determination on this matter was patently unreasonable.  Thus, pursuant to 28

U.S.C. § 2254(d)(2), there is no restriction on the granting of habeas corpus relief.  *See*

*e.g.*, *Bui* v. *Haley*, 279 F.3d 1327, 1334 (11th Cir. 2002) (granting habeas corpus relief,

and holding, based upon its own review of the evidence in the record, that the Alabama

court's factual finding relating to a prosecutor's exercise of peremptory challenges was

an unreasonable determination of the facts).

### D.     Mr. Maples' Claim Relating to His Post-Arrest Statements (Claim XVIII) Mandates Habeas Corpus Relief.

Respondent does not allege that this claim is unexhausted or procedurally barred.  He apparently acknowledges that the claim was fully presented to the Alabama courts and that it was decided against the petitioner.  Furthermore, Respondent does not refute the detailed factual allegations on this claim as set forth in the Petition.  Indeed, the facts related to this issue, which relate to Petitioner's intoxication and drug usage at the time of the criminal incident, were well established at the Morgan County trial.  (*See* Petition ¶¶ 377-92 & references to trial record cited therein.)

Contrary to the Respondent's assertions, the Petition sets forth clearly that the decision of the Alabama courts on this issue was contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.

### 1.     The Issue on Direct Appeal

On direct appeal to the Alabama Court of Criminal Appeals, Mr. Maples argued that federal constitutional law required that the conviction and death sentenced be reversed on the grounds that the trial court improperly admitted his confessions into evidence.  Specifically, Mr. Maples set forth a constitutional argument based upon several United States Supreme Court  precedents.  As set forth in the Petition in this matter, those precedents, including, *inter alia*, *Miranda* v. *Arizona*, 384 U.S. 436 (1966), *Rhode Island* v. *Innis*, 446 U.S. 291 (1980) and *Edwards* v. *Arizona*, 451 U.S. 477 (1981), clearly apply to the facts of the instant case.

-56-

### 2.     The Relevant Facts

The facts are set forth in the Petition (¶¶ 377-92).  For these purposes, the key relevant points are that the confessions extracted from Mr. Maples were not preceded by a complete advisement of his rights pursuant to *Miranda*.  Thereafter, and before there was any meaningful waiver of even those rights that he was advised of, he was subjected to a form of interrogation by a Tennessee law enforcement officer.  This resulted in two inculpatory statements.  Later, Alabama authorities interrogated Mr. Maples on videotape.  Again, there was failure to advise him completely of his *Miranda* rights. With respect to the incomplete set of warnings he was given, he was asked to waive those rights even before they had been fully explained to him.

### 3.     The Alabama Court's Decision

The Alabama Court of Criminal Appeals denied relief in an opinion that utterly failed to reasonably apply the well-established federal constitutional precedents on this issue.  Furthermore, the Alabama court's ruling was clearly contrary to these well-established precedents.  Specifically, the court failed to address the incompleteness of the *Miranda* warnings or the inadequacy of the purported waivers.

Respondent makes no specific denial of these points, but rather merely falls back into a conclusory and baseless assertion that it is not a claim upon which habeas relief may be granted.  In fact, because the Alabama court's decision was so clearly contrary to well established Supreme Court precedents, habeas corpus relief is mandated.  *Williams*, 529 U.S. 362.

**E.    Other Claims Set Forth in the Petition
Mandate Habeas Corpus Relief.**

The claims set forth in items IV, V, VI, VII, VIII, IX, X, XIV, XV, XVI, XVII, XIX, XXI, XXII, XXIII, XXV, XXVI, XXVII, XXVIII, XXIX, XXXII, XXXIII, XXXIV and XXXV are specifically and sufficiently pleaded in the Petition.  All of these claims were exhausted in the Alabama courts.  In each of the sections of the Petition in which these claims are set forth, Mr. Maples cites controlling Supreme Court precedent that the Alabama court unreasonably failed to follow and which mandate habeas corpus relief pursuant to 28 U.S.C. § 2254(d).  Notwithstanding the specific pleading of these issues, Respondent fails to provide specific responses.  He repeatedly ignores the precedents cited and states, in general and conclusory terms, that the claims do not merit habeas relief.  He makes no denials of the specific factual matters asserted and merely attempts to reserve his right to do so at a later time.

As set forth *supra*, where there is a state court decision that is contrary to or an unreasonable application of clearly established federal law, habeas corpus relief is mandated.  28 U.S.C. § 2254(d); *Williams*, 529 U.S. 362.  Accordingly, in each of these claims, this Court should grant relief.

## **CONCLUSION**

For the foregoing reasons, this Court should hold an evidentiary hearing after which, Mr. Maples respectfully submits, a writ of habeas corpus should be granted.

Respectfully submitted,


 _/s/  Marc De Leeuw_____
Marc De Leeuw
125 Broad Street, 32nd Floor
New York, New York 10004
212-558-4000

Kathy Brewer
Becker & Poliakoff, P.A.
3111 Stirling Road
Ft. Lauderdale, Florida 33312-6525

Gary Alexion
Legal Aid Society, Capital Division
One Battery Park Plaza
New York, New York  10004

*Counsel for Petitioner Cory Maples*

John G. Butler, Jr.
223 East Side Square
Huntsville, Alabama 35801

*Local Counsel for*
*Petitioner Cory Maples*

December 19, 2005

<u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on this 19th day of December, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to Assistant Attorney General Corey L. Maze, Office of the Attorney General for the State of Alabama.


        _/s/  Marc De Leeuw_____

        Marc De Leeuw