# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CORY R. MAPLES[1/], | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| vs. | ) | 5:03-CV-2399-SLB-PWG |
| | ) | |
| DONAL CAMPBELL, | ) | |
| Commissioner, Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | |
| Respondent | ) | |

## MEMORANDUM OF OPINION
### Introduction

This is a petition for writ of habeas corpus brought by a person in custody under a judgment

of a court of the State of Alabama.  28 U.S.C. § 2254.  On October 30, 1997, the petitioner Cory R.

Maples, ("Maples") was convicted in the Circuit Court of Morgan County, Alabama, of two counts

of capital murder for the murders of Stacy Alan Terry and Barry Dewayne Robinson II pursuant to

one scheme or course of conduct, § 13A-5-40(a)(10), Ala.Code 1975, and the murder of Stacy Alan

Terry during the course of committing a robbery, § 13A-5-40(a)(2), Ala.Code 1975.  The next day,

the jury returned with a recommendation that Maples be sentenced to death by a vote of 10 to 2.

At a sentencing hearing held on November 21, 1997, the trial court found one aggravating

factor and one statutory mitigating factor.  The trial court sentenced Maples to death.

On March 26, 1999, the Alabama Court of Criminal Appeals affirmed the capital conviction

and death sentence.  *Maples v. State,* 758 So.2d 1 (Ala. Crim. App. 1999).  The Alabama Supreme

---

[1/]     Spelled elsewhere as "Corey Ross Maples."

1

Court affirmed this conviction and sentence on December 10, 1999.   *Ex Parte Maples*, 758 So.2d 81 (Ala. 1999).

A petition for a *writ of certiorari* was denied by the United States Supreme Court on October 2, 2000.   *Maples v. Alabama*, 531 U.S. 30 (2000).

The history of Maples's state collateral review is unusual and implicates an important threshold issue in the present petition; whether Maples's ineffective assistance of counsel claims are procedurally defaulted as a product of his failure to timely appeal the summary dismissal of his Rule 32 petition.   The findings of fact reached by the Alabama Court of Criminal Appeals in its opinion are as follows:

> In August 2001, Maples filed a Rule 32, Ala. R. Crim. P., petition attacking his conviction and death sentence.  On May 22, 2003, Judge Glenn Thompson denied that petition.  On May 23, 2003, the circuit clerk mailed copies of the order denying the petition to the Alabama attorney general's office and to Maples's attorneys--Alabama attorney John G. Butler and New York attorneys Clara Inge-House and Jaasi Munanka.  The notices sent to the New York attorneys were returned to the circuit clerk's office.  On the outside of one of the envelopes were handwritten the words "Left Firm."  It is undisputed that Maples's Alabama attorney received the timely notice that the Rule 32 petition had been denied.
>
> In August 2003, Maples's mother contacted the New York law firm of Sullivan & Cromwell, the firm at which his New York attorneys were associates, and informed them that the Alabama attorney general's office had notified her son that his Rule 32 petition had been denied and that the time for filing an appeal had expired.  Felice Duffy, an associate with Sullivan & Cromwell, investigated and discovered that Maples's petition had been dismissed in May 2003.  [On August 26, 2003,] Duffy and two other associates with Sullivan & Cromwell filed a motion in the circuit court seeking to have Judge Thompson reissue his May 22, 2003, order denying the Rule 32 petition so that they could file a timely notice of appeal.[2]  Judge Thompson denied that motion [on September 3, 2003].

---

[2]   On August 29, 2003, Maples filed the present federal habeas corpus petition.  Resolution of said petition was stayed at Maples's request, pending disposition of his petition for writ of mandamus in state court.  [Doc. #7].

> Twenty-three days after Judge Thompson denied the motion to reissue the order denying the petition, the Alabama Supreme Court released *Marshall v. State*, 884 So.2d 900 (Ala.2003). Based on the [Alabama] Supreme Court's holding in *Marshall*--that a writ of mandamus is the only method by which to obtain an out-of-time appeal from the denial of a Rule 32 petition– [on October 8, 2003,] Maples filed this petition for a writ of mandamus requesting that we grant him an out-of-time appeal.

*Ex parte Maples*,  885 So.2d 845, 846 (Ala. Crim. App. 2004).

The Court of Criminal Appeals denied the petition for writ of mandamus on January 23, 2004.  On February 6, 2004, Maples sought a writ of mandamus with the Alabama Supreme Court, which was denied on September 2, 2004.   On December 2, 2004, Maples petitioned the United States Supreme Court for a writ of certiorari, which was denied on February 22, 2005.

Factual Background

The Alabama Court of Criminal Appeals, in its decision denying Maples relief on direct appeal, adopted the trial court's rendition of the facts.  The outline is more than sufficient for the review required here.

> "At some time in the late evening hours of Friday, July 7, 1995, or the early morning hours of Saturday, July 8, 1995, Stacy Alan Terry, Barry Dewayne Robinson II, and the Defendant, Corey Ross Maples, arrived at the residence of the Defendant on Mud Tavern Road in Morgan County.  All three of the young men were acquaintances.  Mr. Terry, whose nickname was Twinky, and the Defendant had spent the evening of July 7 drinking, playing pool, and 'riding around' in Mr. Terry's 1995 Camaro. The Defendant and Mr. Terry had attended high school together until the Defendant dropped out his senior year.  As evidenced by the testimony of family and friends, the two young men had spent a considerable amount of time together during the week preceding these events.

> "Mr. Robinson was new to the area, but had known Mr. Terry and the Defendant for several months. Mr. Robinson asked Mr. Terry for a ride home from the pool hall where all three young men were playing pool.

"Once the three young men arrived at the home of the Defendant, Corey Maples, he left the car and went into the mobile home. The defendant picked up a .22 caliber rifle and walked back outside to the car where Mr. Terry and Mr. Robinson sat getting ready to leave. The Defendant walked to the driver's side of the car and shot Mr. Terry twice in the head and then shot Mr. Robinson twice in the head.

"At some time around 1:00 a.m. on July 8, 1995, the Defendant's half-brother, Daniel Maples, and his friend, Matt Shell, arrived at the residence on Mud Tavern Road and found the body of Stacy Terry lying in the driveway close to the trailer where the Defendant and his half-brother lived with their father and the Defendant's stepmother.

"At some time around 9:00 p.m. on July 8, 1995, the Decatur police received a report of a body found in a creek commonly referred to as Mud Tavern Creek, one mile down the road from the Defendant's residence. The body was identified as that of Barry Robinson II.

"During the ensuing investigation of the two young men's murders, officers of the Morgan County Sheriff's Department obtained information that implicated Corey Ross Maples in the killings of Mr. Terry and Mr. Robinson. The officers began to look for the Defendant and Mr. Terry's missing Camaro with the personalized tag bearing the word 'TWINK.'

"In the late evening of August 1, 1995, the Nashville Metropolitan Police Department received a telephone call from an individual who had spotted the Defendant at the Best Rest Motel off I-10 in Nashville. The individual had seen a picture of the Defendant and heard a description of the car from a local television station. Members of the Nashville Police Department apprehended the Defendant at the motel. The Defendant was then transported to the Nashville Metropolitan Police Department where he was held until members of the Morgan County Sheriff's Department arrived. During the early morning hours of August 2, 1995, the Defendant gave Investigators Howard Battles and Byron Whitten of the Morgan County Sheriff's office a statement of confession to the murders.

"Mr. Terry and Mr. Robinson died as a result of gunshot wounds to the head. Both young men were shot twice in the head.

4

The medical examiner determined that each man's death was instantaneous to the shots to the head. The wounds were consistent with an execution-type slaying. The evidence proved beyond a reasonable doubt that the Defendant shot both men. He was armed with a .22 caliber rifle which belonged to his father.

"Evidence, both circumstantial and direct, overwhelmingly supported the foregoing finding: Count I of the indictment charged the Defendant, Corey Maples, in the killing of two people in a single transaction or occurrence as described in Ala.Code [1975,] § 13A-5-40[(a)](10)(1994 repl. vol.). Count II of the indictment charged the Defendant, Corey Maples, with the murder of Stacy Terry during the course of a robbery as described in Ala.Code [1975,] § 13A-5-40[(a)](2)(1994 repl. vol.). The jury returned a verdict of guilty on both counts of capital murder after five plus days of testimony. The Defendant was the sole participant in this brutal double murder of Stacy Alan Terry and Barry Dewayne Robinson II, as well as the murder of Stacy Alan Terry in the course of robbing Stacy Alan Terry of his 1995 Camaro automobile." (C.R. 554-56.)

*Maples v. State*, 758 So.2d 1, 14-16 (Ala. Crim. App. 1999).

<u>Direct Appeal</u> and <u>Collateral Proceedings</u>

On direct appeal and collateral review of his conviction, Maples alleged numerous grounds for error. He has received no relief from either the conviction or sentence. The material and relevant pleadings, record and rulings of the state court are voluminous. The state claims are best explained when juxtaposed with the related federal claim.

Maples presents a bewildering number of substantive and ineffective assistance of counsel claims in the § 2254 petition.[3] Respondent has asserted various defenses, including the argument that many claims are procedurally defaulted or that Maples has failed to state a specific ground which would entitled him to relief under 28 U.S.C. §§ 2254(d)(1) or (d)(2).

---

[3]   Indeed, as explained below, the twice amended 218 page petition , despite the prodigious length, is remarkably shallow. The court is frequently left with the almost impossible task of divining what Mr. Maples's actual claim might have been.

The procedural default issues must be resolved first in order to establish which claims, if any, are properly before this court.

## Procedurally Barred Claims

Depending on the circumstances upon which an individual claim[4] is presented in a petition for writ of habeas corpus, practical analysis of statutory and constitutional procedural default principles can be simple and straightforward or complex and intricate. The ultimate focus of the principles of default is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. As such, before seeking relief in federal court from a state court conviction and sentence, a habeas petitioner is required to present his federal claims to the state court exhausting all of the state's available procedural process consistent with the procedural rules in an effort to correct the asserted errors.

If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by state procedural rules, the state court can find that the claim is barred from a merits review. In general, when a state court explicitly rules that a particular claim is defaulted because a petitioner failed to follow state procedural rules, federal review of the claim is precluded.

With regard to exhaustion of state remedies, the Eleventh Circuit has written,

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies. 28 U.S.C.

---

[4]    Pursuant to 28 U.S.C. § 2254 (a), a provision of the federal statute governing the authority and scope of federal review of habeas corpus petitions arising from state court convictions, a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court . . ." unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." In other words, this court's review of habeas claims is strictly limited to federal constitutional questions. Claims pertaining solely to questions of state law fall outside the parameters of this court's authority.

§ 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State...."). "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction. . . . The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir.1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-92, 77 L.Ed.2d 1090 [1983] ).

Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 [1971] ) (internal quotation marks omitted). The Supreme Court has written these words:

> The federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

*Picard*, 404 U.S. at 275, 92 S.Ct. at 512. *See also Duncan*, 513 U.S. at 365, 115 S.Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

_____With regard to procedurally defaulted claims, the Eleventh Circuit has written,

[T]he federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. Federal review of a petitioner's claim is barred by the

procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief. *See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988).[5] The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).

If a federal claim has not first been exhausted in state court, this court may also find that it is "procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citing *Picard v. Connor,* 404 U.S. 270, 276 (1971)) and *Snowden v. Singletary*, 135 F.3d 732, 737(11th Cir. 1998)).

A habeas petitioner may overcome his procedural default in two ways. First, under the "cause and prejudice" exception, a petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The "cause and prejudice" exception is in the conjunctive. A petitioner must prove *both* cause *and* prejudice to excuse his procedural default.

---

[5]   The state procedural rule at issue in the present petition is Rule 32.2(a) and (b) of the Alabama Rules of Criminal Procedure. It has long been accepted that Rule 32 is of such a caliber that a state court dismissal of claim as procedurally defaulted under the rule constitutes an adequate and independent state ground to deny relief. This, in turn, will preclude a district court from addressing the claim. Accordingly, if, during Maples's presentation of any federal claim in state court, the state court specifically found the claim to be procedurally defaulted pursuant Rule 32.2(a) and (b) of the Ala. R. Crim. P., then the claim is also defaulted pursuant to federal procedural default doctrine. *Coleman v. Thompson*, 501 U.S. 722, 729-31 (1991).

8

The United States Supreme Court has summarized the "cause and prejudice" standard as

follows:

> In *Wainwright v. Sykes*, 433 U.S. 72 (1977), this Court adopted the "cause and prejudice" requirement of *Francis v. Henderson*, [425 U.S. 536 (1976)], for all petitioners seeking federal habeas relief on constitutional claims defaulted in state court. The *Sykes* Court did not elaborate upon this requirement, but rather left open "for resolution in future decisions the precise definition of the 'cause'-and-'prejudice' standard." 433 U.S. at 87, 53 L. Ed. 2d 594, 97 S. Ct. 2497. Although more recent decisions likewise have not attempted to establish conclusively the contours of the standard, they offer some helpful guidance on the question of cause. In *Reed v. Ross*, 468 U.S. 1, 82 L. Ed. 2d 1, 104 S. Ct. 2901 (1984), the Court explained that although a "tactical" or "intentional" decision to forgo a procedural opportunity normally cannot constitute cause, *id.,* at 13-14, 82 L. Ed. 2d 1, 104 S. Ct. 2901, "the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met." *Id.,* at 14, 82 L. Ed. 2d 1, 104 S. Ct. 2901. The Court later elaborated upon *Ross* and stated that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). We explained that "a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . would constitute cause under this standard." *Ibid.*

*Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988).

A habeas petitioner must also demonstrate that he was actually prejudiced; he must show

"not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual*

and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."

*United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)).

The second manner in which a habeas petitioner may overcome a procedural default is to

establish a "fundamental miscarriage of justice"has occurred.  A petitioner "can demonstrate a

sufficient probability that our failure to review his federal claim will result in a fundamental

miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  Stated differently, this

exception allows a federal habeas court to consider even a procedurally defaulted claim in the absence of a legally cognizable cause if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," or if the petitioner shows "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323-27, n. 44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992)); *see also, e.g., Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (quoting *Engle v. Isaac*, 456 U.S.107, 135, and *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).[6/]

The state procedural rules implicated in Mr. Maples's petition are Rule 32.1(f) and Rule 32.2(a) of the Alabama Rules of Criminal Procedure. Rule 32.1(a)-(f) defines the scope of post-conviction remedies available to a petitioner, with subsection (f) being devoted to out-of-time appeals. Rule 32.1(f) reads:

> Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:
> . . . .
>
> (f) The petitioner failed to appeal within the prescribed time and that failure was without fault on the petitioner's part.

The second applicable state procedural rule is found in Rule 32.2(a) of the A. R. Crim. P. It reads, in *pare materia*, "A petitioner will not be given relief under this rule based upon any

---

[6/]     The petitioner must show "actual innocence" either as to the crime or his eligibility for the death penalty. As to his "actual innocence" of the crime, such a showing requires the petitioner "to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence--that was not presented at trial." *Schlup*, 513 U.S. at 323-27. As to "actual innocence" regarding his eligibility for the death penalty, a petitioner must show by clear and convincing evidence that, but for a constitutional error at trial, no reasonable juror would have found him eligible for the death penalty under state law.

ground: . . . (2) Which was raised or addressed at trial; or (3) Which could have been but was not

raised at trial, . . .; or (4) Which was raised or addressed on appeal . . .; or (5) Which could have been

but was not raised on appeal . . ."

Whether or not a state procedural rule is "adequate and independent" so as to have a

preclusive effect on federal review of a claim is a federal question.  *Lee v. Kemna*, 534 U.S. 362, 375

(2002).  To be considered "adequate," by a federal court, the state procedural rule must be "'firmly

established and regularly followed.'"  *Id.*  (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984).

In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to find

it to be adequate.  *James v. Kentucky*, 466 U.S. at 345.

On many occasions, Rule 32.2(a) of the A. R. Crim. P. has been found to provide the

"'adequate and independent state grounds'" which would preclude a federal court from considering

a claim and granting relief.  *Coleman v. Thompson*, 501 U.S. 722, 729-31 (1991).  However, Rule

32.1(f) of the A. R. Crim. P. is different.  The latter rule, also referred to herein as the "out-of-time

appeal" rule, pertains to the first three (3) claims in Maples's petition.

The Out-of-Time Appeal[7/]

In his amended habeas petition, Maples makes the following claims:[8/]

**Claim I.**      Trial counsel were ineffective during the guilt stage of Maples's trial, and thereby deprived Maples of his Constitutional Rights.   [Doc. #24, at 4-58].

**Claim II.**     Trial counsel failed to present substantial mitigation evidence during the penalty phase of the trial.  *Id.* at 58-93.

---

[7/]      Rule 4(a) of the A.R.App.P. affords a civil litigant in circuit court 42 days from the entry of the order or judgment appealed from to file a notice of appeal.

[8/]      See Tab 47, at 2-89 in the postconviction record for these claims as presented to the Rule 32 trial court.

**Claim III.**     The overall performance of counsel was ineffective. *Id.* at 93-96.

Respondent contends the foregoing claims are "procedurally defaulted and due to be dismissed because Maples failed to exhaust his Rule 32 claim[s] by failing to appeal the dismissal of his Rule 32 petition." [Doc. #29, at 23-24] (citing *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998), *Bailey v. Nagle*, 172 F.3d 1299, 1305-06 (11th Cir. 1999) (other citation omitted)). Respondent acknowledges Maples moved for permission to file an out-of-time appeal from the dismissal of his Rule 32 petition, but contends that the request was correctly denied. *Id.* at 12.

Maples counters that his Rule 32 claims are exhausted because respondent either expressly waived the exhaustion requirement pursuant to 28 U.S.C. § 2254(b)(3), or in the alternative, respondent should be judicially estopped from raising nonexhaustion as a defense because of representations respondent made in state court during the mandamus proceeding. [Doc. #33, at 19-22]. The underlying factual allegations as to both arguments are the same. Maples notes that respondent filed an opposition to his January 26, 2004, petition for writ of mandamus before the Alabama Court of Criminal Appeals. *Id.* at 19.[9/] In it, respondent argued that Maples was seeking to mislead the court by contending that he could be "executed despite valid post-conviction claims because he was denied the opportunity to timely appeal the dismissal of his Rule 32 petition." *Id.* In a footnote, respondent indicated said contention was "misleading . . . because Maples has filed a petition for writ of habeas corpus in federal court, with the proceedings stayed until the matter is

---

[9/]        As stated, *infra*, on August 29, 2003, Maples filed this federal habeas corpus petition.  Resolution of the petition was stayed, at Maples's request, pending disposition of his petition for writ of mandamus (request for out-of-time appeal from the dismissal of his Rule 32 petition) in state court.  [Doc. #7].

disposed of.  Maples may still present his postconviction claims to that court." *Id.* at Exhibit 2, p. 22, n. 4.

This court has carefully reviewed the representation of the respondent in the mandamus proceedings.  It is clear that respondent did not expressly waive the exhaustion requirement pursuant to 28 U.S.C. § 2254(b)(3), nor does judicial estoppel bar nonexhaustion as a defense.  First, by its very nature, Section 2254(b)(3) anticipates an express waiver of exhaustion *during litigation of a federal habeas corpus petition*.  Section 2254(b)(3), provides no authority to import a representation made in a state court pleading into respondent's answer to the federal habeas petition.

Second, the doctrine of judicial estoppel applies only when a party asserts a discrete position in a legal proceeding, prevails on the basis of that position, and then assumes a contrary position in a subsequent proceeding, to the detriment of the opposing party. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The statements Maples refers to do not satisfy a single requirement for judicial estoppel.  Initially, respondent merely observed that Maples had an avenue to raise his post-conviction claims in federal court, an undeniably correct statement.  Whether or not Maples's Rule 32 claims would be unexhausted but procedurally barred in federal court if Maples's out-of-time appeal were not granted is an entirely separate matter.  Respondent made no representations as to a waiver of a procedural bar or defense.  Second, even if respondent's statement could be considered contradictory to his assertion of nonexhaustion here, there is no indication whatsoever in the appellate opinion that the court relied in any way on respondent's prior representation as affecting the denial of Maples's petition for writ of mandamus.  The state courts denied Maples's petition on separate and clear grounds that his legal counsel received a timely notice of the dismissal of the Rule 32 petition, then failed to appeal the dismissal within the time prescribed under Alabama law.

Maples has failed to show respondent actually prevailed on the basis of the footnote comment.

Next, Maples declares that even if his Rule 32 claims are procedurally defaulted, the default does not prevent federal review because the rule governing out-of-time appeals in Alabama cannot be considered an adequate and independent state rule upon which federal preclusion is found. [Doc. #33, at 23-27]. In other words, Maples contends that he has established cause and prejudice to excuse the default of these claims because the procedural rule upon which the state relied to support the denial of his out-of-time appeal is not firmly established and regularly followed. Maples's argument fails for two reasons.

First, it is true that Alabama's procedure for requesting an out-of-time appeal from the dismissal of a Rule 32 petition has been litigated frequently in the past five years.[10] In that sense, Maples is correct that Rule 32.1(f) of the A. R. Crim. P., is neither firmly established or regularly followed. The Alabama cases addressing the rule have vacillated with respect to the vehicle by which a request is made. However, Maples's request for an out-of-time appeal was not denied because the state court found that he failed to utilize the correct forum for his request. Maples's petition for writ of mandamus was heard and considered by both the Alabama Court of Criminal Appeals and the Alabama Supreme Court. Maples did not file his request for an out-of-time appeal pursuant to Rule 32.1(f). He did not suffer a dismissal because the rule is unclear. He filed a petition for writ of mandamus which was denied after a review of the very issue of timeliness. Maples's argument is without merit.

---

[10]   Alabama courts have reached different conclusions as to whether the proper procedural avenue to seek relief is by a petition brought in the trial court pursuant to Rule 32.1(f) of the Alabama Rules of Criminal Procedure, or a petition for writ of mandamus with the Alabama Court of Criminal Appeals.

Second, Maples alleges the state court's decision to deny his request for an out-of-time appeal was based on yet another rule pertaining to Rule 32 petitioners that has been neither firmly established nor regularly followed by the State of Alabama.  This rule involves how broadly Alabama has interpreted the 'no fault' portion of Rule 32.1(f).  Maples argues that Alabama has allowed a prisoner to allege that his attorney failed to timely file a notice of appeal as a valid basis for granting an out-of-time appeal pursuant to Rule 32.1(f) of the A. R. Crim. P.  Maples cites several Alabama cases in support of this contention.  [Doc. #33, at 24-25].  However, with the exception of *Marshall v. State*, 884 So.2d 898, 898-99 (Ala. Crim. App. 2002), each case cited by Maples either involves the failure of trial counsel to file such a notice on *direct* appeal as opposed to collateral review, or *pro-se* Rule 32 petitioners who did not receive proper notice that their petitions had been dismissed.

*Marshall* at least tangentially involved a claim that a Rule 32 petitioner had not received the order dismissing his petition and that his counsel was ineffective for failing to inform him of the dismissal.  *Id.*  Marshall, however, had filed pro-se motions together with his counsel while the case was pending, and filed additional pleadings after his petition had been dismissed in which he requested to know the status of the petition.  The State did not dispute that Marshall did not receive a copy of the dismissal.  The reason for the State's concession is unknown, and the appellate court expressly declined to rule on the ineffective assistance of counsel issue.  When the appellate decision in Marshall's favor was appealed to the Alabama Supreme Court, the Court analyzed *Ex parte Weeks*, 611 So.2d 259 (Ala.1992), one of the cases relied upon by the Court of Criminal Appeals in granting Marshall relief.  In *Weeks*, the petitioner had contacted the clerk's office and asked the clerk to notify him of developments in his case.  The clerk failed to notify Weeks of the dismissal of his

petition, and Weeks lost his opportunity to appeal the dismissal within the time period allowed.  In

that situation, the Alabama Supreme Court found for Weeks, asserting

> "Although it is generally held in Alabama that a party is under a duty to follow the
> status of his case, whether he is represented by counsel or acting pro se, and that, as
> a general rule, no duty rests upon either the court or the opposing party to advise that
> party of his scheduled trial date, see the cases collected at 18A Ala. Digest Trial
> § 9(1)(1956), a party's right to procedural due process is nonetheless violated if he
> is denied his day in court because the court, acting through its clerk, assumed the
> duty of notifying that party of his scheduled trial date and then negligently failed to
> do so."

*Ex Parte Marshall*, 884 So.2d at 900, 901-03 (quoting *Ex parte Weeks*, 611 So.2d at 262 (other

citation and emphasis omitted)).

The *Marshall* court then reiterated, "[t]his Court in *Ex parte Weeks* made it clear that

procedural-due-process concerns arose when the court assumed a duty of notification it did not

otherwise owe the petitioner and then failed to perform that duty."  *Id.* at 903.  The Supreme Court

did not consider or mention Marshall's ineffective assistance of postconviction counsel claim.

Maples's failure to timely appeal does not present a situation similar to the unique factual

circumstances that provides the underpinning for *Marshall.*  There is no indication that Maples ever

submitted *pro-se* pleadings nor did he request that he be informed of the status of his case.  Further,

*Marshall*, in and of itself, does not establish that the "no fault" provision of Rule 32.1(f) has been

interpreted to apply to the dismissal of Rule 32 petitions when the petitioner is represented by

counsel.  Maples has not established that the State of Alabama's interpretation of Rule 32.1(f)'s 'no

fault' provision for petitioners in Maples's posture is not firmly established or regularly followed.

There is no cause and prejudice to excuse Maples's procedural default.

Finally, Maples contends that the ineffectiveness of his Rule 32 counsel establishes the cause and prejudice necessary to excuse the procedural default of his Rule 32 claims.[11]  This argument is without merit.  There is no constitutional right to postconviction counsel, and as such, the ineffectiveness of postconviction counsel cannot establish the cause and prejudice necessary to overcome Maples's procedural default.  *Smith v. Robbins*, 528 U.S.  259, 275 (2000); *Coleman v. Thompson*, 501 U.S. 722, 751 (1991).

Claims I, II and III of Maples's petition for writ of habeas corpus are procedurally defaulted.

**(1)     Substantive Claims that could have been but
were not raised at trial, or could have been
but were not raised on direct appeal, or both**.

The substantive claims in this subsection could have been, but were not presented at trial, or could have been, but were not presented on direct appeal.  When these claims were reviewed in the Rule 32 petition the trial court found the claims procedurally barred pursuant to Rule 32.2(a)(3) and/or (5) of the Alabama Rules of Criminal Procedure.

| | |
|---|---|
| **Claim VI.** | The evidence of capital murder during a robbery was insufficient to sustain a capital murder conviction and sentence of death as a matter of law.   [Doc. #24, at 124]. |
| **Claim VII.** | Irrelevant and prejudicial evidence was introduced at trial that denied Maples a fair trial and a fair penalty determination. [Doc. #24, at 125]. |
| **Claim XI.** | Jury Issues. [Doc. #24, at 136]. |
| **Claim XXXIII**. | The verdict form improperly limited the freedom of the jury to acquit Maples of a lesser included offense.  [Doc. #24, at 215]. |

---

[11]     Maples does not contend that a miscarriage of justice will occur if his Rule 32 claims are not heard.

      **Claim XXXIV**.        The imposition of the death penalty in this case is cruel and unusual punishment because it is disproportionate to the crime.  [Doc #24, at 216].

Respondent contends the trial court dismissed Claims VI, VII, XI, XXXIII and XXXIV under Rule 32.2(a)(3) and/or (5) because Maples could have, but did not, raise these claims during trial, or on direct appeal, or both.  [Doc. #29, at 29-32, 61-62 (citing (R., Tab. 66 at 4-6)).  Maples simply does not respond to the argument.  After an independent review of the record and applicable law, federal review of these claims is precluded in that the state court affirmatively found default consistent with adequate and independent state procedural rules.

## Claims Reviewable Upon the Merits

The writ of habeas corpus "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).  This is especially true in collateral review of a state court conviction.

> Direct review is the principal avenue for challenging a conviction. "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence.  The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. *Federal courts are not forums in which to relitigate state trials*."

*Id*. (emphasis supplied) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).  "Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-441 (1963).

18

"Accordingly, it hardly bears repeating that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."  *Brecht*, 507 U.S. at 634 (citations, quotation marks, and footnote omitted).  That is because

> [t]he States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights.  Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Engle v. Isaac*, 456 U.S. 107, 128 (1982).[12]

These principles were reinforced by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), signed by President Clinton on April 24, 1996.  In addition to other substantive changes worked by AEDPA in the law applicable to  2254 habeas proceedings, the Act heightened the degree of deference federal courts must accord a state court's factual determinations.

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  *The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.*

28 U.S.C. § 2254(e)(1) (emphasis supplied).  AEDPA also amended § 2254(d), which now provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless the adjudication of the claim—*

---

[12]    "The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht*, 507 U.S. at 635 (citing *Wright v. West*, 505 U.S. 277, 293 (1992) (Thomas, J.); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991); and *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

> (1) resulted in a decision that was *contrary to*, or involved *an unreasonable application* of, clearly established Federal law, *as determined by the Supreme Court of the United States*; or
>
> (2) resulted in a decision that was based on *an unreasonable determination of the facts* in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis supplied).  Maples's habeas petition was filed after the effective date of AEDPA.  Therefore, the provisions of 28 U.S.C. § 2254, as amended by that Act, apply fully to his claims.

The Supreme Court first construed the language of § 2254(d)(1), as amended by AEDPA, in *Williams v. Taylor*, 529 U.S. 362 (2000).  Justice O'Connor spoke for a majority of the Court concerning the proper construction of the amended provision (Part II of the decision).  She observed that § 2254(d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court" by requiring satisfaction of one of two conditions for issuance of the writ.  *Id*. at 412.

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id*. at 412-13 (O'Connor, J., concurring, and, majority opinion as to Part II of the Court's decision).[13]

---

[13]     The *Williams* formulation of the meaning of § 2254(d)(1), as amended by AEDPA, was summarized in *Bell v. Cone*, 535 U.S. 685 (2002), where the Court said:

1.      **"Contrary to . . . clearly established Federal law"**

Justice O'Connor defined the parameters of § 2254(d)(1)'s "contrary to" clause in the

following manner:

> [A] state-court decision can be "contrary to" this Court's clearly established
> precedent in two ways.  First, a state-court decision is contrary to this Court's
> precedent if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law.  Second, a state-court decision is also contrary to this
> Court's precedent if the state court confronts facts that are materially
> indistinguishable from a relevant Supreme Court precedent and arrives at a result
> opposite to ours.  *See* 143 F.3d, at 869-870.
>
> The word "contrary" is commonly understood to mean "diametrically
> different," "opposite in character or nature," or "mutually opposed."  Webster's Third
> New International Dictionary 495 (1976).    The text of § 2254(d)(1) therefore
> suggests that the state court's decision must be substantially different from the
> relevant precedent of this Court.  The Fourth Circuit's interpretation of the "contrary
> to" clause accurately reflects this textual meaning.  A state-court decision will
> certainly be contrary to our clearly established precedent if the state court applies a
> rule that contradicts the governing law set forth in our cases.  Take, for example, our
> decision in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d
> 674 (1984).  If a state court were to reject a prisoner's claim of ineffective assistance
> of counsel on the grounds that the prisoner had not established by a preponderance
> of the evidence that the result of his criminal proceeding would have been different,
> that decision would be "diametrically different," "opposite in character or nature,"
> and "mutually opposed" to our clearly established precedent because we held in
> *Strickland* that the prisoner need only demonstrate a "reasonable probability that . .

---

As we stated in *Williams*, § 2254(d)(1)'s "contrary to" and "unreasonable application"
clauses have independent meaning. 529 U.S. at 404-405, 120 S. Ct. [at] 1495.  A federal habeas court
may issue the writ under the "contrary to" clause *if the state court applies a rule different from the
governing law set forth in our cases, or if it decides a case differently than we have done on a set of
materially indistinguishable facts.  Id.* at 405-406, 120 S. Ct. 1495.  The court may grant relief under
the "unreasonable application" clause *if the state court correctly identifies the governing legal
principle from our decisions but unreasonably applies it to the facts of the particular case. Id.*, at
407-408, 120 S. Ct. 1495.  The focus of the latter inquiry is on whether the state court's application
of clearly established federal law is *objectively unreasonable*, and we stressed in *Williams* that *an
unreasonable application is different from an incorrect one. Id.*, at 409-410, 120 S. Ct. 1495. *See
also id.*, at 411, 120 S. Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable
application clause "simply because that court concludes in its independent judgment that the relevant
state-court decision applied clearly established federal law erroneously or incorrectly").

*Bell*, 535 U.S. at 694-95 (emphasis supplied).

. the result of the proceeding would have been different." *Id.*, at 694, 104 S. Ct. 2052.  A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.  Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (O'Connor, J., concurring, and majority opinion

as to Part II of decision).

## 2.    "Unreasonable application of clearly established Federal law"

Justice O'Connor sketched the parameters of § 2254(d)(1)'s "unreasonable application" clause with broad strokes:

A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision "involv[ing] an unreasonable application of . . . clearly established Federal law."  . . .

. . . .

Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.  . . .

The term "unreasonable" is no doubt difficult to define.  That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning.  For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  . . .  Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

*Williams*, 529 U.S. at 407-11 (O'Connor, J., concurring, and, majority opinion as to Part II of

decision) (alteration and emphasis in original).

22

### 3.  Pleading Requirements and Burden of Proof

Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted)).  The petitioner must specify all the grounds for relief available to the petitioner, state the facts supporting each ground, and state the relief requested.  28 U.S.C. § 2254 Rule 2(c)(1)(2)(3).  A "general reference to the transcripts, case records and brief on appeal patently fails to comply with Rule 2(c) ." *Phillips v. Dormire*,  2006 WL 744387, *1, (E.D. Missouri 2006) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990)).

With regard to the facts supporting his case, the burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks.  *Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, reh'g denied, 714 F.2d 159 (11th Cir. 1983).  Consequently, a petitioner must provide substantial evidence to meet his burden of proof to show why federal post-conviction relief should be awarded.  *Douglas v. Wainwright*, 714 F.2d 1532, reh'g denied, 719 F.2d 406 (11th Cir. 1983), vacated on other grounds, 468 U.S. 1206 (1984) and 468 U.S. 1212 (1984), on remand 739 F.2d 531 (11th Cir. 1984).  That burden is to point to *prima facie* evidence establishing the alleged constitutional violation.  The mere assertion of a ground for relief, without more factual detail, does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.

23

**Discussion**

In his answer, the respondent contends Maples's entire petition should be dismissed because

> Maples cannot meet his burden under either Section 2254(d)(1) or (d)(2) for at least two reasons.  First, . . . [Maples] never cites or argues Section 2254(d)(1) or (d)(2) as the basis for any of his claims. . . . Second, . . . Maples's habeas claims cannot entitle him to habeas relief because they were simply cut-and-pasted from his direct appellate brief to the Alabama Court of Criminal Appeals . . . *before* the ruling of the state courts.

[Doc. #29, at 17-20].

Respondent's allegations concerning the substance of Maples's petition[14] and the state record on direct appeal are accurate.  The petition is not due to be dismissed merely because Maples does not cite Section 2254(d) or appears to have copied claims verbatim from his appellate brief.  What is remarkably absent from the petition is the legal analysis said to support many of Maples's claims.  There are citations to United States Supreme Court cases, however, there is more often than not no development beyond the mere citation and statement identifying a general legal principle.  While such lack of clarity may not be fatal to claims factually presented and predicated upon clear constitutional grounds, this court cannot be charged with the duty of identifying claims Maples has not made.

> **Claim IV**.    The prosecutor improperly commented on Maples's decision not to testify.  [Doc. #1, at 96-103].

Maples declares the prosecutor improperly commented on his right to remain silent during the guilt and penalty phase of his trial.  *Id.* at 96–98.  Specifically, at the guilt phase of the trial, "the

---

[14]    The petition examined in this Memorandum of Opinion is Maples's *third* amended petition.

24

prosecutor informed the jury that '[t]here was an eyewitness and he told you what happened on the tape.'"  *Id.* at 97 (quoting (R. 2960)).[15/]

Additionally, at the penalty phase of the trial, the prosecutor stated,[16/]

> In parts, like the part you just heard [of the videotape], absolutely drags for second if not minutes, <u>with anybody have an opportunity to talk</u>.  We've heard from the psychologist for about an hour who told you what Corey Maples had told him, and we've also heard from Howard Battles and from the video tape about what the defendant told him, but the <u>one thing we have not heard one time in this case;</u> this tape that shows so much remorse, when he asked him there, 'do you have anything else you want to tell us about this,' he sits there and says 'well, no, I guess that's about it.'  <u>When did he say, I'm sorry, one time?   When did he say I hate it, one time?  When did he say I feel sorry for the families, one time?</u>  Not one iota of remorse; and they want to tell you that the tape shows remorse.  You have seen the tape and you have heard the psychologist.  <u>When did he tell you how broken up he was and how sorry he was?</u>  He talked a lot about what a bad childhood he had.  Did he tell you about what a bad impact these two killing[s] had on him since?  <u>Not a word</u>.  The only thing that could even halfway arguably be remorse is him (sic) talking about being haunted by these images.  I guess he was haunted by these images up there at the Kentucky State Fair.  I guess he was haunted by these images after he got the car fixed.  He carried the dead man's car and got a new engine put in it on their warranty and was driving around and partying and going out like a young man would.  He was tickled to get his car back.  <u>Haunted by these images?  That sounds good but there hasn't been any evidence to support that; not one bit</u>.

---

[15/]   In this opinion, "R." shall reference the transcript, and "C." shall reference the court record.

[16/]   Maples fails to mention the prosecutor prefaced his remorse argument with the following statement, "This tape, they suggest to you, is a mitigating circumstance because of his candor and his remorse.  It runs over two hours."  (R. 3286.)  "They" is a reference to defense counsel, who had themselves stated the tape demonstrated remorse in their opening during the penalty phase, arguing

> "We believe that tape also demonstrates his remorsefulness, in that he describes in the tape his being haunted by these images every night.  He describes in this tape that he couldn't sleep, that finally when he was arrested he said, 'Maybe now I can get some sleep.'  In the tape he also describes that when he was arrested, the first words out of his mouth, we talked about it earlier, is 'Thank God, it's finally over.'"

*Maples v. State*, 758 So.2d at 21-23, quoting (R. 3090.)  In closing, counsel reiterated, "in the early morning hours of August 2, 1995, when he put his head in his hands and said when I saw the police cars, 'Thank God it's finally over.  I thought about this every night.  Thank God it's finally over.'"  *Id.* (quoting (R. 3281-82)).

*Id.* at 98 (citing (R. 3286-87) (emphasis added by Maples)).

Maples alleges the repeated comments were improper not only because they challenged his

right to remain silent pursuant to *Miranda v. Arizona*, but additionally sought to ask the jury to draw

an "adverse inference therefrom"; that is, Maples's failure to establish remorse.  Maples asserts that

he could only establish remorse through his own testimony *Id.* at  99, 101-102.  As legal support for

the claim, Maples simply cites, without explanation or analysis, *Doyle v. Ohio*, 426 U.S. 610 (1976),

*Griffin v. California*, 380 U.S. 609 (1965), and *United States v. Badolato*, 701 F.2d 915 (11th Cir.

1983).  *Id.* at 97 & 99.

Trial counsel did not object to the comments made by the prosecutor, and the Alabama Court

of Criminal Appeals found the prosecutor's statements did not rise to the level of plain error.  *Maples*

*v. State*, 758 So.2d at 21-23.  In doing so, the appellate court examined, in entirety, defense counsel's

arguments concerning this subject as well as the prosecutor's argument, writing,

> [t]he prosecutor's comments were a response to the defense's statements and
> insinuations that the appellant's confession showed his remorsefulness about the
> murders.  The prosecutor's statements were reasonable inferences drawn from the
> evidence presented at trial, the appellant's statements to the police and to the
> psychologist, and the appellant's actions between the time of the murders and the
> time of his arrest. . . . .  Furthermore, the prosecutor's statement, "Did he tell you
> about what a bad impact these two killings had on him since?," when read in context,
> does not refer, as the appellant argues, to his silence since the time he made the
> videotaped statement to police.  Rather, it refers to the appellant's lack of remorse
> evidenced in his statements to police after the murders.  Counsel is "'allowed wide
> latitude in drawing reasonable inferences from the evidence in closing arguments.'"
> *Jones v. State*, 600 So.2d 424, 425 (Ala.Cr.App.1992) (quoting *Cross v. State*, 536
> So.2d 155, 160 (Ala.Cr.App.1988)).

*Id.* at 21-23.

In *Isaacs v. Head*, 300 F.3d 1232, 1270 (11th Cir. 2002), the Eleventh Circuit described the

proper manner in which to evaluate a *Griffin* claim.

The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify. A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so. The defendant bears the burden of establishing the existence of one of the two criteria. The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement. . . .

*United States v. Knowles*, 66 F.3d 1146 (11th Cir.1995) (citations, quotations, and footnotes omitted). See also *United States v. LeQuire*, 943 F.2d 1554, 1565 (11th Cir.1991) (same); *Solomon v. Kemp*, 735 F.2d 395, 401 (11th Cir.1984).

In applying *Griffin*, we have strictly enforced the requirement that a defendant show that the allegedly offensive comment was either manifestly intended to be a comment on the defendant's silence or that the comment naturally and necessarily related to the defendant's silence.

It is apparent that Maples has failed to show the state court's decision "was contrary to or involved an unreasonable application of clearly established law" or "was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Quite clearly, the prosecutor's comments were replies in kind to argument initially raised by defense counsel, and the comments were restricted to evidence that had been admitted. These comments were neither improper nor unduly prejudicial to Maples. *McNair v. Campbell*, 307 F.Supp.2d 1277, 1324 (M.D. Ala. 2004), rev'd on other grounds, *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005), (citing *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 868, 99 L.Ed.2d 23 (1988) (finding no Fifth Amendment violation where the prosecutor commented in closing that defendant could have taken the stand and explained his side of the story,

when the remarks followed defense counsel's closing argument that the government had not allowed

defendant, who did not testify, to explain his side of the story)) (other citation omitted).  There is no

evidence the prosecutor's comments in this case were manifestly intended to comment on Maples's

right to silence.  Maples has not shown that a jury would naturally and necessarily interpret the

remarks as a comment on his silence.  The claim is due to be denied.

> **Claim V.**    Numerous instances of prosecutorial misconduct denied Maples a fair trial
> and an accurate sentence determination.  [Doc. #24, at 103-123].

>> A.    Improper comments during penalty phase.

>>> **i.** Failure to call witnesses.

Maples contends the prosecutor made a number of improper comments and arguments during

the penalty phase of the trial.  *Id.* at 103.  First, Maples's stepmother testified that Maples had

assisted police by acting as a drug informant (for the purpose of establishing a non-statutory

mitigating factor), and as a result, was threatened by drug dealers.  *Id.*  The prosecutor did not cross-

examine Maples's stepmother.  Instead, during the penalty phase argument, the prosecutor castigated

Maples for failing to call as witnesses the police officers allegedly assisted by Maples, arguing that

had Maples offered any major assistance, the officers would have testified because "[d]efense

lawyers love to call the police over here to testify. . . . they would have been over here by the hand

full."  *Id.* at 104   (quoting (R. 3292-93)).   The prosecutor then argued, "As I understand the

testimony, he helped them with one drug person."   *Id.*   Maples claims the prosecutor

"impermissibly" prejudiced him "for not calling witnesses," and that such "arguments are improper

as a matter of constitutional law in a capital case."  *Id.* at 104-05.  On direct appeal, the Alabama

Court of Criminal Appeals found the comments a proper attempt to disprove and challenge the strength of Maples's mitigating evidence. *Maples v. State*, 758 So.2d at 55.

Maples offers no federal authority or even argument in support of his general and conclusory allegation of misconduct. This court is not required to "consider unsupported and undeveloped issues." *Moore v. Gibson*, 195 F.3d 1152, 1180 n. 17 (10th Cir.1999), cert. denied, 530 U.S. 1208 (2000). Maples has failed to show that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts in light of the evidence. This claim is due to be denied.

### ii. Improper comment on courtroom demeanor.

Maples also contends the prosecutor improperly inferred his "pedestrian demeanor" in the courtroom was subterfuge by stating, "These cases try just like this; the defendant over there behaving himself and doing nothing to alienate the jury." *Id.* at 105 (quoting (R. 3295)). Maples then concludes, without explanation, the comment violated his "rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." *Id.* On direct appeal, the Alabama Court of Criminal Appeals found the prosecutor's argument was not a comment on Maples's right to remain silent, and was a reply to defense counsel's contention

> that [Maples] was different from others accused of capital murder and did not deserve the death penalty because he had no criminal history and had never been imprisoned. (R. 3264.) He further argued that, because [Maples] was only 21 years old and had longer to live than a 45-year-old convicted of capital murder and facing death, spending the rest of his life in prison would be a harsh enough punishment.

*Maples v. State*, 758 So.2d at 55-56.

Maples offers no federal authority or argument to support the foregoing general and conclusory claim. This court is not required to "consider unsupported and undeveloped issues."

*Moore v. Gibson*, 195 F.3d 1152, 1180 n. 17 (10th Cir.1999), cert. denied, 530 U.S. 1208 (2000). Maples has failed to show that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts in light of the evidence. The claim is due to be denied.

**iii.** The prosecutor told the jury what to think.

Maples declares the prosecutor improperly interjected his own opinion into the case by arguing, "[t]here is no question he made that call, I don't thin[k], and I don't think it is in your minds either. He made the call." [Doc. #24, at 106] (quoting (R. 3292)). The prosecutor also told the jurors, "you have to believe it [the death penalty] deters other criminal conduct, at least sometimes." *Id.* (quoting (R. 3304)). Maples cites *United States v. Young*, 470 U.S. 1 (1985), *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) and *United States v. Rodriguez*, 585 F.2d 1234 (5th Cir. 1988)(for the proposition that it is improper for a prosecutor to give his own opinion)). *Id.* at 105-106.

The Alabama Court of Criminal Appeals examined the claim on direct appeal, and made the following findings of fact and conclusions of law.

> The foregoing was proper argument by the prosecutor regarding the inconsistencies in the appellant's videotaped confession and the psychologist's testimony. The psychologist testified that the appellant told him he was intoxicated and on drugs on the night of the murders, but the appellant denied that in his videotaped confession. Regarding the prosecutor's comment about the telephone call, there was evidence that the appellant made a 911 telephone call and identified himself as "Jamie Dobbs." However, in his videotaped confession, the appellant denied making that call. "During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." *Rutledge v. State*, 523 So.2d 1087, 1100 (Ala.Cr.App.1987) (citation omitted), rev'd on other grounds, 523 So.2d 1118 (Ala.1988). Further, as we previously stated, the prosecutor may argue to impeach the defense's evidence. *Stewart v. State*, 601 So.2d at 506.

*Maples v. State*, 758 So.2d at 56.

Maples merely cites one Supreme Court case and two Eleventh Circuit cases for the "basic rule" that a prosecutor should not give his opinion. He offers no further explanation of the claim. In light of the pleading requirements of § 2254 and the reasoning of the Alabama Court of Criminal Appeals, Maples has failed to show that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts. This claim is due to be denied.

**iv.**     The prosecutor improperly speculated about
what punishment the victim's family wanted.

Maples declares the prosecutor improperly introduced views of the victim's family concerning the proper punishment and improperly compared his rights with the rights to those of the victim. [Doc. #24, at 107-08]. In his argument, the prosecutor referred to the defense argument as being one which asked the jury to think about how awful it would be for Maples to be in the penitentiary awaiting his death or living there the rest of his life, and then stated, "I'll bet you this; I'll bet you Mr. Terry doesn't think it's a tougher punishment than death. Don't you think the Terrys would be tickled to go to the penitentiary this weekend and visit their son?" *Id.* at 107 (quoting (R. 3303)).

Maples alleges the foregoing argument was improper because "the state cannot introduce evidence about the view of the victim's family on the appropriate punishment," nor can it "contrast[ Maples's] constitutional rights with those of the victim." *Id.* at 107-08 (citing *Payne v. Tennessee*, 501 U.S. 808, [830] n. 2 (1991); *Brooks v. Kemp*, 762 F.2d 1383, 1411 (11th Cir. 1985)).

On direct appeal, the Alabama Court of Criminal Appeals found that the prosecutor's comments were to rebut defense counsel's argument "that, because [Maples] had no criminal history

31

and was young, imprisonment for life without the possibility of parole was a much harsher sentence

than death." *Maples v. State*, 758 So.2d at 56-57.  Moreover, the court found that

> [t]he prosecutor did not argue or imply that Mr. Terry wanted [Maples] to be
> sentenced to death; rather he argued that Mr. Terry would much rather have his son
> be alive and in prison than dead.  The prosecutor's argument and example was in
> response to defense counsel's lengthy argument that the appellant did not deserve
> death and that life imprisonment without parole was a harsher punishment than death.
> "The fact that an argument has emotional overtones does not independently indict it
> as improper, and the propriety of argument rests primarily in the relation of its
> content to issues relevant to the ... jury's concern." *Rutledge v. State*, 523 So.2d
> 1087, 1101 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988).

*Id.*

In considering Maples's claim, the court has carefully examined  *Payne v. Tennessee*, 501

U.S. 808, 830 n.2 (1991) and *Brooks v. Kemp*, 762 F.2d 1383, 1411 (11th Cir. 1985)).  Neither case

provides support for the conclusion that the state court's decision is inadequate under § 2254(d).  In

fact, in *Brooks v. Kemp*, the Eleventh Circuit found that a similar prosecutor's ambiguous argument

was not improper noting that "[t]he Supreme Court has directed, . . .that 'a court should not lightly

infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a

jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging

interpretations." *Brooks v. Kemp,* 762 F.2d 1410 -11 (quoting *Donnelly v. DeChristoforo*, 416 U.S.

[637], 647 [1974]).

Maples has failed to show that the state court's decision was contrary to or an unreasonable

interpretation of federal law, or an unreasonable interpretation of the facts.  This claim is due to be

denied.

> **v.**     The prosecutor argued it was more valuable
> for Maples to lose his life than remain in prison.

Maples declares the prosecutor made a "macabre" argument that improperly "minimiz[ed] the awesome sentencing decision jurors are required to make at a capital case, and . . . undermine[d] the gravity of their decision[:] that Maples "was not going to accomplish anything for anybody anywhere in the penitentiary for the rest of his life." *Id.* at 108-109.  In short, Maples alleges that the prosecutor improperly encouraged the jury to avoid its responsibility by taking an "easier," "less difficult," "socially efficient" route by recommending death.  *Id.* at 109 (citing *Caldwell v. Mississippi*, 472 U.S. 320, 322, and 341 (1985).

The Alabama Court of Criminal Appeals characterized Maples's presentation of this claim on direct appeal in the following manner: "[Maples] claims that the prosecutor improperly argued that death would be a more appropriate sentence than life imprisonment without the possibility of parole because the appellant's death would act as a deterrent for others.  He also claims the prosecutor improperly argued that the jury should consider the death penalty as a great deterrent." *Maples v. State*, 758 So.2d at 57.

The appellate court examined the arguments of defense counsel and the prosecutor, and made the following findings of fact and conclusions of law:

> [a]fter defense counsel strongly urged the jury to impose life imprisonment without
> the possibility of parole rather than death, the prosecutor rebutted with the following:
>
>> "I submit to you if the death penalty is given in this case, and one
>> person, just one, any time soon or somebody doesn't kill someone
>> else, just one, save one life, then their deaths won't be completely in
>> vain.  I also submit to you, and this is an ugly thing to say and it's
>> ugly to say in front of his parents, but his life in this case is much
>> more valuable to lose than for him to keep.  He's not going to
>> accomplish anything for anybody anywhere in the penitentiary for the

> rest of his life.  His death might save one person somewhere
> sometime.  If you believe in the death penalty, in my opinion you
> have to believe it deters other criminal conduct, at least sometimes.
> From time to time as a society, and this is obviously not often and
> easily done, but from time to time there is a time when somebody has
> to pay the price with the supreme penalty; and in this case, I submit
> to you this is one of them."

(R. 3304-05) (emphasis by Maples, as acknowledged by appellate court, omitted)).

The appellant claims that the foregoing comments improperly implied to the jury that
death was the only punishment that would deter others from committing similar
crimes and that, therefore, the comments improperly influenced the jury in making
its sentence recommendation.  This argument is simply without merit.  In capital
cases, "the prosecutor and defense counsel shall be given an opportunity to argue for
and against respectively the imposition of the death penalty in the individual case."
*Beck v. State*, 396 So.2d 645, 663 (Ala.1980), rev'd on other grounds, 485 So.2d
1201 (Ala.1984). The prosecutor's comments in favor of the death penalty "'did not
imply that the defendant himself would commit illegal acts in the future, nor did the
prosecutor seek by inflammatory appeal to arouse in the jurors a personal hostility
towards, or fear of, the defendant.  Accordingly, the prosecutor's comments properly
argued the necessity of law enforcement as a deterrent to crime and as a protection
of society.'"  *Kuenzel v. State*, 577 So.2d 474, 503-04 (Ala.Cr.App.1990), aff'd, 577
So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

*Id.*

After a review of Maples's claims and analysis of the state appellate court, it is clear that the

prosecutor's comments were not offered to encourage the jury to recommend death as the easier

punishment.  When viewed in context, the prosecutor was obviously and properly arguing that the

death penalty for Maples could be a deterrent to others.  *U.S. v. Chandler*, 906 F.2d 1073, 195

(1993).  Maples has failed to show that the state court's decision was contrary to or an unreasonable

interpretation.  This claim is due to be denied.

34

> vi.     The prosecutor misstated the law during closing argument.

Maples asserts that the prosecutor misstated Alabama law during his closing argument because he "told the jury that intoxication was not a defense to the crime." [Doc. #24, at 109] (citing (R. 3290)); *Ashley v. State*, 651 So.2d 1096 (Ala. Crim. App. 1994); *Fletcher v. State*, 621 So.2d 1010 (Ala. Crim. App. 1993). The prosecutor also asked the jury to reject Maples's mitigating evidence because it amounted to a "'devil made me do it'" defense, thereby "urg[ing] the jury to reject the defense's mental health mitigating circumstances because" Maples had not entered a plea of not guilty by reason of insanity. [Doc. #24, at 110] (citing (R. 3290)). Other than a general assertion that Alabama law has "radically different standards" for legal insanity when the same mental health evidence is offered as a mitigating factor, Maples makes no attempt to provide constitutional legal support for the claim. *Id.* at 111.

Maples contends the prosecutor improperly argued that being twenty one (21) years of age was not a mitigating circumstance in Maples's case although he would concede that age may have been a factor if the defendant had been fourteen years old. *Id.* at 111 (citing (R. 3254)). Maples argues the prosecutor therefore "fabricated the law of Alabama, and contrasts the fabricated law - and the imaginary capital punishment of a fourteen year old - with what he perceives to be the jury's proper course of action in this case: rejection of Mr. Maples's age as a mitigating circumstance." *Id.* Maples also contends it was improper because the prosecutor insinuated that "the only type of situation in which age" could be a mitigating circumstance was under the fourteen (14) year old child standard. *Id.* The only legal support for this argument is a citation to *Thompson v. Oklahoma*, 487 U.S. 815 (1988), as standing for the proposition that the "Eighth Amendment prohibits imposition of death sentence on juveniles less than the age of sixteen." *Id.*

On direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law with regard to the foregoing claims.

> After thoroughly reviewing the prosecutor's closing and rebuttal arguments, we find that the prosecutor's comments regarding the mitigating evidence of age, voluntary intoxication, and mental impairment were made in response to defense counsel's argument that the jury should consider the appellant's youthful age and the fact that the appellant, according to the psychologist's testimony, suffered from diminished capacity, resulting from his consumption of alcohol and drugs at the time of the murders, as mitigating circumstances. Pursuant to § 13A-5-45(g), Ala.Code 1975, the State has the burden of refuting mitigating circumstances offered by the defense. A prosecutor has a right to argue the weight of the evidence presented and to impeach the defense's evidence. *Taylor v. State*, 666 So.2d 36, 65 (Ala.Cr.App.), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Further, a prosecutor may legitimately argue that intoxication should not be considered a mitigating circumstance. *Arthur v. State*, 711 So.2d 1031 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997); *Bankhead v. State*, 585 So.2d at 108. Therefore, the prosecutor's comments regarding the defense's evidence of mitigating circumstances were not improper. Moreover, the trial court thoroughly instructed the jury to consider the appellant's age, past alcohol and drug use, and mental impairment as mitigating circumstances and to weigh all of the mitigating circumstances against the aggravating circumstances. (R. 3321, 3326-30.)

*Maples v. State*, 758 So.2d at 54.

Maples recitation of *Thompson v. Oklahoma*, 487 U.S. 815 (1988), standing alone in the face of the detailed opinion written by the Alabama Court of Criminal Appeals, fails to establish that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts. This claim is due to be denied.

In a separate claim of prosecutorial misconduct, Maples declares the prosecutor erroneously told the jury "that they could consider the 'particularly violent nature of these murders' as going to a heinous, atrocious and cruel aggravating factor, when this factor was not at issue in his case. [Doc. #24, at 110], (citing *Espinosa v. Florida*, 505 U.S. 1079 (1992) (improper to weigh invalid

aggravating factor during sentencing consideration)).  When examined on direct appeal, the Alabama

Court of Criminal Appeals found no prejudicial error in the remark because

> [t]he trial court instructed the jury that the only aggravating circumstance it was to
> consider in this case was that the capital offense was committed while the appellant
> was engaged in the commission of a robbery. (R. 3323, 3331.)  It further instructed
> the jury that the State had to prove the aggravating circumstance beyond a reasonable
> doubt, and the jury was to consider evidence relating only to the one aggravating
> factor it had been instructed by the court to consider.

*Maples v. State*, 758 So.2d at 55.

This court has examined the record, and found that the prosecutor did not encourage the jury

to improperly consider an aggravating factor that was not properly before it.  The prosecutor was

specifically illustrating that the execution style nature of the murders was evidence of intent and

deliberation as opposed to accident or happenstance.  (R. 3297-98).  Maples has failed to show that

the state court's decision was contrary to or an unreasonable interpretation of federal law, or an

unreasonable interpretation of the facts.  This claim is due to be denied.

Next, Maples declares "the prosecutor improperly accused his defense counsel of lying when

counsel attempted to present mitigating evidence before the jury." [Doc. #24, at 111].  Maples's sole

basis for this claim arises from the fact that the prosecution openly conceded before the jury that

Maples had no prior criminal history, stating, "that we admit [that fact] because it's the truth . . ."

but then subsequently argued against age as a mitigating circumstance.  *Id*.  From this premise,

Maples argues that the prosecutor was instructing the jury that, while it was true Maples had no

criminal history, the remaining mitigating circumstances were lies.  *Id.* at 112.

Maples offers no federal authority to support this general and conclusory claim.  Again, this

court is not obligated to "consider unsupported and undeveloped issues."  *Moore v. Gibson*, 195

F.3d 1152, 1180 n. 17 (10th Cir.1999), cert. denied, 530 U.S. 1208 (2000).  Maples has failed to show that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts in light of the evidence.  This claim is due to be denied.

Maples contends the prosecutor misstated the law on proper weighing of aggravating and mitigating circumstances during closing argument.  [Doc. #24, at 12].  Specifically, Maples contends the prosecutor informed the jury "that the mitigating circumstances 'will never' outweigh the aggravating circumstances and that death is therefore the appropriate sentence."  *Id.* (quoting (R. 3255)).   Maples contends this statement is actually inconsistent with Alabama law, because, in Alabama, "determination of sentence depends on whether aggravating circumstances outweigh mitigating circumstances."  *Id.* (citing (*Ex parte Stewart*, 659 So. 2d 122, 125 (Ala. 1993), *Ex parte Ford*, 515 So. 2d 48 (Ala. 1987), and *Williams v. State*, 601 So. 2d 1062, 1082-83 (Ala. Crim. App. 1991)).

The Alabama Court of Criminal Appeals examined this claim and found no prejudicial error to Maples because

> the trial court repeatedly instructed the jury that comments by the attorneys were not evidence and that it would be instructing the jury on the law.  Further, the trial court explained to the jury in great detail the process of weighing the mitigating circumstances against the aggravating circumstances and instructed the jury that it was to consider evidence of both mitigating and aggravating circumstances in making its recommendation.

*Maples v. State*, 758 So.2d at 55.

Maples offers no authority or argument to support this general and conclusory claim.  Again, this court is under no obligation to "consider unsupported and undeveloped issues."   *Moore v. Gibson*, 195 F.3d 1152, 1180 n. 17 (10th Cir.1999), cert. denied, 530 U.S. 1208 (2000).  Since

Maples has failed to show that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts. This claim is due to be denied.

Next, Maples asserts that the prosecutor erroneously told jurors "only people who supported the death penalty could be on the jury" in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968), *Ex parte Whisenhant v. State,* 555 So. 2d 235 (Ala. App. 1989), and *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)). [Doc. #24, at 113, citing R. 3306]. Maples then extrapolates that the jurors could have only interpreted the prosecutor's statement as an instruction that they must impose the death penalty. *Id.,* citing *United States v. Young*, 470 U.S. 1, 6, 8-9 (1985) and *United States v. Phillips*, 664 F.2d 971, 1029-30, n. 90 (5th Cir. 1981).

The Alabama Court of Criminal Appeals found neither improper argument nor error because review of the record showed that "the prosecutor did not [even] make this statement . . . [and that he] was simply arguing that the jurors had to be able to consider death as punishment to sit on the jury in a capital case." *Maples v. State*, 758 So.2d at 5 (citing (R. 3306-07)).

This court has independently examined the record and finds that the appellate court's depiction of historical fact underlying this claim is correct. Maples has failed to show that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts. This claim is due to be denied.

Maples also contends the "prosecutor improperly informed and intimidated the jury, before their penalty phase deliberations, by telling the jury that they had already found an aggravating circumstance because they found Maples guilty of murder during the course of a robbery." [Doc.

#24, at 113-14] (citing (R. 3252)).[17/]   Maples raises no legal argument in support of his position. Since Maples has failed to show that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts, this claim is due to be denied.

**vii.**    The prosecutor accused Maples of lying.

Finally, Maples contends the prosecutor improperly informed the jury they should reject portions of his mitigating evidence because Maples was a liar.  According to Maples the prosecutor said to reject the psychiatrist's testimony "on the basis that [Maples] did not talk about his drug consumption," when questioned by the police, and because the psychologist mixed up his notes. [Doc. #24, at 114].

The Alabama Court of Criminal Appeals examined this claim and found,

> The foregoing was proper argument by the prosecutor regarding the inconsistencies in the appellant's videotaped confession and the psychologist's testimony. The psychologist testified that the appellant told him he was intoxicated and on drugs on the night of the murders, but the appellant denied that in his videotaped confession. . . .  During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." *Rutledge v. State*, 523 So.2d 1087, 1100 (Ala.Cr.App.1987) (citation omitted), rev'd on other grounds, 523 So.2d 1118 (Ala.1988).  Further, as we previously stated, the prosecutor may argue to impeach the defense's evidence. *Stewart v. State*, 601 So.2d at 506.

*Maples v. State*, 758 So.2d at 56.

Maples offers no authority or argument in support of the foregoing general and conclusory claims.  Maples has failed to show that the state court's decision was contrary to or an unreasonable

---

[17/]      The Alabama Court of Criminal Appeals did not address this claim.

interpretation of federal law, or an unreasonable interpretation of the facts.  This claim is due to be denied.

This court has carefully reviewed Maples's allegations concerning the penalty phase comments made by the prosecutor.  "[P]rosecutorial arguments will not warrant habeas corpus relief unless they meet two requirements.  First, they must have encouraged the jury to take into account matters that are not legitimate sentencing considerations.  *Brooks* [*v. Kemp*, 762 F.1383, 1403 (11th Cir. 1985)].  Second, they must have been so prejudicial, when viewed in the context of the entire sentencing, as to have rendered that proceeding 'fundamentally unfair.'"  *Johnson v. Wainwright*, 778 F.2d 623, 630 (11th Cir. 1985) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).  Maples has failed to show that any of the comments, individually or collectively, violated this standard.

> **B.**    Prosecutorial misconduct during the guilt phase of the trial violated Maples's right to due process of law and requires a new trial.

> **i**.    The prosecutor inserted his own views on Maples's guilt.

Maples contends the prosecutor improperly inserted his own views when he told the jury, "'The truth is in this case that Corey Maples is a murderer; a capital murderer.'"  [Doc. #24, a 114] (citing (R. 2907)).    The prosecutor also stated,   "'we [the prosecution] believe, based on the evidence that you have heard, that is exactly what this is, is a death penalty case.'"  *Id.* (citing (R. 2950)).  He contends that in addition to injecting his own views into the case, the prosecutor engaged in improper vouching of the case as a death penalty case.  *Id.* at 114-15 (citing *United States v. Dack*, 747 F.2d 1172, 1176, n.5 (7th Cir. 1984).  Maples argues that

[t]he prosecutor, as a "public official occupying an exalted station," has the unique ability to "imping[e] on the jury's function." *United States v. Morris*, 568 F.2d 396, 401-02 (5th Cir. 1978); *see also United States v. McKoy*, 771 F.2d 1207, 1210-11 (9th Cir. 1985) ("The rule that a prosecutor may not express his personal opinion of the defendant's guilt or his belief in the credibility of the witnesses is firmly established.").

As a result of this exalted position, "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. at 88. *Walker v. Davis*, 840 F.2d 834, 838 (11th Cir. 1988) ("arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury").

In this case, the prosecutor's arguments were particularly pernicious, for the jury had been informed, through the erroneous actions of the trial court, that other evidence existed to which they were not privy.[18/]

*Id.*

Maples contends the argument was improper because the prosecutor impermissibly "raised the specter of punishment during the guilt stage, by calling it a "'death penalty'" case. *Id.* (citing *United States v. Young*, 470 U.S. 1, 8-9 (1985). On direct appeal, the Alabama Court of Criminal Appeals found that the prosecutor's comments were improper, but not reversible error. *Maples v. State*, 758 So.2d at 58. The court wrote,

> "'While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence.'" *Allen v. State*, 659 So.2d 135, 139 (Ala.Cr.App.1994) (quoting *Sams v. State*, 506 So.2d 1027, 1029 (Ala.1986))." . . . . Because the prosecutor's comments were inferences drawn from the evidence, we do not find that the appellant was prejudiced by these comments.

*Id.*

---

[18/]     This is presented later as a separate claim, and it too, is without merit. *See supra*, Claim XIX.

This court has carefully reviewed the prosecutor's comments and finds that the prosecutor did inject his own opinions regarding guilt into his argument. Improper "remarks made in the course of a prosecutor's closing argument will warrant reversal if the challenged remarks are . . . prejudicial to a substantial right of the defendant." *U.S. v. Boyd*, 131 F.3d 951, 955 (11th Cir. 1997) (other citations omitted). *See United States v. Blakey*, 14 F.3d 1557, 1560 (11th Cir.1994). Moreover, said

> "[i]mproper statements [only] prejudice the defendant when there is "a reasonable probability that, but for the prosecutor's offending remarks, the outcome of the ... [proceeding] would have been different. [A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks and citation omitted).

*U.S. v. Baker*, 432 F.3d 1189, 1252 (11th Cir. 2005). As aptly stated by the Supreme Court,

> It "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 699 F.2d, at 1036. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

It is an understatement that the evidence against Maples was overwhelming. Many of the prosecutor's comments, while posited as an expression of personal opinion, were ultimately based upon inferences derived from the evidence presented at trial. That is not true, however, of the prosecutor's interjection of penalty issues during the guilt phase of the trial. Maples identifies only a single such comment. In light of the weight of the evidence against Maples, the isolated comment about the death penalty does not establish a reasonable probability that the jury would not have found Maples guilty of capital murder had the prosecutor not made the comments.

Maples has failed to show that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts in light of the evidence before it.  This claim is due to be denied.

**ii.**     The prosecutor urged the jury to send a message.

Maples contends the prosecutor improperly argued for the jury "to send 'a message' with their guilty verdict in this case: 'return a verdict of guilty and send that message back.'" [Doc. #24, at 116] (citing (R. 2907)).   According to Maples, such a statement was improper because "[t]he jury's verdict cannot be influenced by considerations wholly irrelevant to Mr. Maples's guilt or innocence." *Id.* (citing *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976) and *Tucker v. Zant*, 724 F.2d 882, 888 (11th Cir. 1984)).   The cited authority does not explain the claims.  *Woodson* and *Tucker* found constitutional prosecutorial comments although emotionally charged so long as the comments relate to the charged crime and the evidence and the comments do not appear to be an attempt to goad the jury into a finding of guilt based solely on emotion or fear as opposed to the evidence.

When viewed in context, the Alabama Court of Criminal Appeals found the prosecutor did not suggest the jury "should consider the impact of its verdict on the community[,]" but was instead properly "urging the jury to protect the public and deter others from committing similar offenses." *Maples v. State*, 758 So.22d at 59, (quoting (R. 2907) ("'If you look at the evidence, there is but one verdict for both counts, and that is that he is guilty.  Think back to that night of July 7 and the early morning hours of July 8, 1995, and return a verdict of guilty and send that message back.'")).

The Alabama Court of Criminal Appeals' characterization of the comment was correct.  The prosecutor did not urge the jury to convict Maples in order to send a message to the community.  He

44

urged the jury to convict Maples because Maples was guilty. The comment was proper. *U.S. v. Diaz*, 190 F.3d 1247, 1254 (11th Cir. 1999). Maples has failed to show that the state court's decision was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts. This claim is due to be denied.

**iii.**    The prosecutor inserted his own
views of the facts of the case.

**iv.**    The prosecutor speculated about
events for which there was no evidence.

Maples declares the prosecutor improperly used his "'exalted station'" when he told the jury that he "believed that Mr. Maples was guilty, and that this case was as strong as any he had tried." [Doc. #24, at117] (citing *United States v. Morris*, 568 F.2d 396 (5th Cir. 1978), *Berger v. United States*, 295 U.S. at 88; *Hall v. United States*, 419 F.2d 582, 84 (5th Cir. 1969)). Maples argues that additional statements made by the prosecutor were also highly improper. For instance, the prosecutor stated, "'I don't think there is any question Mr. Terry was shot first.'" *Id.* (citing (R. 2959)). The prosecutor also surmised, "'I submit to you in this case we've proven the case to you beyond a reasonable doubt; and if we haven't, I don't know whether we ever would in any case.'" *Id.* at 117-18, (citing (R. 2963); *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *McGautha v. California*, 402 U.S. 183, 208 (1971)). Maples argues that the prosecutor opined, without basis, that there was "'no doubt'" Maples checked the pulse of the victims to make sure they were dead, thus inferring Maples's intent to kill. *Id.* at 118 (citing (R. 2903), *United States v. Young*, 470 U.S. at 17; *Brooks v. Kemp*, 762 F.2d 1383, 1399 (11th Cir. 1985)).

Maples also alleges the prosecutor argued "facts" that were not in evidence in an effort to supply the requisite element of intent, when he stated that "Mr. Maples intentionally cocked the gun

45

before shooting it.  [Doc. #24, at 119] (citing (R. 2965)).  Maples declares that this argument is highly improper because "fundamental due process requirements necessitate that a defendant not be sentenced to death on the basis of information which he or she had no opportunity to explain or deny."  *Id.* (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974); *United States v. Warren*, 550 F.2d 219, 228, rev'd on other grounds, 578 F.2d 1058 (5th Cir. 1977); *Skipper v. South Carolina*, 476 U.S. 1 (1986)(other citations omitted)).

The Alabama Court of Criminal Appeals examined each of the cited statements, and agreed the prosecutor's personal opinions regarding guilt were improper.  *Maples v. State*, 758 So.2d at 58.  Nevertheless, the court also found no reversible error on the grounds that the arguments were an expression of opinion concerning inferences, deductions and conclusions drawn from the evidence.  *Id.* (citations omitted).

As stated earlier,

[i]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Darden v. Wainwright*, 699 F.2d, at 1036.  The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

In light of the weight of the evidence against Maples, there is no reasonable probability that the jury would not have found Maples guilty of capital murder had the prosecutor not made the comments about which Maples complains.  These claims are due to be denied.

46

  **v.**  The prosecutor improperly solicited
       hearsay and incompetent testimony.

  **vi.**  The prosecutor improperly led
       witnesses on direct examination.

  **vii.**  The prosecutor vouched for the
       veracity of his own witnesses.

Maples declares his right to confrontation and cross-examination, as guaranteed to him by

*Pointer v. Texas*, 380 U.S. 400, 405 (1965), were violated because

> the prosecutor in this case elicited hearsay on numerous occasions. (R. 1624, 1639,
> 1828, 1874, 1931, 1933, 1956, 1957, 1969, 2059, 2545, 2979.) Although the defense
> objections to some of these attempts by the prosecutor to elicit hearsay were
> sustained, the jury nonetheless heard a case which was colored by incompetent and
> inadmissible evidence. For example, the prosecutor elicited hearsay testimony about
> what one witness said upon hearing an audiotape purportedly containing Mr.
> Maples's voice. (R. 2078.)
>
> On another occasion, the prosecutor elicited testimony from a witness that Mr.
> Maples called the crime scene after Robinson's body had been discovered. (R. 1526-
> 1529.) This testimony was about events that the witness had not seen, and was based
> entirely on hearsay evidence. Although defense objections were sustained to some
> of the testimony, the prosecutor persisted, and eventually succeeded in eliciting the
> improper and inept hearsay testimony. (R. 1529.) This method of presenting a case,
> through repeated attempts to elicit hearsay testimony, have "no place in the
> administration of justice." *United States v. Young*, 470 U.S. at 1, 9, 26.

*Id.* at 120.

Maples also alleges the prosecutor "led witnesses in order to elicit prejudicial and

inadmissible evidence that the jury would not have heard but for the impermissible leading." *Id.* at

121(citing (R. 2338, 2347, 2361, 2369). *Stine v. Marathon Oil Co.*, 976 F.2d 254, 266 (5th Cir.

1992) and *Skipper v. South Carolina*, 476 U.S. at 5, n. 1 [1986]).

Finally, Maples complains the prosecution improperly vouched for one witness, by stating the witness, "tried to be truthful." *Id.* at 121, citing (R. 2953) and *Gradsky v. United States*, 373 F.2d 706, 710 (5th Cir. 1967).

Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted)). The petitioner must specify the grounds for relief available to the petitioner, state the facts supporting each ground, and state the relief requested. 28 U.S.C. § 2254 Rule 2(c)(1)(2)(3). A "general reference to the transcripts, case records and brief on appeal patently fails to comply with Rule 2(c)." *Phillips v. Dormire*, 2006 WL 744387, *1, (E.D. Missouri 2006) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990)). Maples has simply cited portions of the record in support of subclaims v and vi. Such a reference is insufficient to satisfy the heightened pleading requirements of 2254(d). Moreover, he has not alleged that he was prejudiced by the two piecemeal factual allegations he proffers in support of these claims. The claims are due to be denied.

With regard to subclaim vii, the Alabama Court of Criminal Appeals found that

> Although the appellant argues that the prosecutor vouched for the credibility of the State's witnesses, he refers only to one instance where the prosecutor said during rebuttal, "I thought [the witness] tried to be truthful." (R. 2953.) When read in context, the prosecutor's comment was in response to defense counsel's attack on the witness's credibility during closing argument. The prosecutor clearly stated to the jurors that it was their duty to consider how the witness came across on the stand and make their own decision about his credibility. (R. 2953.)

*Maples v. State*, 758 So.2d at 59.

This court has reviewed *Gradsky v. United States*, 373 F.2d 706, 710 (5th Cir. 1967), in light of Maples's petition. In *Gradsky*, the prosecutor literally vouched for the state witnesses by

informing the jury the state would not have used the individuals as witnesses were they not truthful people. The prosecutors' comments in this case to the level of those condemned in *Gradsky*. The factual findings of the Alabama appellate court are presumed to be correct. Maples has proffered no evidence to overcome that presumption. Accordingly, Maples has not shown that the state court's decision was contrary to or an unreasonable application of, clearly established federal law, nor does he show the decision was based on an unreasonable interpretation of the facts in light of the evidence.

> **viii**. The prosecutor improperly introduced
> victim impact evidence.

Maples declares that Mr. Terry's father was unnecessarily introduced during voir dire, Mr. Terry sat at the prosecution table during trial and the court introduced the victim's family before the pathologist[19] testified at trial. [Doc. #24, at 122] (citing (R. 475, 748, 930, 1153, 2277)). Maples contends these actions constituted improper victim impact evidence and unduly inflamed the jury. *Id.* (citing *Payne v. Tennessee*, 501 U.S. 808, [836] n.2 (1991)).

The Alabama Court of Criminal Appeals found the introductions of Mr. Terry did not unduly influence the jury because, pursuant to Alabama law, a family member has the right to sit at counsel table. *Maples v. State*, 758 So.2d at 59-60. Additionally, Mr. Terry was only "acknowledged during voir dire examination so the prosecutor and defense could determine whether any of the prospective jurors knew him and whether that would influence their ability to render an impartial verdict in the case." *Id.*

---

[19]     Maples did not present his claim concerning the pathologist on direct appeal. (C. Tab. 36, at 122). Thus, he raises the claim for the first time in this petition. His failure to first address the claim in state court necessarily means it is procedurally defaulted.

The court fails to derive how introduction of the victim's family, under the circumstances illustrated by Maples, could unduly prejudice and inflame the jury.  This claim is without merit.

ix.     Numerous other instances of prosecutorial
misconduct denied Maples a fair trial.

In this subsection, Maples outlines a laundry list of vague, general and conclusory allegations related to instances of prosecutorial misconduct.  [Doc. #24, at 122-124].  The burden of proof is on the habeas petitioner to establish a factual basis for relief.  *Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir. 1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984).  Consequently, a petitioner must provide substantial evidence to meet his burden of proof to show why federal post-conviction relief should be awarded.  *Douglas v. Wainwright*, 714 F.2d 1532, reh'g denied, 719 F.2d 406 (11th Cir. 1983), vacated on other grounds, 468 U.S. 1206, 104 S.Ct 3575, 82 L.Ed.2d 874 (1984) and 468 U.S. 1212, 104 S.Ct 3580, 82 L.Ed.2d 879 (1984), *on remand* 739 F.2d 531 (11th Cir. 1984).  Petitioner has the burden of establishing sufficient facts to warrant a finding of a denial of his constitutional rights.  *Tyler v. Beto*, 391 F.2d 993, 995 (5th Cir. 1968).  That burden is to demonstrate at least *prima facie* evidence establishing the alleged constitutional violation.

Prosecutorial misconduct results in a new trial only when the arguments are improper and substantially prejudicial.  *U.S. v. Hernandez,* 145 F.3d 1433, 1438 (11th Cir.1998).  The comments Maples complains of during the guilt phase, when viewed in the context of the trial as a whole, do not satisfy this standard.   These claims are due to be denied.

**Claim VIII.**     The trial court unconstitutionally admitted [autopsy] photographs and allowed a slide show for no purpose but to inflame the jury.  [Doc. #24, at 125-28].

50

Maples asserts "that color slides [two photographs] of the autopsies of Terry and Robinson were shown to the jury," and were admitted into evidence over numerous objections by defense counsel. *Id.* at 125-6 (citing (R. 2271, 2291)).  Maples contends the photos served no purpose but to arouse and inflame the jury, and the prejudicial nature of the pictures outweighed any probative value, particularly when the jury was already prone to convict him.  *Id.*

> **A.** Photographs were admitted that served no purpose
> but to inflame the passion of the jury.  *Id.* at 126.

Maples declares "some of the [prejudicial] photographs were close-ups of the victims, others revealed unrelated prior offenses, and many were duplicative and entirely lacked probative value. *Id.* at 126.  Maples also complains that some of the photographs were so graphic and gruesome that the district attorney conceded the jury may not want to view them before lunch, that several of the photographs depicted the victims after the autopsy had begun (wherein the body had been intubated, shaved, and washed), and that the State made a comment at trial that "the jury probably could not tell much from some of the photographs.  *Id.* at 126-27 (citing (R. 1711, 1735)).  Finally, Maples contends the "photographs were unnecessary, for the crime scene and autopsy were described in detail by the medical examiner, police officers, and the pathologist."  *Id.* at 127 (citing (R. 2274-2323, 1531-1542, 1635-1648, 1681-1690)).

As legal support for his claim in this petition, Maples argues the "prejudicial and inflammatory photographs lessen the 'reliability in the determination that death is the appropriate punishment in the specific case.'"  *Id.* (quoting *Woodson v. North Carolina*, 428 U.S. at 305,  accord, *Gardner v. Florida*, 430 U.S. 349, 363 (1977); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Beck v. Alabama*, 447 U.S. 625, 638, n. 13 (1980)).

       **B.**      The courtroom slideshow served no purpose other
                  than to inflame the jury.  [Doc. #24, at 127].

Maples declares "the state transformed some photographs into slides, and projected the images onto a screen. (R. 2278-2299.)  This transformed each inflammatory 8" x 10" photo into a 6' x 8' gruesome spectacle. Such enlargement and projection served no rational purpose, and only created an unfair prejudice against Mr. Maples." *Id.*  As legal support for this contention, Maples cites a number of jurisdictions not including Alabama.

In reviewing these claims on direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law.

> [Maples] specifically challenged five pre-autopsy photographs that were shown to the jury by way of a slide show.  As to the remaining photographs, he makes only generalizations and does not specify which photographs he finds objectionable. . . . .
>
> In reviewing these photographs and slides, we are guided by the following principles:
>
>> "'Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case.  Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Finally photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.'"
>
> *Gaddy v. State*, 698 So.2d 1100, 1148 (Ala.Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997) (quoting *Ex parte Siebert*, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)).
>
> . . . .
>
> In this case, the autopsy slides to which the appellant refers do not give any indication that the autopsy examination had been performed yet on the victims . . .

. [O]ne slide [does] show[] that Stacy Terry had been intubated by rescue workers who had attempted to revive him when they found his body.  Nonetheless, this photograph is neither unnecessarily gruesome nor gory.  Finally, the slides were relevant because they showed the location and severity of the victims' wounds.
. . . .
We have reviewed the remaining photographs that were introduced at trial, and we do not find that they were unduly prejudicial to the appellant.  Many reflect the crime scene and locations where the victims' bodies were found, Terry's vehicle, the mobile home where the appellant lived, and the motel room where the appellant resided before he was arrested.   [Maples] has not shown that the admission of any of the photographs affected or probably affected one of his substantial rights.

*Maples v. State*, 758 So.2d at 76-78.

Maples's complaints and supporting legal argument concerning the photographs and slides fall palpably short of stating a claim that would convince this court that the state court's decision is either contrary to or involved an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.  The laundry list of Supreme Court citations listed by Maples are simply irrelevant to his claim.  The cited Supreme Court decisions which abolished mandatory death penalties for certain offenses, and directed states to create and utilize procedures to guarantee individualized sentencing considerations in capital cases have nothing to do with the issue he purports to raise.  Maples does not proffer federal constitutional law from any source which is related to this claim.  This claim is due to be denied.

    **Claim IX.**    The trial court erred when it refused to remove two venire members who automatically would impose a death sentence upon conviction of capital murder.  [Doc. #24, at 128-135].

Maples contends there were two jurors who the trial court refused to strike for cause, even though said jurors unambiguously stated they "would automatically impose the death penalty if Mr. Maples was convicted of capital murder."  *Id.* at 128.  As such, Maples was forced to use his

peremptory strikes to remove these veniremembers himself. *Id.* As legal support for his claim, Maples cites *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992) *Adams v. Texas*, 448 U.S. 38, 45 (1980); see also *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988). *Id.* Maples claim is without merit. In *Spivey v. Head*, 207 F.3d 1263, 1273 (11th Cir. 2000), the Eleventh Circuit wrote,

> The right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial 'indifferent' jurors. *Irvin v. Dowd*, 366 U. S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); *see Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988) ("It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury."). Claims that the jury was not impartial must focus on the jurors who actually sat. *See Ross*, 487 U. S. at 86, 108 S. Ct. 2273; *Heath v. Jones*, 941 F.2d 1126, 1133 (11th Cir.1991) (holding that habeas petitioner can only raise the trial court's denials of challenges for cause of those venire members who eventually sit on the jury).[20]

As neither of the venirepersons about whom Maples complains sat on his jury, it is immaterial for federal constitutional purposes that Maples used his peremptory strikes to remove these individuals. Maples's claim is due to be denied.

---

[20]   This ruling is consistent with *Morgan v. Illinois*, one of the cases cited by Maples as support for his position. In *Morgan*, the Supreme Court wrote,

> Thereafter, in *Ross v. Oklahoma*, *supra*, a state trial court refused to remove for cause a juror who declared he would vote to impose death automatically if the jury found the defendant guilty. That juror, however, was removed by the defendant's use of a peremptory challenge, and for that reason the death sentence could be affirmed. But in the course of reaching this result, we announced our considered view that because the Constitution guarantees a defendant on trial for his life the right to an impartial jury, 487 U.S., at 85, 108 S.Ct., at 2276-2277, the trial court's failure to remove the juror for cause was constitutional error under the standard enunciated in *Witt*. We emphasized that "[h]ad [this juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove [the juror] for cause, the sentence would have to be overturned." 487 U.S., at 85, 108 S.Ct., at 2277 (citing *Adams*, *supra*).

504 U.S. at 728-29.

      **Claim X.**     The trial court improperly excluded jurors who expressed
reservations about the death penalty.  [Doc. #24, at 135-36].

Maples contends that he was deprived of a representative and impartial jury because
venirepersons Aycock, Bundy, Hensley and Rodgers were "excused in part for their views on the
death penalty." *Id.* at 135, citing R. 461, 540, 666, 671, 756, 902, 919, and *Witherspoon v. Illinois*,
391 U.S. 510, 522-23 (1968).  He additionally contends the exclusion of the venirepersons violated
his equal protection rights pursuant to *Batson* and *J.E.B. v Alabama*, 511 U.S.127, 128-29.  *Id.* at
135.

The latter argument is patently without merit and borders on frivolous.  The former argument,
it is vague, general, conclusory and will not merit relief.   The burden of proof is on the habeas
petitioner to establish a factual basis for the relief he seeks.  *Hill v. Linahan*, 697 F.2d 1032, 1034
(11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir. 1983), *cert.
denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984).   A "general reference to the
transcripts, case records and brief on appeal patently fails to comply with Rule 2(c) ." *Phillips v.
Dormire*,  2006 WL 744387, *1, (E.D. Missouri 2006) (citing *Adams v. Armontrout*, 897 F.2d 332,
333 (8th Cir. 1990)).  This claim is due to be denied.

      **Claim XII.**    Maples was deprived of his constitutional rights when the trial court
denied defense discovery of DNA evidence.  [Doc. #24, at 139-145].

Maples declares that

[d]espite repeated and specific requests for discovery of . . . DNA evidence, the state
did not provide Mr. Maples with the necessary DNA-related documents.  The trial
court inexplicably overruled Mr. Maples's timely and repeated requests for discovery
of the DNA evidence and ordered the *Frye* hearing to proceed without the critical
DNA discovery. (R. 2562.)  Mr. Maples's counsel thus had to defend Mr. Maples

at the *Frye* hearing and at the trial without critical DNA discovery.  This rendered the state's DNA evidence untested and unreliable.

*Id.* at 140.

Maples argues that his defense was crippled by this DNA evidence, which was heavily relied upon by the state in its case against him, because the

> DNA evidence went directly to proving that Mr. Maples committed capital murder, and not just intentional murder. Mr. Bogle testified that he was at the bridge and creek between the time of the killing and the time that Robinson's body was found at the creek. (R. 2347.)  He testified that he was certain that Robinson's body was not there at the time. (R. 2351, 2353.) Mr. Maples used this testimony to argue that someone else may have been involved in the killing, (R. 2933-2934, 2936.), and that the two shootings did not occur at the same time.  (R. 2937.)  The state used its wrongfully admitted DNA evidence to refute this defense, and to argue that both killings occurred at the same time.

*Id.* at 145.

Maples contends his conviction and sentence are constitutionally unreliable as he was not allowed to subject the prosecution's DNA evidence to the adversarial process by carefully "evaluat[ing] the state's techniques, methods, and possible flaws of DNA forensic analysis, or understand the means by which the proponent arrived at a particular conclusion." *Id.* at 140. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

The Alabama Court of Criminal Appeals denied this claim on direct appeal for several reasons. *Maples v. State*, 758 So. 2d at 17.  First, the court found that while Maples filed several requests for discovery, none of the requests purportedly encompassing DNA evidence set out the specific data and documents Maples sought as required by Alabama law.  Since "*Brady* did not create" a general constitutional right to discovery in criminal cases, the court opined, "discovery requests should be specific." *Id.* (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) and

*Moon v. State*, 460 So.2d 287 (Ala. Crim. App. 1984), respectively)).   (other internal citations omitted).   Additionally, the court found that even if the prosecution failed to produce all the documents about which Maples complained, Maples was, pursuant to Alabama law, required to timely object to the failure.

As the factual basis for its decision that Maples failed to make a specific discovery request or timely object to its absence, the appellate court noted that Maples was aware of the DNA evidence and that the State intended to introduce the evidence for more than three months before trial, Maples had requested and had been allowed to conduct independent DNA testing of the same evidence approximately two months before trial, and that he submitted no additional and specific discovery requests to the prosecution in connection with its production of DNA related documents until the day before trial. *Id.* at 17 and 18.

The appellate court also found that Maples was not prejudiced by the lack of DNA materials he now contends were paramount to his defense because there was ample evidence of Maples's guilt, including his confession, witness testimony concerning Maples's actions before and after the murders, items of physical evidence which directly linked him to the crime and corroborated other evidence.   The State DNA expert was thoroughly cross-examined by defense counsel.   Moreover the results of Maples's independent DNA analysis were consistent with and actually more accurate than the State's testing. *Id.* at 19.

This court has carefully reviewed the decision of the Alabama Court of Criminal Appeals, and the underlying record.   Based upon same, the court finds that the state court's findings of fact are more than accurate, and Maples's historical recreation of the claim is erroneous.   Maples has

failed to show that the state court's decision was contrary to or an unreasonable application of federal law, nor was it an unreasonable determination of the facts.  This claim is due to be denied.

> **Claim XIII.**   Maples was deprived of his constitutional rights when the trial court failed to give an intoxication or a manslaughter instruction despite extensive evidence that indicated Maples was using drugs and alcohol on the day of the offense.  [Doc. #24, at 145-152] and [Doc. #33, at 53-55].

Maples contends that "a succession of witnesses" testified that he and the two victims were good friends and that, during the evening immediately preceding the murders, all three individuals had spent the evening socializing and drinking together.  [Doc. #24, at 145-46].  Witnesses also testified to Maples's drug problem, and that Maples was drinking and using drugs on the night of the murder.  *Id.* at 146.  Maples contends the state court's failure to give a jury instruction regarding intoxication or manslaughter represents a decision that is contrary to and an unreasonable of the constitutional precepts of *Beck v. Alabama*, 447 U.S. 625, 634-45 (1980).  *Id.* at 146, 152 and [Doc. #33, at 54-55].  He additionally argues that the state court's determination of the facts was unreasonable in light of the evidence before it.  [Doc. #33, at 54].

In conducting a plain error review of this claim, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law.

> The legislature has defined "intoxicated" to include "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 13A-3-2(e)(1), Ala.Code 1975.  Thus, evidence of ingestion of alcohol or drugs, standing alone, is insufficient to support a charge on intoxication.  In addition, there must be evidence that the ingestion caused a disturbance of the person's mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed. . . .  *Windsor v. State*, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997). . .

. . . .

Furthermore, instructions on intoxication and manslaughter are not required when they would be inconsistent with the defense strategy. . . *Hunt v. State*, 659 So.2d 933 (Ala.Cr.App.1994), aff'd, 659 So.2d 960 (Ala.), cert. denied, 516 U.S. 880, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995). . .

. . . .

The testimony at trial did not establish that [Maples] was intoxicated at the time of the murders.  Although there was some testimony that he had ingested alcohol several hours before the murders occurred, there was no testimony that he was intoxicated at the time of the murders.  Also, there was no evidence that he had ingested drugs before the murders.  Thus, there was no rational basis for instructions on intoxication and manslaughter under the evidence presented in this case.

Furthermore, instructions on intoxication and manslaughter would have been inconsistent with his defense strategy.  At trial, the appellant specifically contended that he was not intoxicated at the time of the murders.  He also contended that, at most, he was guilty of two intentional murders, but not two counts of capital murder.  Thus, the trial court did not err in not instructing the jury on intoxication and manslaughter.

*Maples v. State*, 758 So.2d at 23-24.

Maples's reliance on *Beck* is misplaced.  *Beck* resolved a narrowly focused constitutional issue.  At the time of *Beck's* conviction, Alabama's capital murder statute required a jury to reach a verdict of acquittal or a conviction with an automatic death sentence.   Additionally, Alabama juries were instructed with regard to lesser included offenses of the crime charged, if supported by the evidence, in all cases *except* capital cases.  *Beck* declared Alabama's death penalty statute to be unconstitutional because it precluded jurors from receiving instruction on or considering a non-capital lesser included offense of the capital crime charged even when such instruction was allowed in non-capital cases.

59

The limited holding of *Beck* has never been extended by the Supreme Court.  The Court has taken pains to explain that the *Beck* holding does not reach beyond the unique question it addressed. As Justice Souter wrote in *Schad v. Arizona*, 501 U.S. 624, 645-47, 111 S.Ct, 2491, 2504-05 (1991):[21/]

> Petitioner's second contention is that under *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed. 2d 392 (1980), he was entitled to a jury instruction on the offense of robbery, which he characterizes as a lesser included offense of robbery murder.  [footnote omitted].  *Beck* held unconstitutional an Alabama statute that prohibited lesser included offense instructions in capital cases.  Unlike the jury in *Beck*, the jury here was given the option of finding petitioner guilty of a lesser included noncapital offense, second-degree murder.  While petitioner cannot, therefore, succeed under the strict holding of *Beck*, he contends that the due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included offense supported by the evidence, and that robbery was such an offense in this case.
>
> Petitioner misapprehends the conceptual underpinnings of *Beck*.  Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.  We explained:
>
> > "[O]n the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason - - its belief that the defendant is guilty of some serious crime and should be punished.  On the other hand, the apparently mandatory nature of the death penalty [in Alabama] may encourage it to acquit for an equally impermissible reason - - that, whatever his crime, the defendant does not deserve death . . . . [T]hese two extraneous factors . . . introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case."  *Id.*, 100 S.Ct., at 2392 (footnote omitted).
>
> We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented.  See *id.*, at 629, 630. 632, 634, 637, 642-43, and n. 19, 100 S.Ct., at 2385, 2386, 2387, 2388, 2389-2390, 2392-2393, and n. 19.  As we later

---

[21/]       *Schad* is quoted extensively because the case crystallizes the parameters of *Beck*.

explained in *Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 3159, 82 L.Ed.2d 340 (1984), "[t]he absence of a lesser included offense increases the risk that the jury will convict . . . simply to avoid setting the defendant free . . . . The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." See also, *Hopper v. Evans*, 456 U.S. 605, 609, 102 S.Ct. 2049, 2051-2052, 72 L.Ed.2d 367 (1982). The central concern of *Beck* is simply not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offence of conviction (capital murder) and innocence.

Like the petitioner in *Schad*, Maples's jurors were not faced with an all or nothing choice. First, had the jury found Maples guilty of capital murder, the statute under which he was convicted did not require he be automatically sentenced to death. Instead, a conviction set the punishment at death or life without parole. Second, Maples's jurors were given jury instructions on the following crimes as lesser included offenses of capital murder: murder and first degree theft of property. (R. 2997-3005). Each of these offenses are non-capital offenses, and do not carry the death penalty as punishment in the event of a conviction.

For the foregoing reasons, Maples has failed to establish that the lack of a manslaughter or intoxication instruction by the state court was either contrary to or involved an unreasonable application of, clearly established Federal law as set out in *Beck v. Alabama*. This claim is due to be denied. 28 U.S.C. § 2254(d).

**Claim XIV.**  The trial court applied improper federal constitutional law
           when it sentenced Maples to death. [Doc. #24, at 152-160].

Maples contends the trial court "repeatedly rejected mitigating circumstances that had properly been introduced by Mr. Maples in support of a life sentence . . . . because it improperly concluded that each mitigating circumstance did not relieve Mr. Maples of his responsibility for the

offense." *Id.* at 152.   Such an inquiry was clearly erroneous according to Maples, because "'as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Id.* at 152-53 (quoting *Lockett v. Ohio*, 438 U.S. at 604). (emphasis omitted)).

      **A.**    The trial court improperly rejected three statutory mitigating circumstances.

     Maples contends the following  statutory mitigating factors were erroneously rejected by the trial court: (1) Maples suffered from an extreme mental or emotional disturbance, (2) Maples's ability to appreciate the criminality of his conduct or conform his conduct to the law was substantially impaired, and (3) Maples was a young adult at the time of the offense. *Id.* at 153-158. Maples alleges that although the evidence he presented in support of these factors "was not disputed by any state evidence, the trial court rejected each, and most critically, applied the wrong law when it rejected each proffered mitigating circumstance." *Id.* at 154. (emphasis omitted).

      **i**.    Extreme mental or emotional disturbance.

     Maples contends that a defense psychologist testified that he suffered from a mental disturbance based on his alcohol and drug use. *Id.*  (citing (R. 3159-60)).  Additionally, other than urging the jury to reject this factor, the State "presented no evidence that this mitigating circumstance did not exist." *Id.* (citing (R. 3290-92, 3385)).   Maples declares the trial court then erroneously rejected this factor by concluding he "'knew the difference between right and wrong[.]'" *Id.*   He also faults the state appellate court for finding that the trial court had "considered this mitigating circumstance." *Id.*   According to Maples, the trial court imposed a higher standard upon him by finding he knew the difference between right and wrong.  Such a standard is reserved for legal competency issues, not the less stringent standard for a mental disturbance as a mitigating factor.

*Id.* at 155.  To be a mitigating factor, the mental disturbance need not rise to insanity.  *Id.*  (citing

*Eddings v. Oklahoma*, 455 U.S. 1044, 126 (1982).

**ii.**    Maples was impaired in his ability
to conform his conduct to the law.

Maples declares he also presented "unrebutted evidence" indicating that his "ability to

appreciate the criminality of his conduct or to conform his conduct to the law was substantially

impaired."  [Doc. #24, at 156].  Maples declares that at trial his psychologist agreed that drug and

alcohol use on the night of the crime affected "'his ability to conform his conduct to the law. . . .'"

*Id.* (citing (R. 3108-17, 3155)).  The trial court then erroneously rejected this factor when it found

that "'the Defense never specifically addressed this circumstance.'"  *Id.* (citing (C. 562)).  Maples

then concludes he proved his "extreme mental or emotional impairment[,] . . . a well-defined

mitigating circumstance."  *Id.*  (citing  *Magwood v. State*, 791 F.2d 1438, 1449 (11th Cir. 1986).

**iii.**    Maples's age.

Finally, Maples notes that the trial court refused to find his age at the time of the offense to

be a mitigating circumstance on the basis that "'a 21 year old offender is not so youthful that the

Court should treat him different than other adults.'"  [Doc. #24, at 157] (citing (C. 562)).  Maples

concludes that a refusal to consider his age as a culpability factor instead of an "an adult for trial

purposes[]" violated his Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment constitutional

rights.  *Id.* at 157-58.

Maples also faults the Alabama Court of Criminal Appeals for failing to correct the trial

court, and asserts the appellate court "simply reached the erroneous conclusion that the sentencing

63

court considered 'all' the mitigating evidence presented" as opposed to finding the court "properly" considered all mitigating evidence.  *Id.* at 158  (citing *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).[22]

**B.**     The trial court improperly rejected non-statutory mitigating circumstances.

Maples also contends he presented evidence in support of the following non-statutory mitigating factors: his abusive family history; his drug and alcohol addiction and attempts to cure same; cooperation with law enforcement to catch drug dealers; his abusive mother; and his acceptance of responsibility for the crime.   [Doc. #24, at 159] (citing R. 3262, 3278-79, 3281).

While Maples complains the court erroneously rejected evidence of non-statutory mitigating circumstances, the only specific factor in his petition is the trial court's findings concerning the extent he assisted law enforcement officials with drug stings.   *Id.*  With regard to that factor, he argues that although his stepmother presented unrebutted evidence that he did provide such assistance, the trial court gave little credence to her testimony and "condemned [him] for not calling witnesses or testifying on his own behalf in support of this mitigating circumstance. . ." *Id.*  Maples concludes this procedure violated his Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights. *Id.* at 160.

In examining these claims on direct appeal, the Alabama Court of Criminal Appeals concluded that the trial court "complied with *Lockett v. Ohio*, . . . and its progeny in evaluating the

---

[22]     In *Godfrey*, the Supreme Court reversed the State of Georgia's affirmation of a death sentence on the sole basis that the crime "was 'outrageously or wantonly vile, horrible and inhuman.'" *Id.* (footnote omitted).  The Supreme Court found, "There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Id.*  Maples's citation is of little benefit to his argument.

[mitigating] evidence offered by Maples." *Maples v. State*, 758 So.2d at 33.   In doing so, the

appellate court wrote,

> "A sentencer in a capital case may not refuse to consider or be 'precluded from considering' mitigating factors." *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)).  The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).

*Maples v. State*, 758 So.2d at 29 (other citations omitted)).  Nevertheless, " ' "While *Lockett* and its

progeny require consideration of all evidence submitted as mitigation, whether the evidence is

actually found to be mitigating is in the discretion of the sentencing authority." ' " *Id.* at 33 (quoting

*Ex parte Slaton*, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136

L.Ed.2d 680 (1997)(quoting *Bankhead v. State*, 585 So.2d 97, 108 (Ala. Crim. App. 1989)).

The trial court's sentencing order reads, *in pare materia*,

> "The mitigating circumstances.  The defense asserted the presence of mitigating circumstances.  Although the defense did not rely on all of the statutory mitigating circumstances, the court reviews all of the statutory mitigating circumstances in this sentencing order.

> "1. The Defendant has no significant history of prior criminal activity. See Ala.Code § 13A-5-51(1)(1994 repl. vol.).  The court finds this mitigating circumstance is present in this case. The District Attorney conceded this point during the sentencing phase of the trial, and the court concurs.

> "2. The capital offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance. See Ala.Code § 13A-5-51(2)(1994 repl. vol.).  The Court finds this mitigating circumstance is inapplicable.

> "The Defense asserts that the Defendant had been drinking beer the night of the murders and had a history of drug addiction.  The Defense further alleges

that this substance abuse was extensive and a triggering factor in the events of July 7 and July 8.  This evidence falls woefully short of the statutory mitigating circumstance that the offender was under the influence of extreme mental or emotional disturbance.  Dr. Alan Shealey, a clinical forensic psychologist testifying for the Defendant, presented evidence that the Defendant's background and history fit a profile of a passive-aggressive personality.  This profile resulted from Dr. Shealey's feeding a computer program information provided by the Defendant in an interview.  The court notes the State psychologist did not markedly differ from Dr. Shealey's report.  Both doctors agreed the Defendant was fit to stand trial and [that he] understood the difference between right and wrong.  The only difference between the two experts [was that] the Defendant's expert testified [that] alcohol and past drug abuse might be a trigger for the actions taken by the Defendant on the night of July 7, 1995.  However, the Defendant, in a videotaped confession, denied the use of drugs on the night of the murders and robbery.

. . . .

. . . .

. . . .

"6. The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.  See Ala.Code § 13A-5-51(6)(1994 repl. vol.). The court finds this mitigating circumstance is inapplicable.

"The court notes the Defense never specifically addressed this particular mitigating circumstance.  While the defense does assert [that] the defendant had been drinking alcohol extensively during the period before the crime, the evidence falls short of supporting the assertion the Defendant was so impaired by alcohol he could not appreciate the criminality of his conduct.  The court notes the Defendant stole the vehicle of Stacy Terry and fled the state because he knew the authorities would be after him. The court finds such evidence too weak and unpersuasive to support this statutory mitigating circumstance.

"7. The age of the Defendant at the time of the crime.  See Ala.Code § 13A-5-51(7)(1994 repl.vol.).  The court finds this mitigating circumstance is inapplicable.

"The Defendant was 21 years of age at the time of this capital murder.  The court is not persuaded this constitutes a mitigating circumstance.  Although the age of an offender may be an important consideration in deciding punishment, a 21-year-old offender is not so youthful the Court should treat him differently than other adults.

"8.  § 13A-5-52.  Mitigating Circumstances--Inclusion of Defendant's character, record, etc.  The court finds evidence of this circumstance in this case.

"The defense presented seven nonstatutory mitigating circumstances to be considered in the sentencing phase of the trial.  They are as follows:

"(1)  That the Defendant suffered abuse, neglect, and abandonment by his birth mother during his childhood.  The court does not doubt the abandonment of the Defendant by his birth mother as introduced into evidence by the Defendant's psychologist and the Defendant's family.  However, the Court also notes the testimony supports the fact that the Defendant has good relations with his step-mother, who he has known as his mother since the Defendant was the age of three. The psychologists' testimony and testimony from the Defendant's family lead one to the inescapable conclusion that Corey Ross Maples is a troubled young man with a history of abuse from his mother and self-abuse through drugs and alcohol.

"(2) That the Defendant has suffered from past drug dependency. Testimony elicited throughout the trial from various witnesses, including the Defendant, established the Defendant had a drug dependency on marijuana, crystal methamphetamine, crack, and various other illegal controlled substances.  The court does not doubt the testimony the Defendant has suffered from addiction to various controlled substances.

"(3)  That the Defendant has made efforts at controlling his drug dependency in drug rehabilitation.  Testimony elicited from the Defendant's father and step-mother established the Defendant spent some time in the latter half of 1994 at the Quest Recovery Program for Drug Addiction.  The court finds this testimony credible.

"(4)  That the Defendant has cooperated and assisted law enforcement authorities in its enforcement of drug law violations.  The Defendant's stepmother testified the Defendant had assisted the Decatur Police Department in apprehending a drug violator.  The court notes no police officer testified at trial, nor was there any corroboration of the stepmother's testimony.

67

"(5) That the Defendant had diminished mental capacity at the time of the crime due to his consumption of alcohol.

"While the defense presents this as a mitigating factor, the Court fails to be convinced by the conflicting testimony at trial that this is a mitigating factor. The Defendant acknowledges no inordinate amount of alcohol consumption on the evening of the murder, nor is there any evidence that the amount of alcohol consumption on the evening of July 7, 1995, was any different than any other night.

"(6) That the Defendant displayed remorse and candor in his videotaped confession to law enforcement authorities and further during this confession he accepted full responsibility of the murder of Stacy Terry and Barry Robinson II.

"The court has considered this nonstatutory mitigating circumstance and finds the Defendant did candidly speak of the events of July 7 and July 8, 1995. The court is not persuaded the Defendant exhibited any remorse over the consequences of his actions. While the Court commends the Defendant's candor, the court finds no evidence of remorse.

"(7) That the crime was absent of any prolonged suffering or torture by either of the Decedents.

"While the defense presents this as a mitigating factor, the Court fails to be convinced by the testimony at trial that this is a mitigating factor.

"Weighing the Circumstances

"The court now proceeds to weigh the aggravating and mitigating circumstances to determine the appropriate sentence under the law. The Court has not merely tallied for the purpose of numerical comparison the aggravating and mitigating circumstances, but has marshalled and considered in an organized fashion all of the relevant circumstances.

"The evidence proves beyond a reasonable doubt the existence of one statutory aggravating circumstance. The defense did prove by a preponderance of the evidence that the Defendant has no significant history of prior criminal activity. Insofar as the Defense attempted to assert the presence of several statutory mitigating circumstances, the facts failed to meet the definition of the circumstance or the evidence disproved the factual existence of the circumstance by at least a preponderance of the evidence. The court did weigh several non-statutory mitigating circumstances in

addition to the one statutory mitigating circumstance, but found them weak and unpersuasive.

> "The court is unable to find the kind of mitigating facts that would justify the imposition of a sentence of life imprisonment without parole despite the existence of one statutory aggravating circumstance.  The statutory aggravating circumstance far outweighed the mitigating facts.  The court considered the jury's recommendation as required by law.  See Ala.Code 13A-5-47(e) (1994 repl. vol.).  The court, though, understands the jury's verdict does not require this court to impose the sentence of death."

(C.R. 560-565.)

*Maples v. State*, 758 So. 2d at 30-33.  (emphasis omitted).

After review of the appellate court's explanation of applicable federal law, in light of the trial court's explicit sentencing order, it is clear Maples has failed to establish that the decision was contrary to or an unreasonable application of clearly established federal law, nor has he shown the decision was based upon an unreasonable determination of the facts.

Contrary to Maples's contention, and as evidenced by the trial court's sentencing order, the trial court did not reject evidence presented in support of the first statutory mitigating circumstance solely because Maples knew the difference between right and wrong.  This determination comprised only a portion of the trial court's conclusion regarding the evidence.  The court considered the evidence offered for purposes beyond that which Maples alleges, but ultimately, did not find it to be a mitigating factor.

The court also considered Maples's drug and alcohol use as evidence offered in support of the second statutory mitigating factor.  Finally, with regard to Maples's age, the court clearly acknowledged that youthful age "may" be a mitigating factor, but did not find that this factor was present in Maples's case.

69

Finally, the trial court clearly considered and found much of the evidence offered by Maples in support of non-statutory mitigating factors to be mitigating.  With regard to Maples's assistance with the drug trade, it was within the trial court's discretion to not credit the testimony of his stepmother.  The trial court properly considered all of the evidence offered by Maples in support of the mitigating factors about which he complains.  This claim is due to be denied.

**Claim XV**.　　The warrantless police search of Maples's room was not performed pursuant to voluntary consent, and the items seized pursuant to the illegal search were thus inadmissible at trial.  [Doc. #24, at 160-66].

Maples premises this claim with the assertion, "The United States Supreme Court has held that it is 'a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'"  *Id.* at 160 (quoting *Payton v. New York,* 445 U.S. 573, 586 (1980).  He then contends that once he was arrested and in the custody of Nashville police, a search of his hotel room was twice conducted "without a warrant, valid consent, or any exigent circumstance. . ." resulting in the seizure of  "an extremely prejudicial t-shirt."  *Id.*  Since the t-shirt was the "'poisoned fruit'" of an illegal search, it should not have been admitted at trial.  *Id.*  at 160-61 (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963), *Mapp v. Ohio*, 367 U.S. 643, 654-55  (1961), and *Bumper v. North Carolina*, 391 U.S. 543, 560 (1968)).

While Maples concedes that, pursuant to *United States v.  Matlock*, 415 U.S. 164, 171 (1974), "a third party may have the authority to grant consent to a search", he alleges his roommate, Mr. Tant, was threatened and intimidated into executing a waiver of a search warrant.  *Id.* at 161.  In support of this contention, Maples presents the following testimony given by Tant at trial.

70

Q.  Did they [the police] give you any problem about signing that or threaten you or coerce you in any fashion?

A.  No.  The problem to me at the time was all the police officers around me, they didn't want to do anything and it was my suggestion that — I just came out and asked them what if I signed a piece of paper or something saying I give them permission; and they said oh, yeah, okay.  They came out with some papers like this, and they were just all standing there with guns pointing at me so they came out with this and I signed it and then they got to searching and an officer took me downtown.

*Id.* at 162, quoting (R. 2449) (emphasis added by Maples).

Maples declares that in spite of Tant's denials, his testimony clearly shows he was intimidated by police.  According to Maples, Tant was also in a "vulnerable" state because the searches were conducted at 11:00 p.m. and 6:00 a.m., and Tant was not aware Maples was a murder suspect.  *Id.* at 163-64.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

Maples also argues that even if Tant did consent to the search of the room, Tant did not have authority to allow the police to search Maples's "duffel bag[,]" an item over which Maples exercised singular control.  *Id.* at 165.  Finally, Maples alleges that Tant, as a night clerk at the hotel, did not have the authority to consent to the search simply because he was an employee.  *Id.* at 165-66 (citing *Stoner v. California*, 376 U.S. 483, 487-90 (1964).

When examining this claim for plain error, the Alabama Court of Criminal Appeals found

The evidence showed that, during July and August of 1995, [Maples] shared a motel room with Stephen Tant, who worked as a desk clerk for a motel in Nashville and was allowed to live in the room as part of his pay.  Tant testified that he allowed the appellant to live with him in his motel room for a few weeks while [Maples's] vehicle was being repaired.  (R. 2439-40.)  He stated that he did not know that [Maples] was suspected of committing two murders in Alabama until police officers arrested the appellant at the motel on August 1, 1995.  At that time, he consented to a search of the motel room.  He testified that he was not coerced into consenting to the search; in fact, he testified that he suggested that he sign a paper so the officers could conduct the search.  (R. 2449.)  The State introduced into evidence, without objection, two consent-to-search forms, one signed by Tant on the day of [Maples's]

arrest and the other signed by Tant on the day after [Maples's] arrest.  (State's Exhibits 203 and 204.)

. . . .

The evidence showed that the police were armed with guns at the time of the first search because they had surrounded the motel to capture and arrest the appellant. However, there is no indication that they used the guns to coerce Tant into consenting to the search.  Tant testified that he was not coerced into consenting to the search and that, in fact, he suggested that the officers conduct a search of the premises.  Further, Stella Marger, a motel employee, testified that she saw Tant sign the consent-to-search form and that he did so willingly and without coercion.  (R. 2435-36.)  Additionally, Detective Clifford Mann testified that Tant willingly signed a consent for police officers to search the motel room for incriminating evidence.  (R. 2466.)  Therefore, based on the totality of the circumstances, there is no indication that Tant was coerced into consenting to the search of the motel room.

. . . .

[Additionally,] Tant testified that he was allowed to live in the motel room as part of his pay and that he allowed the appellant to live in the room with him for a few weeks.  He further testified that he voluntarily signed a consent form for police officers to search the room on two different occasions.  Because the evidence showed that Tant was a joint occupant of the motel room and that he had joint access to the room, he had the authority to consent to a search of the room.
. . . .

[Finally,] after the officers advised him of his Miranda rights, [Maples] told them, "My No Fear T-shirt had blood on it.  I still have it.  It is in a laundry bag back at the motel room here in Nashville."  (State's Exhibit 233) [emphasis omitted].  During the second search, officers found the T-shirt in a clear plastic bag located in plain view in the floor of the only closet in the motel room.  Furthermore, the closet was open; there was no door attached to it.

*Maples v. State*, 758 So.2d at 24-26.

The Alabama Court of Criminal Appeals found that the trial judge properly determined that,

under the totality of circumstances surrounding the waiver, Mr. Tant voluntarily consented to the

search of the hotel room.  *Id*. at 25.  *See Bender v. State*, 687 So.2d 219, 221 (Ala. Crim. App. 1996).

Moreover, as the registered guest of the room and Maples's roommate, Mr. Tant had common

authority over the premises or personal effects sought to be searched." *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974). Finally, the appellate court found that Mr. Tant could be considered a joint user of the bag because, "[w]hen an accused leaves property in the joint control of another or in a place where one could not reasonably expect to exclude others, he assumes the risk that the joint occupant will consent to a search of the property." *Id. See Cowart v. State*, 579 So.2d 1, 4-5 (Ala. Crim. App. 1990).

After review, it is clear that Maples's legal support and limited version of this factual history in support of this claim fail to establish the state court's decision is either contrary to or involved an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. This claim is due to be denied.

       **Claim XVI.**    The trial court erred when it denied defense discovery motions, and then refused to view the withheld documents *in camera*. [Doc. #24, at 166-74].

Maples declares the trial court "repeatedly prevented [him] from obtaining critical and necessary discovery[.]" *Id.* at 166 (citing *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963)(for the general proposition that discovery is necessary to ensure a trial is a fair fact finding process). As a result, "Maples' counsel was therefore unable to challenge, sift, and analyze the state's evidence against Mr. Maples." *Id.*

Maples identifies four (4) specific motions for discovery, the denial of which he contends violated his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *Id.* at 167-75. First, Maples alleges that while attempting to prepare a mitigation case for the penalty phase of the trial, the trial court refused to grant him access to various

institutional records in his name.  *Id.* at 167-68 (citing (R. 217)).  This claim is without merit.  On direct appeal, the appellate court found the trial court had handled the motion by

> not[ing] that it was not the prosecutor's responsibility to obtain the information for [Maples].  (R. 213.)  However, contrary to [Maples's] assertion, the trial court ruled that [he]might be entitled to discovery of some of the information. (R. 213.) Therefore, it instructed [Maples] to subpoena the files and agreed that it would conduct hearings if objections were made. (R. 214.)  Defense counsel admitted during the hearing on the motion that that assistance was what he actually sought when he filed the motion for discovery of the files.  (R. 214.)

*Maples v. State*, 758 So. 2d at 34.  Later, the trial court ordered any entities who had been subpoenaed by Maples to provide information about Maples, but failed to comply with same, to produce the documentation requested.  *Id.*  (citing (R.429)).  To the extent counsel for Maples has admitted that subpoenas to other entities were truly "fishing expeditions," the court did not order production.  *Id.*

Second,[23] Maples complains the trial court refused to allow him "discovery on the selection and formation of the grand and petite juries."  *Id.* at 168 (citing (C. 171)).  This evidence was necessary to show the venires were "infected by improper discrimination or underrepresentation of a cognizable group."  *Id.*  (citing *Vasquez v. Hillary*, 474 U.S. 254, 263-64 (1986) and *Duren v. Missouri*, 439 U.S. 357, 370 (1979).  Maples also complains that the trial court denied his motion for expert assistance in preparation of this issue.  *Id.* at 169.  Maples asserts the trial court effectively prevented him from developing and presenting his discrimination claim, depriving him of a fair trial in violation of the Sixth Amendment.  *Id.* (citing *Test v. United States*, 420 U.S. 28, 29 (1975).

---

[23]  Maples raises substantially the same claim in Claim XXII.  For the reasons set out in the discussion of Claim XXII, *infra*, this claim is without merit.

On direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact

in connection with this claim.

> With regard to the grand jury records, the trial court granted [Maples] access
> to the remand record from *Pace v. State*, 714 So.2d 332 (Ala.1997), on return to
> remand, 714 So.2d 340 (Ala.Cr.App.), cert. denied, 523 U.S. 1051, 118 S.Ct. 1372,
> 140 L.Ed.2d 520 (1998), in which the grand jury system in Morgan County was
> explained in detail.  During a motion hearing, the trial court and prosecutor explained
> to the defense, on the record, the procedure by which the foreperson of the grand jury
> that indicted [Maples] was chosen.  Specifically, they explained that the judge
> presiding over the grand jury proceedings drew the foreperson's name at random
> from the names of all of the grand jury members. (R. 52, 69.) The trial court ordered
> that the defense be given a transcript, if any, of the instructions given to the grand
> jury that indicted [Maples] regarding how the foreperson would be selected and of
> all of the grand jury proceedings regarding his case that occurred in open court. (R.
> 63-64, 68-69.) It further ordered that the defense could have access to the name, age,
> sex, and race of each member of the grand jury that indicted the appellant.  (R.
> 59-60.)  After granting all of the above-referenced discovery, the trial court agreed
> that it would reserve ruling on [Maples's] objection to the composition of the grand
> jury until [Maples] could obtain the discovery and present his specific objections.
> However, [Maples] did not subsequently challenge the composition of the grand jury.

*Maples v. State*, 758 So.2d at 35.

> With regard to the petit jury records, the trial court again incorporated by
> reference the *Pace* record.  It also explained to the defense, on the record, the
> procedure by which potential petit jurors are selected in Morgan County.  The trial
> court denied [Maples's] motion challenging the composition of the petit jury for
> systematic underrepresentation of cognizable groups because the petit jury had not
> yet been selected in the case.  However, it noted that [Maples] could refile the motion
> later if he found some specific ground he wanted to raise in support of his challenge.
> [Maples] did not subsequently raise this issue again. Because defense counsel
> admitted that the motion was "somewhat speculative" when it was filed, the trial
> court's ruling was proper.

Maples does not dispute the appellate court's findings of fact. There is no indication that

Maples was deprived of the material information he needed to present his discrimination claims.

This claim is due to be denied.

75

Third, Maples contends that it was necessary for him to obtain discovery of exculpatory and

impeachment evidence pertaining to "state witnesses [Dobbs and Foley], . . . an unrelated homicide.

. .[, and the potential involvement of Dobbs and Foley in the instant offense.]"  [Doc. #24, at 169]

(citing *Brady v. Maryland*, 373 U.S. at 91; *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Ex*

*parte Monk*, 557 So. 2d 832, 833-34 (Ala. 1990)).   The trial court denied discovery of this

information and refused to conduct an *in camera* review of any documents to determine whether any

did contain exculpatory information.   *Id.* at 169-172.   Maples asserts the denial was clearly

erroneous, "particularly in light of the fact that part of Mr. Maples' defense was that other

individuals may have been involved in the homicides."  *Id.* at 170 (citing (R. 2936)).

In examining this claim on direct appeal, the Alabama Court of Criminal Appeals wrote,

> In its general discovery order, the trial court ordered the prosecution to give
> [Maples] any "exculpatory material or other material to which a defendant is entitled
> under constitutional provisions or other provisions of law." (C.R.337.)  During a
> pretrial motion hearing, the prosecutor agreed that, because they would be
> discoverable, he would produce all statements the appellant made to law enforcement
> officers. (R. 157.)  He also represented to the trial court and to defense counsel that
> he did not know that any file or documents existed in relation to an investigation of
> the other murder or to the two witnesses. (R. 172.)  With the exception of the request
> for exculpatory material, the trial court denied the appellant's request.  However, it
> did instruct the prosecutor to determine whether any file related to the other murder
> existed and, if so, to produce any exculpatory material from that file.  In so doing, the
> trial court declined to conduct an in camera review of the documents at that time.
> However, it did state that the appellant could obtain further review if the documents
> produced indicated that other information had not been produced, and that the
> prosecutor could obtain guidance if he had questions in attempting to comply with its
> order.
>
> The trial court clearly attempted to provide information the appellant was
> entitled to receive.  However, the defense does not have an absolute right to
> disclosure of the criminal records of the State's witnesses. *Davis v. State*, 554 So.2d
> 1094 (Ala.Cr.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), opinion on reh'g, 569
> So.2d 738 (Ala.1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d
> 1196 (1991); *Wright v. State*, 424 So.2d 684 (Ala.Cr.App.1982).  The appellant has

not alleged or shown that any exculpatory material was suppressed, and he did not request further review by the trial court after the prosecutor reviewed the files related to the other murder case. Therefore, the trial court did not abuse its discretion in refusing to order discovery or to grant the request for an *in camera* inspection.

*Maples v. State*, 758 So.2d at 38.

Maples does not dispute the appellate court's findings of fact, and he has completely failed to show that any prosecutorial misconduct occurred. "A *Brady* prosecutorial misconduct claim has three essential elements. *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286. . . . [T]he evidence at issue [must] be favorable to the accused as exculpatory or impeaching . . . . the State suppressed the evidence at issue[,] [and the] suppressed evidence is "material" for *Brady* purposes. *Ibid.*" *Banks v. Dretke*, 540 U.S. 668, 670-72 (2004). Maples has made no allegations sufficient to satisfy any of these essential elements. This claim is due to be denied.

Maples also contends the trial court denied additional discovery motions including one in which he requested permission to depose one of the state's expert witnesses. [Doc. #24, at 172] (citing (C. 304) & (R. 114)). Maples states that deposing experts was necessary to ensure reliability in a capital case. *Id.* (citing *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988)(citations omitted)). On direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law.

> The appellant . . . argues that the trial court improperly denied his motion to depose the prosecution's expert witnesses. In denying the motion, the trial court ordered that the prosecution give the appellant a *curriculum vita* for each of its expert witnesses. (R. 112-13.) Moreover, the defense stated that it was already planning to interview each of the prosecution's experts before the trial, and suggested that the motion to depose be renewed if the experts did not cooperate during the interview. (R. 113-14.) The trial court agreed that, if the experts did not cooperate, it would reconsider the motion. The appellant never presented the motion to the trial court again. Because the trial court ordered production of the curriculum vita of each

expert and agreed to reconsider the motion if necessary, we find no abuse of discretion in this regard.

*Maples v. State*, 758 So.2d at 38.

Maples alleges the trial court "reversibly erred" when it refused to allow him to conduct "discovery from news organizations that would allow him to meet his necessary burden of proof [with regard to his motion for change of venue.]"   [Doc. #24, at 173] (citing (C. 263)).  He then concludes that individually and collectively, the denial of his discovery motions violated his Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights.  *Id.* at 174.

In addressing this claim on the direct appeal, the Alabama Court of Criminal Appeals stated the record

> shows that the appellant obtained several items that documented the media coverage of the offense. Furthermore, at a pretrial hearing, the trial court noted that the offense had occurred approximately 1 ½ years before the hearing and that there had not been much publicity about the offense recently.  Therefore, it denied the motion at the time and suggested that the appellant revisit the issue at the time of trial. Specifically, the trial court stated that it would reconsider the motion if the *voir dire* proceedings in the case indicated that the appellant would not be able to obtain an unbiased jury.  As noted in Part XXIII of this opinion, the appellant did not show that a change of venue was necessary because of pretrial publicity.  Therefore, the trial court did not abuse its discretion in denying the appellant's request.

*Maples v. State*, 758 So.2d at 38.

Other than a general observation that the results of his trial should be reliable, Maples has failed to offer any Supreme Court precedent to support his contention that he should have been allowed to depose expert witnesses.  With regard to the discovery pertaining to news organizations, Maples simply cites constitutional amendments.  This court not obligated to "consider unsupported and undeveloped issues." *Moore v. Gibson*, 195 F.3d 1152, 1180 n. 17 (10th Cir.1999), cert. denied, 530 U.S. 1208 (2000).   The 'precedent' cited by Maples does not show the state court's decision

was contrary to or an unreasonable interpretation of federal law, or an unreasonable interpretation of the facts.  These claims are due to be denied.

**Claim XVII**.                    The trial court erred when it admitted a highly inflammatory
                                       t-shirt that had no probative value. [Doc. #24, at 174-80].

Maples contends the trial court erred when it allowed his 'No Fear' t-shirt to be admitted into evidence.  *Id.* at 174.   He describes the shirt as "athletic apparel," having "NO FEAR" inscribed across the front, and written in large letters across the back, "You Gonna Do Somethin or Are you Gonna Just Stand There and Bleed? No Fear."  *Id.*  The back of the t-shirt was also covered with simulated blood spatters.  *Id.*

Maples declares the logo on the shirt had no probative value and great prejudicial effect.  *Id.* at 175 (citing  *Kyles v. Whitley*, 514 U.S. 419 (1995) and *Old Chief* [*v. United States*], 519 U.S. [172], 180 (1997)).  As a factual basis for his contention that the shirt had no probative value, Maples alleges

> Not one of the state's fifty-eight witnesses testified that they saw Mr. Maples wearing
> the shirt on the day of the offense. None of the people who knew Mr. Maples saw
> him before, during or after the offense made any mention of the shirt.  The shirt was
> thus not introduced to establish Mr. Maples's identity at any location.  Mr. Maples's
> identity was not an issue in this case, for the sole issue before the jury was whether
> Mr. Maples committed capital murder or a lesser degree homicide.  The prejudicial
> logo on the shirt was thus not critical to establishing that the shirt belonged to Mr.
> Maples or that anyone saw Mr. Maples wearing the shirt.  There was simply no need
> to introduce the logo.  Admittedly, the state's evidence technician claimed to have
> matched Mr. Robinson's blood with blood on the shirt.  The trial court, if it found
> that the attenuated nexus between Mr. Maples, the garment, and the offense was
> probative, should have admitted a portion of the shirt or otherwise prevented the jury
> from viewing the logo on the garment.

*Id.* at 175-76.

To establish the prejudicial effect of the t-shirt, Maples contends

> In this case, where Mr. Maples was accused of shooting two friends while they allegedly sat in their vehicle, the shirt's logo was particularly prejudicial. Combined with the state's scenario of the offense with the cumulative and remorseless evidence of blood in the car, on the contents of the car, and on later passengers in the car, the shirt's logo — "You gonna do somethin' or are you gonna just stand there and bleed? No Fear" — was horribly prejudicial to Mr. Maples. On the basis of a garment that Mr. Maples purportedly wore at some point, the jury was likely to infer that Mr. Maples was indifferent to the offense and found the bleeding and suffering of others something to be mocked and scorned.

*Id.* at 176.

The Alabama Court of Criminal Appeals disagreed with Maples's assessment of the evidence

at the guilt phase of the trial. The Court wrote,

> In *Barbour v. State*, 262 Ala. 297, 78 So.2d 328, 339 (1954), the Alabama Supreme Court held:
>
>> "'The clothing of the deceased, as well as that of the accused, are usually held admissible on trials of homicides. If tending to elucidate the transaction, to identify any of the parties, to connect the accused with the crime, or to show the character of the wound, motive or intent of the killing, or degree of the crime, whether the killing was in self-defense or not, they are admissible. If such objects tend to corroborate or disprove, illustrate or elucidate any other evidence, they are admissible, though such evidence may have a tendency to bias or prejudice the jury, to elicit their sympathy for, or animosity toward either the deceased or the accused.'" (emphasis and internal citations omitted).
>
> The appellant admitted that he was wearing the "No Fear" T-shirt on the night of the murders and that the T-shirt had bloodstains on it. He also told police officers where they could find the T-shirt. Roger Morrison, the State's DNA expert, testified that one of the bloodstains on the T-shirt matched Barry Robinson's blood. He also testified that the tests excluded the appellant and Stacy Terry as the source of the blood. The bloodstained T-shirt was highly relevant because it connected the appellant to Barry Robinson's death and corroborated his statements to police. Furthermore, the T-shirt, when combined with other evidence presented at trial, was relevant to the charge that the murders occurred as part of one course of conduct. Because the T-shirt had an extremely high probative value, the danger of unfair

prejudice arising from the jury's possible reaction to the slogan on the T-shirt did not substantially outweigh its probative value.

*Maples v. State*, 758 So.2d at 38-39.

This court has reviewed the authority cited by Maples. *Kyles v. Whitley*, 514 U.S. 419 (1995) involves discussion of the term "materiality" in context of *Brady v. Maryland*. Maples has not explained how *Kyles* is applicable to his claims concerning the t-shirt. In *Old Chief* [*v. United States*], 519 U.S. [172], 180 (1997), the

> [defendant] was charged with, *inter alia*, violating 18 U.S.C. § 922(g)(1), which prohibits possession of a firearm by anyone with a prior felony conviction. He offered to stipulate to § 922(g)(1)'s prior-conviction element, arguing that his offer rendered evidence of the name and nature of his prior offense-- assault causing serious bodily injury--inadmissible because its "probative value [was] substantially outweighed by the danger of unfair prejudice ...," Fed. Rule Evid. 403. The Government refused to join the stipulation, however, insisting on its right to present its own evidence of the prior conviction, and the District Court agreed. At trial, the Government introduced the judgment record for the prior conviction, and a jury convicted Old Chief. In affirming the conviction, the Court of Appeals found that the Government was entitled to introduce probative evidence to prove the prior offense regardless of the stipulation offer.

> The Supreme Court found that the district court

> abuses its discretion under Rule 403 if it spurns a defendant's offer to concede a prior judgment and admits the full judgment record over the defendant's objection, when the name or nature of the prior offense raises the risk of a verdict tainted by improper considerations, and when the purpose of the evidence is solely to prove the element of prior conviction. Pp. 649-656.

*Id.* at 180.

The admission of the t-shirt in Maples's case is not analogous to the prior conviction in *Old Chief* for purposes of determining whether the state court's decision in this case passes Section 2254(d) muster. Contrary to Maples's assertion, the t-shirt had independent probative value. Maples has not established that the state court's decision regarding prejudice is either contrary to or involved

an unreasonable application of clearly established federal law, or an unreasonable determination of the facts.

At the penalty phase of the trial, Maples alleges the prosecutor's actions concerning the t-shirt caused him even greater prejudice.  [Doc. #24, at 176].  Maples contends the prosecutor relied heavily on the t-shirt during his closing argument and even displayed the t-shirt to the jury, saying "'I'm going to wave these words [on the shirt] that I just cringe every time I hear.'"  *Id.* at 177 (quoting (R. 2879)).[24/]

When examining this claim on direct appeal, the Alabama Court of Criminal Appeals wrote,

> During his closing arguments, defense counsel asked the jury for mercy and focused on the abuse the appellant suffered as a child, his youth, his diminished capacity, his lack of a prior criminal history, and his drug and alcohol addiction.  In rebuttal, the prosecutor argued against mercy.  The prosecutor focused on the victims and the series of events leading up to the murders.  He stated that the appellant "went back in the house, and they are sitting there and he comes out from around the back of the trailer wearing this T-shirt and with this [gun] in his hand and sticks it up within just no distance of Stacy Terry's head and shoots him twice in the head.  I don't know how long it was before Barry Robinson realized what was going on, but then at some point he sticks it in there and pumps two into his head." (R. 3305.)  At the conclusion of the prosecutor's closing arguments, defense counsel moved for a mistrial, stating:

>> "During the course of his argument he said, 'Wearing this T-shirt,' and he displayed it to the jury for 45 seconds maybe, but for a prolonged period of time displaying to the jury the back side of the T-shirt containing the language that is the subject to our challenge. That was the portion that we had sought to preclude in limine. The Court overruled us on that, but I wanted to clarify that was the part that indeed did manifest itself during the argument, and we move for a mistrial on that basis."

_____

[24/]   This is incorrect.  The prosecutor made this statement at a bench conference with opposing counsel and the trial court during discussion about whether or not the t-shirt could be shown or commented upon during closing arguments at either the guilt or penalty phase of the trial.  There was no comment or display of the t-shirt at the guilt phase of the trial by the prosecutor.  Discussion and display of the t-shirt at the penalty phase of the trial was limited to that described by the Alabama Court of Criminal Appeals as directly quoted hereinabove.

(R. 3310). "'The granting of a mistrial is an extreme measure and should be exercised only when manifestly necessary or when the ends of justice would otherwise be defeated.'"  *Grimsley v. State* 678 So.2d 1197, 1206 (Ala.Cr.App.1996) (citations omitted).  Although a trial court's ruling on a motion for a mistrial may be reviewed on appeal, it is "'within the discretion of the trial court; [it] will not be reversed in the absence of a clear abuse of discretion.'"  *Talley v. State*, 687 So.2d 1261, 1276 (Ala.Cr.App.1996) (quoting *Ex parte Jefferson*, 473 So.2d 1110, 1114 (Ala.1985), cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986)).

The record does not reflect the actual time the slogan on the T-shirt was visible to the jury.  Furthermore, defense counsel did not argue that, and we are unable to conclude from the record whether, any of the writing on the T-shirt was legible to the jury.  Finally, the prosecutor did not make any comment on the slogan itself.   Thus, the trial court did not err in denying [Maples's] motion for a mistrial.

*Maples v. State*, 758 So.2d at 39-40.

In light of defense counsel's express argument and the absence of objection by the prosecutor or comment by the court, the state court's factual findings are at a minimum suspect.  Assuming *arguendo* that a legible version of the t-shirt was displayed to the jury for 45 seconds, however, Maples has nonetheless failed to explain why the prosecutor's act of displaying the t-shirt was improper when juxtaposed with the defense lawyer's closing argument.   Nor has Maples, despite the citation to *Kyles* or *Old Chief*, argued that the prejudicial effect of the t-shirt rendered the penalty phase of his trial fundamentally unfair.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  Maples has not shown that the state court's decision is either contrary to or involved an unreasonable application of clearly established federal law, or an unreasonable determination of the facts.   This claim is due to be denied.

Finally, Maples alleges presentation of the shirt violated his First Amendment rights under the United States constitution because "the constitution does not permit the admission of evidence of beliefs, membership, or views at trial, where such evidence proves nothing more than an abstract

adherence to those beliefs which society as a whole may find offensive." *Id.* at 178, citing *Dawson v. Delaware*, 503 U.S. 159, 165 (1992).   He concludes the t-shirt and logo are patently offensive. Additionally, they were displayed to the jury without explanation, and thus were additionally offensive when considered in the context of the crime Maples was accused of committing. *Id.* at 179.

> The Alabama Court of Criminal Appeals rejected Maples's argument after conducting a plain error review of same.

> The First Amendment prevents a state from presenting evidence of a defendant's abstract beliefs and association with an "ill-received organization or group" when such evidence is irrelevant. *Ex parte Davis*, 718 So.2d 1166, 1177 (Ala.1998); *Dawson v. Delaware*, 503 U.S. 159, 168, 112 S.Ct. 1093, 1099, 117 L.Ed.2d 309 (1992). [Maples] argues that the "No-Fear" T-shirt indicated that he associated himself with "self-styled societal outcasts with an 'attitude,'" because this line of clothing is allegedly targeted to young males "who are inclined to resist authority and challenge societal norms." ([Maples's] brief at p. 73.) [Maples] bases this assertion on *Sportmart, Inc. v. No Fear, Inc.*, [No. 94 C 4890, June 3, 1996] (N.D.Ill.1996) (unpublished), which referred to "No Fear" clothing as "'attitude' sportswear" and on *No Fear, Inc. v. Big Ball Sports*, 133 F.3d 928 (9th Cir.1998)(unpublished), which stated that "No Fear" products connote a "certain machismo."  However, the court in *Sportmart* also stated that the slogans generally printed on "No Fear" products express "themes of courage, achievement and individuality." *Sportmart, supra.* Nothing in the slogan printed on the [Maples's] T-shirt showed any abstract beliefs he held or his association with any ill-received group. Accordingly, the prosecutor's use of the T-shirt at the penalty phase of the trial did not violate [Maples's] First Amendment rights[.]

*Maples v. State*, 758 So.2d at 40-41.

> Maples has failed to establish that the content of the t-shirt in and of itself associated him with any group espousing offensive views.  The content of the t-shirt, when viewed in light of the criminal act that occurred while Maples was wearing it, together with Maples's subsequent actions, may have contributed to the impression that Maples was devoid of compassion or remorse.  The First

Amendment was not violated merely because the content of the t-shirt provided an unusual impression of Maples in the unique context of the offense.  Maples has failed to show the state court's decision is either contrary to or involved an unreasonable application of clearly established law, or an unreasonable determination of the facts.

<u>     Claim XVIII.</u>          Maples's statements should have been suppressed because they were given involuntarily and under coercion, in violation of his Fourth, Fifth, Sixth and Eighth Amendment rights.  [Doc. #24, at 180-189].

    A.          An incomplete *Miranda* warning was nullified by subsequent actions of the arresting officer.

Maples contends that he received an incomplete *Miranda* [*v. Arizona*, 384 U.S. 436, 444 (1966)] warning when arrested at the Nashville hotel because, although the warning was verbally provided to him, he was not given an opportunity to *invoke* the rights explained to him.  *Id.* at 181-82.  Maples alleges that the constitution requires not only that Miranda rights be explained to a suspect, the suspect must be given an opportunity to exercise said rights throughout the investigation. Id. at 182 (citing  *Miranda* and *United States v. Johnson*, 455 F.2d 311, 312-14 (5th Cir. 1972). Moreover, the Nashville police officer obviated the warning because he informed Maples that he would take a statement from Maples upon arrival at the police station.  *Id.* at 182 (citing (R. 2477)). Finally, Maples contends that, once he arrived at the station, the Nashville officer informed Maples that Decatur police were en route to  interrogate him.  *Id.* at 183 (citing (R. 2490-91)).  Yet, the Nashville officer proceeded to question Maples, and Maples made an inculpatory statement.  *Id.* (citing (R. 2497-98)).   According to Maples, the state did not meet the burden of proving his statement was voluntary.  *Id.* at 183 (citing *Arizona v. Fuliminante*, 499 U.S. 279, 285 (1991).

Before discussing Maples's *Miranda* claims in connection with his verbal, written or videotape statements, the Alabama Court of Criminal Appeal expressed its understanding of the law governing confessions as follows:

> Confessions and inculpatory statements are presumed to be involuntary and inadmissible. *Ex parte Callahan*, 471 So.2d 463 (Ala.1985). For a confession to be properly admitted, the State must prove that "'the defendant was informed of his *Miranda* rights and that the confession was voluntarily given.'" *Johnson v. State*, 680 So.2d 1005, 1007 (Ala.Cr.App.1996) (quoting *Mann v. State*, 581 So.2d 22, 23 (Ala.Cr.App.1991)).

>> "'In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. *Seawright v. State*, 479 So.2d 1362 (Ala.Crim.App.1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence.'"

> *Howard v. State*, 678 So.2d 302, 306 (Ala.Cr.App.1996) (quoting *Dixon v. State*, 588 So.2d 903, 907 (Ala.1991)).

>> " ' "In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court." '*Kennedy v. State*, 640 So.2d 22, 26 (Ala.Cr.App.1993), quoting *Bradley v. State*, 494 So.2d 750, 761 (Ala.Cr.App.1985), aff'd, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is 'palpably contrary to the great weight of the evidence.' *Parker v. State*, 587 So.2d 1072, 1088 (Ala.Cr.App.1991)."

> *Rutledge v. State*, 680 So.2d 997, 1002 (Ala.Cr.App.1996).

In *McLeod v. State*, 718 So.2d 727 (Ala.1998), the Alabama Supreme Court explained the standard used to determine whether a confession was voluntarily given:

> "The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the 'totality of the circumstances.' *Boulden v. Holman*, 394

U.S. 478, 480, 89 S.Ct. 1138, 1139- 40, 22 L.Ed.2d 433 (1969); *Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); *see Beecher v. Alabama*, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. *See Ex parte Matthews*, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); *Jackson v. State*, 562 So.2d 1373, 1380 (Ala.Cr.App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); *Eakes v. State*, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is 'whether the defendant's will was overborne at the time he confessed') [emphasis in appellate opinion omitted]....

"....

"[T]he test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by 'apprehension of harm or hope of favor.' *See Gaddy*, 698 So.2d at 1154 (quoting *Ex parte Weeks*, 531 So.2d 643, 644 (Ala.1988)); *Culombe*, 367 U.S. at 602, 81 S.Ct. at 1879; *Jackson*, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess 'the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; '[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' *Jackson*, 562 So.2d at 1380-81 (citations omitted)."

718 So.2d at 729-30.

*Maples v. State*, 758 So.2d 1, 41-42.

The Alabama Court of Criminal Appeals made specific findings of fact and conclusions of law in connection with Maples's claims related to the Nashville police officer.

87

[Maples] made two inculpatory oral statements to Officer Tim Mason of the Nashville Police Department shortly after he was arrested. He argues that those statements were involuntary and inadmissible because he was not fully advised of his *Miranda* rights, because Mason told him he "would" take a statement from him at the police station, because Mason interrogated him without allowing him to assert his right to remain silent, and because Mason coerced him into making the statements. At a hearing on [Maples's] motion to suppress the statements, Officer Mason testified that, at the time of the [Maples's] arrest, he asked [Maples] if he knew why he was being arrested and [Maples] indicated that he did. (R. 420-21.) He then advised [Maples] of his *Miranda* rights, and [Maples] indicated that he understood those rights. (R. 421-22.) According to Mason, [Maples] was coherent and did not appear to be under the influence of alcohol or drugs at the time of his arrest. Mason stated that he did not ask [Maples] any questions at that time; rather, he told [Maples] that they would talk later at the police station. When he arrived at the police station, Mason learned that police officers from Alabama would be interrogating [him.] Shortly thereafter, [Maples] indicated that he needed to use the restroom. As he was escorting [Maples] to the restroom, Mason told [Maples] that police officers from Alabama would be interviewing him later and that he would not be conducting the interview. At that time, [Maples] spontaneously said, "Well, I did it." (R. 423, 2491.) Mason stated that [Maples] then went into the restroom and did not say anything else.

Later, when [Maples] told Mason he would like to smoke a cigarette, Mason escorted him outside to smoke. At that time, [Maples] voluntarily and without prompting from Mason divulged more information about his involvement in the murders. (R. 424.) At trial, Mason testified that [Maples] specifically told him that he had shot and killed two people in a car and that the gun he used to commit the murders was in a safe place. (R. 2492-93.) While cross-examining Mason, defense counsel elicited testimony about a conversation during which [Maples] had asked him if he knew what had happened and he responded that he was curious about the case. (R. 2497.) Mason stated that, although he told [Maples] he was curious about the case, he informed [Maples] that he did not have to talk to him about the case. (R. 2502-03.) He admitted during cross-examination that he had commented to another officer about the location of the murder weapon and that [Maples] may have overheard the comment; however, he stated that he had not made the statement to get the appellant to disclose the location of the gun. (R. 2498-99.) [Maples] did not offer any testimony at the suppression hearing.

   " ' "If a defendant spontaneously volunteers information, either before or after being given the *Miranda* warnings, those statements need not be suppressed." *United States v. Edwards*, 885 F.2d 377, 387 (7th Cir.1989). *See also Crawford v. State*, 479 So.2d 1349, 1352 (Ala.Cr.App.1985) ("An unsolicited remark, not in response to

88

any interrogation, does not fall within the Miranda rule"); *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.[1992] ) ("The protections afforded a suspect under [*Miranda* ] apply only when the suspect is both in custody and being interrogated.  A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings."), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).

> " ' "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda ]."

> " '*Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966)*.  See also Britton v. State*, 631 So.2d 1073, 1078 (Ala.Cr.App.1993); *Williams v. State*, 601 So.2d 1062, 1072 (Ala.Cr.App.1991).' "

*Ex parte Clark*, 728 So.2d 1126, 1132 (Ala.1998) (quoting *Worthington v. State*, 652 So.2d 790, 792-93 (Ala.Cr.App.1994)).

The appellant's arguments that he did not voluntarily make the statements to Officer Mason are without merit.  Mason testified that he advised the appellant of his *Miranda* rights, including his right to stop answering questions at any time during the interview.  (R. 421, 2476-77, 2495)  He also testified that the appellant confessed to the murders within an hour after he had been *Mirandized* and transported to the Nashville Police Department.  (R. 423.)  Clearly, the appellant had been advised of his constitutional rights and had had ample time to invoke those rights before he made the incriminating statements to Mason.

The appellant's arguments that his statements were involuntary because of Mason's comments regarding his curiosity about the case and the whereabouts of the murder weapon are likewise without merit.   The appellant did not make his statements to Mason during any interrogation or because of any police coercion. "[I]n the absence of 'compelling influences, psychological ploys, or direct questioning, 'the 'possibility' that an accused will incriminate himself, even the

subjective 'hope' on the part of the police that he will do so, is not the functional equivalent of interrogation." *Burgess v. State*, [Ms. CR-93-2054, November 20, 1998] --- So.2d ---- (Ala.Cr.App.1998) (citing *Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987)). We do not find that Officer Mason's comments about his curiosity concerning the case and the whereabouts of the gun were intended to prompt an incriminating response from the appellant. Rather, the appellant was engaged in a "custodial conversation" with Mason, as opposed to a "custodial interrogation," when he volunteered information to Mason concerning his involvement in the murders. Further, the evidence showed that the appellant initiated the conversations with Mason regarding his involvement in the murders. Although the appellant was in custody when he made the incriminating statements to Mason, he had been fully advised of his *Miranda* rights and he volunteered the information to Mason. Based on the totality of the circumstances in this case, we conclude that the evidence supports the trial court's determination that the appellant's statements to Mason were voluntary and admissible.

*Maples v. State*, 758 So.2d at 42-43.

The appellate court set out a detailed review of *Miranda* and related federal authority relevant to this claim, as well as its application of law to the determination of facts. After careful consideration of the opinion, and in light of the proper standard of habeas review, it cannot be said that Maples has shown the state court's decision to be contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence. This claim is due to be denied.

**B.**     The videotaped confession was not knowingly and voluntarily given.

Maples contends the state did not meet its burden of showing that his videotaped statement was knowing and voluntary as required by *Miranda* and *Arizona v. Fulminante*, 499 U.S. 279, 285 (1991). [Doc. #24, at 185]. He specifically contends that the videotape did not establish that police informed him that he could stop questioning at any time. *Id.* (citing State's exhibit 230-231).[25]

---

[25]          This court has not been provided with a copy of the videotape.

He further contends the police demanded that he waive his rights before he was fully apprised of them in totality.  Specifically, Maples initially was asked to decide whether or not he would remain silent.  At that time, Maples purportedly waived his right to remain silent.   Thereafter, Maples was told that he was entitled to counsel, but the officers did not inform him that he could revoke the waiver pertaining to his silence.  *Id.* at 185-86.  Thus, Maples believes police demanded his give up his rights without a complete *Miranda* warning.  *Id*. at 186.

Maples also asserts that the conditions surrounding the interrogation lend credence to his claim that his waiver was not voluntary.  *Id.* at 186.  Maples states he was inexperienced with the criminal justice system.  The police began to interrogate him at 3:20 a.m., and the interrogation continued until dawn.  *Id.*  at 186-87.  Maples was "repeatedly yawning and stating he was tired and wanted to get some sleep."  *Id.* at 186.  Maples concludes his waiver was coerced and involuntary in violation of his Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights.  *Id.* at 187.   The Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law in connection with the above claims.

> The appellant also argues that his videotaped statement to Officer Howard Battles, an investigator from Morgan County, was involuntary and inadmissible because he was not adequately informed of his *Miranda* rights before the interview. More specifically, he argues that he was not advised that he could revoke his waiver and stop answering questions at any time during the interview and that he had the right to be represented by counsel.  Additionally, he argues that his statement was involuntary because he was interrogated for nearly three hours, beginning at approximately 3:20 a.m., and because he lacked experience with the criminal justice system.  Therefore, we review this issue for plain error. Rule 45A, Ala. R.App. P.
>
> The appellant's claim that he was not fully advised of his *Miranda* rights prior to making the videotaped statement is without merit. State's Exhibit 232, a "Rights Waiver" form, clearly indicates that the appellant was advised of his constitutional rights and that he voluntarily and knowingly waived those rights.  The form contains a section entitled "Your Rights" and a section entitled "Waiver of

Rights." The form specifically reflects that the appellant was informed of 1) his right to remain silent; 2) his "right to a lawyer for advice before we ask you any questions and to have the lawyer with you during questioning"; and 3) his right to have a lawyer, before questioning, free of cost if he could not afford to hire one. Under the "Waiver of Rights" heading, which was followed by the appellant's signature, the form clearly stated that the appellant understood that he was waiving his rights; that he did not want a lawyer; that he had not been pressured or coerced into submitting to questions; and that he understood that he could stop answering questions at any time and the interview would stop.

Officer Battles testified at the suppression hearing and at trial (and the videotape shows) that he advised the appellant of his constitutional rights before the interview. (R. 2648, 2705.) He further testified that the appellant was coherent and was not intoxicated at the time of the interview. (R. 2645.) He stated that, before the interview, the appellant signed a form indicating that he understood his rights and that he was voluntarily and knowingly waiving those rights. (R. 2648-49.) After hearing Officer Battles's testimony and considering the evidence, the trial court found that the appellant was properly advised of his rights and admitted the videotaped confession into evidence. The evidence supports the trial court's finding that the appellant was fully advised of his *Miranda* rights.

The appellant further argues that his videotaped statement was involuntary because his will allegedly was overborne because the interview was conducted at 3:20 a.m. and lasted for three hours and because he lacked experience with the criminal justice system. After thoroughly reviewing the evidence in this case, including the videotaped confession and the written statement of that confession, we do not find that the appellant's will was overborne when he confessed to Officer Battles. Rather, the evidence shows that the appellant was advised of his constitutional rights and that he voluntarily waived those rights and spoke to Officer Battles. He was 21 years old at the time of the offense and he had an eleventh-grade education. Further, the appellant signed a waiver-of-rights form in which he clearly indicated that he had not been pressured or coerced into making the statement to the Alabama police officers. Moreover, his demeanor during the confession, as evidenced by the videotape, reflected that he was coherent and fully understood what he was doing. The evidence does not show that any of the officers physically intimidated or psychologically pressured the appellant or used any "strong-arm" tactics to coerce him to confess. There is no evidence that the interrogation lasted for an unreasonable period of time or that the early morning hours affected the appellant's willingness to cooperate with the police officers. Thus, there is absolutely no evidence that his will was overborne by the conduct of the police officers. Based on this evidence, the State satisfied its burden of proving that the appellant made his statement voluntarily. Therefore, the trial court properly admitted the statement into evidence.

*Maples v. State*, 758 So.2d at 41-45.

The findings of fact made by the appellate court are presumed to be correct, and Maples has offered no evidence to rebut the findings set out above.  Maples has also failed to show that the state court's decisions were contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence.  This claim is due to be denied.

**Claim XIX.**    The trial court improperly informed the jury that there was other evidence which was not presented to them.  [Doc. #24, at 187-89].

Maples contends that on two occasions during the guilt phase of the trial, the trial court informed the jury that there were documents and tapes which had been offered into evidence, but that before the jury could view the evidence, the court would have to make on ruling on whether the items were admissible.  *Id.*   Maples asserts the jury was led to believe that there was additional evidence against Maples that they would not be able to see.  *Id.*  Thus, Maples concludes his "rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution" were violated.  *Id.* at 189.

 Maples's conclusory allegations and supporting legal citation simply do not state a claim, that the state court decision is either contrary to or involved an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence.  This claim is due to be denied.

**Claim XX.**    The trial court unconstitutionally admitted evidence of DNA without a prior showing of reliability.   [Doc. #24, at 189-193].

Maples alleges the trial court erred "when it ruled that the prosecution had adequately explained the population frequency statistical methodology used to obtain the astronomically high numbers inculpating Mr. Maples." *Id.* at 189.   Maples points to aspects of the method he now contends should have been explained in detail.  He argues the State's expert described the method "in the most general and incomplete terms" citing to pages of the record.  *Id.* at 192.  Maples then asserts his "rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated."  *Id.* at 192-93.

Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted.))  The petitioner must specify all the grounds for relief available to the petitioner, state the facts supporting each ground, and state the relief requested.  28 U.S.C. § 2254 Rule 2(c)(1)(2)(3).   A "general reference to the transcripts, case records and brief on appeal patently fails to comply with Rule 2(c) ." *Phillips v. Dormire*,  2006 WL 744387, *1, (E.D. Missouri 2006) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990)).  Further, a general reference to a constitutional amendment is insufficient for this court to conclude that the state court's decision is either contrary to or involved an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence.

**Claim XXI.**   Constitutional error occurred when the jury was briefed on the case outside the presence of Maples or his counsel.  [Doc. #24, at 193].

Apparently another judge organized the jury which was then sent to the trial judge.  Maples claims constitutional error occurred because the trial judge made the following statement to the jury venire, "'[t]his case, as Judge Brown may have told you, may go possibly as long as three weeks[,]'" from this single statement Maples speculates that it is possible that Judge Brown could have "informed the jury of a great deal of information about the case, about counsel, or about the evidence." *Id.* at 193.  Maples then asserts that this innocuous statement violated his right to be present at every stage of his proceeding citing *Gideon v. Wainwright*, 372 U.S. 335, 337 (1963), *United States v. Diaz*, 223 U.S. 442, 454 (1912) and *Proffitt v. Wainwright*, 685 F.2d 1227, 1258, modified on rehearing, 706 F.2d 311 (11th Cir. 1983).  *Id.*

Maples has a right to be present at every *critical* stage of proceeding in which his presence could effect the fundamental fairness of the case.  *Kentucky v. Stincer*, 482 U.S. 730, 745(1987).  This includes *voir dire*. *Gomez v. U.S.*, 490 U.S. 858, 872 (1989).  However, there is no indication the Supreme Court intended that the administrative process of organizing a jury venire described by Maples is to be considered a critical stage of the proceeding.   Other than his unbridled speculation, there is no evidence Judge Brown told the jury assembly anything more than the trial could last several weeks.   The fairness of Maples's trial was not jeopardized by his absence from the organization of the jury.   The conclusion reached by the Alabama Court of Criminal Appeals is correct.  *Maples v. State*, 758 So.2d at 50.  This claim is due to be denied.


      **Claim XXII.**   The trial court erred when it blocked exploration of possible discrimination in the selection of the venire, and prevented Maples from discovering biases among potential jurors.  [Doc. #24, at 194-97].

Maples contends the trial court erred when it refused to grant him funds for an investigator, statistician and sociologist for the necessary purpose of detecting group bias in the composition of the jury in violation of *Ake v. Oklahoma*, 470 U.S. 68, 83(1985).  *Id.* at 194.

In addressing this issue on direct appeal, the Alabama Court of Criminal Appeals referred to the following portions of its decision in *Finch v. State*, 715 So.2d 906 (Ala.Crim. App. 1997):

"In [*Ex parte* ] *Moody*, [684 So.2d 1114[114] (Ala.1996),] the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant's request for expert assistance.

"'Although the [United States] Supreme Court has not specifically stated what "threshold showing" must be made by the indigent defendant with regard to the need for an expert, the Court refused to require the state to pay for certain experts when the indigent defendant "offered little more than undeveloped assertions that the requested assistance would be beneficial." *Caldwell v. Mississippi*, 472, U.S. 320 at 323, 105 S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985). As we stated in *Dubose* [*v. State*, 662 So.2d 1189, (Ala.1995) ] the Supreme Court cases of *Ake [v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) ] and *Caldwell*, viewed together, seem to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense.  "Rather, the defendant must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial."  *Dubose*, 662 So.2d at 1192, *citing Moore v. Kemp*, 809 F.2d 702 (11th Cir.), *cert. denied*, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).

. . . .

[Maples] did not make a threshold showing that an expert would probably assist his defense and that the denial of the expert would result in a fundamentally unfair trial. Rather, he admitted that he was simply speculating that there had been discrimination in the selection of the grand and petit juries. Jurors in Morgan County are selected at random from a list of licensed drivers, and we have approved that system. *See Finch, supra*. Therefore, because the appellant did not make the required showing of need, the trial court did not abuse its discretion in denying his request for expert assistance.

*Maples v. State*, 758 So.2d at 37.

Maples declares the trial court erred when it refused to order the prosecution to "disclose information favorable to the defense" in connection with the jury selection process. *Id.* at 195 (citing *Brady v. Maryland*, 373 U.S. at 87-88; *United States v. Bagley*, 473 U.S. 667 (1985)).  In examining this claim on direct appeal, the Alabama Court of Criminal Appeals found it to be without merit because

> the trial court had previously ordered the prosecution to produce all *Brady* material and any exculpatory evidence to the defense. Therefore, the appellant's request for such information was unnecessary. With regard to the jurors' views or beliefs, the trial court noted that the defense should be able to obtain the requested information during *voir dire* examination.  (R. 96-97.) Finally, although it denied the appellant's written motion, the trial court instructed the prosecutor that if he or any of his staff members involved in the *voir dire* process became aware, during the *voir dire* examination, of any misrepresentation or omission concerning relationships between members of the prosecuting team and prospective jurors that would be tantamount to a misrepresentation, they would be obligated to make that information known to defense counsel. (R. 100-01.) The prosecutor acknowledged that he intended to comply with the trial court's order.

*Maples v. State*, 758 So.2d 50-51.

In *Banks v. Dretke*, 540 U.S. 668, 670-72 (2004), the United States Supreme Court explained the three essential elements of a *Brady* claim.

> A *Brady* prosecutorial misconduct claim has three essential elements.  *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286. . . . [T]he evidence at issue [must] be favorable to the accused as exculpatory or impeaching . . . . the State suppressed the evidence at issue[,] [and the] suppressed evidence is "material" for *Brady* purposes.  *Ibid.*

*Banks v. Dretke*, 540 U.S. at 671.

Maples has not alleged that the prosecutor deprived him of favorable information during the *voir dire* process which fundamentally affected the fairness of his trial. This claim is due to be denied.

Maples alleges the court refused to allow him to utilize jury questionnaires and conduct individual, sequestered voir dire of each juror. *Id.* at 195-97. He asserts that his motion was well supported by federal law, and cites *Turner v. Murray*, 476 U.S. 28, 36-37 (1986) for the proposition that "[t]he Supreme Court has held that *voir dire* in a capital case must be particularly thorough. . . [,]" and that failure of the trial court to allow such an inquiry is reversible error. *Id.* at 196. Maples declares that "trial judges must adopt procedures for *voir dire* that provide a 'reasonable assurance that prejudice would be discovered if present.'" *Id.* at 197 (citing *United State v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976); *United States v. Nash*, 910 F.2d 749, 753 (11th 1990)(citations omitted)(same). He then concludes that he was unable to expose juror bias during group questioning, and would have been able to do so had the jurors been individually sequestered.

On direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law.

> We have reviewed the transcript of the voir dire proceedings, and we are satisfied that the method of the examination and the empaneling of the jury "provided reasonable assurance that prejudice would have been discovered if present." [*Haney v. State*, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993)]. The trial court found that [the confusion and problems caused by a jury questionnaire outweighed the benefits, and] individually sequestered voir dire examination would be too time consuming, but it assured the defense that it would try to create an atmosphere in which jurors would feel free to be open and honest in answering questions. (R. 133-34.) The trial court divided the venire into four panels of fifteen members each, and it allowed both the prosecution and defense to use all of the time they wanted to use during *voir dire* examination. In fact, both the prosecution and defense conducted extensive *voir dire* examination. Furthermore, individual

questioning was allowed if needed.  There is no indication that the appellant was prejudiced by the trial court conducting voir dire examination of prospective jurors in panels rather than individually. Therefore, the trial court did not err in denying the appellant's motion for individually sequestered voir dire examination.

*Maples v. State*, 758 So.2d at 51-52.

Maples has failed to show, under the Supreme Court precedent he cites, that he was not afforded ample opportunity to question each venire member to the fullest extent or that the process employed by the trial judge allowing him the opportunity was contrary to or an unreasonable application of clearly established federal law, or an unreasonable interpretation of the facts in light of the evidence before it.  This claim is due to be denied.


     **Claim XXIII.**     The trial court erred when it admitted evidence of extrinsic uncharged offenses. [Doc. #24, at 198-99].

Maples contends the prosecutor introduced evidence of entirely unrelated offenses at trial. *Id.* at 198 (citing (*Spencer v. Texas*, 385 U.S. 554, 575 (1967)("It is surely engrained  in our jurisprudence that an accused's reputation or criminal disposition is not basis for penal sanctions."). Specifically, Maples alleges a fingerprint card, created when Maples was arrested on a previous charge, was introduced into evidence.  *Id.*  He also contends the prosecutor showed pictures of his bedroom, which displayed stolen road signs.  *Id.* at 199.

 In examining these claim on direct appeal, the Alabama Court of Criminal Appeals found that

> [t]he redacted copy of the fingerprint card did not contain any reference to the appellant's prior arrest record.  The offenses involved and the headings "Date Arrested" and "Date of Offense" were deleted from the copy of the fingerprint card. Furthermore, Harding never testified that the appellant was booked into the jail or

that he was arrested.  In fact, the State did not present any evidence concerning the circumstances surrounding fingerprinting the appellant.

The appellant argues that the admission of the fingerprint card and of the testimony about the fingerprint card was extremely prejudicial because he argued that his lack of a significant criminal history was a mitigating circumstance.  According to the appellant, the jury might have used this evidence to reject this mitigating circumstance.  However, the State conceded during the penalty phase that the appellant had no significant criminal history. (R. 3079, 3252, and 3296.) Furthermore, the trial court charged the jury that, as a matter of law, the mitigating circumstance that the appellant had no significant history of criminal activity existed. (R. 3326). Accordingly, the appellant has not shown that the admission of the fingerprint card and the testimony concerning the fingerprint card prejudiced him. Thus, their admission did not constitute plain error.

. . . .

The photographs in question were part of a series of photographs showing the interior of the trailer. There was no testimony that the photographs depicted the appellant's bedroom. Rather, Exhibits 41, 42, and 43 showed "another bedroom in the mobile home." (R. 1591-92.)  There is nothing to show that the appellant stole the street signs or that they were, in fact, in the appellant's bedroom. Accordingly, the appellant has not shown that the admission of these photographs did or probably did affect one of his substantial rights, and there was no plain error in this regard.

*Maples v. State*, 758 So.2d at 61-62.

The state court's findings of fact are presumed to be correct.  Maples has offered no evidence to rebut the presumption.   The jury was never told, nor was it inferred that Maples had been previously been arrested or was responsible for the theft of road signs.  Neither the fingerprint card nor the photographs would have led the jury to convict Maples of capital murder.  Maples has failed to establish he was prejudiced by the disclosure.  The state court's decision is not contrary to nor does it involve an unreasonable application of clearly established federal law.  This claim is due to be denied.

**Claim XXIV.**  The jury was improperly and unconstitutionally required to conduct a portion of their deliberations and review of the evidence in open court.  [Doc. #24, at 199-200].

Maples contends that during deliberations, the jury desired to review Maples video and audio taped statements, and the trial court improperly "required that they view the video tape in the open courtroom.  *Id.* at 200.  Maples then concludes his "rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated.  *Id.*

Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c."  *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted.))  The petitioner must specify all the grounds for relief available to the petitioner, state the facts supporting each ground, and state the relief requested.  28 U.S.C. § 2254 Rule 2(c)(1)(2)(3).  Further, a general reference to constitutional amendments is insufficient for this court to conclude that the state court's decision is either contrary to or involved an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.

**Claim XXV.**  The trial court improperly instructed the jury on the law.  [Doc. #24, at 200-05].

A.  The trial court gave a confusing and incorrect definition of reasonable doubt.

Maples alleges the trial court's instruction on reasonable doubt was "utterly confusing" and "incorrect as a matter of law."  *Id.* at 200-01.  The instruction reads,

That burden, we have talked about in the *voir dire* process, is to satisfy you of the defendant's guilt beyond a reasonable doubt.  In other words, by the close of this case, in order for you to return a verdict of guilty, you must not be able to say that you believe the defendant is not guilty, and give a good reason why you believe that,

101

> if you are going to convict him.  If after the close of the case, you still have some
> doubt or doubts for which you can articulate or give a reason, not an imaginary or a
> fanciful reason, but a legitimate reason, then you should acquit the defendant.

*Id.* (citing (R. 1443)).

Maples argues that by stating, "you must not be able to say that you believe the defendant is

not guilty, and give a good reason why you believe that, if you are going to convict him,"[26] the trial

court shifted the burden of proof from the state to the defendant "to provide 'good' reasons why the

state's case was subject to reasonable doubts."  *Id.* at 201.  Since according to *In re Winship*, 397

U.S. at 363, and *Sandstrom v. Virginia*, 442 U.S. 510 (1979), the reasonable doubt instruction

reduces the risk of conviction based on factual error, and a shifting of that burden deprives a

defendant of due process and a fair trial,  this instruction violated his Fourth, Fifth, Sixth, Eighth and

Fourteenth Amendment constitutional rights.  *Id.*

When examining this claim for plain error, the Alabama Court of Criminal Appeals

specifically noted that the above statement occurred during the trial court's "introductory remarks

to the jury, not during its oral charge."   *Maples v. State*, 758 So.2d at .   The appellate court

additionally wrote,

> Moreover, during its guilt-phase instructions, the trial court thoroughly explained the
> concept of reasonable doubt to the jury as follows:
>
> > "As I have already told you, the burden is on the State to
> > prove the defendant's guilt as charged.  Before a conviction can be
> > had in this case, the State must satisfy each and every member of the
> > jury of the defendant's guilt beyond a reasonable doubt.  Even if the
> > State demonstrates a probability of guilt, if the State does not
> > establish the defendant's guilt beyond a reasonable doubt, you must
> > acquit the defendant.

---

[26]        Maples also contends the trial court twice made this statement, but cites only the statement made above.

"To clarify the term reasonable doubt, it may help you to some extent for me to say that the doubt which would justify an acquittal must be an actual doubt and not a mere guess or a surmise. It is not a forced or a capricious doubt because everything that relates to human affairs is open to some possible or imaginary doubt. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt. It is a doubt which arises from all or part of the evidence, or from a lack of evidence, or from contradictory evidence which remains after careful consideration of all the evidence. You will observe that the State is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond a reasonable doubt."

(R. 2974-75.)  The trial court further explained:

"In a criminal case such as this, the burden of proof rests on the prosecution. The prosecutor must prove every essential element of the crime beyond a reasonable doubt. This burden of proof on the prosecution to establish the defendant's guilt beyond a reasonable doubt never shifts. The defendant is under no obligation to prove his innocence, nor is he under an obligation to prove anything.

"The term reasonable doubt is expressed very easily, but it sometimes is difficult to define. It is such a doubt as reasonable men and women would entertain after a careful and honest review and consideration of all the evidence in the case. It must be found that in reason it must survive the test of reasoning or the mental processes of such a reasonable examination. It must be such a doubt that arises from some question from the evidence and it must be such a doubt that that a reasonable man or woman would entertain after examining all the evidence. A reasonable doubt, as I have mentioned, may arise not only from the evidence produced, but also from a lack of evidence. The burden is upon the State to prove the defendant guilty beyond a reasonable doubt of every essential element of the crime charged.

"The defendant has the right to rely upon the failure of the prosecution to establish proof. A defendant may also rely upon evidence brought out on cross examination of witnesses for the prosecution and upon evidence presented on behalf of the defendant. The law never imposes upon a defendant in a criminal case the burden or duty of producing any evidence. A reasonable doubt exists in any case when, after careful and impartial consideration of all the

evidence in the case, the jurors do not feel convinced beyond a reasonable doubt that the defendant is guilty of the charge.

"If, after comparing and considering all the evidence in this case, your minds are left in such a condition that you cannot say you have an abiding conviction beyond a reasonable doubt of the defendant's guilt, then you are not convinced beyond a reasonable doubt and the defendant will be entitled to a not guilty verdict.
"The rule which requires proof beyond a reasonable doubt is applicable to every single element necessary that constitutes the crime charged so that if you are not satisfied beyond a reasonable doubt on a single element, you must find the defendant not guilty."

(R. 3007-09.)  The court's instruction clearly conveyed the definition of reasonable doubt to the jury, and it did not impermissibly shift the burden of proof to the appellant.  Furthermore, the instruction on reasonable doubt did not violate the principles set forth in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).

*Maples v. State*, 758 So.2d at 65-66

It is well established that "[t]he government must prove beyond a reasonable doubt every element of the charged offense." *Victor v. Nebraska*, 511 U.S. 1, 3 (1994) (citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed2d 368 (1970)).   The constitution neither requires nor prohibits courts from defining reasonable doubt to juries. *Id.* at 5.  "Rather, 'taken as a whole, the instruction [must] correctly conve[y] the concept of reasonable doubt to the jury.'"  *Id.* (quoting *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954)).  In reviewing the constitutionality of such an instruction, "the appropriate standard is whether there exists a 'reasonable likelihood' that the jury read the instruction to lower the required threshold." *Johnson v. Alabama*, 256 F.3d 1156, 1192 (11th Cir. 2001) (citing *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991)) (other citations omitted).

104

Maples has offered no evidence that the state court's decision was contrary to or involved an unreasonable application of clearly established law or was based upon an unreasonable determination of the facts in light of the evidence.  The statement at issue was an introductory comment, not a specific jury instruction.  Additionally, the state appellate court carefully examined the instructions as a whole, and concluded that the reasonable doubt standard was properly explained.  After review of the instruction, there is no likelihood that the jury could have understood the trial judge's instructions to lower the state's burden of proof.  Accordingly, this claim is due to be denied.

> **B.**      The trial court improperly instructed the jury that
> they could consider any circumstances in aggravation.

Maples contends the trial court "instructed the jury that they 'should consider any evidence that was presented during the guilt phase of the trial that is relevant to the existence of an aggravating or mitigating circumstance.'"  [Doc. #24, at 202] (citing (R. 3322)).  Maples interprets this instruction as "invit[ing] the jury to consider 'any' aggravating circumstance and evidence, despite the applicability of only a single aggravating circumstance[]" in his case, a situation he finds "constitutionally intolerable." *Id.* (citing *Woodson v. North Carolina*, 428 U.S. 313-316).  Maples then concludes the instruction violated his Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights. *Id.*

The Alabama Court of Criminal Appeals disagreed with Maples's interpretation of the charge, writing

> [Maples] argues that the last sentence of the above-cited portion of the trial court's
> instruction indicated to the jurors that they could consider "any" aggravating

105

circumstance and evidence.  However, the trial court did not instruct the jurors that they could consider "any" aggravating circumstances.  In fact, the trial court specifically instructed the jury that it could consider only one aggravating circumstance in the case.   Immediately after the trial court made [the] above-referenced statement, it further instructed the jury as follows:

> "The law of Alabama provides a list of aggravating circumstances that may be considered by the jury in recommending punishment if the jury is convinced beyond a reasonable doubt from the evidence that one or any of such aggravating circumstances exist in this case.  The same definitions that I gave you earlier in the guilt phase of the trial concerning reasonable doubt apply to this matter also.  If the jury is not convinced beyond a reasonable doubt, based upon the evidence, that one or more such aggravating circumstances exist, then the jury must recommend that the defendant's punishment be life imprisonment without parole, regardless of whether there are any mitigating circumstances in the case.  Of the list of aggravating circumstances provided by law, there is one circumstance which you may consider in this case if you are convinced beyond a reasonable doubt based on the evidence that the circumstance does exist.  The aggravating circumstance that you may consider in this case is as follows: the capital offense was committed while the defendant was engaged in the commission of a robbery.  As I stated before, the burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what punishment is to be recommended in this case.  This means before you can even consider recommending that the defendant's punishment be death, you must be convinced beyond a reasonable doubt based on the evidence that at least one aggravating circumstance exists.

> "In deciding whether the State has proven beyond a reasonable doubt the existence of an aggravating circumstance, you should bear in mind the definition I gave you as to reasonable doubt. The defendant does not have to prove anything about an aggravating circumstance.  The burden is wholly upon the State to prove such a circumstance beyond a reasonable doubt.  A reasonable doubt about an aggravating circumstance may arise from all the evidence, from any part of the evidence, or from a lack or failure of the evidence. You may not consider any other aggravating factor other than the one upon which I have instructed you.   You may not consider any aggravating circumstance unless you are convinced beyond a reasonable doubt of the existence of that aggravating circumstance in

106

> this case.  If you find no aggravating circumstance has been proven
> beyond a reasonable doubt to exist in this case, then you must return
> a verdict recommending a sentence of life imprisonment without
> parole.  In that event, you need not concern yourself with mitigating
> circumstances in this case.  If you find beyond a reasonable doubt that
> an aggravating circumstance on which I have instructed you does
> exist in this case, then you must proceed to consider and determine
> the mitigating circumstances."

(R. 3322-25.) (emphasis added).  Thus, reading the challenged statement in the
context of the trial court's entire charge, we find no error.

*Maples v. State*, 758 So.2d at 67-68.

Maples's allegations and legal citation[27] fails to state a claim that the state court's decision

is contrary to or involved an unreasonable application of clearly established federal law, or an

unreasonable determination of the facts in light of the evidence.   This claim is due to be denied.

> **C.**     The trial court constitutionally erred when it
> refused to give numerous requested jury instructions.

As his factual basis for this claim, Maples declares the trial court refused to give "over forty

(40) requested jury charges that correctly stated the law and could have guided the jury's verdicts.

The only proposed guilt phase charges Maples describes at any length are listed as charges 22-30,

"address[ing] the manner in which the jury should consider and evaluate the testimony of witnesses."

*Id.* at 203.  Maples admits an instruction on evaluating witnesses was given, but concludes it "was

incomplete and confusing."  *Id.* at 204  (citing (R. 3005-06).

Maples also contends the trial court erred when it failed to give proposed charges 2,3,4,6

and 11 at the penalty phase of the trial.  *Id.* at 204.  Maples declares these charges were a "proper

statement of [Alabama] law, and would have been helpful to the jury in its deliberations."  *Id.*  He

---

[27]      Maples refers to three (3) pages of a dissenting opinion in a Supreme Court case that abolished mandatory
death penalties for certain offenses.

then asserts that "'accurate sentencing information'" is "'indispensible'" to a jury's sentencing determination, particular when they have "'never made a sentencing decision before.'"  *Id.* (citing *Gregg v. Georgia*, 428 U.S. 153, 189 (1976)).  Maples admits the trial court did "touch on the law guiding aggravating and mitigating circumstances[,]" but concludes the trial court's instructions "did not present the law clear as properly articulated in the refused instructions."  *Id.*   Maples then concludes his Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights were violated.  *Id.* at 205.

Maples's allegations and supporting authority fail to state a claim that the state court's decision is either contrary to or involved an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence.   This claim is due to be denied.

**Claim XXVI.**          The trial court constitutionally erred when it refused to grant the defense motion to prevent the state from diminishing the jury's role in a capital case.  [Doc. #24, at 205-06].

In Maples's pleadings, he reveals that although the trial court denied his first motion requesting the state be prevented from diminishing the jury's role in sentencing, upon renewal of the motion, the state court actually granted the relief.  *Id.* at 205.   Maples alleges the trial court "failed to enforce the order: both the court and the prosecutor repeatedly instructed the jury that their sentence was a 'recommendation.'"  *Id.* (citing *Caldwell v. Mississippi*, 472 U.S. at 328).  Finally, Maples contends that a *Caldwell* violation occurs anytime the jury is only allowed to issue an

108

advisory sentence.[28/] Maples provides no identifying or contextual description of the instructions or how many times these actions purportedly occurred.  In fact, he doesn't even attempt to string cite various pages in the record.

"Habeas corpus review exists only to review errors of constitutional dimension," and a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted.))  The petitioner must specify all the grounds for relief available to the petitioner, state the facts supporting each ground, and state the relief requested.  28 U.S.C. § 2254 Rule 2(c)(1)(2)(3).

The burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks.  *Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir. 1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984).  That burden is to demonstrate at least *prima facie* evidence establishing the alleged constitutional violation.  The mere assertion of a ground for relief, without factual support, does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.  This claim is due to be denied.

| | |
|---|---|
| **Claim XXVII.** | The trial court erred when it denied defense motions for a change of venue.  [Doc. #24, at 206-208]. |
| **Claim XXVIII.** | The trial court erred when it refused to control pretrial publicity.  [Doc. #24, at 208-209]. |

---

[28/]     This is incorrect.  The Supreme Court has never ruled that Alabama's jury advisory system is unconstitutional.  *See  Harris v. Alabama*, 513 U.S. 504 (1995).

With regard to Claim XXVII, Maples alleges the trial court erred when it denied his motion for change of venue based on extensive pretrial publicity. *Id.* at 206-07. Maples then cites *Irvin v. Dowd*, 366 U.S. at 719-21, *Coleman v. Zant*, 708 F.2d 541, 544-45 (11th Cir. 1983), and *Richeau v. Louisiana*, 373 U.S. 723, 729 (1963) for the proposition that due process requires "a change of venue . . . whenever it is demonstrated that jurors called for the case entertain an opinion on guilt or punishment and are unable to lay aside their opinions and render a verdict based solely on the evidence [ad]duced at trial." *Id.* at 207. Maples's interpretation of the legal principles to be drawn from the Supreme Court authority he cites is an unwarranted generalization of the substantive law.

Maples alleges he

> documented some of the extensive pretrial publicity that surrounded the crime, Mr. Maples's arrest, and the pending trial. This showing included documentation of the print and television coverage of the crime. (C. 160-170; 238-368.) The coverage surrounding the homicides and Mr. Maples's involvement therein was overwhelming: over 150 pages of press coverage of the event was introduced by Mr. Maples in support of the change of venue motion.[29] This press coverage included damaging and inadmissible evidence that characterized Mr. Maples as being on the run, as a dangerous and wanted man, and as someone with satanic tattoos. Further, the press reports contained extensive quotes from investigators working on the case.[30]

> Not surprisingly, many of the venire members had heard about the case. Mr. Maples demonstrated to the court that of the sixty potential jurors on Mr. Maples's venire, fifty percent of them had heard about the case, either through press coverage or from their conversations with neighbors and friends. (R. 1362-1363.) Many of the jurors

---

[29] Contrary to Maples's assertions , coverage of his case was not particularly significant. A review of the record, as cited by Maples, indicates that there was media coverage of the murders between July 6, 1995, and during the period surrounding Maples's capture on August 1, 1995. Two local television news channels, the Decatur Daily and the Huntsville Times followed the story during this period. There was no evidence of coverage of the story after August 2, 1995. (C. 160-170) and (R. 239-366).

[30] This particular coverage was factual in that law enforcement officials were looking for Maples, a reward was offered for assistance in his arrest, and that he had several identifying tattoos. It was not inflammatory and prejudicial. Additionally, the court can find no reference to Satanism.

recalled specific details of the offense, and several candidly admitted that it would be difficult for them to set aside what they had heard from extra-judicial sources.[31]

*Id.* at 206-07.

In Claim XXVIII, Maples asserts that he filed "a motion to seal the file until the jury is sequestered, and a motion to control pretrial publicity in order "to restrict the flow of prejudicial publicity available to potential jurors in his case." *Id.* at 208. citing C. 223, 235. He argues the motions were erroneously denied by the trial judge. *Id.* citing R. 179, 186. As a result, Maples alleges the venire was exposed to prejudicial publicity. *Id.* citing C. 160-170; 238-368. He insists trial counsel documented this "media blitzkrieg" to the trial court and asked the proceedings be closed until the jury was sequestered. *Id.* Half of the venire had heard about the case due to their exposure to "extensive and inflammatory" media events before the trial. *Id.* at 209. Maples contends he had a right to a fair trial, free of prejudicial publicity. *Id.* citing *Sheppard v. Maxwell*, 384 U.S. at 362. He concludes, with regard to both claims, that his Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights were violated. *Id.* at 208-09.

When examining these claims on appeal, the Alabama Court of Criminal Appeals correctly explained the law governing prejudicial pretrial publicity as follows

> "In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Franklin v. State*, 424 So.2d 1353 (Ala.Crim.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. *Anderson v. State*, 362 So.2d 1296, 1298 (Ala.Crim.App.1978). As the Supreme Court explained in *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):

---

[31]    Maples does not identify any of these jurors.

111

> " ' " To hold that the mere existence of any
> preconceived notion as to the guilt or innocence of an
> accused, without more, is sufficient to rebut the
> presumption of a prospective juror's impartiality
> would be to establish an impossible standard. It is
> sufficient if the juror can lay aside his impression or
> opinion and render a verdict based on the evidence
> presented in court...."

> " 'The standard of fairness does not require jurors to be totally
> ignorant of the facts and issues involved.  *Murphy v. Florida*, 421
> U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589
> (1975). Thus, "[t]he proper manner for ascertaining whether adverse
> publicity may have biased the prospective jurors is through the voir
> dire examination."  *Anderson v. State*, 362 So.2d 1296, 1299
> (Ala.Crim.App.1978).'

> "*Ex parte Grayson*, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106
> S.Ct. 189, 88 L.Ed.2d 157 (1986[1985])."

*Maples v. State*, 758 So.2d at 68-69, quoting *Williams v. State*, 565 So.2d 1233, 1237-38

(Ala.Cr.App.1990).

The appellate court continued its analysis, writing

> "The way to demonstrate actual jury prejudice is through an extensive
> and thorough voir dire examination.  *Anderson.* There is no question
> that the voir dire examination in the case at bar was both thorough
> and extensive as to each prospective juror's knowledge of and
> feelings about this case.  The fact that virtually every prospective
> juror had some knowledge of the appellant's case does not mean the
> appellant could not receive a fair and impartial trial. *See Thomas* [*v.
> State,* 539 So.2d 375 (Ala.Crim.App.1988)].  Merely because these
> jurors were not totally ignorant of the facts and issues in this case,
> does not mean they were unable to render a fair and unbiased verdict.
> Anderson."

*Holladay v. State*, 549 So.2d 122, 126 (Ala.Cr.App.1988), aff'd, 549 So.2d 135
(Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
Furthermore, the passage of time between the initial publicity surrounding the
commission of the offense and the time of the trial "'cannot be ignored as a factor in
bringing objectivity to the trial.'"  *Robinson v. State*, 430 So.2d 883, 886

(Ala.Cr.App.1983) (quoting *Dannelly v. State*, 47 Ala.App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)).  See also *Pilot v. State*, 607 So.2d 306 (Ala.Cr.App.), aff'd, 607 So.2d 311 (Ala.1992).

*Id*. at 69.

The appellate court examined the evidence of pretrial publicity and the venire responses to voir dire questions to determine whether Maples suffered a prejudice.  According to the appellate court,

> During voir dire examination, both the district attorney and defense counsel extensively questioned potential jurors about their exposure to pretrial publicity about the murders.  [Maples] correctly points out that many of the potential jurors indicated that they had read or heard something about the case.  However, there was no indication that any of the jurors were biased against the appellant or had fixed opinions as to his guilt or innocence as a result of the publicity.  [None of the jurors were disqualified on the basis of what they read or heard.]  In addition, the trial of this case occurred more than two years after the murders were committed.
>
> [Maples] did not show that the community was so saturated with prejudicial publicity that he could not receive a fair trial or that any of the pretrial publicity actually biased any of the prospective jurors against him.  Instead, he simply made bare allegations that there had been prejudicial pretrial publicity and that this publicity had biased the jurors.

*Id.*

Finally, the appellate court found no prejudicial pretrial publicity had occurred.  It necessarily determined the trial court's decision to deny Maples's motions to control pretrial publicity were not erroneous.  *Id.* at 70.[32]

---

[32]     The court also found the trial judge did make efforts to control publicity such as refusing to allow cameras on the floor of the courthouse in which the case was tried, getting opposing counsel to agree not to speak to the press during the trial, and ordering that all transcripts of pretrial hearings be sealed until the conclusion of trial. *Id.*  The court also stated that he would rehear the motions in the event he was notified that an inordinate amount of press coverage was occurring.  *Id.*  Counsel never asked for a rehearing.

After careful review of the record, and the decision of the Alabama Court of Criminal Appeals, it is apparent that Maples has failed to show the appellate court's decision regarding the motion for change of venue was contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence. Maples's failure to establish any prejudice to Maples's trial due to pre-trial publicity also means that the state courts' decision to deny his motions to control pretrial publicity was not contrary to or an unreasonable application of federal law, nor was it an unreasonable determination of the facts in light of the evidence before it. These claims are due to be denied.

**Claim XXIX**.          Maples was subjected to double jeopardy when the same evidence was used to elevate the intentional murder to capital murder and then used as the sole aggravator to impose the death penalty. [Doc. #24, at 209-211].

This claim is without merit. It is well established that the use of an aggravating circumstance to satisfy an element of the offense during the guilt phase as well as a factor to be considered in the sentencing phase is proper. The constitutionality of this statutory scheme has been upheld by the United States Supreme Court in *Lowenfeld v. Phelps*, 484 U.S. 231, 241-46 (1988).

After careful review of the record, Maples's claim is due to be denied.[33] There is no evidence that the state court's decision was contrary to or involved an unreasonable application of applicable federal law or constituted an unreasonable determination of the facts in light of the evidence presented in state court.

---

[33]    See *Tuilaepa v. California,* 512 U.S. 967, 971 (1994) (*citing Lowenfeld v. Phelps*, 484 U.S. at 244-246, wherein the Supreme Court stated, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. . . . The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."

**Claim XXX**.          The  trial  court  and  the  prosecutor repeatedly read the
                        indictment to the jury and thereby prejudiced Maples and
                        relieved the state of its burden of proof. [Doc. #24, at 211-
                        12].

The entire factual basis for supporting the above conclusion consists of two readings of the

indictment to the jury and notification that the district attorney signed the indictment.  *Id.* at 211,

(citing (R. 1461 and 2970)).  According to Maples, such reading informed the jury that the judge and

the district attorney believed he was guilty of the crimes for which he had been indicted.  His entire

legal basis for supporting the conclusion is a statement that the district attorney is a servant in the

law and should therefore have no interest in the case except to see that justice is done.  *Id.* at 212

(citing (*Berger v. United States*, 295 U.S. 78 (1935)).  When reviewing this claim for plain error, the

Alabama Court of Criminal Appeals examined the record, and made the following findings of fact

and conclusions of law.

> During its initial comments to the jury, the trial court explained that the
> indictment itself was not evidence; rather, it stated that the evidence came from the
> witness stand and from the items admitted into evidence during the trial. (R.
> 1445-46.)  It also explained that the State carried the burden of proving the
> truthfulness of the matters alleged in the indictment before the jury could find the
> appellant guilty.  (R. 1445.)
>
> In his guilt-phase opening statement, the prosecutor explained that the
> indictment set forth the elements of the offense that the State would be required to
> prove in each case.  After reading the indictment, he encouraged the jurors to use the
> indictment as a "road map" to determine whether the State had proved each element
> of each offense.  (R. 1460.)  In that opening statement, there was no mention that the
> district attorney had signed the indictment.  Furthermore, the prosecutor did not
> express any personal opinion regarding [Maples's] guilt or innocence.  (R. 1461-62.)
>
> During his guilt-phase closing argument, the prosecutor again stated that the
> indictment was not evidence in the case.  (R. 2891.)  Instead, he likened the
> indictment to a question that asked whether the State had proved what it must to
> convict the appellant.  (R. 2891.)  When he read the indictment, he did not mention

that the district attorney had signed the indictment, and he did not indicate that he believed the appellant was guilty.

During its guilt-phase closing instructions, the trial court cautioned the jury that the indictment was not evidence, and then read the indictment, including the district attorney's signature, to the jury. (R. 2971-73.)

Immediately after reading the indictment, the trial court further instructed the jury as follows:

"As I said, you're not to consider the indictment as evidence. It is merely a written charge made by the State. Your duty is to decide the facts. You take the law as I give it to you and the evidence as it has been presented, and therefrom determine the true facts. To the charge placed against him, the defendant has pled not guilty. He is cloaked with the presumption of innocence that is with him when he enters upon the trial of the case, and this presumption stays with him as a shield against his conviction until, but only until, the State meets its burden of proof and proves his guilt."

(R. 2973.) Later in its charge, the trial court further explained to the jury:

"The indictment is a written accusation charging the defendant with the commission of a crime; in this case capital murder. The indictment is without probative force and carries with it no implication of guilt. The fact that the Grand Jury returned an indictment is in no way any evidence against the defendant and no adverse inference can be drawn against the defendant from the finding of an indictment."

(R. 3009-10.) This court has stated:

"The appellant further argues that his indictment violated the Sixth Amendment of the United States Constitution, because the trial judge, by reading his indictment to the jury prior to the commencement of trial, gave the jury the impression that he was already guilty of the charges against him.

However, an indictment is issued in order to ensure that an accused is aware of the nature of the charges against him and to protect him from future jeopardy. The reading of an indictment before a jury at the commencement of trial merely provides a starting point or framework from which a juror can interpret the evidence. The trial

court, as in the instant case, informs the jury that the indictment is not to be considered as evidence against the appellant, and therefore, the appellant suffered no prejudice."

*Rheuark v. State*, 601 So.2d 135, 140-41 (Ala.Cr.App.1992).

"Moreover, the district attorney's noting in reading the indictment to the jury, that it was signed by him, is not an injection of his personal belief or otherwise improper. Similarly, in *Arthur v. State*, 711 So.2d 1031 (Ala.Cr.App.1996), the appellant argued that the prosecutor improperly inserted his credibility in an attempt to bolster the possibility of conviction by stating that the indictment had been signed by him in his capacity as district attorney.
. . . .

*Boyd v. State,* 715 So.2d 825, 841-42 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).

We have reviewed the trial court's instructions and the prosecutor's comments, and we do not find that they were improper. Neither stated or implied that the indictment was evidence or that the district attorney's signature on the indictment indicated that the prosecutor believed the appellant was guilty. Rather, both explained that the indictment was not evidence and reminded the jurors that it was their duty to weigh the evidence presented in determining the appellant's guilt. Therefore, we find no error in this regard.

*Maples v. State*, 758 So.2d at 71-73.

After careful review of the record, and the decision of the Alabama Court of Criminal Appeals, it is apparent that Maples has failed to show the appellate court's decision was contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence. This claim is due to be denied.

**Claim XXXI.**          Maples was unconstitutionally required to give physical samples. [Doc. #24. at 212-13].

117

Maples admits that the State "may have the authority to collect physical exemplars from criminal suspects," but argues that [t]he trial court's contradictory rulings" concerning the collection of the exemplars "severely hampered [his] ability to rebut the state's evidence. . . " and "deprived him of fair and reliable capital proceeding and sentence." *Id.* (citing *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (for the proposition that he had a right to rely on the finality of the trial court's rulings)). Maples then concludes that his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Maples supports his argument by alleging that

> [t]he state moved the trial court to authorize the collection of physical exemplars from Mr. Maples on February 5 and 6, 1997. (C. 340, 341) Mr. Maples immediately objected to the state's motion and properly asserted that the case was in the final stages of preparation and that granting the state's motion would materially affect the evidentiary record in the case. (C. 342)  The trial court initially agreed with Mr. Maples, and denied the state's request on February 14, 1997.  Subsequently, however, the trial court reversed itself, and granted state discovery of physical exemplars. (C. 391) These contradictory and unpredictable actions of the trial court denied Mr. Maples a fair and reliable capital proceeding and sentence. *Gregg*, 428 U.S. 153 (1976).  Further, the state failed to show that the state's interest in obtaining the physical exemplars outweighed Mr. Maples's right to be free of such serious intrusions as collecting blood and other physical exemplars.

*Id.* at 213.

The Alabama Court of Criminal Appeals conducted a plain error review of this claim and found Maples's claim to be meritless. *Maples v. State*, 758 So.2d at 73-74.  In so doing, the court made the following findings of fact and conclusions of law.

> The trial court first gave the State permission to obtain physical exemplars in December 1995, but the State did not obtain the samples.  Later, on February 7, 1997, four weeks before the trial was scheduled to begin, the State filed a second motion for production of the exemplars.  The trial court noted that the State's request came too close to the trial date to afford the appellant an opportunity to secure independent testing of the samples without a continuance.  Because it did not want to delay the

118

trial further, the trial court denied the request.  However, on February 21, 1997, the trial court granted the State's request for a continuance based on an assistant district attorney's conflict of interest.  At that hearing, the trial court also stated that it would reconsider its ruling on the State's request for the exemplars because the taking of the samples and the appellant's independent analysis would no longer delay the trial.  The appellant objected generally to the continuance, but did not object to the trial court's granting of the discovery request.

. . . .

Under Rule 16.2, Ala. R.Crim. P., the State has a right to obtain such samples.  The trial court acknowledged that right in its initial decision, but also recognized that granting the request at that time would require a continuance.  Therefore, it initially denied the State's request.  However, when the trial was subsequently continued for another reason, the trial court acted within its discretion in revisiting the issue and granting the State's request.  Because the State had a right to obtain the exemplars, the trial court did not err in changing its decision and granting the State's request.  Furthermore, law enforcement agencies have a "critical and urgent" need for scientific testing in the investigation and prosecution of criminal cases, as the Alabama Legislature recognized.  Therefore, the State's interest in obtaining physical exemplars for DNA testing did outweigh the [Maples's] right to be free from physical intrusions.

*Id.*

After careful review of the record, and the decision of the Alabama Court of Criminals, Maples has failed to show the appellate court's decision was contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence before it.  Moreover, the Supreme Court cases cited by Maples are not related to the constitutionality of requiring physical exemplars.  This claim is due to be denied.


**Claim XXXII**.          The trial court invaded the province of the jury, and instructed the jury that it had to find an aggravating circumstance.   [Doc. #24, at 213].

Before the jury began to deliberate during the penalty phase of the trial, Maples contends the trial court twice instructed the jury that because it found Maples guilty of intentional murder during the course of a robbery, it also had already found the existence of one statutory aggravating factor. *Id.* at 213.   Maples contends this instruction invaded the province of the jury, relieved the prosecution of its burden of proof at the penalty phase, and rendered his death sentence unreliable. *Id.* at 214 (citing (*Sandstrom*, 442 U.S. at 521-22)).

This claim is substantially the same as Maples's twenty-ninth (29) claim, and is due to be denied for the same reasons.


**Claim XXXV**.          The cumulative effect of all of these errors resulted in constitutional error.  [Doc. #24, at 217].

Maples has failed to identify a claim in his petition which entitles him to 28 U.S.C. § 2254 relief.  It follows that he has also failed to establish that purported errors collectively would entitle him to relief.  This claim is due to be denied.

For the foregoing reasons, Maples's petition for writ of habeas corpus is due to be **DENIED**.  An appropriate order will be entered.

**DONE**, this the 29th day of September, 2006.


*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE