FILED

2015 Sep-14  PM 02:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| CORY R. MAPLES, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) **CASE NO.  5:03-CV-2399-SLB** |
| | ) |
| JEFFERSON S. DUNN, Commissioner of the Alabama Department of Corrections, | ) ) ) |
| | ) |
| Respondent. | |

## MEMORANDUM OPINION

This case is presently before the court on Cory R. Maples's Amended Petition for Writ of Habeas Corpus, (doc. 24),[1] seeking relief from his state-court conviction for capital murder and death sentence pursuant to 28 U.S.C. § 2254.  Maples was convicted of capital murder and sentenced to death for the murders of Stacy Alan Terry and Barry Dewayne Robinson, II.  He has filed this petition seeking habeas relief pursuant to § 2254 based, *inter alia*, on the alleged constitutionally-ineffective assistance of his trial counsel.  For the reasons set forth below, the court finds that Maples's Amended Petition for Writ of Habeas Corpus is due to be denied.

---

[1]Reference to a document number, ["Doc. ____"], refers to the number assigned to each document as it is filed in the court's record and citations to page numbers in such documents refer to page number assigned to the document in the court's electronic filing system.  Unless otherwise indicated, citations to the state-court records reflects the volume, tab, and page numbers assigned by respondent.

## TABLE OF CONTENTS

I.  THE OFFENSE CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.  THE SENTENCING ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.  APPLICABLE STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    A. HABEAS STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        1. Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        2. The Rule 32 Court's Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    B.   EXHAUSTION, PROCEDURAL DEFAULT, AND THE CAUSE-AND-
       PREJUDICE STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    C. CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL . . . . . . . . . . . 21
        1. The Performance Prong . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        2. The Prejudice Prong . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        3. Deference Accorded State Court Findings of Historical Fact and Decisions
           on the Merits When Evaluating Ineffective Assistance of Counsel
           Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    D. EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

V.  THE POST-REMAND INEFFECTIVE-ASSISTANCE CLAIMS . . . . . . . . . . . . 30

VI.  THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS . . . . . . . . . . . . . . 34
    A.  INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF
       TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        1.  Counsel's Chosen Strategy Not to Investigate, Pursue, and Present a
           Defense Based on Intoxication Was Unreasonable . . . . . . . . . . . . . 34
           a. History of the claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
           b. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
           c. Evidence at trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
              i. Maples's videotaped confession . . . . . . . . . . . . . . . . . . . 41
              ii. Testifying guilt phase witnesses who saw Maples before the
                 murders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
              iii. Guilt phase witnesses who saw Maples after the murders
                 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
              iv. Additional witnesses counsel failed to adequately interview
                 or investigate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

       d. Notice of Maples's extreme intoxication through penalty-phase testifying witness Dr. Shealy. . . . . . . . . . . . . . . . . . . . . . . . . 65
       e. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
   2. Counsel's Failure to Request the Assistance of a Pharmacologist or Other Expert in Drug Interactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
   3.   Counsel Failed to Request Jury Instructions on Intoxication and Manslaughter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
   4. Counsel Was Ineffective for Admitting Critical Elements of the Charged Offenses During Closing Argument and Arguing a Position That Was Inconsistent with His Opening Statement. . . . . . . . . . . . . . . . . . . . . 80
       a. Maples's claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
       b. Counsel's Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
       c. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
   5. Alabama's System of Indigent Representation in Capital Cases Contributed to Counsel's Deficiencies and Further Deprived Maples of Effective Assistance of Counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
B. INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
   1. Alabama Code § 13A-5-46(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
   2.   Counsel Failed to Adequately Investigate Maples's Family History and Character References.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
       a. Procedurally barred allegations. . . . . . . . . . . . . . . . . . . . . . . . . . 104
       b. Maples's family history (abuse and abandonment by his mother). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
          i. The trial evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
             A. Dr. Allen Shealy. . . . . . . . . . . . . . . . . . . . . . . . . 109
             B. Philip Maples.. . . . . . . . . . . . . . . . . . . . . . . . . . . 110
             C. Elyse Maples. . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
             D. Kenneth Maples. . . . . . . . . . . . . . . . . . . . . . . . . 112
          ii. The alleged undisclosed evidence. . . . . . . . . . . . . . . . . . 113
             A. Philip Maples. . . . . . . . . . . . . . . . . . . . . . . . . . . 113
             B. Denise Imgrund. . . . . . . . . . . . . . . . . . . . . . . . . . 114
             C. Elyse Maples. . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
             D. Other Family Members. . . . . . . . . . . . . . . . . . . . 116
          iii. Analysis.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
       c. Maples's Character References. . . . . . . . . . . . . . . . . . . . . . . . . . 122
          i. The trial evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
          ii. The post-conviction allegations. . . . . . . . . . . . . . . . . . . . 124
          iii. Analysis.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

3.  Counsel Failed to Adequately Investigate Mr. Maples's Drug Addiction and Attempted Recovery, Depression, and Suicide Attempts... . . 133
4.  Counsel Failed to Present Evidence of Maples's Assistance to the Police in Their Enforcement of Drug Law Violations... . . . . . . . . . . . . . . . . 142
5.  Counsel Failed to Procure a Competent Psychological Evaluation... . 148
6.  Counsel Failed to Investigate Maples's Post-Arrest Behavior.. . . . . . 156
7.  Counsel Failed to Investigate Maples's Head Trauma.. . . . . . . . . . . 157
C.    COUNSEL WERE INEFFECTIVE FOR USING CONTRADICTORY STRATEGIES IN THE GUILT PHASE AND PENALTY PHASE. . . . 165
D.  COUNSEL'S CUMULATIVE ERRORS.. . . . . . . . . . . . . . . . . . . . . . . . . . . 176

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

CERTIFICATE OF APPEALABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

# I.  **THE OFFENSE CONDUCT**

In its decision denying Maples relief on direct appeal, the Alabama Court of Criminal Appeals adopted the statement of facts set forth in the trial court's sentencing order.  These facts were set forth in the court's prior Memorandum Opinion and are not disputed.

At some time in the late evening hours of Friday, July 7, 1995, or the early morning hours of Saturday, July 8, 1995, Stacy Alan Terry, Barry Dewayne Robinson II, and the Defendant, [Cory][2] Ross Maples, arrived at the residence of the Defendant on Mud Tavern Road in Morgan County.  All three of the young men were acquaintances.  Mr. Terry, whose nickname was ["]Twinky,["] and the Defendant had spent the evening of July 7 drinking, playing pool, and ["]riding around["] in Mr. Terry's 1995 Camaro.  The Defendant and Mr. Terry had attended high school together until the Defendant dropped out his senior year.  As evidenced by the testimony of family and friends, the two young men had spent a considerable amount of time together during the week preceding [the murders].

---

[2]Throughout the state proceedings, Cory Maples was referred to as "Corey Maples." The correct spelling is "Cory."

Mr. Robinson was new to the area, but had known Mr. Terry and the Defendant for several months.  Mr. Robinson asked Mr. Terry for a ride home from the pool hall where all three young men were playing pool.

Once the three young men arrived at the home of the Defendant, [Cory] Maples, he left the car and went into the mobile home.  The defendant picked up a .22 caliber rifle and walked back outside to the car where Mr. Terry and Mr. Robinson sat getting ready to leave.  The Defendant walked to the driver's side of the car and shot Mr. Terry twice in the head and then shot Mr. Robinson twice in the head.

At some time around 1:00 a.m. on July 8, 1995, the Defendant's half-brother, Daniel Maples, and his friend, Matt Shell, arrived at the residence on Mud Tavern Road and found the body of Stacy Terry lying in the driveway close to the trailer where the Defendant and his half-brother lived with their father and the Defendant's stepmother.

At some time around 9:00 p.m. on July 8, 1995, the Decatur police received a report of a body found in a creek commonly referred to as Mud Tavern Creek, one mile down the road from the Defendant's residence. The body was identified as that of Barry Robinson II.

During the ensuing investigation of the two young men's murders, officers of the Morgan County Sheriff's Department obtained information that implicated [Cory] Ross Maples in the killings of Mr. Terry and Mr. Robinson. The officers began to look for the Defendant and Mr. Terry's missing Camaro with the personalized tag bearing the word ["]TWINK.["]

In the late evening of August 1, 1995, the Nashville Metropolitan Police Department received a telephone call from an individual who had spotted the Defendant at the Best Rest Motel off I-10 in Nashville.  The individual had seen a picture of the Defendant and heard a description of the car from a local television station.  Members of the Nashville Police Department apprehended the Defendant at the motel.  The Defendant was then transported to the Nashville Metropolitan Police Department where he was held until members of the Morgan County Sheriff's Department arrived.  During the early morning hours of August 2, 1995, the Defendant gave Investigators Howard Battles and Byron Whitten of the Morgan County Sheriff's office a statement of confession to the murders.

Mr. Terry and Mr. Robinson died as a result of gunshot wounds to the head. Both young men were shot twice in the head. The medical examiner determined that each man's death was instantaneous to the shots to the head. The wounds were consistent with an execution-type slaying. The evidence proved beyond a reasonable doubt that the Defendant shot both men. He was armed with a .22 caliber rifle which belonged to his father.

Evidence, both circumstantial and direct, overwhelmingly supported the foregoing finding: Count I of the indictment charged the Defendant, [Cory] Maples, in the killing of two people in a single transaction or occurrence as described in Ala. Code [1975,] § 13A-5-40[(a)](10)(1994 repl. vol.). Count II of the indictment charged the Defendant, Corey Maples, with the murder of Stacy Terry during the course of a robbery as described in Ala. Code [1975,] § 13A-5-40[(a)](2)(1994 repl. vol.). The jury returned a verdict of guilty on both counts of capital murder after five plus days of testimony. The Defendant was the sole participant in this brutal double murder of Stacy Alan Terry and Barry Dewayne Robinson II, as well as the murder of Stacy Alan Terry in the course of robbing Stacy Alan Terry of his 1995 Camaro automobile. (C.R. 554-56.)

(Doc. 34 at 3-5 [quoting *Maples v. State*, 758 So. 2d 1, 14-16 (Ala. Crim. App. 1999)]

(internal quotations omitted).)

## II. <u>THE SENTENCING ORDER</u>

The pertinent portions of the trial court's sentencing order are set forth below:

*Application of the Law*

The only sentences available to the court in this proceeding are death or life imprisonment without parole. The Alabama Code provides a rather strict procedure to be followed in determining whether to sentence a Defendant who has been convicted of a capital offense to death or life imprisonment without parole. See Ala. Code § 13A-5-39 through 13A-5-59 (1994 repl. vol.) Each person who is convicted of a capital offense must be sentenced in accordance with the statutory scheme. The court will follow the statutory arrangement in explaining its application of the law to the fact of this case.

*The crime*.  The Defendant was convicted of murder during the commission of a robbery in the first degree and murder of two persons pursuant to a common plan or scheme.  *See* Ala. Code § 13A-5-40(a) (1994 repl. vol.)

*The aggravating circumstances*.  The State proved beyond a reasonable doubt that one statutory aggravating circumstance applies in this case:  The capital offense was committed while the Defendant was engaged . . . in the commission of . . . robbery . . . .  *See* Ala. Code § 13A-5-49(4) (1994 repl. vol.).

The Defendant committed the capital offense while he was engaged in the commission of a robbery.  *See* Ala. Code § 13A-5-49(4) (1994 repl. vol.).  This aggravating circumstance also constituted the aggravating component of the capital offense.  Therefore, the jury verdict which found the Defendant guilty of a murder during the commission of a robbery in the first degree established this aggravating circumstance beyond a reasonable doubt.

The State did not rely on any other statutory aggravating circumstance as those circumstances are defined and construed.  The court has not considered any of the facts of this case as non-statutory aggravating circumstances.  . . . [T]he State did not rely on any other aggravating circumstances, [and the court finds all other statutory aggravating circumstances to be inapplicable].

. . .

*The mitigating circumstances*.[3]  The defense asserted the presence of mitigating circumstances.  Although the defense did not rely on all of the statutory mitigating circumstances, the court reviews all of the statutory mitigating circumstances in this sentencing order.

1.  *The Defendant has no significant history of prior criminal activity*.  *See* Ala. Code § 13A–5–51(1) (1994 repl. vol.).  The court finds this

---

[3]In Alabama, "A mitigating circumstance is a fact or situation that does not bear on the question of a defendant's guilt but is considered in imposing punishment and [especially] in lessening the severity of a sentence."  *Ex parte Lewis*, 24 So. 3d 540, 543-44 (Ala. 2009)(quoting BLACK'S LAW DICTIONARY 260 (8th ed. 2004))(internal quotations omitted).

mitigating circumstance is present in this case. The District Attorney conceded this point during the sentencing phase of the trial, and the court concurs.

2. *The capital offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance.* *See* Ala. Code § 13A–5–51(2) (1994 repl. vol.). The Court finds this mitigating circumstance is inapplicable.

The Defense asserts that the Defendant had been drinking beer the night of the murders and had a history of drug addiction. The Defense further alleges that this substance abuse was extensive and a triggering factor in the events of July 7 and July 8. This evidence falls woefully short of the statutory mitigating circumstance that the offender was under the influence of extreme mental or emotional disturbance. Dr. Alan [Shealy], a clinical forensic psychologist testifying for the Defendant, presented evidence that the Defendant's background and history fit a profile of a passive-aggressive personality. This profile resulted from Dr. [Shealy]'s feeding a computer program information provided by the Defendant in an interview. The court notes the State psychologist did not markedly differ from Dr. [Shealy]'s report. Both doctors agreed the Defendant was fit to stand trial and understood the difference between right and wrong. The only difference between the two experts being the Defendant's expert testified alcohol and past drug abuse might be a trigger for the actions taken by the Defendant on the night of July 7, 1995. However, the Defendant, in a videotaped confession, denied the use of drugs on the night of the murders and robbery.

3. *The victim was a participant in the Defendant's conduct or consented to it.* *See* Ala. Code § 13A–5–51(3) (1994 repl. vol.). The court finds this mitigating circumstance is inapplicable.

. . .

4. *The Defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.* *See* Ala. Code § 13A–5–51(4) (1994 repl. vol.). The Court finds this mitigating circumstance is inapplicable.

. . .

5.  *The Defendant acted under extreme duress or under the substantial domination of another person.*  *See* Ala. Code § 13A–5–51(5) (1994 repl. vol.).  The Court finds this mitigating circumstance is inapplicable.

No evidence exists to lead this court to believe the Defendant acted under extreme duress or under the substantial domination of another person. Quite the contrary, the evidence shows the Defendant asserted he alone killed the two men with no external influences.  This mitigating circumstance was neither asserted nor proved; the court rejects this mitigating circumstance.

6.  *The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.*  *See* Ala. Code § 13A–5–51(6) (1994 repl. vol.).  The court finds this mitigating circumstance is inapplicable.

The court notes the Defense never specifically addressed this particular mitigating circumstance.   While the defense does assert the defendant had been drinking alcohol extensively during the period before the crime, the evidence falls short of supporting the assertion the Defendant was so impaired by alcohol he could not appreciate the criminality of his conduct.  The court notes the Defendant stole the vehicle of Stacy Terry and fled the state because he knew the authorities would be after him.  The court finds such evidence too weak and unpersuasive to support this statutory mitigating circumstance.

7.  *The age of the Defendant at the time of the crime.*  *See* Ala. Code § 13A–5–51(7)(1994 repl. vol.).  The court finds this mitigating circumstance is inapplicable.

The Defendant was 21 years of age at the time of this capital murder. The court is not persuaded this constitutes a mitigating circumstance. Although the age of an offender may be an important consideration in deciding punishment, a 21-year-old offender is not so youthful the Court should treat him differently than other adults.

8.  *§ 13A–5–52. Mitigating Circumstances – Inclusion of Defendant's character, record, etc.*  The court finds evidence of this circumstance in this case.

The defense presented seven nonstatutory mitigating circumstances to be considered in the sentencing phase of the trial.  They are as follows:

(1)  That the Defendant suffered abuse, neglect, and abandonment by his birth mother during his childhood.  The court does not doubt the abandonment of the Defendant by his birth mother as introduced into evidence by the Defendant's psychologist and the Defendant's family.  However, the Court also notes the testimony supports the fact that the Defendant has good relations with his step-mother, who he has known as his mother since the Defendant was the age of three.  The psychologists' testimony and testimony from the Defendant's family lead one to the inescapable conclusion that [Cory] Ross Maples is a troubled young man with a history of abuse from his mother and self-abuse through drugs and alcohol.

(2)  That the Defendant has suffered from past drug dependency.  Testimony elicited throughout the trial from various witnesses, including the Defendant,[4] established the Defendant had a drug dependency on marijuana, crystal methamphetamine, crack, and various other illegal controlled substances.  The court does not doubt the testimony the Defendant has suffered from addiction to various controlled substances.

(3)  That the Defendant has made efforts at controlling his drug dependency in drug rehabilitation.  Testimony elicited from the Defendant's father and step-mother established the Defendant spent some time in the latter half of 1994 at the Quest Recovery Program for Drug Addiction.  The court finds this testimony credible.

(4)  That the Defendant has cooperated and assisted law enforcement authorities in its enforcement of drug law violations.  The Defendant's stepmother testified the Defendant had assisted the Decatur Police Department in apprehending a drug violator.  The court notes no police officer testified at trial, nor was there any corroboration of the stepmother's testimony.

(5)  That the Defendant had diminished mental capacity at the time of the crime due to his consumption of alcohol.

While the defense presents this as a mitigating factor, the Court fails to be convinced by the conflicting testimony at trial that this is a mitigating factor.  The Defendant acknowledges no inordinate amount of alcohol

---

[4]Maples did not testify at trial.  However, his statements were introduced into evidence through his videotaped confession and Shealy's testimony.

consumption on the evening of the murder, nor is there any evidence that the amount of alcohol consumption on the evening of July 7, 1995[,] was any different than any other night.

(6) That the Defendant displayed remorse and candor in his videotaped confession to law enforcement authorities and further during this confession he accepted full responsibility of the murder of Stacy Terry and Barry Robinson, II.

The court has considered this non-statutory mitigating circumstance and finds the Defendant did candidly speak of the events of July 7 and July 8, 1995. The court is not persuaded the Defendant exhibited any remorse over the consequences of his actions. While the Court commends the Defendant's candor, the court finds no evidence of remorse.

(7) That the crime was absent of any prolonged suffering or torture by either of the Decedents.

While the defense presents this as a mitigating factor, the Court fails to be convinced by the testimony at trial that this is a mitigating factor.

*Weighing the Circumstances*

The court now proceeds to weigh the aggravating and mitigating circumstances to determine the appropriate sentence under the law. The Court has not merely tallied for the purpose of numerical comparison the aggravating and mitigating circumstances, but has [marshaled] and considered in an organized fashion all of the relevant circumstances.

The evidence proves beyond a reasonable doubt the existence of one statutory aggravating circumstance. The defense did prove by a preponderance of the evidence that the Defendant has no significant history of prior criminal activity. Insofar as the Defense attempted to assert the presence of several statutory mitigating circumstances, the facts failed to meet the definition of the circumstance or the evidence disproved the factual existence of the circumstance by at least a preponderance of the evidence. The court did weigh several non-statutory mitigating circumstances in addition to the one statutory mitigating circumstance, but found them weak and unpersuasive.

The court is unable to find the kind of mitigating facts that would justify the imposition of a sentence of life imprisonment without parole despite the existence of one statutory aggravating circumstance. The statutory aggravating circumstance far outweighed the mitigating facts. The court considered the jury's recommendation as required by law. *See* Ala. Code 13A-5-47(e) (1994 repl. vol.). The court, though, understands the jury's verdict does not require this court to impose the sentence of death.

The jury deliberated for about four hours before returning the advisory verdict affixing punishment at death, ten for death and two for life without parole.

The courts accepts the jury's recommendation. The court fixes the Defendant's punishment at death.

(Rule 32 C.R. Vol. 37, Tab 62, at 3-12 [footnotes added].)

## III.  <u>PROCEDURAL HISTORY</u>

On September 29, 2006, this court entered a Memorandum Opinion and Final Judgment denying Cory R. Maples's petition for habeas relief based on his failure to timely appeal the Rule 32[5] court's denial of his ineffective assistance claims.  (*See* docs. 34 and 35.) The Eleventh Circuit Court of Appeals affirmed this court's judgment.  *See Maples v. Allen*, 586 F.3d 879 (11th Cir. 2009).  That court held, in part, "It is undisputed that Maples never appealed [the Rule 32] court's dismissal of his Rule 32 claims.  Thus, Maples did not properly exhaust those claims in state court.  And because any further attempts by Maples

---

[5]In Alabama state courts, "Rule 32, A. R. Cr. P., provides a procedure for securing the post-conviction relief from a conviction or sentence previously provided by either a writ of habeas corpus or a writ of error coram nobis."  *Ex parte Powell*, 641 So. 2d 772, 775 (Ala. 1994)(citing H. Maddox, ALABAMA RULES OF CRIMINAL PROCEDURE § 32.0 (1990)). Throughout this Memorandum Opinion the court has used the term "Rule 32" to refer to the state post-conviction proceedings.

to exhaust those claims in state court would be futile, Maples's unexhausted claims are procedurally defaulted." *Id.* at 886 (citing, *inter alia*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).  Also, the Eleventh Circuit found that Maples had not established "cause" under the "cause and prejudice" standard because "counsel's failure to file a timely notice of appeal of the Rule 32 Order cannot establish cause for his default because there is no right to post-conviction counsel." *Id.* at 891 (citing *Coleman*, 501 U.S. at 752; *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1344 (11th Cir. 2007)).

Maples petitioned for a writ of certiorari to the United States Supreme Court, *Maples v. Allen*, Petition for Writ of Certiorari, 2010 WL 2727329 (July 9, 2010), and the Court granted the petition as to the following issue:

> Whether the Eleventh Circuit properly held – in conflict with the decisions of this Court and other courts – that there was no "cause" to excuse any procedural default where petitioner was blameless for the default, the State's own conduct contributed to the default, and petitioner's attorneys of record were no longer functioning as his agents at the time of any default.

*Id.*, 2010 WL 2727329 at *i; *Maples v. Thomas*, 131 S. Ct. 1718 (2011)(granting in part Maples's cert. petition).

The Supreme Court reversed the decision of the Eleventh Circuit, finding the "extraordinary circumstances" surrounding Maples's failure to appeal the Rule 32 court's order "show[ed] ample cause . . . to excuse the procedural default in which he was trapped when counsel of record abandoned him without a word of warning." *Maples v. Thomas*, ___

13

U.S. ___, 132 S. Ct. 912, 927 (2012).  The Court reversed and remanded the case for

consideration of whether Maples could establish prejudice under the cause-and-prejudice

standard, *id*. at 927-28, an issue not previously reached by this court or the Eleventh Circuit.

On March 8, 2012, the Eleventh Circuit remanded the case to this court with

directions to comply with the Supreme Court's instructions.  *Maples v. Comm'r, Ala. Dep't*

*of Corr.,* 460 Fed. Appx. 860 (11th Cir. 2012).

This court entered a scheduling order based upon the parties' joint proposed briefing

schedule.  (Doc. 59.)  Pursuant to that order, Maples was directed to "file a brief explaining

a) why Claims I, II, and III in his amended habeas petition (doc. 24 which was filed May 23,

2005) are not procedurally barred, and b) why he is entitled to relief based on Claims I, II,

III."[6]  (Doc. 59 at 1.)  Respondent, the Commissioner of the Alabama Department of

Corrections, was directed to respond to Maples's "Opening Brief, and explain why Claims

---

[6]Maples alleged thirty-five claims in his habeas petition, but only Claims I, II and III
are subject to the prejudice inquiry dictated by the Supreme Court's remand instructions.  As
pointed out by Maples in his initial post-remand brief –

> [This] court rejected Claims VI, VII, XI, XXXIII, and XXXIV because they
> were not presented at trial or on direct appeal and thus had been procedurally
> barred by the trial court at the state postconviction stage.  [(Doc. 34 at 17-18.)]
> The district court rejected on the merits Claims IV, V, VIII, IX, X, XII, XIII,
> XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, XXIII, XXIV, XXV,
> XXVI, XXVII, XXVIII, XXIX, XXX, XXXI, XXXII, and XXXV. (Id. at
> 18-120.) [to] XXXII, and XXXV.  (*Id*. at 18-120).

(Doc. 60 at 32 n.5.)  Accordingly, the determinations made regarding Claims IV through
XXXV in the 2006 Memorandum Opinion and Final Judgment remain final and will not be
disturbed.

I, II, and III in petitioner's most recent habeas petition are procedurally barred or otherwise not meritorious." (*Id.*)  Thereafter, Maples was afforded an opportunity to file a Reply Brief, followed by respondent's Sur-Reply Brief.  (*Id*. at 1-2.)  The parties have complied with these briefing obligations.

## IV.  APPLICABLE STANDARDS OF REVIEW

Since Maples's habeas petition was filed after 1996, it is governed by the Anti-Terrorism Effective Death Penalty Act (AEDPA), as codified in 28 U.S.C. § 2254.

> As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner.  Section 2254(a) permits a federal court to entertain only those applications alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States."  Sections 2254(b) and (c) provide that a federal court may not grant such applications unless, with certain exceptions, the applicant has exhausted state remedies.

*Cullen v. Pinholster*, 563 U.S. 170, ___, 131 S. Ct. 1388, 1398 (2011).  The ultimate purpose of these limitations is to ensure that state courts are afforded the first opportunity to correct only federal questions affecting the validity of state court convictions.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).

## A.  HABEAS STANDARD OF REVIEW

### 1.  Generally

The parties agree that Maples's ineffectiveness claims were adjudicated on the merits by the Rule 32 court.  Therefore –

> Under § 2254(d), [his] application [for habeas relief] "shall not be granted with respect to [such a] claim . . . unless the adjudication of the claim":

"(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

"(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

This is a "difficult to meet," *Harrington v. Richter*, [562 U.S. 86, 102,] 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011), and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002)(*per curiam*)(citation and internal quotation marks omitted).   The petitioner carries the burden of proof.   *Id.*, at 25, 123 S. Ct. 357.

*Cullen*, 131 S. Ct. at 1398.

The "backward-looking language" of § 2254(d) "requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court."  *Id*.  Also, the "[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'"  *Id.* at 1399 (quoting *Lockyer v. Andrade*, 588 U.S. 63, 71-72 (2003)).

## 2.  The Rule 32 Court's Order

Maples argues that the Rule 32 court's decision should not be afforded 2254(d) deference because the Supreme Court expressed consternation that the order was a word for

16

word copy of the proposed order the State had submitted.[7]  (Doc. 60 at 36 [quoting *Maples*,

132 S. Ct at 919 n.5].)  The Supreme Court has –

> . . . criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record.  See, *e.g.*, *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656-657, 84 S. Ct. 1044, 1047-1048, 12 L. Ed. 2d 12 (1964); *United States v. Marine Bancorporation*, 418 U.S. 602, 615, n. 13, 94 S. Ct. 2856, 2866, n. 13, 41 L. Ed. 2d 978 (1974).  We are also aware of the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor.  See J. Wright, The Nonjury Trial – Preparing Findings of Fact, Conclusions of Law, and Opinions, Seminars for Newly Appointed United States District Judges 159, 166 (1962).  Nonetheless, our previous discussions of the subject suggest that even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.  *United States v. Marine Bancorporation*, *supra*, at 615, n.13, 94 S. Ct., at 2866, n.13; *United States v. El Paso Natural Gas Co.*, *supra*, 376 U.S., at 656-657, 84 S. Ct., at 1047-1048.

*Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985), *quoted in Jefferson v. Upton*, 560

U.S. 284, 293-94 (2010)("Although we have stated that a court's 'verbatim adoption of

findings of fact prepared by prevailing parties' should be treated as findings of the court, we

have also criticized that practice. . . .  And we have not considered the lawfulness of, nor the

application of the habeas statute to, the use of such a practice where (1) a judge solicits the

---

[7]The Supreme Court did not actually express any opinion regarding the Rule 32 court's adoption of the State's proposed order; it noted only, "One of Maples'[s] attorneys observed, without contradiction, that the trial court's order was a 'word for word copy of the proposed Order that the State had submitted [with] its [December 2001] Motion to Dismiss.'"  *Maples*, 132 S. Ct. at 919 n.5.

proposed findings *ex parte*, (2) does not provide the opposing party an opportunity to criticize the findings or to submit his own, or (3) adopts findings that contain internal evidence suggesting that the judge may not have read them")(internal citations omitted).

Maples filed his initial Rule 32 petition on July 24, 2001. (Rule 32 C.R., Vol. 32, Tab 47.) On September 27, 2001, The State filed an answer and motion to dismiss Maples's initial Rule 32 petition. (*Id.* at Tab 48). The State also submitted a proposed dismissal order based on the claims as alleged in the initial Rule 32 petition. On December 7, 2001, Maples filed an amended Rule 32 petition along with a response in opposition to the State's motion to dismiss. (*Id.*, Vol. 33, Tabs 49 and 50.) Maples defended his initial petition in the motion but also stated that he was submitting an amended petition to correct the alleged deficiencies. While many of the claims in the amended Rule 32 petition were identical to the initial Rule 32 petition, others were reworded and contained additional factual allegations.[8]   On December 12, 2001, Maples filed two broad-based discovery motions (one for institutional files and another pursuant to Rule 16, Ala. R. Crim. P.) and a general *ex parte* motion for funds. (Doc. 80, Tabs 22, 24, and 25.)

On December 27, 2001, the Rule 32 court found that the "Petition" was adequately pleaded. (Doc. 78, Tab 4.) No further judicial action was taken until some 18 months later, on May 22, 2003, when the Rule 32 court signed the State's proposed order. (Rule 32 C.R.

---

[8]To the extent a claim in the amended Rule 32 petition differs from the initial Rule 32 petition such that a notation or ruling is appropriate, the court has done so.

Vol. 37, Tab 66.)   The only alteration the trial judge made to the proposed order was to change the year and to sign his name.   (*Id.* at 86.)

Although the wholesale adoption of a party's proposed opinion may be disfavored, it is not per se illegal or improper.   In this case, the Rule 32 court's order is neither conclusory nor unsupported.   Moreover, the judge that presided over Maples's post-conviction proceedings also presided over his trial.   As such, the Rule 32 court had extensive personal knowledge of the facts underlying Maples's claims.   The court finds that the Rule 32 court's order was an adjudication on the merits of Maples's ineffectiveness claims and is entitled to deference.

## B.   EXHAUSTION, PROCEDURAL DEFAULT, AND THE CAUSE-AND-PREJUDICE STANDARD

The sole issue facing this court on remand is whether Maples has established prejudice sufficient to excuse his procedural default with regard to his ineffective-assistance claims.   In keeping with well-established principles of comity and federalism, a petitioner is required to first present his federal claims to the state court by exhausting all of the state's available procedures. *Medellin v. Dretke*, 544 U.S. 660, 666 (2005)(holding that a petitioner "can seek federal habeas relief only on claims that have been exhausted in state court"). However, "Procedural default may be overcome . . . by a showing of (1) cause and prejudice; or (2) a fundamental miscarriage of justice." *Bishop v. Warden*, *GDCP*,  726 F.3d 1243, 1258 (11th Cir. 2013)(quoting *Hill v. Jones*, 81 F.3d 1015, 1022-23 (11th Cir. 1996)).   In this case, the only exception at issue is the cause-and-prejudice exception.   And, because the

Supreme Court held that Maples has shown cause for his procedural default, the only issue before this court is whether he has shown the necessary prejudice.

To establish prejudice sufficient to excuse his procedural default, Maples "must shoulder the burden of showing, not merely that the errors at his trial created a ***possibility*** of prejudice, but that they worked to his ***actual*** and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982)(emphasis in original). Indeed, "A mere possibility of actual prejudice resulting from an error at trial will not waive the procedural default bar where other substantial evidence of guilt is present." *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992)(citing *Wainwright v. Sykes*, 433 U.S. 72, 91 (1977)(finding no "actual prejudice" when "[t]he other evidence of guilt presented at trial . . . was substantial to a degree that would negate any possibility of actual prejudice" as a result of the alleged error)).

Maples received an adjudication on the merits of the ineffectiveness claims from the Rule 32 court. He has retooled and significantly altered the factual basis of some of his ineffectiveness claims when compared to the claims he presented to the Rule 32 court. Accordingly, those claims, or aspects of those claims, are subject to dismissal for nonexhaustion, and, thus, are procedurally defaulted on that basis. *See Kelley v. Secretary for Dept. of Corrections*, 377 F.3d 1317, 1345 ("The habeas petitioner can escape the exhaustion requirement only by showing cause for the default and actual prejudice resulting therefrom . . . . Absent the applicability of [this] exception[], nonexhausted claims cannot

be raised in federal habeas corpus petitions.")(citations omitted).  Maples has not argued

cause and actual prejudice to overcome the procedural default of claims not presented to the

Rule 32 court.

## C.  CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

The Supreme Court's "benchmark" for judging any claim that trial counsel provided

ineffective assistance is "whether counsel's conduct so undermined the proper functioning

of the adversarial process that the trial cannot be relied upon as having produced a just

result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The Court's opinion in

*Strickland* established a two-pronged standard for judging, under the Sixth Amendment, the

effectiveness of attorneys who represent criminal defendants at trial:

> A convicted defendant's claim that counsel's assistance was so
> defective as to require reversal of a conviction or death sentence has two
> components.  First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the defendant by the
> Sixth Amendment.  Second, the defendant must show that the deficient
> performance prejudiced the defense.  This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both showings, it cannot be said
> that the conviction or death sentence resulted from a breakdown in the
> adversary process that renders the result unreliable.

*Id.* at 687; *see Williams v. Taylor*, 529 U.S. 362, 390 (2000); *Grayson v. Thompson*, 257 F.3d

1194, 1215 (11th Cir. 2001).

Therefore, the two parts of the *Strickland* standard are conjunctive; a petitioner

accordingly bears the burden of proving **both** "deficient performance" **and** "prejudice" by

21

"a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000)(*en banc*).  However, a court is not required to address both aspects of the *Strickland* standard when a habeas petitioner makes an insufficient showing on one of the two prongs.  *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

### 1.  The Performance Prong

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007)(citing *Chandler*, 218 F.3d at 1313). To satisfy the performance prong of the *Strickland* test, a defendant must prove that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment.  *Strickland*, 466 U.S. at 687.  The standard for gauging attorney performance is "reasonableness under prevailing professional norms."  *Id*. at 688; *see Williams v. Taylor*, 529 U.S. 362, 390-91 (2000); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986); *Chandler*, 218 F.3d at 1313.  "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007)(citing *Chandler*, 218 F.3d at 1313).

22

"Furthermore, [the court] must recognize that omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987))(internal quotations omitted). The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only counsel that performs within reasonable professional norms. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error and in light of all the circumstances. *See*, *e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001)(giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998)(noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence — which is also constitutionally protected — and would restrict the wide latitude counsel have in making tactical decisions." *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005). Judicial scrutiny of counsel's performance is required to be "highly deferential," because representation is an art, and an

act or omission that is unprofessional in one case may be sound or even brilliant in another.

*See Strickland*, 466 U.S. at 697.  Indeed, reviewing courts are instructed that they "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations and internal quotation marks omitted); *see also Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)(holding that, "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate"  (internal quotations omitted)).

"Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'"  *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315).  "Even if many reasonable lawyers would not have done as defense

24

counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers*, 13 F.3d at 386.

### 2. The Prejudice Prong

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). "It is not enough for the [habeas petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693; *see also Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). Instead, to prove prejudice, the *habeas* petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see Williams*, 529 U.S. at 391. In the context of the death sentence itself, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695).

In order to satisfy this high standard, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001)(quoting *Strickland*, 466 U.S. at 687). In other words, "[a] finding of prejudice requires proof of unprofessional errors

so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001)(quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996)(quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986)))(internal quotation marks omitted).

Because he did not exhaust his claims in state court, to succeed on his claims for habeas relief based on ineffective assistance, Maples "must make two showings of prejudice. First, [he] must show that counsel's failure[s alleged in his amended petition] prejudiced him for the purposes of determining whether there was ineffective assistance of counsel." *Owens v. United States*, 483 F.3d 48, 64 n.13 (1st Cir. 2007)(citing *Strickland*, 466 U.S. at 688, 104 S. CT. 2052). "Second, [he] must also show prejudice to excuse his procedural default on [his ineffective assistance of trial counsel] claim." *Id*. (citing *Knight v. United States*, 37 F.3d 769, 774 (1st Cir. 1994)). "A finding of cause and prejudice does not entitle the prisoner to habeas relief [but] merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted," *Martinez*, 132 S. Ct. at 1320; however, because "these showings of prejudice overlap, [the court will] resolve them simultaneously," *Owens*, 483 F.3d at 64 n.13 (citing *Strickler v. Greene*, 527 U.S. 263, 282 (1999)); *see also Mincey v. Head*, 206 F.3d 1106, 1147 and n.86 (11th Cir. 2000)(citing *Prou v. United States*, 199 F.3d 37, 49 (1st Cir. 1999)).

Therefore, the court has addressed the merits of Maples's ineffective-assistance claims for the purpose of deciding whether he can establish actual prejudice to excuse his procedural default.

### 3. Deference Accorded State Court Findings of Historical Fact and Decisions on the Merits When Evaluating Ineffective Assistance of Counsel Claims

When the state court has adjudicated a petitioner's ineffectiveness claims on the merits, the findings of historical facts made in the course of evaluating that claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)(2) and (e)(1).  *See Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).  To overcome the state court's finding of fact, the petitioner must show that those findings were unreasonable in light of the evidence before it and carry his burden of proving the facts by "clear and convincing evidence."[9]

---

[9]The court is aware of some caselaw in this Circuit holding that the interplay between the presumption of correctness accorded factual determinations under § 2254(d)(2) and the burden of proof that must be met to overcome the presumption under § 2254(e)(1) remains an open question.  In *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d 739, 746 (11th Cir. 2011), the Eleventh Circuit held, "[N]o court has fully explored the interaction of § 2254(d)(2)'s 'unreasonableness' standard and § 2254(e)(1)'s 'clear and convincing evidence' standard." *Cave*, 638 F.3d at 746 (quoting *Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1294 n.51 (11th Cir. 2007)).  Just the year before, the Eleventh Circuit had held, "[W]e must presume the state court's factual findings to be correct ***unless the petitioner rebuts that presumption by clear and convincing evidence***." *Ward v. Hall*, 592 F.3d at 1177 (citing § 2254(e)(1) and *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001))(emphasis supplied).  Also in *Ward*, the Eleventh Circuit held unequivocally that "28 U.S.C. § 2254(e)(1) commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by ***clear and convincing evidence***.' 28 U.S.C. § 2254(e)(1)." *Id.* at 1155 (emphasis added).

Deference to a state court resolution of a claim of ineffective assistance involves a double layer of reasonableness. Under the AEDPA, the federal habeas court may grant relief on such a claim only if the state court determination involved an "unreasonable application" of *Strickland* to the facts of the case. *Strickland* itself, of course, requires an assessment of whether counsel's conduct was professionally unreasonable or did not result in actual prejudice. These two assessments cannot be conflated into one. *See Harrington*, 562 U.S. at 101-02. Thus, habeas relief on a claim of ineffective assistance of counsel can be granted with respect to a claim actually decided by the state court only if the habeas court determines that it was "objectively unreasonable" for the state court to find that counsel's conduct was not "professionally unreasonable" or did not result in actual prejudice. The *Harrington* Court explained,

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. [356], [371], 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; see also *Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best

28

practices or most common custom.  *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles [v. Mirzayance]*, 556 U.S.[111, 123], 129 S. Ct. [1411], 1420 [(2009)].  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  556 U.S., at [123], 129 S. Ct. at 1420.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105; *see also Premo v. Moore*, 562 U.S. 115, 123 (2011).

## D.  EVIDENTIARY HEARING

Maples has asked the court for an evidentiary hearing on his claims.  "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) [and (d)(2)] on the record that was before that state court." *Cullen*, 131 S. Ct. at 1400; *see Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015)(applying *Cullen* to claim brought pursuant to § 2254(d)(2)).  "Therefore, before a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated [on the merits] by the state court, he must demonstrate a clearly established federal-law error[, § 2254(d)(1),] or an unreasonable determination of fact[, § 2254(d)(2),] on the part of the state court, based **solely** on the state court record." *Landers*, 776 F.3d at 1295 (emphasis added).  "Once a petitioner has demonstrated such an error or unreasonable

determination, the decision to grant an evidentiary hearing rests in the discretion of the district court." *Id*. (internal citations and quotations omitted).

Therefore, Maples must show prejudice sufficient to excuse his procedural default, as well as his right to relief under § 2254(d), based on the record before the Rule 32 court before the court will consider his request for an evidentiary hearing.

## V. THE POST-REMAND INEFFECTIVE-ASSISTANCE CLAIMS

In his post-remand brief, Maples declares that the habeas claims subject to the Supreme Court's remand instruction are "[t]hose claims focused on the ineffective assistance provided by state-appointed trial counsel at both the guilt and penalty phases of [his] trial for the shooting deaths of two individuals in 1995 (Claims I, II, and III of Maples'[s] Amended Petition for a Writ of Habeas Corpus)."  (Doc. 60 at 14.)  Maples alleges that he was "unquestionably" prejudiced by the procedural default because –

> As a result of the default, [he] was denied any federal review of the merits of serious – and in Maples'[s] view, ***meritorious*** – claims that this trial and death sentence were tainted by constitutional error.  Those claims . . . focus on the appalling representation that Maples received at trial and sentencing which ultimately led to Maples'[s] sentence of death rather than life imprisonment without parole (or another severe term of imprisonment).

(*Id.* [emphasis in original].)  He contends that his "attorneys made at least three terrible mistakes that fell well short of the minimally competent representation that the Constitution guarantees to all defendants:" (1) "counsel inexplicably pursued fundamentally contradictory theories both during different stages of the guilt phase and during the guilt and sentencing phases that doomed his case," (2) "counsel inexplicably failed to investigate and present an

obvious intoxication defense," and (3) "counsel failed to investigate, develop and present mitigating evidence that would have created a reasonable probability that the jury and court would have struck a different balance on death versus life imprisonment without the possibility for parole." (*Id.* at 16, 17, 18, 19.) Maples also argues that Alabama's system of compensating capital defense attorneys caused his counsel's ineffectiveness.[10] (*Id.* at 20-22, 95-97.)

The ineffectiveness sub-claims that are discussed in Maples's post-remand briefs do not refer to the claim numbers in his amended petition. Also, these sub-claims do not bear the same alphanumeric identifiers as the claims in his amended petition. Moreover, the post-remand briefs do not address many of the sub-claims alleged in Claims I, II and III of the amended petition at all. Instead, Maples has left this court with the task of determining which claims in his amended habeas petition he contends are not procedurally defaulted and have merit.

The court's review shows that Maples has foregone the opportunity to establish why all the sub-claims in Claims I through III of his amended petition are not procedurally defaulted and why he is entitled to relief as to those claims. Therefore, Claims I.D.,[11] E.i &

---

[10]In the Background section of his post-remand Opening Brief, Maples criticizes Alabama's "low eligibility requirements" for appointed counsel in capital cases. (Doc. 60 at 20-21.) His amended petition does not contain a claim for relief based on Alabama's system for appointing counsel in capital cases. (*See* doc. 24.) Therefore, this claim has not been considered.

[11]"Counsel Failed to Adequately Challenge the State's Investigation and Presentation of the Case" during the guilt stage. (Doc. 24 ¶¶ 37-65.)

iii,[12] and F. through J.[13], as well as Claims II.C.,[14] G.,[15] I.,[16] and J.[17] in the amended petition

---

[12]"Counsel Failed to Request and Use Necessary Expert Assistance" during the guilt stage. (*Id.* ¶¶ 67-70 [mental health expert]; *id.* ¶ 73 [ballistics expert]; *id.* ¶ 74 [blood splatter expert]; *id.* ¶ 75 [neurologist].) In his post-remand briefs, Maples contends, "Nor did counsel consult or try to put on an expert witness that could explain the extreme level of intoxication that would be experienced by a man of relatively slight built like Maples after having twenty alcoholic drinks over the course of an afternoon and evening, or the exacerbating effect that the use of illegal narcotics like marijuana, crystal meth, and/or crack can have on a man who has consumed such a copious quantity of alcohol over that relatively short period." (Doc. 60 at 65-66.) Therefore, the court finds that Maples's claim that counsel were ineffective based on their failure to request a pharmacologist or other drug expert, (*see* doc, 24 ¶¶ 71-72), has not been abandoned.

[13]In these claims, Maples alleges his counsel were ineffective during the guilt stage as follows:

> F.  Counsel Failed to Present, Adequately Argue and/or Obtain Favorable Rulings on Motions, (*id.* ¶¶ 76–89);
>
> G.  Counsel Failed to Adequately Question and Investigate Venire Members' Backgrounds, (*id* ¶¶ 90-92);
>
> H.  Counsel Requested Verdict Forms that Were Inconsistent with the Strategy of the Defense, (*id.* ¶¶ 93-94);
>
> I.  Counsel Failed to Adequately Investigate the State's Capital Murder Charge, (*id.* ¶¶ 95-100); and
>
> J.  Counsel Failed to Prevent or Even Object To Egregious Instances of Prosecutorial Misconduct, (*id.* ¶¶ 101-18).

[14]Counsel were ineffective during the penalty stage based on "Counsel['s] Fail[ure] to Obtain the Services of a Mitigation Expert." (*Id.* ¶¶ 142-43.)

[15]Counsel were ineffective during the penalty phase based on "Counsel['s] Fail[ure] to Investigate Post-Arrest Medical Issues." (*Id.* ¶ 158.)

[16]Counsel were ineffective during the penalty stage based on "Counsel['s] Fail[ure] to Prevent or Otherwise Object to Egregious Instances of Prosecutorial Misconduct." (*Id.*

are deemed **ABANDONED** and remain **PROCEDURALLY DEFAULTED** as set out in this court's September 29, 2006, Memorandum Opinion and Judgment.  (Docs. 34 and 35.)

The sub-claims in the amended petition that are addressed in Maples's briefs are: Claims I.A. through C., Claims II.A. and B., D. through F., H., and Claim III.  To the extent Maples fails to argue all additional sub-claims and claims that are embedded within these sub-claims, those claims have been deemed **ABANDONED** and remain **PROCEDURALLY DEFAULTED** as set out in this court's September 29, 2006, Memorandum Opinion and Judgment.  (Docs. 34 and 35.)

With these rulings in mind, the reader is advised that the use of the words "claim" and "claims" in the remainder of this Memorandum Opinion, unless otherwise specifically noted, refer only to those ineffectiveness sub-claims that Maples has addressed and argued in his post-remand briefs.

---

¶¶ 160-175.)

[17]Counsel were ineffective during the penalty stage based on "Counsel['s] Fail[ure] to Recognize or Adequately Object to Trial Error During the Sentencing Phase."  (*Id*. ¶¶ 177-79.)

## VI.  THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

## A.  INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF TRIAL

### 1. Counsel's Chosen Strategy Not to Investigate, Pursue, and Present a Defense Based on Intoxication Was Unreasonable.  (Doc. 24, Claim I.C., ¶¶ 26-31.)

#### a.  History of the claim

In his amended habeas petition, Maples alleges:

26.  As detailed below, substantial evidence existed that Mr. Maples was intoxicated on alcohol and drugs on the night of the offense, showing that Mr. Maples lacked the capacity to form the specific intent necessary under Alabama's capital murder statutes.  Some, but not all, of this available evidence of intoxication was presented by the State during the guilt phase of the trial.  Counsel's performance was unreasonable and woefully inadequate in that, as further explained below, (a) they failed to introduce all available evidence of intoxication, (b) they systematically objected when the State attempted to introduce evidence that showed or tended to show that Mr. Maples was intoxicated, thereby causing some of the evidence favorable to the defense not to be included and (c) they called "defense" witnesses whose testimony tended to contradict the more reliable available evidence that Mr. Maples was intoxicated and cross-examined prosecution witnesses to rebut evidence of Mr. Maples' use of alcohol and drugs.  Counsel's conduct in failing to pursue and present a defense based on intoxication "fall[s] 'outside the wide range of professionally competent assistance.'"  *Daniels v. State*, 650 So. 2d 545, 552 (Ala. Crim. App. 1994)(quoting *Strickland*, 466 U.S. at 690).

27.  The State introduced extensive evidence proving that Mr. Maples was intoxicated by the time he went to a pool hall shortly before the shootings (drinking a "few beers" at an evening cookout (R. at 2738-39.); drinking more alcohol at a party, (R. at 2740.); and going to a bar and continually drinking more alcohol between 8:30 p.m. or 9:00 p.m. and 10:30 p.m. or 11:00 p.m. (R. at 1795-1821.)).  At the pool hall, Mr. Maples appeared drunk to some of those present.  A witness at the pool hall testified that Mr. Maples was acting "[j]ust loud in general, you know, like a drunk person would act when they get too much in them or something."  (R. at 1858-60.)  Jason Boyd, who was at the pool hall and played pool with Mr. Maples, testified that Mr. Maples "wasn't

shooting [pool] as well [as normal] and seemed like he was a little hyper, but that was about it" and that it was possible that he was affected by "something." (R. at 1848.)

28.   The State also introduced evidence that Mr. Maples used crack and crystal methamphetamine on the night of the shootings:  evidence of drug paraphernalia (R. at 2516-17.), testimony from April Phillips, an acquaintance of Mr. Maples whom Mr. Maples visited shortly after the shootings, that Mr. Maples had drugs in his hand and told her that he had been doing "crystal meth and crack" that evening (R. at 1894, 1910-11, 1915.), and testimony that Mr. Maples bought crack cocaine on the night of the shootings (R. at 1458, 1983, 1986).

29.   In stark contrast, Counsel attempted to establish through cross-examination of State witnesses and the testimony of several defense witnesses that Mr. Maples was not intoxicated at the time of the shootings.  Amazingly, while summarizing the cross-examination and direct examination testimony during his closing argument, Counsel inaccurately told the jury that "[t]here is no evidence that he consumed drugs that night."  (R. at 2920.)

30.   Given this abundant evidence that Mr. Maples was intoxicated at the time of the offense, no reasonable counsel would have failed to present and pursue a defense of intoxication.  Such failure, which could only amount to Counsel's failure to conduct a substantial investigation into any of Mr. Maples'[s] plausible lines of defense, constituted ineffective assistance of counsel.  *See House v. Balkcom*, 725 F.2d 608, 617-18 (11th Cir. 1984).  Indeed, a defense based on intoxication would have rebutted the specific intent element required by law for each capital offense Mr. Maples was charged.  In the absence of specific intent, Mr. Maples could only be convicted of a lesser included offense (Ala. Code § 13A-1-9(a) (1994)), in this case manslaughter (Ala. Code § 13A-6-3 (1994)).  In addition, a finding of intoxication at the guilt phase of the trial would have been consistent with the mitigating factors presented by the defense during the sentencing phase of the trial.  . . .

30A.   Similarly, Counsel failed to investigate evidence of intoxication.  Accordingly, although Counsel briefly interviewed James Smith (a.k.a. "Fishbone"), one of the prosecution's witnesses regarding Mr. Maples'[s] post-crime behavior, Counsel never inquired about whether Mr. Maples appeared to be intoxicated.  Nor did Counsel ask the three other individuals who were present at Mr. Smith's house about Mr. Maples'[s] appearance,

although Counsel were already aware of the conclusive evidence of Mr. Maples'[s] intoxicated state shortly before the shootings . . . , as well as after the shootings, based, among other things, on his interview of Ms. Phillips conducted at about the same time as Mr. Smith's interview. Therefore, Counsel unreasonably failed to properly investigate all the evidence of Mr. Maples'[s] intoxicated state available to him.

30B.  Had Counsel done so, Counsel would have learned that Mr. Maples appeared to be intoxicated and in fact told Mr. Smith that he had taken drugs prior to his arrival at Mr. Smith's house. Such evidence could have been used to support an intoxication defense; it also would have undermined the State's robbery theory by demonstrating that Mr. Maples apparently did not need to sell the cue stick found in Mr. Terry's vehicle in order to obtain drugs, thus establishing a reasonable doubt regarding Mr. Maples'[s] intentions to rob in order to feed a drug habit.  . . .

31.  In light of the foregoing, Counsel's performance fell so far below the standard of reasonable performance that it cannot be considered either a strategic decision or effective assistance of Counsel.  Given the evidence against Mr. Maples and the prosecution's strategy at trial, no competent counsel would have made the strategic choices Counsel made or conducted the defense as Counsel did.  Counsel's choice of strategy, use of inconsistent strategies, and efforts (or lack thereof) to implement these strategies were unreasonable and constitute ineffective assistance of counsel.  *See Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000).  Thus, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

(Doc. 24 ¶¶ 26-31.)  This habeas claim is identical to the claim as pleaded in Maples's amended Rule 32 petition.[18]  (*Compare* doc. 24 ¶¶ 26-36 *with* Rule 32 C.R. Vol. 33, Tab 49, at 7-13.)

Denying this claim, the Rule 32 court held:

> . . . Maples alleges that trial counsel was ineffective for failing to present a defense based on intoxication.  Maples contends that there was extensive evidence that he was intoxicated on the night of the murders.  This claim is not supported by the record.[19]  *See Maples*, 758 So. 2d at 24.  Evidence was presented that Maples consumed alcohol before the murders and possessed illegal drugs after the murders.  No evidence was presented at trial establishing that Maples was intoxicated at the time of the murders to the degree that he was incapable of forming the specific intent to kill.  *See Williams v. State*, 710 So. 2d 1275, 1332 (Ala. Crim. App, 1996)(holding voluntary intoxication must amount to insanity rendering defendant incapable of forming specific intent to commit crime).  Maples fails to plead any facts in his petition that were available to his trial counsel that would have established such extreme intoxication.
>
> Moreover, not presenting evidence of intoxication during the guilt-phase of trial could have been a strategic choice by trial counsel given that Maples stated in his videotaped confession, which was admitted into evidence, that he was not intoxicated at the time of the murders.  Maples contention that any reasonable attorney would have presented an intoxication defense presents

---

[18]Maples's Rule 32 petition contained the same allegations as his amended Rule 32 petition, except his original petition did ***not*** assert that counsel had failed to adequately interview and present additional evidence from witnesses April Phillips, James Smith, and the three unidentified individuals at Smith's house. (Rule 32 C.R., Vol. 32, Tab 47, at 7-10.)  Moreover, in his post-remand briefs, Maples alleges facts in support of this claim that were never presented to the Rule 32 court or set out in his third amended habeas petition.

[19]The Alabama Court of Criminal Appeals held:  "The testimony at trial did not establish that the appellant was intoxicated at the time of the murders.  Although there was some testimony that he had ingested alcohol several hours before the murders occurred, there was no testimony that he was intoxicated at the time of the murders.  Also, there was no evidence that he had ingested drugs before the murders." *Maples v. State*, 758 So. 2d at 24.

the wrong standard of review for courts reviewing post-conviction petitions. As pointed out by the State, the Eleventh Circuit in *Chandler v. United States*, 218 F.3d 1305, 1315, 1318 (11th Cir. 2000)(en banc) held:

> [B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, *a petitioner must establish that no competent counsel would have taken the action that his counsel did take*.

> [C]ounsel's reliance on particular lines of defense to the exclusion of others – whether or not he investigated those other defenses – is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable.

(Emphasis added)

In [this] claim, Maples fails to plead facts which, if true, would entitle him to relief.  Given the overwhelming evidence against him, Maples has failed to establish that the line of defense taken by his trial counsel was unreasonable; thus, he fails to demonstrate that trial counsel's performance was deficient or prejudicial. . . .

. . . Maples contends that trial counsel were ineffective for not requesting jury instructions on intoxication and manslaughter.  The underlying substantive issue was raised on direct appeal.  The Court of Criminal Appeals held that no plain error had occurred because "there was no rational basis for an instruction on intoxication and manslaughter under the evidence presented in this case."  *Maples*, 758 So. 2d at 24.

Based on the holding of the Court of Criminal Appeals, Maples is unable to establish that trial counsel's performance caused him to suffer any substantial prejudice, thus, he is unable to establish ineffective assistance under the *Strickland* test.

(Rule 32 C.R. Vol. 37, Tab 66, at 13-15 [footnote added].)

Maples declares, "The Alabama trial court's conclusion that [his] counsel's handling of the intoxication issue was constitutionally effective is based on an unreasonable

application of *Strickland* and an unreasonable assessment of the trial record." (Doc. 73 at 29.) This court disagrees. For the reasons set forth *infra*, the evidence at trial and the additional facts alleged are not sufficient to establish as reasonable probability that the result of the guilt phase of the trial would have been different if counsel had investigated and/or presented an intoxication defense.

### b. Prejudice

In his post-remand brief, Maples argues that intoxication was the "most plausible line of defense," (doc. 60 at 66), and that, despite notice of his extreme intoxication at the time of the murders, counsel "were constitutionally deficient in failing to investigate, develop and present an obvious intoxication defense that probably would have spared Maples a conviction for capital murder," (*id*. at 62). He concedes that counsel may decide not to pursue one defense strategy if there is "an alternative reasonable defense theory," but he argues that "no reasonable decision was made in this case." (*Id*. at 66 [citing *Hunt v. Comm'r, Ala. Dept. of Corr*., 666 F.3d 708, 726 (11th Cir. 2012].)

As discussed above, *Strickland* requires the petitioner to show that the alleged errors "actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693. Similarly, to show prejudice sufficient to overcome a state-court default, the petitioner must show "actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Under both standards, the petitioner must show a reasonable probability that the result of the proceeding would have been different but for the alleged ineffective

39

assistance of counsel. *See Strickler v. Greene*, 527 U.S. 263, 289 (1999); *Strickland*, 466 U.S. at 694.

> [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 696.

Therefore, in order to establish either prejudice to excuse his default or *Strickland* prejudice, Maples must show " a reasonable probability that, but for counsel's unprofessional errors, the result of the [guilt phase of his trial] would have been different." *Id.* at 694; *see also Spencer v. Secretary, Dept. of Corrections*, 609 F.3d 1170, 1180 (11th Cir. 2010)(quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003)).   This determination entails consideration of whether the intoxication defense he claims counsel was ineffective for failing to raise had a reasonable probability of success under the law as it existed at the time of his trial. *See Reaves v. Secretary, Florida Dept. of Corrections*, 717 F.3d 886, 903-04 (11th Cir. 2013); *Hooks v. Workman*, 689 F.3d 1148, 1198-99 (10th Cir. 2012); *Zamora v. Dugger*, 834 F.2d 956, 960 (11th Cir. 1987).

In Alabama, a defense of intoxication requires showing –

> that the intoxication "[was] of such character and extent as to render the accused incapable of consciousness that he is committing a crime." [*Jones v. State*, 362 So. 2d 1303, 1315 (Ala. Crim. App. 1978).] Also, [the Alabama Supreme] Court has stated that "[m]ere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the

> grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act." *Gautney v. State*, 284 Ala. 82, 88, 222 So. 2d 175 (1969)(quoting *Walker v. State*, 91 Ala. 76, 82, 9 So. 87, 89 (1890))(emphasis omitted).  Intoxication "must be so excessive as to paralyze the mental [faculties], and render the accused incapable of forming or entertaining the design to take life."  *Id*.  ***The degree of intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity***.  *Crosslin v. State*, 446 So. 2d 675 (Ala. Cr. App. 1983), appeal after remand, 489 So. 2d 680 (Ala. Cr. App. 1984), citing *Maddox v. State*, 31 Ala. App. 332, 344, 17 So. 2d 283, 285 (1944)(other citations omitted).

*Ex parte Bankhead*, 585 So. 2d 112, 120-21 (Ala. 1991) (emphasis added), *rev'd on other grounds* 625 So. 2d 1146 (Ala.1993); *see also Ex parte McWhorter*, 781 So. 2d 330, 340-343 (Ala. 2000).  "Under Alabama law, a murder defendant . . . may offer evidence that he was insane from voluntary intoxication and thereby hope to raise a reasonable doubt as to whether he possessed the requisite intent to kill, reducing the maximum charge to manslaughter."  *Williams v. Campbell*, No. 04-0681-WSC, 2007 WL 1098516, at *10 (S.D. Ala. April 11, 2007).

### c.  Evidence at trial

#### i.  Maples's videotaped confession

As the Rule 32 court found, the evidence against Maples was overwhelming.  (*Id*. at 9, 14.)  This court notes that the evidence that Maples was not so intoxicated as to paralyze his mental faculties is strong.  Indeed, the most damning piece of evidence was Maples's videotaped confession.  Maples's two-hour[20] confession was shown to the jury.  (Doc. 78,

---

[20]This court has examined the videotape in its totality.  (*See* doc. 78, Exhs. 230 and

41

Exh. 230.)   This confession established Maples's guilt of the two capital offenses and negated an intoxication defense.

Maples was arrested in Tennessee and two investigators from the Morgan County Sheriff's Department interviewed him shortly thereafter.  The interview was videotaped and this video was played for the jury at Maples's trial.

During the interview, Maples initially said that he did not remember a lot about the murders; however he later recounted many details of his thoughts and actions before, during, and after the murders.  He told the investigators Terry had claimed to be tired and so they decided to leave Q Balls around 11:30 or 11:45 p.m. on Friday night.  Terry had agreed to give Robinson a ride home, and they decided to take Maples home first, even though they had to pass by Robinson's house on the way to Maples's house.  Maples said that he did not know if Terry and Robinson had other plans after they dropped him at his house.  He said that he had been in the front passenger seat of Terry's car and Robinson had been in the back seat behind him during the ride from Q Balls to his house.  At his house, Maples got out of the car and went in through the back door; he told the investigators that he "probably" had decided to kill Terry and Robinson by the time he walked into his house.  He went into his parents' bedroom and saw his father's shotgun.  He bent down to pick up the weapon and he

---

231.)  The tape of the entire interview is almost three hours long.  However, the final hour is devoted exclusively to discussion about another unsolved murder and Maples's relationship with Jamie Dobbs and Alex Foley.  This portion of the tape was excluded from the evidence presented at trial.  (*See* R. Vol. 20, Tab 21, at 3041.)

looked out his parents' bedroom window at Terry and Robinson in the driveway.  He said that he had watched as Robinson appeared to be playing with the passenger seat; Robinson was bent over like he was looking for something.  Maples said that he walked out the back door with the shotgun in hand.  Terry's window was open and Maples said that he placed the barrel of the shotgun an inch or two inside the window and shot Terry twice.  Then, in a single motion, he took a half step forward and shot Robinson.  He told the investigators that he had said nothing to either victim and that neither victim had provoked him.  He remembered that Robinson had jumped a little when he shot Terry, but Robinson had not tried to get out of the car.

After he shot both men, he pulled Terry's body from the car and left it in the yard.  Initially, he told the investigators that he could not remember what he had done with the shotgun, but, later in the interview, he told them he had taken the shotgun back into the house and placed it exactly where he found it.  Before leaving he took Terry's wallet out of his pocket and took the cash – he remembered Terry had $100 in $20 bills.  He knew everyone would know he was responsible for the murders, so he left town.  He drove away in Terry's car with Robinson's body.  A short distance down the road he stopped at a bridge over a little creek, where he dumped Robinson's body over the edge of the bridge and into the creek.

During the interview, the investigators asked Maples about his consumption of drugs and alcohol before, during, and after the offense.  Maples said he had been drinking the afternoon and night of the murders and that he was mad, but his anger and gloominess had

43

nothing to do with the victims.  The investigators asked Maples if he had been drinking "a lot," and Maples said, "Yes sir, a little bit."  When they asked how much he had to drink, Maples stated that he had seven to eight beers when he attended a BBQ and another party at the home of Terry's sister, Carla Terry.  He further stated that they had some liquor but that he had not been "on it that hard."  He did not say when, with whom, or how much of this liquor he had consumed.

Later, Maples stated that he had between six and seven beers by the time he had left a party at Carla Terry's house at about 7:30-7:45 p.m., which was about 30 to 45 minutes after he arrived.  He told the investigators that he could tell he had six beers, but he also told them that he was not starting to get drunk or staggering or anything.  He said he had smoked a joint with a girl at an undisclosed time that afternoon or evening.  However, he repeatedly denied consuming any hard drugs, including crack or methamphetamine, before the murders, and he told the investigators that he had not used any crack cocaine in three or four months before the murders.  He denied going to a bar before the murders, he denied going to "Crack Town" after the murders, and he denied doing drugs at Phillips's house.

Maples told the investigators that "stuff from the past and personal problems" had been on his mind at the time of the murders and that, when he drank, these problems got to him easier.  The problems on his mind included that he was a "screw-up," that he was lonely, that he was down on himself about problems he had caused his family, and that he had issues

44

with his "real" mom.  He denied getting into any fights or arguing with anyone before the murders.

Throughout the interview, Maples was able to describe his activities the afternoon and evening before the murders, the details of the murders, and his actions immediately following the murders through to his arrest.  At times during the interview, he was vague and he left out some details.  For instance, he never mentioned stopping anywhere before arriving in Ardmore, Tennessee, the morning after the murders; he told the investigators that he had driven around all night without getting out of the car.  However, when specifically asked if he had stopped at someone else's house, he admitted he had gone to Phillips's house and that he had placed his bloody socks under her couch.[21]  He told the investigators that, after the murders, he did not buy drugs, trade the victims' possessions for drugs, or sell Terry's pool cue;[22] he said that he did have something to drink with him when he got to Phillips's house.

During his videotaped confession, Maples was able to recall his thoughts and actions before, during, and after the murders.  The confession is strong evidence that Maples was not "insane from voluntary intoxication" at the time of the murders, and, therefore, such evidence negates any inference that he was prejudiced by counsel's failure to investigate and to present an intoxication defense.

---

[21]Robinson's DNA was found on the socks Maples left at Phillips's house.

[22]Evidence presented at trial indicated Maples had traded Terry's pool cue for crack.

### ii.  Testifying guilt phase witnesses who saw Maples <u>before</u> the murders

In his Amended Petition, Maples contends:

27.  The State introduced extensive evidence proving that Mr. Maples was intoxicated by the time he went to a pool hall shortly before the shootings (drinking a "few beers" at an evening cookout (R. at 2738-39.); drinking more alcohol at a party, (R. at 2740.); and going to a bar and continually drinking more alcohol between 8:30 p.m. or 9:00 p.m. and 10:30 p.m. or 11:00 p.m. (R. at 1795-1821.).  At the pool hall, Mr. Maples appeared drunk to some of those present.  A witness at the pool hall testified that Mr. Maples was acting "[j]ust loud in general, you know, like a drunk person would act when they get too much in them or something."  (R. at 1858-60.)  Jason Boyd, who was at the pool hall and played pool with Mr. Maples, testified that Mr. Maples "wasn't shooting [pool] as well [as normal] and seemed like he was a little hyper, but that was about it" and that it was possible that he was affected by "something." (R. at 1848.)

(Doc. 24 ¶ 27; *see also* doc. 60 at 70.)[23]

---

[23]In his post-remand brief, Maples contends that "the State itself introduced evidence that Maples had been drinking heavily throughout the day and night" before the murders, including:

- The State presented evidence that Maples had been drinking a "few beers" at a cookout (R. at 2738-39); had been drinking more alcohol at a party (R. at 2740); had been drinking more alcohol between 8:30 p.m. or 9 p.m. and 10:30 p.m. or 11 p.m.  (R. at 1795-1821).

- The State presented evidence that at the Caddy Shack, Maples and Terry "were just up going back and forth to the bar" (R. at 1801) and that the group was "having alcohol … to drink" (R. at 1802).

- Le Ann Clemons testified that at the Caddy Shack Maples was telling her "stuff that really didn't make much sense."  (R. 1803.)

- At the pool hall, Jason Boyd testified that Maples "wasn't shooting [pool] as well and he seemed like he was a little hyper."  (R. at 1848.)

In his post-remand Opening Brief, Maples argues that Tatum Frank Terry [hereinafter "Tatum"] "testified that Maples had called Terry from the BBQ twice; that a group of individuals left the BBQ to go to Terry's sister's house so that Maples could meet up with Terry;" that he did not observe "any problems or arguments or fights or anything else between [Maples] and Stacy [Terry] at that time;" and "that he never saw Stacy Terry again and did not see Maples again until the week of Maples'[s] trial." (Doc. 60 at 32 [citing R. Vol. 19, Tab 17, at 2738-40, 2742].) Tatum also testified that Maples had a few beers in his presence during this time and that Maples did not appear to be drunk or impaired when he left the party. (R. Vol. 19, Tab 17, at 2741.)

About 8:45 p.m. or 9:00 p.m., Maples and Terry sat with Le Ann Clemons and Beverly Shawnbaum at the Caddy Shack bar for about an hour and one-half. (R. Vol. 14 at 1799-800.) Clemons testified that, during this time, she saw Maples get up to go the bathroom twice and go back and forth to the bar. (*Id.* at 1801.) She admitted they were all

---

- Jason Bright testified that at the pool hall Maples was acting "[j]ust loud in general, you know, like a drunk person would act when they got too much in them or something." (R. at 1858-60.)

- April Phillips testified that Maples told her that he was doing "crystal meth and crack cocaine" on "th[e] day" of the shootings. (R. at 1912.)

- James "Fishbone" Smith testified that Maples tried to borrow money for crack cocaine on the day of the shootings. (R. at 1883-84.) Fishbone also testified that two guys got into Maples'[s] car and took him to get some crack. (R. at 1986.)

(Doc. 60 at 70-71.)

drinking alcohol, but she denied that anyone in the group was "real drunk," appeared like they "had been drinking heavily," or was "high or [did] not know what was going on or [was] kind of out of it." (*Id.* at 1802.) Also, she testified that Maples did not appear sad, angry, argumentative, or fearful. (*Id.* at 1801-02, 1806.) Their conversation was general in nature and nothing about the evening caused her concern. (*Id.*) She testified that Maples asked her out, and she declined. (*Id.* at 1803.) She stated that Maples was telling her that he had been an Auburn student and "stuff that really didn't make much sense," to which Maples's defense counsel objected based on relevance. (*Id.*) The trial court allowed the prosecution to proceed, and, when Clemons was asked if Maples had told her anything else she believed to be untrue, she replied that Maples told her that he had a condo in Decatur and asked if she wanted to move in with him. (*Id.* at 1803-05.) Clemons testified she had laughed and said, "no." (*Id.* at 1805.) Maples did not get upset with her response and she interpreted his behavior as attempts to impress her or to flirt with her. (*Id.* at 1806, 1808.)

Clemons and Shawnbaum closed their bar tabs and left the bar between 10:30 and 11:00 p.m. (*Id.* at 1800, 1816.) Defense counsel elicited from Clemons that Maples had paid everyone's tab. (*Id.* at 1810.) As they were leaving, Terry and Maples pulled up in Terry's car and asked the women if they wanted to ride, which they declined. (*Id.* at 1806-07.) Again, no one was upset or angry. (*Id.*) Shawnbaum's testimony was similar to Clemons's testimony about the events of the evening, including her testimony about Maples's appearance and demeanor. (*See id.* at 1811-18.)

Curtis Collins, owner of Q Balls, testified that, although he was unsure of the time, he thought that he had seen Terry's car enter the Q Balls parking lot around 9:00 p.m.  He saw that the passenger, Maples, had trouble getting out of the car, so he had checked Terry and Maples for the smell of alcohol when they walked in; he detected nothing.  (*Id.* at 1825-27.)  Collins explained that Q Balls was a non-alcoholic, kid-friendly establishment and that he did not want alcohol or loud talk.  (*Id.* at 1831-33.)  Later Collins testified he had heard a commotion in the poolroom and quieted Maples and another individual who were having a "loud talk."  (*Id.* at 1827-29.)  The men complied without incident.

Luke Skinner, testified that around 9:00 or 9:30 p.m., he got into a loud argument with Maples, but he did not remember what it was about.  (*Id*. at 1836.)  The argument was broken up by a Q Balls employee.  (*Id*. at 1837.)

Jason Boyd testified he had played pool with Maples sometime that evening.  (R. Vol. 15 at 1847-48.)  When asked if Maples had appeared to be drunk, Boyd testified he had noticed Maples did not play pool as well as he usually did and that he seemed a little hyper.  (*Id.*)  He conceded that it was possible that Maples had been drinking.  (*Id*. at 1848.)

Jamie Dobbs[24] testified that Maples, Terry, and a third person came to his house in Decatur, Alabama, sometime between 10:30 and 11:00 p.m.  (R. Vol. 16 at 2066-74, 2089.)  He testified that Maples had wanted to come inside to talk to him, but he blew him off.  (*Id.*

---

[24]Shortly after murdering Terry and Robinson, Maples called the Decatur police and confessed to the murders; however, he told the police he was Jamie Dobbs and gave the police Dobbs's address.

49

at 2074.)  Dobbs indicated that sometimes when Maples came to his house Dobbs would either let him in or give him some excuse so Maples was aware that might be a possibility; Dobbs testified that Maples did not seem angry.  (*Id.*)

Daniel Maples, Maples's brother, testified that he had seen Maples at Q Balls around 10:30 or 11:00 p.m. and that Maples did not appear to be drunk, intoxicated, or impaired. (R. Vol. 19, Tab 17, at 2757.)

Jason Bright played pool with Terry from about 11 p.m. to around midnight.  (R. Vol. 15 at 1855.)  He noticed that Maples "seemed a little energetic" and "[a] little hyperactive . . . [because he] was being a little loud."  (*Id.* at 1857-58.)  When asked to explain, Bright testified that Maples was "[j]ust loud in general, you know, maybe like a drunk person would act when they get too much in them or something."  (*Id.* at 1858.)  When asked if he thought Maples "was drunk or had been drinking a good bit," Maples's counsel objected on grounds of speculation and the question was withdrawn.  (*Id.*)  Nevertheless, Bright testified that he did not get close enough to Maples that night to smell alcohol and had been around Maples only three times prior to that evening.  (*Id.* at 1859.)  Maples's counsel asked Bright if his characterization of Maples as "a little more energetic, maybe a little loud" was truthful, and Bright answered, "Yes."  (*Id.* at 1860.)

Landon Pendleton was also at Q Balls that evening and saw Terry and Maples around midnight.[25]  (R. Vol. 13, Tab 16, at 1500.)  When asked if "there seem[ed] to be anything

---

[25]In his videotaped statement, Maples said that he and Terry had gone to Q Balls twice

unusual or odd going on at Q Balls that night," Pendleton answered, "Not really.  Everybody was kind of acting a little cocky up there, but nothing really out of the ordinary."  (*Id.* at 1495.)

Maples faults counsel for not speaking with or questioning differently guilt-phase witnesses Tatum Terry, Le Ann Clemons, Beverly Shawnbaum, Jason Bright, and Jason Boyd, (doc. 60 at 32, 65), but he has not alleged what these witnesses would have said that was different from their actual trial testimony.  Each of these witnesses testified about seeing Maples before the murders.  However, none of these witnesses perceived Maples to be extremely impaired.  Moreover, even if one or more of these witnesses would have testified that Maples was extremely intoxicated, the jury still heard Maples's statement that he had a "little bit" to drink the night of the murders as well as his detailed recollection of the events of that night.  Therefore, the court finds that the testimony of these witnesses at trial does not

_____

that evening.  The first time was after they left Terry's sister's house, and they stayed 30-45 minutes playing three or four games of pool, and left to go riding around before going back to Q Balls around 10:00 to 10:30 p.m.  Maples denied that he had been to the mall that evening and did not mention he had been to the Caddy Shack bar.

In his cross-examination of Pendleton, defense counsel intentionally asked about the Caddy Shack bar.  Pendleton also had been to Q Balls twice that night.  Specifically, Pendleton testified that after he, Matt Shell, and Daniel Maples left the party at Terry's sister's house, they drove to town and around the mall, where the Caddy Shack bar was located.  (R. Vol. 13, Tab 16,  at 1494, 1500.)  Pendleton saw Terry's car sitting in front of the Caddy Shack.  (*Id.* at 1499.)  The group then went to Q Balls, and did not see Terry or Maples there at that time.  (*Id.* at 1500.)

51

support a finding that Maples was prejudiced based on his counsel's failure to raise an

intoxication defense with these witnesses.

### iii. Guilt phase witnesses who saw Maples <u>after</u> the murders

Maples alleges that counsel failed to adequately investigate two witnesses who saw

him ***after*** the murders:  April Phillips and James "Fishbone" Smith.[26]  (*Id.*)  He contends:

> 28.  The State also introduced evidence that Mr. Maples used crack and
> crystal methamphetamine on the night of the shootings:  evidence of drug
> paraphernalia (R. at 2516-17.), testimony from April Phillips, an acquaintance
> of Mr. Maples whom Mr. Maples visited shortly after the shootings, that Mr.
> Maples had drugs in his hand and told her that he had been doing "crystal meth
> and crack" that evening (R. at 1894, 1910-11, 1915.), and testimony that Mr.
> Maples bought crack cocaine on the night of the shootings (R. at 1458, 1983,
> 1986.)
>
> . . .
>
> 30A.  Similarly, Counsel failed to investigate evidence of intoxication.
> Accordingly, although Counsel briefly interviewed James Smith (a.k.a.
> "Fishbone"), one of the prosecution's witnesses regarding Mr. Maples'[s]
> post-crime behavior, Counsel never inquired about whether Mr. Maples
> appeared to be intoxicated.  Nor did Counsel ask the three other individuals
> who were present at Mr. Smith's house about Mr. Maples'[s] appearance,
> although Counsel were already aware of the conclusive evidence of Mr.
> Maples'[s] intoxicated state shortly before the shootings (see Paragraphs 26 to
> 29), as well as after the shootings, based, among other things, on his interview
> of Ms. Phillips conducted at about the same time as Mr. Smith's interview.
> Therefore, Counsel unreasonably failed to properly investigate all the evidence
> of Mr. Maples'[s] intoxicated state available to him.

---

[26]In his post-remand brief, Maples asserts that counsel neglected to "speak with" these
witnesses.  (*See* doc. 60 at 65.)  However, he admitted in his amended habeas petition that
counsel "briefly interviewed" Smith and interviewed Phillips "at about the same time as Mr.
Smith's interview."  (Doc. 24 ¶ 30A.)

30B.  Had Counsel done so, Counsel would have learned that Mr. Maples appeared to be intoxicated and in fact told Mr. Smith that he had taken drugs prior to his arrival at Mr. Smith's house.  Such evidence could have been used to support an intoxication defense; it also would have undermined the State's robbery theory by demonstrating that Mr. Maples apparently did not need to sell the cue stick found in Mr. Terry's vehicle in order to obtain drugs, thus establishing a reasonable doubt regarding Mr. Maples'[s] intentions to rob in order to feed a drug habit.

(Doc. 24 ¶¶ 28, 30-31.)

April Phillips testified that she first saw Maples at around 1:00 a.m., and she observed him intermittently between that time and 4:00 a.m.  Maples contends that counsel should have interviewed her further concerning her testimony that Maples had behaved and talked frenetically during this time and that he had reported doing drugs and held crack and methamphetamine in his hands.  (R. Vol. 15 at 1884-99, 1905-16.)  Phillips testified that Maples appeared at her home in Terry's car and told her that Terry had let him borrow it.  (*Id.* at 1889.)  He wanted to see Phillips's roommate, his ex-girlfriend Heather Davis, who lived with Phillips,  but Davis was at work.  (*Id.* at 1889-90.)   He also told Phillips that he had been in a fight at the pool hall and he wanted to clean the blood off; and Phillips allowed him to use her bathroom.  (*Id.* at 1890-91.)

During the time he was at her home, Maples repeatedly talked, in a bragging tone, about beating up someone, he showed Phillips the blood in Terry's car, he touched the bloody seat, and he worried aloud about cleaning the inside of the car because Terry would be angry.  (*Id.* at 1891-92, 1895-97.)  According to Phillips, while holding drugs in his hand, Maples had told her he had been using crystal meth and crack cocaine that day, and he repeatedly

53

asked her to take drugs with him.   (Doc. 60 at 31 [citing R. Vol. 15 at 1912, 1893-94, 1916].)  She testified that Maples left her house once to "get more dope."  (*Id*. [citing R. Vol. 15 at 1915].)

On cross-examination, defense counsel tried to discredit Phillips's testimony based on her long-held dislike for Maples, the fact that Robinson had once been her boyfriend, and her history of drug addiction at the time of the murders.   They also elicited Phillips's admission that she had not seen Maples take drugs, only that she had seen drugs in his hands. (R. Vol. 15 at 1907-08, 1911-14.)  Although Maples complains about counsel's failure to investigate or question Phillips, he does not allege what ***more*** Phillips would have said that would be relevant to Maples's intoxication at the time of the murders.

James "Fishbone' Smith testified at trial that he was partying with friends on his front porch at about 1:00 a.m. when he first saw the man his friends identified as "Cory."  He testified Maples sold him Terry's pool cue. (R. Vol. 15 at 2004, 2005-06, 2015.)  According to Smith, Maples wanted to purchase crack cocaine and Smith directed him to three individuals; these individuals left with Maples to buy drugs before returning about fifteen to twenty minutes later.  (*Id.* at 1991-1995.)  Smith testified he did not get into Maples's car because there was something "nasty" in it that looked like paint and that Maples had this stuff all over the back of his shirt and his pants.  (*Id.* at 1883, 1992-94.)  Smith had never seen Maples prior to that night, and he could not identify Maples in the courtroom.  (*Id.* at 1995.)

Counsel tried to discredit Smith based on his history of drug offenses, the fact that he lived in a crack house, and the fact that Smith blamed Maples for his being caught pawning Terry's pool cue.[27] (*Id*. at 2002-03, 2007-08.) Maples admits counsel interviewed Smith, but he contends that, had counsel asked Smith, he would have reported that Maples "appeared to be intoxicated and in fact told Mr. Smith he had taken drugs prior to his arrival at Mr. Smith's house." (Doc. 24 ¶ 30B.) Maples does not allege what type of drugs he told Smith he had taken, which arrival time Smith was referring to (before or after Maples left with Smith's friends to buy crack), or the extent to which Smith perceived Maples to be impaired. Moreover, given his denial of any drug use before the murders, Maples has not established that Smith's testimony was relevant to his level of intoxication at the time of the murders, which preceded his arrival at Smith's house.

Importantly, Maples fails to mention that his brother, Daniel Maples, testified that he had spoken with Maples at about 2:00 a.m. (R. Vol. 19, Tab 17, at 2760-61.) He said Maples had called him to say that he would not be coming home that evening; Daniel told him to come home because someone had shot Terry. (*Id*.) Daniel testified that Maples had sounded normal; he was not talking crazy. (*Id.*)

---

[27]At the time Smith was found to have pawned Terry's pool cue, the murders had been publicized and it had been reported that police were looking for Cory Maples. Trevor Nickens, a pawnbroker, testified that Smith had pawned the pool cue that was identified as belonging to Stacy Terry. (R. Vol. 15 at 2020.) Several days later, Smith also tried to pawn a ring and Nickens called the Decatur Police Department. (*Id.* at 2022.) Smith testified that he voluntarily contacted the police about the pool cue, but Nickens's testimony contradicted Smith's testimony.

Considering Maples's videotaped confession, the testifying witnesses' perceptions of Maples before the murders, and his brother's perception of him shortly after the murders, the court finds the overwhelming evidence negates any contention that Maples was so impaired at the time of the offense that legal intoxication was a plausible defense, much less the most plausible defense.  The  record evidence supports a defense strategy – the only one left after Maples's confession – that Maples did not murder the victims in order to obtain money for drugs and that the facts supported reasonable doubt as to whether Terry and Robinson were shot at the same time.  A concession that Maples was high, based on the available evidence that showed he was not so incapacitated as to lack specific intent, would have provided the State with a motive for the killings – he needed money for drugs.  Counsel's discrediting of Phillips and Smith was in furtherance of the defense strategy to defeat the offenses of capital murder, particularly murder during the course of a robbery, by proving Maples did not need to rob Terry in order to pay for drugs.

Moreover, if Smith's *additional* statement that Maples appeared intoxicated had been considered, counsel would have been placed in the position of crediting the remainder of Smith's testimony.  Contrary to Maples's contention, Smith's testimony would not have rebutted the State's argument that Maples had robbed Terry because he needed Terry's pool cue and other property to exchange for crack cocaine.  Instead, it would have supported the State's theory of murder in the course of a robbery.  To the extent Maples may be complaining that defense counsel called Daniel Maples as a defense witness, and that Daniel

56

Maples's testimony regarding Maples's impairment was not as reliable as the other testifying witnesses, he has made no factual allegations to support this contention.   None of the witnesses who saw Maples before the murders testified that he was extremely impaired. Maples had denied he was intoxicated at the time of the murders and his actions after the murders and his ability to recall the details of the murders during his videotaped confession overwhelmingly prove that he was not legally incapacitated by drugs or alcohol at the time of the murders.  Further, Daniel Maples's post-murder impression of Maples countered the testimony of April Phillips and the alleged additional statement James Smith would have proffered, and thus assisted the defense with its argument that Maples did not rob and murder the victims in order to buy crack.

In the end, the allegations of counsel's failure to investigate Maples's intoxication further and his attack on the tactics taken by counsel in connection with the guilt phase testifying eyewitnesses shows nothing more than the same testimony counsel faced at  trial – with the exception of Smith.   The State's trial evidence did not establish extreme intoxication at the time of the offense and Maples has not alleged sufficient facts to show a reasonable probability that the alleged additional testimony would have changed this conclusion.  Maples cannot show actual prejudice based on the evidence of how he appeared to Phillips and Smith *after* the murders; evidence of intoxication *after* the murders does not support an intoxication defense.  Moreover, being forced to credit Phillips's testimony and Smith's testimony would have supported the State's claim that Maples had murdered

Robinson and Terry to obtain money and property to purchase drugs.   Under the circumstances in this case and given the overwhelming evidence of his guilt, the court finds that Maples has not demonstrated a reasonable probability that the result of the guilt phase of his trial would have been different if counsel had presented an intoxication defense.

### iv.  Additional witnesses counsel failed to adequately interview or investigate

Maples also faults counsel for not "ask[ing]" three unidentified individuals at Smith's house about Maples's appearance after the murders.   Maples has not alleged how the testimony of these three individuals that saw him ***after*** the murders and for the purpose of obtaining crack would have rebutted his own statement that he had not taken drugs and had only had a little bit to drink ***before*** the murders and other witnesses who testified that Maples was not legally intoxicated ***before*** the murders.   Regardless, the court finds that Maples's counsel was aware of these witnesses and Maples has failed to allege facts showing that trial counsel did not know what they would say.

The trial record shows that, on December 13, 1995, the defense filed a detailed motion for discovery of prosecution files, records, and information necessary to a fair trial. (R. Vol. 1, Tab 2, at 93-106).   Counsel was already aware of at least 41 witnesses from previous discovery requests.  (*Id.* at 97.)   The discovery motion also requested the names and addresses of all persons who had given any statements or had any knowledge of "all events pertaining to the deaths of the victims and events leading up to the[] deaths," "[a]ny condition of [Cory] Maples, including but not limited to his mental or physical state at any

time[,]" and any exculpatory or favorable evidence relating to guilt or punishment, including whether he had a mental or emotional disturbance, or could not conform his conduct to the requirements of law.  (*Id.* at 98, 100.)   At a hearing on January 19, 1997, counsel explained that they had hired former agent of the Alabama Bureau of Investigation, Johnny Nesmith, at a rate of approximately $30.00 per hour, and that he had performed $1,000 worth of services.  (R. Vol. 6 at 220.)  At that time, the court awarded $1,500 to counsel for Nesmith's services to supplement the $500.00 original award.  (*Id.* at 221.)  In a May 22, 1997, pre-trial motion hearing in which defense counsel was attempting to secure even more information from third parties on some of the 110 individuals identified by the State to the defense during the discovery process, defense counsel stated that a witness named Michael Hatton corroborated Smith's story.  (R. Vol. 7, Tab 10, at 308, 329.)

In his opening argument at the guilt phase of trial, counsel stated that, in addition to James Smith, the State might call "a bunch of other witnesses, three or four witnesses, that are going to testify that they saw [Cory] in that section of town[, Smith's crack house,] in the after hours." (R. Vol. 13, Tab 15, at 1469.)   The State never called the "three or four witnesses" from the crack house at trial.  However, defense counsel asked Investigator Howard Battles, with the Morgan County Sheriff's Office, whether officers had taken statements from individuals who had witnessed the events at the Smith's crack house, including  Jimmy Jacob Chambers, Barbara Nicholas, Corrocas Bledsoe and Larry Cantrell Byrd.  (R. Vol. 20 at 2849-50.)   Therefore, the court finds this demonstrates that trial counsel

59

were aware of the identity of individuals at the crack house and that they were generally aware of the nature of their anticipated testimony.

This evidence of counsel's knowledge of the witnesses at the crack house highlights Maples's failure to plead with any specificity any facts that, if true, would establish that counsel's failure to question the three individuals referred to in paragraph 30A of his amended petition resulted in any actual prejudice.  All indications are that if counsel had done so, the witnesses would have provided the same testimony as Smith did – and provided the motive for the capital murder-robbery of Terry and Robinson.  Maples has failed to allege facts that, if true, would establish ineffective assistance of counsel in connection with the failure to call these witnesses.

Next, in his post-remand brief, Maples alleges counsel "neglected to speak with or call to testify at trial" unidentified individuals at the BBQ he attended earlier on the day of the murders and the bartender at Caddy Shack about his level of impairment.  (Doc. 60 at 65.) He goes even further in his post-remand reply brief and asserts that counsel failed to speak to other patrons at Q Balls and "failed to speak with witnesses who could have testified that the owner of the pool hall regularly overlooked patrons drinking and taking controlled substances outside his establishment."  (Doc. 73 at 33.)  Maples did not include these allegations in his Rule 32 petitions,[28] and, therefore, the Rule 32 court would not have been

---

[28]Maples contends that he filed a discovery request with the Rule 32 court asking for production of information including the name of any person who had seen him consume alcohol or had reported him as appearing to be under the influence of alcohol or a controlled

on notice that Maples was arguing this specific factual basis for the claim.  Therefore, this sub-claim is procedurally defaulted.  Maples has not argued that he is excepted from this default under a cause and prejudice or fundamental miscarriage of justice theory.  Moreover, given the other evidence in the record, including Maples's specific denial that he was drunk or high at the time of the murders, the court finds no actual prejudice arising from counsel's failure to speak with these additional witnesses.

The court finds that Maples has failed to identify by name these witnesses, to declare what the witnesses would have told counsel about Maples's level of intoxication if they been discovered, to explain how these statements would have established a viable intoxication defense or another defense more plausible than that chosen by trial counsel, and to show how he suffered actual prejudice by the lack of these witnesses' testimony.  (*See* doc. 60 at 65.) There was trial testimony from witnesses who saw and interacted with Maples at the BBQ, Caddy Shack, and Q Balls.  Tatum was with Maples at the BBQ and at Carla Terry's house; he testified that Maples was not intoxicated.  Le Ann Clemons and Beverly Shawnbaum testified that they actually sat, drank, and interacted with Maples at Caddy Shack for an hour and a half that evening and that Maples did not appear to be high or extremely intoxicated.

─────────────

substance within the 12-hour period before the murders. (Doc. 73 at 67-68; *see also* doc. 78, Tab 25 at 143-44.)  He argues that his discovery request put the Rule 32 court on notice that the requested information formed the factual basis of his post-conviction claim for relief. (Doc. 73 at 66.)  However, there is no Alabama rule or case law that supports a finding that information sought in a discovery request constitutes the factual basis of a properly pled claim for post-conviction relief.

A number of State witnesses who were at Q Balls – Jason Bright, Jason Boyd, Landon Pendleton, and Luke Skinner – testified concerning Maples's level of impairment, stating Maples either was not impaired or he was not extremely impaired.  Daniel Maples also testified that Maples was not impaired.[29]

Counsel reasonably could have limited their investigation based on the testimony from these witnesses as well as Maples's own statement.  Moreover, considering the content of their testimony, the court finds no reasonable probability that Maples was prejudiced by counsel's purported failure to investigate the other unidentified witnesses based on Maples's present conclusory allegations.  The court finds that Maples has failed to allege facts that, if true, would establish actual prejudice based on counsel's failure to investigate or call as witnesses other individuals with Maples before the murders.

Finally, in his post-remand reply brief, Maples alleges:

Upon information and belief, Maples consumed more than 20 alcoholic drinks over the course of the day and night of the shootings.  Upon information and belief, Maples also smoked several joints of marijuana during that period as well.[30]  Moreover, Maples told his trial counsel at the outset of the

---

[29]The record shows John Lansdale and Matt Shell, as well as Robinson's roommate, Frank Mienen, were also at Q Balls.  Also, although not at Q Balls, Jamie Dobbs saw Maples between 10:30 and 11:00 p.m.  Maples makes no allegations regarding these witnesses.

[30]In his initial post-remand brief, Maples alleged:

Based on information and belief, Maples consumed alcohol (including not only beer, but vodka and whiskey) and drugs even in excess of the copious quantities described by the evidence at trial.  If granted an evidentiary hearing, Maples would seek to document such use.

> representation about the enormous quantities of alcohol and drugs he
> consumed in the hours leading up to the shootings and told his lawyers that
> [unidentified] others would testify that he was drunk and high.

(Doc. 73 at 70 [footnote added].)  He also alleges in a footnote that "upon information and

belief, Maples continued to drink and smoke marijuana after he left the Caddy Shack."  (*Id.*

at 39-40 n.5.)

---

(Doc. 60 at 25-26 n.2.)  In another footnote in that brief, he asserted that he –

> has not had an opportunity to discover evidence concerning counsels' failure
> to investigate, develop, and present evidence concerning the guilt (e.g.
> Maples'[s] intoxication on the evening of the offense) . . . . phase.  If he is
> granted an evidentiary hearing, he will seek to do so.

(*Id.* at 29 n. 4.)   The court notes that when the magistrate judge entered a scheduling order
in this case on March 9, 2005, and that order states, "The parties may not engage in discovery
without the express permission of the court."  (Doc. 20 at 6.)  Moreover, the order requires
Maples, the petitioner, to demonstrate his need for discovery and an evidentiary hearing –
"Petitioner shall have the burden to allege and demonstrate that the petitioner did not receive
a full, fair and complete hearing in state court and that the records of those proceedings are
not a sufficient basis for determining the issues in this petition.  Failure to do so will result
in this court's examination only of the record of the state court proceedings."  (*Id.*)  Maples
filed his third amended petition thereafter, and, in his Prayer for Relief, he asked the court
to "grant petitioner discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and
a sufficient period of time to conduct discovery, and further grant petitioner authority to
obtain subpoenas to further document and prove the facts set forth in this petition."  (Doc.
24 ¶ 472(b).)  Rule 6(b) of the Habeas Rules requires, "A party requesting discovery must
provide reasons for the request.  The request must also include any proposed interrogatories
and request for admissions, and must specify any requested documents."  Maples's Prayer
for Relief is not a proper request for discovery.  He did not include in his Prayer for Relief
the scope of discovery sought; he did not submit the proposed interrogatories and requests
for admission; and he did not specify the requested documents.  Therefore, his Petition has
been decided based on the record of the state court proceedings.

Maples filed his initial habeas petition on August 29, 2003, and his third amended habeas petition on May 23, 2005.  Yet, more than eight years after the habeas petition was filed, Maples attempts to insert new allegations of even more alcohol and marijuana consumption on the afternoon and evening of the murders than he relayed to law enforcement officers in 1993, or to Shealy, the defense psychologist, in 1997.  Nothing about the claim as pleaded in the Rule 32 court would have notified that court that these facts, asserted for the first time in the post-remand Reply Brief, were being proffered as support for the claim.  Such "circumstances present . . . a case in which the prisoner has attempted to expedite federal review by deliberately withholding essential facts from the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 257, 260 (1986).  Accordingly, these allegations are unexhausted and procedurally defaulted, and Maples has not argued that he is excepted from the default under a cause and prejudice or fundamental miscarriage of justice theory.

Alternatively, Maples does not allege that counsel should have called ***him*** to testify at the guilt phase of trial, he does not state whether the "more than twenty drinks" is a reference to Shealy's testimony that he drank between 18 and 21 alcoholic beverages that afternoon and evening or some other unknown number, he fails to identify by name the "others" about which he told counsel – although he must know who they are, he does not allege counsel failed to investigate these other witnesses, he does not allege what the other witnesses would have stated about his consumption or impairment, he does not allege how the other witnesses' testimony would have supported a more plausible intoxication defense

64

in light of the other trial evidence set out above, and he does not allege how he was prejudiced under *Strickland*.  Since he has not alleged facts that, if true, would entitle him to relief on this aspect of his ineffectiveness claim, he cannot establish actual prejudice to overcome the procedural default of his untimely collateral appeal and/or *Strickland* prejudice.

### d. Notice of Maples's extreme intoxication through penalty-phase testifying witness Dr. Shealy

In his post-remand briefs, Maples alleges "his trial counsel had ample notice that they had a strong intoxication defense," based on the notice of his alcohol and marijuana consumption on the day of the murders several months before trial from Shealy's report. (Doc. 60 at 64.)  While counsel certainly was aware of Shealy's report before the trial, for the reasons already discussed and the reasons set out herein, it does not follow that counsel was ineffective for failing to investigate and pursue an intoxication defense based upon that report.

Maples told Shealy he drank between 18 and 21 alcoholic beverages between 2:00 p.m. and 10:30 p.m. on the day of the murders and that he had smoked a marijuana joint with someone at 3:00 p.m. that afternoon.  (R. Vol. 21, Tab 27, at 3112-17, 3132.)  Shealy testified that Maples had "seven or eight beers [at the BBQ], then he went to [Carla Terry's] house to meet [Terry]."  (*Id.* at 3115.)  Maples "funneled a couple of beers" at Carla Terry's house, and "had two or three more standing around talking."  (*Id.* at 3116.)  Maples and Terry then went to Caddy Shack "for about two hours" and had "seven or eight mixed drinks; White Russians."  (*Id.*)  Maples reported no alcohol or drug usage after leaving Caddy Shack,

and he told Shealy that he and Terry went to Q Balls around 10:00 p.m. and stayed until midnight. (*Id.* at 3116-17.) Maples never reported to Shealy that he smoked crack or used crystal methamphetamine before the murders and there was no testimony from Shealy regarding anything Maples told him about his drug and alcohol consumption after the murders.[31]

Notice of the information in Shealy's report must be considered in light of and weighed against other known evidence of ***impairment*** – evidence that showed Maples was not extremely intoxicated at the time of the offense –  taking into account what could be argued as contradictory evidence of impairment.  Neither Maples nor Shealy testified at the guilt phase of trial, and Maples does not allege that he or Shealy[32] should have been called to testify at that phase for the purpose of establishing legal intoxication.  He also does not dispute the State's contention that Shealy's testimony regarding Maples's alcohol and

───────────────

[31]In the "Statement of Events" portion of his post-remand Opening Brief, Maples states that Shealy's testimony shows that on the day of the murders he, along with other friends, had "consumed at least 'two fifths of whiskey and some beer.'"  (Doc. 60 at 26 [quoting R. Vol. 21, Tab 27, at 3114].)  This misrepresents the record.  At that portion of the trial record, Dr. Shealy testified that Maples had reported drinking this amount of alcohol on ***July 4, 1995***, and, due to his hangover, he did not begin drinking again until July 7, 1995, the day of the murders.

[32]In his amended habeas petition, Maples alleges "[a] mental health expert would have testified during the guilt phase of Mr. Maples'[s] trial to the effects of [Maples's history of physical abuse and abandonment, prior experience with violent deaths, past head injuries, and drug and alcohol abuse on the day of the murders] upon [his] narrative style and his flat affect . . . apparent on the videotape of his statement to the police and in his courtroom demeanor."  (Doc. 24 ¶ 68; *see also id*. ¶ 67.)  He did not raise this claim in his post-remand briefs, and as such, it has already been deemed abandoned.

marijuana consumption was inadmissible hearsay.  (*See* doc. 70 at 60 n.6 ["Maples's brief references Dr. Shealy's penalty-phase testimony that Maples told Dr. Shealy he began drinking alcohol at 2:00 p.m. and continually drank alcohol up until the time of the crime, a period of approximately ten hours.  . . .  Although testimony based on hearsay may be allowed during the penalty phase . . . , Maples has not attempted to demonstrate that such hearsay testimony could be presented during the guilt phase.  There is no exception to the hearsay rule for a party's own statements."].)  Maples simply argues that notice of the information in the report should have prompted counsel to "consult or try to put on an expert witness," (doc. 60 at 65), "who could have testified to the impact on Maples'[s] mental functioning at the time of the shootings [after] having consum[ed] such copious quantities of alcohol and drugs," (doc. 73 at 33).  This allegation refers to his claim that counsel were ineffective for failing to consult with and present the testimony of a pharmacologist or a drug expert, discussed *infra*.

Reasonable counsel could have concluded that, considering the evidence of Maples's impairment through his own videotaped statement and Shealy's report, Maples's proclaimed consumption of 20 drinks and a marijuana joint over approximately a 9 hour period may have simply filled in details of his consumption that Maples left out in his videotaped confession ***and*** would not have established that Maples was extremely intoxicated, as opposed to partially intoxicated or simply drunk at the time of the offense.  It is not necessarily the amount of intoxicants that establishes extreme intoxication, but the effect of those intoxicants

on a particular individual.[33]  The effects of any intoxicants on Maples before the offense are

a known quantity based on witness testimony concerning his demeanor, his denial that he was

intoxicated, and his clear recollection of his actions before, during, and after the murders.

An additional problem that Maples's trial counsel faced when considering the "notice"

of Maples's intoxication from the Shealy report is the problem of Maples's credibility, *i.e.*,

whether Maples exaggerated or lied outright about his alcohol consumption to Shealy.  The

possibility that Maples lied to Shealy is particularly true since Maples's report of his mental

processes to Shealy before, during, and after the murders showed that he was aware of and

remembered the details of the conversation he had on the way home from Q Balls, and he

was sufficiently cognizant of his own thoughts to negate any assertion that he was stupefied

by drugs and/or alcohol.  He told Shealy that he believed it was odd that Terry and Robinson

decided to drop him off at home first when they had initially stated Robinson would be taken

home first and the group had to pass by Robinson's house in order to take Maples home.  (*Id.*

at 3117.)  He told Shealy he remembered getting out of the car at his house and struggling

to find his keys.  (*Id.* at 3118.)  He remembered going into the house with the intent to go to

bed and yet he also stated that he went to his parent's bedroom because he knew that was the

---

[33]Indeed, the trial court remarked in its sentencing order that Maples's alcohol use on
the night of the murders was no different than any other night for Maples.  (Rule 32 C.R.
Vol. 37, Tab 62, at 10-11 ["The Defendant acknowledges no inordinate amount of alcohol
consumption on the evening of the murder, nor is there any evidence that the amount of
alcohol consumption on the evening of July 7, 1995[,] was any different than any other
night."].)

room he could look out the window to view Terry and Robinson's exact location outside. (*Id.* at 3112, 3118.)  He remembered that Robinson was standing outside of the car with his head in the door as if he were looking for something.  (*Id.* at 3118.)  He claimed he did not know what made him go back outside and "that his memory started getting fuzzy when he came out of the house."  (*Id.* at 3111.)  Maples then told Shealy that the next thing he remembered was standing ten feet from the driver's door, seeing Terry dead with his head laid back on the seat and Robinson's body prostrate half way in and half way out of the car. (*Id.* at 3118-19.)  These statements directly contradicted his videotaped confession regarding the murders, in which he told the investigators that he had shot Terry first by sticking the rifle through the open car window and then, taking a half step forward, shot Robinson.  (*See*, *e.g.*, doc. 78, Exh. 230.)  In his petition, Maples alleges that counsel did not ask Shealy to view Maples's videotaped confession.  (Doc. 24 ¶ 69.)  But even without this information, Shealy testified that Maples's memory was not completely obliterated by intoxication, a conclusion buttressed by the videotaped confession.  He testified, "Most of us know that if you drink enough you can't remember," (R. Vol. 21, Tab 27, at 3113-14), and Maples "wasn't so intoxicated that his memory was totally wiped out because he remembered the details of what happened before [the murders]," and "[h]e remembered the details afterward," (*id*. at 3122-23).  Shealy said:

> He couldn't remember what happened during a particular part of that time.
> The hypothesis would have been that there was either a disassociative
> experience where he blocked out that part from his memory which would have
> been perhaps contributed to by the intoxication; the alcohol and drugs, or

another possibility that I considered at that time was because of his heavy hallucinogenic drug usage, LSD and so forth, it could have been a disassociative experience related to a flashback.  Particularly – not being a clear motive – I mean, there hadn't been a falling out or a fight or anything based on what I had been told in terms of what he knew at that time and what he told me, and so I was trying to form some hypotheses about why he might not be able to remember.  One hypothesis was that he might be lying or he might be malingering and saying that he didn't remember.  Those were all possibilities that I considered.

(*Id*. at 3123-24.)  Shealy opined that "alcohol and drug use combined with perhaps some internal stimulus from some memory or something that provoked [Maples]," (*id*. at 3168); he testified on cross-examination that the alcohol and drugs alone were not enough to provoke Maples's murder of Terry and Robinson, (*id*. at 3170-71).

Even setting aside Maples's statements to Shealy about his alcohol consumption and memory lapse, Maples's videotaped statement that he was not intoxicated at the time of the murders, his detailed account of the murders, the testimony of witnesses who saw him before the murders, and his brother's testimony that he sounded normal shortly after the murders overwhelming negates any inference of intoxication rising to the level of insanity before or during the murders.  Thus, contrary to Maples's contention, Shealy's report did not put counsel on notice of a ***viable*** intoxication defense.

### e.  Discussion

Considering the evidence presented at trial and the evidence Maples alleges counsel should have presented regarding his intoxication at the time of the murders, the court finds Maples has not shown a reasonable probability that the result of his trial would have been

70

different if counsel had investigated and presented an intoxication defense.  The totality of the evidence pertaining to Maples's mental state at the time of the murders, actually presented and alleged, is such that no reasonable juror would have believed that he was intoxicated to the level of insanity, *i.e.*, he was not conscious that he was committing a crime or was incapable of forming the intent to murder.

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume . . . that the judge or jury acted according to law.  An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.  A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.  The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  . . .

> The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors.  When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

*Strickland*, 466 U.S. at 694-95.  Therefore, in order to find that he was prejudiced by counsel's failure to raise an intoxication defense, Maples must establish a reasonable probability that the jury would have found he was not guilty of capital murder based on evidence of his intoxication.

Under Alabama law, as set forth above, the jury had to find that Maples was intoxicated to the point of insanity in order to find him not guilty of capital murder.  *See Ex parte Bankhead*, 585 So. 2d at 120-21.  "[E]vidence that the defendant ingested alcohol or

drugs, standing alone, does not warrant a charge on intoxication.  There must be evidence that the ingestion caused a disturbance of the person's mental or physical capacities and that mental or physical disturbance existed at the time the offense was committed." *Johnson v. State*,  2014 WL 2061147 at *48  (Ala. Crim. App. 2014)(internal quotations and citations omitted).  The evidence that Maples contends supports a viable intoxication defense shows, at best, that he was drunk at the time he shot Terry and Robinson.  However, this evidence does not support a reasonable probability that the jury would have found Maples to be so drunk that his "mental facilities" were "paralyze[d]" and he was "incapable of forming or entertaining the design to take life." *Ex parte Bankhead*, 585 So. 2d at 120-21.  Indeed, Maples's videotaped confession overwhelmingly negates any argument that he was so drunk he could not form the intent to murder Terry and Robinson given his ability to recall the details and his thoughts before and during the murders. *See Reaves v. Secretary, Florida Dept. of Corrections*, 717 F.3d 886, 904 (11th Cir. 2013)(finding no prejudice to defendant arising from counsel's failure to present an intoxication defense, in part, because of defendant's "ability to later recall the [murder] in considerable and vivid detail" (citing *Davis v. State*, 875 So. 2d 359, 367 (Fla. 2003))); *Ex parte McWhorter*, 781 So. 2d 330, 342-43 (Ala. 2000)("The evidence offered by McWhorter as to his alleged intoxication was glaringly inconsistent with his own statement giving detailed descriptions of the events occurring at the crime scene."); *see also Lucas v. Warden, Georgia Diagnostic and Classification Prison*, 771 F.3d 785, 795 (11th Cir. 2014)(finding no *Strickland* prejudice arising from counsel's

failure to present evidence "suggesting the petitioner had no memory of the events of the murder due to drug use or brain damage" because substantial evidence, including a videotaped confession, demonstrated "a memory of the murders"); *Harich v. Dugger*, 844 F.2d 1464, 1471-72 (11th Cir. 1988)(finding no prejudice based on counsel's failure to raise an intoxication defense based, in part, on petitioner's statement recalling details about where he went and what he did), *overruled in non-pertinent part by Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997).

In his videotaped confession, Maples said he was not intoxicated at the time of the murders, having "a little bit" to drink, and he denied using any hard drugs.  He was able to recall details of the murders, including what he was thinking at that time.  Individuals who saw him before the murders said he was not intoxicated.  No one who saw him after the murders could testify to his condition at the time of the murders.  The evidence of Maples's conduct before and during the murders "suggests a perfectly adequate understanding of his actions" that negates any suggestion that he was legally intoxicated at the time of the murders.  *Hunt*, 666 F.3d at 728 (citing *White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992)).  Moreover, Maples's expert Shealy reported that he did not think Maples was so intoxicated at the time of the murders that he did not know what he was doing.

The court finds that Maples has not established that he suffered actual prejudice as a result of counsel's failure to raise an intoxication defense.  Based on the facts presented at trial and consideration of the evidence that Maples alleges should have been presented, the

court finds no reasonable probability that the result of Maples's trial would have been different and no reasonable jurist could decide otherwise.  *See Brooks v. Commissioner, Alabama Dept. of Corrections*, 719 F.3d 1292, 1300 (11th Cir. 2013).  Also, the court finds the decision of the Rule 32 court denying this claim was based on a reasonable application of *Strickland* and reasonable determination of the facts based on the record before it.

Therefore, Maples's claim for relief based on counsel's failure to present an intoxication defense is due to be denied as procedurally defaulted and, in the alternative, without merit.  Maples's request for an evidentiary hearing or opportunity for discovery is denied.

### 2.  Counsel's Failure to Request the Assistance of a Pharmacologist or Other Expert in Drug Interactions.  (Doc. 24 ¶¶ 71-72.)

Maples contends that counsel should have "obtain[ed] an expert to testify as to [his] cognitive ability to form an intent to rob, and whether and to what extent that ability was impacted by his drug ingestion, especially [his] impairment after ingesting drugs and alcohol following a relatively drug-free period."[34]  (Doc. 24 ¶ 71.)  Also, he alleges:

---

[34]The record does not contain evidence that Maples had refrained from drinking alcohol for any period of time.  Indeed, the record contains evidence that he continued to drink after leaving rehab.  (*See* R. Vol. 19, Tab 17, at 2749; R. Vol. 21, Tab 27, at 3169-70.)  During the cross-examination of Shealy, the following occurred:

> Q.  Can you see anything in particular about this particular incident about why it would lead to a homicidal rage when obviously from the history he gave you that he had been drunk and extremely intoxicated over a couple of years period of time?  I mean, is there anything in particular about this incident why it would set him off to kill two people?

Under these circumstances, Counsel [were] ineffective for failing to request the services of an expert who could review the available evidence, determine how much of which drugs Mr. Maples ingested or used prior to the shootings, and offer testimony about the effects those drugs would have had on his mental state at the time of the shootings. Depriving Mr. Maples of his constitutionally guaranteed assistance of experts cannot be considered a strategic decision under *Ake* and its progeny. But for Counsel's failure to request a pharmacologist or other expert in drug interactions and elicit testimony from that expert, the outcome of Mr. Maples'[s] trial would have been different.

(*Id*. ¶ 72.)

The Rule 32 court held this claim was "deficiently pleaded and not specific" because Maples had "fail[ed] to plead facts that would establish what a pharmacologist or neuro-pharmacologist's testimony would have been or that their testimony would have even been favorable to his defense." (Rule 32, Vol. 37, Tab 66 at 30-31.) Similarly, Maples has not alleged the substance of the expected testimony of a pharmacologist or other drug expert.

In his confession, Maples describes drinking before the murders and he says he smoked a joint. However, he denied, unequivocally and repeatedly, any use of hard drugs. He remembered not only the details of the evening – including shooting Terry through his open window twice and, in a single motion, taking a half step forward and shooting Robinson. He told the investigators that he had troubling thoughts that night, as he often did when he drank. He never stated that he was so drunk or high that he did not know what he

---

A. No. It's a very good question, and certainly puzzling probably to everybody, I would imagine to everybody here. . . . .

(R. Vol. 21, Tab 27, at 3169-70.)

was doing.  His statement to the investigators, recorded on videotape and played for the jury, shows Maples knew what he was doing – even if he denied knowing *why* he was doing it – when he murdered Terry and Robinson.  Moreover, his confession shows that he was capable of rationale thought – he took the money from Terry's billfold after taking his body out of the car and laying it on the ground, he replaced the weapon, and he left in Terry's car.  He got rid of Robinson's body by throwing it over a bridge and into a creek.  He had sufficient self awareness to know that he had to leave town because he would be suspected of the murders.

Assuming an expert in the effects of drugs and alcohol examined this case, the court finds no realistic probability that such an expert would testify that Maples, in light of his confession and other evidence in the record before the state court, was unable to form the intent to murder Terry and Robinson at the time he shot both men.  Perhaps this is the reason that Maples did not specifically plead what the expert's expected testimony would be.[35] Regardless, considering Maples's amended petition, his post-remand briefs, and the entire state-court record, this court finds no reasonable probability that the result of Maples's guilt-phase trial would have been different if Maples's trial counsel had consulted and/or obtained an expert in drug use and effect.  The evidence that Maples was not so intoxicated as to be insane at the time of the murders is overwhelming – he said he was not intoxicated, he

---

[35]In *Harrington*, the Supreme Court held that reasonable counsel may choose not to consult an expert if the expert "would be fruitless," or even "harmful to the defense." *Harrington*, 562 U.S. at 108 (citing  *Strickland*, 466 U.S. at 691).

recalled the details of the night, including his thoughts at the time of the murders, he left town to avoid being arrested for the murders, people who saw him before the murders testified he was not intoxicated to an extreme extent, and his brother who spoke with him about an hour after the murders denied Maples seemed anything but normal.

The court finds that Maples has not shown that a pharmacologist or similar expert would have testified that he was intoxicated to the point of insanity at the time of the murders.  Therefore, he cannot show actual prejudice based on counsel's failure to consult a pharmacologist or similar expert.

The court finds this claim is procedurally defaulted or, in the alternative, due to be denied on the merits.  To the extent Maples may be requesting an evidentiary hearing as to this claim, it is due to be denied.  *Cullen*, 131 S. Ct. at 1400.

**3.    Counsel Failed to Request Jury Instructions on Intoxication and Manslaughter.**  (Doc. 24, Claim I.C.ii., ¶¶ 32-36.)[36]

Maples alleges that counsel was ineffective for failing to request jury instructions on intoxication and manslaughter based on the evidence presented at trial and additional "available evidence of intoxication."  (Doc. 24 ¶¶ 32, 35.)  Had counsel done so, Maples contends that he "would have been entitled to a jury instruction on intoxication that could have negated [the] specific intent required to establish capital murder[,]" and a manslaughter

---

[36]This claim is identical to the amended Rule 32 petition.  The initial Rule 32 petition made the same allegations as the amended Rule 32 petition, except Maples claimed only that counsel should have requested an intoxication and manslaughter instruction based on the State's evidence as presented at trial.  (*See* Rule 32 C.R., Vol. 32, Tab 47 at 7-10.)

verdict would have rendered him ineligible for the death penalty.  (Doc. 60 at 63-64 [citing

*Coon v. State*, 494 So. 2d 184, 186-87 (Ala. Crim. App. 1986); *Crosslin v. State*, 446 So. 2d

675, 681-82 (Ala. Crim. App. 1983)]; *see also* doc. 24, ¶¶ 32-36.)

> On direct appeal, the Alabama Court of Criminal Appeals held:

> The testimony at trial did not establish that the appellant was intoxicated at the time of the murders. Although there was some testimony that he had ingested alcohol several hours before the murders occurred, there was no testimony that he was intoxicated at the time of the murders. Also, there was no evidence that he had ingested drugs before the murders. Thus, there was no rational basis for instructions on intoxication and manslaughter under the evidence presented in this case.

> Furthermore, instructions on intoxication and manslaughter would have been inconsistent with his defense strategy. At trial, the appellant specifically contended that he was not intoxicated at the time of the murders. He also contended that, at most, he was guilty of two intentional murders, but not two counts of capital murder. Thus, the trial court did not err in not instructing the jury on intoxication and manslaughter.

*Maples v. State*, 758 So. 2d 1, 24 (Ala. Crim. App. 1999).

> The Rule 32 court held:

> . . . Maples contends that trial counsel were ineffective for not requesting jury instructions on intoxication and manslaughter.  The underlying substantive issue was raised on direct appeal.  The Court of Criminal Appeals held that no plain error had occurred because "there was no rational basis for an instruction on intoxication on manslaughter under the evidence presented in this case."  *Maples*, 758 So. 2d at 24.

> Based on the holding of the Court of Criminal Appeals, Maples is unable to establish that trial counsel's performance caused him to suffer any substantial prejudice, thus, he is unable to establish ineffective assistance under the *Strickland* test.  *Williams v. State*, 783 So. 2d 108, 133 (Ala. Crim. App. 2000).  [This claim] is without merit; therefore, it is due to be dismissed.

(Rule 32 C.R. Vol. 37, Tab 66, at 13-15.)

As set forth *supra*, the court finds that Maples was not prejudiced by counsel's failure to present an implausible and unsupported intoxication defense. "Counsel's failure to request an intoxication instruction is . . . justified by the implausibility, on this record, of an intoxication defense." *Hunt v. Commissioner, Alabama Dept. of Corrections*, 666 F.3d 708, 727 (11th Cir. 2012). For this reason, Maples cannot show the Rule 32 court unreasonably rejected this claim. Given the Court of Criminal Appeals finding that such instructions were not warranted by the evidence, reasonable jurists would agree with the Rule 32 court's conclusion that failure to request jury instructions on the intoxication defense and manslaughter that were not warranted by the evidence did not cause Maples's actual prejudice. *Id*. at 729 (finding no prejudice when "there is no realistic possibility that, had [such] instruction[s] been given, the jury might actually have concluded that [defendant's] intoxication amounted to insanity and acquitted him of capital murder on that basis").

This claim is procedurally defaulted, or in the alternative, due to be denied on the merits. To the extent Maples may be requesting an evidentiary hearing as to this claim, which was adjudicated on the merits in the Rule 32 court, the request for a hearing will be denied. *Cullen*, 131 S. Ct. at 1400.

**4.  Counsel Was Ineffective for Admitting Critical Elements of the Charged Offenses  During Closing Argument and Arguing a Position That Was Inconsistent with His Opening Statement.**  (Doc. 24, Claim I.B.i.-iii., ¶¶ 19-25.)

### a.  Maples's claim

In his amended habeas petition, Maples claims that counsel was ineffective during closing arguments of the guilt phase of his trial because he admitted that Maples was guilty of capital murder and that he flipped positions between his opening and closing arguments.[37] Specifically, Maples alleges:

> 19.  The relevant Alabama statute enumerates one capital offense as "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct."  Ala. Code § 13A-5-40 (10) (1994) ("Count One").  During closing arguments, Counsel admitted both elements of this offense – (1) the intentional murders of two people (2) pursuant to one scheme or course of conduct.  But for Counsel's ineffective performance in these admissions, there is a reasonable probability that the outcome of Mr. Maples'[s] trial would have been different.  Counsel's admissions denied Mr. Maples his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

---

[37]To the extent Maples alleges that counsel conceded guilt to the capital offenses with three statements in his closing argument, this habeas claim is virtually identical to that presented in the Rule 32 petition, (R. 32 C.R., Vol. 32, Tab 47, ¶¶ 11-17 at 5-6), and the amended Rule 32 petition, (*id.*, Vol. 33, Tab 49, ¶¶ 11-17 at 5-7).  To the extent Maples alleges that counsel's initial strategy was to deny that he committed the killings and then flip-flopped strategies in his guilt-phase closing arguments, this is a retooling of the claim as alleged in all previous pleadings.  Nonetheless, since the propriety of counsel's guilt-phase closing arguments necessarily requires a determination of the reasons why counsel made the arguments he did and the Rule 32 court's order reflects that it was on notice of this aspect of Maples's claim and conducted its analysis in such a manner, the post-remand retooling does not raise a new claim.  Thus nonexhaustion with regard to the allegations in Maples's post-remand brief is not at issue.

### i.  Counsel's Admission of Intent.

20.   Counsel's admissions during trial deprived Mr. Maples of his constitutional right to be tried before an impartial jury.  During closing arguments, Counsel told the jury that Mr. Maples intentionally caused a loss of life and that he should be guilty of at least one lesser included count of murder.  "We are asserting that there is at least sufficient evidence as to one murder that he's guilty of and possibly two." (R. at 2913-14, 2939.)  Later in the closing, Counsel admitted "two murders, ladies and gentlemen, his own actions for which he is responsible." (R. at 2918, 2929-30.)

### ii.  Counsel's Admission of One Scheme or Course of Conduct.

21.   Counsel also admitted that Mr. Maples murdered pursuant to one scheme or course of conduct.  "What we have here is the instance of him walking out to the car and in an instantaneous rush killing two people." (R. at 2918.)  The State noted this admission during closing argument when they argued that "[Counsel] told you both deaths were caused instantaneously." (R. at 2959.)

### iii.  These Admissions by Counsel Constitute Ineffective Assistance of Counsel.

22.  Despite Mr. Maples'[s] desire, expressed in open court, to plead not guilty to all of the counts contained in the indictment, Counsel's admissions, as detailed in Paragraphs 20 to 21, were the functional equivalent of a plea of guilty to capital murder, a plea which resulted in a sentence of death.  . . .  It is fundamental that counsel may not override their client's decision to plead not guilty.  . . .  Therefore, Counsel's conduct in overriding Mr. Maples'[s] decision to plead not guilty falls outside the wide range of professionally competent assistance.  . . .

23.  The crime of intentional murder is automatically elevated to capital murder when two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct.  . . .  Thus, Counsel's admission of Mr. Maples'[s] guilt to a capital crime denied him the right to have his guilt presented to the jury as an adversarial issue.  . . .

24. The jury, having been informed by Mr. Maples'[s] own Counsel that he was guilty as charged, could not possibly have accorded Mr. Maples a presumption of innocence. Thus, Mr. Maples was tried by a jury that had a fixed opinion of his guilt prior to deliberations. Unsurprisingly, the jury deliberated less than four hours before unanimously determining that Mr. Maples was guilty of two counts of capital murder.

25. Counsel's admissions during closing arguments at the guilt phase of the trial deprived Mr. Maples of a fair trial and were based on a failure to know or understand the law that cannot be accorded deference as a reasonable trial strategy. . . . There is a reasonable probability that, but for Counsel's deficient performance, the result of the proceeding would have been different.

(Doc. 24 ¶¶ 19-25 [internal citations and quotations omitted, except as otherwise indicated].)

In his post-remand brief, Maples declares that counsel was ineffective because he

"flipped positions," hurting Maples's credibility. (*See* doc. 60 at 53-55.) He argues:

During opening arguments, Maples'[s] counsel took the position that Maples was innocent of the shootings altogether, telling the jury that the State could provide no reason that Maples would "suddenly snap" and murder a friend (R. at 1466); that the State had essentially focused its investigation on Maples from the outset and stopped asking "who did this" (R. at 1468); and that there are "at least doubts" going to "the very issue of who did this crime" (R. at 1473).

. . .

Having opened the trial by telling the jury that someone else committed the shootings and having apparently tried to advance that theory with a meager and confusing presentation during the trial in response to the State's evidence . . . , what counsel did during the closing arguments of the guilt phase was utterly unreasonable and destroyed any chance that Maples would be spared a capital murder conviction. At closing, Maples'[s] counsel suddenly flipped positions. Rather than sticking with the position that Maples should be acquitted of the shootings because of doubts over who committed them, counsel told the jury that Maples had committed the shootings. Specifically, counsel told the jury at closing that "[w]e are asserting there is at least sufficient evidence as to one murder that he's guilty of and possibly two" (R.

at 2939; see R. at 2913-14), and counsel admitted to the jury "two murders, ladies and gentlemen, his own actions for which he is responsible."  (R. at 2929-30.)  That was a shocking turn of events and must have seriously undermined Maples'[s] credibility to the jury.

(*Id*.)

The Rule 32 court made the following findings of fact and conclusions of law:

[Maples] alleges that trial counsel were ineffective for arguing that "[he] intentionally caused a loss of life and that he should be guilty of at least one lesser included account of murder.'"  (Maples petition at p. 5)

A claim of ineffective assistance regarding trial counsel's closing argument cannot be viewed in isolation, but must be viewed in the context of the entire argument and the evidence presented at trial.  *Duren v. State*, 590 So. 2d 360, 367 (Ala. Crim. App. 1990).  When viewed in the proper context, the two quotes . . . of Maples's petition from trial counsel's guilt-phase closing arguments do not establish ineffective assistance of counsel.

A defense attorney's performance is not ineffective "as long as the approach 'might be considered sound trial strategy.'"  *Chandler*, 218 F.[3d] [1305] at 1314 [(2000)], quoting *Darden v. Wainwright*, 106 S. Ct. 2464, 2474 (1986).  Trial counsel's guilt phase strategy was to convince the jury that, though Maples may have been guilty of two intentional murders, he was not guilty of capital murder.  Given the overwhelming evidence of guilt presented against Maples, including his videotaped confession and DNA evidence, this was a reasonable trial strategy.

Maples has failed to plead and prove that, given the facts of the case, "no competent counsel would have taken the action that his counsel did take."  *Chandler*, 218 F.[3]d at 1315.  The allegation . . . does not establish deficient or prejudicial performance on behalf of trial counsel as required by the *Strickland* test.  [This claim] is without merit; therefore it is dismissed.  Rules 32.3, 32.6(b), and 32.7(d), *ARCrP*.

[In the next claim,] Maples alleges that trial counsel were ineffective for admitting that he murdered the victims pursuant to one scheme or course of conduct.  In support of his allegation, Maples quotes this Court one sentence

[that Maples acted in an instantaneous rush] from trial counsel's entire closing argument that covers 33 pages of record.  (R. 2908-2941)

> . . .

> When read in the context of trial counsel's entire closing argument and the evidence presented at trial it is obvious that trial counsel was arguing that Maples suffered from some form of diminished capacity and that he did not murder the victim[s] with the intent to rob Terry.  This was in keeping with trial counsel's strategy that, though Maples have been guilty of intentional murder, he was not guilty of capital murder.  Trial counsel never told the jury that Maples was "guilty as charged" as Maples contends in his petition.

> Maples has failed to plead or prove that, even if trial counsel erred, "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S. Ct. 2064.  Claim I.B. (ii) does not establish deficient or prejudicial performance on behalf of trial counsel as required by the *Strickland* test.  Claim I.B.(ii) is without merit; therefore, it is dismissed.  Rules 32.3, 32.6(b), and 32.7(d), *ARCrP*.

(Rule 32 C.R. Vol. 37, Tab 66, at 12-13.)  Elsewhere in its opinion, the court held:

> During the guilt phase, trial counsel's strategy was to attack the elements of the indictment that raised the offenses from intentional murders to capital murders.  Trial counsel attempted to show that the murders were not committed pursuant to a common plan or scheme as alleged in Count I of the indictment by arguing that the lapse of time between the discovery of Terry's body and the discovery of Robinson's body established a reasonable doubt that someone else could have murdered Robinson.  Trial counsel attempted to show that Maples took Terry's car as a mere afterthought and not as part of a plan to rob him . . . .

(*Id.* at 85.)

Maples asserts the Rule 32 court's determination that –

"[t]rial counsel's guilt phase strategy was to convince the jury that, though Maples may have been guilty of two intentional murders, he was not guilty of capital murder[]" . . . . is flat wrong, and an objectively indefensible characterization of the trial record.  As the opening statements quoted above

made clear Maples'[s] counsel's strategy for the guilt/innocence phase was to deny that Maples was guilty of the shootings at all – apparently by trying to create reasonable doubt about "who did this crime." (R. at 1473). It was not until closing arguments that Maples'[s] counsel adopted the strategy identified by the Alabama trial court. But in doing so, it abandoned the strategy it opened with.

(Doc. 60 at 41 [quoting Rule 32 C.R. Vol. 37, Tab 66, at 12]; *see also id.* at 42-43 ["the court utterly failed to recognize that counsel had specifically told the jury at opening statements that Maples did not commit the shootings"].)

### b. Counsel's Arguments

At the beginning of his opening statement, Maples's counsel told the jury:

On July 7th or 8th of 1995, two young men lost their lies in Morgan County, Alabama, tragically. It is also a fact that the State of Alabama has leveled a finger of accusation at [Cory] Maples and says that he is responsible for those two young men's deaths. It is equally a fact that to that charge, [Cory] Maples today asserts before you, the trier of this case, that he is not guilty of that charge; hence the reason for this trial.

(C.R. Vol. 13, Tab 15, at 1464-65.) He then asked the jury to consider the following questions:

- "[W]hy would [Cory] Maples suddenly, after a week of spending time with this young man[, Stacy Terry,] that he had known his whole life, why would he suddenly snap or do whatever and become a murderer of . . . his friends[?] (*Id*. at 1466.)

- "Why would he suddenly at the end of [a] week [spent with Terry] decide to become both a murderer and a robber?" (*Id*.)

- "It is true that [Cory] was ultimately found in possession of the car of Stacy Terry. That is not in contest or in question. The issue is what does that mean." (*Id*. at 1467.)

85

- "How" did Terry pool cue "end[ ] up in the hands of individuals in the Northwest Decatur section of town[?]"  (*Id*. at 1467-68.)

- Why does Maples, in his videotaped statement, inaccurately describe "how the two young men died"?  (*Id* at 1470-71.)

In summation, he asked the jury to "[c]ompare the evidence and search vigorously for the truth because the State has not done that in this case," and to return a verdict of not guilty. (*Id*. at 1473.)

> During closing argument, counsel stated:
>
> Now, at the beginning of this case, all we had faced before us were the charges in the indictment.  Throughout this case it has become apparent the Court is going to charge you on lesser included offenses.  At the beginning of this case when I said [Maples] was not guilty, I still say ***he's not guilty of the charges in the indictment***, but I am telling you unequivocally that the proper and just verdict would be a ***finding of guilty as to at least one count of regular murder***.

(C.R. Vol. 20, Tab 19, at 2913 [emphasis added]; *see also id*. at 2914-15 ["While the evidence may be sufficient as to the cause of death, as to these other circumstances, we assert to you the evidence is insufficient to remove all reasons of doubt of his guilt of capital murder."].)  The focus of counsel's argument thereafter was to negate the factors that supported the capital murder charges – "Since we have conceded to you there was a loss of life caused intentionally at the hand of [Cory] Maples, it is really two questions.  The first one is, were these deaths caused, quote, pursuant to one act or one scheme or course of conduct. . . . The second one is in count number two, were they committed during the course of a robbery . . . ."  (*Id*. at 2914.)

86

In discussing "the so-called robbery count," counsel argued, *inter alia*:

> Remember the crucial point in [Maples's videotaped] statement when he was talking about his past and he says, "I'm not making excuses, I'm responsible." Do [you] remember him saying that?  This is not a man trying to get out of anything or hide anything or conceal anything.  He said, "I don't know, no apparent reason, pointless."  He said, "I've been thinking about that personal stuff all night; that stuff I think about when I drink."  He said he didn't say anything to [Terry and Robinson] before the events.  There is no element of provocation or that . . . he said ["]get out of the car.["]  If it was a robbery, he could have held a gun to them and forced them out of the car at gunpoint and gunned them down then and left in the car.  There would have been no blood or anything.  What we have here is the instance of him walking out to the car and in ***an instantaneous rush*** killing two people.  Now, as Mr. Matthews pointed out, after the events he testified he "freaked out hard."  He said, "What the blank have I done."  When asked, he said "there was no money involved."  When asked about the problems that was on his mind, he said, "Those were my usual personal problems."  He said, "There was no real reason why I did it."  He didn't try to make justification[s].

(*Id.* at 2917-18 [emphasis added].)  Counsel argued, "The only evidence [of robbery] that comes in [Maples's] statement when he says[,] after the fact, after both men are dead, then he takes the car.  The testimony is that this was a mere afterthought."  (*Id.* at 2925-26.)  Then counsel stated, "Now, is this a man who is evasive and trying to hide and run from the police and try to keep that car for himself, or is this a tortured man who did something he never quite understands and flipped out and snapped and his whole life was turned upside down by his own actions for which he is responsible; ***two murders, ladies and gentlemen, his own actions for which he is responsible***."  (*Id.* at 2929-30 [emphasis added].)

As to the one-scheme-or-course-of-conduct capital murder charge, counsel began by noting that the State had "rel[ied] upon Maples'[s] statement to say that these two young men

were killed together at the same time or roughly the same time." (*Id*. at 2930.) He argued

that the testimony of Pat Bradberry, a neighbor, was inconsistent with Maples's videotaped

statement that he shot Terry and Robinson at the same time:

> Mrs. Bradberry tells us there [were] two sets of shots and that is inconsistent
> with what [Cory] Maples testified to in this statement. When I say there is no
> evidence of that, [Cory] Maples testified in his statement or stated in his
> statement that these things . . . all happened like that (snapping fingers). He
> doesn't mention a time period passing or more shots; he doesn't mention any
> of this kind of evidence. The State is now saying that must have happened
> because they have to in order for you to believe that [Cory] Maples killed these
> two young men pursuant to the same scheme or course of conduct.

(*Id*. at 2931-32.) He pointed to a number of inconsistencies between Maples's videotaped

confession and other evidence, including:

- Evidence that Robinson moved in reaction to being shot; Maples said Robinson did not move, (*id*. at 2932);

- Evidence of blood splatter in the back seat of the car; Maples stated, at the time he shot Robinson, Robinson was in the front seat, (*id*. at 2932-33);

- Evidence that Robinson was found without of his shoes, (*id*. at 2933);

- Evidence that Robinson's body was not in the creek at 4:00 p.m. the afternoon following his murder, although Maples had stated he put Robinson's body in the creek at 1:00 or 1:15 a.m., (*id*. at 2934-35); and

- Picture of Robinson's body in the creek shows his clothing is "soaked, but "[t]here is at least six or seven inches between the water and his clothing," (*id*. at 2935).

Based on this evidence, counsel argued "a reasonable inference is that [Terry and Robinson]

were killed at separate and distinct times." (*Id*. at 2937; *see also id*. at 2939.)

In summation, counsel told the jury:

> . . . Maples stands before you on the first words I told to you . . . on his plea of not guilty to the charges in the indictment. The State has elected to pursue these charges [of capital murder] and now we know . . . that you will assert and agree with us that this evidence that I have just mentioned creates real reasonable doubts as to whether the State has proven these two charges. . . . [Y]ou will be asked a second question, and that is, is he guilty of murder. We are asserting there is at least sufficient evidence as to one murder that he's guilty of and possibly two. You will be asked for that. It will be a serious verdict, it will send a message, it will condemn murder clearly, and it will be the just and appropriate verdict.

(*Id.* at 2939.)

In response, the State argued, *inter alia*, "[I]f I understood [Maples's counsel] right, when he was talking about the robbery count, he . . . said something about instantaneously killing two people. Well, that sounds to me pretty much like in count one, one course of the same transaction, instantaneously." (R. Vol. 20, Tab 20, at 2955.) The State also argued:

> Mr. Craig [Maples's counsel] wants to get [Robinson's] body off somewhere to get all this separated out, but if I understand him right, he told you both deaths were caused instantaneously. . . . If the deaths didn't happen at the same time, then what do you think happened? . . . Do you think for a second that Barry Robinson – that after [Maples] killed Terry that Robinson just continued to sit there and wait awhile for his turn? Is that logical? Is that believable, or is it more logical to believe it happened just like the defendant told you on the tape. Somebody said something about there not being any eyewitnesses in this case. There was an eyewitness and he told you what happened on the tape.

(*Id.* at 2959-60.)

89

### c. Discussion

Maples alleges that counsel's closing argument was "the functional equivalent of a plea of guilty to capital murder." (Doc. 24 ¶ 22.)  The court disagrees.

First, the court notes that, assuming counsel conceded Maples was guilty of capital murder, such concession was not the functional equivalent of a guilty plea:

> [Maples] retained the rights accorded a defendant in a criminal trial. The State was obliged to present during the guilt phase competent, admissible evidence establishing the essential elements of the crimes with which [Maples] was charged.  . . .  That aggressive evidence would thus be separated from the penalty phase, enabling the defense to concentrate that portion of the trial on mitigating factors.  . . .  Further, the defense reserved the right to cross-examine witnesses for the prosecution and could endeavor, as [counsel] did, to exclude prejudicial evidence.  . . .  In addition, in the event of errors in the trial or jury instructions, a concession of guilt would not hinder the defendant's right to appeal.

*Florida v. Nixon*, 543 U.S. 175, 188 (2004)(internal citations omitted).

However, the court finds that counsel did not concede Maples was guilty of capital murder.  As set forth above, counsel argued that Maples was guilty of intentional ("regular") murder of Terry and maybe Robinson.  Given the evidence, counsel's strategy was to admit what could not be denied – the fact that Maples shot Terry.  The evidence regarding Robinson's murder was slightly less definitive, and counsel so argued, pointing to evidence that suggested Robinson was not murdered at the same time as Terry.  Nevertheless, this evidence was inconsistent with Maples's videotaped statement that he had shot both men at the same time.      "Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear." *Id*. at 191.

90

Therefore, conceding guilt may be a valid and reasonable strategy.  *Harvey*, 629 F.3d at 1243; *see Darden v. United States*, 708 F.3d 1225, 1230 (11th Cir. 2013).  Also, such a strategy does not constitute constitutionally-ineffective assistance unless the habeas petitioner can show that the result of the guilt proceeding would have been different had counsel not made the statements of which he complains.

Maples complains of three comments:  (1) two comments conceding Maples's guilt to one or two intentional murders, (R. Vol. 20, Tab 19, at 2929-30 ["two murders, ladies and gentlemen, his own actions for which he is responsible"]; *id*. at 2939 ["We are asserting there is at least sufficient evidence as to one murder that he's guilty of and possibly two."]); and the "instantaneous rush" comment, (*id*. at 2918 ["What we have here is the instance of his walking out to the car and in an instantaneous rush killing two people."]).  These comments were made in an effort to convince the jury that Maples, who had confessed to killing Terry and Robinson and taking Terry's car, was not guilty of either of the capital murder charges in the indictment.  The overwhelming evidence, including the videotaped confession, negates any reasonable probability that he would not have been convicted of both counts of capital murder had counsel not made these three comments and/or had made a more effective closing argument.  *Lee v. Thomas*, 2012 WL 1965608, at *54  (S.D. Ala. 2012)("There being no showing of prejudice here, particularly in light of the overwhelming evidence that [defendant] was in fact guilty of murder, the Court finds no *Strickland* prejudice in trial counsel's concession to the jury during the guilt phase without prior consultation with

[defendant].  Defendant has not shown that, but for his counsel's murder concession, there is a reasonable probability that the outcome of his trial would have been different.")(citations omitted); *see Atwater v. Crosby*, 451 F.3d 799, 808-09 (11th Cir. 2006); *Parker v. Head*, 244 F.3d 831, 840 (11th Cir. 2001).

The court finds that Maples has not shown actual prejudice for purposes of overcoming the procedural default flowing from the untimely collateral appeal or establishing *Strickland* prejudice.  Therefore, this claim is procedurally defaulted or, in the alternative, without merit.  Maples's request for an evidentiary hearing is denied.

### 5.  Alabama's System of Indigent Representation in Capital Cases Contributed to Counsel's Deficiencies and Further Deprived Maples of Effective Assistance of Counsel.  (Doc. 24, Claim I.A., ¶¶ 17-18.)[38]

Maples alleges that his trial counsel were ineffective, in part, because "of the insufficient funding available for counsel in a capital case" at the time of his trial.  (Doc. 24 ¶¶ 17-18.)  Specifically, he argues:

> 17.    In part, Counsel's ineffectiveness was the product of the insufficient funding available for counsel in a capital case.  At the time of Mr. Maples'[s] trial, Alabama law provided that court-appointed attorneys in capital cases could not be compensated more than $1,000 for out-of-court work for each phase of a capital trial, based on a $20 hourly rate.  <u>See</u> Ala. Code § 15-12-21 (1994).  Accordingly, Counsel received no compensation whatsoever for out-of-court work in excess of fifty hours, other than overhead expenses, and were compensated at rates far below market level for the initial fifty hours.  If Counsel had received adequate compensation, Counsel could

_____

[38]This habeas claim is substantially similar to its predecessors as set forth in Maples's initial and amended Rule 32 petitions.  (Rule 32 C.R., Vol. 32, Tab 47, ¶¶ 9-10 at 3-4 "Rule 32 petition"; *id.*, Vol. 33, Tab 49, ¶¶ 9-10 at 3-4 "Amended Rule 32 petition.")

have performed adequate investigation in preparation of both the guilt and penalty phases of Mr. Maples'[s] trial, including searching for and interviewing relevant witnesses.  If adequately compensated, Counsel also could have adequately prepared the few defense witnesses called to testify on Mr. Maples'[s] behalf.  Adequate compensation of Counsel could also have resulted in the avoidance of the multitude of issues raised in this Petition that, individually and cumulatively, result in ineffective assistance of counsel.  This compensation is simply inadequate for the time required to adequately represent a capital defendant.  But for Counsel's inadequate compensation, the outcome of Mr. Maples'[s] trial would have been different.

18.  This inadequate and statutorily-limited compensation violated the separation of powers doctrine, deprived Mr. Maples of effective assistance of counsel and violated his due process and equal protection rights. . . . "It is by this time well-established that the Sixth Amendment guarantees to criminal defendants not only the right of assistance of counsel, but requires that assistance be 'legally effective.'"  *Walthrop v. State*, 506 So. 2d 273, 275 (Miss. 1987)(citation omitted); *see also Strickland v. Washington*, 466 U.S. 668 (1984).  The failure to provide adequate funding to Mr. Maples'[s] court-appointed Counsel curtailed this most fundamental right.

(Doc. 24 ¶¶ 17-18.)

In his post-remand brief, Maples contends:

Alabama's system of funding in capital cases, which severely constrained Maples'[s] counsel's efforts on behalf of their client, compounded those errors.  As detailed above, at the time of Maples'[s] trial, under Ala. Code § 15-12-21(d)(Supp. 1994), a court-appointed attorney in a capital case can be compensated no more than $1000 for each phase of the trial.  This presupposes 50 hours of work at $20 per hour [for work performed outside of the courtroom].   Counsel accordingly received no compensation for out-of-court work in excess of fifty hours and was compensated far below market level for the initial fifty hours of work.  Thus, the absence of additional funds greatly limited counsel's ability to investigate and develop Maples'[s] defense.  At bottom, Alabama's funding system for capital cases was simply inadequate for the time required to thoroughly and adequately prepare a capital defendant's case.

The Supreme Court recognized that Maples'[s] counsel were "underfunded." *Maples*, 132 S. Ct. at 919. And other courts have recognized the impact of poor funding in capital cases on an accused's defense. *See Bailey v. State*, 424 S.E.2d 503, 508-09 (S.C. 1992)(holding that capital litigation complexity required court-appointed attorneys to receive reasonable compensation from state and county funds); *Makemson v. Martin Cnty.*, 491 So. 2d 1109, 1112-13 (Fla. 1986)(holding that $3,500 limit on compensation in capital trial violated separation of powers and denied capital defendants effective assistance of counsel).

In this case, the Alabama indigent capital representation scheme almost certainly contributed to the ineffective assistance of counsel that Maples received (we do not yet know how much, because Maples has never received an evidentiary hearing into counsel['s] out-of-court work on his case), and the systematic shortcomings in that scheme provide an additional and independent basis for holding that Maples was deprived of effective assistance of counsel under the Sixth Amendment. Serious facial constitutional challenges have been brought against the Alabama system of indigent representation in capital cases. But even if the system is constitutional on its face, it deprived Maples of his constitutional right to effective assistance of counsel in this case.

(Doc. 60 at 95-97.)

The Supreme Court did not hold, and never has held, that Alabama's system for appointing and compensating counsel for indigent capital defendants is unconstitutional per se under the United States Constitution.

Also, specifically as to Maples's takings claim, the court finds that Maples has no standing to assert a claim for the loss of counsel's property by virtue of an unconstitutional taking. Maples was not denied just compensation; rather, his lawyers labored under the severe compensation caps, perhaps depriving *them* of fair compensation for *their* work. Similarly, even if the compensation caps amount to a violation of the separation-of-powers

doctrine,[39] and the court does not believe that they do,[40] Maples has no standing to object to it.  As with the takings claim, Maples's lawyers suffered the alleged injury, if any, of inadequate compensation, not petitioner, and they, not he, would have standing to assert such a claim.  Finally, Maples's equal protection claims seem to assert that the compensation caps deprive him and other indigent defendants of equal protection because the caps result in a denial of effective assistance of counsel.  This pleads nothing more than that Maples was deprived of his constitutional right to effective assistance of counsel because he received ineffective assistance of counsel.  For the foregoing reasons, the court finds Maples has not established that he was actually prejudiced based on counsel's alleged inadequate compensation.

Inadequate funding of counsel appointed to represent capital defendants, as unfair as it might be to the attorneys, does not amount to ineffective assistance of counsel **unless** the lack of adequate funding **caused** actual errors or shortcomings in the performance of counsel

---

[39]Presumably, Maples's separation-of-powers claim is based on the Alabama legislature's failure to provide adequate and reasonable financing of indigent defense in Alabama courts.  *See Sparks v. Parker*, 368 So. 2d 528, 531 (1979)(citing, *inter alia*, Ala. Const. amend. 328(6.10)).

[40]"Indeed, 'Alabama courts have repeatedly held that caps on attorney's fees for indigent defendants do not violate the separation of powers doctrine, do not constitute a taking without just compensation, do not deprive indigent capital defendants of the effective assistance of counsel, and do not deny equal protection.' *Williams v. State*, 782 So. 2d 811, 841 (Ala. Crim. App. 2000)(citations omitted).  *See also McGowan v. State*, 990 So. 2d 931, 1001 (Ala. Crim. App. 2003)('The Alabama Supreme Court, as well as this court, has addressed these same contentions in a number of previous cases and has consistently rejected them.')(citations omitted).  This claim does not provide a basis for habeas relief." *James v. Culliver*, CV-10-S-2929-S, 2014 WL 4926178, *147 (N.D. Ala. Sept. 30, 2014).

95

that resulted in prejudice.  The *Strickland* standard requires an analysis of ***specific*** errors or shortcomings by counsel.  *Strickland v. Washington*, 466 U.S. 668, 690, 693 (1984); *see also United States v. Cronic*, 466 U.S. 648, 658-59 n.26 (1984)("Apart from circumstances [of the complete denial of counsel], however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.")(citations omitted).  The *Strickland* Court wrote:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

*Strickland*, 466 U.S. at 690.  Thus, the allegation that compensation caps hindered the ability of counsel to represent a capital defendant has meaning only by reference to specific errors or shortcomings purportedly caused by inadequate defense funding.  Only by examining specific errors or shortcomings can it be determined, first, that it was an error outside the broad scope of competence expected of counsel, and second, whether the error caused real prejudice to the defendant.

Consequently, the claim that the State of Alabama provides inadequate compensation for indigent capital defense cases divorced from analysis of any particular errors or omissions

does not state a basis for habeas relief.  As the district court for the Southern District of

Alabama has held:

> Petitioner argues that counsel was ineffective "in part" due to "grossly
> insufficient funding available for defense counsel in capital cases."  Am. Pet.
> ¶¶ 28-30.    Smith pleads no facts in support of this claim.   Instead, his
> argument is based on the assumption that counsel was *ipso facto* inadequate
> because, in Smith's opinion, Alabama inadequately compensated his attorneys.
> But Smith's conclusion does not follow.  Other capital defendants in this state
> have made similar claims based on Alabama's statutory scheme.  *See*, *e.g.*,
> *Hallford v. Culliver*, 379 F. Supp. 2d 1232, 1279 (M.D. Ala. 2004) ("The
> essence of [Petitioner]'s argument becomes simply that the court ought to
> presume counsel could not provide constitutionally adequate representation
> because of the inadequate compensation."), *aff'd*, 459 F.3d 1193 (11th Cir.
> 2006).   However, even if the Court were to agree that the compensation
> provided to defense counsel in death cases in Alabama is woefully inadequate,
> "that fact is insufficient as a matter of law to overcome the presumption of
> effectiveness which attends the performance of counsel."  [*Hallford*, 379 F.
> Supp. 2d at 1279.]  Whereas "attorneys are expected to competently represent
> indigent clients" regardless of how much or little they are paid, *see id.* (citing
> *Waters v. Kemp*, 845 F.2d 260, 263 (11th Cir. 1988)), and whereas Petitioner
> has pled no facts to rebut that presumption, the Court does not find that
> counsel's performance was deficient and concludes that no habeas relief is due
> Petitioner on his inadequate compensation-based claim.

*Smith v. Thomas*, Civil Action No. 05-0474-CG-M, 2013 WL 5446032, *11 (S.D. Ala. Sept.

30, 2013)(footnote omitted).

Like the petitioner in *Smith v. Thomas*, Maples has alleged counsel were ineffective

"in part" due to inadequate funding and, also, he fails to allege a specific connection between

the inadequate funding and the deficient performance of his trial counsel.[41]   Instead, he

--------

[41]The only specific allegation of a potential effect of inadequate funding on counsel
performance is found in Maples's post-remand reply brief and states, "Such an expert also
could have testified to the impact on the brain of a history of alcohol and drug abuse, as

complains about below market hourly compensation and the 50- hour cap for out of court

work on his case and supports that complaint with a vague, general, conclusory assertion that

"the absence of additional funds greatly limited counsel's ability to investigate and develop

Maples'[s] defense." (Doc. 60 at 96.) In equally conclusory fashion, Maples alleges that

trial counsel could have "search[ed] for and interview[ed] relevant witnesses[,] . . . .

adequately prepared the few defense witnesses called to testify on Mr. Maples'[s] behalf, .

. . [and] avoid[ed] . . . the multitude of issues raised in this Petition that, individually and

cumulatively, result in ineffective assistance of counsel" if only counsel had adequate

funding at the guilt and penalty phases of trial.[42] (Doc. 24 ¶ 17.)

In his post-remand brief, he declares that he does not know if the compensation caps

had any effect on his trial counsel's ability to represent him because he has never been

afforded an evidentiary hearing. (Doc. 60 at 96.) His vague factual allegations and the latter

assertion put the cart before the horse. In order to receive an evidentiary hearing, Maples

first must allege a claim with specific allegations that, if true, would entitle him to relief. *See*

*Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)("In deciding whether to grant an evidentiary

hearing, a federal court must consider whether such a hearing could enable an applicant to

---

Maples had. Yet Maples'[s] counsel – ***perhaps*** due to the sharp funding restraints on out-of-court work – never even consulted such an expert to explore this defense." (Doc. 73 at 33 [emphasis added].) For reasons set forth above, the court finds Maples has not established actual prejudice with regard to counsel's failure to procure such expert testimony.

[42]Maples points to the guilt and penalty phases of trial even though he places this claim under the heading of those claims pertaining to ineffectiveness at the guilt phase of trial only.

prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."); *see also Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015)("before a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record").  Maples has not done so in connection with this claim because it is supported only with conclusory allegations, followed by an admission that he does not know if the compensation caps affected his counsel's performance.

Alternatively, the claim is without merit.  The Rule 32 court rejected this claim, holding:

> Maples alleges trial counsel were ineffective based, in part[,] on inadequate compensation.  The underlying substantive claim was raised and rejected on direct appeal.  *Maples*, 758 So. 2d at 80.  The appellate courts of Alabama have rejected this claim on numerous other occasions.  *See*, *Ex parte Smith*, 698 So. 2d 219 (Ala. 1997); *Ex parte Grayson*, 479 So. 2d 75 (Ala. 1985); *Hyde v. State*, 778 So. 2d 199 (Ala. Crim. App. 1998); *Stewart v. State*, 730 So. 2d 1203 (Ala. Crim. App. 1997); *Barbour v. State*, 673 So. 2d 461 (Ala. Crim. App. 1994).  This claim fails to allege a material issue of law; therefore, it is summarily dismissed.  Rule 32.7(d), [Ala. R. Crim. P.]

(Rule 32 C.R. Vol. 37, Tab 66, at 10.)  On direct review, the Alabama Court of Criminal Appeals rejected Maples's claim that the limitation cap for attorney compensation "violates the separation of powers doctrine, constitutes a taking without just compensation, and denies equal protection in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution[.]" *Maples v. State*, 758 So. 2d at 80.  For reasons already set out

herein above, Maples cannot establish that the state court's adjudication is contrary to or an unreasonable application of clearly established federal law and/or is an unreasonable determination of the facts in light of the evidence before it.

Accordingly, this claim is due to be dismissed.  Maples's request for an evidentiary hearing is due to be denied.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL.

Maples alleges that his trial counsel were ineffective at the penalty phase of trial for failing to investigate, develop, and present mitigating evidence regarding the following:  (1) his troubled family history; (2) his health history, including depression, suicide attempts, and serious head trauma; and (3) his good moral character.  (Doc. 60 at 81-95.)  Maples admits that trial counsel presented some evidence of his dysfunctional and abusive family history and his good moral character; however, he argues that trial counsel, having notice of mitigating circumstances, unreasonably failed to properly prepare the limited witnesses of which they were aware so that the breadth of this mitigating evidence was before the jury and trial judge.  Maples also contends that counsel unreasonably failed to expand their investigation and discover additional witnesses and further mitigation evidence regarding these topics.  He contends that counsel failed to investigate and present *any* evidence of his history of depression, suicide attempts, and head trauma.[43]  (Doc. 73 at 58.)

---

[43]In the December 2005 reply brief, Maples alleged:

"When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. To make this finding the court considers not only petitioner's allegations of evidence that was not, but should have been, presented to the judge or jury during sentencing but also prosecution evidence that surely would have been presented in response to the mitigation evidence. As the Supreme Court has stated:

> To establish [*Strickland*] prejudice, [the habeas petitioner] must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S., at 694, 104 S. Ct. 2052. That showing requires [the petitioner] to establish "a reasonable probability that a competent attorney, aware of [the available

---

Lead trial counsel has admitted to Mr. Maples'[s] current counsel that he was wholly unprepared for the penalty phase of trial. In other words, he conducted no investigation that would have permitted him to make a strategic decision not to introduce mitigating evidence.

Thus, trial counsel's failure to present such evidence cannot be deemed a reasonable strategy. Indeed, realizing the deficiency in his performance, lead trial counsel has stated that he did not know how to prepare a mitigation case.

(Doc. 33 at 49.)  Maples did not make these allegations to the Rule 32 court and these allegations fundamentally alter the claims that were presented to the Rule 32 court. Also, he did not include these allegations in his amended habeas petition, (doc. 24), or his post-remand briefs, (docs. 60, 73). He has offered no cause and/or prejudice to overcome his state-court default; he has offered no excuse for his failure to raise and, in effect, to abandon the allegations during this habeas proceeding. Accordingly, these allegations shall not be considered. Even if these allegations could be considered supplemental facts, for the reasons set out in the body of this Memorandum Opinion, Maples cannot establish the prejudice required to overcome the procedural default or to show that he is entitled to relief on this ineffective-assistance claim.

mitigating evidence], would have introduced it at sentencing," and "that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wiggins v. Smith*, 539 U.S. 510, 535, 536, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

> . . .

> In evaluating that question, it is necessary to consider ***all*** the relevant evidence that the jury would have had before it if [trial counsel] had pursued the different path – not just the mitigation evidence [trial counsel] could have presented, but also [other] evidence that almost certainly would have come in with it. *See Strickland*, *supra*, at 695-696, 700, 104 S. Ct. 2052.[44] Thus, to establish prejudice, [the petitioner] must show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence (including the additional testimony [trial counsel] could have presented) against the entire body of aggravating evidence (including the [evidence of another murder]). . . .

*Wong v. Belmontes*, 558 U.S. 15, 20 (2009)(emphasis in original and footnote added).

## 1.  Alabama Code § 13A-5-46(f)

Before addressing Maples's ineffectiveness claims, the court pauses to address an assertion by Maples regarding the jury's vote count.  Maples argues that he can establish prejudice as a result of counsel's alleged ineffectiveness during the penalty phase "because it is reasonably likely that the vast amount of mitigating evidence that counsel failed to investigate and present" would have "altered the balance that the jury and [the trial] court

---

[44]In *Strickland*, the Supreme Court noted, "Indeed, admission of the evidence respondent now offers might even have been harmful to his case:  his "rap sheet" would probably have been admitted into evidence, and the psychological reports would have directly contradicted respondent's claim that the mitigating circumstance of extreme emotional disturbance applied to his case."  *Strickland*, 466 U.S. at 700.

struck in sentencing Maples to death." (Doc. 60 at 103.) He contends he suffered actual prejudice because, even without the undisclosed evidence, the jury recommended a death sentence by a vote of ten to two, and, "Under Alabama law if more than two jurors vote against the death penalty, the jury's recommendation **automatically** becomes life without parole." (Doc. 60 at 105 [citing Ala. Code § 13A-5-46(f)](emphasis added).) According to Maples, he "was one juror away from a recommendation of life without parole even with his counsel's constitutionally inadequate performance." (*Id.*)

Maples's assertion that he was only one juror away from an advisory verdict for life is without merit. Under Alabama's capital-murder sentencing law, "[t]he decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors." Ala. Code § 13A-5-46(f). However, less than ten jurors voting for death would not support an advisory verdict for life.

Section 13A-5-46(f) provides:

> The decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a **majority of the jurors**. The decision of the jury to recommend a sentence of death must be based on a vote of **at least 10 jurors**.

Ala. Code § 13A-5-46(f). If the jury returns an advisory verdict in which six to nine jurors vote for death, the trial court will refuse to accept the recommendation and will send the jury back for further deliberations until at least seven jurors vote for life or at least ten jurors vote for death or until a mistrial is declared. *See Borden v. Allen*, 646 F.3d 785, 796 n.11 (11th Cir. 2011); *see also Johnson v. State*, 120 So. 3d 1130, 1157-58 (Ala. Crim. App. 2009). In

103

Alabama, a jury recommendation of death is proper if the number of jurors recommending death is ten or greater; a jury recommendation of life without parole is proper if the number of jurors recommending life is seven or greater.  Any combination of jurors not falling within these requirements will result in continued deliberations until a sufficient number or jurors vote for life or for death or a mistrial is declared.

The court rejects Maples's assertion that he was only one vote away from an advisory verdict for life without parole.  The court finds that he was five jurors away from the seven jurors required to return an advisory verdict for life without parole.

### 2.   Counsel Failed to Adequately Investigate Maples's Family History and Character References.  (Doc. 24 ¶¶ 119-37.)

#### a.  Procedurally barred allegations

Maples added more factual allegations to support this claim between the time he filed his Rule 32 petition and his amended Rule 32 petition.  (*Compare* Rule 32 C.R. Vol. 32, Tab 47, ¶¶ 115-132 at 50-57 *with id.*, Vol. 33, Tab 49, ¶¶ 115-132 at 57-68.)  The amended petition filed in this court is virtually identical to the amended Rule 32 petition, with one exception.  In his amended habeas petition, Maples alleges:

> Counsel offered nothing to convey the history of mental illness afflicting Mr. Maples'[s] birth mother and grandmother.  Nor did Counsel offer any evidence regarding Petitioner's mother's Pseudotumor Cerebri,[45] a condition that

---

[45]"Pseudotumor cerebri . . . occurs when the pressure inside your skull (intracranial pressure) increases for no obvious reason.  Symptoms mimic those of a brain tumor, but no tumor is present. Pseudotumor cerebri can occur in children and adults, but [it is] most common in obese women of childbearing age." *Gurganus v. Colvin*, Civil Action No. 6:11-

severely affected her brain.  Counsel failed to have Petitioner tested for the
same condition, failed to investigate Petitioner's medical history and condition
adequately, and failed to present evidence regarding these issues.

(Doc. 24 ¶ 123 [footnote added].)  This claim was not raised during his Rule 32 proceedings;

therefore, this claim is procedurally defaulted for that reason.  Maples does not assert that he

can establish cause and prejudice for his default nor does he contend that a miscarriage of

justice will occur if the claim is not heard.  Therefore, the court finds that this claim is

procedurally defaulted.

Moreover, Maples made specific factual allegations in a reply brief, filed December

19, 2005, that were never alleged in his amended habeas petition or his post-remand briefs.

(*Compare* doc. 33 at 38-46 *with* docs. 24, 60, 73.)  The majority of these factual allegations

go far beyond acceptable supplementation of the factual allegations he raised before the Rule

32 court.  Specifically, Maples declares that his father and step-mother, Philip and Elyse

Maples, abused him physically and emotionally, that his father was an alcoholic womanizer

who was frequently absent and introduced him to alcohol at age five,[46] and that his father

would physically retaliate when attacked by his mother, Denise Imgrund.  (*Id.* at 38-44.)  He

describes specific incidents of the physical and emotional abuse by Philip and Elyse Maples

that included beatings with whips, belts, tree branches, and wires that produced scars on his

---

CV-4262-SLB, 2013 WL 5354156, *2 n.1 (N.D. Ala. Sept. 24, 2013)(citing
http://www.mayoclinic.com/health/pseudotumor-cerebri/DS00851).

[46]Maples reports that he has a genetic predisposition to substance abuse, as his "great-
great-grandfather, great-grandfather, and grandfather on his mother's side were alcoholics,"
and his father "is an alcoholic with a family history of alcoholism."  (*Id.* at 44.)

back; forcing him to eat cigarettes until he vomited; and sleeping in the woods as punishment or because he was unwanted in the home, which forced him to scrounge for food, shelter and warmth. (*Id.*) Philip Maples purportedly worked Maples "like a dog," and Philip and Elyse Maples repeatedly told Maples he was no good, called his mother a "crazy bitch," and berated and shamed him in front of others.[47] (*Id.* at 39.)

Also, Maples alleges that he suffers from symptoms of an emotional disorder because his mother, Denise Imgrund, reported that he was fidgety, clingy, and chronically scratched right after she divorced Maples's father. (Doc. 33 at 41-42.) Philip and Elyse Maples would report that he was a fidgety, disruptive child who "lacked concentration" and was "always talking and not listening." (*Id.* at 43-44.) Maples contends he began self-medicating with beer at age 12 and smoking marijuana at age 13 to cope with his "emotional turmoil." (*Id.* at 45.) He also "self-mutilated" by cutting himself with razor blades. (*Id.*) He declares that his friends, Chris Basden and Shannon Ferrell, would report that he engaged in heavy drug use after being abandoned by his mother for the second time as a teenager and was "chronically depressed and suicidal." (*Id.* at 46.) Also, Basden was aware of Maples's self-mutilation. (*Id.*)

――――――――――

[47]The court notes that at the penalty phase of trial, defense psychologist Dr. Alan Shealy testified that Maples had reported that "he always had a good relationship with his father." (R. Vol. 21, Tab 27, at 3125.) He also had "always gotten along with his stepmother" all in all. (*Id.* at 3128.) Growing up, he was disciplined by his father and that included "being whipped with a belt when he was younger and as he became older it was being grounded or having restrictions placed on him." (*Id.* at 3128-29.)

Maples alleged his counsel was ineffective for failing to present evidence that his mother's –

> family history is replete with instances of learning disabilities, emotional disorders and substance abuse.  Ms. Imgrund has first cousins with Tourette's Syndrome and dyslexia.  Her 39-year-old brother has suffered from bouts of depression and social isolation.  Her maternal grandfather and paternal great-grandfather were both alcoholics, and so is her father.  And her mother, according to Ms. Imgrund, suffered from "mood swings."

(*Id*. at 42.)  Also,  Denise Imgrund suffered "severe headaches as a result of optic nerve damage" and  suffered "two weeks of blindness." (*Id.*)  Maples alleges that, as a child, he "began to suffer from debilitating headaches, similar to his birth mother," that would cause nose bleeds and blurred vision.  (*Id.* at 44.)  Also, he alleges that he "continues to suffer from these headaches today, which reduce him to a fetal position."  (*Id.*)

Finally, Maples alleges that he "suffered additional, substantial losses in his young life," including the loss of three friends in vehicle accidents, his maternal grandmother when he was an infant, and his paternal grandfather when he was ten years old.  (*Id.* at 45.)

These allegations fundamentally alter the claim that was raised in state court and are an attempt to create a significantly different and more substantial claim that is in a stronger posture than that which was before the Rule 32 court.  Maples's failure to present these allegations to the Rule 32 court is fatal to his federal habeas claim based on these allegations, which he also failed to raise in his amended habeas petition and/or his post-remand briefs.  Accordingly, these allegations, are unexhausted and procedurally defaulted.  Maples has not

alleged that he can establish cause and prejudice to overcome this particular default or that a miscarriage of justice will occur if these aspects of the claim are not heard.

**b. Maples's family history (abuse and abandonment by his mother).** (Doc. 24, Claim II.A., ¶¶ 123-28, 130, 132-34.)

Maples complains (1) that the scope of trial counsel's investigation into his "troubled family history" and "physical[] and mental[] abuse[] by his birth mother" was unreasonably limited considering information known to counsel, and  (2) that counsel unreasonably failed to present the full expanse of his mother's physical and mental abuse at the penalty phase of the trial.  (Doc. 60 at 82-86; *see also* doc. 73 at 44-45 ["Had counsel properly investigated all mitigating evidence, they could have presented to the jury a far more compelling and complete view of (among other things) the nightmarish abuse Maples suffered at the hands of his mother, his troubled mental health history, his efforts to help law enforcement authorities combat illegal drug use, and his good moral character."].)  He contends that had trial counsel interviewed additional family members, who were willing corroborating witnesses, counsel could have discovered "a mountain of undisclosed information [concerning his mother's abuse and two abandonments that] would have been especially important to the jury's assessment of culpability given that Maples was . . . 21 when the shootings occurred."  (Doc. 60 at 85.) According to Maples, this evidence establishes that, "in this case, 'the violence experienced by [him] as a child far exceeded – in both frequency and severity – the punishments described at sentencing,'" (doc. 60 at 85 [quoting *Williams v. Allen*, 542 F.3d at 1342]), and would have changed the balance of aggravating and mitigating factors in favor of life without parole.

### i.  The trial evidence

Maples does not dispute the accuracy of the Rule 32 court's findings concerning the mitigating evidence actually presented at the penalty phase of trial.  This evidence is set forth below.

### A.  Dr. Allen Shealy

With regard to Maples's childhood abuse and abandonment, the Rule 32 court determined:

> Dr. Allen [Shealy], an expert in forensic psychology, testified for Maples at the penalty phase of trial.  Shealy stated that Maples said that his biological mother[, Denise Imgrund,] "beat him a lot", that "[h]e remembers being tied to a chair and whipped with a broom handle", and that "his mother was crazy, that she had stabbed his father and poured grease on [his father] while he was asleep." ([R. Vol. 21, Tab 27, at] 3126).  Shealy indicated that [Maples] remembered his biological mother leaving him when he was three years old and that the abuse and abandonment of Maples at the hands of his biological mother would have had "a lot of long term effects".  ([*Id*. at] 3137).

(Rule 32 C.R. Vol. 37, Tab 66, at 47-48.)  Shealy also testified that Maples had told him "that his grandmother used to tell him he would come to her house on the weekends with fingernail marks on his neck and bruises on his body from his mother's abuse[.]"  (R. Vol. 21, Tab 27, at 3126.)  However, Maples denied remembering these incidents, but it made him angry and he wondered what he had done to cause it.  (*Id.* at 3127-28.)  Shealy also testified that Maples told him that at age 18, after 15 years with no contact, he went to stay with his mother for a few months and that she was "easily angered."  (*Id.* at 3127.)

According to Shealy, Maples was damaged psychologically by this abuse and abandonment. (*See id.* at 3136-39.) Although Maples denied that it had any effect on him and "didn't bother him," Shealy testified:

> The effects of abandonment would be most severe before . . . age two, so [at] age three, he was not the most vulnerable but still vulnerable to the effects of abandonment by the mother. The physical abuse would have been during the most vulnerable years, the years when he was totally dependent on – dependent on his mother. As infants we are essentially dependent on our mothers for survival. If the mother is abusive [to an infant], that is pretty emotional – it has a lot of long term effects on people. A lot of people that I see in mental hospitals and so forth suffered from abandonment or neglect or abuse during their early childhood.
>
> . . .
>
> Children who have been abused or neglected or abandoned during early childhood are much more likely to seek out – well, first of all to be rebellious against authority since they have been betrayed by authority, and sort of act out in some antisocial ways and have a problem trusting authority . . . . As part of their rebellion, they are likely to run with a bad crowd, and also because of the frustrated dependency needs and the affectional needs of the child, are much more likely to use substances to escape from bad feelings . . . to numb them from hurt and pain. That became a psychological hypothesis during this evaluation as I saw Corey Maples describe to me his sort of going from being the hurt child during childhood to being that nothing bothered him. . . . . I saw this young man who essentially denied the pain of what obviously had to be a very painful experience of having been abandoned and abused by the mother. . . . [He would n]ot allow himself to have any feelings because of going through life with sort of numbing feelings that happen[] to people who have been traumatized and abused during early childhood, or just pretending they have no feelings about it.

(*Id.* at 3136-38.)

### B. Philip Maples

The Rule 32 court found:

Maples's father[, Philip Maples,] testified that Maples's biological mother "is just the woman that had him", that "she's a nut case", and she "tried to kill [Cory Maples] and [Philip Maples] on several different occasions." (R. [Vol. 21, Tab 27, at] 3194). Philip Maples said that Cory's biological mother "beat [Cory Maples] on several occasions, choked him, left him in the car with the windows rolled up, slapped him, you know, just crazy stuff." ([*Id*. at] 3195) Philip Maples also testified that his ex-wife had stabbed him and poured hot grease on him while he slept. Regarding her temper, Philip Maples stated that "[y]ou could be talking to her one minute and she would be fine and the next minute she was a whole other person in the world." ([*Id*. at] 3196).

(Rule 32 C.R. Vol. 37, Tab 66, at 49-50.) Philip Maples also testified that Denise Imgrund had shot at him. (R. Vol. 21, Tab 27, at 3196.) He was aware that Denise Imgrund had tied Cory Maples to a chair and beat him. He testified, "I was at work and I didn't know about it until I went home and seen the bruises and stuff. A kid two years old, you know, you get to playing and stuff, and [Cory] showed me basically what had went on. Of course, he had rope marks on his arm and stuff." (*Id.* at 3195.) Soon after, Philip Maples divorced Denise Imgrund.

When discussing the evidence presented regarding the effect that Denise Imgrund's second abandonment of Maples, the Rule 32 court held,

Philip Maples testified that when Maples came back from living with his biological mother that he was changed. Philip Maples said his son's mind wandered a lot, that he would not check in when he went out and [he had] heard that Maples was "running around" with people that were known to be into drugs. (R. 3199) Philip Maples testified about getting Cory treatment for his drug addiction and how treatment was beneficial to him.

(Rule 32 C.R. Vol. 37, Tab 66, at 51.)

111

### C.  Elyse Maples

During the penalty phase, Maples's step-mother, Elyse Maples, testified that Maples

went to stay with his mother for a little while at around age 17.  (R. Vol. 21, Tab 27, at 3180-

81.)  She testified:

> I'm not sure if it even lasted three months; his actual living with her.  I think he
> wanted us to believe that he was, but she called me at work several times and
> would tell me things like she had company coming over and she didn't want
> [Cory] there when her company come over, could he stay with me and I would
> tell her yes, of course he could, and he would never call for us to make
> arrangements for him to come to the house, so he was actually on the streets
> basically.  She called me three weeks after she hadn't seen him any more and
> asked me if he came home and he hadn't, so he was basically on the streets
> then.

(*Id.*)

### D.  Kenneth Maples

Kenneth Maples, Maples's paternal uncle and a firefighter, lived approximately a

quarter mile from Maples.  (*Id.* at 3188-89.)  He testified he had been called to the scene of

the crime and had taken part in the attempt to resuscitate Stacy Terry.  (*Id.*)  Kenneth testified

he had known Maples all of his life, but he had only met Denise Imgrund "once or twice,"

explaining that he worked the night shift and odd hours and thus never saw "a lot of people."

(*Id.* at 3190.)  He never saw Denise Imgrund around Maples as he was growing up.  (*Id.* at

3191.)  Kenneth Maples testified that he believed Maples "was okay" until "the incident with

his mother."  (*Id.* at 3190.)  He knew Maples had a DUI and "some other misdemeanor

charge." (*Id*. at 3191.)  He testified that he felt that Maples had been a "pretty good kid," and

112

he did not believe Maples would have been facing the death penalty "[i]f it wasn't for drugs." (*Id*. at 3192.)

### ii.  The alleged undisclosed evidence

#### A.  Philip Maples

Maples claims that, "[i]f Philip Maples had been examined more effectively, the judge and the jury would have learned that Mr. Maples'[s] birth mother, Denise Imgrund, was mentally unstable and subject to frequent violent outbursts." (Doc. 24 ¶ 124.) He alleges that, in addition to the assaultive incidents about which Philip Maples testified at trial, he would have testified to a violent choking incident witnessed by Denise Imgrund's father, John Imgrund, after which John Imgrund had told Philip Maples that he was afraid Denise would kill Cory Maples.  Philip Maples also could have testified to other incidents when Denise Imgrund had assaulted either Philip or her friends and that Denise was unpredictable and extremely volatile.  He also could have testified that Denise Imgrund was self-destructive – pulling out her hair and scratching herself until she bled.  Further Maples alleges his father could have testified that his maternal grandmother had behaved in a similar manner.  Maples alleges his father could have testified that his mother tried to sell him to a neighbor, Joey Hembree, when he was three.  (Doc. 24 ¶¶ 123-26,128.)  These incidents are repeated in his December 2005 brief.  Further, Maples alleges that, after he was born, his mother left for four weeks, that his mother left the family home and his father had left him with the paternal

grandparents, and that he had lived with his maternal grandparents and his mother after his parents separated.  (Doc. 33 at 36-39.)

In his post-remand reply brief, Maples asserts for the ***first*** time that Philip Maples had "informed counsel" that they should contact John Imgrund and Joey Hembree.  (Doc. 73 at 49.)  John Imgrund purportedly "witnessed first-hand the abuse Maples suffered and . . . could have testified about his belief that Denise [Imgrund] would have killed young Cory Maples if [he had] stayed in her custody."  (*Id.*)  Joey Hembree "had firsthand knowledge of the abuse Maples suffered from his mother and . . . could have testified about . . . the time that Denise [Imgrund] tried to sell [Cory Maples] to Hembree for $10,000."  (*Id.*)

Embedded in his allegations about what Philip Maples would have testified to, Maples alleges that counsel was ineffective for failing to contact Denise Imgrund's "former friends or associates . . . to provide testimony substantiating her violent and unpredictable behavior."  (Doc. 24 ¶ 125.)  However, Maples did not identify these friends and associates nor does he allege with any specificity what counsel would have discovered from the unnamed acquaintances of Denise Imgrund.  (*See id.*)  Such allegations are insufficient to comply with the fact pleading requirements of the Rules Governing Section 2254 cases and have not been considered by this court.

### B.  Denise Imgrund

Maples contends, "At no time did Counsel attempt to contact Denise, although her testimony would have revealed extensive mitigating circumstances, including evidence of her

severe physical and mental abuse of Mr. Maples, as well as evidence of history of mental illness in the family." (Doc. 24 ¶ 126.)  The only specific allegations of Denise Imgrund's predicted testimony are found in Maples's December 2005 brief.  In that brief, the only admissions specifically attributed to Denise Imgrund are that she never bonded with her son and that her mother had mood swings.  (*See* doc. 33 at 40, 42.)

### c. Elyse Maples

Maples alleges that, had Elyse Maples been adequately prepared, she would have testified that, after Maples turned three, he occasionally spent time with his mother.  She would have testified that Maples once returned from a visit with his mother with scratches on his neck that his mother had inflicted, and that Maples had told her it was his fault that Denise Imgrund had scratched him.  (Doc. 24 ¶ 130.)  Elyse Maples could have testified that Maples "cried for his mother until his early teenage years," and that she "would sit with [Cory] Maples at night because he had nightmares and would ask about his mother."  (*Id.*)  She also "would have provided more details about the circumstances leading up to Denise Imgrund's second abandonment of Mr. Maples," and that Denise would call frequently saying she did not want Maples in her house over the weekend.  (*Id.*)  On occasion, she would throw Maples out of the house.[48]  (*Id.*)

---

[48]In his post-remand brief, Maples alleges that he had "nightmares ***about*** his mother" and "that [his] mother abandoned him a second time when Maples was seventeen – without any notice, leaving his clothes out on the steps."  (Doc. 60 at 84-85.)  In his December 2005 brief, Maples alleges that his mother had actually moved without telling him.  (Doc. 33 at 41.)

115

### D. **Other Family Members**

With regard to other family members who did not testify, Maples alleges that he spent most of his childhood with the families of two paternal aunts, Margaret Daniels and Dale Ray, and that these family members could have provided extensive evidence of the effect of his mother's abuse. (Doc. 73 at 49.) The Daniels family members could have testified about Denise Imgrund's "erratic nature" and that Maples, who was a good-natured child, had spent summers at their home and attended church with them. (Doc. 24 ¶¶ 132-33.) Also, "[t]he Rays would have testified that until Maples was seventeen, he spent nearly every weekend at their home." (*Id.* ¶ 133.) According to his amended petition,

> When Mr. Maples was younger, he would ask the Rays why his mother was not around, and they would try to make him understand that it was not his fault that she left him. The Rays were also witnesses to the effects of Denise's mental illness. Once, the Rays and Denise were chatting in the kitchen when Denise suddenly became angry for no apparent reason, and stormed out the room. Dale Ray also noticed that Denise was both physically and emotionally distant from Mr. Maples. In addition, at least one family member saw Denise physically abuse Mr. Maples. Other family members saw Denise act erratically towards [them] and their friends.

(*Id.*) Another aunt, Dianne Ferrell, could have testified that she saw Denise slap Maples once.[49] (*Id.* ¶¶ 132, 133.)

_____

[49]In his post-remand brief, Maples cites to ¶ 133 of his Habeas Petition as support for his claim that family members would testify that his mother beat him in public. (*See* doc. 60 at 84 [citing "Compl. ¶ 133"].) Although Maples alleges in his petition and his amended petition that "Diane Ferrell once saw Denise slap Mr. Maples because he was crying," and that "at least one family member," presumably in addition to Diane Ferrell, "saw Denise physically abuse Mr. Maples," he has not alleged that these isolated incidents occurred in a public place. (*See* doc. 1 ¶ 133; doc. 24 ¶ 133.) Thus, the court has not considered this claim

116

Maples contends that his brother, Daniel Maples, could have testified that Cory Maples had told him about an incident when Denise Imgrund had left Cory alone in a pool once and Philip Maples had found him when he came home from work. (*Id*. ¶ 134.)

### iii.  Analysis

The procedural default question can be resolved on the *Strickland* prejudice prong, and therefore, the court foregoes analysis of the *Strickland* performance prong.  This approach is approved by the Supreme Court in *Strickland* and by Eleventh Circuit precedent.   As explained in *Lee v. Comm'r, Ala. Dept. of Corr.*, 726 F.3d 1172 (11th Cir. 2013):

> In this case, we need not reach the performance prong because we are so readily convinced Lee has not shown the requisite prejudice.  *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."); *Frazier v. Bouchard*, 661 F.3d 519, 531-32 (11th Cir. 2011) (stating we "may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied" (internal quotation marks omitted)); *Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1248 (11th Cir. 2009) (per curiam); *Hall v. Head*, 310 F.3d 683, 699 (11th Cir. 2002).  Indeed, the Supreme Court has said that "[t]he object of an ineffectiveness claim is not to grade counsel's performance" and consequently, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

*Lee*, 726 F.3d at 1193.

---

regarding ***public*** abuse.

Maples cannot establish actual prejudice to overcome the procedural default or establish *Strickland* prejudice because he cannot establish actual prejudice resulted from counsel's purported failure to present additional evidence of his troubled, abusive childhood.

In Maples's case, the additional testimony "'basically substantiat[ed]' and 'support[ed]' the story that [Maples's] trial lawyers had put before the jury[.]" *Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1265-66 (11th Cir. 2012)(quoting *Cullen*, 131 S. Ct at 1435). "[G]enerally . . . evidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." *Id*. at 1260-61 (citations omitted). The evidence Maples contends his trial counsel was ineffective for failing to present consists of the same examples, perhaps with more details, or different examples of abuse and abandonment of Maples by his mother, Denise Imgrund. Contrary to Maples's contention, his post-conviction allegations of abuse and abandonment do not "far exceed[] – in both frequency and severity" – the evidence of abuse and abandonment actually presented during the penalty phase. (*See* doc. 60 at 85 [quoting *Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008)].) Maples's father, his step-mother, and Shealy gave detailed testimony that Maples was abused frequently and severely by his mother, that she had abandoned him twice, and that she was "a nut case."

Moreover, Shealy explained the serious psychological effects of the abuse and abandonment. This testimony did not deal lightly the abuse and abandonment.[50]

The allegations concerning testimony of additional witnesses specifically pleaded and not already deemed defaulted – namely, Denise Imgrund, John Imgrund, Joey Hembree, the Daniels, the Ferrells, and the Rays – do "not paint a vastly different picture of [Maples's] background than that created by" the testimony presented at the penalty phase of Maples's trial. *See Williams v. Allen*, 542 F.3d at 1342. Indeed, their testimony regarding any physical and emotional abuse by Denise Imgrund offers little evidentiary color to the picture actually painted during the penalty phase and it is decidedly less powerful than the testimony actually presented.

Further, during the penalty phase, the trial court found that mitigating evidence of Maples's childhood abuse and abandonment existed and that Maples was a disturbed young man who had engaged in drug-induced self-abuse. However, he also found the mitigating

_____

[50]Maples alleges that counsel's examination of his uncle, Kenneth Maples, elicited nothing but a "brief and cursory" recitation that Maples was okay and that this examination of Kenneth Maples is an example of "an inexcusable lack of preparation" because Kenneth Maples did not know Denise Imgrund.  (Doc. 24 ¶ 132 [citing R. at 3190].)  Even if Kenneth Maples's testimony was brief, he agreed with Elyse Maples's assessment of Maples as an okay child  and he verified that Denise Imgrund was not in Maples's life when he was a child.  Maples does not allege how counsel should have effectively examined Kenneth Maples, what additional, beneficial information would have been derived therefrom, or how counsel can be faulted because Kenneth Maples did not know Denise Imgrund.  Maples has not alleged with any specificity how he was prejudiced by Kenneth Maples's testimony or his failure to testify differently.  Because Maples has not established that he was prejudiced by counsel's performance, he has not shown actual prejudice to overcome the procedural default of this aspect of this claim.

weight of this evidence to be "weak and unpersuasive," noting that Maples "ha[d] good relations with his step-mother, who he has known as his mother since the . . . age of three." (Rule 32 C.R. Vol. 37, Tab 62, at 10-11.)  The Rule 32 judge and the trial judge were one and the same.

The Rule 32 court found "any additional evidence regarding alleged abuse that Maples suffered would have been at best, cumulative," to the testimony of Philip Maples and Shealy. (Rule 32 C.R. Vol. 37, Tab 66, at 48-57.)  Specifically, it found that the trial record refuted that counsel were ineffective for failing to prepare Philip Maples adequately and to have him testify to Maples's abuse and abandonment at the hand of Denise Imgrund.  (*Id*. at 49-50, 51-52.)  The court dismissed as insufficiently pled Maples's contention that Philip Maples would have testified that Denise Imgrund and her mother suffered from the same mental illness on the basis that Maples had failed to show by records or affidavits that either individual suffered from a mental illness.[51]  (*Id.* at 52 [citing Alabama Rules of Criminal Procedure 32.3, 32.6(b) and 32.7(d)].)  Maples's assertion that counsel failed to contact Denise Imgrund's former associates and friends was subject to Rule 32.6(b) dismissal because he did not identify any friend or associate or "indicate what evidence or testimony [they] would have provided."  (*Id.* at 50.)  Counsel's alleged failure to contact Denise Imgrund was also dismissed pursuant to

---

[51]Other than an assertion that Philip Maples could have testified that Denise Imgrund behaved in the same manner as her mother, Maples has not alleged that Philip Maples was competent to testify that both women suffered from a mental illness, much less the same mental illness.

Rule 32.6(b) because Maples did not "indicate how trial counsel could have contacted [her] or indicate what 'extensive mitigating circumstances' she would have testified about."[52]  (*Id.* at 51.)  His assertion that Elyse Maples could have detailed more instances of abuse also was subject to Rule 32.6(b) dismissal because "Maples fail[ed] to indicate what additional facts counsel would have learned had they more thoroughly interviewed his stepmother."  (*Id.* at 53.)  The court denied the ineffectiveness claim concerning Kenneth Maples, finding that, although his testimony might not have been helpful, Maples had failed to establish he was prejudiced by it.  (*Id.* at 55.)  Finally, the court found that Maples had failed to identify any family member or to indicate with any specificity what the substance of their testimony would have been.  (*Id.* at 56.)  The court further found that "any additional testimony regarding alleged abuse that Maples suffered at the hands of his biological mother would have been, at best, cumulative."  (*Id.*)

Fairminded jurists could debate whether the state court's adjudication of this claim reflects a reasonable application of *Strickland*.  This court recognizes that the Rule 32 court addressed many of Maples's allegations in support of this claim paragraph by paragraph, and found that several were insufficiently pled because he had failed to identify witnesses and/or assert the substance of their testimony.  In some instances, Maples's amended Rule 32 petition identified those witnesses and the substance of the witness's testimony.  Regardless, the Rule

---

[52]Philip Maples testified, "Obviously, she lives in Birmingham and he has been at the county jail for over two years and she hasn't been here to see him and she ain't been to trial." (R. Vol. 21, Tab 27, at 3198.)

32 court also found that any additional testimony was cumulative of the testimony presented at trial.  Even if the state court unreasonably determined that Maples failed to identify witnesses and the substance of their testimony in the amended Rule 32 petition, its decision that any additional testimony from witnesses would have been cumulative of that presented at trial is not an unreasonable application of *Strickland*.  Alternatively, even if this aspect of the claim is considered *de novo*, Maples's allegations, if true, fail to show *Strickland* actual prejudice because this court finds the alleged testimony was merely cumulative of the testimony presented at trial and would not have changed the result of the penalty phase.

For all of the foregoing reasons, this claim is procedurally defaulted, or in the alternative, due to be denied on the merits.  Maples's request for an evidentiary hearing is due to be denied.

### c.  Maples's Character References

The court notes that the allegations supporting this claim are included within Maples's allegations concerning evidence of his abusive childhood.  (Doc. 24 at ¶¶ 129, 131-37.)  The good-character habeas allegations are virtually identical to the claim as pleaded in Maples's amended Rule 32 petition.  (Rule 32 C.R. Vol. 32, Tab 47, ¶¶ 121, 123, 124-29.)  The initial Rule 32 petition specifically identified Philip, Elyse, and Daniel Maples, and the substance of their purported character evidence testimony.  (Rule 32 C.R. Vol. 33, Tab 49, ¶¶ 121, 123, 126.) It also identified generally the substance of the good-character testimony of other family members, teachers, counselors, coaches and friends in the amended Rule 32 petition, but

Maples did not identify any of those individuals by name, except jailor Sam Frost, or attribute specific testimony to any unidentified character witness.  (*Id*. ¶¶ 125-29 at 54-55.)

### i.  The trial evidence

Maples does not dispute the Rule 32 court's factual findings regarding the testimony of Philip and Elyse Maples as to his good character at the penalty phase of trial.  The Rule 32 court wrote:

> While Philip Maples did not testify concerning his son's "good moral character", Elyse Maples, Cory's step-mother since he was three years old, testified that Maples was a "very fun loving" child that "enjoyed being around other kids a lot." (R. 3176)  Elyse testified that Maples "was a typical boy", that he "was adventuresome', and "wasn't somebody that got into trouble a lot." (R. 3177)  Elyse said that Maples "did very well in school" and "was very smart." (*Id.*)  Elyse testified that Maples tested above average intelligence and was in special class until "the sixth or seventh grade and then his grades started falling."  (R. 3178)

(Rule 32 C.R. Vol. 37, Tab 66, at 52-53.)

Also, during the penalty phase, Shealy testified that he had spoken to Sam Frost, a jailor at the Morgan County Jail.  (R. Vol. 21, Tab 27, at 3143.)  Frost had been friends with Maples since high school and he told Shealy that Maples had participated in football and baseball in high school, had not been a troublemaker, was not a person who got into fights, and was a perfectionist.  (*Id.* at 3143-44.)  Shealy also testified that Maples reported he was only a half credit short of graduating high school; he told Shealy that he had quit school because he was disappointed he could not graduate with his class.   Shealy testified that

Maples had tried to get in the Army, but they had not accepted him because he had failed a drug test.  (*Id*. at 3142.)

The trial record contains evidence that Maples had no serious criminal record at the time of the murders; friends and acquaintances had testified that Maples was not a troublemaker and that the charges against him were surprising.  (*See* R. Vol. 16 at 2041 [Danny Mayberry]; *id.* at 2082 [Jamie Dobbs]; R. Vol. 19 at 2750 [Allen Birdsong]).  Allen Birdsong testified during the guilt phase of the trial that Maples had lived with and worked for him in his cable TV installation business until approximately one month before the murders, when they parted on good terms.  (R. Vol. 19 at 2746.)  He trusted Maples around large sums of money, he allowed Maples to use his vehicles, and he considered Maples to be a personal friend.  (*Id.* at 2746-49.)

In his videotaped confession Maples stated that he had gone to a Baptist church.  (Doc. 78, Exh. 230.)

### ii.  The post-conviction allegations

Maples alleges that counsel failed to investigate and to present evidence of his "good moral character" from his family – Philip, Elyse, and Daniel Maples, his "sport coaches, teammates or anyone at Maples's church,"  his school guidance counselor; and his friends – Chris Basden, Kenneth Hall, Mike and Kathy Hall, Sam Frost, and Frost's relatives.  (*See* doc. 24 ¶¶ 123, 129, 132-37.)

124

Maples contends that his father could have testified that he played Little League and competed in horse competitions as a young man. (Doc. 24 ¶ 129.)   Elyse Maples could have testified that although he dropped out of high school, he passed a G.E.D. test with "high enough marks to qualify for admission to the University of Alabama in Huntsville."  (*Id.* ¶ 131.)   Also, she could testify that he tried to enter the Army but was rejected because he failed a drug test.  (*Id.*)  His aunts, uncles, cousins, and brother could have testified to his "good moral character and friendliness." (*Id.* ¶¶ 132-34.)  The Daniels would relate that he spent summers at their home until he was thirteen, playing with his cousins and attending church.  (*Id.* ¶ 132.)  The Ferrells would state that Maples spent nearly every weekend at their home until he was seventeen and he was a friendly person who never looked down on anyone. (*Id.* ¶ 133.)  Daniel Maples would testify that "Maples was a fun, loving brother who respected his father and did what he was told to do;" also Daniel would have testified that Cory Maples "did not allow Daniel to hang around Mr. Maples'[s] drug associates."  (*Id.* ¶ 134.)

He alleges that "anyone at [his] church" could have testified that Maples was baptized in the Baptist church, went to church regularly until he was twelve or thirteen years old, and participated in church events." (*Id.* ¶ 129.)  Gaye Lenhardt, Maples's high school guidance counselor, would have testified that Maples was easy to talk to and polite and he "had relatively few absences and very few disciplinary problems."  (*Id*. ¶ 135.)  Maples also took challenging courses, including vocational courses in electrical engineering, but did not

125

complete them and dropped out of high school.  (*Id.*)  Glen Lang, Maples's high school football and golf coach, would testify that he was not a good golfer although he tried, and was friendly and polite.  (*Id.*)

Chris Basden, Maples's childhood friend, would have testified that Maples was a "softy" although he portrayed a "tough guy" image, and was witness to Maples's drug addiction.  (*Id.* ¶ 136.)  Basden purportedly would have testified that he remained friends with Maples throughout his addiction even after fighting once, that he witnessed Maples's happiness to see his mother as a teenager, that Maples became addicted to drugs after his mother abandoned him, and that, shortly before the murders, Maples seemed to be getting better and recovering from his drug addiction.  (*Id.*)  Maples alleges that the evidence would show that counsel knew about Basden "through other interviews" and considered him to be "an appropriate witness for the second stage," but then failed to call him.  (*Id.* ¶¶ 136-37.)

Kenneth Hall and his parents, Mike and Kathy Hall, could have testified that Maples was "very respectful" and spent time on the Halls's property playing sports and engaging in outdoor activities.  (*Id.* ¶ 137.)  The Halls were aware Maples had "some problems with drugs," but they also noticed that "just prior to the shootings" Maples seemed to have "gotten his act together." (*Id.*)

Sam Frost would have testified that Maples "was generally happy in high school and never got into fights," and he would have indicated to counsel that his brother, grandmother, and other relatives would have testified to the same thing.  (*Id.*)  Sam Frost also did not

believe Maples had committed the crimes "knowing Maples's character" and, despite the murder charges, he still considered Maples a friend.  (*Id.*)

### iii.  Analysis

Much of the testimony Maples contends that these witnesses would have testified to was cumulative of the testimony of his father, step-mother, Shealy and the witnesses at the guilt phase of trial whom had expressed surprise that Maples would be involved with a such a serious crime.  Further, the additional testimony boils down to a "generic impression of [Maples's] good nature." *Brooks v. Comm'r, Ala. Dept. of Corr.*, 719 F. 3d 1292, 1301 (11th Cir. 2013).  The court notes that presentation of this repetitive, generic "good character" testimony could easily have spurred the prosecution to undercut it by highlighting the circumstances surrounding the two capital offenses for which Maples had been convicted. Maples had robbed and murdered execution style two individuals, one of whom was his close friend.  Had counsel elicited testimony that Maples was a good and nonviolent person, the prosecutor would have argued that, despite his intelligence and  supportive extended family, Maples chose a culture of drugs and violence over education and responsibility.  Maples had admitted that he ripped off his best friend, Kenneth Hall, on a drug transaction in revenge for sleeping with Maples's then-girlfriend.[53]  Also the State could have argued that Maples was

---

[53]Shealy testified that Maples related this story to him.

clever and brazen enough to call police mere hours after the murders, identify himself as Jamie

Dobbs, give the police Dobbs's address, and confess, as Dobbs, to Terry's murder.[54]

---

[54]At the guilt phase of trial, the State introduced a Decatur police dispatch audiotape, recorded at approximately 5:00 a.m. on the morning of the murders, from an individual claiming to be Jamie Dobbs and asserting that he had just committed a murder by killing Stacy Terry with a .22 calibur pistol.  (R. Vol. 15 at 1919-22; 1941-42.)  The individual stated he was driving from Athens to Decatur and did not want to come to the station, but that police could come to his house in Decatur, and gave police what turned out to be an accurate description of Jamie Dobbs's car and Dobbs's actual address.  (*Id.* at 1922-24.)  The police immediately sent a patrol unit to Dobbs's residence; they discovered that Dobbs's vehicle was in the driveway and that the hood was cold.  (*Id.* at 1925-26.)  Thereafter, Jamie Dobbs called the police department to ask why officers were at his home.  (*Id.* at 1930.)  This call was recorded as well, and an officer testified that the second individual's voice was distinctly different from the voice of the first "Jamie Dobbs."  (*Id.* at 1930-31.)

Jamie Dobbs testified that the first recorded tape that contained the murder confession was Cory Maples's voice.  (R. Vol. 16 at 2077-80.)  Dobbs had been good friends with Maples for three years.  (*Id.* at 2067.)  Dobbs had a large inheritance and the two often ran around together until Maples moved to Tennessee approximately six months before the murders.  (*Id.* at 2068-69.)  The two had "had words and stuff and altercations."  (*Id.* at 2069.)  Dobbs described one altercation several months before the murders that began as an "argument and then it escalated into a fight, if you call it that.  That was all that was ever – you know, after that it was through with.  We started talking again a month later."  (*Id.*)

Defense counsel elicited from Dobbs that Maples had not exhibited "violent tendencies or anything of that nature" around him.  (*Id.* at 2082.)  Dobbs was surprised that Maples had been accused of double murder.  (*Id.*)  Dobbs admitted that when police knocked on his door he was initially concerned that there was a warrant for his arrest because he had been in trouble before.  (*Id.* at 2083.)  Defense counsel also asked whether police had continued to call him and question him about the whereabouts of Maples because they suspected Dobbs was somehow involved, to which Dobbs answered, "Yes, sir, that maybe I might have known where he was at."  (*Id.* at 2083-84.)  After Maples was arrested, Dobbs was not contacted again by law enforcement.  (*Id.* at 2084.)

The prosecution argued that the voice on the first recorded audiotape and Maples's videotape showed that both voices belonged to Maples.  During guilt phase deliberations, the jury asked to listen again to the first audiotape and videotape for a few minutes.

Moreover, with regard to Daniel Maples and Chris Basden, defense counsel and the prosecutor were privy to a portion of Maples's videotaped confession that was excluded from the jury. In that portion of the videotape, Maples had said that, a few months before the murders, he was avoiding Alex Foley, a drug dealer and personal associate to whom he owed money for drugs. (Doc. 78, Exh. 231.) One night, Dobbs had called Maples and had asked him to come to his house. Maples and his brother Daniel drove by Dobbs's house, but decided not to stop because they saw Foley's car and thought Maples was being set-up. When they drove back by later, Foley's car was no longer at Dobbs's house and Maples and Daniel went in. Basden was at Dobbs's house. A fight broke out between Maples and another man when that man pushed Daniel. Dobbs punched Maples in the head and Maples turned around and saw Dobbs with a knife in one hand and a beer bottle in the other. Maples left Dobbs's residence, went home, and got two guns. He returned to Dobbs's residence and exited the car with a gun in his pocket. When he saw Maples with a gun, Dobbs either threatened to call the police or said he had called the police. Maples realized that his actions could get him into trouble and he allowed Dobbs to "con" him into giving his weapons to Dobbs. Maples denied he had traded his weapons for drugs, but he never got his weapons back from Dobbs.[55]

---

[55]Although the story Dobbs told to the jury during the guilt phase of the trial appears to refer to this event, the jury was not made aware of many details. Maples also told a version of this story to Shealy and Shealy testified to it at trial. However, in that version, Maples did not mention his brother was present or that the incident had occurred only months before the murders.

Had Maples called Daniel Maples to testify that Maples told him not to become involved in drugs and that Maples was not violent, Daniel would have been questioned about the incident at Dobbs's house.  Likewise, Basden would have been subject to the same line of questioning had he been called to testify as to Maples's good character.  Additionally, and pursuant to Maples's own allegations, he and Basden also had been in a fight once.  Instead of mere generic evidence of good character from Daniel Maples and Chris Basden, the jury would have been reminded that Maples had been involved in at least one, and maybe two, other violent incidents with his drug culture friends and he had not sheltered his brother from drug activity.  Thus, counsel may have strategically chosen not to call Daniel Maples or Chris Basden as character witnesses because these witnesses could have been "more harmful than helpful."  *See Evans v. Sec., Dept. of Corr.*, 703 F.3d 1316, 1342 (11th Cir. 2013)(internal quotation omitted).  Even if the decision not to call these witnesses was not strategic, Maples was not prejudiced by the failure.  Indeed, there is a reasonable probability that their testimony would have had an aggravating rather than a mitigating effect by negating his alleged recovery, his protection of his brother, and his non-violent nature.

"In the light of seriousness of [Maples's] crime," there is no reasonable probability that the balance of aggravating and mitigating factors would have been altered by "the minimally consequential testimony regarding [his] 'good qualities.'"  *See McClain v. Hall*, 552 F.3d 1245, 1254 (11th Cir. 2008).  The probability is even less so when one considers the double-edged nature of some of the generic good character testimony and the possibility that  an

130

emphasis on generic good character evidence would have given the prosecutor incentive and opportunity to undermine it.  Because Maples has not established actual prejudice caused by trial counsel's failure to present evidence of Maples's good character, the court finds this claim is procedurally defaulted.  Maples's request for an evidentiary hearing is denied.

Alternatively, the court finds the claim is without merit.  To the extent Maples makes allegations concerning the good character evidence his step-mother could have offered, the Rule 32 court found this claim to be  "refuted by the record," and, therefore, meritless.  (Rule 32 C.R. Vol. 37, Tab 66 at 52-53.)  The court also rejected Maples's contention that counsel was ineffective for failing to elicit from Elyse Maples that, although he had dropped out of high school, he passed the GED exam, and that he had attempted to enlist in the Army but was rejected because of drug problems.  It found:

> "'The mere fact other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.'"  *Chandler*, 218 F.3d at 1316, n. 20, quoting *Waters v. Thomas*, 46 F. 3d 1506, 1514 (11th Cir. 1995) (en banc). Maples has failed to plead and prove that any addition[al] testimony from his stepmother would have resulted in a different recommendation by the jury or different sentence by this Court.  *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

(*Id.* at 53-54.)  Not only is the state court's rejection of this aspect of the claim reasonable, the additional testimony concerning Maples's GED score and his attempt to enlist in the Army is cumulative of Shealy's testimony at the penalty phase of trial.

With regard to the testimony Daniel Maples purportedly would have offered, the Rule 32 court held:

131

"There has never been a case where additional witnesses could not have been called. *Fortenberry v. State*, 659 So. 2d 194, 199 (Ala. Crim. App. 1994) (quoting *State v. Tarver*, 629 So. 2d 14, 21 (Ala. Crim. App. 1993). Additionally, the Court of Criminal Appeals has held:

> "We refuse to set a standard that a court may be reversed because it did not hear unoffered testimony from still more friends and relatives. We also refuse to say that a member of the bar is guilty of ineffectiveness for not calling every witness and friend who was willing to testify."

*Williams v. State*, 782 So. 2d 811, 824 (Ala. Crim. App. 2000), quoting *State v. Tarver*, 629 So. 2d 14, 21 (Ala. Crim. App. 1993).

Maples has failed to proffer any evidence that testimony from his half brother would have produced a different result at the penalty phase of trial. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

(*Id.* at 56-57.) The Rule 32 court's application of *Strickland* to the allegations concerning Daniel Maples is reasonable.

As for other family, teachers, coaches, counselors and friends, the Rule 32 court rejected the claim for lack of specificity on the basis that Maples failed to identify these individuals or specifically allege the substance of their testimony. (*Id.* at 55-58.) Maples's amended Rule 32 petition identified those witnesses and, for the most part, the substance of the witnesses' testimony. However, even if the Rule 32 court's determination is unreasonable, the additional good character testimony from these witnesses either is refuted by or cumulative of the testimony in the trial record, and is generic good character evidence that either carries with it an aggravating edge or could have spurred the prosecutor to undermine it. Maples has not shown that counsel was objectively deficient for failing to investigate and present more

132

generic evidence of his good character at the penalty phase of trial and there is no reasonable probability that the balance of aggravating and mitigating factors would have been altered at the penalty phase of trial had the evidence been presented.

For all the foregoing reasons, this claim is procedurally defaulted, or in the alternative, without merit and is due to be denied. Maples's request for an evidentiary hearing is due to be denied.

### 3. Counsel Failed to Adequately Investigate Mr. Maples's Drug Addiction and Attempted Recovery, Depression, and Suicide Attempts. (Doc. 24, Claim II.B., ¶¶ 138-41.)[56]

Maples alleges that his counsel were ineffective because they failed to investigate and present evidence of his history of addiction, depression and suicide attempts that occurred during the time "he was abusing crack cocaine, crystal methamphetamine, LSD and other drugs," and his efforts to recover from drug addiction. (Doc. 24 ¶¶ 138, 140.) Specifically, he contends:

---

[56]This habeas claim is virtually identical to the claim as pleaded in his amended Rule 32 petition. (*See* Rule 32 C.R. Vol. 33, Tab 49, at 68-70.) The amended Rule 32 petition, supplemented the allegations of his initial Rule 32 petition. In the initial Rule 32 petition, Maples complained that counsel did not interview any witnesses about his suicide attempts or depression when he was on drugs, and he supported that contention with allegations that Philip and Elyse Maples could "have more thoroughly testified to [his] dedication to conquering drug problems," that counsel "never contacted any of the counselors at Quest who interacted with [him]," that Birdsong would have testified that he was "hard working[,]" that counsel did not contact any other employer, and that his "friends and family noted that [when he returned from Tennessee] he looked happy, put on weight and appeared to be on the path to recovery." (Rule 32 C.R. Vol. 32, Tab 47, at 56-57.)

138.  Counsel did not interview any witnesses about Mr. Maples'[s] depression and suicidal behavior prior to the shootings, when Mr. Maples was abusing crack cocaine, crystal methamphetamine, LSD and other drugs. [Elyse] Maples would have testified that Mr. Maples wrote poetry about depression and loneliness.  He even left a suicide note stating that he had always been a screw-up.  After discovering the note, [Elyse] Maples found Mr. Maples hiding in the woods.  Mr. Maples'[s] ex- girlfriend, [Heather] Davis, could have testified that around 1994 she was with Mr. Maples when he took over thirty sleeping pills and drank a bottle of alcohol just before crashing [Elyse] Maples'[s] car.  [Jamie] Dobbs, a friend of Mr. Maples, also could have testified that he witnessed Mr. Maples play Russian roulette on at least one occasion, sticking a gun into his mouth and pulling the trigger.  Mr. Dobbs could also testify that he saw Mr. Maples attempt suicide by slashing his wrists with a butcher knife.  Both [Elyse] Maples and Philip Maples could have more thoroughly testified to Mr. Maples'[s] dedication to conquering his drug problems.  In 1995, Mr. Maples voluntarily applied and was admitted to Quest Recovery Center, a non-residential drug treatment program in Morgan Country. Counsel never contacted any of the counselors at Quest who interacted with Mr. Maples.  If such evidence had been presented, the jury would have learned about Mr. Maples'[s] mental state at the time of the shootings.  Counsel's failure to present such evidence prejudiced Mr. Maples and, if the evidence had been presented, there is a reasonable probability that the jury would have returned a different sentence.

139.  Prior to the shootings, Mr. Maples went to Tennessee to work with a friend, Allen Birdsong, and [to] escape the drug culture he was caught up in. Mr. Birdsong would have gladly testified to the hard working character Mr. Maples demonstrated while he and Mr. Maples were together in Tennessee. Mr. Maples'[s] hard working character also would have been a mitigating factor.  *See Horton v. Zant*, 941 F.2d 1449, 1463 (11th Cir. 1991) (finding that the fact that defendant was a "hard worker" was mitigating evidence). However, Counsel failed to elicit such testimony from Mr. Birdsong during the penalty phase of Mr. Maples'[s] trial and failed to even contact any other employer who could have testified to Mr. Maples'[s] hard working moral character.  But for Counsel's error, there is a reasonable probability that the jury would have returned a different verdict.

140.  Counsel had in their possession Mr. Maples'[s] application to Quest that chronicled his past drug use, his suicide attempts and his desire to improve his life, but Counsel inexplicably failed to submit the application into

evidence, nor did they contact any of the counselors at Quest who interacted with Mr. Maples, including Kathy Goodwin, the director of Quest who initially interviewed Mr. Maples for admission into the program.  If Counsel had contacted Ms. Goodwin or any other counselors at Quest and presented their testimony, there is a reasonable probability that the jury would have returned a different sentence.  Such a failure to contact and present these witnesses prejudiced Mr. Maples and, as there is a reasonable probability that the jury would have returned a different sentence if they had heard such evidence, constitutes ineffective assistance of counsel.

141.  Because Counsel failed to adequately interview and present the testimony of those few witnesses that they did call at the penalty phase and did not call many potential witnesses who were sources of important information about Mr. Maples'[s] life, . . . Counsel were unable to present an adequate picture of Mr. Maples'[s] life to the jury.  Thus, Counsel were unable to articulate to the jury any coherent reason why the jurors should refrain from sentencing Mr. Maples to death.  If Counsel had called these witnesses and properly presented this evidence, there is a reasonable probability that the jury would not have sentenced Mr. Maples to death.

(*Id*. ¶¶ 138-41.)

A review of the testimony presented at the penalty phase of trial shows that Maples reported his extensive history of drug use to Shealy.  Shealy testified that Maples had described himself as an outgoing child whose years in elementary and junior high school were "good years [and] he got along with everybody."  (R. Vol. 21, Tab 27, at 3129.)  According to Shealy, Maples "started drinking around age thirteen" and "began smoking marijuana when he was eleven or twelve in the sixth grade."  (*Id.*)  From the age of seventeen until he was twenty, "he had used heroin once, he had used Ecstacy, various pills, crack cocaine, methamphetamine, PCP, and something called Crank."[57]  (*Id.* at 3117.)

---

[57]"Crank" is another name for crystal meth.  *See United States v. Espinoza*, 550 Fed.

135

Maples told Shealy that Jamie Dobbs introduced him to cocaine.   (*Id.* at 3133.)

Maples reported –

> Jamie had a big inheritance and they partied a lot together, and for a period of
> what seemed almost a year of time, some period of months, he and Jamie spent
> most of their time essentially staying intoxicated with various drugs; cocaine,
> marijuana, heroin, LSD, and they ran through this inheritance . . . .   They both
> were smoking crack. [Cory] told [Shealy that he] wanted out of the situation,
> that he made a New Year's resolution to not do [crack] any more.  He held up
> to his end, and a friend accused him of stealing from him.  Jamie got into the
> middle of it and . . . Jamie hit [Cory] in back of the head with a beer bottle and
> [Cory] pulled a razor and [Maples] told [Shealy] he got a gun after [Dobbs], and
> then during those days of serious drug use and drug abuse, he spent a lot of time
> on the street.  He told me sometime in the Spring of 1993 to New Year's 1994
> were in the street days and the heavy drug use days.

(*Id.* at 3134.)  Shealy reported that about a year before the murders, Maples had received

treatment at Quest Recovery Center for "all kinds of drugs, hallucinogenics, LSD."  (*Id.* at

3113.)

In addition to his testimony based on Maples's reports, Shealy testified, based on the

results of the Minnesota Multiphasic Inventory [MMPI] test, that Maples was suffering from

mild situational depression.  (R. Vol. 21, Tab 27, at 3147-48.)  He also testified that, although

Maples claimed he was not hurt or haunted by his mother's abuse, he had adopted a tough-guy

mentality to overcome his emotional pain.

Elyse Maples testified during the penalty phase that she and Philip Maples tried to help

Maples with his drug problem, of which they became aware after Maples left or was kicked

---

Appx. 690, 692 (11th Cir. 2013)(unpublished); *see also United States v. McIntosh*, 23 F.3d
1454, 1458 (8th Cir. 1994)("crank" is a street name for methamphetamine).

out of Denise Imgrund's home when he was a teenager.  (R. Vol. 21, Tab 27, at 3182.)  She testified that she had tried to get help for Maples; a women "who was with the Mental Health Association in Decatur" had helped her find places Maples could go to.  (*Id.*)  She and Philip Maples tried to get Maples into Bradford and Decatur General West, but due to financial constraints were only able to get him into Quest Recovery Center.  (*Id.* at 3182-83.)  Maples's treatment ended in January 1995, over six months before the murders.  (*Id.* at 3183.)  At that time, Elyse Maples saw a lot of improvement, but Maples did not stay with her for very long because "[w]e had some problems with some threats, so we moved him out of the State."[58] (*Id.* at 3183-84.)

 While in Tennessee, Maples found work with Birdsong.  Birdsong had testified during the guilt phase of the trial that Maples had lived with him in Ardmore, Tennessee, until approximately a month before the murders.  (R. Vol. 19, Tab 17, at 2745-47.)  He testified that he and Maples drank alcohol, "partied, . . . socialized, [and] went out", but he had not seen Maples use drugs.  (*Id.* at 2749.)

 Philip Maples testified that he knew Maples was drinking alcohol as a teenager before he went to live with his mother at 17.  He did not know Maples was into drugs and spending time with people who were "up to no good and [were known to be] into drugs and stuff" until

---

 [58]Elyse Maples testified, "[Cory] had worked with the Decatur city police to catch somebody with some drugs, and we had some threats – some telephone threats and we just didn't feel like [Cory] would be safe in the area so we moved him."  (R. Vol. 21, Tab 27, at 3184.)

after Maples moved back to his house after living with his mother.  (R. Vol. 21, Tab 27, at 3199.)  Philip Maples testified that Quest had helped Maples, but he added:  "It's a long [drawn] out thing.  You don't just get over something like [drug addiction] overnight, you know, but it was a big change back toward the good."  (*Id.* at 3199-200.)

Although he contends counsel should have called an employee from Quest to testify during the penalty phase, Maples does not allege specifically what the Director of Quest or any other employee would have testified nor does he allege specifically what additional testimony Philip or Elyse Maples would have offered concerning his good faith attempt at recovery and how this evidence would be mitigating.   However, he has offered specific allegations of his prior suicide attempts witnessed by Elyse Maples, Davis, and Dobbs, and this evidence was not before the jury.  Nevertheless, he does not allege that he had severe depression or suicidal thoughts as an on-going condition after he went to Quest or at the time

of the murders.[59]   Instead, by his own allegations, Maples's bouts of severe depression and suicide attempts were caused by his drug use.

In the amended petition, Maples frames this claim in such a way that the relevance of the depression and suicide attempts is tied to another mitigating factor that was well known to the jury – his history of drug abuse and his attempted recovery.  The trial court did not doubt that Maples had suffered from addiction and it found that he had made an attempt at recovery.  (Rule 32 C.R. Vol. 37, Tab 62, at 11-12.)  Nevertheless, it found the weight of this evidence in mitigation to be weak and unpersuasive.  (*Id*.)  Even if Maples's drug-induced depression and suicide attempts had been made a part of the evidence to support the mitigating factor that Maples suffered from a serious drug addiction from which he attempted to recover, this court finds that this evidence would not likely have changed the balance of aggravating and mitigating factors such that there is a reasonable probability that the outcome of the

---

[59]In state court, Maples never presented this claim in a manner that would have alerted the state court that he was offering his severe depression and suicidal ideation for any time period other than his drug-use prior to attending the Quest program, nor did he do so in the amended habeas petition filed in this court.  The allegations that Maples had a long history of depression or symptoms of emotional disorders set out in his December 2005 brief were a significant departure from the claim raised in the Rule 32 court, in the amended habeas petition in this court, and the post-remand briefs, wherein this claim was abandoned.  Such allegations would alter the fundamental nature of the claim as raised in the Rule 32 court and, therefore, are unexhausted and procedurally defaulted.  Maples has offered no showing of cause or prejudice to excuse his procedural default nor has he shown that a miscarriage of justice will occur if these allegations are not heard.  Therefore, the claim that Maples had a long history of depression and suicidal ideation after he completed the Quest program  has not been considered.

penalty phase of trial would have been different.  Therefore, the court finds that Maples has

not shown actual prejudice and this claim is procedurally defaulted.

In the alternative, the court finds that this claim is without merit.  The Rule 32 court

found:

> In [this claim] of Maples's petition, he alleges trial counsel were ineffective for failing to adequately investigate his drug addiction, depression and attempted recovery. In paragraph 130, Maples alleges that his father and stepmother "could have more thoroughly testified to [his] dedication to conquering his drug problems." (Maples's Petition at p. 56)  Also, Maples allege[s] trial counsel did not contact any counselors at Quest Recovery Center who interacted with him.

> Maples fails to indicate what additional testimony his father and stepmother would have provided that would have caused a different result in the jury's recommendation or this Court's sentencing.  Maples also fails to identify any drug counselor by name or indicate what his or her testimony would have been.

> "A claim of failure to call witnesses is deficient if it does not show what the witnesses would have testified to or how that would have changed that testimony might have changed the outcome." *Thomas* [*v. State*], 766 So. 2d [860,] 893 [(Ala. Crim. App. 1998), *overruled on other grounds by Ex parte Taylor,* 10 So. 3d 1075 (Ala. 2005)].  The allegation . . . is insufficiently pleaded and is not specific; therefore it is summarily dismissed. Rules 32.3, 32.6(b) and 32.7(d), *ARCrP*.

(Rule 32 C.R. Vol. 37, Tab 66, at 58-59.)

The Rule 32 court's determination is a decision on the merits for purposes of habeas

review.   While fairminded jurists could agree with the Rule 32 court's decision insofar as

Maples's failure to allege with specificity any testimony his father or the drug counselor

would have proffered in support of the claim, no reasonable jurist would agree with the trial

court's determination that the claim did not *identify* witnesses Elyse Maples, Heather Davis, Jamie Dobbs, and Allen Birdsong *and* describe the substance of their testimony. As such, that portion of the Rule 32 court's denial of Maples's claim is unreasonable based on the record before it. Nevertheless, Maples is not entitled to habeas relief on this claim because he has not established *Strickland* prejudice. Even if the court assumes these allegations are true, Maples still cannot establish actual prejudice for purposes of *Strickland*.

To establish *Strickland* prejudice, Maples must show that "there is a reasonable probability that," had the jury and the trial judge heard evidence of his depression and suicide attempts during the time he was abusing drugs and his efforts at recovering from drug addiction, they "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *See Strickland*, 466 U.S. at 695. The trial judge found that Maples had a "history of . . . self-abuse through drugs and alcohol," that he had "suffered from addiction to various controlled substances," and that he had "made efforts at controlling his drug-dependency in drug rehabilitation." (Rule 32 C.R. Vol. 37, Tab 62, at 10.) Considering this evidence, the trial judge stated in his sentencing order, "The court is unable to find the kind of mitigating facts that would justify the imposition of a sentence of life imprisonment without parole despite the existence of one statutory aggravating circumstance. The statutory aggravating circumstance *far outweighed* the mitigating facts." (*Id* at 11-12.) Simply put, additional evidence that Maples suffered depression and had tried to kill himself

during the time before he completed the Quest program is not sufficient to shift the balance

of the aggravating circumstance in favor of mitigating circumstances and life without parole.

For all of the foregoing reasons, this claim is procedurally defaulted, or in the

alternative, due to be denied.  Maples's request for an evidentiary hearing is due to be denied.

### 4. Counsel Failed to Present Evidence of Maples's Assistance to the Police in Their Enforcement of Drug Law Violations.  (Doc. 24, Claim II.D., ¶¶ 144-48.)[60]

Maples alleges that, although counsel had a written report prepared by the Decatur

Police "that clearly and incontrovertibly documented Mr. Maples's assistance to the Decatur

Police in arrest of a prominent drug dealer," counsel failed to offer that report into evidence

at the penalty phase of trial.  (Doc. 24 ¶ 144.)  The trial court had rejected Maples's assistance

to the police as a mitigating factor because no police officer had testified regarding Maples's

assistance and Elyse Maples's testimony on this issue had not been corroborated.  In his

habeas petition, Maples alleges:

> 144.  Counsel were ineffective at the penalty phase of the trial by setting
> forth mitigating factors but then failing to present any substantial evidence in
> support of those factors.  In particular, Counsel failed to present any substantial
> evidence in support of the non-statutory mitigating factor that Mr. Maples
> cooperated and assisted the police in their enforcement of drug law violations.
> Counsel failed to present any substantial evidence even though, at least five
> months prior to trial, Counsel received documentation that clearly and

--------

[60]The content of the claim virtually identical to that alleged in the amended Rule 32 petition.  (Rule 32 C.R. Vol. 33, Tab 49, ¶ 135-39 at 71-74.)  In his initial Rule 32 petition, Maples alleged counsel were ineffective for failing to corroborate with documentary evidence his past cooperation with the police.  Therefore, Elyse Maples's testimony was subject to attack by the prosecutor and deemed uncorroborated by the trial court.  (Rule 32 C.R. Vol. 32, Tab 47, ¶ 135-39 at 57-59.)

incontrovertibly documented Mr. Maples'[s] assistance to the Decatur Police in the arrest of a prominent drug dealer.  A jury can consider "***as a mitigating factor***, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  Given the importance of having the jury consider ANY aspect of a defendant's character or record during the penalty phase of a death penalty case, it is inexcusable for Counsel to possess incontrovertible evidence in support of a mitigating factor and fail to present it.  Such an unreasonable decision falls below the minimum standard of effective assistance and cannot be considered reasonable trial strategy. *Jackson v. Herring*, 42 F.3d 1350 (11th Cir. 1995).  If such evidence had been presented to the jury, there is a reasonable probability that the jury would not have sentenced Mr. Maples to death.

145.  The only evidence Counsel presented in support of this mitigating factor was the testimony of Mr. Maples'[s] step-mother, who told the court that "Mr. Maples had worked with the Decatur city police to catch somebody with some drugs."  (R. at 3184.)  No other evidence or testimony was offered.

146.  During closing, the prosecution scoffed at Counsel's attempt to present this evidence in support of this mitigating factor:

> [Mr. Maples] didn't clean up drugs in the City of Decatur.  If he had made a mark over there or done anything major, they would have police officers and narcotics officers over here to tell you about it.  Defense lawyers love to call police over here to testify.  I mean, if they can get a police officer to come to their side, they are just tickled pink, and they would have been over here by the hand full.  (R. at 3292-93.)

Likewise, in the sentencing order, the court judge determined that Mr. Maples had not cooperated and assisted law enforcement authorities in their enforcement of drug laws.  "The court notes no police officer testified at trial, nor was there any corroboration of the step-mother's testimony."  (Sentencing Order at 10.)

147.  If Counsel had investigated and presented available evidence in their possession, the court and the jury would have read a case report filed with the Decatur Police Department, written by Lieutenant Larry Greene, detailing Mr. Maples'[s] assistance in the October 1994 arrest of Mark Carroll, who died before the trial, for unlawful distribution of controlled substances.  The case

report includes transcripts of conversations recorded by Mr. Maples over the course of several weeks, between himself and Mr. Carroll, including a conversation in which Mr. Maples purchased the drugs from Mr. Carroll that resulted in his immediate arrest. The case report lists many other officers involved in this transaction who could have testified on Mr. Maples'[s] behalf, including, but not limited to, Detective Greene, Sergeant Larry Glover, Lieutenant Frank DeButy, Investigator Chris Matthews, Officer Denise Stogner, Officer Proncey Robertson and Investigator Faron White, along with other investigators of the Decatur Police Narcotics Unit and the Morgan County Drug Unit. If this evidence had been presented to the jury, there is a reasonable probability that the jury would not have sentenced Mr. Maples to death.

148. Counsel's failure to advocate for their client at sentencing, when the sentence was death, was equivalent to providing no representation at all at a critical stage of his trial. *See United States v. Cronic*, 466 U.S. 648, 659 (1984). Had the jury and court heard this evidence, they would have been less inclined to impose death, and much more inclined to impose a sentence of life without the possibility of parole.

(*Id*. ¶¶ 144-48.)

In his December 2005 brief, Maples contends that "Greene could have testified about Mr. Maples'[s] assistance and his good character. Officer Greene has stated that during the investigation, Mr. Maples was very nice, polite and punctual. Indeed, Officer Greene repeatedly referred to Mr. Maples as a 'straight-up guy' who kept his word." (Doc. 33 at 48.) Maples alleges for the first time in his post-remand reply brief, "Upon information and belief, [Elyse] Maples had extensive knowledge about Maples'[s] involvement with the Decatur police department as a confidential informant." (Doc. 73 at 52.) He also asserts that she identified Larry Greene as the officer Maples worked with and that Greene "had first-hand knowledge about the threats that Maples received because he witnessed several of them and eventually began to stake out [Elyse] Maples'[s] work place for her protection." (*Id*.) Yet,

144

counsel did not ask further questions of Elyse Maples about this fact nor did they attempt to contact Officer Greene.  (*Id.*)  The court finds the allegations are supplemental to the claim as raised in the Rule 32 court.  Still, Maples cannot establish that he was prejudiced by the lack of additional testimony and, thus, cannot establish actual prejudice to overcome his procedural default even if these allegations are considered.

A review of the testimony at the penalty phase shows that Elyse Maples testified that Maples had assisted the Decatur police with the capture of "somebody," that thereafter her family had been threatened, and that Maples had been sent to Tennessee because of these threats.  (R. Vol. 21, Tab 27, at 3184.)  Following this testimony, in his closing argument, the prosecutor argued that, as he understood the testimony, Maples had assisted law enforcement with the arrest of one person, but the defense had not called any Decatur City police officers to testify on his behalf to verify, in essence, what a good citizen he had been and how he had assisted the drug enforcement officers in any significant manner.  (R. Vol. 22, Tab 30, at 3292-93.)  Moreover, the prosecutor pointed to testimony that Maples had admitted to "ripping off" Kenneth Hall, his former friend, during a drug deal as revenge for Kenneth having slept with Maples's girlfriend.  (*Id.* at 3293.)  The prosecutor then asked the jury if they thought Maples had assisted law enforcement officers to help the community or to get even with someone else like he had done to Kenneth Hall.  (*Id.*)

An examination of the police report shows that, in September 1994, Maples had contacted the Decatur Police Department to offer his assistance in creating a drug case against

145

Mark Carroll, an individual from whom he had previously bought drugs.  (Doc. 33-1 at 37-45.)  Maples acted as an informant, bought marijuana and cocaine from Carroll, and subsequently Carroll was charged with unlawful distribution of a controlled substance in violation of Alabama law based on Maples's drug buys.  Maples contends that each of the officers involved in the operation could have testified on his behalf and each officer's name appears in the report.

In light of the prosecutor's closing arguments, which were supported by trial testimony, the court finds there is no reasonable probability that the jury or the trial judge would have found Maples's cooperation with law enforcement officers to be a significant mitigating factor even if the report and the police officers' testimony had been admitted into evidence and even if the judge had found Else Maples's testimony regarding the threat to be credible.  First, the court notes that testimony of Maples's assistance to law enforcement likely would have caused the prosecutor to present and emphasize Maples's prior lawless behavior.  Moreover, presentation of this evidence would have allowed the prosecution to present evidence of Maples's reasons for providing assistance, which may have shown Maples was not motivated by civic duty.  Even if Maples's assistance with law enforcement was given some weight toward mitigating his sentence for the murders of Robinson and Terry, this evidence is not of such quality and weight that it would likely have shifted the balance from the single statutory aggravating circumstance, which the trial court had found "far outweighed" the mitigating facts, toward the mitigating circumstances and life without parole.

146

Under these circumstances, even if Maples's assistance to law enforcement had been corroborated in the manner he alleges and had been considered a mitigating factor, its weight, if any, as mitigation for the murders was only slight. This court finds no reasonable probability that evidence of Maples's cooperation in the arrest of Carroll would have altered the balance of mitigating versus aggravating factors to such an extent that the sentence would have been different. The court finds that Maples has not shown actual prejudice; therefore, this claim is procedurally defaulted.

The court finds that, even assuming counsel had presented evidence of the Decatur police report as well as the alleged testimony from officers, there is no reasonable probability that this evidence would have changed the outcome of the penalty phases, thus establishing prejudice to support his *Strickland* claim. Because Maples has not shown actual prejudice based on counsel's failure to present additional mitigating evidence of his assistance to law enforcement, he cannot show his counsel was ineffective under the *Strickland* standard.

The court finds this claim is procedurally defaulted, and, in the alternative, without merit. Maples's request for an evidentiary hearing is due to be denied.[61]

---

[61]Maples complains that he requested discovery regarding this claim in state court, in that he asked for all information and documentation regarding his cooperation. (*See* doc. 73 at 68.) This is the only other sub-claim, other than his intoxication claim, where he specifically points out that he requested discovery. (*See also* doc. 78, Tab 25 at 144.) However, Maples clearly already had the Decatur police report with the names of police officers and the information concerning details of his assistance before he filed his amended Rule 32 petition. Thus, he already had the necessary information to state his claim before the Rule 32 court.

**5.  Counsel Failed to Procure a Competent Psychological Evaluation.**  (Doc. 24, Claim II.E., ¶¶ 149-55.)[62]

In his amended habeas petition, Maples alleges:

149.  Counsel hired a psychologist to evaluate Mr. Maples'[s] mental state both at the time of the crime and at the time of his arrest.  The psychologist's evaluation, as detailed in Paragraphs 150 to 155, *infra*, was woefully inadequate, which should have been apparent to Counsel.  In addition, Counsel's presentation of the psychological evaluation to the jury was confusing and misleading and, upon information obtained through interviews with jurors, may have resulted in the jury's discounting much, if not all, of the psychologist's testimony.

150.  Counsel failed to inform the psychologist of important facts and circumstances in Mr. Maples'[s] background . . . thereby assuring that even if the psychologist had done his job properly, he could not have done it well.

151.  The psychologist retained by Counsel spent very little time with Mr. Maples.  And he spent no time at all with any family members or people who knew Mr. Maples other than a former schoolmate who – fortuitously for the psychologist – happened to be working in the jail the afternoon the psychologist went to the jail to interview Mr. Maples.  According to the psychologist's testimony, he spent only four hours at the jail, conducted only two tests – one a simple intelligence test – and based his entire evaluation only on Mr. Maples'[s] direct reporting to him.  And even that reporting was skimpy and incomplete because of the psychologist's superficial interaction and failure to probe, as was apparent during his confusing and inadequate testimony.

152.  As a result, the psychologist failed to discover, for example, that Mr. Maples had suicidal thoughts and had, in the past, attempted suicide.  He failed to discover that Mr. Maples was being given an anti-depressant while he was in the Morgan County jail and failed to learn the reasons why Mr. Maples had been prescribed such medication.  He failed to discover more instances of his birth mother's physical abuse and abandonment when he was a small child,

---

[62]The content of the claim is identical to that alleged in the initial and amended Rule 32 petitions.  (*See* Rule 32 C.R. Vol. 32, Tab 47, ¶¶ 140-146; Rule 32 C.R. Vol. 33, Tab 49, ¶¶ 140-146.)

instances Mr. Maples had suppressed, but which were well known by his father and other family members.  He failed to discover the long-standing pattern of self-destructive and abusive behavior by Mr. Maples'[s] birth mother and maternal grandmother, possibly indicative of genetic mental illness or disease. He failed to probe Mr. Maples'[s] feelings about his birth mother, either as he remembered her from his childhood, or when he met her again as a teenager. He also failed to probe Mr. Maples'[s] feelings when she abandoned him a second time as a teenager.  And, of course, he could not have known many other facts about Mr. Maples'[s] background . . . because Counsel never informed him of those facts.

153.  Based on this superficial and inadequate psychological evaluation, which Counsel should have recognized as superficial and inadequate, the psychologist incorrectly concluded and testified that Mr. Maples had passive-aggressive personality disorder.  (R. 3149.)  Equally damaging to Mr. Maples'[s] defense was the defense psychologist's assertion, on both direct and cross-examination, that there was virtually no difference between his evaluation and the prosecution psychologist's evaluation of antisocial personality disorder. (R. 3158.)  He testified to this in spite of the fact that the prosecution psychologist's evaluation was patently incorrect under the diagnostic criteria set forth in the standard psychological manual, the Diagnostic and Statistical Manual IV.

154.  Counsel should have engaged a psychologist who could carefully and thoroughly evaluate Mr. Maples'[s] mental state and who could explain that mental state and its causes to the jury.  In addition, Counsel should have thoroughly investigated Mr. Maples'[s] family, social, medical and life history and shared all they learned with the psychologist.  But Counsel did neither of these things, and as a result, they obtained a severely limited and compromised psychological evaluation.  In addition, their inadequate preparation of the psychologist to testify resulted in his testimony being confusing, difficult to follow, misleading and completely devoid of any explanation of Mr. Maples'[s] flat affect.  Upon information learned from interviews with jurors, because of the superficiality of the psychologist's evaluation, and the inadequate presentation of his testimony by Counsel, some of the jurors may have discounted the psychologist's testimony.[63]

---

[63]In its order, the Rule 32 court found that Maples had presented "absolutely no evidence that any juror discounted any of Dr. Shealy's testimony."  (Rule 32 C.R. Vol. 37,

155.  It was Counsel's legal obligation to obtain, adequately prepare, and properly question an expert for the mitigation phase of Mr. Maples'[s] trial. They failed completely in this task.  Such a failure cannot be strategic.  Instead, Counsel's failure was ineffective assistance of counsel and deprived Mr. Maples of his right to a reasonably substantial penalty phase investigation.  *See Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982); *Baxter v. Thomas*, 45 F.3d 1501 (11th Cir. 1995).

(Doc. 24 ¶¶ 149-55 [footnote added].)[64]

Maples attacks Shealy for failing to discover his suicidal ideations and past suicide attempts, that he was being given an anti-depressant in jail and the reason why the medication was prescribed, and more instances of the abuse and abandonment by his mother, as well as a "possible genetic mental illness or disease" she and his maternal grandmother suffered.  (*Id.* ¶ 152.)  He contends Shealy "***incorrectly*** concluded and testified" that Maples suffered from passive-aggressive personality disorder and "that there was virtually no difference between

---

Tab 66, at 62.)

[64]In his December 2005 reply brief, Maples alleged, "[A]lthough Dr. Shealy interviewed Mr. Maples, he has admitted to habeas counsel that, if he had it to do over, he would have gathered a detailed social history from collateral sources."  (Doc. 33 at 47.) Maples did not make these allegations to the state court and has offered no cause and prejudice pertinent to it to overcome that default.  Even if the  allegation was considered supplemental, Maples still fails to allege how or why Shealy's opinion or conclusions would have changed had he  independently discovered that information.  Also, Maples does not allege that Shealy's testimony or opinion would have been altered in connection with any of the other alleged deficiencies Shealy purportedly displayed as set out in this claim.  To the extent that he might be contending that Shealy or counsel failed to discover the physical and emotional abuse he suffered from Philip and Elyse Maples, or his depression or symptoms of an emotional disorder, or any other allegation set out above, those allegations are unexhausted and procedurally defaulted.  Maples has not argued cause and prejudice to overcome that default or miscarriage of justice if the allegations are not heard, and Maples abandoned these allegations in his post-remand briefs.

his evaluation and the prosecution psychologist's evaluation of anti-social personality disorder." (*Id.* ¶ 153.)  As for the latter diagnosis, Maples argues "that the prosecution psychologist's evaluation was patently incorrect under the diagnostic criteria set forth in the standard psychological manual, the Diagnostic and Statistical Manual [DSM] IV." (*Id.*)  He complains that counsel's inadequate preparation of Shealy caused his testimony to be "confusing, difficult to follow, misleading and completely devoid of any explanation of . . . Maples's flat affect." (*Id.* ¶ 154.)  He declares that interviews with jurors showed that "some of [them] may have discounted the psychologist's testimony" because of its "superficiality" and "inadequate presentation." (*Id.*)

With regard to Maples's childhood abuse and abandonment from his mother, he does not allege how Shealy's knowledge of additional incidents of abuse would have changed or altered his opinion or alerted reasonable counsel to seek additional expert assistance, and he has not demonstrated a reasonable probability that the balance of aggravating and mitigating factors at the penalty phase of trial would have been altered.  Indeed, Shealy testified in detail about Maples's abusive childhood and abandonment and the psychological effects thereof, all of which was to Maples's benefit for mitigation purposes.

Maples also fails to allege specific facts concerning his suicidal thoughts, past history of suicide attempts[65] and jailhouse prescription,[66] or explain how this additional information

---

[65]As set forth above, Maples alleged in the Rule 32 proceedings that he was depressed and suicidal during his drug-use days, thus supporting the non-statutory mitigating factor that he suffered from serious drug addiction from which he had attempted to recover.  Shealy,

would have altered or changed Shealy's diagnosis or opinion in any fashion, much less describe how the change in Shealy's opinion would have resulted in a reasonable probability that he would have been sentenced to life without parole.  Even if this court assumes that reasonable counsel would have recognized that Shealy had failed to independently discover this information, Maples has failed, nevertheless, to explain how and why this information would have produced an opinion or conclusion from any expert such that there is a reasonable probability that the balance of aggravating and mitigating factors would have been altered.

Maples does not explain why Shealy's diagnosis of passive-aggressive personality disorder is wrong nor does he explain with any specificity how and why the State's expert misapplied the DSM IV criteria in his diagnosis of anti-social personality disorder.  Diagnoses of mental health disorders are within the special knowledge of the experts.  Without detailed allegations regarding the correct diagnosis as well as allegations that his attorneys knew or should have known the experts' opinions were incorrect, Maples cannot show a reasonable probability the result would have been different.  The court finds Maples has failed to allege facts establishing Shealy's alleged inadequacies, and, therefore, he has failed to allege facts

Philip Maples, and Elsye Maples testified about Maples's history of drug abuse and addiction and his attempt at recovery.  The trial judge credited it as a mitigating factor although he found its weight to be weak and unpersuasive.

[66]Maples alleged in his Rule 32 petition that he had  suffered nightmares in jail and he  was prescribed Elavil for six months.  He contends that his use of Elavil could have explained his flat affect and disputed the prosecutor's argument that he showed no remorse.

that would establish that counsel was ineffective for failing to recognize the inadequacies or that he was prejudiced thereby.

The record shows that Shealy drew his results from his interview with Maples and the MMPI, a test which Maples fails to mention in his amended petition. (R. Vol. 21, Tab 27, at 3146-52, 3164-65. *See generally* doc. 24.) Shealy also administered a Bendner Gestalt Performance Test, which Maples also does not mention, the results of which showed Maples did not have a "conduct disorder, impulse disorder, [or] chronic acting out . . . ." (R. Vol. 21, Tab 27, at 3166.) Shealy disagreed with the State's expert, who had diagnosed Maples with an anti-social personality disorder; Shealy noted that expert had not performed a complete examination and had limited his evaluation to the issue of Maples's competency to stand trial. (*Id.* at 3159, 3161.) The State's expert did not testify at the penalty phase of trial. While it is true that Shealy testified that there was not much difference between a diagnosis of anti-social personality disorder and passive/aggressive personality disorder, he testified that passive/aggressive individuals suppress their anger, are over-controlled, and do not have a pattern of violent behavior going back to childhood. (*Id.* at 3161.) Shealy's testimony that Maples has a passive/aggressive personality disorder, not an antisocial personality disorder, certainly was to Maples's benefit.

Maples has alleged that he suffered from depression and suicidal thoughts and actions during the period of time he was abusing drugs. He has not alleged that he suffered from clinical depression or some other mental health disorder at the time of the murders or that he

153

did not suffer from passive/aggressive personality disorder.  Assuming counsel should have had Maples examined by another mental-health expert or they should have required Shealy to interview Maples's family and/or Maples more thoroughly, nothing in the record before the trial court or the Rule 32 court indicates what other diagnosis Shealy or another psychologist would have  made.

Maples does not allege why Shealy's testimony was confusing or misleading or why counsel's preparation of Shealy was inadequate.  Moreover, his contention that counsel failed to prepare Shealy to explain Maples's "flat affect" is completely devoid of any context.  Maples does not describe why counsel's preparation was inadequate, does not state what inferences or conclusions Shealy would have drawn from his "flat affect," allege why Shealy's testimony regarding Maples's demeanor would have been mitigating, or how Shealy's testimony would be of such mitigating significance that there is a reasonable probability that the balance of aggravating and mitigating factors would have tipped in his favor.  Indeed, Maples ignores the fact that Shealy testified Maples had adopted a tough-guy image and did not display his feelings to cover the pain he suffered as a result of his mother's abuse and abandonment.  This testimony was adequate to address Maples's flat affect or stoic demeanor.

Finally, Maples's allegations of interviews with unnamed jurors who "might" have discounted Shealy's testimony is tantamount to an attempt to use jury testimony to impeach a verdict; therefore, this is not "competent evidence" in this court.  *Brown v. United States*, 720 F.3d 1316, 1337 (11th Cir. 2013)(rejecting affidavits from jurors "who swore some of the

154

additional evidence gathered during the habeas process might have had an impact on jury deliberations" (citing *Tanner v. United States*, 483 U.S. 107, 120-21 (1987) and Fed. R. Evid. 606(b))). Alabama law follows the same "historic 'anti-impeachment' rule" rejecting jurors' testimony regarding their verdict. *See Jones v. State*, 753 So. 2d 1174, 1203-1204 (1999)(quoting Ala. R. Evid. 606, advisory committee's note).

This court finds that Maples has failed to allege facts sufficient to demonstrate actual prejudice. His allegations regarding Shealy's testimony and other psychological testimony that should have been presented is not sufficient to shift the burden between mitigating and aggravating circumstances such that there exists a reasonable probability of a different outcome. Accordingly, Maples has not shown actual prejudice to overcome the procedural default of this claim and it remains procedurally defaulted.

Because Maples has not shown actual prejudice based on counsel's failure to present additional mitigating evidence of his assistance to law enforcement, he cannot show his counsel was ineffective under the *Strickland* standard.

The court finds this claim is procedurally defaulted, and, in the alternative, without merit. Maples's request for an evidentiary hearing is due to be denied.

**6. Counsel Failed to Investigate Maples's Post-Arrest Behavior.** (Doc. 24, Claim II.F., ¶¶ 156-57.)[67]

Maples declares that counsel were ineffective because records and witnesses from the county jail could have shown that Maples had exhibited good behavior during the two years he spent in Morgan County Jail awaiting his capital murder trial.  (Doc. 24 ¶ 156 [citing *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986)].)  He alleges that this "good behavior is especially significant because county jails are not intended as places for such long term incarceration and consequently are not usually equipped with facilities and resources for activities and outdoor exercise" to relieve the "tedium" of jail.  (*Id.* ¶ 157.)  He identifies one witness, a jailer, Sam Frost, who could have testified to Maples's "good behavior."  (*Id.* ¶ 156.)

As Maples contends, the Supreme Court has stated that evidence of good behavior in jail cannot be excluded from the jury during the penalty phase and can be valid evidence of mitigation.  However, Maples has made no specific allegations that would establish that his good behavior would have carried sufficient, if any, mitigating weight to create a reasonable probability of a different verdict during the penalty phase.  The court finds that evidence of Maples's good behavior in jail is not so weighty.  Indeed, the court finds very little likelihood

---

[67]The habeas claim is virtually identical to the claim as pleaded in Maples's amended Rule 32 petition.  (Rule 32 C.R. Vol. 33, Tab 49, ¶¶ 147-48.)  Maples presented a similar claim in his initial Rule 32 petition, but did not identify Officer Frost as a witness or assert that there was documentary evidence to support his good behavior in jail.  (Rule 32 C.R. Vol. 32, Tab 47, ¶¶ 147-48.)

156

that such evidence would have influenced either the jury or the trial court.  Therefore, the court finds Maples has not established actual prejudice to overcome his procedural default.

Because Maples has not shown actual prejudice based on counsel's failure to present additional mitigating evidence of his good behavior in jail, he cannot show his counsel was ineffective under the *Strickland* standard.

The court finds this claim is procedurally defaulted, and, in the alternative, without merit.  Maples's request for an evidentiary hearing is due to be denied.

**7.  Counsel Failed to Investigate Maples's Head Trauma.**  (Doc. 24, Claim II.H., ¶ 159.)[68]

Maples alleges that

Counsel were ineffective for failing to discover that Mr. Maples had suffered a number of traumatic head injuries, including, a fall off a twenty foot cliff onto rocks when he was a teenager and having been hit with a baseball bat during an attack on him the year before the shootings.  Although documentary and other evidence in the form of hospital records and oral testimony from Ms. Maples and from friends who were with Mr. Maples during these incidents was available, Counsel did not use this information in any way.  If the jurors had been aware of these traumas, or if the psychologist[, Dr. Shealy,] had adequately explained the impact of these traumas upon Mr. Maples's behavior and mental state, there is a reasonable probability that Mr. Maples would not have been sentenced to death.

(Doc. 24 ¶ 159.)  In his post-remand brief, Maples argues:

Counsel's failure to uncover that a defendant experienced head trauma or had other brain damage likewise contributes to a finding of ineffective

_____

[68]The content of the claim identical to that alleged in the initial and amended Rule 32 petitions.  (Rule 32 C.R. Vol. 32, Tab 47, ¶ 150 at 63; *id.*, Vol. 33, Tab 49, ¶ 150 at 78, respectively.)

performance. *See Armstrong v. Dugger*, 833 F.2d 1430, 1432-34 (11th Cir. 2011)(defendant prejudiced by counsel's failure to uncover mitigating evidence showing that defendant "had organic brain damage"). Indeed, serious head injuries may cause "'problems with planning, sequencing and impulse control'" and are therefore particularly relevant mitigating factors in a death penalty case. *Sears*, 130 S. Ct. at 3262 (citation omitted); Frazier v. Bouchard, 661 F.3d 519, 529 (11th Cir. 2011), cert. denied, 184 L. Ed. 2d 58 (2012); Baxter, 45 F.3d at 1512 n.30.

Despite notice that Maples may have diminished mental capacity – such as his noted sporadic behavior, attention deficit, and sudden outbursts of anger (R. at 3169-70, 3145, 3199) – counsel failed to investigate and uncover Maples'[s] past serious head traumas. Dr. Shealy's assertion that there was no "evidence of any neuropsychological problems" (R. at 3148) is markedly insufficient to satisfy counsel's obligation to investigate their client's mental capacity, because, as noted above, the report was simply geared towards fitness to stand trial and had glaring inaccuracies and missing information that should have put counsel on notice that further inquiry was warranted. *See Cooper*, 646 F.3d at 1345.

Had counsel investigated further, the jury would have learned that Maples had fallen onto rocks off a twenty-foot cliff. (Compl. ¶ 159.) The jury would have also learned that Maples had been hit in the head with a baseball bat during the year before the shootings. (*Id.*) These injuries could have reasonably impaired Maples'[s] judgment and diminished his mental capacity and were therefore pertinent as mitigating factors during the penalty phase. *See Powell v. Allen*, 602 F.3d 1263, 1274 (11th Cir. 2010)(requiring that counsel address the relationship between head injuries and the defendant's subsequent behavior), *cert. denied*, 131 S. Ct. 1002 (2011). Counsel's failure to investigate and present this evidence therefore amounts to ineffective assistance. *See Baxter*, 45 F.3d at 1512-14 & n.30 (finding counsel deficient in part because he failed to discover the defendant had been dropped on his head as a baby, leaving a "sunken place" in his head.)[69]

---

[69]The court notes that Maples's situation does not begin to compare with the petitioner's history of injury and mental illness in *Baxter*. In addition to being dropped as a baby, the petitioner in *Baxter* had been institutionalized in a psychiatric hospital for three years as a teenager because he was too disturbed to stay at the Children's Home, his school records placed his IQ in the intellectually-disabled range, and he had left school in the second

(Doc. 60 at 90-91.)

Maples fails to reveal the content of the hospital records evidencing the alleged head injuries.  Also, he has not described what Elyse Maples and his friends, who he does not identify, would have said regarding the nature and severity of his head injuries and he has offered no evidence as to the effect of the head injuries (or that these witnesses would have been qualified to testify as to the effects of these head injuries).  Maples also does not allege how Shealy's testimony failed to adequately explain why or how these head injuries impacted his behavior and/or mental state.  Also, Maples has failed to allege his counsel acted unreasonably with regard to presenting this unknown evidence regarding the impact of his head injuries.  Without this sort of detail, Maples cannot establish that this evidence was reasonably likely to alter the balance between the mitigating and the aggravating facts sufficient to show actual prejudice.  Accordingly, Maples has not established actual prejudice to overcome the procedural default of this claim and it remains procedurally defaulted.

Moreover, the court notes that in his post-remand briefs and for the first time in any pleading, Maples alleges, "Despite notice that [he] may have diminished mental capacity – such as his noted sporadic behavior, attention deficit, and sudden outbursts of anger (R. 3169-70, 3145, 3199) – counsel failed to investigate and uncover Maples'[s] past serious head traumas." (Doc. 60 at 90.)  Maples did not present these allegations to the Rule 32 court.  The

---

grade. *Baxter*, 45 F.3d 1501, 1512-13 and nn. 30, 32.  Maples has no such history of being institutionalized and the evidence is that he is of average, if not above average, intelligence.

allegations do not simply supplement the claim presented to that court, rather they are intended to alter the nature of the claim as presented in the Rule 32 court. Accordingly, the allegations are unexhausted and procedurally defaulted. Maples has not argued that he can establish cause and prejudice to overcome the exhaustion requirement with regard to his post-remand allegations. Alternatively, even if the court considered the allegations to be supplemental allegations to the claim as presented in state court, Maples's reliance on mere citations to the record to support these allegations is insufficient to satisfy the pleading requirements for habeas corpus cases, and thus cannot, in conjunction with the allegations made in the petition, establish the requisite actual prejudice to overcome the procedural default.

Alternatively, the court notes that none of the citations to the state-court record support Maples's assertion that counsel had "notice" of his brain injury. (Doc. 60 at 90 [citing R. at 3169-70, 3145, 3199].) Instead, one citation simply shows Shealy's hypotheses as to what might have triggered Maples to murder the victims on the night of the murders. (R. Vol 21, Tab 27, at 3169-70.) Shealy testified:

> Q. Can you see anything in particular about this . . . incident about why it would lead to a homicidal rage when obviously from the history he gave you that he had been drunk and extremely intoxicated over a couple of years period of time? I mean, is there anything in particular about this incident why it would set him off to kill two people?

> A. No. It's a very good question, and certainly puzzling probably to everybody, I would imagine to everybody here. I don't know what evidence has been presented, but in my evaluation and what I know about it without hearing the evidence from witnesses in this case, I puzzled over what might have been the cue. Combined with the weakened mental state from the intoxication, what might have been the cue that set him off, and I wondered if it had to do with the

intoxicated state.  Maybe there was anger about this friend who had betrayed him earlier, or these two friends that had betrayed him earlier; this Kenneth or this Jamie.  Maybe it was accumulated rage, maybe he was going back to his mother and other people who had betrayed him, and something about the situation which I could only guess at.  It might even have been an internal fantasy that he had.  There is no way really to know or you could know from the evidence that has been presented, but I certainly couldn't know what set him off.

Q.  There is no way to know, and obviously from what you have seen, the alcohol and drugs weren't enough on their own to do it?

A.  Right.

(*Id*. at 3169-71.)  This testimony does not support Maples's assertion that his counsel should have been on notice of a brain injury based on a history of diminished mental capacity.[70]

Likewise Shealy's testimony at page 3145 concerns his finding that Maples was reading at a college level, which he considered unusual.  (*Id*. ast 3145.)  He testified:

Usually, when you find people who have a history of – a criminal defendant with a history of antisocial behavior, you would find under achievement.  That is, the actual intelligence would be higher than the achievement.  In this case [Maples's] achievement, what he had actually learned, is more than you would expect from his actual ability which suggested that he had actually been – probably had applied himself and been a good student.  What I'm saying is usually with a psychopathic personality and antisocial personality disorder, you usually . . . find a lower achievement and a higher intelligence.  In this case we found a higher achievement . . . .

---

[70]It also is completely contradictory to numerous pages of Maples's pleadings in which he contends that he was not a person who would burst into anger or violence.  Indeed, at trial and to this day, Maples relies on his history of non-violence to support his allegations of good behavior as a mitigating factor.

(*Id*. at 3145-46.)  This testimony does not support Maples's assertion that his counsel should have known that he had a traumatic brain injury.  Indeed, this testimony regarding Maples's achievement level negates any assertion that he had difficulty in concentration and focus.

Finally the testimony at page 3199 of the transcript is Philip Maples testifying as to Maples's drug problems after returning home from living with his mother.  (*Id*. at 3198-99.) Philip Maples testified as follows:

> Q.  Did [Maples] ever – after he went to stay with his mother at age seventeen, though, did you start to see some drug problems?
>
> A.  I seen a change in him.  I mean, it was like his mind was wandering a lot, you know, or he didn't check back in with me like he always did when he first moved in with her or whatever.  He called and would check in with us and let us know he was all right, and then he got to where we didn't hear from him more and more and more, so it was just signs like that, and we heard from different people that the folks he was running around with was up to no good and was well-known into drugs and stuff.

(*Id*.)  Again, this testimony does not support Maples's contention that his counsel should have had notice of his diminished mental capacity due to traumatic brain injury.  This testimony, except for a mention of his mind wandering, does not concern Maples's mental capacity at all; rather, his father is testifying to clues from Maples's behavior that supported Philip Maples's conclusion his son had a drug problem.

None of the pages cited by Maples support his claim that his counsel had notice of his "diminished mental capacity" sufficient to warrant investigation of possible traumatic brain injury.  Moreover, the information available to counsel demonstrates counsel's failure to investigate such a brain injury was reasonable.  Maples knew that he was smart and capable,

reporting that he was in advanced placement classes in the sixth grade, but went from this level to quitting high school because it wasn't "cool" to be smart, and because he would not be allowed to graduate with his classmates.  (R. Vol. 21, Tab 27 at 3129, 3142.)  Further, Dr. Shealy's psychological testing showed that Maples was focused, meticulous, "extremely orderly, organized, careful, conscientious[,]" and not "expansive and impulsive."  (*Id.* at 3167.)  Frost allegedly told Shealy that Maples was a well-behaved, perfectionist who was always "three sheets to the wind"[71] the year before the murders.  (*Id.* at 3143.)  Also, based on his objective testing, Shealy "ruled out that [Maples] was brain damaged."  (*Id*. at 3148.)  Maples does not contend that Shealy was unaware of his past physical injuries.  Maples has not shown that counsel was ineffective for failing to investigate possible traumatic brain injury.

Moreover, the court finds that Maples has failed to show that further investigation would have revealed that he actually suffered from such a brain injury and that its existence

---

[71]"Three sheets to the wind" is a euphemism for drunkenness.  One writer stated the origin of the phrase as follows:

> On a square-rigged sailing ship, a "sheet" is a line attached to the lower corners of a squaresail, used for trimming it to the wind.  When sheets are allowed to run free, the sails lose their wind and flap and flutter.  The ship's forward motion stops, and as she loses steerageway, she becomes impossible to control.  A person is said to be "three sheets to the wind" when in an advanced state of inebriation, fluttering and wallowing around out of control.

R. Perry Sentell, Jr., *The Georgia Supreme Court and Local Government Law: Two Sheets to the Wind*, 16 GA. ST. U. L. REV. 361, 361 (1999)(citing Olivia A. Isil, WHEN A LOOSE CANNON FLOGS A DEAD HORSE THERE'S THE DEVIL TO PAY 102 (1996)).

would have shifted the balance between the aggravating circumstance and mitigating circumstances such that the result of his sentencing proceedings would have been different.

The court further notes that Maples requested an extension of time to file the amended habeas petition, in order to have a neuropsychologist examine him so that he could have the results of that exam when he filed his third amended petition.  (Doc. 23 at 4.)  Although he was granted the requested extension, Maples did not include the results of such examination in his amended petition.

Maples has not established actual prejudice to overcome the procedural default and as such, the claim is procedurally defaulted.  Maples's request for an evidentiary hearing is due to be denied.

Alternatively, the Rule 32 court rejected the claim and made the following findings:

> Maples fails to provide the Court with any supporting documents, such as a report from a doctor or hospital or an affidavit from any individual that would lend any credibility to this claim.  Paragraph 150 is deficiently pleaded because it contains only a bare allegation with no factual basis.  "[N]o purpose would be serviced by any further proceedings" by the Court; therefore, [this claim] is summarily dismissed.  Rules 32.3, 32.6(b) and 32.7(d), ARCrP.

(Rule 32 C.R. Vol. 37, Tab 66, at 67.)  In his post-remand reply brief, Maples contends that his claim contained "sufficient specificity" to entitle him to relief.  (Doc. 73 at 59.)  However, this court's review of that pleading shows that the Rule 32 court reasonably rejected this claim for lack of specificity.  At least fairminded jurists could debate the determination.  The trial court's decision is not made unreasonable because the court found that Maples had failed to provide documentary evidence lending credibility to his claims.  The import of that comment

was that Maples had left the court with no specific allegations to support his ineffectiveness claim and no way to discern the supporting facts; it did not dismiss this claim based on a lack of documentary proof.

For the foregoing reasons, this claim is procedurally defaulted and due to be denied. Maples's request for an evidentiary hearing is due to be denied.

## C. COUNSEL WERE INEFFECTIVE FOR USING CONTRADICTORY STRATEGIES IN THE GUILT PHASE AND PENALTY PHASE (Claim III, Doc. 24 ¶¶ 180-87.)[72]

Maples alleges:

> 180. Counsel were ineffective for using different and contradictory strategies about Mr. Maples'[s] intoxication during the guilt and penalty phases of Mr. Maples'[s] trial. Presenting affirmative evidence that is internally inconsistent renders Counsel's performance ineffective. *See Waters v. Thomas*, 46 F.3d 1506, 1530 (11th Cir. 1995)(Clark, J. dissenting)("[B]ecause the guilt phase and penalty trials are integrally related, devising one strategy for the guilt phase and a separate one for the penalty phase is also insufficient. In order to be effective, a capital defense attorney must develop a consistent theory to be used at the guilt and penalty phases.")(citing Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. Ill. L. Rev. 323, 356-57); *Sobel v. State*, 564 So. 2d 1110 (Fla. Dist. Ct. App. 1990)(holding that counsel was ineffective when he called witnesses who gave testimony adverse to the insanity defense he had asserted). Conflicting evidence also confuses the jurors and causes them to distrust all evidence presented by Counsel, thus undermining Mr. Maples'[s] credibility. *See generally*, White, *supra*, para. 180.

---

[72]This habeas claim is virtually identical to the claim as pleaded in Maples's Rule 32 petition and amended Rule 32 petition (which were themselves identical), with the exception of the last sentence in which Maples argues that the jury was "more conviction prone" and therefore "less able to fairly consider factual issues that individually or collectively may raise reasonable doubt[.]" (Doc. 24, ¶¶ 180-87; Rule 32 C.R., Vol. 32, Tab 47, ¶¶ 171-78; Rule 32 C.R., Vol. 33, Tab 49, ¶¶ 171-178.)

181.  During the guilt phase of the trial, the State introduced substantial evidence proving that Mr. Maples was intoxicated by the time he went to a pool hall shortly before the shootings.  . . .

182.  The State also introduced evidence that Mr. Maples used crack and crystal methamphetamine on the night of the shootings.  . . .

183.  In stark contrast, during the guilt phase Counsel attempted to establish through cross-examination that Mr. Maples was neither intoxicated nor under the influence of drugs at the time of the shootings.  Counsel also called several witnesses in a misguided attempt to show that Mr. Maples was not intoxicated prior to the shootings.  Inexplicably, while summarizing the cross-examination and direct examination testimony during his closing argument, Counsel inaccurately told the jury that "[t]here is no evidence that he consumed drugs that night."  (R. at 2920.)

184.  However, during the penalty phase, Counsel employed a strategy directly contradictory to his guilt phase strategy.  In Counsel's opening statement at the penalty phase, Counsel expressly contradicted their argument in the guilt phase and substantially undercut their own credibility, as well as Mr. Maples'[s] credibility, by stating that "there was at least evidence of at least alcohol usage on this occasion . . . but there was also drug usage."  (R. at 3085.) Counsel further stated that Mr. Maples was so intoxicated and under the influence of drugs at the time of the offense that "but for the alcohol and for the drug usage on this occasion, this would probably not have happened.  That is a mitigating factor."  (R. 3085-86.)  Counsel then introduced evidence of Mr. Maples'[s] alcohol and drug usage to support at least two mitigating factors: (1) that the shootings occurred while Mr. Maples was under the influence of extreme mental or emotional disturbance due to his use of drugs and alcohol prior to the shootings (Ala. Code § 13A-5-51(2) (1994)) and (2) that the capacity of Mr. Maples to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired by drug and alcohol use (Ala. Code § 13A-5-51(6) (1994)).

185.  Dr. Allen Shealy, a psychologist, testified that Mr. Maples was drinking steadily for a period of approximately ten hours just prior to the shootings, in addition to smoking at least some marijuana during this time (a marijuana joint and 2/5th of whisky and some beer before 5 p.m., 7-8 additional beers by 7:30 p.m., then funneling (quickly drinking) at least 2 more beers prior to meeting friends at a bar where he drank 7-8 White Russian mixed drinks.  (R.

166

at 3109-24.)  This pattern of alcohol and marijuana abuse served as a trigger that, along with an internal stimulus due to emotional instability, contributed to a state of extreme mental or emotional disturbance.  (R. at 3168.)  It also impaired Mr. Maples "in terms of his capacity to behave in a normal fashion or to conform his behavior to the requirements of the law." (R. at 3155.)  Thus, Counsel provided evidence at the penalty phase of the trial in order to support two of Mr. Maples'[s] mitigating factors that directly contradicted evidence they presented at the guilt phase.

186.  As instructed by the trial judge during the penalty phase, the jury can consider evidence introduced by either party during both the guilt phase and the penalty phase.  (R. at 3318-19.)  Counsel's conduct in presenting contradictory evidence severely damaged Mr. Maples'[s] case by undermining his credibility and confusing the jurors, thus strengthening the State's case and leaving the jury little alternative but to sentence Mr. Maples to death.  "Such conduct . . . brings into question the fundamental fairness of the trial and shows a collapse of the adversarial process." *Ex parte Womack*, 541 So. 2d 47, 68 (Ala. 1988); *see also Freeman v. Class*, 95 F.3d 639, 642-43 (8th Cir. 1996)(holding that counsel was ineffective under *Strickland* when counsel introduced into evidence documents that directly inculpated the defendant).

187.  This error of contradictory strategies fell far below the standard of reasonable performance and demonstrated such a failure to know or understand the law that it cannot be considered permissible trial strategy.  Counsel even admitted at the beginning of the penalty phase that they lacked knowledge of the law with respect to how to conduct an effective penalty phase defense, telling the court, "I don't know . . . I'm unfamiliar with this process." (R. at 3064.)  However, lack of knowledge of the law cannot be considered a trial strategy.  *See Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991).  Here, Counsel's deficient performance prejudiced the jury against Mr. Maples, resulting in a conviction of death that the jury would not otherwise have returned.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  Further, the fact that the jury was more conviction prone, *Green*, 343 F. Supp. 2d at 33-34, and such juries are less able to fairly consider factual issues that individually or collectively may raise a reasonable doubt, magnifies the errors of Counsel . . . and heightens the probability that but for Counsel's errors, the outcome of the proceeding would have been different.

(Doc. 24 ¶¶ 180-87.)

According to Maples, his trial counsel "took fundamentally inconsistent positions [about his] intoxication between the guilt phase and the penalty phase." (Doc. 60 at 59.) He alleges that, even if counsel's decision not to pursue an intoxication defense at the guilt phase of trial was not constitutionally deficient under *Strickland*, their "flip flop on the fact and relevance of intoxication from the guilt phase to the penalty phase was itself constitutionally deficient under *Strickland*." (*Id.*) He contends that he was prejudiced because counsel directly contradicted their position on intoxication, which "deprive[d] the jury of any confidence of relying on his intoxication as a mitigating factor on which to base a recommendation for life in prison instead of the death penalty." (*Id.* at 100.)

This court already has addressed the reasonableness of counsel's strategy at the guilt phase of trial. Indeed, the court notes that the number of strategic options available to counsel during the guilt phase of the trial were limited by Maples's videotaped confession, including his statement that he was not intoxicated at the time of the murders. In addition to Maples's statement denying he was intoxicated, his actions on the night of the murders and his ability to recall the details of that night, as well as the testimony from witnesses that saw him before the murders, severely limited counsel's ability to argue a legal intoxication defense persuasively. In the guilt phase closing argument, defense counsel argued that there was no evidence that Maples was under the influence of drugs at the time of the offense. Counsel was clearly referring to crack cocaine and/or crystal methamphetamine, which the State had argued was the reason that Maples robbed and murdered Terry and Robinson – to feed a drug habit.

168

(R. Vol. 20, Tab 19, at 2920-24 [arguing that the testimony of Phillips and Smith did not show that he robbed the victim to get crack cocaine or meth, asserting that Maples had denied using crack and crystal meth consumption, no State witness had testified that they saw Maples consume these drugs, and that the State's assertion that Maples robbed Terry because he was in love with the vehicle was unbelievable].)  Counsel did not mention marijuana but he did state that Maples could only surmise that the murders occurred because the personal demons he thought about *when he drank* caused him to mentally snap.  (*Id.* at 2917-18.)  Counsel did not take any legal position on the subject of Maples's intoxication.

What counsel did at the *penalty* phase closing argument was to emphasize Maples's alcohol and marijuana usage.  They also built credibility with the jury by openly acknowledging and expressing that counsel understood that, as evinced by their guilty verdict, the jury had accepted evidence that defense counsel had not, including evidence that *after the murders* Maples had bought some crack cocaine.  The penalty phase evidence supported defense counsel's maintenance of its own guilt phase factual position because that evidence revealed that Maples may have consumed 18 to 21 alcoholic drinks (beer and liquor) and shared a marijuana joint.

Maples's counsel also did not pursue intoxication at the time of the offense as a singular, isolated mitigating factor during the penalty phase of trial.  Instead, counsel's penalty phase strategy was to argue that Maples's actions on the night of the offense were based upon several mitigating factors that, in combination, established Maples should be sentenced to life

without parole.  (R. Vol. 22, Tab 29, at 3273-76.)  Specifically, counsel declared that Maples had a history of childhood trauma.  (*Id.*)  He argued that the childhood abuse drove him to self-medicate with alcohol and illegal drugs, and Maples had sought treatment for his drug addiction.  (*Id.*)  Also, counsel argued that childhood abuse played a part in Maples's diminished mental capacity as result of a personality disorder.  (*Id.*)  Counsel argued that the combination of the alcohol consumption and his personality disorder  caused him to snap and commit the murders.  (*Id.*)  Counsel clearly explained to the jury during the penalty phase the relevance of Maples's intoxication on the night of the offense.  Maples's credibility was not damaged at this stage of the trial because counsel did not take a "fundamentally" or "directly" contradictory position concerning the nature and extent of Maples's alcohol and drug use from the guilt phase of trial to the penalty phase of trial – either factually or legally.  That the penalty phase revealed that Maples had informed Shealy that he had more drinks than previously admitted does not change or alter that conclusion.

By taking no legal stance on Maples's alcohol and marijuana ingestion at the guilt phase of trial, and then explaining its legal relevance at the penalty phase of trial, counsel maintained a fairly consistent position on the matter throughout both phases of trial.  That consistency matched counsel's strategies at the guilt and penalty phase of trial, *i.e.*, Maples's alcohol and marijuana use did not rise to the level necessary to negate specific intent to commit the capital offenses, but such use was sufficient to lessen or mitigate Maples's culpability for the murders.

170

Moreover, and contrary to Maples's contention, (*see* doc. 73 at 59-60), counsel's statement at the penalty phase closing argument that he was "unfamiliar with this process" does not establish that his counsel's performance was deficient.  Counsel made a self-deprecating statement, admitting his inexperience with the penalty phase of a capital case, but the evidence presented, the strategies taken, and his penalty phase argument as a whole show that counsel knew well what his duties were.  (R. Vol. 21, Tab 25, at 3081-82.)  In any event, Maples has not shown otherwise with regard to this claim or any other penalty phase ineffectiveness claim.  There is no reasonable probability that the result of the penalty phase would have been different had counsel argued that Maples was intoxicated at the guilt phase of his trial.  Therefore, the court finds Maples has not established actual prejudice, and this claim remains procedurally defaulted.  Maples's request for an evidentiary hearing is due to be denied.

Alternatively, the court finds this claim without merit.  The Rule 32 court held:

> In [this] Claim . . . of Maples's petition he alleges that trial counsel were ineffective for "using different and contradictory strategies about [his] intoxication during the guilt and penalty phase of [his] trial." (Maples's petition at p. 75)  Specifically, Maples contends that the State "introduced substantial evidence" that he was intoxicated shortly before the murders, and that he used crack and crystal methamphetamine on the night of the murders and, "[i]n stark contrast", trial counsel attempted to establish that Maples was not intoxicated or under the influence of drugs.  Maples contends that, during the penalty phase, trial counsel "employed a strategy directly contradictory to his guilt phase strategy", by attempting to establish that alcohol was the cause of the murders.

> During the guilt phase of trial, Maples's confession to police was admitted into evidence.  In it, Maples said he was not intoxicated at the time he

171

committed the murders.  On direct appeal, the Criminal Court of Appeals held that:

> [a]lthough there was some testimony that [Maples] had ingested alcohol several hours before the murders occurred, there was no testimony that he was intoxicated at the time of the murders. Also, there was no evidence that Maples ingested drugs before the murders.

*Maples*, 758 So. 2d at 24.

During the penalty phase of trial, Dr. Shealy testified concerning statements Maples made during their interview.  According to Shealy, Maples said that he was intoxicated at the time he committed the murders.  The Court of Criminal Appeals found that:

> [Shealy] testified that [Maples] told him he was intoxicated and on drugs on the night of the murders, but [Maples] denied that on his videotaped confession.

*Maples*, 758 So. 2d at 56.

In *Strickland*, the Supreme Court stated that:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.

466 U.S. at 691, 104 S. Ct. at 2066.

In *Bui v. State*, 717 So. 2d 6 (Ala. Crim. App. 1997), the petitioner contended that his trial counsel were ineffective during the guilt phase of his trial for presenting allegedly inconsistent defenses.  The Court of Criminal Appeals held that "an attorney's presentation of somewhat inconsistent alternative defenses is not necessarily defective performance." *Id.* at 21.

The *Bui* Court went on to indicate that:

> We are loathe to find fault with the appellant's trial counsel for attempting to make the most of the unfavorable facts of a case he

172

> was presented with and for advocating as many plausible explanations for the appellant's actions as the evidence might support, even where those explanations may not have been entirely consistent.

*Id.*

During the guilt phase, trial counsel's strategy was to attack the elements of the indictment that raised the offenses from intentional murders to capital murders.  Trial counsel attempted to show that the murders were not committed pursuant to a common plan or scheme as alleged in Count I of the indictment by arguing that the lapse of time between the discovery of Terry's body and the discovery of Robinson's body established a reasonable doubt that someone else could have murdered Robinson.  Trial counsel attempted to show that Maples took Terry's car as a mere afterthought and not as part of a plan to rob him as alleged in Count II of the indictment.

Although Maples argues that trial counsel's guilt and penalty "strategies fell far below the standard of reasonable performance and demonstrated such a failure to know or understand the law that is cannot be considered permissible [trial] strategy", he fails to plead and prove, given the overwhelming evidence against him, "that no counsel would have taken the action that his counsel did take."  *Chandler*, 218 F.3d at 1315.  Maples has failed to carry his burden of proof and show that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2968.  Maples has failed to establish that trial counsel's performance was deficient or caused him to be prejudiced.

(Rule 32 C.R. Vol. 37, Tab 66, at 83–86.)

Maples declares that the "Alabama trial court's conclusion [that counsel's] astounding handling of the intoxication issue was constitutionally adequate is clearly wrong and based on an unreasonable application of *Strickland*."  (Doc. 73 at 27.)  After careful consideration, this court rejects Maples's argument.  The Rule 32 court did not unreasonably determine that counsel's guilt and penalty phase strategic decisions were dictated by the evidence – including

173

Maples's videotaped taped confession.  Maples's denial on videotape of using drugs and being drunk at the time of the murders limited the arguments that counsel could make regarding Maples's actual drug and alcohol use before the murders.  Indeed, his detailed recollection of his thoughts and actions before, during, and after the murders on videotape limited the arguments counsel could make persuasively regarding the effect of marijuana and alcohol consumption on Maples at the time of the murders.[73]  Nothing Maples has argued regarding the performance of counsel under the circumstances demonstrates that he was denied effective assistance of counsel and/or that he suffered actual prejudice.

The court has difficulty imagining any course of action available to counsel that had any remote possibility of changing the outcome of this case.  Given Maples's videotaped confession – admitting to the murders and to taking Terry's car and denying he was drunk or had used any hard drugs, the court finds no reasonable probability that the result of either the guilt or penalty phases of his trial would have been different but for the alleged errors of counsel.  Counsel committed to a reasonable guilt phase strategy that avoided intoxication because that defense was not legally viable under any of Maples's statements about the level of his alcohol and marijuana ingestion and to the extent that crack or crystal meth might have been included in the mix, carried with it the dangerous prospect of supplying motive.  Had counsel's reasonable strategy been successful, they would have won an acquittal as to the

---

[73]Shealy testified that the alcohol and marijuana alone were not enough on their own to set off Maples.  (R. Vol. 21, Tab 27, at 3170-71.)

capital offenses by convincing the jury to convict Maples of non-capital intentional murders. However, their guilt phase strategy failed.  And, at the penalty phase counsel addressed the issue of intoxication head on and as sympathetically as possible by arguing that the impetus for the murders was Maples's prior substance abuse history, his drunkenness at the time of the offenses, and his mental disorder – all of which were connected to the abuse and abandonment he suffered.

Maples has not shown actual prejudice as a result of his counsel's alleged contradictory strategies at the guilt and penalty phases.  For all of the foregoing reasons, this claim is procedurally defaulted, or in the alternative, due to be denied.  Maples's request for an evidentiary hearing is due to be denied.

**D.  COUNSEL'S CUMULATIVE ERRORS.**[74]

Maples  asserts that "when considered cumulatively, there can be no doubt that Maples

suffered prejudice" under *Strickland*. (Doc. 60 at 106.)  This court has examined counsel's

alleged errors, addressed in this Memorandum Opinion above, as a whole, for the purpose of

determining whether Maples has established actual prejudice for purposes of overcoming his

procedural default and/or for establishing his *Strickland* claims.  Based on this consideration,

this court finds Maples has not shown actual prejudice.  There is no reasonable probability that

the result of Maples's trial would have been different if not for the alleged errors of counsel.

The court finds that the record contains overwhelming evidence that Maples was guilty

of capital murder in the deaths of Terry and Robinson.  Moreover, the evidence he contends

mitigates his crimes actually provides little or no reason for lessening the severity of his

---

[74]In his habeas petition, Maples raised this as a separate claim (Claim XXXV), and alleged that the "cumulative effect" of all errors alleged in his petition entitled him to relief. (Doc. 24 ¶ 470.)  That claim was denied on the merits in this court's September 29, 2006, Memorandum Opinion.  (Doc. 34 at 120.)  The Rule 32 court also denied this claim, but did so after globally excepting the ineffective assistance of counsel claims from its holding. (Rule 32 C.R. Vol. 37, Tab 66 at 7.)  At the time this court's Memorandum Opinion was entered, the ineffectiveness claims were found to be procedurally defaulted by the untimely collateral appeal.

Now, the court is asked to conduct a 2254(d) analysis as to whether there was cumulative prejudice in connection with Maples's ineffectiveness claims.  Turning again to the state court's order, this court finds the state court did not consider this question in connection with that claim as a whole (or the guilt or penalty phases of trial), but only in connection with those ineffectiveness sub-claims for which Maples specifically made a cumulative error argument.   Maples did not assert a specific, cumulative-error argument within any of the ineffective-assistance sub-claims; accordingly, there was no ruling on this question.

punishment.  The court finds none of Maples's claims of ineffective assistance of counsel –
separately or together – "were so serious as to deprive [him] of a fair trial, a trial whose result
is reliable."  *See Strickland*, 466 U.S. at 687.  "The defendant must show that there is a
reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding
would have been different.  A reasonable probability is a probability sufficient to undermine
confidence in the outcome."  *Id*. at 694.  Nothing Maples has presented undermines the court's
confidence in the outcome of his trial.

The court finds this claim is procedurally defaulted, and, in the alternative, without
merit.  Maples's request for an evidentiary hearing is due to be denied.

## CONCLUSION

For the foregoing reasons, the court finds that Maples's claims are due to be denied and
his Petition is due to be dismissed.  An Order dismissing Maples's Amended Petition for Writ
of Habeas Corpus, (doc. 24), will be entered contemporaneously with this Memorandum
Opinion.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States
District Courts, the district court must issue or deny a certificate of appealability when it enters
a final order adverse to the habeas petitioner. This Court may issue a certificate of
appealability "only if the applicant has a made a substantial showing of the denial of a
constitutional right." 28 U.S.C. 2253(c)(2). To make such a showing, Maples must

demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)(citation and internal quotation marks omitted).  This court finds that Maples's claims do not satisfy either standard.

Therefore, the district court will deny Maples a certificate of appealability in the Order entered contemporaneously herewith.

**DONE** this 14th day of September, 2015.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE