FILED

2019 Dec-03  PM 03:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 1

1

2                IN THE UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF ALABAMA

3                      EASTERN DIVISION

4

5    CORY R. MAPLES,                  )

                                      )

6              Petitioner,            )

                                      ) CIVIL ACTION FILE

7         vs.                         )

                                      ) NO: 5:03-CV-02399-KOB

8    JEFFERSON S. DUNN,               )

     COMMISSIONER OF THE              )

9    ALABAMA DEPARTMENT OF            )

     CORRECTIONS,                     )

10                                    )

               Respondent.           )

11

12

13

14

15

16            DEPOSITION OF PHIL D. MITCHELL

17                 DECATUR, ALABAMA

18            THURSDAY, SEPTEMBER 5, 2019

19

20

21

22

23   REPORTED BY:  TANYA L. VERHOVEN-PAGE,

                   CCR-B-1790

24

25   FILE NO.  166898

5:03-cv-02399-KOB
10/21/2019  Evidentiary Hrg
Respondent Exhibit No. 6

1

2                    September 5, 2019

3                        9:00 a.m.

4

5                      Deposition of

6       PHIL D. MITCHELL, held at The Hampton Inn,

7       2041 Beltline Road, S.W., Decatur, Alabama

8       before Tanya L. Verhoven-Page, Certified Court

9       Reporter and Notary Public of the State of

10      Alabama.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2                    APPEARANCES OF COUNSEL
3

    On behalf of the Petitioner:
4
         LATHAM & WATKINS
5        555 11th Street, N.W.
6        Washington, D.C. 200004
7
         BY:  REBEKAH SOULE, ESQ.
8
         BY:  ELANA DAWSON, ESQ.
9
         BY:  HEATHER ARTINIAN, ESQ.
10
11
    ALSO PRESENT:  Bethany Anderson
12                 Jessica Gabrian
13
14
    On behalf of the Respondent:
15
         OFFICE OF THE ATTORNEY GENERAL
16       STATE OF ALABAMA
         501 Washington Avenue
17       Montgomery, Alabama 36130
18
         BY:  BETH HUGHES, ESQ.
19
20
21                      -     -     -
22
23
24
25

Page 4

```
 1
 2                      I N D E X
 3
 4           WITNESS: PHIL D. MITCHELL
 5
 6    Examination                          Page
 7  BY MS. SOULE                            5
    BY MS. HUGHES                          60
 8  BY MS. SOULE                           75
    BY MS. HUGHES                          86
 9  BY MS. SOULE                           86
10
11                    EXHIBITS:
12   Mitchell
    Deposition
13    Exhibit            Description        Page
14
    Exhibit 1        Case Action Summary     12
15
    Exhibit 2        Attorney's Fee
16                   Declaration             14
17  Exhibit 3        Document bearing Bates
                     number MAPLES-TC-0000372  28
18
    Exhibit 4        Document bearing Bates
19                   number MAPLES-TC-0000334  30
20  Exhibit 5        Document bearing Bates
                     numbers MAPLES-TC-0000141
21                   through MAPLES-TC-0000187  38
22  Exhibit 6        Document bearing Bates
                     numbers MAPLES-TC-0000188
23                   through MAPLES-TC-0000234  38
24  Exhibit 7        Document bearing Bates
                     numbers MAPLES-TC-0000235
25                   through MAPLES-TC-0000309  40
```

1                          P. MITCHELL

2           DECATUR, ALABAMA; THURSDAY, SEPTEMBER 5, 2019

3                          9:00 A.M.

4

5           Thereupon --

6                          PHIL D. MITCHELL,

7           called as a witness, having been first duly sworn,

8           was examined and testified as follows:

9

10

11                          EXAMINATION

12      BY MS. SOULE:                                          10:00

13           Q     Good morning, Mr. Mitchell.                 10:00

14           A     Good morning.                               10:00

15           Q     So I know that you are well familiar with   10:00

16      how depositions go, but before we sort of jump into   10:00

17      questions I just sort of wanted to go over some of    10:01

18      the basic instructions.                               10:01

19                You know, when I ask a question, you, of    10:01

20      course, need to answer the question orally.  She      10:01

21      won't be able to sort of read any head nods or        10:01

22      anything like that.  If you don't understand a        10:01

23      question, please let me know and I can rephrase it.   10:01

24                And we need to take turns so the courter     10:01

25      can accurately capture what each of us says without   10:01

Page 6

1          P. MITCHELL

2  us talking over each other.  So I'll do my best not        10:01

3  to talk over you, and if you can do your best not to        10:01

4  talk over me.  And then, also, you know, please            10:01

5  answer the question I ask you and only the question I       10:01

6  ask you.  We, of course, want you to provide truthful       10:01

7  and complete responses to my questions.                    10:01

8          And I'm going to be asking you today              10:01

9  about your independent recollection of past events.         10:01

10  If you don't have an independent recollection of           10:01

11  that, you know, please just say that you don't.  I'm       10:02

12  not asking you to speculate or guess but.  If I do         10:02

13  want you to do that, I'll tell you specifically to         10:02

14  speculate or guess.                                        10:02

15          Okay?                                            10:02

16     A    Okay.                                            10:02

17     Q    And I'll ask you a number of questions           10:02

18  about what you did and, by that, I'm asking about you      10:02

19  personally or specifically, and not about the team in      10:02

20  general or sort of the royal you, as you could say.        10:02

21     A    Pardon.  What's the last part?                   10:02

22     Q    The royal you or like the royal we, like         10:02

23  you in combination with other people.                      10:02

24          I'm asking what you did specifically.            10:02

25     A    Okay.                                            10:02

1                          P. MITCHELL

2      Q      All right.  I'd like to start talking a          10:02

3   little bit about your background.                          10:02

4             Where did you attend undergraduate?              10:02

5      A      Jacksonville State University in                 10:02

6   Jacksonville, Alabama.                                     10:02

7      Q      And when did you graduate?                        10:02

8      A      December of 1987.                                 10:02

9      Q      Okay.  And where did you attend law               10:02

10  school?                                                     10:02

11     A      University of Alabama School of Law.              10:03

12     Q      And when did you graduate from law                10:03

13  school?                                                     10:03

14     A      1991.                                             10:03

15     Q      All right.  When were you admitted to the         10:03

16  Alabama State Bar?                                          10:03

17     A      The fall of 1991.                                 10:03

18     Q      And where was your first job as an                10:03

19  attorney?                                                   10:03

20     A      Legal Services Corporation of Alabama.            10:03

21     Q      And what type of work did you do there?           10:03

22     A      Civil legal services for indigent                 10:03

23  qualified folks under the Legal Services Corporation        10:03

24  or guidelines.                                              10:03

25     Q      And how long did you work there?                  10:03

Page 8

P. MITCHELL

| | | | |
|---|---|---|---|
| 1 | | P. MITCHELL | |
| 2 | A | Until April of 1993. | 10:03 |
| 3 | Q | Okay.  And what was your next job after | 10:03 |
| 4 | | that? | 10:03 |
| 5 | A | I returned to Decatur, Alabama and began | 10:03 |
| 6 | | practicing with Bingham Edwards. | 10:03 |
| 7 | Q | I'm sorry.  Can you say that again? | 10:04 |
| 8 | A | Bingham, B-I-N-G-H-A-M, Edwards. | 10:04 |
| 9 | Q | And did you start there in April 1993? | 10:04 |
| 10 | A | Yes, ma'am. | 10:04 |
| 11 | Q | And what type of work were you doing at | 10:04 |
| 12 | | Bingham and Edwards? | 10:04 |
| 13 | A | General practice of law. | 10:04 |
| 14 | Q | Okay.  And where did you work after | 10:04 |
| 15 | | Bingham and Edwards? | 10:04 |
| 16 | A | I had a law school classmate of mine join | 10:04 |
| 17 | | Bingham and I, and we formed Edwards, Mitchell and | 10:04 |
| 18 | | Reeves in -- I believe it was 1998. | 10:04 |
| 19 | Q | Okay. | 10:04 |
| 20 | A | Same location, different personnel. | 10:04 |
| 21 | Q | And when did you leave Edward, Mitchell | 10:04 |
| 22 | | and Reeves? | 10:04 |
| 23 | A | December 31st of 2007 -- no -- 2007. | 10:05 |
| 24 | Q | Are you currently a practicing attorney? | 10:05 |
| 25 | A | Yes. | 10:05 |

P. MITCHELL

1

2    Q      Where do you currently practice?          10:05

3    A      Harris, Caddell & Shanks.                  10:05

4    Q      And what city is that in?                  10:05

5    A      Decatur, Alabama.                          10:05

6    Q      Do you currently serve as appointed        10:05

7    counsel for any defendants in a criminal case?    10:05

8    A      No.                                        10:05

9    Q      And how do most of your clients find you?  10:05

10   A      Either through referrals, associations     10:05

11   with our law firm, internet.                      10:05

12   Q      Okay.  When did you begin representing      10:05

13   people in criminal cases?                         10:05

14   A      It would have been around April of 1993.   10:05

15   Q      Okay.  Prior to taking on Mr. Maples'      10:06

16   case, had you represented a paying client in a    10:06

17   criminal case?                                    10:06

18   A      Yes.                                       10:06

19   Q      Can you give me an approximate estimate    10:06

20   of how many criminal cases you were involved in prior 10:06

21   to your representation of Mr. Maples?             10:06

22   A      It would just be an estimate, if you want  10:06

23   that.                                             10:06

24   Q      Yes, please.                               10:06

25   A      Probably between 100 and 200.              10:06

Page 10

P. MITCHELL

1

2     Q     Okay.  Had you ever represented someone    10:06
3  in a criminal trial before Mr. Maples?            10:07
4     A     No.                                       10:07
5     Q     Did you have any experience with a        10:07
6  capital case before Mr. Maples' case?             10:07
7     A     No.                                       10:07
8     Q     So just to confirm, when you were         10:07
9  appointed to represent Mr. Maples, you had never  10:07
10 conducted or prepared for a penalty phase of a    10:07
11 capital case before?                              10:07
12    A     I have never been involved in a capital   10:07
13 case before, no.                                  10:07
14    Q     Had you ever attended a capital trial     10:07
15 before you were appointed as Mr. Maples' counsel? 10:07
16    A     I don't recall.                           10:07
17    Q     Had you ever done so by the time of       10:07
18 Mr. Maples' trial?                                10:07
19    A     I don't recall.                           10:07
20    Q     Had you ever attended a sentencing        10:07
21 portion of a capital case before you were appointed 10:07
22 as Mr. Maples' counsel?                           10:07
23    A     I don't recall if I was.                  10:08
24    Q     Had you ever done so by the time of       10:08
25 Mr. Maples' trial?                                10:08

P. MITCHELL

1
2       A     I don't have a recollection of that.          10:08
3       Q     Okay.  Were you working on other cases at     10:08
4   the same time you were representing Mr. Maples?         10:08
5       A     Yes.                                          10:08
6       Q     Were you working on other cases for           10:08
7   paying clients?                                         10:08
8       A     Yes.                                          10:08
9       Q     Were you working as appointed counsel on      10:08
10  other criminal cases?                                   10:08
11      A     I imagine that I was.                         10:08
12      Q     Do you have any independent recollection      10:08
13  of that or --                                           10:08
14      A     That was a significant part of my             10:08
15  practice, so I would assume that it was.  I can't       10:08
16  name any specific cases, but from the time that I've    10:08
17  returned to Decatur I have taken on criminal cases.     10:08
18          Before I went to Harris Caddell, it            10:08
19  was -- I had always maintained some criminal            10:08
20  representation.                                          10:08
21      Q     Okay.  How did you come to be appointed       10:08
22  as counsel for Mr. Maples?                              10:09
23      A     Judge Craig asked if I would assist him       10:09
24  as junior counsel, and I told him that I would.  I      10:09
25  had a relationship with Judge Craig and he asked        10:09

Page 12

P. MITCHELL

1
2   Judge Thompson, who was the presiding judge over        10:09
3   Mr. Maples' case, to appoint me and he did so.          10:09
4       Q     And how did you know Mr. Craig?               10:09
5       A     Mr. Craig was a -- was formerly in the        10:09
6   law firm with Mr. Edwards where I began practicing.     10:09
7       Q     Okay.                                         10:09
8       A     And I got to know him from that               10:09
9   relationship.                                           10:09
10      Q     Okay.  When were you appointed to serve       10:09
11  as counsel for Mr. Maples?                              10:09
12      A     It would be speculation, but I believe it     10:09
13  was sometime mid '95, maybe.  I don't know.  The        10:09
14  records would have to reflect.  You'd have to see the   10:09
15  records.                                                10:09
16            MS. SOULE:  I'd like to mark this             10:10
17      as Exhibit 1.                                       10:10
18            (Mitchell Deposition Exhibit No. 1            01:33
19      was marked for the record.)                         01:33
20  BY MS. SOULE:                                           10:10
21      Q     I'll give you a second to look at this.       10:10
22  If it helps, I'm just going to ask you about the        10:10
23  first couple of pages.                                  10:10
24      A     Okay.                                         10:11
25      Q     Do you recognize this document?               10:11

P. MITCHELL

1

2    A    It appears to be part of the case action    10:11

3    summary and some specific orders for Mr. Maples'    10:11

4    case.    10:11

5    Q    Are you familiar with Alacourt?    10:11

6    A    I am familiar with Alacourt.    10:11

7    Q    Can you describe what Alacourt is?    10:11

8    A    Alacourt is a judicial filing system that    10:11

9    came in sometime in the mid 2000s for attorneys and    10:11

10   clerks to keep electronic copies of case files.    10:11

11   Q    So I will represent to you that we pulled    10:11

12   this case action summary off of Alacourt.    10:11

13        Do you have any reason to believe that    10:11

14   this is not an accurate copy of the case summary?    10:11

15   A    Of the documents that you presented here.    10:11

16   It does not appear to be a full copy of the case    10:11

17   action summary, but I have no reason to believe that    10:12

18   that would not have been a copy of the actual    10:12

19   documents uploaded from the paper file to the    10:12

20   Alacourt system.    10:12

21   Q    Okay.    10:12

22   A    When it came on-line.    10:12

23   Q    Okay.  Can you turn to the second page.    10:12

24        So on the second page it lists -- there's    10:12

25   a table and it says -- an entry, there's a date.  It    10:12

Page 14

P. MITCHELL

1

2   says September 6, 1995.                                10:12

3          And the action reads:  The Court hereby        10:12

4   appoints Honorable Phil Mitchell in this case,        10:12

5   effective immediately.  The clerk is to provide a     10:12

6   copy of this Order to the District Attorney, Mr. Mark 10:12

7   Craig and Mr. Mitchell.                               10:12

8          Do you have any reason to believe that         10:12

9   you were not appointed on September 6th, 1995, as     10:12

10   this document states?                                 10:12

11      A    No.                                           10:12

12                                                          01:33

13          (Mitchell Deposition Exhibit No. 2            01:33

14      was marked for the record.)                        01:33

15   BY MS. SOULE:                                          01:33

16      Q    Do you recognize this document?               10:14

17      A    Yes, ma'am.                                    10:14

18      Q    Can you tell me what it is?                    10:14

19      A    That's my fee declaration in Mr. Maples'      10:14

20   case following conclusion of the trial and            10:14

21   sentencing.                                            10:14

22      Q    And I'll represent to you that we also        10:14

23   pulled this from the docket on Alacourt.              10:14

24          Do you have any reason to believe that         10:14

25   this is not a complete or accurate copy of the fee    10:14

Page 15

1                       P. MITCHELL

2     declaration you filed?                              10:14

3          A     It appears to be.  I don't have any      10:14

4     reason to believe that it's not.                    10:14

5          Q     Did you prepare this fee declaration     10:14

6     yourself?                                           10:14

7          A     Physically, it's computer generated as  10:14

8     for the time, but my assistant at the time would have  10:14

9     likely prepared the actual first page.              10:14

10         Q     Okay.  Would you have reviewed it after  10:15

11    your assistant may have prepared it?                10:15

12         A     Yes.                                      10:15

13         Q     Would you have ensured that it was       10:15

14    accurate?                                           10:15

15         A     Yes.                                      10:15

16         Q     Who was your assistant at that time?     10:15

17         A     Diana L. Johnson.                         10:15

18         Q     What was the date that this was filed?   10:15

19         A     May 19th of 1998 is the stamp filing on  10:15

20    the front page.                                     10:15

21         Q     Is this record solely for your time or   10:15

22    does it also include time spent by Mr. Craig?       10:15

23         A     Solely for my time.                       10:15

24         Q     And why did you submit this declaration  10:15

25    to the court?                                       10:15

Page 16

P. MITCHELL

```
1
2       A      To be paid on the appointed case for       10:15
3   Mr. Maples.                                            10:16
4       Q      If you'll look there in the middle of the  10:16
5   page, it looks like there's a Signature of Attorney    10:16
6   and then it lists your name.                           10:16
7              Did you sign this form?                     10:16
8       A      Yes.                                        10:16
9       Q      Did you sign it after reading the          10:16
10  declaration above?                                     10:16
11      A      Yes.                                        10:16
12      Q      So you attested this billing information    10:16
13  was accurate?                                          10:16
14      A      Yes, that's what the attestation is.        10:16
15      Q      And you were telling the truth when you     10:16
16  said it was an accurate reflection of your work?       10:16
17      A      To the best of my knowledge.                10:16
18      Q      Can you look at pages three through ten.    10:16
19      A      The numbered pages at the top are you       10:16
20  referring to?                                          10:16
21      Q      Yes.                                        10:16
22      A      Do you want me to look through each entry   10:17
23  or do you want me to look at a specific --             10:17
24      Q      No, just a -- can you tell me what these    10:17
25  pages are, pages three through ten?                    10:17
```

P. MITCHELL

1

2    A      Four through ten is the entries of my        10:17

3    time worked on the case and the expenses incurred in    10:17

4    relation to my work on the case.        10:17

5    Q      Okay.  And if you go through this, it        10:17

6    lists a date and then it lists the professional        10:17

7    services rendered and the time you spent, and then it    10:17

8    has a dollar amount.        10:17

9          Is this an itemized list of the time you    10:17

10   spent on this case?        10:17

11   A      Yes.        10:17

12   Q      And how would you have prepared this        10:17

13   list?        10:17

14   A      This list would have been prepared on a    10:17

15   computer program contemporaneously as the case        10:18

16   progressed.        10:18

17   Q      Okay.  So you would enter your time in on    10:18

18   a daily basis as you were going through the case?    10:18

19   A      I can't recall if it was daily, but it    10:18

20   was contemporaneously as the time was incurred.        10:18

21   Q      Okay.  What was your practice at the time    10:18

22   to ensure your billing was correct?        10:18

23   A      This would be entered in the computer        10:18

24   program and when the matter was concluded, if it was    10:18

25   an appointed matter, the bill would be printed and I    10:18

Page 18

1                          P. MITCHELL

2   would review the bill, review the entries, review the   10:18

3   rates to see that it was generating the proper amount   10:18

4   due for the time entries.                               10:18

5        Q    Okay.  Can you go back to page one.  I'd      10:19

6   like to sort of look at sort of the third row down      10:19

7   where it starts with, The undersigned attorney          10:19

8   declares that on September 6th, 1995.                    10:19

9             If you see there, it lists four numbers       10:19

10  on the left side and it lists, in-court appearance,     10:19

11  out-of-court preparation, trial level, out-of-court     10:19

12  preparation, appellate level, extraordinary expenses.   10:19

13            Is this a table listing the hours that        10:19

14  you spent for each of those types of representation?    10:19

15       A    The numbers past the total hours would be     10:19

16  the total hours spent.                                  10:20

17       Q    Okay.                                         10:20

18       A    The 79.74 in-court appearance and the         10:20

19  180.2 for out-of-court preparation, at the trial        10:20

20  level.                                                  10:20

21       Q    Okay.  And then what would be -- so if        10:20

22  you -- let's talk about in-court appearances first.     10:20

23            Am I correct then that you billed for         10:20

24  700 -- 79.7 -- sorry.  Just to correct the record, it   10:20

25  is 79.7 -- hours for in-court appearances?              10:20

Page 19

P. MITCHELL

1

2      A      That's what it shows on this form.              10:20

3      Q      And was there a cap on the amount of           10:20

4  in-court hours you could be reimbursed for?            10:20

5      A      Not in connection with a capital case.         10:20

6  As I recall, all of your in-court hours were paid at   10:20

7  the in-court hourly rate.                               10:20

8      Q      And then is it correct that for               10:20

9  out-of-court preparation of the trial, I believe you   10:20

10 billed 180.2 hours?                                     10:21

11     A      That's what the form shows, yes.              10:21

12     Q      Okay.  And was there a cap on the amount      10:21

13 of hours you could be reimbursed for out-of-court      10:21

14 preparation?                                            10:21

15     A      Yes, ma'am, as I recall, there was $1,000     10:21

16 cap on capital cases for the amount of time that you   10:21

17 could bill for as an appointed attorney for            10:21

18 out-of-court preparation work.                          10:21

19     Q      So am I correct, then, that your fee         10:21

20 declaration shows that you worked more out-of-court    10:21

21 hours than the cap; is that correct?                    10:21

22     A      What is 180.2 times 20?  I think that's      10:21

23 significantly more than $1,000, so yes.                 10:21

24     Q      So is it correct that you continued to       10:21

25 bill and detail your out-of-court preparation time     10:22

Page 20

1                         P. MITCHELL

2     that you spent after you exceeded the cap?        10:22

3         A     Yes.                                     10:22

4         Q     I think that's all the questions for this  10:22

5     for now.  We might go back to it later.          10:22

6         A     May I ask a question or can we go off the  10:22

7     record for just a second?                        10:22

8              MS. SOULE:  Sure.                        10:22

9              (Brief pause.)                           10:22

10    BY MS. SOULE:                                      10:22

11        Q     Did you utilize an investigator to assist  10:22

12    you with Mr. Maples case?                         10:23

13        A     I have to answer that with yes, we did,  10:23

14    even though your -- the start of your question was  10:23

15    only what I did.  I have to answer that as yes, we  10:23

16    did.                                              10:23

17        Q     Did you personally direct or oversee the  10:23

18    investigators's work?                             10:23

19        A     Partially.                               10:23

20        Q     And what was the investigator's name?    10:23

21        A     Johnny Nesmith.                          10:23

22        Q     You said that you partially oversaw his  10:23

23    work.  Who else oversaw his work?                 10:23

24        A     Judge Mark Craig.  He was the lead       10:23

25    counsel on the case.                              10:23

1                    P. MITCHELL

2       Q      Do you recall, sitting here today, that      10:23

3  Mr. Nesmith did specifically towards developing         10:23

4  evidence for the penalty phase of Mr. Maples' case?      10:23

5       A      That may get into some issues that are       10:24

6  outside of the penalty phase.  I don't know that I       10:24

7  want to respond to that unless you're willing to         10:24

8  waive the attorney-client privilege.                     10:24

9       Q      I'm only asking you specifically about       10:24

10  work he did on the penalty phase.                        10:24

11      A      I don't know that I can answer that          10:24

12  question that way, without getting into my              10:24

13  understanding might extend beyond the penalty phase.    10:24

14             MS. SOULE:  Can we go off the                10:24

15      record for a second.                                10:24

16             (Brief pause.)                               10:26

17  BY MS. SOULE:                                            10:26

18      Q      Let me see if I can rephrase this.           10:26

19      A      Okay.                                         10:26

20      Q      As you're sitting here today, do you         10:27

21  recall yourself personally directing Mr. Nesmith to     10:27

22  investigate anything specific to the penalty phase?     10:27

23      A      As I sit here today, I cannot recall         10:27

24  anything specific that I directed him to investigate.   10:27

25      Q      Okay.  When you were appointed to            10:27

Page 22

P. MITCHELL

| | | |
|---|---|---|
| 1 | represent Mr. Maples, were you aware that it was a | 10:27 |
| 2 | capital case? | 10:27 |
| 3 | | 10:27 |
| 4 | A     Yes. | 10:27 |
| 5 | Q     Were you aware that there was a videotape | 10:27 |
| 6 | that appeared to show Mr. Maples' confession to the | 10:27 |
| 7 | crimes he was charged with? | 10:27 |
| 8 | A     At the time that I was appointed? | 10:27 |
| 9 | Q     At any time during your representation. | 10:27 |
| 10 | A     Yes. | 10:28 |
| 11 | Q     Did you become aware of that videotape | 10:28 |
| 12 | early on in your representation of him? | 10:28 |
| 13 | A     I believe so. | 10:28 |
| 14 | Q     Okay.  So you did not learn of the | 10:28 |
| 15 | videotape right before the trial? | 10:28 |
| 16 | A     No. | 10:28 |
| 17 | Q     Did you have any kind of training on | 10:28 |
| 18 | capital cases when you were appointed to represent | 10:28 |
| 19 | Mr. Maples? | 10:28 |
| 20 | A     No. | 10:28 |
| 21 | Q     During your representation of Mr. Maples, | 10:28 |
| 22 | did you participate in any kind of training on | 10:28 |
| 23 | capital cases? | 10:28 |
| 24 | A     I don't recall specifically. | 10:28 |
| 25 | Q     During your representation of Mr. Maples, | 10:28 |

Page 23

P. MITCHELL

1

2    did you use or reference any manuals or aids          10:28

3    regarding capital cases?                              10:28

4         A    Possibly.  I don't recall specifically     10:28

5    the names of any.                                     10:29

6         Q    Okay.  During your representation of        10:29

7    Mr. Maples, do you recall talking to any lawyers who  10:29

8    had experience with capital cases?                    10:29

9         A    Yes.                                        10:29

10        Q    Who?                                        10:29

11        A    My cocounsel, Judge Mark Craig.             10:29

12        Q    Anyone else?                                10:29

13        A    Probably, but I can't recall any specific   10:29

14   names.                                                10:29

15        Q    Okay.  What was your role in preparing      10:29

16   for the penalty phase of Mr. Maples' trial?           10:29

17        A    To assist Judge Craig in any tasks that     10:30

18   he needed me to assist him with in connection with    10:30

19   the penalty phase of the trial.                       10:30

20        Q    Did you take all of your direction, then,  10:30

21   from Mr. Craig in relation to the penalty phase?      10:30

22        A    I would say that he, as lead counsel,       10:30

23   would have given the direction, yes.                  10:30

24        Q    Do you know who Dr. Allen Sheely is?        10:30

25        A    I do.                                       10:30

1                        P. MITCHELL

2        Q      Who is he?                            10:30

3        A      He is an expert that was retained by us   10:30

4   in connection with Mr. Maples' case.            10:30

5        Q      Okay.  Were you personally involved in   10:30

6   retaining Dr. Sheely as an expert?              10:30

7        A      I would -- I believe that I was involved   10:30

8   in discussing and vetting his appointment.     10:31

9        Q      Do you recall how Dr. Sheely was       10:31

10  identified as an expert?                        10:31

11       A      Judge Craig identified him.          10:31

12       Q      Did you personally interview Dr. Sheely   10:31

13  before he was retained?                         10:31

14       A      I don't recall.                      10:31

15       Q      Were you Dr. Sheely's primary contact?   10:31

16       A      No.                                  10:31

17       Q      Was Mark Craig Dr. Sheely's primary   10:31

18  contact?                                        10:31

19       A      Yes, Judge Craig was Dr. Sheely's primary   10:31

20  contact.                                        10:31

21       Q      Did you personally provide Dr. Sheely   10:31

22  with instructions about what he was retained to do?   10:31

23       A      No.                                  10:31

24       Q      Do you recall whether you gave Dr. Sheely   10:31

25  any records related to Mr. Maples, as you sit here   10:32

Page 25

P. MITCHELL

1

2    today?                                                      10:32

3        A      I believe so.                                   10:32

4        Q      You recall giving him records?                  10:32

5        A      I believe so.                                   10:32

6        Q      Okay.  What records do you recall giving        10:32

7    him specifically?                                          10:32

8        A      I believe he was given the records that         10:32

9    were subpoenaed from the North Alabama Regional            10:32

10   Hospital, which was the Quest Drug Program, and the        10:32

11   medical records from the Decatur General Hospital          10:32

12   and/or Decatur General West Hospital.                      10:32

13       Q      You said you believe so.  Do --                 10:32

14       A      Well, I said I believe that I provided          10:32

15   him.  I am confident that he was provided those            10:32

16   records.                                                   10:32

17              Those records came through subpoenas that       10:32

18   were issued by me through my office, and I have            10:32

19   information that indicates that those records were         10:32

20   provided to him.                                           10:32

21       Q      Do you have a memory, sitting here today,       10:33

22   of providing him with those records?                       10:33

23       A      Physically delivering that to him?  No, I       10:33

24   do not have a memory today that I physically               10:33

25   delivered those records to him.                            10:33

                              P. MITCHELL

1

2      Q      Do you have a memory of providing them to     10:33

3  him in any other way, as you sit here today?          10:33

4      A      I don't know that I can answer that          10:33

5  question specifically.  I know that he received the   10:33

6  records.                                               10:33

7      Q      I'm asking about your memory as you sit      10:33

8  here today.                                            10:33

9      A      No, I don't know how that he received the    10:33

10  records that were received by me through the          10:33

11  subpoenas.                                            10:33

12     Q      I'm not sure you're -- you're answering      10:33

13  the question I'm asking.                              10:33

14     A      Okay.                                        10:33

15     Q      As you sit here today, do you have a         10:33

16  recollection of giving Dr. Sheely records related to  10:33

17  Mr. Maples?                                            10:33

18     A      A recollection, yes.                         10:33

19     Q      Can you tell me what that recollection       10:33

20  is?                                                   10:33

21     A      I recall that he received records of --      10:33

22  that I've described, through the case, in connection  10:33

23  with his work on Mr. Maples' case.                    10:34

24     Q      Did you personally make any arrangements     10:34

25  for Dr. Sheely to interview members of Mr. Maples'    10:34

1                     P. MITCHELL

2    family?                                          10:34

3         A     I don't recall.                       10:34

4         Q     Did you personally prepare Dr. Sheely to  10:34

5    testify during the penalty phase?                10:34

6         A     No.                                   10:34

7         Q     During your representation of Mr. Maples,  10:34

8    did you retain a medication specialist to assist you  10:34

9    in preparing for the penalty phase of Mr. Maples'  10:35

10   trial?                                           10:35

11        A     No, I did not.                        10:35

12        Q     Sorry.  Can you say that again?       10:35

13        A     No, I did not.                        10:35

14        Q     Thank you.  We were just talking over  10:35

15   each other there.                                10:35

16        A     That's no problem.                    10:35

17        Q     During your representation of Mr. Maples,  10:35

18   do you recall whether you retained anyone         10:35

19   specifically to assist with the penalty phase?   10:35

20        A     Dr. Sheely was retained partially to  10:35

21   represent -- or to provide evidence in the penalty  10:35

22   phase.                                           10:35

23        Q     Is it correct that you also had       10:35

24   Dr. Sheely address issues of mental competency and  10:35

25   mental capacity?                                 10:35

Page 28

P. MITCHELL

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | A | I recall that, yes. | 10:35 |
| 3 | Q | Okay.  Anyone else beyond Dr. Sheely? | 10:35 |
| 4 | A | Repeat your question. | 10:36 |

5   Q    Do you recall whether anyone else was    10:36
6   retained specifically to assist with the penalty    10:36
7   phase beyond Dr. Sheely?    10:36

8   A    No, I do not recall.    10:36

9   Q    Okay.  I want to go back to the records    10:36
10  we were discussing that you say that you believe    10:36
11  Dr. Sheely received.    10:36

12       If Dr. Sheely denied receiving those    10:36
13  records, would you dispute his recollection?    10:36

14  A    I don't know that I -- that would be his    10:36
15  testimony.  I don't know what his testimony would be.    10:36

16  Q    Okay.    10:37

17  A    It is my recollection that he received    10:37
18  the records that I've discussed.    10:37

19       MS. SOULE:  I'd like to mark this.    10:37

20       (Mitchell Deposition Exhibit No. 3    01:33
21  was marked for the record.)    01:33

22  BY MS. SOULE    10:38

23  Q    So I'd like you to look at what's marked    10:38
24  as Exhibit 3.    10:38

25  A    Okay.    10:38

Page 29

P. MITCHELL

1

2    Q      This is what appears -- well, you can        10:38

3    tell me if you agree with this.                     10:38

4           Does this appear to be a letter on a         10:38

5    letterhead of the Alabama Prison Project addressed to  10:38

6    Mark Craig?                                          10:38

7    A      That's what it appears to be.                10:38

8    Q      Okay.  Have you seen this letter before?    10:38

9    A      Not before today.                            10:38

10   Q      Okay.  If you can just sort of read the     10:38

11   letter.                                             10:38

12   A      Okay.  Okay.                                 10:38

13   Q      Does this letter offer Mr. Craig            10:39

14   assistance with Mr. Maples' case in relation to the  10:39

15   penalty phase?                                      10:39

16   A      It speaks for itself.  I mean, it appears   10:39

17   to provide some avenues for assistance that might be  10:39

18   available.                                          10:39

19   Q      Do you recall hearing about this offer     10:39

20   when you were representing Mr. Maples?             10:39

21   A      I do not recall that.                        10:40

22   Q      Okay.  Would it be correct, then, that     10:40

23   you didn't accept this offer?                       10:40

24   A      The offer was not made to me.  I did not    10:40

25   accept that offer.                                  10:40

Page 30

1                          P. MITCHELL

2              (Mitchell Deposition Exhibit No. 4        01:33

3          was marked for the record.)                  01:33

4    BY MS. SOULE:                                       01:33

5          Q     And can you look at what's been marked as   10:40

6    Exhibit 4.  This is a document that is titled Alabama   10:40

7    Prison Project Mitigation Program, Capital Murder    10:40

8    Defendant Information Sheets.                         10:40

9              Have you seen this document before?       10:40

10         A     No, ma'am, not that I recall.           10:40

11         Q     Does the handwriting on this document   10:40

12   look like your handwriting?                         10:40

13         A     No, it does not.                         10:40

14         Q     What potential witnesses did you meet   10:40

15   with to gather evidence related to mitigation?      10:41

16         A     I met -- well, that's -- I think that,  10:41

17   again, is going to get into some of the guilt phase 10:41

18   issues which we've talked about.                     10:41

19         Q     I'd only like you to tell me the names of 10:41

20   any witnesses that you discussed issues related to  10:41

21   mitigation with.                                     10:42

22         A     Again, that's going to be very difficult 10:42

23   to answer without some potential waiver of the      10:42

24   attorney-client privilege.  I don't want to violate 10:42

25   his privilege by answering that question incorrectly 10:42

```
 1                    P. MITCHELL

 2   based on what I feel I need to protect.          10:42

 3            MS. SOULE:  Can we take a quick          10:42

 4       break.                                        10:42

 5                 (Brief pause.)                      10:42

 6                                                     10:43

 7   BY MS. SOULE:                                     11:05

 8       Q    So Mr. Mitchell, I want to ask you about 11:05

 9   a number of people or groups of people and whether or 11:05

10   not you talked to them about evidence related to  11:05

11   mitigation.                                        11:05

12            If you spoke to them about evidence       11:05

13   related to guilt, I don't need to know that.  All I'm 11:05

14   asking you is whether or not you spoke to them about 11:05

15   evidence related to mitigation.                    11:05

16       A    What if they were -- spoken to them about 11:05

17   both built and mitigation?                         11:05

18       Q    I'm just asking about the mitigation      11:05

19   piece.  So if you spoke to them about both --      11:05

20       A    So if I spoke to them about both, you do  11:05

21   not want me to respond.                            11:05

22       Q    No, you can say -- if you spoke to them   11:05

23   about both, it would be true then, correct, that you 11:06

24   spoke to them about mitigation?                    11:06

25       A    Let me say -- let me phrase with this.  I 11:06
```

Page 32

                              P. MITCHELL
1
2    think this may help us.  Okay?                          11:06
3            In connection with this or any case, but        11:06
4    particularly with a capital case, any witness that      11:06
5    you interview, you would want to collect information    11:06
6    that might be useful in either the guilt phase or the   11:06
7    penalty phase.  And so when interviewing a witness as   11:06
8    a lawyer, for any case, I am going to look to all       11:06
9    aspects of the case when I interview any witness.       11:06
10           So I -- I hope that helps.  There may be        11:06
11   many that you ask about that my response could be       11:06
12   both.                                                   11:06
13      Q    Well, I'm asking you about the mitigation       11:06
14   phase.  So I don't need to know if it's both.  I just   11:06
15   need to know if you recall asking them about            11:06
16   mitigation.  Okay?                                      11:07
17           Does that -- does that make it clear            11:07
18   about --                                                11:07
19      A    No, ma'am, it does not.  I cannot --            11:07
20   again, as I've given you the general directive, when    11:07
21   I interview a witness, I interview a witness to         11:07
22   gather information that might be useful for any         11:07
23   aspect of the case.                                     11:07
24      Q    So let's talk about this in specifics.          11:07
25           Did you talk to any of Cory's paternal          11:07

                         P. MITCHELL

1

2   aunts related to evidence for mitigation,            11:07

3   specifically mitigation?                             11:07

4        A    I don't recall without specific names.  I  11:07

5   don't have an independent recollection of someone    11:07

6   that was Cory's aunt.                                11:07

7        Q    Did you speak to Margaret Daniels about    11:07

8   evidence related to mitigation?                      11:07

9        A    I don't recall that name.                  11:07

10       Q    Did you speak to Dale Ray regarding        11:07

11  evidence related to mitigation?                      11:08

12       A    I don't recall that name.                  11:08

13       Q    Did you speak to Lee Daniel related to     11:08

14  evidence for mitigation?                             11:08

15       A    The name sounds familiar, but I don't      11:08

16  have an independent recollection of a conversation   11:08

17  with -- is that a him or her?                        11:08

18       Q    A him.                                     11:08

19       A    I don't have an independent recollection   11:08

20  of a conversation with him.                          11:08

21       Q    Did you speak with Fred Ray related to     11:08

22  evidence for mitigation?                             11:08

23       A    Not that I recall.                         11:08

24       Q    Did you speak to any of Cory's cousins on  11:08

25  his father's side related to evidence for mitigation? 11:08

Page 34

P. MITCHELL

1

2     A     Again, without specific names, I don't        11:08

3     have a recollection of who would have been Cory's   11:08

4     cousins.                                            11:09

5     Q     Did you speak to his cousin Shannon -- I      11:09

6     believe her last name was Maples at the time?       11:09

7     A     I recall that name.  I don't have an          11:09

8     independent recollection, as we sit here today 22   11:09

9     years later, of a conversation that I had with her. 11:09

10    Q     Okay.  Did you speak to Tracy Maples          11:09

11    related to evidence for mitigation?                 11:09

12    A     Would be the same answer.  I seem to          11:09

13    recall that name, but I don't have an independent   11:09

14    recollection of a conversation that I had with her. 11:09

15    Q     We might go back to some other names of       11:09

16    family members.                                     11:09

17          Did you speak to someone named Tim            11:09

18    Bettingfield related to evidence for mitigation?    11:09

19    A     I don't recall that name as I sit here        11:10

20    today.                                              11:10

21    Q     Did you speak to Derek Shelton related to     11:10

22    evidence for mitigation?                            11:10

23    A     I don't recall that name as I sit here        11:10

24    today.                                              11:10

25    Q     Did you speak to Alan Birdsong related to     11:10

Page 35

1                          P. MITCHELL

2    evidence for mitigation?                              11:10

3         A     Alan Birdsong was spoken to.               11:10

4         Q     Do you recall speaking to Alan Birdsong    11:10

5    related to evidence for mitigation?                   11:10

6         A     I don't know if I personally spoke with    11:10

7    him.                                                  11:10

8         Q     So is it correct, then, that you do not    11:10

9    recall if you spoke to --                             11:10

10        A     I do not personally recall speaking to     11:10

11   Alan Birdsong as we sit here today.                   11:10

12        Q     Okay.  Do you recall speaking to Chris     11:10

13   Baisden relating to evidence for mitigation?          11:10

14        A     I would have to give the same answer.  I   11:11

15   recall that Chris Baisden was spoken to.              11:11

16        Q     Do you, as you sit here today,             11:11

17   specifically recall speaking to Chris Baisden         11:11

18   yourself related to evidence for mitigation?          11:11

19        A     I not recall as I sit here today if I      11:11

20   personally spoke with Chris Baisden.                  11:11

21        Q     Okay.  Do you recall speaking to any of    11:11

22   Cory's teachers related to evidence for mitigation?   11:11

23        A     I don't recall any specific names of his   11:11

24   teachers as I sit here today.  If there were specific 11:11

25   names, I -- it might refresh my recollection.         11:11

Page 36

P. MITCHELL

1

2    Q    Do you recall speaking to any teachers,   11:11

3 generally, related to evidence for mitigation?   11:11

4    A    As I sit here today, I do not recall   11:11

5 that.   11:11

6    Q    Do you recall speaking to any coaches   11:11

7 Cory may have had related to evidence for mitigation?   11:11

8    A    I don't have an independent recollection   11:11

9 as I sit here today of that.   11:11

10    Q    Okay.  Do you recall speaking to Cory's   11:11

11 biological mother relating to evidence related to   11:12

12 evidence related to mitigation?   11:12

13    A    No.   11:12

14    Q    Do you recall speaking to any of Cory's   11:12

15 biological mother's family related to evidence   11:12

16 related to mitigation?   11:12

17    A    Again, without specific names, I don't   11:12

18 have an independent recollection of what members of   11:12

19 the biological family you'd be referring to.   11:12

20    Q    Do you have any general recollection of   11:12

21 speaking to any of Cory's biological mother's family   11:12

22 members related to evidence related to mitigation?   11:12

23    A    Again, I don't know their status.  I   11:12

24 don't have an independent recollection that I can   11:12

25 identify today as someone who is a biological family   11:12

P. MITCHELL

1

2      member to his biological mother.                       11:12

3          Q      Okay.  Thank you.                           11:12

4          A      That's the best I can do.                   11:12

5          Q      Do you recall whether you requested any     11:13

6      of Cory -- or Mr. Maples' educational records?         11:13

7          A      I don't recall personally doing so.         11:13

8          Q      Okay.  Do you recall ever reviewing         11:14

9      Cory's educational records?                            11:14

10         A      As we sit here today, I do not have a       11:14

11     personal recollection of that.                         11:14

12         Q      Okay.  Do you recall if Cory received his   11:14

13     GED?                                                   11:14

14         A      I recall that he did.                       11:14

15         Q      Do you recall if you ever requested         11:14

16     records related to his GED?                            11:14

17         A      I do not recall personally doing so.        11:14

18         Q      Do you recall reviewing any records         11:14

19     related to his GED?                                    11:14

20         A      I do.                                       11:14

21         Q      What records do you recall reviewing?       11:14

22         A      I recall reviewing records in the case      11:14

23     that indicated that he received his GED.               11:14

24         Q      Okay.                                       11:14

25         A      I cannot identify today specifically        11:14

Page 38

P. MITCHELL

1

2  which record that was, but I do have a recollection    11:14

3  of records in the case that indicated he'd received    11:15

4  his GED.                                                11:15

5       Q    Do you recall asking Mr. Maples about his    11:15

6  medical history?                                        11:15

7       A    I recall that that was asked of him.         11:15

8       Q    Do you recall personally asking him --       11:15

9  Mr. Maples about his medical history?                   11:15

10      A    I can't say specifically that I was the      11:15

11 one that asked those questions.  So I don't have an    11:15

12 independent recollection that I was the one that       11:15

13 spoke the words to ask him of his medical history.     11:15

14      Q    Okay.  Do you recall personally obtaining    11:15

15 medical records for Mr. Maples?                         11:15

16      A    As I've explained before, yes, I do.         11:15

17      Q    Do you recall obtaining medical records      11:15

18 for any of Cory's family?                               11:16

19      A    I do not recall.                             11:16

20      Q    Do you recall obtaining medical records      11:16

21 related to Mr. Maples' birth?                           11:16

22      A    I do not independently recall doing so.      11:16

23           (Mitchell Deposition Exhibits Nos.           01:33

24      5 and 6 were marked for the record.)              01:33

25

Page 39

                        P. MITCHELL

 1
 2    BY MS. SOULE:                                        01:33
 3        Q     So, Mr. Mitchell, you've been handed       11:17
 4    what's been marked as Exhibit 5 and Exhibit 6.       11:17
 5            Let's talk about Exhibit 5.  Can you take     11:17
 6    a look at Exhibit 5.  Do you recognize this document? 11:17
 7        A     The document appears to be medical          11:19
 8    records from Decatur General Hospital on Mr. Maples.  11:20
 9        Q     Do you recall whether you obtained these    11:20
10    records during your representation of Mr. Maples?     11:20
11        A     I obtained medical records pursuant to a    11:20
12    subpoena for his medical records from Decatur General 11:20
13    Hospital, so I have no reason to believe that this is 11:20
14    not the medical records we obtained.                 11:20
15        Q     Can you look at what's been marked as       11:20
16    Exhibit 6.                                            11:20
17            Do you recognize what has been marked as      11:22
18    Exhibit 6?                                            11:22
19        A     They appear to be additional medical        11:22
20    records on Cory Maples from Decatur General Hospital. 11:22
21        Q     And do you recall whether you obtained      11:22
22    these records during your representation of           11:22
23    Mr. Maples?                                           11:22
24        A     Again, that would be the same response.     11:22
25            I would have no reason to believe that        11:22

Page 40

                         P. MITCHELL

1

2    they were not.  They were -- we submitted a subpoena    11:22

3    to Decatur General Hospital and records were            11:22

4    produced.                                               11:22

5         Q    Can you turn -- there's numbers at the        11:22

6    bottom of the page.  Can you turn to page that          11:22

7    ends -- it's labeled Maples-TC-0000206 in Exhibit 6,    11:22

8    please?                                                 11:23

9              Can you -- if you'll look on this page,       11:23

10   it has a section at the top of the page that says       11:23

11   Chief Complaint.  Can you just look at that real        11:23

12   quick?                                                  11:23

13        A    Yes, ma'am.                                   11:23

14        Q    To the extent that you can read the           11:24

15   handwriting there, can you tell me what that says or    11:24

16   what you understand it to say?                          11:24

17        A    Do you want me to read it?                    11:24

18        Q    No, you can summarize it.  That's fine.       11:24

19        A    It appears to be a medical record             11:24

20   relating to a fall that Cory had where he injured --    11:24

21   hit his head and injured his right shoulder.            11:24

22             (Mitchell Deposition Exhibit No. 7            01:33

23        was marked for the record.)                        01:33

24   BY MS. SOULE:                                           01:33

25        Q    Mr. Mitchell, you've been handed what's       11:28

Page 41

P. MITCHELL

1
2  been marked as Exhibit 7.  Do you recognize this        11:28
3  document?                                                11:28
4      A    Yes.  Those appear to be the medical           11:28
5  records for Mr. Maples that were produced by the        11:28
6  North Central Alabama Mental Health Board and the       11:28
7  drug treatment program that they have -- had            11:28
8  operated, I think, at that time, Quest Recovery,        11:28
9  pursuant to a subpoena that was issued in Mr. Maples'   11:28
10 case.                                                    11:28
11     Q    Okay.  Sitting here today, do you recall       11:28
12 reviewing these records during your representation of   11:28
13 Mr. Maples?                                              11:28
14     A    I recall that those records were reviewed      11:28
15 by me, yes.                                              11:28
16     Q    Can you look at the bottom to what is          11:28
17 marked Maples-TC-0000245.  So in the third box          11:29
18 down -- actually, let's go back to the start of this.   11:29
19          Let's go to the page before, which is         11:29
20 Maples-TC-0000244.  I'd just like you to look at this   11:29
21 document, that goes through Maples-TC-0000253.          11:29
22     A    Through 253?                                   11:30
23     Q    Uh-huh.                                        11:30
24     A    Okay.                                          11:30
25     Q    So this document is titled Psychosocial       11:30

Page 42

P. MITCHELL

1

2  History, Assessment, Adult Version.                     11:30

3          Would you agree that this document              11:30

4  appears to be completed with information from Cory --   11:30

5  from Mr. Maples?                                         11:30

6      A    I don't know whether it was completed          11:30

7  from information from Cory or someone else related,     11:31

8  but it appears to be related to Mr. Maples.             11:31

9      Q    Let's go back to the page marked               11:31

10 Maples-TC-0000245?                                       11:31

11     A    Okay.                                           11:31

12     Q    If you look down at the third box there,       11:31

13 it lists Family Deaths.  Do you recall seeing that      11:31

14 Mr. Maples' cousin died of a gun shot at the age of     11:31

15 16 in 1990?                                              11:31

16     A    Do I recall seeing that?                        11:31

17     Q    Uh-huh.                                          11:31

18     A    When?                                            11:31

19     Q    When you were representing Mr. Maples and      11:31

20 you were reviewing these documents.                      11:31

21     A    I would have reviewed that when I              11:31

22 reviewed the document.  I don't have an independent     11:31

23 recollection of anything that's in the document        11:31

24 without looking at it today.                            11:31

25     Q    Okay.  Can we go to what's at the --           11:31

Page 43

                              P. MITCHELL

1

2  labeled at the bottom Maples-TC-0000248, and I'd like      11:32

3  you to look at what's marked as questions number          11:32

4  seven and number eight.                                    11:32

5          Question seven says have you ever thought          11:32

6  of ending your own life or the life of someone else.       11:32

7  And the handwritten answer says:  Just got so              11:32

8  depressed I wanted it to end, my life.                     11:32

9          Then I think it says:  No current                  11:32

10 ideations or plans.  Last thoughts were two weeks          11:32

11 ago.                                                       11:32

12          Is my reading of that consistent with             11:32

13 your reading?                                              11:32

14     A     That's what it appears to say, yes.              11:33

15     Q     Do you recall seeing Mr. Maples' answer          11:33

16 at the time and being aware that he had contemplated       11:33

17 suicide?                                                   11:33

18     A     Yes, I was aware of that during the              11:33

19 representation of him.                                     11:33

20     Q     Do you recall, sitting here today, this         11:33

21 answer in this document, being aware of it at the          11:33

22 time of your representation of Mr. Maples?                 11:33

23     A     I think I've answered that.  I was aware         11:33

24 of his suicidal ideations at the time of                   11:33

25 representation.                                            11:33

Page 44

P. MITCHELL

1

2      Q     Okay.  Were you -- I'm trying to           11:33

3   understand if you were aware of it as a general       11:33

4   matter or if you were aware of it from this document.  11:33

5      A     I cannot tell you if I can recall that       11:33

6   today.  I can tell you that I reviewed the documents   11:33

7   as they came in with the records.                      11:33

8      Q     Okay.  Let's look at question eight.  The    11:33

9   question reads, Have you ever attempted to end your    11:34

10  own life.  And then yes is circled.                    11:34

11            And then the question asks, If yes,          11:34

12  describe the incidents.  And the written answer there  11:34

13  says, Slit wrist four years ago under the influence.   11:34

14            Was my reading of that consistent with      11:34

15  your reading?                                          11:34

16      A     That's what it appears to say from my       11:34

17  reading.                                               11:34

18      Q     Do you recall reviewing those answers       11:34

19  that were provided, at the time of your                11:34

20  representation?                                        11:34

21      A     I don't have an independent recollection    11:34

22  of reviewing this document, but I did review the       11:34

23  document as the records came in.                       11:34

24      Q     If you go to the next page, which is        11:34

25  marked Maples-TC-0000249.  If you will look at what's  11:34

Page 45

P. MITCHELL

1

2   marked as question 17.  It lists other types of                11:35

3   hospitalizations and then it says Psychiatric, none.           11:35

4           Then under Medical it lists, Three years              11:35

5   ago a snake bite.  In parentheses, poisonous.  And            11:35

6   then two years ago, a 50-foot fall, concussion.               11:35

7   Appears to say FX arm, and then it looks like some of         11:35

8   the writing there is cut off.  I'm not sure if you            11:35

9   can read that better than I can.                              11:35

10          Is what I read there accurate and                    11:35

11  consistent with what you're reading it?                       11:35

12      A    What you have read, I would believe that            11:36

13  the designation there is fracture of arm, something           11:36

14  ribs and knee, wrist and -- I can't make out the last        11:36

15  part.                                                         11:36

16      Q    Okay.  You're better at handwriting than           11:36

17  I am.                                                         11:36

18          Let's go to what is a couple pages later.           11:36

19  It's Maples-TC-0000253.  I'd like you to look at the          11:36

20  bottom -- towards the bottom of the page where it             11:36

21  says Interviewer's Signature, and then a handwritten          11:36

22  name, Kathy S. Goodwin.                                       11:37

23          Do you know who Ms. Goodwin was based on            11:37

24  this document?                                                11:37

25      A    Based on this document, no, I do not.              11:37

Page 46

1                      P. MITCHELL

2    She signed as the interviewer's signature with a        11:37

3    title and date.  And it also says the same for          11:37

4    Program Director Signature.                              11:37

5              So reviewing this now, I would assume          11:37

6    that she is the program director for this agency.        11:37

7        Q    Okay.  Do you recall speaking with             11:37

8    Ms. Goodwin?                                             11:37

9        A    I don't recall today independently             11:37

10   speaking with Ms. Goodwin.                               11:37

11       Q    Okay.  Do you recall personally speaking       11:37

12   with anyone at Quest?                                    11:37

13       A    I don't have an independent recollection       11:37

14   today of who I would have spoke with at Quest.           11:37

15       Q    Do you recall speaking with anyone at          11:38

16   Quest?                                                   11:38

17       A    I had to speak with someone at Quest to        11:38

18   discuss the records that were needed and to get the      11:38

19   information that they needed to produce the records.     11:38

20       Q    Okay.  Do you recall speaking to anyone        11:38

21   at Quest beyond your conversations to get these          11:38

22   records?                                                 11:38

23       A    Not that I recall as I sit here today.         11:38

24       Q    Okay.  Thank you.                               11:38

25              In your work as an attorney, have you        11:39

Page 47

1                         P. MITCHELL

2    ever received records from third parties related to        11:39

3    your cases?                                                11:39

4         A    Yes.                                             11:39

5         Q    Would you keep a copy of records you            11:39

6    received from third parties as part of your regular        11:39

7    practice?                                                  11:39

8         A    Yes.                                             11:39

9         Q    Would you keep records from third parties        11:39

10   you received after you've finished a particular case       11:39

11   as part of your typical practice?                          11:39

12        A    Repeat that.                                     11:39

13        Q    Would you keep records from third parties        11:39

14   that you received in relation to a case after the          11:39

15   case had concluded as part of your regular practice?       11:39

16        A    As part of my regular practice, anything         11:39

17   that comes in related to a case would be kept within       11:39

18   the file.                                                  11:39

19        Q    Okay.  Was that your practice during the         11:39

20   time when you represented Mr. Maples?                      11:39

21        A    Yes.                                             11:39

22        Q    When you interview potential witnesses,          11:40

23   do you do anything to ensure you don't forget what         11:40

24   they said?                                                 11:40

25        A    Yes.                                             11:40

Page 48

P. MITCHELL

1

2      Q      Would you create interview memos to      11:40
3    document what was said during the course of an    11:40
4    interview?                                          11:40

5      A      I have, on occasion, in connection with   11:40
6    my practice over the years.                         11:40

7      Q      Was that your practice during your        11:40
8    representation of Mr. Maples?                       11:40

9      A      Possibly.  I don't know.  I can't answer  11:40
10   that question.                                      11:40

11     Q      Okay.                                      11:40

12     A      As we sit here today.                      11:40

13     Q      Would you keep interview memos after a     11:40
14   case concluded?                                     11:40

15     A      If I made an interview memo or notes from  11:40
16   discussing a case with a witness, that would be     11:40
17   maintained in my files for that particular matter.  11:41

18     Q      And that was your regular practice?        11:41

19     A      Yes.                                       11:41

20     Q      Was that your regular practice during the  11:41
21   time you represented Mr. Maples?                    11:41

22     A      Yes.                                       11:41

23     Q      Do you recall throwing away any documents  11:41
24   related to Mr. Maples?                              11:41

25     A      Not that I recall.                         11:41

Page 49

1                          P. MITCHELL

2       Q      During the sentencing or penalty phase of    11:41

3  Mr. Maples' trial, Mr. Craig stated that Mr. Maples      11:41

4  had assisted law officers in the past in relation to     11:41

5  a drug bust.  Do you know what he was talking about?     11:41

6       A      I recall information about that.             11:42

7       Q      Do you recall speaking to anyone at the      11:42

8  Decatur Police regarding assistance Cory may have        11:42

9  provided them?                                            11:42

10      A      I don't have an independent recollection     11:42

11  that I did that.  I cannot say whether it was me or      11:42

12  someone else.                                            11:42

13      Q      But you don't recall doing that              11:42

14  personally?                                              11:42

15      A      I don't have an independent recollection     11:42

16  that I personally spoke with a police officer at the    11:42

17  Decatur Police Department regarding that.               11:42

18      Q      Okay.  Do you recall where Mr. Maples was    11:42

19  incarcerated before he was convicted?                   11:42

20      A      At the Morgan County Jail in Decatur,        11:42

21  Alabama.                                                 11:42

22      Q      Do you recall personally interviewing        11:42

23  anyone from the Morgan County Jail regarding            11:42

24  Mr. Maples?                                              11:43

25      A      As I sit here today, I don't have a          11:43

Page 50

P. MITCHELL

1

2  personal recollection of any such interview.          11:43

3       Q     Okay.  Do you recall personally          11:43

4  investigating Mr. Maples' physical and mental health  11:43

5  while he was in jail, prior to his conviction, for    11:43

6  purposes of the penalty phase?                        11:43

7       A     Yes, I have a recollection that that was  11:43

8  done.                                                 11:43

9       Q     Do you recall personally investigating    11:43

10 that?                                                 11:43

11      A     I recall that I was involved and informed 11:43

12 on the investigation of that aspect of the case.      11:43

13      Q     Can you -- I think my question is a yes   11:43

14 or no question.                                       11:44

15            Do you recall personally investigating    11:44

16 Mr. Maples' physical and mental health while he was   11:44

17 in jail, prior to his conviction, for purposes of the 11:44

18 penalty phase?                                        11:44

19      A     Again, I recall that that was done.  I    11:44

20 can't tell you if we -- as I sit here today, whether  11:44

21 it was me or whether it was someone else, but I       11:44

22 recall that that was done.                            11:44

23      Q     I'm asking about whether you recall if    11:44

24 you have -- if you personally did that.  It's a yes   11:44

25 or no question.                                       11:44

Page 51

P. MITCHELL

1

2    A    As I sit here today 22 years later, I    11:44

3    cannot tell you yes or no whether I personally did    11:44

4    that, from my recollection.    11:44

5    Q    So does that mean you do not recall    11:44

6    investigating?    11:44

7    A    I do not recall, as we sit here today,    11:44

8    whether I did or not, personally.    11:44

9    Q    Do you know whether Mr. Maples was taking    11:45

10    any medication while he was in jail awaiting trial?    11:45

11    A    I believe he was, but I don't know the    11:45

12    specifics, as I sit here today.    11:45

13    Q    Did you personally inform Mr. Maples'    11:45

14    father that he would be testifying during the penalty    11:45

15    phase?    11:45

16    A    I don't recall that I personally did so.    11:45

17    Q    Did you personally inform Mr. Maples'    11:45

18    stepmother that she would be testifying during the    11:45

19    penalty phase?    11:46

20    A    I don't have an independent recollection,    11:46

21    as I sit here today, that I did that.    11:46

22    Q    Did you personally prepare Mr. Maples'    11:46

23    father to testify during the penalty phase?    11:46

24    A    I don't recall the extent of my    11:46

25    involvement in preparing him for the penalty phase as    11:46

Page 52

1                      P. MITCHELL

2   I sit here today.                                    11:46

3       Q     Did you personally prepare Mr. Maples'     11:46

4   stepmother to testify during the penalty phase?      11:46

5       A     Again, I don't recall the extent of my     11:46

6   involvement in preparing her to testify, as I sit    11:46

7   here today.                                          11:46

8       Q     Did you speak to Mr. Maples' uncle,        11:46

9   Kenneth Maples, prior to the penalty phase?          11:46

10      A     I don't independently recall if I was the  11:47

11  lawyer who spoke with Mr. Maples, Kenneth Maples,    11:47

12  prior to the penalty phase.                          11:47

13      Q     Did you personally prepare Kenneth Maples  11:47

14  to testify during the penalty phase?                 11:47

15      A     Again, I don't independently recall today  11:47

16  the extent of my involvement in preparing Mr. Kenneth 11:47

17  Maples for testimony in the penalty phase.           11:47

18            MS. SOULE:  Okay.  I'd like to take        11:47

19      a short break.                                   11:47

20                 (Brief pause.)                        11:48

21            MS. SOULE:  Are you ready?                 11:48

22            THE WITNESS:  Sure.                        12:18

23            MS. SOULE:  Beth, are you ready?           12:18

24            MS. HUGHES:  Yes.                          12:18

25

Page 53

1                         P. MITCHELL
2    BY MS. SOULE:                                        12:18
3        Q     Mr. Mitchell, we were talking earlier     12:18
4    about records that you say that Dr. Sheely may have  12:18
5    received.                                            12:18
6             Do you recall personally mailing any       12:18
7    records to Dr. Sheely?                               12:18
8        A     From an independent recollection?         12:18
9        Q     Yes.                                       12:18
10       A     I don't independently recall that.        12:18
11       Q     Okay.  Do you recall asking your          12:18
12   assistant to mail records to Dr. Sheely?            12:19
13       A     Again, I don't have an independent        12:19
14   recollection as I sit here today, to that.          12:19
15       Q     Do you recall handing them to Dr. Sheely? 12:19
16       A     I do not recall handing any records to    12:19
17   Dr. Sheely.                                          12:19
18       Q     Okay.  Do you recall transferring them in 12:19
19   any other way than --                                12:19
20       A     Yes.  Go ahead, I'm sorry.                 12:19
21       Q     Do you recall transferring them to        12:19
22   Dr. Sheely in any other specific way?                12:19
23       A     Yes.  I recall that the records were      12:19
24   transferred to Dr. Sheely.                           12:19
25       Q     How were they transferred?                12:19

Page 54

P. MITCHELL

1

2      A      They would have been transferred to him      12:19

3    either through my office or through Mark's office,      12:19

4    but I don't have an independent recollection as I sit      12:19

5    here today that I did that.      12:20

6      Q      So I want to make sure that we're clear.      12:20

7            You don't have a recollection of giving      12:20

8    records to Dr. Sheely, but you believe that he      12:20

9    received them?      12:20

10     A      That is my recollection.      12:20

11     Q      Okay.      12:20

12     A      Correct.      12:20

13     Q      Do you have any records corroborating      12:20

14    that he received them?      12:20

15     A      I don't know.      12:20

16     Q      We also spoke earlier about records      12:20

17    related to Mr. Maples' GED.      12:20

18            And I believe you said you recall      12:20

19    reviewing records that indicated that Mr. Maples      12:20

20    received his GED; is that an accurate summary of what      12:20

21    you said?      12:20

22     A      I believe so.      12:20

23     Q      Okay.  What records were those?      12:20

24     A      I cannot specifically identify those      12:20

25    records as I sit here today.      12:20

Page 55

                              P. MITCHELL

1

2       Q      Okay.  Do you recall receiving a copy of    12:20

3    his test scores?                                      12:21

4       A      I don't independently recall that as I      12:21

5    sit here today.                                       12:21

6       Q      Okay.  Do you recall receiving a copy of    12:21

7    his certificate?                                      12:21

8       A      I don't recall receiving a copy of his      12:21

9    certificate.                                          12:21

10      Q      Okay.  During your representation of         12:21

11   Mr. Maples, did you talk to Diane Farrell regarding   12:21

12   mitigation evidence?                                  12:21

13      A      I don't have an independent recollection    12:21

14   of that person as I sit here today.                   12:21

15      Q      Okay.  During your representation of         12:21

16   Mr. Maples, did you talk to Clint Curtis related to   12:21

17   mitigation evidence?                                  12:22

18      A      I don't have an independent recollection    12:22

19   of that person as I sit here today.                   12:22

20      Q      During your representation of Mr. Maples,    12:22

21   did you talk to Shane Curtis -- Shane Curtis to       12:22

22   develop potential mitigation evidence?                12:22

23      A      I don't have an independent recollection    12:22

24   of a person by that name as I sit here today.         12:22

25      Q      Okay.  During your representation of         12:22

Page 56

P. MITCHELL

1

2  Mr. Maples, did you talk to Debby Higgins related to        12:22

3  mitigation evidence?                                        12:22

4      A    I recall that name, but I don't have an            12:22

5  independent recollection as to whether or not I spoke       12:22

6  with her personally while representing Mr. Maples.          12:22

7      Q    Okay.  During your representation of              12:22

8  Mr. Maples, do you recall speaking to Shannon Smith,        12:22

9  or she may have also gone by Shannon Farrell,               12:22

10  regarding mitigation evidence?                             12:23

11      A    I don't have an independent recollection         12:23

12  as I sit here today of that name.                          12:23

13      Q    During your representation of Mr. Maples,        12:23

14  did you talk to Gay Lenhart regarding potential            12:23

15  mitigation evidence?                                       12:23

16      A    I don't have an independent recollection         12:23

17  as I sit here today regarding that name.                   12:23

18      Q    Okay.  During your representation of             12:23

19  Mr. Maples, did you talk to Glen Lang regarding the        12:23

20  mitigation?                                                12:23

21          MS. HUGHES:  Excuse me.  Who?                      12:23

22  BY MS. SOULE:                                              12:23

23      Q    Glen Lang.                                        12:23

24      A    Spell that last name, please.                    12:23

25      Q    L-A-N-G.                                          12:23

Page 57

1                        P. MITCHELL

2        A     The name sounds somewhat familiar, but I    12:23

3   don't have an independent recollection that I spoke    12:23

4   with that person as I sit here today.                  12:23

5        Q     Okay.  During your representation of        12:23

6   Mr. Maples, did you talk to Billy Hopkins related to   12:23

7   mitigation evidence?                                   12:23

8        A     I don't have a recollection of talking      12:24

9   with Mr. Hopkins as I sit here today.                  12:24

10        Q     During your representation of Mr. Maples,  12:24

11   did you talk to Billy Rhodes, R-H-O-D-E-S, regarding  12:24

12   mitigation evidence?                                  12:24

13        A     I don't have an independent recollection   12:24

14   of speaking with him as I sit here today.             12:24

15        Q     Okay.  During your representation of       12:24

16   Mr. Maples, did you talk to Judy Simms to develop     12:24

17   mitigation evidence?                                  12:24

18        A     The name sounds familiar but, again, I do  12:24

19   not have an independent recollection if I spoke with  12:24

20   her personally regarding mitigation.                  12:24

21        Q     Okay.  During your representation of       12:24

22   Mr. Maples, did you talk to Rod Frost related to      12:24

23   mitigation evidence?                                  12:24

24        A     Spell that last name.                      12:24

25        Q     Frost, F-R-O-S-T.                          12:25

Page 58

P. MITCHELL

1

2      A      I don't have an independent recollection    12:25

3   of that name.                                         12:25

4      Q      Okay.  During your representation of        12:25

5   Mr. Maples, did you talk to Kenneth Hall related to   12:25

6   mitigation evidence?                                  12:25

7      A      That name sounds familiar, but I don't      12:25

8   have an independent recollection if I personally      12:25

9   spoke with Mr. Hall regarding mitigation.             12:25

10     Q      Okay.  During your representation of        12:25

11  Mr. Maples, did you talk to Rhonda Hembree,           12:25

12  H-E-M-B-R-E-E, regarding mitigation evidence?         12:25

13     A      Again, that name sounds familiar, but I     12:25

14  don't have an independent recollection as I sit here  12:25

15  today if I spoke with her regarding mitigation.       12:25

16     Q      During your representation of Mr. Maples,   12:25

17  did you talk to Margie Moore related to mitigation    12:25

18  evidence?                                             12:26

19     A      As I sit here today, I don't have an        12:26

20  independent recollection of that name.                12:26

21     Q      Okay.  During your representation of        12:26

22  Mr. Maples, did you talk to Larry Green related to    12:26

23  mitigation evidence?                                  12:26

24     A      Again, that name sounds familiar, but I     12:26

25  don't have an independent recollection as I sit here  12:26

Page 59

P. MITCHELL

1

2 today of whether I personally spoke with Mr. Green        12:26

3 regarding mitigation.                                     12:26

4     Q    During your representation of Mr. Maples,        12:26

5 did you speak with Sam Frost related to evidence for      12:26

6 mitigation?                                               12:26

7     A    I don't have an independent recollection         12:26

8 of that name as we sit here today.                        12:26

9     Q    Okay.  As you sit here today, do you have        12:26

10 any specific recollection of any of the conversations    12:26

11 you had with witnesses relating specifically to          12:26

12 mitigation?                                              12:27

13    A    Not in specific detail.  I have                  12:27

14 recollections of the general topics that were            12:27

15 discussed in connection with the mitigation phase of     12:27

16 the case.                                                12:27

17    Q    Can you name the witnesses that you have         12:27

18 those recollections for?  And here, again, I'm only      12:27

19 talking about evidence related to mitigation.            12:27

20    A    My answer to that would be I have a              12:27

21 recollection, but not specific, regarding the            12:27

22 witnesses that were presented for testimony in the       12:27

23 mitigation phase of the case.                            12:27

24    Q    Okay.  Anyone beyond those witnesses?           12:27

25    A    Not that I recall independently as I sit         12:27

Page 60

```
 1                      P. MITCHELL
 2   here today, I cannot remember specifics regarding.    12:27
 3             MS. SOULE:  All right.  I think we          12:28
 4        will -- we'll take a real quick break.           12:28
 5             (Brief pause.)                              12:28
 6             MS. HUGHES:  Ready?                          12:30
 7             MS. SOULE:  Uh-huh.                          12:30
 8                      EXAMINATION                        12:30
 9   BY MS. HUGHES:                                        12:30
10        Q     Mr. Mitchell, my name is Beth Hughes.  I   12:30
11   work in the Attorney General's office.                12:30
12             I believe you've met with Rich Anderson     12:30
13   from our office; is that correct?                     12:30
14        A     Yes, ma'am.                                12:30
15        Q     And you also talked to him on the phone?   12:30
16        A     Yes, ma'am.                                12:30
17        Q     You agree that Judge Craig was the lead    12:30
18   counsel in this case; is that correct?                12:30
19        A     Yes, ma'am.                                12:30
20        Q     And you also remember that you hired an    12:30
21   investigator in this case; is that correct?           12:30
22        A     Yes, ma'am.                                12:30
23        Q     And that the investigator investigated     12:30
24   possible mitigation evidence to present in the        12:30
25   penalty phase of the trial?                           12:30
```

Page 61

P. MITCHELL

1

2      MS. SOULE:  Objection.  I don't          12:30

3      believe that's been established.          12:30

4  BY MS. HUGHES:                                12:30

5      Q    You can answer.                      12:30

6      A    I would say that our investigator was  12:30

7  hired to investigate all aspects of the case that we  12:31

8  needed, including mitigation, if those facts came up  12:31

9  through his investigation.                    12:31

10     Q    You also remember that you hired     12:31

11 Dr. Sheely to -- to evaluate Mr. Maples; is that  12:31

12 correct?                                       12:31

13     A    Yes, ma'am.                          12:31

14     Q    And you have no reason to dispute that  12:31

15 Judge Craig had used the same investigator in prior  12:31

16 cases, do you?                                 12:31

17     A    I don't recall that, but I don't have any  12:31

18 reason to dispute that.                        12:31

19     Q    Isn't it true that while you -- while  12:31

20 Judge Craig was the lead investigator -- was the lead  12:31

21 counsel in this case, you shared responsibilities and  12:31

22 worked closely with him?                       12:31

23     A    Yes, ma'am.                          12:31

24     Q    And you would not dispute that you and  12:31

25 Judge Craig would discuss which witnesses you wanted  12:31

Page 62

1                           P. MITCHELL

2  to call during the penalty phase of the trial; is      12:31

3  that correct?                                           12:31

4       A    Yes, ma'am, there were discussions           12:31

5  regarding that.                                         12:31

6       Q    You would not have put someone on the        12:31

7  stand during the penalty phase without preparing       12:31

8  them, would you?                                        12:31

9       A    As a team, no, ma'am.                         12:31

10      Q    You would have talked to these witnesses      12:32

11 and had an idea of what their testimony would be        12:32

12 before you put them on the stand; is that correct?      12:32

13           MS. SOULE:  Objection.  Can you be            12:32

14      clear of whether or not you're talking             12:32

15      about him individually or them as a team?          12:32

16           MS. HUGHES:  I said you.                       12:32

17 BY MS. HUGHES:                                           12:32

18      Q    You would never have, personally, not        12:32

19 talked to witnesses and then put them on the stand      12:32

20 without knowing what their testimony would be in the    12:32

21 penalty phase of a capital trial, would you?            12:32

22      A    If I was personally going to examine that     12:32

23 witness, certainly, I would.  If not personally, I      12:32

24 would be involved in the preparation to the extent      12:32

25 that my lead counsel required me to.                     12:32

Page 63

P. MITCHELL

1

2      Q     And you have testified today that your          12:32

3  memories of what happened in this case are not clear   12:32

4  22 years later; is that correct?                       12:32

5      A     Well, it's very difficult to remember         12:32

6  specific details of a case that's 22 years in the      12:32

7  past.                                                   12:32

8      Q     If Judge Craig has clear memories of what     12:32

9  strategies were or what -- why you called certain      12:33

10 witnesses, you would not dispute his memories, would   12:33

11 you?                                                    12:33

12     A     I would have no reason to.                    12:33

13          MS. SOULE:  Objection.                         12:33

14 BY MS. HUGHES:                                          12:33

15     Q     Would your file in this case have the         12:33

16 same content as Judge Craig's file?                     12:33

17          MS. SOULE:  Objection.                         12:33

18 BY MS. HUGHES:                                          12:33

19     Q     Would you have witness statements and         12:33

20 transcripts of conversations with witnesses that       12:33

21 would be in your file?                                  12:33

22     A     There would be.                               12:33

23          MS. SOULE:  Objection.                         12:33

24          THE WITNESS:  There would be.                  12:33

25

Page 64

1                    P. MITCHELL

2  BY MS. HUGHES:                                    12:33

3      Q     And you testified today that your fee   12:33

4  declaration was fairly accurate; is that correct? 12:33

5           MS. SOULE:  Objection.  That             12:33

6       mischaracterizes his testimony.              12:33

7           THE WITNESS:  Yes, ma'am, I would        12:33

8       testify that the fee declaration is          12:33

9       accurate to the extent that the $1,000       12:33

10      cap that we discussed, the hours that I      12:33

11      put on the fee multiplied by the $20 per     12:33

12      hour would exceed the $1,000 cap.            12:33

13  BY MS. HUGHES:                                    12:33

14      Q     Would you agree that you did not record 12:34

15  every single detail concerning this case on your fee 12:34

16  declaration?                                      12:34

17      A     No, I would not, because there may be -- 12:34

18  knowing that that's a capital case, I would not put 12:34

19  in anything that I felt was privileged related to go 12:34

20  up to someone outside the case to review.  So it was 12:34

21  more of a generalized fee declaration.            12:34

22      Q     Did the cap on the out-of-court        12:34

23  preparation time affect your representation of    12:34

24  Mr. Maples?                                       12:34

25      A     No, ma'am.                              12:34

Page 65

P. MITCHELL

1

2      Q      While you do not have specific memories      12:34

3  of your preparation for the penalty phase, you would      12:34

4  not have gotten to the penalty phase without      12:34

5  preparing; is that correct?      12:34

6      A      No, ma'am, we would not have.      12:34

7      Q      You'll agree that you called four      12:34

8  witnesses to testify at the penalty phase of the      12:34

9  trial; is that correct?      12:34

10      A      That's my recollection.      12:34

11      Q      And that you recognize the importance of      12:35

12  preparing for the penalty phase of the trial; is that      12:35

13  correct?      12:35

14      A      Yes, ma'am.      12:35

15      Q      And that you, in fact, prepared for the      12:35

16  penalty phase of this case; is that correct?      12:35

17      A      Yes, ma'am.      12:35

18      Q      You did review the videotape of the -- of      12:35

19  the Defendant's confession before the trial, is that      12:35

20  correct?      12:35

21          MS. SOULE:   Objection.      12:35

22          THE WITNESS:   Yes, ma'am.      12:35

23  BY MS. HUGHES:      12:35

24      Q      You testified that you issued subpoenas      12:35

25  for records from your office; is that correct?      12:35

Page 66

1                          P. MITCHELL

2       A      Yes, ma'am.                                12:35

3       Q      Do you recall all of the subpoenas that    12:35

4  you issued?                                            12:35

5       A      I don't recall all.  There was a           12:35

6  substantial number.                                    12:35

7       Q      Can you give me some examples of what --   12:35

8              MS. SOULE:  Objection.  I think --         12:36

9  BY MS. HUGHES:                                         12:36

10      Q      -- of the witnesses that you subpoenaed    12:36

11 for the penalty phase of the trial?                    12:36

12             MS. SOULE:  Thank you.                      12:36

13             THE WITNESS:  Again, the records --        12:36

14        the medical records from Decatur General       12:36

15        Hospital, Decatur General West, the North      12:36

16        Alabama Mental Health Center, Quest            12:36

17        Recovery, jail records, police department      12:36

18        records.  Those are some of the subpoenas      12:36

19        that I recall being issued by my office        12:36

20        in connection with the matter.                 12:36

21 BY MS. HUGHES:                                         12:36

22      Q      Would Judge Craig's office also have       12:36

23 issued those subpoenas?                                12:36

24      A      He may have.                               12:36

25             MS. SOULE:  Objection.  To the            12:36

Page 67

1                           P. MITCHELL

2          extent it's beyond --                          12:36

3    BY MS. HUGHES:                                        12:36

4          Q     Was the investigator that was hired able 12:36

5    to obtain useful information for the penalty phase of 12:36

6    the trial?                                            12:36

7          A     I believe so.                             12:36

8          Q     You've reviewed the letter that was from  12:37

9    the Alabama Prison Project.  I think it was Exhibit   12:37

10   3.                                                    12:37

11              In that letter, they indicate that you     12:37

12   had to obtain funds from the Court to -- to hire      12:37

13   them; is that -- do you see that in the record?       12:37

14              MS. SOULE:  Objection.  I believe          12:37

15         that mischaracterizes the letter.               12:37

16              THE WITNESS:  There's a paragraph          12:37

17         in the letter that says:  Although the          12:37

18         Mitigation Investigation Program receives       12:37

19         Law Foundation support, we rely heavily         12:37

20         upon court-ordered expert fees.                 12:37

21   BY MS. HUGHES:                                        12:37

22         Q     Okay.  Thank you.                         12:37

23              And you would have met with witnesses to   12:37

24   prepare for the penalty phase of the trial; is that   12:37

25   correct?                                              12:37

Page 68

1                          P. MITCHELL

2        A      In connection with lead counsel, yes,      12:37

3    ma'am.                                                12:37

4        Q      And just because you don't have an         12:37

5    independent recollection of talking to people doesn't  12:37

6    mean that you didn't talk to them; is that correct?   12:37

7             MS. SOULE:  Objection.                       12:38

8             THE WITNESS:  No ma'am, that does            12:38

9        not mean that.                                    12:38

10   BY MS. HUGHES:                                        12:38

11       Q      Okay.  What does it mean?                  12:38

12       A      Pardon?                                    12:38

13       Q      What does it mean?                         12:38

14             MS. SOULE:  Objection.                      12:38

15             THE WITNESS:  It means that I do            12:38

16       not have a specific recollection of the          12:38

17       details, but I do have a recollection            12:38

18       that the witnesses were spoken with and          12:38

19       it is my recollection that I was in the          12:38

20       presence of some or all of those                 12:38

21       witnesses in connection with the                 12:38

22       preparation for the mitigation.                  12:38

23   BY MS. HUGHES:                                        12:38

24       Q      If you don't remember -- if you don't     12:38

25   have a specific recollection of talking to cousins or  12:38

Page 69

P. MITCHELL

1

2   to the Defendant's mother's family, that doesn't mean      12:38

3   that you didn't talk to them; is that correct?            12:38

4           MS. SOULE:  Objection.                            12:38

5           THE WITNESS:  I just don't have an                12:38

6       independent recollection of that.  I -- I             12:38

7       may or may not have.  I don't know, as we             12:38

8       sit here 22 years later, how I can                    12:38

9       refresh that.                                         12:38

10  BY MS. HUGHES:                                            12:38

11      Q    Have you reviewed your file?                     12:38

12          MS. SOULE:  Objection.                            12:38

13          THE WITNESS:  I have reviewed                     12:38

14      aspects of my file.                                   12:38

15  BY MS. HUGHES:                                            12:39

16      Q    Is it possible that you or Judge Craig           12:39

17  obtained the educational records, but you just don't      12:39

18  today recall obtaining those records?                     12:39

19      A    My recollection is that I don't believe I        12:39

20  obtained those records.  I don't know whether Judge       12:39

21  Craig did or not, but it's possible.                      12:39

22      Q    It's possible that Judge Craig did?              12:39

23      A    Yes, ma'am.                                      12:39

24      Q    Can you look, again, at Exhibit 6,               12:39

25  please, specifically page 206.                            12:39

Page 70

P. MITCHELL

1

2      MS. SOULE:  One second while I pull      12:39

3  that up.                                     12:39

4      THE WITNESS:  Yes, ma'am.                12:39

5  BY MS. HUGHES:                               12:39

6      Q    I believe you reviewed the Chief   12:39

7  Complaint there; is that correct?           12:39

8      A    Yes, ma'am.                         12:39

9      Q    Do you see anything on that chief  12:40

10  complaint about a -- that the Defendant had a   12:40

11  concussion?                                  12:40

12      A    I'm not able to read all of the   12:40

13  examination notes, but from the Chief Complaint, no,   12:40

14  I don't see the word concussion in there.    12:40

15      Q    Okay.  You don't recall talking to   12:40

16  someone from Quest, but is it possible that you   12:40

17  did -- you don't have an independent recollection of   12:40

18  that, but is it possible you, in fact, did talk to   12:41

19  someone from the Quest Recovery Center?       12:41

20      MS. SOULE:  Objection.                   12:41

21      THE WITNESS:  I don't have an           12:41

22  independent recollection but that is         12:41

23  possible.                                    12:41

24  BY MS. HUGHES:                               12:41

25      Q    Because you don't recall Kathy Goodwin   12:41

Page 71

```
 1                        P. MITCHELL
 2   today, that doesn't mean you didn't speak to her; is    12:41
 3   that correct?                                           12:41
 4            MS. SOULE:  Objection.                         12:41
 5            THE WITNESS:  That's possible that             12:41
 6        I spoke with her but I just don't have an          12:41
 7        independent recollection today.                    12:41
 8   BY MS. HUGHES:                                          12:41
 9        Q    Did you turn over your file to               12:41
10   Mr. Maples' present counsel in this case?              12:41
11            MS. SOULE:  Objection.                         12:41
12            THE WITNESS:  No, ma'am, I have                12:41
13        not.                                               12:41
14   BY MS. HUGHES:                                          12:41
15        Q    Is it your belief that someone, during       12:41
16   the representation, talked to people at Decatur         12:41
17   Police Department before Mr. Maples' trial --           12:41
18            MS. SOULE:  Objection.                         12:41
19   BY MS. HUGHES:                                          12:41
20        Q    -- the penalty phase of Mr. Maples'          12:41
21   trial?                                                  12:41
22            MS. SOULE:  I would like -- your               12:41
23        question wasn't specific to the penalty           12:41
24        phase.                                             12:41
25            MS. HUGHES:  And I added that.                 12:41
```

Page 72

                          P. MITCHELL
1
2          MS. SOULE:  Okay.  Sorry.                    12:41
3          MS. DAWSON:  Just to clarify, you            12:42
4     added whether they spoke to them prior to         12:42
5     the penalty phase.  It wasn't clear the           12:42
6     content of the conversations with the             12:42
7     police department.                                12:42
8          MS. SOULE:  So I would ask you to            12:42
9     limit the question to just the penalty            12:42
10    phase.                                            12:42
11         MS. HUGHES:  Okay.                           12:42
12         MS. SOULE:  In relation to the               12:42
13    penitentiary phase.                               12:42
14         THE WITNESS:  Would you repeat the           12:42
15    question so I make sure that I'm                  12:42
16    answering it correctly.                           12:42
17  BY MS. HUGHES:                                      12:42
18    Q    Okay.  So do you believe that someone       12:42
19  talked -- someone who was involved in the          12:42
20  representation of Mr. Maples, talked to people at the  12:42
21  Decatur Police Department before the penalty phase of  12:42
22  Mr. Maples' trial?                                  12:42
23    A    Yes, ma'am.                                  12:42
24         MS. SOULE:  Objection.  You still           12:42
25    didn't limit it to evidence in relation          12:42

Page 73

P. MITCHELL

1

2      to the penalty phase.                              12:42

3  BY MS. HUGHES:                                         12:42

4      Q     Did someone from your office talk to         12:42

5  people at the Decatur Police Department about          12:42

6  evidence that could possibly be used as mitigation     12:42

7  before the penalty phase of the trial?                 12:42

8      A     I believe so.                                12:42

9      Q     And you believe that an investigation was    12:42

10 conducted into Mr. Maples' mental health that          12:42

11 pertained to the mitigation phase of his trial; is     12:42

12 that correct?                                          12:43

13     A     Yes, ma'am.                                  12:43

14           MS. SOULE:  Objection.                       12:43

15 BY MS. HUGHES:                                         12:43

16     Q     You don't personally recall, but would       12:43

17 someone have talked to Mr. Maples' father and          12:43

18 stepmother to know that they would testify before the  12:43

19 penalty phase of the trial?                            12:43

20           MS. SOULE:  Objection.                       12:43

21           THE WITNESS:  Yes, ma'am, I believe          12:43

22     so.                                                12:43

23 BY MS. HUGHES:                                         12:43

24     Q     Would someone have prepared them to          12:43

25 testify for the penalty phase of the trial?            12:43

Page 74

```
 1                      P. MITCHELL
```

| | | |
|---|---|---|
| 2 | MS. SOULE:  Objection. | 12:43 |
| 3 | THE WITNESS:  Yes, ma'am, I believe | 12:43 |
| 4 | so. | 12:43 |
| 5 | BY MS. HUGHES: | 12:43 |
| 6 | Q     And although you don't recall | 12:43 |
| 7 | specifically talking to Kenneth Maples, who is the | 12:43 |
| 8 | Defendant's uncle, would someone have prepared him to | 12:43 |
| 9 | testify for the penalty phase of the trial? | 12:43 |
| 10 | MS. SOULE:  Objection. | 12:43 |
| 11 | THE WITNESS:  Yes, ma'am, I believe | 12:43 |
| 12 | so. | 12:43 |
| 13 | BY MS. HUGHES: | 12:43 |
| 14 | Q     You were very specific when you answered | 12:43 |
| 15 | about certain people that you talked to or didn't | 12:43 |
| 16 | talk who could have -- possible mitigation witnesses. | 12:43 |
| 17 | And I think your response was that you -- | 12:43 |
| 18 | that you're familiar with names, but you don't know | 12:44 |
| 19 | whether you personally spoke to them.  For example, | 12:44 |
| 20 | Debby Higgins, Kenneth Hall, Rhonda Hembree and Larry | 12:44 |
| 21 | Green. | 12:44 |
| 22 | That doesn't mean that Judge Craig or the | 12:44 |
| 23 | investigator didn't speak to those witnesses; is that | 12:44 |
| 24 | correct? | 12:44 |
| 25 | MS. SOULE:  Objection. | 12:44 |

Page 75

```
                          P. MITCHELL
 1
 2            THE WITNESS:  That is correct.        12:44
 3            MS. HUGHES:  That's all I have.       12:44
 4            MS. SOULE:  Can we just have a        12:44
 5       break?                                     12:44
 6                 (Brief pause.)                   12:44
 7                 EXAMINATION                      01:04
 8  BY MS. SOULE:                                   01:10
 9       Q    Mr. Mitchell, you mentioned during   01:10
10  Ms. Hughes' questions that you believe Mr. Nesmith  01:10
11  assisted with the mitigation phase.  What do you    01:11
12  recall he assisted with?                        01:11
13       A    Again, that -- I think that that answer  01:11
14  might get into a broader discussion --          01:11
15       Q    What do you recall specifically in   01:11
16  relation to mitigation that he assisted with?   01:11
17       A    Again, I'm very concerned that that may  01:11
18  open up a discussion regarding confidential     01:11
19  information that is beyond the penalty phase.  If you  01:11
20  want to waive that, I'd be glad to answer.      01:11
21       Q    Do you recall any specific witnesses that  01:12
22  Mr. Nesmith spoke to in relation to mitigation?  01:12
23       A    Let me answer that generally, again, as I  01:12
24  provided you in my original testimony.          01:12
25       Q    I'd like you to answer my specific   01:12
```

Page 76

P. MITCHELL

1

2  question.  I don't -- I don't want your -- I would      01:12

3  like you --      01:12

4       A    Then I don't know that I can answer that      01:12

5  without -- I feel like that will make it into a      01:12

6  waiver of his confidentiality.  I don't want to open      01:12

7  that door.      01:12

8       Q    I'm not asking for any of the substance      01:12

9  of those conversations.  I just want to know the      01:12

10  names of any witnesses he spoke to, specifically in      01:12

11  relation to evidence for mitigation.      01:12

12       A    Any witness that he spoke with that he      01:13

13  gathered information from that would have been      01:13

14  reviewed and possibly used for mitigation.  I can't      01:13

15  give you any specific name as I sit here today, but      01:13

16  any witness that he spoke with may have been used for      01:13

17  that purpose.      01:13

18       Q    And were you with him for those      01:13

19  interviews?      01:13

20       A    I have a recollection, but not a specific      01:13

21  recollection, that I was with him for some      01:13

22  interviews.      01:13

23       Q    So you can't say that you know for sure      01:13

24  that he talked to every witness that he spoke to      01:13

25  about evidence for mitigation?      01:13

Page 77

P. MITCHELL

1

2      A      Would you please repeat that.                    01:13

3      Q      If you weren't with him when he spoke to         01:13

4  them, can you say for certain that you know that he         01:13

5  spoke to every single witness that he met with about        01:13

6  evidence for mitigation?                                     01:14

7      A      I would know for certain that if any             01:14

8  evidence produced from his interviews related to            01:14

9  mitigation, that would be considered of use for             01:14

10  mitigation purposes.                                        01:14

11      Q      That was not my question.                        01:14

12           MS. SOULE:  Can we -- if it -- can                 01:14

13      you read my question back.                              01:14

14           (The last question was read back                   01:14

15      into the record.)                                        01:14

16           THE WITNESS:  If I was not with                     01:14

17      him, I would not know what specifically                 01:14

18      he spoke to any witness that he                          01:14

19      investigated, other than the work product              01:14

20      that he produced for us.                                 01:14

21  BY MS. SOULE:                                                01:14

22      Q      Okay.  What evidence related to                  01:14

23  mitigation do you believe that Mr. Nesmith obtained?        01:15

24      A      Again, unless you want to waive his             01:15

25  confidentiality provisions, I do not feel comfortable      01:15

Page 78

P. MITCHELL

1
2    getting into a discussion of that.                      01:15
3         Q     How often did you speak with Mr. Nesmith?    01:15
4         A     On many occasions through the course of      01:15
5    the representation.  I would need -- probably defer     01:15
6    back to my fee petition for specifics.                  01:15
7         Q     Do you have that?  I believe it was          01:15
8    Exhibit 2.                                              01:15
9         A     Yes, ma'am.                                  01:15
10        Q     You said you needed to refer to it to        01:16
11   answer my question?                                     01:16
12        A     And your question again was?                 01:16
13        Q     How often did you speak with Mr. Nesmith?    01:16
14        A     From reviewing my fee petition, I spoke      01:16
15   with him on 5/29 of '96.  I met with him on 1/12 of     01:16
16   '97.  Traveled to Tuscaloosa with him on 1/22 of '97.   01:16
17   I spoke with him on 2/11 of '97.  I spoke with him on   01:17
18   2/12 of '97.  I met with him on 2/25 of '97.  I met     01:17
19   with him on August the 5th of 1997.  I met with him     01:18
20   on August the 7th of 1997.  I met with him on August    01:18
21   the 16th of 1997 -- excuse me -- October the 16th of    01:19
22   1997.                                                   01:19
23             It is my recollection that Mr. Nesmith        01:19
24   was with us during the trial of the case or was         01:19
25   present at the courthouse.  My records reflect that I   01:19

Page 79

P. MITCHELL

1

2    met with him again on August the 23rd of 1997.        01:19

3        Q    Did you say August 23rd?                     01:20

4        A    Excuse me.  October the 23rd, 1997.          01:20

5             Those are the record -- the entries I        01:20

6    have in my fee petition where I met or spoke with our  01:20

7    investigator.  There may be other times, but          01:20

8    that's -- the best of my recollection as we sit here   01:20

9    today is going to be my fee petition.                 01:20

10       Q    Do you have any specific recollection of      01:20

11   meeting with any witnesses with Mr. Nesmith to         01:20

12   develop mitigation evidence, in particular?  Please    01:20

13   answer yes or no.                                      01:20

14       A    Repeat the question again.                    01:20

15       Q    Do you have any specific recollection of      01:20

16   meeting with any witnesses with Mr. Nesmith to         01:20

17   develop mitigation evidence, in particular; yes or     01:20

18   no?                                                    01:20

19       A    Yes, I believe some of the entries in my      01:20

20   fee petition show that.                                01:21

21       Q    Do you have a specific recollection of        01:21

22   those as you sit here today?                           01:21

23       A    As refreshed by my fee petition, yes, I       01:21

24   do.                                                    01:21

25       Q    Okay.  Who do you recall meeting with in      01:21

Page 80

1                           P. MITCHELL

2      relation to developing mitigation evidence?          01:21

3          A      I would defer to my fee petition where it  01:21

4      says that I met with Mr. Nesmith and witnesses in   01:21

5      connection with the case.                            01:21

6          Q      I'm asking for your recollection as you   01:21

7      sit here today.                                      01:21

8          A      As to specifics of what was discussed?    01:21

9          Q      I'm asking for your recollection as you   01:21

10     sit here today of which witnesses you recall meeting  01:21

11     with, with Mr. Nesmith, in relationship to developing  01:21

12     evidence for mitigation.                             01:21

13         A      That would be in my file.  I do not have  01:21

14     a specific recollection of that without going through  01:21

15     the fee petition.                                    01:21

16         Q      Do you know if Mr. Nesmith had any        01:21

17     experience doing work related to the development of  01:21

18     mitigation evidence in capital cases?                01:22

19         A      I don't have an independent recollection  01:22

20     of that, as we sit here today.                       01:22

21         Q      Ms. Hughes also asked you about the       01:22

22     preparation for witnesses at trial.                  01:22

23                Did you examine any of the witnesses      01:22

24     during the penalty phase of the trial?               01:22

25         A      I don't recall doing so.  I believe Judge  01:22

Page 81

P. MITCHELL

1

2   Craig examined all four of the witnesses in the          01:22

3   penalty phase.                                           01:22

4       Q     Okay.  Do you have any specific               01:22

5   recollection of being the person responsible for        01:22

6   preparing any of the witnesses to testify during the    01:22

7   penalty phase?                                           01:22

8       A     Not individually.                             01:22

9       Q     Do you have any specific recollection         01:22

10  about how Mark Craig directed you to be involved in     01:22

11  the penalty phase?                                       01:22

12      A     Yes.                                           01:22

13      Q     What is that recollection?                    01:22

14      A     My recollection is that, when we met as a     01:22

15  team, we were developing mitigation testimony,          01:22

16  mitigation evidence for the penalty phase throughout    01:23

17  the course of the investigation of the case in the      01:23

18  representation of Mr. Maples.                            01:23

19          And my investigation is that, before the        01:23

20  penalty phase we finalized into a list of specific      01:23

21  topics that we wanted to have brought out in the        01:23

22  mitigation phase of the penalty phase of the case,      01:23

23  and that we discussed the aspects of how we were        01:23

24  going to do that through the witnesses that             01:23

25  testified.                                              01:23

Page 82

P. MITCHELL

1

2      That's my recollection of the -- in        01:23

3  answer to the question you've asked me.        01:23

4      Q    Ms. Hughes also asked you about whether  01:23

5  someone could have spoken to someone at the Quest  01:23

6  Recovery Center.                                01:23

7          Do you have any recollection of anyone  01:23

8  speaking to someone at the Quest Recovery Center  01:23

9  beyond asking for their records?                01:23

10     A    I don't have an independent recollection  01:23

11 of that.                                        01:24

12     Q    In response to Ms. Hughes' questions, I  01:24

13 believe you said that someone spoke to the Police  01:24

14 Department in relation to evidence for mitigation.  01:24

15         Who spoke to the Police Department in    01:24

16 relation to evidence for mitigation?            01:24

17     A    That would have been me or Johnny Nesmith  01:24

18 or Judge Craig.  I don't have an independent    01:24

19 recollection of who, as we sit here today.      01:24

20     Q    What were the conversations -- were those  01:24

21 conversations limited to requesting records related  01:24

22 to mitigation?                                  01:24

23     A    I do not believe so.                   01:24

24     Q    Can you name anyone at the Police       01:24

25 Department that you know was spoken to in relation to  01:25

Page 83

1                    P. MITCHELL

2   mitigation?                                              01:25

3        A      It would be reflected on the records that   01:25

4   were produced by the Decatur Police Department, but     01:25

5   as I sit here today I -- I have an estimation, a        01:25

6   guess, but I'm not going to speculate.                  01:25

7        Q      If you don't have an independent            01:25

8   recollection --                                         01:25

9        A      I do not have an independent                01:25

10  recollection.  I would have to rely upon the records    01:25

11  that were produced by the Police Department.            01:25

12       Q      Is there anything in your fee petition      01:25

13  that indicates that you spoke to anyone at the Police   01:25

14  Department?                                             01:25

15       A      I'd have to look.                           01:25

16       Q      Related to mitigation?                      01:25

17       A      There is a 5/20/1997 entry that says,       01:27

18  Examined records at Decatur Police Department records   01:27

19  room in response to subpoena, which would indicate to   01:27

20  me that I had to speak with someone at the Decatur      01:27

21  Police Department when that examination was             01:27

22  performed.                                              01:27

23       Q      Does anything in that entry indicate that   01:27

24  you would have spoken to them beyond related to         01:27

25  requesting those records?                               01:27

Page 84

P. MITCHELL

1

2      A      The entry indicates that I examined the      01:27

3   records at the Decatur Police Department's record      01:27

4   room, in response to that subpoena.      01:27

5      Q      But I don't believe that's --      01:27

6      A      That indicates to me that I had spoke      01:27

7   with someone beyond the request for those records,      01:27

8   yes, to answer your question.      01:27

9      Q      Do you have any specific recollection of      01:28

10   what that conversation was in relation to evidence      01:28

11   for mitigation?  Or actually, let me back up.      01:28

12          Do you have any specific recollection      01:28

13   that you spoke to anyone -- that when you spoke to      01:28

14   someone at the Police Department, you spoke to them      01:28

15   about evidence for mitigation, beyond what was in the      01:28

16   records?      01:28

17      A      In response to mitigation, I generally      01:28

18   have a recollection of that.  I do not have a      01:28

19   specific recollection.      01:28

20      Q      What is your general recollection?      01:28

21      A      The general recollection was that it was      01:28

22   discussed regarding the assistance that he had      01:28

23   provided in the Decatur Police Department in trying      01:28

24   to arrest others for drug crimes.      01:29

25      Q      Do you specifically remember talking to      01:29

Page 85

1                          P. MITCHELL

2    someone about that?                                      01:29

3         A      I don't have a specific recollection as      01:29

4    we sit here today regarding that.  That is only a        01:29

5    general recollection.                                    01:29

6         Q      Do you know who you spoke to about it?       01:29

7         A      I do not have a specific recollection        01:29

8    beyond what would be shown on the records.               01:29

9         Q      You said in response to Ms. Hughes'          01:30

10   questions that you believe someone spoke to the          01:30

11   Morgan County Jail in relation to getting evidence       01:30

12   for mitigation?                                          01:30

13        A      I do believe so.                             01:30

14        Q      Who do you recall spoke to the jail?         01:30

15        A      My recollection would be that that would     01:30

16   be Judge Mark Craig.                                     01:30

17            MS. SOULE:  All right.  That's --               01:30

18        we're finished for today.  Thank you very           01:30

19        much.                                               01:30

20            MS. HUGHES:  I just have one                     01:30

21        question.                                           01:30

22            MS. SOULE:  I don't believe that                 01:30

23        you get any --                                      01:30

24            MS. HUGHES:  You can lodge an                    01:30

25        objection.                                          01:30

Page 86

1                         P. MITCHELL

2            MS. SOULE:  We'll object and then        01:30

3         go ahead and ask your question.            01:30

4                         EXAMINATION                 01:30

5    BY MS. HUGHES:                                   01:30

6         Q    I just wanted to make sure I understood  01:30

7    correctly that there were times that you met with  01:30

8    Mr. Nesmith that would not be reflected in -- on your  01:30

9    fee declaration sheet; is that correct?         01:30

10           MS. SOULE:  Objection.                   01:30

11           THE WITNESS:  There could be.  I         01:30

12        just don't have an independent              01:31

13        recollection of that.                       01:31

14           MS. HUGHES:  That's it.                   01:31

15                                                    01:31

16                         EXAMINATION                 01:31

17   BY MS. SOULE:                                    01:31

18        Q    Would your record at the time of what you  01:31

19   did be the best approximation of who you spoke to and  01:31

20   when, in your fee petition?                      01:31

21        A    Unless there was some other document in  01:31

22   my file.                                         01:31

23           MS. SOULE:  All right.  Thank you        01:31

24        very much.                                  01:31

25           THE WITNESS:  Thank you.                  01:31

Page 87

1                          P. MITCHELL

2

3                   (Thereupon, the deposition was

4            concluded at approximately 12:31 p.m.)

5

6

7

                              _____

8                         PHIL D. MITCHELL

9

10

11   Subscribed and sworn to before me

12   this_____ day of_____, 2019.

13   _____

14

15

16

17

18

19

20

21

22

23

24

25

1

2                      D I S C L O S U R E

3

4      STATE OF ALABAMA      )   DEPOSITION OF:

5

6      JEFFERSON COUNTY      )   PHIL D. MITCHELL

7

8           Pursuant to Article 8.B of the Rules and
       Regulations of the Board of Court Reporting of the
9      Judicial Council of Alabama, I make the following
       disclosure:

10

            I am a Alabama Certified Court Reporter.  I am
11     here as a representative of TSG Reporting.

12          TSG Reporting was contacted by the offices of
       Latham & Watkins, LLP to provide court reporting
13     services for this deposition.  TSG Reporting will not
       be taking this deposition under any contract that is
14     prohibited by O.C.G.A. 15-14-37 (a) and (b).

15          TSG Reporting has no contract or agreement to
       provide court reporting services with any party to
16     the case, or any reporter or reporting agency from
       whom a referral might have been made to cover the
17     deposition.

18          TSG Reporting will charge its usual and
       customary rates to all parties in the case, and a
19     financial discount will not be given to any party in
       this litigation.

20

21     DATED: 9-5-2019

22

23                     _____
                       Tanya L. Verhoven-Page,
24                     Certified Court Reporter,
                       B-1790.

25

Page 89

1

2                       C E R T I F I C A T E

3

4    STATE OF ALABAMA:

5    JEFFERSON COUNTY:

6

7              I hereby certify that the foregoing

8         deposition was reported, as stated in the

9         caption, and the questions and answers

10        thereto were reduced to written page

11        under my direction, that the preceding

12        pages represent a true and correct

13        transcript of the evidence given by said

14        witness.

15             I further certify that I am not of

16        kin or counsel to the parties in the

17        case, am not in the regular employ of

18        counsel for any of said parties, nor am I

19        in any way financially interested in the

20        result of said case.

21             Dated this 5th day of September,

22        2019.

23                    *Tanya Page*

24        _____

          Tanya L. Verhoven-Page,

25        Certified Court Reporter,

Page 90

1

2               ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:          Maples v. Dunn

4    Dep. Date:          September 5, 2019

5    Deponent:           Phil D. Mitchell

6                         CORRECTIONS

7    Pg.    Ln.    Now Reads        Should Read      Reason

8    _____ _____ _____ _____ _____

9    Pg.    Ln.    Now Reads        Should Read      Reason

10   _____ _____ _____ _____ _____

11   Pg.    Ln.    Now Reads        Should Read      Reason

12   _____ _____ _____ _____ _____

13   Pg.    Ln.    Now Reads        Should Read      Reason

14   _____ _____ _____ _____ _____

15   Pg.    Ln.    Now Reads        Should Read      Reason

16   _____ _____ _____ _____ _____

17   Pg.    Ln.    Now Reads        Should Read      Reason

18   _____ _____ _____ _____ _____

19   Pg.    Ln.    Now Reads        Should Read      Reason

20   _____ _____ _____ _____ _____

21                           _____

                             Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   This the_____ day of_____, 2019.

24   _____

25   (Notary Public)    My Commission Expires:_____