# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **CORY R. MAPLES,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Case No.: 5:03-CV-2399-KOB** |
| ) | |
| **JEFFERSON S. DUNN,** ) | |
| **Commissioner of the Alabama** ) | |
| **Department of Corrections** ) | |
| ) | |
| **Respondent.** ) | |

## <u>MEMORANDUM OPINION</u>

All death penalty habeas cases are hard.  They often involve gruesome criminal conduct, grieving families and communities, and petitioners facing the ultimate penalty for the crimes they committed many years before.  And when the petitioners claim ineffective assistance of counsel, as they all seem to do, the court has to balance the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland v. Washington*, 466 U.S. 668, 689 (1984), against the petitioner's constitutional right to effective counsel without judging counsel's performance through the 20/20 lens of hindsight.  *See Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995).

After a week-long evidentiary hearing, such as the one held in this case, with testimony from numerous lay and expert witnesses who the petitioner contends his

trial counsel should have presented as mitigation in the penalty phase of the trial, the "what might have been" evidence requires the court to first determine how much of it reasonable trial counsel should have uncovered during a reasonable investigation. Then, the court must weigh whether such evidence would have been sufficient to move enough jurors—in this case, only one more was needed—to vote for life in prison instead of the death penalty; but in doing so, the court should avoid looking through the 20/20 lens of hindsight. *See Waters*, 46 F.3d at 1514. This task is often a daunting one.

In this case, twenty-one-year old Cory R. Maples shot two of his friends, Stacy Terry and Barry Robinson, each in the head twice without any known provocation and in his family's front yard. He left Terry's body in the yard, then threw Robinson's body in a creek a short distance away, stole Terry's car, fled to Tennessee, and evaded arrest for nearly a month. When arrested, he gave a video-taped confession in which his speech was almost monotone, and he showed little emotion and no regret. But Maples said he could not remember why he killed his friends.

Because Maples's confession would be presented to the trial jury, counsel knew Maples would likely be convicted. *See Maples v. Comm'r, Ala. Dep't of Corr.*, 729 F. App'x 817, 825 (11th Cir. 2018). His videotaped confession did not show Maples in a good light. Counsel knew that overcoming the effect that video

confession would most likely have on the jury's view of Maples would require presenting a different Cory Maples to the jury during the penalty phase. Yet they did relatively little to investigate potential witnesses who could show the jury a different side of Maples or who could provide more explanation of traumatic effects of his mother's treatment of him as a toddler.

The gravity of Maples's crimes is not lost on this court—just as it was not lost on the jury that, by a vote of 10 to 2, recommended Maples be put to death for his crime, or on the trial judge who imposed the death penalty. But Maples, like all defendants, had a constitutional right to effective counsel in the penalty phase of his trial.  For the reasons discussed below, the court finds that his trial counsel failed to reasonably investigate and present mitigating evidence on Maple's behalf. Had his counsel done so, a reasonable probability arises that at least one juror would have been swayed to vote for life without the possibility of parole instead of death.  Based on the record, including the testimony and exhibits presented at the evidentiary hearing, the court finds that Maples's claim of ineffective assistance during the penalty phase is due to be granted.

# I.   BACKGROUND

## A.   Factual Background

The facts that follow are largely derived from the trial court's factual findings reflected in its sentencing order. *See* (Rule 32 C.R. Vol. 37, Tab 26 at 1–12).[1] Maples and Terry had spent the evening of Friday, July 7, 1995 drinking, playing pool, and riding around in Terry's new red Camaro. Robinson, who was new to the area but had known Terry and Maples for months, asked Terry for a ride home from the pool hall where the three men had been playing pool.

Sometime around or shortly after midnight that night, the trio arrived at the driveway of Maples's family home. Once there, Maples went into his home, picked up a .22 caliber rifle, and walked back outside to the car where Terry and Robinson were preparing to leave. Maples walked to the driver's side of the car and shot Terry twice in head, then shot Robinson twice in the head. Both men died instantaneously. Maples then pulled Terry's body out of the car, drove the car to a nearby bridge, and threw Robinson's body into the Mud Tavern Creek one mile from Maples's home.

---

[1] A note about citations: If the state court record is part of this court's electronic record, this court has cited to the document number in this court's electronic record; if not, the court has cited directly to the state court record.  Regarding page numbers for cites to documents in this court's electronic record, the court has cited to the actual page number for transcripts, such as ones from witness depositions or the evidentiary hearing, and not to the PDF page number for that court document. In all other instances, the court's citation refers to the document number in this court's electronic record with the PDF page number of that specific document.

Around 1:00 A.M. on Saturday, July 8, 1995, Maples's half-brother, Daniel Maples and his friend Matt Shell discovered Terry's body in the driveway near the Maples home. Later that night, Decatur police discovered Robinson's body in the creek.

On the night of August 1, 1995, almost a month later, the Nashville Police found and arrested Maples after receiving a tip from someone who spotted him with Terry's red Camaro. Shortly after being taken into custody, in the early hours of the following morning, Maples confessed to the murders on a video recording. He showed no remorse and could not think of a reason why he shot Terry and Robinson. He had not been fighting with either of them and denied harboring any animosity towards them. And he had no history of serious violent crime.

Following his indictment, the trial court appointed two attorneys, Mark Craig and Phil Mitchell, to represent Maples. His attorneys later retained Johnny Nesmith, a private investigator, and Dr. Allen Shealy, a clinical and forensic psychologist, to help them prepare for trial.

## B.    Procedural History

After a jury trial, Maples was convicted of capital murder. The jury recommended Maples be sentenced to death by a vote of 10 to 2, which the trial court accepted. The court found one statutory aggravating factor—murder during a robbery; one statutory mitigating factor—Maples's limited criminal history; and a

few non-statutory mitigating factors—Maples had a "history of abuse from his mother," suffered from drug dependency, and "made efforts at controlling his drug dependency in drug rehabilitation." *See Maples v. State*, 758 So. 2d 1, 31-32, 81 (Ala. Crim. App. 1999) (citing C.R. 560-565) (explaining in detail the trial court's sentencing order). The trial judge concluded that Maples's mitigating factors were weak and unpersuasive and found that the single statutory aggravating factor justified imposing the death penalty. *See Maples*, 758 So. 2d at 21-21.

On direct appeal, the Alabama Court of Criminal Appeals and the Alabama Supreme Court affirmed the convictions and sentence. *Ex parte Maples*, 758 So. 2d 81 (Ala. 1999); *Maples v. State*, 758 So. 2d 1 (Ala. Crim. App. 1999). The United States Supreme Court denied *certiorari*. *Maples v. Alabama*, 531 U.S. 830 (2000).

Maples then retained new, *pro bono* counsel and filed his initial petition for postconviction relief under Alabama Rule of Criminal Procedure 32 in state court, which he later amended. The trial court denied Maples's petition and sent notice by mail to Maples's attorneys of record. But unknown to both Maples and the trial court, Maples's *pro bono* counsel had changed law firms without notice to them. So, Maples was never informed of the trial court's decision and, through no fault of his own, did not timely appeal the trial court's Rule 32 order to the state appellate court.

Through new counsel, Maples sought federal habeas relief. The district court denied his request because of his procedural default in state court, and the Eleventh

6

Circuit affirmed. *Maples v. Allen*, 586 F.3d 879 (11th Cir. 2009), *rev'd sub nom. Maples v. Thomas*, 565 U.S. 266 (2012). Maples then appealed to the United States Supreme Court.  After finding that Rule 32 counsel had abandoned him, the Supreme Court reversed, holding that Maples's procedural default was excused by his prior counsel's silent abandonment. *Maples v. Thomas*, 565 U.S. 266, 289 (2012). The Court left open the question of whether Maples showed actual prejudice, and the Eleventh Circuit remanded the case back to the district court to address that issue. *Maples v.Comm'r, Ala. Dep't of Corr.*, 460 F. App'x 860 (11th Cir. 2012).

On remand, the district court denied Maples's request for an evidentiary hearing and concluded that Maples's penalty-phase mitigation claim was procedurally defaulted for lack of prejudice. *Maples v. Dunn*, No. 5:03-CV-2399-SLB, 2015 WL 5444096 (N.D. Ala. Sept. 14, 2015). Specifically, the district court found reasonable the state habeas court's conclusion that Maples, in his amended Rule 32 petition, did not allege facts that established *Strickland* prejudice and determined that the claim was procedurally defaulted.  *Maples*, 2015 WL 5444096 at *50-78.  Maples appealed. *See Maples v. Comm'r, Ala. Dep't of Corr.*, 729 F. App'x 817 (11th 2018).

## 1.    The Eleventh Circuit Remanding Opinion

The Eleventh Circuit "granted Maples a Certificate of Appealability (COA) as to one claim: 'Whether the district court erred in denying [Maples's] claim that

his trial counsel rendered ineffective assistance of counsel in the investigation and presentation of mitigating evidence during the penalty phase of [Maples's] 1997 trial?'" *Maples*, 729 F. App'x at 819. On appeal, the Circuit Court held that Maples had adequately *alleged* a claim of ineffective assistance of trial counsel during the penalty phase of his trial. It remanded the case and instructed this court to hold an evidentiary hearing to provide Maples the *opportunity to prove* the allegations in his Amended Rule 32 Petition of ineffective assistance of counsel during the penalty phase of his trial. *Id.* at 828.

After ordering an evidentiary hearing, the Eleventh Circuit instructed this court to "make factual findings and conclusions of law as to whether Maples has shown actual prejudice to excuse his procedural default of his penalty-phase mitigation claim in state court . . . ." *Id.* And if this court concludes that Maples has shown actual prejudice, the Eleventh Circuit instructed this court to rule on the merits of Maples's penalty-phase mitigation claim. *Id.*

The Eleventh Circuit further advised that because it determined the state habeas court's decision was unreasonable, this court "is no longer bound by § 2254(d) or limited to consideration of the facts developed in the state [habeas] court record when evaluating the merits of [Maples]'s claim"; accordingly, the Eleventh Circuit instructed this court to review Maples's claim *de novo*. *Maples*, 729 F. App'x at 828.

8

## II.  **STANDARDS OF REVIEW**

### A.  **Mandate Rule**

Because the Eleventh Circuit remanded this case with instructions, the mandate rule applies. "The mandate rule is a specific application of the 'law of the case' doctrine which provides that subsequent courts are bound by any findings of fact or conclusions of law made by the court of appeals in a prior appeal of the same case." *Friedman v. Mkt. St. Mortg. Corp.*, 520 F.3d 1289, 1294 (11th Cir. 2008) (quotation marks omitted). Under this rule, "a district court cannot amend, alter, or refuse to apply an appellate court's mandate simply because an attorney persuades the court that the decision giving rise to the mandate is wrong, misguided, or unjust." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 881 F.3d 835, 844 (11th Cir. 2018).

But, as explained above, the Circuit Court's decision does not limit this court's fact-finding on remand. The Circuit decision only discussed Maples's *allegations*— not what he might actually prove. Instead, the Eleventh Circuit directed this court to conduct an evidentiary hearing and "make factual findings and conclusions of law as to whether Maples has shown actual prejudice to excuse his procedural default of his penalty-phase mitigation claim in state court." *Maples*, 729 F. App'x at 828. As noted, the Circuit Court also directed this court to review Maples's claim *de novo*. *Id.*

**B.     Cause-and-Prejudice Standard**

Generally, "a state prisoner's habeas claims may not be entertained by a federal court when (1) a state court [has] declined to address [those] claims because the prisoner failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (alterations in original) (citation and internal quotation marks omitted). "The bar to federal review may be lifted, however, if the prisoner can demonstrate cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law"—the "cause and prejudice" standard. *Maples*, 565 U.S. at 280, 289 (alterations in original) (citation and internal quotation marks omitted).

As explained above, the Supreme Court has already held that Maples established *cause* for his procedural default—his abandonment by Rule 32 counsel constituted "cause to excuse the missed notice of appeal deadline." See *Maples*, 565 U.S. at 280. But he must still show *prejudice* for the failure to appeal his ineffective assistance of counsel claim. *Id.* "To prevail on a cause and prejudice theory, a petitioner must show 'actual prejudice.' 'Actual prejudice means more than just the possibility of prejudice; it requires that the error worked to [the petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional

dimensions.'" *Fordham v. United States*, 706 F.3d 1345, 1350 (11th Cir. 2013) (quoting *Ward v. Hall*, 592 F.3d 1144, 1179 (11th Cir. 2010)).

The standard for actual prejudice to overcome a procedural default overlaps with the standard for *Strickland* prejudice to prove an ineffective-assistance claim. *Maple*s, 729 F. App'x at 821 (citing *Strickler v. Greene*, 527 U.S. 263, 289 (1999)); *see also Mincey v. Head*, 206 F.3d 1106, 1147 & n.86 (11th Cir. 2000) ("the prejudice *Strickler* requires to overcome procedural default is the same as the prejudice *Strickland* requires to demonstrate prejudice" for ineffective assistance of counsel). So, to establish either prejudice to excuse his procedural default for failing to appeal the Rule 32 court's denial of his claim and *Strickland* prejudice for ineffective assistance of counsel, Maples must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the [penalty phase of his trial] would have been different." *See Strickland*, 466 U.S. at 696.

Here, Maples's procedural default stems from his failure to fully exhaust his ineffective assistance of counsel claim in state court; he failed to appeal the Rule 32 court's denial of that claim. To determine whether a failure to appeal a claim was prejudicial, the court must first review "the merits of the [un-appealed] claim. If the Court finds that the neglected claim would have a reasonable probability of success on appeal, then . . . it is necessary to find appellate counsel's performance prejudicial because it affected the outcome of the appeal." *Heath v. Jones*, 941 F.2d 1126, 1132

(11th Cir. 1991) (quoting *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990)).

So, the court will first decide the merits of Maples's claim of ineffective assistance of trial counsel during the penalty phase.  And, the court will assess the merits of that claim based on the Eleventh Circuit's finding that, *if* Maples proved the allegations in his amended Rule 32 petition, those allegations would constitute deficient performance and "establish a reasonable probability that, but for trial counsel's deficient performance, the result of Maple's penalty-phase proceeding would have been different." *Maples*, 729 F. App'x at 826.  As the court subsequently will explain thoroughly, because Maples has proven enough of his allegations to prove both deficient performance and prejudice under the *Strickland* standard, Maples has also shown prejudice to overcome procedural default for his failure to fully exhaust the ineffective assistance of counsel claim in state court.

## C.    The *Strickland* Standard

For Maples to prevail on his ineffective assistance of counsel claim, he must prove "[1] that his counsel's performance was deficient and [2] that his counsel's deficient performance prejudiced him." *See Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (citing *Strickland*, 466 U.S. at 688).  Maples must prove both of these prongs by a preponderance of competent evidence. *See Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000).

**Performance Prong**

To satisfy the performance prong, a petitioner must establish by a preponderance of the evidence that counsel's performance was unreasonable. *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313).  Deficient performance is "'representation [that falls] below an objective standard of reasonableness.'" *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 551 (11th Cir. 2015) (citing *Strickland*, 466 U.S. at 688).

The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms. *Stewart*, 476 F.3d at 1209. The court does not consider "what the best lawyers would have done"; instead the court must determine "whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

Judicial scrutiny of counsel's performance must be highly deferential, because "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693. Indeed, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  Because of this strong presumption,  a movant "'must establish that no competent counsel

would have taken the [challenged] action.'" *Khan v. United States*, 928 F.3d 1264, 1272 (11th Cir. 2019) (quoting *Chandler v. United States*, 218 F.3d 1305, 1314-15 (11th Cir. 2000) (en banc) and citing *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005)).

*Strickland*'s strong presumption "is an evidentiary presumption that carries through the trial" and requires the petitioner to "present evidence that outweighs the presumed evidence of competence." *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1238–39 (11th Cir. 2011). And "where the record is incomplete or unclear about [counsel]'s actions," the court presumes that counsel "exercised reasonable professional judgment." *Id.* at 1239 (alteration in original).

Review of counsel's performance is highly deferential and must not be made with the benefit of hindsight.  As the Eleventh Circuit has instructed, "[t]he widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight—except perhaps the rule that we will not judge trial counsel's performance through hindsight."  *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995).

When examining counsel's performance at the penalty phase of trial, the court must decide "'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'" *Stewart*, 476 F.3d at 1209 (quoting *Henyard v. McDonough*,

14

459 F.3d 1217, 1242 (11th Cir. 2006)). To meet the requirements of *Strickland*, counsel does not need to investigate "every conceivable line of mitigating evidence" regardless of its likelihood of benefitting the defendant at sentencing. *Pittman v. Sec'y, Florida Dep't of Corr.*, 871 F.3d 1231, 1250 (11th Cir. 2017) (quoting *Wiggins v. Smith*, 539 U.S. 510, 533 (2003)).

In fact, the *Strickland* standard does not even "require defense counsel to present mitigating evidence at sentencing in every case." *Pittman*, 871 F.3d at 1250. Rather, the *Strickland* standard for counsel's performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. And, of course, reasonableness depends upon the context of the particular case. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). So, the district court must make a case-by-case determination regarding whether a mitigation investigation was reasonable under the facts of that particular case. *Hardwick*, 803 F.3d at 552.

"Even assuming [trial counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Hardwick*, 803 F.3d at 552. "Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Id.* "[S]trategic choices made after less than complete investigation are reasonable precisely to the

extent that reasonable professional judgments support the limitations on investigation." *Id.* at 528 (quoting *Strickland*, 466 U.S. at 690–691).

Counsel's failure to present mitigating evidence is not *per se* ineffective assistance of counsel; "it can, on occasion, be justified as a strategic choice." *Hardwick*, 803 F.3d at 551 (citing *Lightbourne v. Dugger*, 829 F.2d 1012, 1025 (11th Cir. 1987)). "Strategic choices made *after thorough investigation* of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Strickland*, 466 U.S. at 690 (emphasis added). So, counsel's decision not to investigate further or present mitigating evidence is "only reasonable, and thus due deference, to the extent that it is based on a professionally reasonable investigation." *Hardwick*, 803 F.3d at 551.

**Prejudice Prong**

A petitioner also must meet a high burden to establish that his lawyer's deficient performance caused prejudice to his case. *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). The petitioner does not meet that high burden merely by showing "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (citing *Strickland*, 466 U.S. at 693). Instead, a petitioner must show "'a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating

circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209 (quoting

*Strickland*, 466 U.S. at 695).

In evaluating whether the petitioner has shown a reasonable probability that,

if counsel had not been deficient the petitioner would not have been sentenced to

death, the court must "consider 'the totality of the available mitigation evidence –

both that adduced at trial, and the evidence adduced in the habeas proceeding' –

and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558

U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000)); *see*

*also Sears v. Upton*, 561 U.S. 945, 956 (2010) (holding that a proper prejudice

analysis under *Strickland* must take into account the newly uncovered mitigation

evidence, along with the mitigation evidence introduced during the penalty phase

of the trial, to assess whether a reasonable probability arises that the petitioner

would have received a different sentence after a constitutionally sufficient

mitigation investigation).

## III.   **EVIDENTIARY HEARING EVIDENCE**

Per the Eleventh Circuit's instructions, this court held an evidentiary hearing

over five days, from Monday, October 21, 2019 through Friday, October 25, 2019.

Maples presented 22 witnesses in person, including three expert witnesses. These

witnesses were Maples's father, Philip Maples; his step-mother, Elise Maples; his

friends Derek Shelton, James Beddingfield, and Roderick Frost; Shelton's mother,

Deborah Atkinson; his uncle, Kenneth Maples; his aunt, Dianne Ferrell; his cousin, Shannon Smith; his high school counselor, Martha Lenhart; his second grade teacher, Judy Simms; his high school principal, Bill Simms; his high school coaches Glen Lang and Billy Hopkins; Philip Maples's friend, Margie Moore; Maples's friend and former employer, Alan Birdsong; the Director of Quest, Kathy Goodwin; and Maples's trial counsel, Mark Craig.   Maples also presented three expert witnesses—Dr. Robert Shaffer, a clinical psychologist specializing in neuropsychology and forensic psychology who testified about Maples's mental functioning at the time of the crime; Dr. Wilkie Wilson, a neuropharmacologist who testified about the effects of drugs on Maples's brain; and Dr. Jolie Brams, a licensed clinical, forensic psychologist who testified about the impact of Maples's early childhood background on his life. Maples also presented four witnesses by deposition: his trial co-counsel, Phil Mitchell; his birth mother, Denise Maples; his aunt, Dale Ray; and her husband, Fred Ray.[2] The State offered one witness: its

---

[2] Because many witnesses carry the "Maples" family name, the court refers to Petitioner Cory Maples as "Maples," and to others by their first name for clarity.

psychological expert, Dr. Glen King. The court also admitted 40 of Maples's exhibits and 21 of the State's exhibits.

As stated above, the Eleventh Circuit also instructed this court to make findings of fact after conducting the evidentiary hearing to determine whether Maples proved his Rule 32 allegations.

## IV.   <u>LEGAL ANALYSIS</u>

For organizational ease, the court will first discuss *Strickland's* deficient performance prong and Maples' allegations regarding deficient performance; make factual findings regarding whether Maples has proven each deficient performance allegation; and then analyze whether the proven allegations constitute deficient performance.

Before it proceeds to the prejudice prong of *Strickland* and discusses the mitigation evidence trial counsel should have presented to the jury but for their deficient performance, the court will assess the alleged strategic choices of counsel; discuss whether those choices were reasonable; and make factual findings as to what mitigation evidence it will consider based on those strategic choices.  Next, the court will address the prejudice prong of *Strickland*; make factual findings as to whether Maples has proven each category of mitigation evidence he claims counsel should have presented to the jury; and then weigh the totality of the proven mitigation evidence against the evidence in aggravation.   Because Maples has proven

significant allegations of both deficient performance and prejudice, the court will grant him habeas relief

## A.     Deficient Performance

The Eleventh Circuit found that the allegations Maples made in his amended Rule 32 petition, *if true*, "show that [(1)] trial counsel failed to conduct a minimally adequate mitigation investigation and that [(2)] trial counsel's preparation for Maples's penalty-phase presentation fell below an objective standard of reasonableness." *Maples*, 729 F. App'x at 824 (internal quotation marks omitted). Like the Circuit Court, this court will also bifurcate its discussion of Maples's allegations of deficient performance into two parts: those relating to trial counsel's investigation, and those relating to trial counsel's penalty-phase preparation.

### 1.     Deficient Mitigation Investigation

#### a.  Maples' Evidence of Deficient Mitigation Evidence

The Eleventh Circuit found that the following allegations from Maples's amended Rule 32 petition, if true, "show that trial counsel failed to conduct a minimally adequate mitigation investigation":

- Before Maples's case, trial counsel had never assisted with a capital penalty phase.

- Trial counsel's entire mitigation investigation consisted only of briefly speaking to Maples's father and stepmother and hiring a psychologist, Dr. Allen Shealy, who only met with Maples for a few hours. Trial counsel did not contact any other individuals, despite Maples's father and stepmother recommending several potential mitigation witnesses by name, including neighbors, teachers,

friends, and relatives. Trial counsel also neglected to request Maples's educational and medical records. Further, trial counsel failed to provide Dr. Shealy with more thorough information about, among other things, the abuse Maples suffered as a child, Maples's struggles with drug addiction, and Maples's past suicidal ideation, thereby jeopardizing the thoroughness of his assessment.

- Trial counsel conducted this cursory investigation despite their awareness that Maples had a history of personal trauma that warranted additional investigation. For example, trial counsel were in possession of Maples's application to a drug-addiction program which indicated that Maples struggled with addiction and multiple suicide attempts. Yet, trial counsel did not contact any of Maples's counselors from the program—not even Kathy Goodwin, the director of the program who interviewed Maples for admission to the program.

*Maples*, 729 F. App'x at 823–24.

The Circuit Court found that, "based on the allegations, the scope of trial counsel's mitigation investigation was unreasonable" because "[a]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice' about penalty-phase strategy." *Id.* (quoting *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008)). The following subsections detail the evidence Maples advanced—or failed to advance— during the evidentiary hearing as to each of these allegations.

### i.    Trial Counsel's Inexperience

The Eleventh Circuit found that Maples had adequately alleged trial counsel's inexperience as *one of several* allegations that, "if true, amount to deficient performance under *Strickland*"; Maples had alleged, "Before Maples's case, trial

counsel had never assisted with a capital penalty phase." *Maples*, 729 F. App'x at 823–24. Although inexperience of counsel in a death penalty case is a factor that may contribute to a finding of ineffective assistance of counsel, that inexperience *alone* is not enough to find counsel ineffective. *See Sinclair v. Ferrell*, 2010 WL 1487820 *10 (S.D. Ala. March 15, 2010) (citing *United States v. Kelley*, 559 F.2d 399, 401 (5th Cir. 1977)).

At the evidentiary hearing, Craig testified that before representing Maples, he had never served as lead counsel in a capital murder case and had never been involved in the penalty phase of a capital case; he had served as second chair in a capital murder case in which the defendant was convicted of lesser charges, so the case did not proceed to the penalty phase. (Doc. 191 at 932-33). Similarly, Mitchell testified that before representing Maples, he had never represented anyone in a murder trial and had no capital experience at all. (Doc. 184-37 at 10). In fact, trial counsel admitted this fact to the trial jury during the penalty phase presentation when Craig stated, in opening: "Now, I will confess to you as I stand before you in this part of the proceedings that while I've been in capital cases before, I've never been at this part . . . so we may appear to be stumbling around in the dark as we're proceeding . . . ." (Doc. 184-40 at 3081–82). During closing, Craig again stated "I have never stood before a jury that has convicted a client of mine of capital murder and had to request that jury to spare his life." (Doc. 184-40 at 3255-3256).

22

But Craig also testified to efforts he made to prepare himself for the penalty phase: he read treatises and the *Capital Defense Manual* to educate himself; he spoke with experienced criminal defense attorneys and obtained their recommendations for an expert witness and an investigator; and he sought counsel from his law professor at Vanderbilt and from the Southern Center for Human Rights. (Doc. 191 at 945-46, 1003-1006). His billing records do not reflect these efforts because he did not charge for educating himself. (Doc. 191 at 946, 1004). He does not recall anyone to whom he spoke recommending that he hire a mitigation specialist, and, to his knowledge, mitigation specialists were not in common use in North Alabama in the 1990s. (Doc. 191 at 1006-1007).

But despite Craig's efforts, the court finds that Maples has proven his trial counsel—Mark Craig and Phil Mitchell—had not participated in the penalty phase of a capital trial before his trial. The court will consider whether this factor contributed overall to the failures of counsel in representing Maples.

### ii.    Failure to Investigate Mitigation Witnesses

The Eleventh Circuit found that Maples had adequately alleged trial counsel's failure to contact witnesses as one of the allegations that, "if true, amount to deficient performance under *Strickland*." *Maples*, 729 F. App'x at 823. According to the Eleventh Circuit, Maples adequately alleged that

> Trial counsel's entire mitigation investigation consisted only of briefly speaking to Maples's father and stepmother and hiring a psychologist,

> Dr. Allen Shealy, who only met with Maples for a few hours. Trial counsel did not contact any other individuals, despite Maples's father and stepmother recommending several potential mitigation witnesses by name, including: neighbors, teachers, friends, and relatives.

*Id.* at 824. Maples alleged that trial counsel "failed to contact Maples's drug-addiction program or a single person from the laundry list of people whom Maples's father and stepmother named as potential witnesses." *Id.* at 824–25.

At the evidentiary hearing, Elise Maples testified that she gave Craig the names and contact information of family members, neighbors, cousins, and friends of Maples who could testify about him. (Doc. 188 at 24). Philip Maples added that trial counsel did not ask either him or Elise for such a list, but Elise provided one anyway. (Doc. 189 at 468).

Maples presented no evidence as to the actual names on the list Elise Maples prepared. But every family member, neighbor, friend, teacher, school administrator, and coach that appeared at the evidentiary hearing testified that he or she had not spoken to trial counsel or their investigator, Johnny Nesmith, before the trial. Each of these witnesses also testified they were available at the time and willing to speak with trial counsel. Both Craig and Mitchell similarly testified that they did not recall speaking with any of these potential witnesses before Maples's trial. (Doc. 191 at 991, 1082–83); (Doc. 184-37 at 32–36, 55–59). The court assumes that some or all these witnesses were on the "laundry list" of names mentioned in the Circuit opinion.

Even Kenneth Maples, who *did* testify during Maples's penalty-phase presentation, testified at the evidentiary hearing that trial counsel never contacted him or asked him to testify—Philip Maples had done so instead. (Doc. 188 at 127). Craig, however, recalls that he had spoken to Kenneth, but he did not clarify when they first spoke or for how long. (Doc. 191 at 1082–83).

Unlike Kenneth Maples, Alan Birdsong testified that one of Maples's trial counsel (he did not recall who) called and asked him to testify at Maples's trial in the guilt phase. (Doc. 189 at 347-348); *see* (Doc. 184-41) (transcript of testimony at guilt phase of Maples's trial). But Birdsong testified that trial counsel only asked him *whether* he would testify at the trial and never asked him any other questions prior to trial, including any about Maples's background. (*Id*.). Trial counsel's notes about Birdsong state, summarily, that Birdsong "[p]robably has no background knowledge in this case," lending further credence to Birdsong's testimony that trial counsel did not explore his knowledge about Maples's social background. (Doc. 184-29 at 1).  Counsel did not call him for mitigation.

Among the witnesses that trial counsel failed to contact was Officer Lary Greene, who Maples had helped to arrest a local drug dealer. (Doc. 189 at 247). Greene testified that no one from Maples's trial counsel team contacted him to testify, but that he would have been willing to do so if asked. (*Id.* at 249). Craig

likewise testified he is "fairly confident" he never interviewed Greene. (Doc. 191 at 969).

Trial counsel also failed to contact Kathy Goodwin, the director of the Quest program where Maples sought drug rehabilitation. Goodwin testified that she was still working at Quest from 1995 to 1997, and she does not remember anyone from Maples's trial counsel team reaching out to her. (Doc. 189 at 390). Craig and Mitchell both testified that they do not recall contacting Kathy Goodwin. (Doc. 191 at 967); (Doc. 184-37 at 46).

Based on the unrebutted testimony of the witnesses at the evidentiary hearing, the court finds that trial counsel did not contact any of the potential mitigation witnesses that testified during the evidentiary hearing except for Elise Maples, Philip Maples, Dr. Shealy[3] and Alan Birdsong.

### iii. Failure to Request Educational and Medical Records

The Eleventh Circuit found that Maples had adequately alleged that trial counsel "neglected to request Maples's educational and medical records"—one of several allegations that, "if true, amount to deficient performance under *Strickland*." *Maples*, 729 F. App'x at 823–24.

---

[3] As the court will discuss *infra*, although counsel contacted Dr. Shealy, they failed to take certain steps that may have allowed Shealy to make a more thorough assessment of Maples.

Craig and Mitchell both testified that they do not recall requesting Maples's educational records. (Doc. 191 at 967, 989–990); (Doc. 184-37 at 37, 69). When pressed further, Craig added that he is "pretty sure" he did not request them. (Doc. 191 at 1082). Martha Lenhart, the school administrator who had "complete" responsibility for fulfilling records requests at Maples's high school at the time of the trial, testified that no one requested Maples's records. (Doc. 189 at 269–270). Lenhart added that if anyone had made such a request, a record of that request would have been kept with Maples's cumulative file, and she saw no such record in Maples's file. (*Id.* at 270). So, the court finds that trial counsel neglected to request Maples's *educational* records.

But Maples failed to prove that his trial counsel neglected to request his *medical* records, including the records from Quest. Mitchell testified that he subpoenaed Maples's records from Quest and from the hospitals that had treated Maples in the past. (Doc. 184-37 at 25). When asked whether he recalled personally obtaining Maples's medical records, Mitchell answered affirmatively. (*Id.* at 38). Mitchell further testified that he recalled *reviewing* Maples's medical records as well. (*Id.* at 41). Additionally, Mitchell's fee declaration stemming from his representation of Maples—a contemporaneous record Maples himself submitted to the court—also contains two expense line items for "Medical Records pursuant to Subpoena" dated May 3, 1997. (Doc. 184-12 at 9). The fee declaration also contains

a billable line item for "review[ing] medical records from Decatur General West." (*Id.* at 5–6). Furthermore, the Quest records exhibit produced by Maples himself contain a subpoena dated February 1997 requesting those records, as well as a document from Quest responding to the subpoena and agreeing to produce Maples's records, also dated February 1997. *See* (Doc. 184-25 at 2–8).

Maples failed to present any contradicting or impeaching evidence to undermine the credibility of Mitchell's testimony or the line items in Mitchell's fee declaration. Further, Maples failed to mention trial counsel's alleged failure to request medical records in his pre-hearing brief. Tellingly, in that brief, Maples even omitted this allegation from his citation of the Eleventh Circuit's opinion that had previously discussed it, changing the allegation from "[t]rial counsel also neglected to request Maples's educational *and medical* records," *Maples* 729 F. App'x at 824 (emphasis added), to "[t]rial counsel neglected to request Mr. Maples's educational records." (Doc. 158 at 12). Thus, the court finds that Maples's trial counsel *did* request and review his medical records, including the Quest records.

So, the court finds that Maples has proven this allegation *only* as to his educational records but not as to his medical records.

### iv.   Failure to Provide Information to Expert Witness

The Eleventh Circuit found that Maples had adequately alleged that his trial counsel failed to adequately prepare Dr. Shealy to assess Maples as they had not

requested Maples's medical and educational records; and they had "failed to provide Dr. Shealy with more thorough information about, among other things, the abuse Maples suffered as a child, Maples's struggles with drug addiction, and Maples's past suicidal ideation, thereby jeopardizing the thoroughness of his assessment." *Maples*, 729 F. App'x at 824. As a result, according to Maples, Dr. Shealy's testimony was "confusing and misleading." *Id*.

The court first notes that neither Maples nor Dr. Shealy testified at the evidentiary hearing. So, the court lacks direct evidence of what Maples may have told Dr. Shealy about "the abuse [he] suffered as a child, [his] struggles with drug addiction, and [his] past suicidal ideation," beyond the transcript of a telephone call between Craig and Dr. Shealy and Dr. Shealy's own trial testimony. *See* (Docs. 148-15 at 3093-3174; 184-28 at 1-13; 191 at 976, 979); *see also Maples*, 729 F. App'x at 824.

The court begins with what trial counsel *did* provide Dr. Shealy. First, the court finds trial counsel provided Dr. Shealy with Maples's medical records, including his records from Quest. Although Craig testified that he does not recall providing Dr. Shealy with Maples's medical records (doc. 191 at 976), co-counsel Mitchell testified that he had a "recollection of giving Dr. Shealy records related to Mr. Maples," and that Mitchell is confident Dr. Shealy had those medical records (doc. 184-37 at 25-26). Maples failed to offer any evidence contradicting Mitchell's

testimony. And, in his pre-hearing brief, Maples tellingly abandoned any contention that trial counsel failed to provide Dr. Shealy with his medical records, including those from Quest. *See generally* (Doc. 158).

The Quest records contain considerable information about Maples's substance abuse and suicidality. There, Maples detailed his history of drug abuse, including specific information about the types of drugs he abused and the age he began using certain substances. (Doc. 184-25 at 16–17). Maples also disclosed his suicidality in the Quest records. Maples answered "Yes" to the question about whether he had ever thought about ending his own life, stating that he "just got so depressed [he] wanted [his life] to end." (Doc. 184-25 at 14). When asked whether he had *attempted* to end his own life, Maples answered "Yes," adding that he had slit his wrist while under the influence. (*Id.*). So, Dr. Shealy would have been aware of Maples's substance abuse and suicidality by reviewing these records alone.

The court also finds that trial counsel ensured Dr. Shealy took steps to assess the effects of Maples's childhood trauma and drug addiction. Dr. Shealy's phone call with Craig and his trial testimony both indicate that Dr. Shealy had at least some knowledge about these aspects of Maples's history. Regarding Maples's childhood trauma, Dr. Shealy told Craig during a phone call that "[t]he core psychological factor in [Maples's] life was that issue of abandonment by the mother and the abuse by the mother." (Doc. 184-28 at 7). Dr. Shealy believed that Maples's childhood

abuse was "the most mitigating . . . part of [his] history." (*Id.*). And at trial, Dr. Shealy testified about specific instances of abuse he had learned about during his examination of Maples, including Maples "being tied to a chair and whipped with a broom handle," returning home with "fingernail marks on his neck and bruises on his body," and an instance where Denise "had run away with him . . . to Pennsylvania." (Doc. 184-40 at 3125-3127).

Regarding Maples's drug addiction, Craig testified that he recalled speaking "somewhat at length" with Dr. Shealy about Maples's drug issues. (Doc. 191 at 976). And the memorandum of Craig's phone conversation with Dr. Shealy substantiates Craig's recollection. During that call, Dr. Shealy explained that Maples "has a long history of intense substance abuse, and I believe has been to treatment for it one time," ostensibly referencing Maples's time at Quest. (Doc. 184-28 at 3). Dr. Shealy added that "before this, all of [Maples's] legal history was substance abuse related. A DUI and, I believe, possession." (*Id.*). And at the trial, Dr. Shealy was able to testify at length about Maples's substance abuse history. *See* (Doc. 184-40 at 3116-3117).

But trial counsel failed to take certain steps that would have allowed Dr. Shealy to perform a more thorough assessment. First, the court finds that trial counsel failed to alert Dr. Shealy about, or ask him to assess, Maples's suicidality. Because trial counsel had requested and reviewed Maples's Quest records, they were

ostensibly aware of Maples's suicidality by the time they hired Dr. Shealy. Indeed, Mitchell testified that he was aware of Maples's suicidal ideation during his representation of Maples. (Doc. 184-37 at 43). But Craig testified that he does not recall telling Dr. Shealy about Maples's suicide attempts. (Doc. 191 at 976). And Craig and Dr. Shealy did not discuss Maples's suicidality during their memorialized October 1997 phone call. *See* (Doc. 184-28). Further, Dr. Shealy did not testify about Maples's suicidality during the trial.

Second, trial counsel failed to direct Dr. Shealy to further investigate evidence of Maples's previous depression. Again, because trial counsel had reviewed Maples's Quest records, they were ostensibly aware that Maples had reported experiencing depression by the time they hired Dr. Shealy. During their memorialized phone call, Dr. Shealy told Craig that his testing showed Maples was "maybe *situationally* depressed." (Doc. 184-28 at 3) (emphasis added). Craig did not ask Dr. Shealy any follow-up questions about that finding, nor did he indicate to Dr. Shealy that Maples's Quest records suggested Maples's depression predated his time in jail and warranted further investigation. *See* (*id.*). And Craig does not rebut this fact, testifying only that he does not specifically recall asking Dr. Shealy further about Maples's depression. (Doc. 191 at 976).

Third, the court finds that trial counsel failed to arrange for Dr. Shealy to meet anyone from Maples's family. Craig testified that he did not arrange for Dr. Shealy

32

to meet anyone from Maples's family, and, to his knowledge, Dr. Shealy never interviewed anyone from Maples's family. (Doc. 191 at 975). Dr. Shealy's own time records corroborate Craig's recollection, reflecting no instances where Dr. Shealy met with anyone other than Maples. *See* (Doc. 184-33 at 1).

The information Maples provided at the evidentiary hearing from Elise, Phil and especially his cousin Shannon Smith could have been beneficial to Dr. Shealy. He testified at trial to a very limited extent about the profound effect of abandonment by a mother on a toddler's development and the lasting consequences it can have. *See* (Doc. 184-40 and Doc. 191 at 886-87).  Had he known more about Maples's issues as elicited at the evidentiary hearing, Dr. Shealy could have provided details about how Denise's abandonment and particularly her second rejection of Maples affected his emotional development, much as the experts did at the evidentiary hearing.  *See* (Docs. 191, 192).

Fourth, the court finds trial counsel failed to provide Dr. Shealy with Maples's educational records, which, as stated above, they did not request.[4]

---

[4]  Regarding Maples's school record, the court notes that those records show that he had some minor conduct issues in elementary school, but no disciplinary issues in high school.  Those records also show that he struggled academically in some subjects but reveal no remarkable intellectual deficiencies.  But, as the court will subsequently discuss in detail, counsel chose not to call any school official at trial who would testify regarding Maples's good school record, and the court credits counsel's strategic decision.

So, although Dr. Shealy may have had Maples's medical records, the court finds that trial counsel failed to provide other valuable information to Dr. Shealy to assist him in adequately assessing Maples.

As the court has already noted, Maples presented three additional experts at the evidentiary hearing: Dr. Robert Shaffer, a clinical psychologist specializing in neuropsychology and forensic psychology who testified about Maples's mental functioning at the time of the crime; Dr. Wilkie Wilson, a neuropharmacologist who testified about the effects of drugs on Maples's brain; and Dr. Jolie Brams, a licensed clinical, forensic psychologist who testified about the impact of Maples's background on his life, specifically his mother's abandonment and the issues caused by it. The court doubts that the trial judge in 1997 would have allowed three experts to testify in mitigation or that all three of these additional experts were necessary for a constitutional penalty phase presentation of mitigation evidence. Instead, had counsel adequately prepared Dr. Shealy and provided him with and pointed him to crucial mitigation evidence, Dr. Shealy could have recognized, understood, and explained the adverse impact Maples's troubled background had on Maples's mental health without the need for additional experts.

### v.   Failure to Further Investigate Maples's Traumatic History

The Eleventh Circuit found that Maples had adequately alleged that trial counsel conducted a "cursory investigation despite their awareness that Maples had

a history of personal trauma that warranted additional investigation." *Maples*, 729

F. App'x at 824. As an example, the Eleventh Circuit cited Maples's allegation that

> trial counsel were in possession of Maples's application to a drug-addiction program which indicated that Maples struggled with addiction and multiple suicide attempts. Yet, trial counsel did not contact any of Maples's counselors from the program—not even Kathy Goodwin, the director of the program who interviewed Maples for admission to the program.

*Id.* The Eleventh Circuit concluded that, based on Maples's allegations, "potentially

powerful mitigating evidence stared [trial counsel] in the face, such as Maples's

suicide attempts, but they ignored the evidence, failing to take any steps to pursue

it." *Id.* (internal quotation marks and first alteration omitted) (alteration in original)

(citing *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009)).

Beyond his mental health, Maples also alleged his trial counsel unreasonably

failed to investigate his history of head trauma stemming from his twenty-foot fall

from a bluff as a teenager and a fight in which he was allegedly struck in the head.

### (a)   History of Suicidality

The court finds that Maples's trial counsel failed to investigate his alleged

suicidality beyond reviewing the Quest records. As stated above, trial counsel

became aware of Maples's suicidality at some point during their investigation—at

the latest when they obtained and reviewed the Quest records. When asked whether

he investigated Maples's attempted suicide, Craig testified that he does not recall

"any other investigation of that" beyond receiving the Quest records. (Doc. 191 at

964). Craig also testified that he does not recall contacting Kathy Goodwin or anyone else from Quest. (*Id.* at 967).

Mitchell similarly testified that he does not recall speaking with Goodwin or anyone else at Quest other than to discuss the production of the Quest records. (Doc. 184-37 at 46). Goodwin also testified that she was still working at Quest from 1995 to 1997, and she does not remember anyone from Maples's trial counsel team reaching out to her. (Doc. 189 at 390). The trial record contains no references to Maples's suicidal ideations or acts, further indicating that trial counsel did not explore this avenue. And Craig's memorandum of his call with Dr. Shealy likewise contains no reference to Maples's suicidality, indicating trial counsel did not direct Dr. Shealy to investigate it or even discuss it with him. *See generally* (Doc. 184-28).

### (b)    History of Depression

The court finds that trial counsel also failed to investigate Maples's history of depression beyond reviewing the Quest records. Trial counsel learned of Maples's history of depression at the latest when they reviewed his Quest records. But, as explained above, trial counsel failed to direct Dr. Shealy to further explore Maples's history of depression—even after Dr. Shealy stated that his findings showed Maples was experiencing situational depression, which Dr. Shealy surmised was because of Maples being in jail. Nor did trial counsel speak to anyone who could provide further details about Maples's history of depression, such as his friends, extended family, or

36

counselors at Quest. And though the court has no evidence about what questions, if any, trial counsel asked Philip or Elise Maples about this issue, trial counsel posed no questions to them at trial that would have allowed them to speak about Maples's depression, further indicating trial counsel did not investigate this evidence at all.

### (c)     Head Trauma: Fall from Bluff

The court finds that Maples failed to prove his allegation that counsel were ineffective for failing to investigate Maples's twenty-foot fall from the bluff, a fall which Maples alleges caused him to suffer head trauma. At the evidentiary hearing, Craig testified that he does not recall reading that Maples had injured himself by falling off a bluff, and he does not recall following up on that information. (Doc. 191 at 961). As noted earlier, Mitchell testified and the evidence supports that counsel had the medical records from the hospital about the fall.  Trial counsel offered no evidence of Maples's fall at the trial, further indicating they did not investigate further this facet of Maples's history.

But the court finds that trial counsel did not know, and had no reason to know, that the fall inflicted head trauma. Nothing in Maples's hospital records from that fall alerted trial counsel to such a possibility. Those records show that Maples was seen in the emergency room on October 10, 1990, for injuries suffered in a fall from a 20-foot bluff. (Doc. 184-23 at 19). He was 16 years old at the time. (*Id*.). In the emergency room, Maples complained of pain in the right side of his face, his left

knee, and his right shoulder and forearm. (*Id.*). He denied any loss of consciousness. (*Id.*). His pelvis, cervical spine, chest, left knee and right wrist were x-rayed. (*Id.* at 24; Doc. 184-24 at 1). All, except his right wrist, were negative for fractures. His fractured right wrist was set in the emergency room. (Doc. 184-24 at 1). Maples was released the same day. He did not receive an MRI or a CT scan. (Doc. 190 at 584–85).

Specifically, the hospital records do not indicate that Maples "suffered head trauma," that he had a concussion or a brain injury, or even that he lost consciousness. (Doc. 191 at 1042–43; doc. 184-23 at 19). Craig testified that the "closest thing" to an indication that Maples suffered head trauma was the note that Maples had an abrasion on the right side of his face. (Doc. 191 at 1042). And Dr. Shealy told Craig during their phone call that his own testing revealed Maples had "no evidence of any organic problems of any brain damage." (Doc. 184-28). Maples has presented no compelling evidence to suggest his trial counsel had sufficient reason to disregard their own expert's findings.

Maples *did* report suffering a concussion from his fall on his Quest records. But there, over four years after the fall, Maples stated that he had fallen *fifty* feet, suffered a concussion, and fractured his arm, hand, wrist, knee, ankle and ribs. (Doc. 184-25 at 15). This account runs contrary to the contemporaneous hospital records, which were supported by x-rays and physician examination.  So, Maples failed to

38

support his claim of ineffective assistance for failing to investigate further about his fall.

### (d) Head Trauma: Hit in Head with Baseball Bat

In his Amended Petition, Maples alleges that trial counsel failed to investigate his traumatic head injury caused when he was "hit with a baseball bat during an attack on him the year before the shootings." (Rule 32 C.R., Vol. 33, Tab 49, ¶ 150). The court finds that Maples failed to prove this event happened at all, much less that trial counsel should have somehow uncovered it.

The record contains evidence of one incident where Maples was allegedly hit in the head during a fight with Jamie Dobbs in 1994. Trial counsel learned about this fight from Maples's video-taped confession, statements Maples made to Dr. Shealy, and from questioning Dobbs. But no account of this fight included Maples being hit with a bat. Also, nothing in the record indicates that trial counsel should have been aware of another fight where Maples was struck with a baseball bat. The medical records do not show any treatment for the alleged head injury caused by Maples being hit with a bat. And Maples offered no evidence at the evidentiary hearing indicating he had ever been hit in the head with a bat.

The sole piece of testimony that hews somewhat closely to Maples's baseball-bat allegation was Dr. King's testimony that, during his 2019 evaluation of Maples,

Maples had told him he had been hit in the back of the head with a *baseball* (not the bat) when he was 17. (Doc. 192 at 1211). And, in his pre-hearing brief, Maples again tellingly abandons any contention that he was struck in the head with a baseball bat or that trial counsel failed to investigate this facet of Maples's history.

When citing the section of the Eleventh Circuit opinion that mentions this incident, Maples selectively paraphrased the section to exclude any mention it. *Compare Maples*, 729 F. App'x at 826 (". . . Maples has a history of head trauma. Maples once fell off a 20-foot cliff as a teenager *and was struck in the head with a bat*." (emphasis added) *with* (Doc. 154 at 17) ("Maples has a history of head trauma, including a fall off a 20-foot cliff as a teenager."). Trial counsel had no reason to believe that Maples was struck in the head with a baseball bat, and Maples failed to prove he was.

### b.   The Scope of Trial Counsel's Mitigation Investigation was Unreasonable

As stated above, the Eleventh Circuit found that, "based on the allegations, the scope of trial counsel's mitigation was unreasonable." *Maples*, 729 F. App'x at 824. The Circuit Court found that trial counsel "unreasonably decided to end the[ir] . . . investigation after only talking to Maples's father, Maples's stepmother, and Dr. Shealy." *Id.* (alteration in original) (internal quotation marks omitted) (citing *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011)). The Circuit Court concluded that "[p]otentially powerful mitigating evidence stared [trial counsel] in

the face, such as Maples's suicide attempts, but they ignored the evidence, failing to take any steps to pursue it." *Id.* (second alteration in original) (internal quotation marks omitted) (citing *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009)). Based on Maples's allegations, the Circuit Court found that "[t]rial counsel requested neither Maples's medical records nor his educational records" and "failed to contact Maples's drug-addiction program or a single person from the laundry list of people whom Maples's father and stepmother named as potential witnesses." *Id.* at 824–25. The Circuit Court stated that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice' about penalty-phase strategy." *Id.* (alteration in original) (quoting *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008)).

Had Maples proven each of these allegations, the Circuit Court's deficient performance analysis would control this court's own decision on this issue. But Maples proved some, though not *all*, of these allegations.  So, after sifting through the ways in which trial counsel were *not* deficient, the court must evaluate what proven allegations remain and whether they rise to the level of deficient performance.

Based on the evidence presented, the court finds that trial counsel were *not* deficient in failing to uncover evidence of Maples's head trauma stemming from his fall from a cliff or his alleged fight. The evidentiary hearing evidence showed that

41

trial counsel requested and reviewed Maples's medical records, including hospital records stemming from Maples's fall. (Docs 184-23 at 19 and Doc. 191 at 1042-43). As explained above, nothing in those records put trial counsel on notice that Maples had suffered any form of head trauma that warranted further investigation. So, the court cannot say that all reasonable counsel nevertheless somehow would have pursued this line of investigation.

The same holds true for Maples's allegation that he was struck in the head with a bat—Maples presented no evidence that this event occurred at all, let alone that his trial counsel should have been aware of it. The court cannot say that all reasonable counsel would have investigated further to determine both whether it occurred at all and, if so, whether it caused head trauma.

And counsel did obtain the records from Quest, and Mitchell recalled providing them to Dr. Shealy. (Doc. 184-37 at 25-26). So counsel could not be deficient for failing to obtain these records or failing to give them to Dr. Shealy.

So what proven allegations of deficient performance remain? The court finds that Maples proved that his trial counsel: (1) had never participated in a capital penalty phase before his case; (2) concluded their mitigation investigation after only briefly speaking to his father, stepmother, and Dr. Shealy, declining without reason to interview any of his extended family; (3) failed to request his educational records; (4) failed to further investigate evidence of his suicidality and depression; and (5)

failed to provide Dr. Shealy crucial resources and oversight. For the following reasons, the court finds that, based on these proven allegations, trial counsel's failure to broaden the scope of their mitigation investigation was unreasonable under prevailing professional norms.

As the court stated previously, the fact that Maples's counsel were inexperienced in a penalty phase of a death penalty trial is not *per se* ineffective assistance of counsel. *See Sinclair v. Ferrell*, 2010 WL 1487820 *10 (S.D. Ala. March 15, 2010) (citing *United States v. Kelley*, 559 F.2d 399, 401 (5th Cir. 1977)). However, counsel's inexperience is one factor that the court has considered in concluding that counsel were constitutionally ineffective in their mitigation investigation for the penalty phase of Maples' trial.

Under the prevailing professional norms at the time of Maples's trial, death penalty trial counsel must "conduct a thorough investigation of the defendant's background." *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing the 1980 ABA Standards for Criminal Justice as the source of counsel's duty to thoroughly investigate a defendant's background; so that duty to investigate thoroughly originated before Maples's 1998 trial). "Counsel in a death-penalty case has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Andrus*, 140 S. Ct. at 1881 (internal quotation marks omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). When

assessing the reasonableness of an attorney's investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

In assessing the reasonableness of an attorney's performance, the Supreme Court has looked to standards promulgated by the American Bar Association (ABA) as appropriate guides. *See Wiggins*, 539 U.S. at 524; *see also Williams v. Allen*, 542 F.3d 1326, 1339 (11th Cir. 2008) (citing ABA guidelines). The relevant ABA standards pertaining to capital defense work in 1997 provided that a mitigation investigation "should comprise efforts to discover *all reasonably available* mitigating evidence." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989) (emphasis added). As part of these efforts, counsel had a duty to collect information about Maples's "educational history (achievement, performance and *behavior*) . . . [and] family and social history (including *physical*, sexual or *emotional abuse*)," and to "obtain names of collateral persons or sources to verify, corroborate, explain and expand upon [the] information obtained." *Id.,* 11.4.1(D) (emphasis added). The Guidelines do not establish a specific number of persons who should be interviewed, and the Eleventh Circuit has rejected the idea of a "magic number" of witnesses an attorney must interview. *Alderman v. Terry,* 468 F.3d 775, 792 (11th Cir. 2006).

But the Eleventh Circuit has "found deficient performance in cases where an attorney's efforts to speak with available witnesses were insufficient to formulate an accurate life profile of [the] defendant." *Williams*, 542 F.3d at 1339 (alteration in original) (internal quotation marks omitted) (quoting *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995)). The Eleventh Circuit has also found deficient performance where "the information that trial counsel *did* acquire would have led a reasonable attorney to investigate further." *Williams*, 542 F.3d at 1340 (emphasis added) (citing *Wiggins*, 539 U.S. at 527). Both principles apply here.

First, from the Quest records, trial counsel discovered *some* information indicating Maples had struggled with depression and suicidality for years before the events of this case. But perhaps because of their inexperience, counsel failed to realize the significance of the numerous references to depression and suicide in the Quest records and made no effort to investigate these facets of Maples's history. Trial counsel conducted absolutely no investigation into Maples's suicidal ideation or whether he had attempted suicide—even though Maples reported having attempted suicide in the Quest records.

Counsel also failed to follow up on the Quest records by interviewing any of the counselors who could have provided further details about Maples's struggles with depression and suicidality or even call those records to Dr. Shealy's attention. Trial counsel did not ask their retained psychologist to investigate this aspect of

45

Maples's history. As to Maples's depression, trial counsel chose to uncritically accept Dr. Shealy's assessment that Maples was only situationally depressed because of his time in jail even though they knew the Quest records showed that Maples had struggled with depression for years before his incarceration. Had counsel provided specific information about Maples's history of depression and suicidality in the Quest records to Dr. Shealy, perhaps Dr. Shealy could have explored further to explain a link between Maples's mistreatment by his mother and his depression and suicidality.

Trial counsel also unreasonably declined to speak with any of Maples's extended family members who could have provided further details about Maples's struggles with depression and suicidality. *See Daniel v. Comm'r, Ala. Dep't Corr.*, 822 F.3d 1248, 1264 (11th Cir. 2016) (finding deficient performance when no competent attorney in 2003 would have failed to conduct timely and thorough background interviews with the defendant and his immediate family members when they were available to counsel); *Cooper v. Sec'y, Dep't Of Corr.*, 646 F.3d 1328, 1351-52 (11th Cir. 2011) (finding deficient performance based on an inadequate mitigation investigation in 1984 where counsel only interviewed the defendant, his mother, and a psychologist, but not other available family members). Counsel's failure to interview Maples's available family members was deficient.

46

Trial counsel also unreasonably failed to facilitate any interviews of Maples's family members by Dr. Shealy.  *See Hardwick*, 803 F.3d at 553-54 ("Other than Hardwick's mother, the attorney failed to ask any of Hardwick's family members about Hardwick's dysfunctional upbringing . . . . And critically, counsel failed to provide any of this information to Dr. Barnard or another mental health expert. . . .").  Had Dr. Shealy spoken to any of these witnesses, he likely would have discovered that Maples's depressive symptoms predated his incarceration, which would have changed the profile of Maples he presented to trial counsel and ultimately to the jury.[5]

Also, counsel failed to arrange for Dr. Shealy to interview Elise or Philip Maples or any of Maples's extended family members. Apparently, Maples himself was not particularly forthcoming with Dr. Shealy about his relationship with Denise. Dr. Shealy testified at trial that Maples told him that Denise used to beat him a lot, was crazy, and stabbed his father and poured hot grease on him while he was

---

[5] Notably, during closing argument, the State indirectly commented on trial counsel's failure to facilitate any meetings between Dr. Shealy and other witnesses by criticizing Dr. Shealy for only interviewing Maples:

> That's where the psychologist got his information was from the defendant. He talked to one deputy that went to school with him over there for a few minutes when he came to the jail and that person said he wasn't a troublemaker in school. That's not very detailed information. The rest of it he got from the defendant . . . .

(Rule 32 C.R., Vol. 22, Tab 30 at 3289).

sleeping.  (Doc. 148-15 at 3126-3128).  In fact, Dr. Shealy's testimony at trial about Denise's abuse of Maples barely touched the surface of the depth of abuse Maples suffered at the hands of mother in his early life, as the court will discuss in depth *infra*.  Had he spoken directly with those with first-hand observations of the abuse, Dr. Shealy would have had more information from which to develop his testimony about the adverse effects of maternal abandonment on Maples personally. *See* (Docs. 148-15 at 1-82, 184-28 at 1-13, 191 at 976, 979).

Trial counsel also learned from Philip that Maples's birth mother Denise had repeatedly abused him. Again, however, trial counsel made no effort to contact anyone else who had witnessed Denise's abuse or its effects on Maples. Here, as in *Williams*, "a reasonable investigation . . . should have included, at a minimum, interviewing other family members who could corroborate the evidence of abuse and speak to the resulting impact on [Maples]." 542 F.3d at 1340. Trial counsel failed to interview additional family members who could have provided a much fuller picture of Maples's traumatic life.  Counsel adopted a well-reasoned penalty phase strategy to humanize Maples (doc. 191 at 1050) and to emphasize his birth mother's abuse and abandonment of him (doc. 191 at 1065). So, trial counsel had "every incentive" to pursue witnesses, such as extended family members and Quest counselors, who could have helped humanize Maples and who would have testified about Denise's adverse impact on him.

Perhaps the best witness at the evidentiary hearing who presented Maples in a positive light was his cousin Shannon Smith.  She not only testified about how close they were and how much fun they had together, she also testified about Maples's apprehensions about Denise coming back into his life in his late teens and how devastated he was when she rejected him again. By failing to interview Smith, counsel missed a great opportunity to humanize Maples and to explain the impact Denise's abandonment had on Maples just a few years before the murders.  Smith also observed that, after Denise kicked him out, Maples seemed depressed and really drifted apart from his family.  *See generally* (Doc. 188 at 162-190).  Had counsel known about Smith's observations of Maples seeming depressed, the Quest records may have had more significance.  But counsel failed to even contact her. That failure was unreasonable.

Trial counsel also learned from Elise's "laundry list" that Maples had many family members who had known him since childhood and could testify to their love for him, and at the very least could testify that he was respectful towards others and generally got along well with people.  (Doc. 188 at 24-25); *see Blake v. Kemp*, 758 F.2d 523, 534 (11th Cir. 1985) (finding deficient performance and prejudice where counsel failed to interview witnesses who knew the defendant since childhood and could have testified that the defendant was respectful towards and generally got along with others). But again, trial counsel made no effort to contact any of

these potential witnesses despite their availability and willingness to speak with counsel. *See Johnson v. Sec'y, DOC*, 643 F.3d 907, 935 (11th Cir. 2011) (finding deficient performance where trial counsel's failure to speak with witnesses was not product of witnesses' unavailability or unwillingness but counsel's lack of effort). Without contacting them, counsel did not know whether their testimony would be beneficial.

Trial counsel also failed to request Maples's educational records against the guidance of both the ABA Guidelines and the 1992 Alabama Capital Defense Trial Manual. The latter, which Craig testified to having read in its entirety while defending Maples (*see* Doc. 191 at 989), states that the mitigation "investigation must include obtaining all medical, mental health, *school*, employment and other records that relate to the client." (Doc. 184-18 at 69) (emphasis added). Yet trial counsel failed to do so despite the minimal amount of time it would have taken to request them. Those records would have revealed that Maples had virtually no disciplinary issues throughout his entire school tenure—even in his senior year of high school—further corroborating any evidence of his good character.[6]

---

[6]  However, as the court subsequently explains, it credits counsel's strategic choice not to call any school officials to discuss Maples's good school record and does not consider his school record as mitigation evidence in weighing prejudice.

The court finds, as did the Eleventh Circuit, that "[a]ny reasonably competent attorney would have realized pursuing these leads was necessary to making an informed choice about penalty-phase strategy." *Maples*, 729 F. App'x at 825 (internal quotation marks omitted) (quoting *Williams*, 542 F.3d at 1340). Based on counsel's failures as described above, the court finds that the scope of counsel's mitigation investigation in this case was deficient.

### 2. Evidence of Deficient Penalty-Phase Presentation

#### a. Maples's Evidence of Deficient Penalty Phase Presentation

The Eleventh Circuit found that the following allegations from Maples's Amended Petition show that "trial counsel's preparation for Maples's penalty-phase presentation fell below an objective standard of reasonableness":

- Trial counsel offered just four witnesses at the penalty phase: Dr. Shealy, Maples's father, Maples's stepmother, and Maples's uncle—and wholly failed to prepare them for their testimony. In fact, trial counsel did not even inform the majority of the witnesses—Maples's stepmother, father, and uncle—prior to trial that they would even testify; counsel told them during a break in the trial that they would testify.

- And when trial counsel did put the mitigation witnesses on the stand, he elicited limited, scattered mitigation evidence. The testimony from Maples's father, stepmother, and uncle was superficial at best. And Dr. Shealy's testimony was not only based solely on his short discussion with Maples, without the benefit of any educational, medical, or other records provided by the defense, but was also confusing and misleading.

*Maples*, 729 F. App'x at 824. The court finds that Maples has proven his trial counsel failed to adequately prepare the penalty-phase witnesses and failed to inform the Maples family about mitigation until after trial had begun.

All three of the lay witnesses who testified on Maples's behalf during the penalty-phase presentation also testified at the evidentiary hearing, and all three testified that trial counsel failed to prepare them. At the evidentiary hearing, Elise Maples testified that she did not know she would be asked to testify during the penalty phase of Maples's trial. (Doc. 188 at 25). She further testified that she even believed she would not testify at all because she was told that anyone who would be testifying would not be allowed in the courtroom,[7] but she had been allowed to remain in the courtroom the entire trial. (*Id.* at 25–26). Elise testified that trial counsel first explained the concept of mitigating circumstances to her *after* the trial had begun, "when we realized that [Maples] was going to be found guilty." (*Id.* at 26). She testified that trial counsel explained that they needed witnesses to talk about Maples's life, how he grew up, how he was in high school, and what kind of child he was. (*Id.*). She testified that trial counsel never asked her what she would testify

---

[7] The court's review of the trial record reveals that the parties had invoked the rule of witness exclusion, Rule 615 of the Alabama Rules of Evidence. *See, e.g.*, (Rule 32 C.R., Vol. 19, Tab 17 at 2753; 2765 (presiding judge asks parties if witnesses can be released from "the rule" and therefore allowed to remain in the courtroom)).

about if called at the penalty-phase hearing, and trial counsel did not prepare her to testify. (*Id.* at 26–27).

Philip Maples's evidentiary hearing testimony echoed Elise's own about lack of preparation. Philip testified that Maples's trial counsel told him that they *might* call him to testify only after the trial had started and in the hall of the courthouse. (Doc. 189 at 469). He testified that trial counsel did not explain what they would ask him about; he had "no idea" what trial counsel would do or whether they would even call him. (*Id.*). Philip testified that trial counsel never sat down with him to discuss the questions they were going to ask him or what his answers might be. (*Id.* at 470–71). He only found out trial counsel was certain to call him on the same day he testified. (*Id.* at 471). And before he testified on the stand, he had not previously spoken with trial counsel about Maples's childhood or family background. (*Id.*).

Kenneth Maples's evidentiary hearing testimony continued the theme of ill-preparation. Kenneth testified that, prior to testifying at Maples's penalty-phase hearing, Kenneth had not spoken with trial counsel or Johnny Nesmith, trial counsel's private investigator. (Doc. 188 at 127). He testified that Philip had asked him to come and testify—not trial counsel. (*Id.*). And when Kenneth came to the courthouse, trial counsel did not discuss the questions they would ask him or his responses. (*Id.*).

Alan Birdsong, who testified only during the guilt phase of Maples's trial,[8] also testified at the evidentiary hearing that trial counsel did not tell him what questions they would ask him beforehand, and he never told trial counsel what he would say once in court. (Doc. 189 at 348). And though Dr. Shealy did not testify at the evidentiary hearing, the bill he submitted to Craig did not contain a time entry for preparation prior to testimony but appeared otherwise exhaustive. (Doc. 181-33 at 1). Craig also testified that he did not recall having any substantive discussions with Dr. Shealy prior to trial other than their memorialized phone call on October 15, 1997. (Doc. 191 at 985).

For their part, neither Craig nor Mitchell could recall whether they had prepared Elise, Philip, or Kenneth Maples to testify, but both believed the Maples family had been prepared. Mitchell testified that he could not recall the extent of his own involvement preparing the Maples family to testify at the penalty phase, but he believed that "someone" did so—presumably either Craig or Nesmith. (Dep. of Phil Mitchell at 51–52, 72–73). Craig testified that while he could not specifically recall preparing the Maples family to testify, it was his habit and practice at the time to prepare all witnesses prior to testimony. (Doc. 191 at 985–987, 1000). And he believed he had maintained that practice in Maples's case because of the questions

---

[8] *See* (Doc. 184-41) (trial transcript from Birdsong's testimony during the guilt phase of Maples's trial).

he put to the witnesses, as reflected in the trial transcript. (*Id.* at 1000). The court presumes Craig meant that the questions he posed to the witnesses indicate he knew what their answers would be ahead of time.

At this point, the court notes that both counsel and the mitigation witnesses cannot be expected to have clear recollections of exactly what happened around the time of trial over twenty years ago.  The court accepts that Craig habitually prepared witnesses and thought he had prepared these witnesses and also accepts that they did not think they had been prepared to testify.

But the trial transcript does little to corroborate Craig's testimony that he *adequately* prepared these witnesses. To the contrary, some of the questions Craig asked the witnesses evince a lack of preparation or advance conversation with the witnesses. For example, in his opening argument, Craig told the jury that Kenneth would testify about Denise's abuse of Maples. (Rule 32 C.R. Vol. 21, Tab 27 at 3087). But when Kenneth took the stand, Craig asked him whether he knew Denise to which Kenneth replied: "I met her maybe once or twice." (*Id.* at 3190). Kenneth had virtually no testimony to offer about Denise or her abuse of Maples—a fact which evidentially caught Craig off-guard. Indeed, at the evidentiary hearing, Kenneth confirmed he had no knowledge about how Denise's abandonment had affected Maples. (Doc. 188 at 131).

In another exchange with Elise Maples, Craig asked whether anything about Maples's behavior while he was growing up had caused her concern, to which she replied: "He liked to have his daddy's attention. I don't know exactly what you're asking." (Doc. 148-16 at 3177). Then, Craig and Elise had the following exchange regarding Denise's childhood abuse of Maples:

> Q   Did [Maples] get to see his mother much during those years?
>
> A   He saw his mother, while [Philip] and I were dating, probably twice and we had to stop that and he didn't see her again until he was seventeen.
>
> Q   What are you aware of his history with his mom? Are you saying that she saw him twice while you all were dating and then seventeen years passed -- well, fourteen years or so passed before she seen him again, is that right?
>
> A   Yes.
>
> Q   Did you try to be a mother to [Maples] the best you could?
>
> A   Yes I did.
>
> Q   Now, let's go into his early junior high school years and so forth . . .

(Doc. 148-16 at 3178–79).

That exchange comprises the entirety of Craig's questions to Elise about Denise's childhood abuse of Maples. Craig never afforded Elise the opportunity to provide details about the abuse she witnessed or its effect on Maples. For example, Craig never asked Elise *why* she and Philip decided they "had to stop" Maples from

seeing Denise again. Craig also failed to ask Elise about other matters about which she testified at the evidentiary hearing, including that Maples often cried because he wanted his mother and asked often where she was and when she was coming back; he had "a lot of nightmares" and was afraid of the dark and had to sleep with a light on; Denise locked Maples in a closet; and Denise left him alone playing near the pool at her apartment. *See generally* (Doc. 188 at 19-122). Craig's failure to ask about these matters indicates that he failed to adequately interview or prepare Elise for her testimony.

Dr. Shealy's testimony also displayed hallmarks of ill-preparation. For example, much of Dr. Shealy's answers on direct examination were multi-page narratives, with one lasting seven full pages (Doc. 148-15 at 3114–20), and another lasting five pages (i*d.* at 3126–30). And much of Dr. Shealy's testimony was irrelevant, including a page-length discussion of Maples's competency to stand trial (*id.* at 3106–07) and repeated, unprompted mentions that Maples had his first sexual encounter at age 14—even while admitting that fact was "not a major factor in understanding [Maples's] psychological and emotional involvement" (i*d.* at 3130, 3132).

These exchanges help corroborate the evidentiary hearing testimony that trial counsel did not preview the witnesses' testimony or prepare them to testify during the penalty phase. Therefore, the court finds Maples proved that trial counsel

57

"wholly failed to prepare" the penalty-phase witnesses to testify. The court also finds that trial counsel failed to inform the Maples family they would be testifying during the penalty phase until after Maples's trial had begun.

### b. Trial Counsel's Preparation for the Penalty-Phase Presentation was Unreasonably Cursory

The Eleventh Circuit found that, "based on Maples's allegations, trial counsel's preparation for the penalty-phase presentation was unreasonably cursory." *Maples*, 729 F. App'x at 825. The Circuit Court explained:

> In light of Maples's videotaped confession, trial counsel had "every expectation that [Maples would] be convicted and w[ould] be facing a death sentence." Trial counsel knew from the outset that Maples's life depended on the penalty-phase presentation. Yet they (1) waited until midway through trial to inform Maples's family members that they would be testifying and (2) failed to prepare any of the penalty-phase witnesses for their testimony. No reasonable attorney who knows his client's life depends on the penalty-phase presentation would devote such minimal effort to preparing the presentation.

*Id.* (alterations in original) (internal citation omitted).

As explained above, the court has already found Maples proved that trial counsel waited until the time of trial "to inform Maples's family members that they would be testifying and [] failed to prepare any of the penalty-phase witnesses for their testimony." *Id.* Because Maples has proved his allegations as presented to the Eleventh Circuit, the Circuit Court's analysis controls this court's own.

Weighing heavy in the court's determination that trial counsel's preparation for the penalty phase was woefully insufficient is that counsel knew from the outset

that Maples had confessed to the murders on video. Having viewed the entirety of Maples's video confession—as did trial counsel—the court finds that humanizing Maples for the jury that also viewed that confession was a tall order. In his confession, Maples showed very little emotion or remorse as he told in a matter-of-fact way and tone how he shot his two friends in the head, left Terry's body at the scene, dumped Robinson's body in the creek, and drove off in Terry's red Camaro. Knowing they had a hard up-hill road, reasonable counsel would have explored more leads to humanize their client and to develop the impact Denise's treatment had on Maples, including evidence of his depression and suicidality. So, the court finds, as did the Circuit Court, that trial counsel's preparation for the penalty phase was unreasonably cursory.

### 3.   Trial Counsel's Strategic Choices

As the court thoroughly discussed *supra*, the scope of counsel's mitigation investigation and penalty-phase presentation was unreasonably deficient. But for counsel's deficient performance, they would have uncovered and presented powerful mitigation evidence that the jury never heard.

But before the court addresses and considers mitigation evidence that a reasonable investigation would have uncovered, the court must first address whether counsel's inadequate mitigation investigation and deficient penalty-phase presentation involved any reasonable strategic decisions by counsel. Counsel's

failure to present mitigating evidence is not *per se* ineffective assistance of counsel and can "on occasion, be justified as a strategic choice." *Hardwick*, 803 F.3d at 551. If counsel's reasonable strategic decision justified their failure to uncover or present specific evidence to the jury, the court will not consider that evidence as mitigating in weighing the totality of the evidence under the prejudice analysis.

As the court has already mentioned, Craig testified at the evidentiary hearing that trial counsel's strategy "was to humanize Cory" and focus on the abuse and abandonment Maples suffered as a young child. (Doc. 191 at 1050, 1065). The court has already considered this strategy in finding that counsel's mitigation efforts to humanize Maples fell short of their goal.  Counsel failed to thoroughly investigate several aspects of Maples's life that would have humanized him for the jury, including his struggles with depression and suicidality and the abuse and abandonment Maples suffered at the hands of his mother. Counsel's inexperience in preparing for and presenting evidence at the penalty phase of a death penalty trial may have contributed to these failures.  So, this overall trial strategy by counsel does not excuse, and actually underscores, the unreasonable scope of counsel's mitigation investigation or deficient penalty-phase presentation.

However, by indulging in the "strong presumption" that counsel provided adequate representation, the court credits *some* of the strategic considerations made by counsel as reasonable.  As an initial matter, the court recognizes that, while

neither attorney had experience in a penalty phase of a capital case, Craig did have almost ten years of legal experience, had tried at least six criminal jury trials prior to this case, and was familiar with juries in Northern Alabama in the 1990s.  (Doc. 191 at 997-98).  That experience positively affected some of their strategic decisions.

### Strategic decision to limit witnesses regarding Maples's good character

These murders occurred in a small community in rural Morgan County, Alabama, where "everyone knows everybody," and where one of the victims Stacy Terry was particularly beloved by the community.  Noting "it was a fine line that we had to walk in the mitigation phase," trial counsel wanted to *limit* testimony about Maples's good character and his loving family to avoid opening the door to victim impact evidence about Stacy Terry and Barry Robinson. (*Id.* at 1065–66). Counsel did not want to put on witnesses who on cross examination would testify in glowing terms about how great Terry was and how everyone loved him.  The court finds that this strategy was generally reasonable.

Craig testified that he knew Terry was "extremely popular, by all accounts," and knew that Terry and Maples went to the same school, played on the same football team, had friends in common, and correctly assumed they had some of the same teachers; he did not know how any such "witnesses that could speak positively of Cory" would "not have knowledge in a positive way of [Terry]." (*Id*. at 1080–81). Therefore, he wanted to "avoid *calling* mutual friends of [Maples and Terry],"

"mutual teachers of the two," and "mutual coaches of the two." (*Id.* at 1091–92) (emphasis added).

So, counsel's strategic decision involved not *calling* as witnesses mutual friends, teachers, or coaches of Maples and Terry. That strategic decision appears reasonable, but counsel did not conduct any type of investigation as to what these witnesses would actually testify. Instead, that strategic decision was based on *assumptions*, which the court finds were reasonable as to the school officials and coaches, but unreasonable as to Maples's family members and *some* friends who testified at the evidentiary hearing. By failing to interview family and friends, counsel's assumptions prevented their presentation of valuable mitigation testimony.

Craig's testimony at the evidentiary hearing shows his strategic choice did not cover his failure to thoroughly interview and call as witnesses *family* members, including Maples's cousin Shannon Smith, aunt Dianne Ferrell, aunt Dale Ray, and uncle Fred Ray, who could have presented powerful mitigation evidence on Maples's behalf. Counsel's strategy involved not calling mutual friends, school officials, and coaches; Craig did not mention that his strategy involved not calling the family members who testified at the evidentiary hearing. *See* (Doc. 191 at 1091-92). And, the court finds that a reasonable investigation into mitigation evidence would have involved counsel at least interviewing available family members and

62

selecting the best of those witnesses to present testimony to humanize Maples and substantiate his childhood abuse and its impacts on him.

Although Maples's cousin Shannon Smith knew Terry and testified about him, she was a powerful mitigation witness for Maples. And when she testified about the victim, her demeanor did not change in a way that would have negated the mitigation evidence she presented in Maples's favor, as did most other witnesses. Smith was a family member who not only could testify about Maples's good character when he was younger, but she also shed light on the abuse he suffered at the hands of his mother and his mental state. So even crediting trial counsel's strategic choice to avoid testimony from mutual friends and school personnel, the court finds that counsel's failure to interview or call Shannon Smith as a mitigation witness was unreasonable and the court will consider her testimony. So, as the court will discuss in detail *infra*, the court will consider the mitigation evidence presented by these family members when weighing the mitigating and aggravating factors under the prejudice standard.

Regarding school officials and coaches, the court finds reasonable counsel's strategic choice to not interview or call these witnesses during the penalty phase of the trial. The reasonableness of counsel's concerns with such witnesses became obvious at the evidentiary hearing when mutual friends and all of the school personnel, including coaches, testified that Maples was a "good guy," a hard-

working team member, polite, etc., then lavished great praise on Terry—and did so with a much-improved countenance.

The court takes this opportunity to note another factor the transcript alone cannot convey: the change in the witnesses' demeanor when asked about Terry. While many of these witnesses (with the exception of Maples's cousin Shannon Smith), especially school personnel, appeared guarded or somewhat apprehensive when testifying to Maples's positive characteristics, they each came alive when given the chance to describe Terry. The court presumes the trial jury would also have noticed this shift in demeanor, which would have further limited the weight of Maples's school conduct and friendships as a mitigating factor.

Because counsel reasonably assumed that school personnel would most likely know both Maples and Terry—and would speak favorably about the victim—counsel did not interview any of the school witnesses.  The court cannot find fault in their strategic decision not to interview such witnesses they reasonably knew they would not call.  Even if counsel should have at least interviewed these school witnesses, the court finds reasonable counsel's strategic decision to not *call* them as witnesses at the penalty phase of Maples's trial.  Those interviews would have revealed what counsel wanted to avoid—witnesses who would have spoken very highly of Terry. So, the court will not consider the testimony of the school personnel and coaches who testified at the evidentiary hearing glowingly about the victim,

including Martha Lenhart, Judy Sims, Bill Simms, Glen Lang, and Billy Hopkins. *See generally* (Doc. 189).

Regarding counsel's failure to interview or call *any* of Maples's personal friends or family friends as mitigation witnesses, the court finds that strategic decision unreasonable. Craig testified that he wanted to avoid "evidence that would call [the defense's] key witnesses into discredit," evidence that Maples was dishonest, evidence that Maples had stolen from his friends, or evidence from mutual friends regarding Terry's good character. (Doc. 191 at 1066–67). Although these strategies appear reasonable, counsel could not know whether *all* of Maples's friends from different facets of his life would testify regarding these matters that counsel wanted to avoid unless counsel first interviewed those friends. So, counsel's assumption, without any investigation or interviews, that he would not call any of Maples's personal friends or family friends was unreasonable.

To be sure, some of Maples's and Terry's mutual friends did in fact testify at the evidentiary hearing to the very things that counsel wanted to avoid. Both Derek Shelton and James Beddingfield testified glowingly about Terry. And, while living with Beddingfield, Maples stole Beddingfield's father's pager. Though Maples eventually returned the pager and apologized, the incident caused the two to drift apart after Maples moved out. (Doc. 189 at 356, 361). To Beddingfield's knowledge,

Maples then befriended Jamie Dobbs and increased his drug use. *See* (Doc. 188 at 210-232 & Doc. 189 at 354-365).

So, had counsel interviewed Shelton and Beddingfield, the court finds that counsel reasonably would have decided not to call them as witnesses at the penalty phase of the trial based on their reasonable strategic decisions as explained above. So, the court will not consider the testimony of Shelton and Beddingfield as mitigation evidence.

But, counsel's strategic decision to avoid certain evidence would not apply to several witnesses who testified at the evidentiary hearing, including Margie Moore, Deborah Adkison, Robert Frost, and Alan Birdsong.  These witnesses did not offer any testimony at the evidentiary hearing that counsel sought to avoid.  Had they interview these witnesses, the reasons underlying their strategic choice to avoid certain types of testimony would not have applied.

Margie Moore, a family friend whose husband knew Maples's father Philip, testified at the evidentiary hearing that she saw Denise cut Philip with a knife, which corroborated Philip's testimony about Denise's violent behavior.  And Moore did not know the victim Terry and would not have provided testimony counsel wanted to avoid. *See* (Doc. 188 at 153-161).

Likewise, Deborah Adkison, Derek Shelton's mom, was not a "mutual friend" of the victim Terry, and her testimony at the hearing focused on Maples's riding

horses with her family and being a part of the Saddle Club with her son Derek. Although she lived near Terry and knew him, she hardly mentioned Terry in her testimony and did not speak glowingly about him. *See* (Doc. 188 at 191-209).

And Maples's friend Robert Frost testified at the hearing that Maples was a few grades below him in school; that he and Maples hunted together when Maples was 16 or 17 years old; that he was with Maples when he fell from the bluff; that Maples was a "meek" and "quiet fellow" who never got in trouble; that Maples was not aggressive or violent; and that he found Maples to be a trustworthy friend. Frost did not mention Terry in his testimony. *See* (Doc. 190 at 536-37).

The court notes that Alan Birdsong testified at the guilt phase of Maples's trial, but counsel did not call him to testify in the penalty phase of the trial for mitigation. *See* (Ddoc. 184-41). Birdsong also provided novel testimony at the evidentiary hearing regarding Maples's good character and relationship with his brother Daniel. Birdsong did not know Terry and did not provide the other types of evidence that counsel wanted to avoid. (Doc. 189 at 341-53). So, counsel's strategic choice to avoid certain testimony does not apply to Birdsong's mitigation evidence presented at the evidentiary hearing.

So, the court will consider the testimony of Margie Moore, Deborah Adkison, Roderick Frost, and Alan Birdsong in weighing the mitigation evidence against the aggravation evidence to determine if Maples has shown prejudice.

### *Strategic decision to not call Officer Greene as a witness*

Maples's faults his counsel for failing to call Officer Greene as a mitigation witness to show he cooperated with the police. But trial counsel testified that they wanted to avoid testimony from Officer Greene about Maples's cooperation: it would have led to further testimony about Maples's arrest for felony drug possession, which counsel wanted to avoid. (Doc. 191 at 1068). The only evidence trial counsel presented regarding Maples's assistance to police was Elise Maple's testimony that "[Maples] had worked with the Decatur city police to catch somebody with drugs, and we had some [telephone] threats" because of Maples's involvement. (Doc. 184-40 at 122). And in its sentencing order, the trial court rejected Maples's assistance to law enforcement as a mitigating factor because "no police officer testified at trial, nor was there any corroboration of the step-mother's testimony." (Rule 32 C.R. Vol. 37, Tab 62, at 10).

At the evidentiary hearing, Maples presented both the missing case report and the testimony of its author, Lary Greene. (Doc. 184-27 [Mark Carroll Arrest Records]; doc. 189 at 240 [Lary Greene testimony]). Greene testified that Maples had been arrested in 1994 for driving on a suspended license. (Doc. 189 at 243, 252). During Maples's arrest, officers found "a quantity of cocaine" on his person. Greene interviewed Maples and gave him "an opportunity to . . . work [his drug possession] case off." This meant Maples had "to turn a quantity of substance or illegal substance

greater than what [he] had on [his] person[ ]. And [Maples] only had . . . three rocks of cocaine."  Maples told Greene that "he knew somebody that he purchased drugs from before and was willing to turn [him] over to [the Decatur police] and [to] buy the cocaine for [the police]." (*Id.* at 241-42). Greene informed Maples that, if he did not work off his case, he would be charged with possession of a controlled substance—a first degree felony with a potential penalty of 10 to 20 years. (*Id.* at 251–52).

According to Greene's testimony, Maples made three separate attempts to buy drugs from Mark Carrell before ultimately succeeding. On Maples's first attempt, Carrell arrived at the meeting place but claimed he had no drugs to sell because his supplier was out. Maples arranged a second meeting with Carrell but Carrell again claimed his supplier was out. Finally, on October 5, 1994, Maples successfully completed a controlled buy from Carrell. Carrell was arrested and subsequently convicted for that specific buy. (*Id.* at 243–47).

Greene testified that Maples was a "reliable and respectful cooperator." (*Id.* at 249–50). Greene also testified that people who cooperate with law enforcement face "high risk," including "death," because "[p]eople do not like rats . . . [Maples's] life was in risk." (*Id.* at 248). Because of Maples's cooperation, the Decatur police "disposed of" his drug case. (*Id.* at 252.)

As stated above, Elise had testified at the trial that Maples and his family received telephone threats after Maples's cooperation with the police. At the evidentiary hearing, Philip Maples corroborated that testimony, explaining that "[p]eople started calling and threatening us and threatening [Maples], threatening Daniel." (Doc. 189 at 463–464). Philip then elaborated on the nature of the threats, describing an instance where "we [had] come home, [and] all the covers on the bed [were] in one big pile on the bed, the phone receiver turned upside-down on the phone." (*Id.* at 464). Philip testified that he found "paint on the back of the house" with a message stating, "we got you any time we want you." (*Id.*). On cross examination, Philip clarified that the message was written with what "looked like a big carpenter pencil"; "[i]t wasn't painted." (*Id.* at 517). Philip described another instance where he and his neighbors saw people lying down in the neighbor's front yard pointing rifles at the Maples family's house, prompting Philip to call the police. (*Id.* at 517).

Maples's novel evidence, namely Greene and Philip's testimony and Greene's case report, corroborate Elise's testimony and establish that Maples had helped the police to successfully convict a drug dealer—and did so at great personal and family risk. But this same evidence also shows that Maples cooperated to escape his own pending drug charge, which carried a possible sentence of 10–20 years—a fact not presented to the trial jury. And Philip's testimony about the threats that the Maples

family faced because of Maples's cooperation cuts both ways. Though Maples took on great personal risk by cooperating, the burden of that risk did not fall on him alone; his family suffered the consequences as well. Jurors could have interpreted this new evidence as an additional example of how Maples's actions have hurt his family.

And counsel believed Maples's cooperation could be a double-edged sword. He cooperated in the arrest of his drug dealer to avoid prosecution for his own arrest for possession of cocaine.  Trial counsel wanted to minimize evidence that Maples had become a drug informant because that evidence would also include that Maples had been found with crack cocaine. (*See* Doc. 191 at 1067-68).

According to Craig, in Morgan County in the mid-nineties, drug evidence was a "double edged sword."  (Doc. 191 at 1058). So, using Elise's testimony about the assistance Maples gave the police avoided eliciting more details about Maples's illegal drug activity and avoided calling a police officer who from counsel's experience often were not good witnesses for the defendant.  That decision was reasonable.  So, the court will give deference to counsel's trial strategy and not consider as mitigation evidence the testimony of Officer Greene or his report in making its prejudice determination.

**B.      Prejudice Evidence**

Now that the court has determined what mitigation evidence it will not consider based on counsel's strategic choices, it must now determine whether the mitigation evidence the jury should have heard but for counsel's deficient performance prejudiced Maples.  The Eleventh Circuit found that "the allegations in Maples's amended Rule 32 petition[] show that there is a reasonable probability that, but for counsel's unprofessional errors, the result in the proceeding would have been different." *Maples*, 729 F. App'x at 825 (internal quotation marks omitted). The Eleventh Circuit categorized into four broad categories the mitigation evidence that, if proven, the jury would have heard but for counsel's deficient performance: (1) abuse and abandonment by Maples's birth mother Denise; (2) Maples's depression and suicidality; (3) Maples's good character; and (4) Maples's history of head trauma. *See id.* at 825–26. The court will first address whether Maples has presented sufficient evidence for each category and then weigh the proven mitigation evidence against the evidence in aggravation to determine whether Maples has shown prejudice.

**1.      Maples's Mitigation Evidence**

**a.  Evidence of Abuse and Abandonment by Denise Maples**

The Eleventh Circuit found that Maples had adequately alleged that, because of trial counsel's deficient performance, the jury never heard evidence that Denise Maples "has a mental illness; routinely threw violent, self-mutilating tantrums;

72

stabbed Maples's father once while he was driving; attempted to slit the throat of Maples's father; once tried to sell Maples to a neighbor; and once left Maples in a car for hours when he was a toddler." *Maples*, 729 F. App'x at 825.

The Eleventh Circuit also found that the jury never heard that "Maples cried for his birth mother, who had abandoned him in childhood, until his early teenage years and that Maples's stepmother had to sit with him at night while he was growing up because of his nightmares," or that "[Denise] emotionally abused him again in his late teenage years" when she "again neglected him, verbally abused him, and after just a few months abandoned him once more." *Id.* at 826. The court finds that Maples proved many, but not all, of his allegations regarding Denise Maples's conduct.

### i. Denise's Mental Illness

The court finds that Maples has not presented persuasive evidence that Denise Maples in fact had a "mental illness," as Maples alleged. Although Maples presented some evidence during the evidentiary hearing about Denise's erratic behavior, he failed to present reliable evidence in the form of medical records or expert review. No expert examined Denise or reviewed her medical records to make a reliable diagnosis of a mental illness. Anecdotes and hearsay testimony about Denise's

behavior and lay opinions that she was "crazy" are not reliable and do not form a basis for finding that Denise in fact had a mental illness.

The only expert testimony Maples presented about Denise's mental status came from Dr. Jolie Brams,[9] who opined that Denise was "clearly mentally ill." (Doc. 192 at 1132; *see also* doc. 186-46 at 5). Dr. Brams did not state *which* mental illness she believed Denise exhibited. More importantly, Dr. Brams did not speak with Denise or her blood relatives, read her deposition,[10] or review her medical records before making that statement. (Doc. 192 at. 1132–33). When Dr. Brams issued her report, she had only talked *about* Denise with Maples, his father and other "friends and family" of his father. (*Id*. at 1132). And though courts in this district have held that "a physician need not necessarily examine a patient, interview that patient, or speak with the patient's treating physician(s) . . . to render opinions regarding diagnosis," in such cases experts have, at the very least, "relied on medical records"—something Dr. Brams failed to do before opining about Denise's mental health. *See Geyer v. NCL (Bahamas) Ltd.*, 203 F. Supp. 3d 1212, 1216-17 (S.D. Fla. 2016) (citing *Haller v. AstraZeneca Pharm. LP*, 598 F. Supp. 2d 1271, 1294-95 (M.D. Fla. 2009)).

---

[9] Dr. Brams is a licensed clinical psychologist.

[10] Dr. Brams *did* eventually read Denise's deposition, but not before opining in her expert report that Denise was mentally ill. *See* (Doc. 192 at 1133).

Finally, Denise herself testified that the only mental health diagnosis she has ever received was for depression in the 1990's. (Doc. 186-6 at 157). That diagnosis, taken alone, lends little insight into her alleged violent behavior and abuse of Maples.

Because the court finds that Maples has not established that Denise Maples suffered from a mental illness, the court gives no weight to Denise's alleged mental illness as a mitigating factor. But the court nevertheless gives weight to statements regarding Denise's abusive and erratic behavior because such behavior, even if not proof of a mental illness, affected Maples.

### ii.    Denise's Violent and Self-mutilating Tantrums

The court does find that Maples proved that Denise Maples "routinely threw violent, self-mutilating tantrums," as alleged. *Maples*, 729 F. App'x at 825. At the evidentiary hearing, Philip Maples testified that Denise would "be talking to you and everything would be fine, and then she would start beating herself in the face and pulling her hair out by lumps of it and just scratch her face until it bled, and scratch her chest till it bled." (Doc. 189 at 416). Philip added: "And five minutes later, she would be sitting over there wiping the blood off with a napkin or something and just like nothing had ever happened." (*Id.*).

In her deposition, Denise did not deny engaging in such behavior, but she offered testimony that lent insight into her behavior. She testified that, while married to Philip, she "felt alone and pretty much neglected; and [she] was hurt." (Doc. 186-

6 at 94, 96). She felt isolated living out in the country. (*Id.* at 96). She testified that she was volatile when she became angry at Philip. (*Id.* at 96–97). And she was irrational at times because she "did not understand what was going on, and [she] felt . . . like [she] had no one [she] could turn to, and [she] knew that at that point in time that the marriage was deteriorating and [Philip] was sleeping with other people." (*Id.* at 98). Philip admitted infidelity with two women during his marriage to Denise. (Doc. 189 at 496).

Had defense counsel presented evidence of Denise's violent, self-mutilating behavior, in response, the State may have offered evidence that explained Denise's behavior in more sympathetic terms—her young age, frustration, isolation, and Philip's infidelity. Nevertheless, the court finds that, on the balance, evidence of Denise's self-mutilating and violent behavior has mitigating weight. Such behavior lends credence to Maples's portrayal of her as a violent, unstable parent—even if the circumstances underlying Denise's violent behavior were somewhat sympathetic. And the jury would not have blamed Maples, who was younger than three at the time, for the difficult circumstances that may have caused Denise's violent outbursts. The court will consider both Maples's novel evidence of Denise's violent outbursts and the humanizing context the State elicited from her on cross in her deposition that it offered at the evidentiary hearing, but the court affords the latter less weight than the former.

76

### iii.    Denise Attacked Philip While He Was Driving

The Eleventh Circuit found that Maples had alleged his trial counsel should have offered testimony that Denise had stabbed Philip while he was driving to show her violent nature. *Maples*, 729 F. App'x at 825. Maples alleges that "[o]nce, [Denise] attacked [Philip] Maples, without provocation, with a metal hairbrush while he was driving, causing his eye to bleed profusely." (Rule 32 C.R. Vol. 33, Tab 49 ¶ 116). The trial jury heard no such testimony during the penalty-phase presentation.

At the evidentiary hearing, Philip testified that Denise had "pop[ped him] in the face with [a long-bristle brush,] . . . bristle[s] first, and blood [went] everywhere. The bristles stick in the skin, nose bleed." (Doc. 189 at 417). He added that this "happened several times." (*Id.*). In her deposition, Denise testified that she did not remember hitting Philip with a metal hairbrush and causing his eye to bleed. (Doc. 186-6 at 166). She did, however, recall *throwing* a hairbrush at Philip on two other occasions. (*Id.* at 102, 105).

The court credits Philip Maples's testimony that Denise Maples hit him with her brush while he was driving and affords it mitigating weight as it provides support for other evidence of Denise's violent outbursts.

### iv.    Denise Attempted to Slit Philip's Throat

The Eleventh Circuit found that Maples had adequately alleged that, because of trial counsel's deficient performance, the jury did not hear that Denise had

"attempted to slit the throat of Maples's father." *Maples*, 729 F. App'x at 825. At trial, Philip testified—without elaboration or context—that Denise had "stabbed [him]." (Doc. 184-40 at 134). At the evidentiary hearing Philip elaborated on the incident:

> [We] just had got through cooking and I went over to the counter to get some bread or something and was turning around, and when I turned around, the girl that was visiting with us hollered look out, and I looked and [Denise] come at me with a knife and cut me open all the way down that arm (indicating).

(Doc. 189 at 417).

He testified that he believes the knife would have hit him in the "throat or the chest or something like that," if he had not raised his arm. (*Id.* at 418). He believed that Denise had acted intentionally and out of anger. (*Id.* at 418–419). Margie Moore, who was "the girl that was visiting," testified that Denise cut Philip in his *back* with a butcher knife. (Doc. 188 at 154–55). She mirrored Philip's sentiment that Denise's act did not appear to be an accident. (*Id.* at 154).

In her deposition, Denise Maples denied "ever swing[ing] a butcher knife at [Philip], attempting to slit his throat." (Doc. 186-6 at 166). She testified that cutting Philip's arm was an accident, (*id.* at 167), explaining:

> I was using my – the knife to cut the fish, and he said something to me. And I turned around with the knife still in my hand and responded with my – with a hand gesture, not realizing that I had actually sliced his arm with a knife.
> . . .

78

> He didn't realize it either until the – the wound actually opened and the air hit it; and then he was like, oh, my gosh. He wasn't mad at the time; but when [Lamar Moore, Margie Moore's husband,] walked in the room and started yelling that I cut [Philip] with a knife, then he got mad.

(*Id*. at 103).

The court credits the testimony of Philip and Moore that Denise cut Philip with a knife and that Denise's act was not an accident. Though the jury heard from Philip that Denise had "stabbed [him]," they did not hear the details of this story that demonstrated Denise's actions were unprovoked. The jury also lacked the benefit of Moore's corroborating testimony. The court affords this testimony mitigating weight and will consider it in the totality of evidence when assessing prejudice.

### v.   Denise Tried to Sell Maples to a Neighbor

The Eleventh Circuit found that Maples had alleged his trial counsel could have offered testimony that Denise once tried to sell Maples to a neighbor. *Maples*, 729 F. App'x at 825, 845. In his Amended Petition, Maples alleges: "Philip Maples . . . could have testified that [Denise] attempted to sell Mr. Maples when Mr. Maples was three years old." (Rule 32 C.R. Vol. 33, Tab 49 ¶ 118).

But Philip did not testify that Denise had tried to sell Maples at the evidentiary hearing—that testimony came from Elise Maples. Even then, Elise testified only that "Joey Hembree . . . told me that Denise tried to sell him – tried to sell Cory." (Doc. at 188 at 39). Joey Hembree did not testify at the evidentiary hearing.

Philip testified about the Hembrees at the evidentiary hearing:

79

> They watched [Maples], the whole family watched him. They loved
> him. . . . They would tell me any time I got ready to go do something,
> needed somebody to watch him, bring him over there, you know. That's
> what kind of people they were.

(Doc. 189 at 431). He said that he and Denise left Maples with the Hembrees on

occasion and that they took good care of him. (*Id.* at 510). He did not mention that

Denise had ever tried to sell Maples to the Hembrees. And Denise herself denied she

ever tried to sell Maples. (Doc. 186-6 at 168).

The court finds that Maples failed to prove that Denise tried to sell him to Joey

Hembree. This allegation appears to be yet another that Maples tellingly abandoned

before his evidentiary hearing presentation. In his pre-hearing brief, Maples omitted

this allegation from his citation of the Eleventh Circuit's finding that had previously

discussed it, changing the allegation from "Maples's birth mother . . . attempted to

slit the throat of Maples's father; ***once tried to sell Maples to a neighbor***; and once

left Maples in a car for hours . . . ," *Maples*, 729 F. App'x at 825 (emphasis added),

to "Mr. Maples's birth mother . . . cut Mr. Maples's father with a kitchen knife; and

left Mr. Maples in a car unattended." (Doc. 158 at 17). The court affords this

unproven allegation no mitigating weight.

### vi.   Denise Left Maples in a Hot Car

The Eleventh Circuit found that Maples had alleged his trial counsel could

have offered testimony that Denise "once left Maples in a car for hours when he was

a toddler." *Maples*, 729 F. App'x 825. In his Amended Petition, Maples alleged,

"One hot summer day when Mr. Maples was an infant, [Denise Maples] locked him in a car outside a shopping mall with the car windows rolled up. A passerby saw Mr. Maples screaming and sweating and ran to find [Denise], who claimed she lost track of time." (Rule 32 C.R., Vol. 33, Tab. 49, ¶ 118). At the evidentiary hearing, Dr. Shaffer[11] testified that Maples had recalled this same incident: "[Maples] recalled being enclosed in a hot car . . . he was in a shopping area, [] the car got extremely hot, [and] some passerby actually broke the window to gain access to the car and waited there until his mother returned from the store." (Doc. 190 at 565). Dr. King, the State's expert at the evidentiary hearing, testified that Maples had recounted the same incident to him. (Doc. 192 at 1213).

But Maples presented no witnesses who *directly* testified about this version of events, and Philip testified to a different version at the evidentiary hearing. According to Philip, Maples was locked in the hot car by Denise at her mother's house, "[a]nd when [Philip] got there, [Maples] was in the car with the windows rolled up, just sweating and screaming like crazy, and she was in the house with her mother." (Doc. 189 at 425). For her part, Denise denied she left Maples in a hot car outside a shopping mall. (Doc. 186-6 at 167–68). But when asked whether she *ever*

---

[11] Dr. Shaffer is a licensed clinical psychologist specializing in forensic psychology and neuropsychology.

left Maples in the car to go shopping when he was young, Denise answered: "I don't know." (*Id.* at 171).

The court finds that Maples failed to prove that Denise locked him in a hot car at the mall. But the court credits Philip's testimony that Denise left Maples unattended in the car at her mother's house. This testimony is somewhat cumulative of Philip's testimony at trial that Denise had "left [Maples] in the car with the windows rolled up." (Doc. 184-40 at 133). But Philip's evidentiary hearing testimony added greater detail and depth to the incident by describing Maples as "sweating and screaming like crazy." (Doc. 189 at 425). The court therefore accords this testimony modest mitigating weight.

### vii.   Denise Abandoned Maples as a Child

The Eleventh Circuit found Maples had adequately alleged that, because of trial counsel's deficient performance, the jury did not hear that "Maples cried for his birth mother, who had abandoned him in childhood, until his early teenage years and that Maples's stepmother had to sit with him at night while he was growing up because of his nightmares." *Maples*, 729 F. App'x at 826. As an initial matter, the court finds that Denise exited Maples's life when he was about three or four years old and had no contact with him again until he was about 16 or 17.

At the evidentiary hearing, Philip testified that, when Denise became pregnant with Maples, Denise and her family "wanted her to get an abortion because they

82

didn't want their daughter pregnant and unmarried." He testified that, after he "put [his] foot down" opposing an abortion, Denise and her family wanted to "take [Maples] to the church and turn him over" for adoption. Philip testified that he opposed putting his child up for adoption because he wanted to keep him, so "they decided if she's going to be pregnant, she's going to be married." So, Philip married Denise after dating about six months. (Doc. 189 at 413-15).

Denise testified at her deposition that she and her family were opposed to abortion. She stated that she married Philip because "he was pretty insistent that that's what we would do," but that her mother and father did not want her to marry Philip. She did not want to marry Philip because she was afraid that she would not be a good mother and that "she would not succeed at this" because her mother did not show her how to be nurturing. She testified that, if she had to do it over again, she "would have given up the baby for adoption" because she and Philip were too young. (Doc. 186-6 at 61-64).

Elise and Philip Maples both testified that after Denise abandoned Maples when he was about three or four years old, Maples would frequently wake up crying and ask for his birth mother, wanting to know where she was and when she was coming back. (Doc. 188 at 37–38; doc. 189 at 437). According to Elise, this conduct occurred until Maples was about 10 or 11 years old. (Doc. 188 at 38). Elise and Philip both testified that Maples also had frequent nightmares around the same

period—three to four times a week, according to Philip. (*Id.* at 37; doc. 189 at 438). Elise testified that Maples could not sleep alone or without a light on, so she would sit with him in the lit living room until he fell asleep. (Doc. 188 at 37). This behavior also lasted until Maples was 10 or 11. (*Id.* at 38–39).

None of this testimony was presented to the trial jury. The court grants it full mitigating weight and will consider it when assessing prejudice.

### viii.   Denise Emotionally Abused Maples as a Teen

The Eleventh Circuit found Maples had adequately alleged that, because of trial counsel's deficient performance, "[t]he jury also did not hear evidence that Maples's birth mother emotionally abused him again in his late teenage years." *Maples*, 729 F. App'x at 826. The Circuit Court explained:

> Specifically, the jury was not able to fully appreciate Maples's encounter with his mother at age 17, where she again neglected him, verbally abused him, and after just a few months abandoned him once more—an event that deeply hurt him and launched him into a period of drug abuse. Underscoring the extent to which this episode of abuse affected Maples, he dropped out of high school during the time that he lived with his mother.

*Id.* at 826.

The court finds that Maples failed to show that his mother verbally abused him, but he did show neglect on her part, and he did show that his inability to form a relationship with his mother after he moved in with her deeply hurt him and immediately preceded a period of heavy drug use.

When Maples was around 16 or 17, Denise re-entered his life, and he moved in with her against his father's advice. (Doc. 186-13 at 3196-97). At the evidentiary hearing, Shannon Smith—Maples's first cousin—testified that she and Maples discussed Denise's return at the time:

> [W]hat I remember, was just us talking like [was] she was going to stay, maybe not wanting to get too excited about her being around because she had left previously.
>
> Just, you know, wondering what she was doing, if her, you know, intentions were true. And I mean, I think just, like I said, he just questioned why, you know, she had already left and why come back.

(Doc. 188 at 171–72).

Despite his apparent reservations, according to Smith, Maples was interested in trying to have a relationship with his birth mother. (*Id.*). Dr. Shaffer testified that Maples said he agreed to live with Denise against his father's advice "because he wanted to know why he was hurt, why he was tied up and kept from her and also why he hadn't seen her for years at that point." (Doc. 190 at 571).

Maples told Dr. Shaffer that Denise "was very generous with him. She took him places, took him to stores, gave him everything he asked for" to "win [him] over." (*Id.*). But despite a promising start, cracks soon began forming in their relationship.

At the evidentiary hearing, Elise and Philip Maples both testified that Denise would ask them to take Maples to their home whenever she was expecting company.

(Doc. 188 at 61; doc. 189 at 457). They also testified that Maples dropped out of high school while living with Denise. (Doc. 188 at 63–64; doc. 189 at 458).

Maples stopped living with Denise after only a few months. Elise testified that Maples told her Denise had "put him out on the street." (Doc. 188 at 63). When asked, Denise testified only that Maples had moved out—she did not clarify whether Maples did so voluntarily. (Doc. 186-6 at 152, 170). And when asked whether she had placed Maples's belongings outside (as Maples had alleged in his Amended Rule 32 Petition), Denise answered: "Possibly. I don't – I don't remember the circumstances of his leaving." (*Id.* at 152–53).

However, Denise did remember Maples's reaction to no longer living with her: "He was angry." (*Id.* at 153). Denise testified that she and Maples were only in touch a couple of times after that and eventually stopped talking altogether. (*Id.*).

Elise testified that Maples told her he thought Denise was "embarrassed of him." (Doc. 188 at 61). Elise's testimony that Denise sent Maples back when she had guests confirms Maples's impression.  Elise added that when Maples returned to her home after living with Denise, he seemed distant from people in his life and less interested in participating in family activities. (*Id.* at 64). Smith similarly testified that after living with Denise, Maples stopped "being a jokester all the time, he started being sad . . . being a different person. He didn't laugh a lot anymore. He didn't joke a lot anymore." (Doc. 188 at 172). And Elise, Philip, and Smith all

testified that Maples began using drugs more heavily after living with Denise. (Doc. 188 at 65, 175, doc. 189 at 459). Elise went as far as to characterize Maples's drug-binges during this period as "drug holiday[s]." (Doc. 188 at 65).

The court finds that Maples proved that he was deeply hurt by the fact that he and Denise failed to develop a relationship and that this episode contributed to Maples's increased drug use. The court will take conduct in reaction to this experience into account when assessing the totality of the evidence that should have been presented to the jury. The court accords less weight to the fact that Maples began using drugs more heavily after living with Denise because Philip did testify to this fact during the penalty-phase presentation, but not to the extent elicited at the evidentiary hearing. *See* (Rule 32 C.R., Vol. 21, Tab 27 at 3198–99). The court also accords less weight to the testimony regarding Denise wanting Maples out of her house any time she had company over because Elise already testified to this fact during the penalty phase. *See* (*id.* at 3180).

The court also finds that blame for the failed relationship between Denise and Maples cannot be placed solely at Denise's feet, and the State could have presented evidence to that effect during the penalty phase. Denise testified that Maples was drinking while staying with her. (Doc. 186-6 at 165). She also suspected he was doing drugs at this time. (*Id.* at 166). The court will also consider Denise's testimony

about Maples's contributing behavior when weighing the impact of Denise's second departure on Maples's emotional state.

Denise also denied being verbally abusive to Maples. (*Id*. at 169). And because Maples did not testify, the court lacks any testimony he could have provided regarding verbal abuse. So, the court finds that Maples failed to prove Denise verbally abused him and will not accord that allegation any mitigating weight.

Maples also alleged the fact that he dropped out of high school while living with Denise "[u]nderscored the extent to which this episode of abuse affected [him]." *Maples*, 729 F. App'x at 826. But at trial, Dr. Shealy testified that Maples told him he had dropped out of school because "he needed a half credit to graduate on time and he was upset that he couldn't graduate with his classmates, so he decided that he was going to quit school and go into the Army in 1992." (Doc. 148-15 at 3142). This testimony largely undermines the weight of Maples's allegation that Denise's abuse—not his own frustration at his lack of necessary credits—caused him to drop out. So, the court accords that allegation less mitigating weight.

### ix.    Additional Evidence of Denise's Abuse

At the evidentiary hearing, Maples presented further evidence of Denise's abuse of both Maples and his father that went beyond the specific allegations the Eleventh Circuit addressed in its opinion. The court discusses that evidence here.

Elise and Philip both testified that on one occasion when Maples was about three-and-a-half years old, they went to pick Maples up from Denise's apartment complex and found him playing with a toy truck by the swimming pool unattended—Denise was not at home. (Doc. 188 at 40; doc. 189 at 424). For her part, Denise confirmed that she had a pool at her apartment complex and that Maples would go play by the pool alone. (Doc. 186-6 at 129–30).

Philip testified that when he and Denise were still together, he recalled two or three times where he heard Denise tell Maples that she hated him and wished he had never been born. (Doc. 189 at 420). Philip also testified that on one occasion, Maples's grandmother witnessed Denise shoving a spoon into the back of Maples's throat while feeding him, prompting his grandmother to step in to stop it. (*Id.* at 420–21).

Philip also recalled an instance after he divorced Denise where Maples came home from Denise's father's house with bruises on his throat, suggesting he had been choked. (*Id.* at 422). Philip believed Denise had been the one to choke Maples because, according to Philip, Denise's father stated to him verbatim: "[Y]ou're going to have to take [Maples] because I'm scared Denise is going to kill him." (*Id.* at 422–23).

As further evidence of Denise's father's state of mind, in her own deposition, Denise confirmed that her father believed Maples was better off living with Philip.

(Doc. 186-6 at 134). She also confirmed that her father had a conversation with Philip about that topic, though she could not recall specific details. (*Id.* at 134–35).

Denise also admitted that she consciously drank alcohol after she became pregnant with Maples, though she could not recall how many times and testified that she did "not [drink] much." (*Id.* at 159). She also admitted that during one of her fights with Philip, she broke a record on his head. (*Id.* at 139). She testified that Maples was present during some of their fights, and she believes it affected him. (*Id.* at 100–101).

Dianne Ferrell, Maples's aunt, testified that on one occasion, she observed "some marks on [Maples's] arm like spots, little round spots." (Doc. 188 at 136). According to Ferrell, Maples told her "that his mom had burned him with a cigarette or whatever." (*Id.*). Denise denied having done so. (Doc. 186-6 at 126).

The court finds this novel testimony about Denise's various abusive conduct sufficiently credible to warrant mitigating weight.

### b. Evidence of Depression and Suicidality

The Eleventh Circuit found Maples had sufficiently alleged:

> Due to the deficient performance, the jury did not hear evidence that, in the years leading up to his crimes, Maples suffered from serious depression and suicidal ideation. Maples wrote poetry about depression and loneliness; once wrote a suicide note and then hid in the woods; and took anti-depressants in jail prior to trial. Nor did the jury hear evidence that *Maples attempted suicide on three separate occasions by* (1) taking over thirty sleeping pills, drinking a bottle of alcohol, and crashing a family member's car; (2) playing Russian roulette (he put a

90

gun in his mouth and pulled the trigger); and (3) slashing his wrists with
a butcher knife.

*Maples*, 729 F. App'x at 826 (emphasis in original). The Eleventh Circuit found that

"[t]rial counsel offered no evidence of Maples's *multiple* suicide attempts and

suicidal ideation" and "no evidence of Maples's serious and grave depression." *Id.*

at 826–27 (emphasis in original). The Circuit Court found such evidence was not

"merely cumulative," and trial counsel's failure to present it meant that "the gravity

of the . . . personal trauma that Maples experienced was not accurately depicted." *Id.*

at 826.

But as stated before, the Eleventh Circuit based its decision on Maples's

allegations; it tasked this court with determining whether Maples's *proved* his

allegations. The court finds that Maples proved some—but not all—of these

allegations.

### i. Depression and Suicidal Ideation

The Eleventh Circuit found that Maples sufficiently alleged that trial counsel

failed to present evidence that Maples suffered from serious depression and suicidal

ideation evidenced by his poetry, as suicide note, and taking anti-depression

medication while in jail. *Maples*, 729 F. App'x at 826. The court finds that Maples

presented novel evidence about his depression and suicidal ideation from both lay

and expert witnesses. But Maples failed to prove that he ever wrote a suicide note or

that he took anti-depressants in jail prior to trial.

91

At the trial, the only testimony the jury heard regarding Maples's depression was Dr. Shealy's testimony that Maples was mildly depressed because he was in jail. (Doc. 184-40 at 85–86). As discussed above, Dr. Shealy's assessment of Maples stemmed solely from his in-person examination of Maples and a discussion with a guard at the jail. Dr. Shealy never spoke with anyone from Maples's family, including the witnesses who testified at the evidentiary hearing.

At the evidentiary hearing, Elise testified that when Maples returned from living with Denise, he seemed less interested in participating in activities and became distant from people in his life. (Doc. 188 at 64–65). Maples "was always down, always seemed down." (*Id.* at 70). He would write "really dark poetry about . . . rejection." (*Id.*). Elise was concerned Maples would hurt himself because he would leave cryptic letters saying he was "gone forever" before going to the woods or leaving town. (*Id.* at 70–71). But Elise testified on cross that Maples wrote the letters and poetry in response to breaking up with girlfriends. (*Id.* at 111). Notably, Elise did not testify to Maples leaving a "suicide note," as Maples alleged.

Shannon Smith testified that after Denise exited Maples life the second time, he stopped being a "jokester all the time" and "started being sad." (Doc. 188 at 172). In her opinion, Maples "showed signs of being depressed. Just being a different person. He didn't laugh a lot anymore. He didn't joke a lot anymore." (*Id.*). On one occasion during the same period, Maples told Smith that he wanted to die. (*Id.* at

173). Smith also testified that Maples seemed affected by his cousin Chris's death, which happened while Smith and Maples were in high school. (*Id.* at 174).

Philip Maples also testified that Chris's death affected Maples; it "bothered him real bad" because the two had been close. (Doc. 189 at 455). Yet Philip never had a conversation with Maples about how Chris's death made Maples feel because Philip "didn't know how to handle a conversation like that." (*Id.*). Philip also testified that, in his opinion, Maples had been depressed "several different times through his life." (*Id.* at 466).

Kathy Goodwin, who interviewed Maples when he went to the Quest Recovery Center, also testified to signs of depression from her limited interaction with Maples. After interviewing Maples, Goodwin observed that he had a "flat affect." (*Id.* at 382). Goodwin observed that Maples's social relationships were significantly impaired. (*Id.* at 383–84). Goodwin testified that she perceived that Maples had "some suicidal ideations." (*Id.* at 374).

At the evidentiary hearing, Maples also introduced his intake records from Quest, including a series of questions that further evince Maples's depression. When asked whether he had thought about ending his own life, Maples stated that he "just got so depressed [he] wanted [his life] to end." (Doc. 184-25 at 14). When asked to describe his peer relationships, Maples answered "None." (*Id.* at 49). And when asked whether he had a best friend, Maples circled "No." (*Id.*). When asked whether

he feels "worried, anxious, or depressed most of the time," Maples's answered "Yes" and circled "depressed." (*Id.* at 53). When asked whether he "often feel[s] isolated and alone," Maples answered "Yes." (*Id.* at 54).

Dr. Wilkie Wilson, Maples's neuropharmacology expert, testified that Maples's self-reports of depression and suicidal ideation on the Quest questionnaire fit with his use of stimulants to try to "fix" his depression. (Doc. 191 at 767). Dr. Wilson added that Maples's choice of drugs, especially stimulants, is consistent with someone who is depressed. (*Id.* at 768).

And Dr. Robert Shaffer, Maples's neuropsychology expert, testified that Maples's self-report of suicidality "confirms the seriousness" of Maples's "emotional dysregulation," which goes beyond depression and "involves dissociation, a sense of unreality." (Doc. 190 at 593). Dr. Shaffer added that Maples's condition is "predicted in high numbers by early childhood abuse and attachment problems." (*Id.*).

Maples also introduced a copy of his poetry to support his allegation that he wrote poems about "depression and loneliness." *Maples*, 729 F. App'x at 826. Maples's poems are thematically dark and do convey a sense of loneliness and rejection. (*See generally* doc. 184-8). But they make no overt mention of suicide, and some even end on a hopeful note. One concludes with Maples wishing to get his "feet planted on the ground" and "take [his] life into [his] hands" so he can "think

positive" and "turn [his life] around." (Doc. 184-8 at 2). Another, apparently written to an ex-girlfriend, talks about moving on from the relationship and about being "happy by my self [sic]." (*Id.* at 4). The court finds that while Maples's poetry does convey a sense of loneliness and contain dark themes, it is not clearly indicative of depression or suicidality.

None of the testimony and evidence of Maples's depression outlined above was presented to the jury at Maples's trial. The court finds this evidence entitled to mitigating weight and will consider it among the totality of the evidence. However, again Maples failed to prove he ever wrote a suicide note. No witness testified to any such note, and Maples failed to produce one. The court also finds that Maples failed to prove he took anti-depressants while in jail awaiting trial. Neither party offered Maples's records from the Morgan County jail (where Maples had stayed prior to trial) or any other evidence that Maples took anti-depressants at that time. So, the court accords these allegations no mitigating weight.

### ii.    Suicide Attempts

The Eleventh Circuit found that Maples had sufficiently alleged that the jury did not hear evidence of Maples's three suicide attempts, including taking sleeping pills, drinking alcohol, and crashing a car; playing Russian roulette; and slashing his wrists with a knife. *Maples*, 729 F. App'x at 826. The court finds Maples proved only the last of these three allegations.

(a)     Overdose and Car Crash

Maples alleged that his "ex-girlfriend, [Heather] Davis, could have testified that around 1994 she was with Mr. Maples when he took over thirty sleeping pills and drank a bottle of alcohol just before crashing [Elise] Maples's car." (R. 32 C.R. Vol 33, Tab 49 ¶ 130). But Davis did not testify at the evidentiary hearing.

Dr. Shaffer was the only witness who testified about this alleged suicide attempt, and he could only recount what Maples told him during their March 2019 meeting. At the evidentiary hearing, Dr. Shaffer testified that Maples told him

> . . . about a relationship with a woman in which he engaged soon after he stopped attending high school. And this relationship went on for about a year, and sounded like it was very emotionally intense. And he talked about becoming depressed and emotionally upset during that time period, such that he began to question his life. And he said he took between twenty-five and twenty-seven pills, drank a fifth of liquor, and drove his car into a tree after that.
>
> Q  Did he describe that as a suicide attempt to you?
>
> A  Well, he talked about being so upset that it didn't matter what happened to him.  But I would consider it a suicidal attempt or gesture, certainly.
>
> Q   And did he tell you around what age he was when this happened?
>
> A  As I understand, it was around 1993, I think it makes him about nineteen or twenty.

(Doc. 190 at 592-93).

But on cross examination, Dr. Shaffer also testified:

96

Q  Did Maples report going to the hospital after he consumed those pills and alcohol?

A  He did not.

Q  Did he say he went and had his stomach pumped out because of the excessive pills and alcohol?

A  No, he didn't.

Q  Did you see a police report from where he supposedly ran his vehicle into a tree after he did that?

A  No, I did not.

Q  An insurance claim?

A  No.

Q  Repair bill?

A  None.

(*Id*. at 692-93).

Neither party asked Philip or Elise Maples about this incident at the evidentiary hearing, including whether they had to repair the car or file an insurance claim. And Maples himself did not testify. Maples presented no evidence that could help prove this incident occurred beyond his out-of-court statement to Dr. Shaffer in 2019, about twenty-five years after the alleged 1994 event. The court finds that Maples has not proven that he tried to commit suicide by overdosing on pills and crashing a car into a tree. So, the court will not consider this unproven allegation as a mitigating factor.

(b)    Russian Roulette

In his Amended Petition, Maples alleges that "[Jamie] Dobbs, a friend of Mr. Maples, also could have testified that he witnessed Mr. Maples play Russian roulette on at least one occasion, sticking a gun into his mouth and pulling the trigger." (Rule 32 C.R., Vol. 33, Tab. 49, ¶ 130). But Dobbs did not testify at the evidentiary hearing.

The only witness to testify about Maples playing Russian Roulette was Maples's childhood friend, Derek Shelton. He testified:

> Q    (By Ms. Soule) Do you recall Cory ever playing Russian roulette?
>
> A   Yes, ma'am.
>
> Q   How old were you when that happened?
>
> A    Thirteen, fourteen, somewhere, between sixth and seventh grade.
>
> Q    When Cory was playing Russian roulette, did he pull the trigger?
>
> A   Yes, ma'am.
>
> Q   Was it normal to you for a kid to play Russian roulette?
>
> A   No, ma'am.

(Doc. 188 at 221-22). Regarding the context of this incident, Shelton said:

> We were in his – in the living room and he had watched some movie, I can't remember the name of it, but it was the – had to do with death and like people that had committed suicide or been hit by trains or

something like that. And that's when he come out with the pistol and
stuck it to his head and pulled the trigger.

(*Id*. at 232).

But Maples had "[b]een laughing and cutting up," and Shelton did not "take
him as serious at all." (*Id*). And Shelton "could tell by the cylinder that there was no
ammunition in the gun, so [he] really didn't think that much of it." (*Id*. at 228).
Notably, Shelton did not testify that Maples put the gun "in his mouth," as Maples
had alleged. *Maples*, 729 F. App'x at 826. Maples presented no other testimony
about this or any similar incident.

Though Maples's behavior may have been aberrant and even troubling, in the
context as Shelton explained it, the court finds Maples did not seriously attempt or
intend to end his life. The court affords this incident no weight as a mitigating
circumstance.

(c)     Slashing Wrists

The Eleventh Circuit found that Maples alleged that, because of trial counsel's
deficient performance, the jury never heard evidence that Maples had "slash[ed] his
wrists with a butcher knife." *Maples*, 729 F. App'x at 826. Specifically, Maples
alleged that "Mr. Dobbs could also testify that he saw Mr. Maples attempt suicide
by slashing his wrists with a butcher knife." (Rule 32 C.R., Vol. 33, Tab. 49, ¶ 130).
The court notes again that Dobbs did not testify and the record contains no statement

from Dobbs regarding his knowledge of Maples slashing his wrists with a butcher knife. Nevertheless, the court finds Maples proved that he had cut his wrists.

First, on his Quest application, Maples reported that he had "slit [his] wrist four years ago under the influence." (Doc. 184-25 at 14). And Elise and Philip Maples both testified they had seen scars on Maples's arm and wrist. (Doc. 188 at 71; doc. 189 at 461). Neither witness was asked what type of knife Maples used—Philip volunteered only that Maples had used a "knife or razor blade." (Doc. 189 at 461). And neither witness personally observed Maples cut himself—the cuts had already scarred over by the time Philip and Elise first saw them. (Doc. 188 at 71; doc. 189 at 461). Even so, the court credits the testimony of these witnesses and finds that Maples had cut his wrists.

When opining as to the importance of Maples's cutting in the larger picture of his mental health, Dr. Jolie Brams described it as a suicidal gesture, one which "may or may not [have been] suicidal, but [was] self-harm." (Doc. 191 at 911–12). As the court understands it, Dr. Brams meant that Maples's cutting himself may not have been an intentional suicide *attempt*, but it still constituted a suicidal *gesture* or self-harm episode that indicated Maples had a history of suicidal ideation.

The State's expert, Dr. Glen King, testified that when he asked Maples whether he had ever made a suicide attempt, Maples said "no." (Doc. 192 at 1216). But when asked whether he followed up on Maples's response, Dr. King testified

that he "knew [Maples] had some prior history of a possible suicide attempt . . . but [he] did not follow up at [that] point." (*Id.*).

Regardless whether Maples's cutting constituted a genuine suicide attempt, a suicidal gesture, or self-harm, the court finds it is entitled to weight as a mitigating circumstance—one which the jury could have considered had trial counsel presented it. Therefore, the court will consider Maples's cutting episode when weighing the totality of the evidence.

### c.  Evidence of Maples's Good Character

The Eleventh Circuit found Maples had sufficiently alleged:

> Due to [trial counsel's] deficient performance, the jury heard only a few scattered statements about Maples's good character, even though Maples had [(a)] lifelong, positive relationships with friends and family members; [(b)] looked after his younger brother, discouraging him from using drugs; [(c)] acted in an undercover capacity to assist police officers with arresting a drug dealer; [(d)] never had disciplinary issues in school; was regarded as a respectful young man by school staff; [(e)] was active in extracurriculars as a youth, including church and high school sports; [(f)] and had a record of good behavior in jail during the two years leading up to trial.

*Maples*, 729 F. App'x at 826. The Circuit Court found that this alleged evidence of Maples's good character "could have shown the jury that Maples tried to be a good person despite his traumatic childhood, adolescence, and ongoing resulting mental health problems." *Id.* at 827. As before, Maples proved many, but not all, of these allegations.

Before discussing the evidence regarding Maples's good character, the court has already found that it credits some of counsel's strategic decisions and will not consider certain testimony presented at the evidentiary hearing based on counsel's strategy. As discussed thoroughly *supra*, based on counsel's reasonable strategic choices, the court will not consider or discuss the testimony of friends Derek Shelton and James Beddingfield; school officials Martha Lenhart, Judy Sims, Bill Simms, Glen Lang, Billy Hopkins; and Officer Greene as mitigation evidence.

### i.  Lifelong, Positive Relationships

As stated above, the Eleventh Circuit found that Maples had alleged the jury heard little about Maples's "lifelong, positive relationships with friends and family members." *Maples*, 729 F. App'x at 826. Maples's trial counsel presented *some* evidence to this effect. During the *guilt* phase of the trial, Alan Birdsong testified that Maples had lived with and worked for him in his cable TV installation business shortly before the murders, when they parted on good terms. (Doc. 184-41 at 2746). Birdsong trusted Maples to be around large sums of cash money and to utilize his vehicle. (*Id*. at 2748–49). He considered Maples a friend. (*Id*. at 2745, 2749).

During the penalty phase, Elise testified that, as a kid, Maples was "very fun loving" and "enjoyed being around other kids a lot." (Doc. 184-40 at 114). Elise had a "good relationship" with Maples when he was young. (*Id*. at 116). During his brief time on the stand during the penalty phase, Kenneth Maples agreed with trial counsel

that Maples was "a pretty good kid that got messed up on drugs." (*Id*. at 130). Philip Maples similarly testified that his son is "a good kid." (*Id*. at 138).

Maples offered considerably more testimony about his relationships with family and friends at the evidentiary hearing—both from the witnesses who testified at the penalty phase and those who did not. At the evidentiary hearing, Elise testified that she and Maples were "really close," and that Maples eventually started referring to her as "mama." (Doc. 188 at 47–48). Maples was "very good" and "very loving" to Elise; "he just always accepted me and just took me right in as his mother." (*Id.* at 50).

Philip testified that Maples loved his family and "all them loved him." (Doc. 189 at 441). Maples was particularly close to his cousins and would wrestle and play football with them. (*Id.* at 442). Maples was also close with his grandmother, who "thought [Maples] hung the moon . . . she loved him to death." (*Id.*). Maple treated his grandmother well and would go to her house to do chores; "whatever she needed done, he would go over there and do it." (*Id.*). Maples was "just your average kid" who "loved to have fun and cut up and play and just enjoyed everything." (*Id.* at 443).

In addition to this expanded testimony by Elise and Philip, Maples presented witnesses who had no opportunity to testify at Maples's trial. Dianne Ferrell, one of Maples's aunts, testified at the evidentiary hearing that Maples was a good, loving,

and friendly nephew. (Doc. 188 at 141). He would play ball and hide-and-seek with her children. (*Id.*). Maples "had people that loved him all over the neighborhood [and] church[;] everybody loved him." (*Id.* at 148). But Maples stopped coming around as often once he started driving. (*Id.* at 149).

Shannon Smith, Maples's first cousin (and Dianne Ferrell's daughter), testified that she and Maples "were very close": "[Maples] was more like my brother than my cousin, just because we were so close in age. We were always together." (*Id.* at 163). Smith described Maples as a "very funny" and "very caring person." (*Id.* at 165) "If you were having a bad day, he wanted to know what was wrong. He would tell a joke, anything to try to make your day better, make you smile. He was an all around good kid." (*Id.*). But by the time Maples had dropped out of high school after he lived with Denise, Smith and Maples "had gotten different friends" and "weren't as close." (*Id.* at 182). Smith "didn't see him a lot . . . he would come to family functions every now and then, but it wasn't as often." (*Id.* at 188). As noted earlier, Smith also testified about Maples's experience with Denise as a teenager. The court finds that Smith provided critical mitigating testimony and was an excellent witness—perhaps the best lay witness presented at the evidentiary hearing.

Debbie Adkison, a family friend and mother of Maples's friend Derek Shelton, described Maples as "a very good boy" who "never got in trouble." (*Id.* at 194). Adkison "liked [Maples] a lot, still do, like him a lot." (*Id.*). Adkison was

104

"devastated" to learn that Maples had been charged with capital murder "[b]ecause he never got in trouble, [Maples] was a good kid." (*Id.* at 198). But on cross, the State demonstrated that Adkison was unaware of Maples's misdeeds later in life, including his DUI arrest, his arrest for possession of drugs, his sale and use of drugs, and his thefts. (*Id.* at 203–04).

Dale Ray, one of Maples's aunts, testified by deposition that, as a child, Maples "was a fun kid" who "loved to be hugged and . . . loved to give hugs." (Doc. 184-38 at 23). Dale enjoyed having Maples around; Maples treated her "good" and "respectful." (*Id.* at 25, 27). Maples also got along well with Dale's sons and would play with them on weekends. (*Id.* at 24). But once Maples turned "driving age, then it started kind of drifting off." (*Id.* at 26). At that point, Maples "didn't come around as much . . . he [would] still come around but not like he did before." (*Id.* at 26).

Fred Ray, Maples's uncle and Dale's husband, testified by deposition that he first met Maples when Maples was 12–13 years old and saw him about twice a week on average during that period. (Doc. 184-39 at 10). Like Dale, Fred also testified that Maples treated him "good" and "respectful": "he's always 'yes, sir' and 'no, sir.'" (*Id.* at 13). Maples "would give us bye hugs when he left[,] [e]ven as a teenager." (*Id.* at 14). And Maples would help Dale "if she needed anything done . . . I'm sure he would help." (*Id.* at 13). But, echoing other witnesses, Fred testified

that "Maples was just a good teenage boy *up until a certain age*." (*Id.*) (emphasis added).

Maples presented substantial novel evidence of his good character—especially in childhood. But the evidence offered does not establish that Maples had "*lifelong*, positive relationships." Most of the family and friends who testified about Maples's good character also testified that they did not remain close to Maples after he began driving and after he dropped out of high school and began using drugs heavily in his late teens. If Maples's trial counsel had elicited this novel evidence about Maples's relationships, the State would have also elicited testimony from these same witnesses showing how most had drifted apart from Maples as he grew older and more drug-dependent. The State also would have shown that some of Maples's character witnesses were unaware of Maples's drug-related legal issues and thefts in the years leading up to the murders.

The court accords Maples's novel evidence of his relationships with friends and family some mitigating weight, especially that from Shannon Smith. But the court will also consider the State's novel evidence showing that many of those relationships became strained as Maples grew older and more involved with drugs.

### ii. Relationship with His Brother

The Eleventh Circuit found that Maples had adequately alleged that, because of trial counsel's deficient performance, the jury did not hear how Maples had

"looked after his younger brother, discouraging him from using drugs." *Maples*, 729 F. App'x at 826. Indeed, trial counsel elicited no testimony about Maples's relationship with his brother. Daniel Maples had testified at the *guilt* phase of the trial, but trial counsel did not ask Daniel about his relationship with Maples. *See generally* (Doc. 186-20 at 2754–66). Instead, at trial, Daniel testified that Maples left Terry's body in the driveway of Maples's home where Daniel found it. (*Id.* at 2759). Daniel also told the jury that an hour after he found Terry's body, Maples called him to say he would not be coming home. (*Id.* at 2759–61).

At the evidentiary hearing, Maples presented—for the first time—testimony that paints his relationship with Daniel in a positive light. Elise, Daniel's birth mother, testified that Daniel and Maples were "really close." (Doc. 188 at 47). Maples was "very protective" of Daniel; Maples would read to Daniel at night; Maples "read to him a lot and taught him a lot of things." (*Id.*). And though Maples was using drugs, Elise testified that Maples did not bring them around Daniel. (*Id.* at 66).

Philip similarly testified that Maples had a good relationship with Daniel. (Doc. 189 at 447). Maples would read to and play with Daniel; "they [were] always together when they [were] young." (*Id.*). Shannon Smith testified that Maples was a "good big brother" to Daniel. (Doc. 188 at 178). Alan Birdsong described Daniel as Maples's "pride and joy"; Maples "thought the world of his little brother." (Doc. 189

107

at 345). Birdsong believed that if anything would have angered Maples, it would be "if someone messed with Daniel." (*Id.*). The court credits the testimony of these witnesses.

Maples also alleged that, but for trial counsel's deficient performance, Daniel himself would have testified that Maples was "a fun, loving brother" who "looked after him," "discouraged [him] from using drugs," and kept him away from Maples's "drug associates." (Doc. 24 at ¶¶ 134). But notably Daniel did not testify at the evidentiary hearing.

And other evidence shows that Maples put Daniel in harm's way. In a portion of Maples's videotaped confession not played to the trial jury, Maples admitted he took Daniel to Jamie Dobbs's house the night of his fight with Dobbs and Chris Basden. (Doc. 78, Ex. 231) Though the fight was allegedly about drug money Maples owed to his drug dealer, the fight sparked when someone pushed Daniel. (*Id.*). While the jury heard testimony about this fight during the trial, they did not hear that Maples had brought his little brother with him. *See* (Rule 32 C.R., Vol. 16 at 2069 [James Dobbs testimony]; doc. 184-40 at 72 [Dr. Allen Shealy testimony]).

The fact that Daniel did not testify at the evidentiary hearing undermines the credibility of the testimony regarding Maples's close relationship with his brother. And if Maples had presented evidence about his good relationship with Daniel at trial, the court finds that the State would have presented evidence showing Maples

108

brought Daniel to the fight at Dobbs's house and would have reminded the jury that Maples left Terry's body for Daniel to find. The court will consider this novel "bad" evidence alongside Maples's novel "good" evidence when reweighing Maples's sentencing profile.

### iii.    Assisting Police

The Eleventh Circuit found that Maples adequately alleged that, because of trial counsel's deficient performance, the jury heard only scattered statements that Maples had "acted in an undercover capacity to assist police officers with arresting a drug dealer." *Maples*, 729 F. App'x at 826. Specifically, Maples alleged that, but for trial counsel's deficient performance, "the court and the jury would have read a case report, written by Lieutenant Larry [sic] Greene, detailing Mr. Maples's assistance in the October 1994 arrest of Mark Carroll . . . for unlawful distribution of controlled substances." (Doc. 24 at ¶¶ 147).

As discussed *supra*, the court has already credited as reasonable trial counsel's strategic choice to avoid testimony from the police officer about Maples's cooperation: it would have led to testimony about Maples's arrest for drugs, which counsel wanted to avoid.  So, the court will not consider Maples's successful assistance to law enforcement and the risks he undertook to do so as mitigating circumstances.

109

### v.    Good School Record

The Eleventh Circuit found that Maples adequately alleged that, because of counsel's deficient performance, the jury did not appreciate that Maples "never had disciplinary issues in school[ ] [and] was regarded as a respectful young man by school staff." *Maples*, 729 F. App'x at 826. In his Amended Petition, Maples alleged that Martha Lenhart, his high school counselor, would testify "that, while Mr. Maples struggled academically in high school, during his senior year he dedicated himself to graduating on time and, after graduation, seeking employment in a technical trade. . .Ms. Lenhart also found Mr. Maples exceptionally easy to talk to and very polite." (Rule 32 C.R., Vol. 33, Tab 49, ¶ 127).

But Lenhart testified at the evidentiary hearing that she could remember "nothing spectacular" about Maples. (Doc. 189 at 259). Looking at his records, she testified that Maples had "poor work habits," stating that he "[j]ust wasn't doing the work that he needed to [do] to pass." (*Id*. at 277–78). She also testified that she was unaware of disciplinary issues, but only because the principals handled disciplinary issues. (*Id*. at 269). She did not testify that Maples was "exceptionally easy to talk to" or that he was "very polite," as alleged in the Amended Petition. But she did testify that Maples was "always respectful to [her], so [she has] no negative image of him." (*Id.* at 274).

110

However, as the court stated previously, counsel reasonably and strategically chose not to call witnesses who could provide sympathetic testimony about the victims, such as how well loved they were, and so avoided calling teachers and coaches. (Doc. 191 at 1054, 1065-66, 1080, 1091). Martha Lenhart testified that she remembered "nothing spectacular" about Maples, but she testified that Terry "was just an all around good kid, just a good kid. Good student, didn't get in trouble, and did his work. Good kid." (Doc. 189 at 279). And the testimony of other school personnel and coaches who testified at the hearing about Terry's great qualities— and their demeanor while doing so—confirmed the reasonableness of counsel's decision to avoid calling school witnesses who knew both Maples and the victims. So, the court will not consider as mitigating evidence the testimony of school personnel and coaches regarding Maples's good character when counsel reasonably would not have called those witnesses to testify at the trial.

Nevertheless, Maples presented testimony at the evidentiary hearing from his cousin Shannon Smith, who testified that Maples was well-behaved in school. Smith, who was in the same grade as Maples throughout his time in school, testified that Maples "got along good with everybody"; she never saw him get in fights or act violently; and Maples was "very respectful" towards his teachers, referring to them as "ma'am" or "sir," and did "most everything the teacher said." (Doc. 188 at 166–

67). So, the court will consider Smith's testimony regarding Maples's good conduct in school as mitigating evidence.

### vi.   Extracurricular Activity

The Eleventh Circuit found that Maples adequately alleged the trial jury heard only scattered statements that Maples "was active in extracurriculars as a youth, including church and high school sports." *Maples*, 729 F. App'x at 826. At trial, the sole evidence before the jury in this regard was Dr. Shealy's isolated testimony that one of Maples's high school friends, who happened to be a guard at Maples's jail and was present the day Dr. Shealy conducted his evaluation of Maples, told him Maples played varsity football and baseball in high school. (Doc. 184-40 at 81).

At the evidentiary hearing, Maples presented novel evidence of his participation in extracurricular activities. But the court has already found that it credits some of counsel's strategic decisions and will not consider certain testimony presented at the evidentiary hearing based on counsel's strategy.  As discussed thoroughly *supra*, based on counsel's reasonable strategic choice to not call any mutual friends, school personnel, or coaches who testified glowingly about Terry, the court will not consider or discuss the testimony of any of these witnesses about Maples's extracurricular activities.

But the court will consider the testimony of Maples's family and family friends Diane Ferrell and Debbie Adkison who testified about Maples's

112

extracurricular activities.  Ferrell testified that Maples went to church "pretty much every weekend" when he was a *toddler*. (Doc. 188 at 141). Dale Ray also testified that Maples attended church when he was a child. (Doc. 184-38 at 25). But Fred Ray testified that "most of the time [Maples] did not" attend church, presumably referring to his teenage years. (Doc. 184-39 at 16).  The court finds this testimony not to be positive for Maples and gives it no mitigating weight.

Smith testified that Maples went to church with her, and in his free time played football and rode horses in the saddle club. (Doc. 188 at 163–65). Debbie Adkison testified that Maples played football with her son, Derek Shelton, and that Maples and his family rode horses with her family; Maples was "really good" at barrel racing. (*Id.* at 192-93). Also, Elise testified about Maples's horse riding endeavors and playing sports at the evidentiary hearing. (Doc. 188 at 58-59).

The court will consider in mitigation Maples's novel evidence from his family members, Ferrell, and Adkison about Maples's participation in extracurricular activities.

### vii.    Good Behavior in Jail Before Trial

The Eleventh Circuit found that Maples adequately alleged he was prejudiced because the jury did not hear that he "had a record of good behavior in jail during the two years leading up to trial." *Maples*, 729 F. App'x at 826. But Dr. Lawrence Maier's report, completed a year before the trial, states that Maples was caught

making a shank and attempting to receive contraband while in jail awaiting trial. (Doc. 186-15 at 2). Neither party offered Maples's records from his time at the Morgan County jail before trial. And Maples presented no other evidence of his behavior in jail during the evidentiary hearing.

So, the court finds Maples failed to prove he had a record of good behavior in jail during the two years leading up to trial and does not consider this failed allegation as mitigation evidence.

### d. Evidence of Head Trauma

The Eleventh Circuit found that Maples adequately alleged that, because of trial counsel's deficient performance, "the jury also did not hear evidence that Maples had a history of head trauma. Maples once fell off a 20-foot cliff as a teenager and was struck in the head with a bat about a year before his crimes." *Maples*, 729 F. App'x at 826. As explained above, Maples failed to present any evidence showing he was hit in the head with a bat. So, the court accords this allegation no mitigating weight.

Regarding evidence of Maples's fall from the bluff, the court has already found that Maples failed to show his trial counsel had reason to know they should investigate whether this incident caused head trauma. Accordingly, the court cannot conclude that the jury did not hear such evidence because of the deficient

114

performance of trial counsel. *See Maples*, 729 F. App'x at 826. The court accords this unproven allegation no mitigating weight.

### 2. Totality of Evidence Establishes Prejudice

To prove prejudice, Maples must show that, "but for counsel's unprofessional performance, there is a reasonable probability the result of the proceeding would have been different." *Putman v. Head*, 268 F.3d 1223, 1248 (11th Cir. 2001) (citing *Strickland*, 466 U.S. at 694). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding" because "[v]irtually every act or omission of counsel would meet that test." *Strickland*, 466 U.S. at 693.

But a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* When, as in this case, the petitioner "challenges a death sentence . . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome, which is a lesser showing than a preponderance of the evidence." *Sealey v. Warden, Georgia Diagnostic Prison*, 954 F.3d 1338, 1360 (11th Cir. 2020)

(internal quotation marks and citations omitted) (quoting *Strickland*, 466 U.S. at 694).

To assess prejudice, the court reweighs "the evidence in aggravation against the *totality* of the available mitigating evidence." *Dallas v. Warden*, 964 F.3d 1285, 1306 (11th Cir. 2020) (emphasis in original) (quoting *Wiggins*, 539 U.S. at 534). The court examines "all of the good and all of the bad, what was presented during the trial and what was offered collaterally later." *Id.* "The question is whether, viewed as a whole and cumulative of mitigation evidence presented originally, there is a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence." *Id.* (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 399).

But Maples cannot show prejudice "simply by pointing to new evidence that is 'weak or cumulative of the testimony presented at trial.'" *Morrow v. Warden*, 886 F.3d 1138, 1150 (11th Cir. 2018) (quoting *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1296 (11th Cir. 2012)), *cert. denied* 139 S. Ct. 1168 (2019). "Mitigating evidence in postconviction proceedings is cumulative 'when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.'" *Dallas*, 964 F.3d at 1308 (quoting *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1260-61 (11th

116

Cir. 2012)). However, even if counsel elicited some mitigation evidence of a troubled childhood at trial, that fact "does not mean trial counsel's deficient performance caused no prejudice." *Daniel v. Comm'r, Alabama Dep't of Corr.*, 822 F.3d 1248, 1276 (11th Cir. 2016). In some cases, "the nature, quality, and volume of the mitigation evidence is significant enough to conclude that it 'bears no relation' to the cursory evidence that trial counsel presented." *Daniel*, 822 F.3d at 1276 (citing *Rompilla v. Beard*, 545 U.S. 374, 393 (2005)) ("Mrs. Daniel's telling of one specific instance of abuse, albeit severe, did not give the jury a true picture of the chronic physical, emotional, and sexual abuse that Mr. Daniel suffered in his critical developmental years.").

Further, the Eleventh Circuit has advised that "[t]o the extent some of the new mitigating allegations in Maples's amended Rule 32 petition could be characterized as cumulative, that characterization goes to the weight of the evidence, not to whether we consider it at all." *Maples*, 729 F. App'x at 825 n. 7. Though the Circuit Court referenced Maples's "allegations," this court applies this principle to Maples's evidence—that is, to the extent some of Maples's evidentiary hearing evidence "could be characterized as cumulative, that characterization goes to the weight of the evidence, not whether [the court] consider[s] it at all." *Id.* Thus, the court considers the much more detailed evidence of such topics as Denise's abuse as cumulative evidence, according it less mitigating weight. But the court also

117

considers the "nature, quality, and volume of the mitigation evidence" in determining the amount of weight to give that mitigating evidence. *See Daniel*, 822 F.3d at 1276.

The Eleventh Circuit found Maples had alleged facts that, *if true*, show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result in the proceeding would have been different." *Maples*, 729 F. App'x at 825 (quoting *Williams*, 542 F.3d at 1342). Here again, as the court has thoroughly explained, Maples has proven *some*, but importantly not *all*, of his allegations regarding the mitigation evidence the jury would have heard but for counsel's deficient performance. But Maples also presented evidence that went well beyond the evidence envisaged by his allegations.

And the court only considers evidence of prejudice that the jury would have heard but for trial counsel's deficient performance. So, the court will *not* consider evidence that trial counsel reasonably failed to discover or present—for example, Maples's alleged but unproven head trauma. Though Maples presented expert testimony at the evidentiary hearing suggesting he suffers from head trauma, he failed to prove that his trial counsel's failure to discover that trauma constituted deficient performance. Further, as previously explained, because the court finds that Maples did not overcome the presumption that trial counsel's strategic reasons for

not calling Office Greene or mutual friends, teachers, or coaches of Terry were reasoanble, the court will not consider their testimony in evaluating prejudice.

So, with all of the court's previous findings in mind, the court finds that, in addition to the evidence already presented during the penalty-phase presentation, the jury would have heard the following evidence but for trial counsel's cursory preparation and deficient performance:

- Maples's birth mother Denise routinely threw violent, self-mutilating tantrums; she attacked Philip with a metal brush while he was driving, causing him to bleed; once intentionally cut Philip's arm while hosting guests for dinner; left Maples unattended in a hot car when he was a toddler long enough for him to be sweating and screaming by the time his father found him; left toddler Maples unattended to play by the apartment complex pool; would sometimes tell toddler Maples she hated him and wished he had never been born; once choked toddler Maples so severely that her own father urged Philip to take custody of Maples out of fear that Denise would "kill him"; and burned toddler Maples's arms with cigarettes.

- Maples would wake up crying and asking for Denise, who had abandoned him in childhood, until his pre-teen years. During that same period, his stepmother often had to sit with him at night in a lit room because of his frequent nightmares.

- Denise also hurt Maples again in his late teenage years when he went to live with her. She acted ashamed of him, making him leave any time she expected company, and after just a few months she abandoned him once more—an event that deeply hurt him and launched him into a period of heavier drug abuse. He also dropped out of high school while living with her.

- In the years leading up to his crimes, after abandoned again by Denise, Maples suffered from serious depression and suicidal ideation. Those closest to him noticed changes in him indicative of

depression, including changes in his demeanor, interests, and social life. His counselor at Quest likewise noticed signs of depression and suicidal ideation during her interaction with him. His records from Quest show his feelings of suicidality and depression. He experienced emotional dysregulation that went beyond depression and caused him to experience dissociation. He once slashed his wrists badly enough to cause scars.

- Maples had many positive, humanizing relationships with friends and family; was well-loved by his family members; was very close to and protective of his brother Daniel and read to him when he was young; would wrestle and play football with his cousins; would go to his grandmother's house and help her with chores; was "very caring" and "more like a brother" to his cousin Shannon Smith; rode horses in a saddle club and worked at a stable caring for the horses as a teenager; played football in high school; and was praised as a good worker by his co-worker.

In retort, the State would have also presented the following evidence and argument:

- Maples told Dr. Shealy he dropped out of high school because he was upset about being a credit short of graduation—not because of how he felt about Denise's abandonment.

- Most of Maples's family members who testified to his good character drifted apart from him as he grew older and became more mixed up with drugs. Many did not know Maples had committed some crimes and misdeeds in the years leading up to the murders.

- And Maples put his brother in harm's way at times, once taking him to a friend's house where a fight broke out about drug money Maples owed, during which Daniel was pushed. And Daniel himself did not testify on Maples's behalf during either the original penalty-phase presentation or most tellingly at the evidentiary hearing.

Based on Maples's allegations, some of which this court has found Maples has not proven, the Eleventh Circuit found:

120

> With *Strickland* as our guide, reexamining in combination *all* of the evidence—that adduced in Maples's penalty phase and that alleged in his amended Rule 32 petition—de novo, and considering that Maples was only one vote away from a life sentence even without this additional mitigating evidence, we are unconvinced that Maples's trial produced a reliable, just result.

*Maples*, 729 F. App'x at 825 (emphasis in original). The Circuit Court added that "[t]his is so despite the fact that Maples's trial counsel presented a case in mitigation, including relatively lengthy testimony by Dr. Shealy that included some examples of the physical abuse Maples suffered as a child." *Id.* at 825 n.7. The Circuit Court found that Maples's "new and more extensive allegations identify powerful, more in-depth mitigation evidence, and establish a reasonable probability that, but for trial counsel's deficient performance, the result of Maples's penalty-phase proceeding would have been different." *Id.* at 826.

Now, after finding that Maples has not proven all of allegations and the court has before it less mitigation evidence to weigh in Maples's favor, the court still agrees with the Eleventh Circuit that "[t]he evidence actually offered by trial counsel compared to the evidence that was available, merely scratched the surface of the kind of trauma Maples suffered." *See Id.* at 827. And the court also agrees with the Eleventh Circuit that "[t]he mitigation evidence that was actually presented painted a picture of Maples as someone who was abused as a child but suffered no real continuing effects from the abuse, got mixed up with drugs as an adult, and made bad decisions solely as a result of his drug addiction." *See Id.* And the court agrees

with the Eleventh Circuit that "the *totality* of the mitigation evidence paints a different picture of Maples as someone with life-threatening mental health issues who has experienced lasting, ongoing trauma due to his birth mother's abuse and rejection, and who, despite such issues, tried to lead a productive life." *See Id.* (emphasis in original).   Considering the "nature, quality, and volume" of the mitigation evidence that the jury did not hear because of counsel's deficient performance, the mitigation evidence that counsel did present at the penalty phase of Maples's trial barely touched the surface of Maples's troubled background.  *See Daniel*, 822 F.3d at 1276.

And the Eleventh Circuit found crucial the fact that "even with trial counsel's cursory mitigation presentation, two jurors *still* voted against the death penalty: just one vote shy of enough votes to preclude a jury recommendation of death." *Id.* (emphasis in original). Thus, "the impact of evaluating the totality of the evidence is even more striking considering that it need only sway one more juror." *Id.*

The court finds that Maples's new mitigation evidence is not "merely cumulative." *See* Maples, 729 F. App'x at 826–27. Trial counsel presented no evidence about Maples's suicidal ideation and instance of self-harm. Trial counsel offered an inaccurate picture of Maples's depression as a mild product of his incarceration despite clear evidence in counsel's possession suggesting Maples's depression was severe and predated the murders. Trial counsel failed to discover or

present many details about the severity of Denise's abuse and neglect, such as the fact that, when he was a toddler, Denise allowed him to play alone at an apartment complex pool. And trial counsel offered no evidence showing the lasting effects Denise's abuse and abandonment had on Maples while he was growing up, including his regular nightmares and severe fear of darkness. Trial counsel also "failed to fully bring evidence of Maples's good character to light, which could have shown the jury that Maples tried to be a good person despite his traumatic childhood, adolescence, and ongoing resulting mental health problems." *Id.* at 827.

After the evidentiary hearing, it remains true that "even if a portion of the new evidence is cumulative in a sense, its relevance or strength is not undermined when it is considered and reweighed with all of the evidence." *Id.* The evidence Maples presented at the evidentiary hearing was "considerably more detailed and substantive than what was actually presented during the penalty-phase hearing." *Id.* For example, regarding Maples's good character, at trial Kenneth Maples had to be led on direct examination into agreeing that Maples was "okay" and "a pretty good kid that got messed up on drugs." (Doc. 148-18 at 3190, 3192). By contrast, at the evidentiary hearing, his cousin Shannon Smith freely testified that Maples was "a very caring person" who would do "anything to try to make your day better, make you smile." (Doc. 188 at 165).

Another striking feature of the evidentiary hearing was the sheer volume of new witnesses willing to testify on Maples's behalf, which included Maples's aunts, uncles, cousins, and friends from different eras of his life. While some of their testimony may have overlapped, the court must nevertheless consider the "nature, quality, and *volume*" of the evidence. *See Daniel*, 822 F.3d at 1726 (emphasis added). While a trial judge most likely would not have allowed a five-day penalty phase in which counsel could have called *all* the additional mitigation witnesses, better investigation and preparation would have allowed counsel to select the best family and friend witnesses and prepare them for succinct and pointed testimony that would have gone further to humanize Maples.

Second, the court finds that Maples's new mitigation evidence was not all a "double-edged sword." Though some of the new evidence presented could be classified as "double-edged" at first glance, "[t]he State had already harped on some of the damaging aspects of Maples's past." *Maples*, 729 F. App'x at 826. Much of the new "bad" evidence was thus cumulative of that already presented at trial. *Id.* at 826. For example, the jury had already heard about Maples's DUI and drug possession arrests, his thefts, and his heavy drug use. But the trial jury did not hear evidence about the community's love for Stacy Terry in the penalty phase, as this court did in the evidentiary hearing. As frequently noted, trial counsel was wise to keep such testimony out by not calling witnesses who would remind the jury of the

wonderful young lives that were lost because of Maples's conduct. But on the balance, the State's new evidence does not outweigh Maples's new evidence such that it undermines the reasonable probability of a different outcome.

Furthermore, the Eleventh Circuit observed that "the impact of evaluating the evidence is even more striking considering that it need only sway one more juror." *Maples*, 729 F. App'x at 827. "And the probability that one more juror would have been moved to vote for life over death is further compounded by the limited aggravation evidence in this case—the state trial court found only one statutory aggravating factor applicable here," which was murder during robbery. *Id.* (citing *Williams*, 542 F.3d at 1343). These findings remain equally applicable here even though Maples's present sentencing profile slightly differs from the one portrayed by his allegations.

Likewise, it remains true after Maples's evidentiary hearing presentation that "the *totality* of the mitigation evidence paints a different picture of Maples as someone with life-threatening mental health issues who has experienced lasting, ongoing trauma due to his birth mother's abuse and rejection, and who, despite such issues, tried to lead a productive life." *Id.* (emphasis in original). Stated differently, Maples's new evidence better achieved trial counsel's stated strategic goal—to "humanize" Maples. "Thus, it is reasonable to conclude that the evidentiary scales would have been tipped, yielding a sentence of life rather than death." *Id.* at 827–28.

Therefore, the court finds that Maples has established sufficient prejudice to warrant relief.

After examining and weighing all the aggravating and mitigating evidence presented both at trial and at the evidentiary hearing, this court finds, as did the Eleventh Circuit, that a reasonable probability exists that Maples's new evidence "would have shifted the life-versus-death balance." *Maples*, 729 F. App'x at 827 (citing *Williams*, 542 F.3d at 1343). The evidence that Maples did prove at the evidentiary hearing had a very strong mitigating effect. Though the evidence Maples presented at the evidentiary hearing differed from the allegations he raised before the Eleventh Circuit, the difference is not so vast as to compel a different outcome than that predicted by the Circuit Court.

## VIII.  CONCLUSION

Under a *de novo* standard of review, and for the reasons stated above, the court finds Maples has shown actual prejudice to excuse his procedural default of his penalty-phase mitigation claim in state court. The court also finds that Maples has shown deficient performance and prejudice under the *Strickland* standard. Therefore, the court will **GRANT** Maple's Amended Petition for Writ of Habeas Corpus (doc. 24) as to his claim of ineffective assistance of counsel during the penalty phase of his trial. A writ of habeas corpus shall issue directing the State of Alabama to vacate and set aside the death sentence of Cory R. Maples unless, within

90 days of this judgment's entry, the State of Alabama initiates proceedings to retry Maples's sentence. In the alternative, the State of Alabama shall re-sentence Maples to life without the possibility of parole.

The court will enter a separate Final Order in accordance with this Memorandum Opinion.

**DONE** and **ORDERED** this 27th day of January, 2022.

_____
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE